**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF<br>BALTIMORE,<br><br>             Debtor.[1] | Chapter 11<br><br>Case No. [_____] |

**INFORMATIONAL BRIEF OF THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE**

The Roman Catholic Archbishop of Baltimore, a corporation sole (the "***RCAB***"), by and through its undersigned counsel, files this informational brief to provide the Court, creditors, and other parties in interest an overview of the RCAB, the causes and corresponding necessity for this chapter 11 case, and the RCAB's intended goals in this chapter 11 case. To that end, the RCAB respectfully states:

**INTRODUCTION**[2]

1.    The Roman Catholic Archdiocese of Baltimore (the "***Archdiocese***") is the ecclesiastical district comprising the geographic area decreed by the Roman Catholic Church as the Archdiocese of Baltimore.

2.    Within the Archdiocese, Archbishop William E. Lori has been appointed as Archbishop (the "***Archbishop***")[3] to exercise authority and jurisdiction in assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Archdiocese with loyalty to the Holy Father.

---

[1] The last four digits of the Debtor's federal tax identification number are: 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

[2] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them in the body of this Informational Brief.

[3] All references to the defined term "Archbishop" in this informational brief refer to the position within the Archdiocese, including Archbishop Lori and all of his predecessors and successors.

3.      The Archbishop carries out his canonical duties in accordance with the Code of Canon Law, which is (a) the ecclesiastical law of the Roman Catholic Church ("**Canon Law**") and (b) central to the practice of the Roman Catholic faith.

4.      The Archbishop also has authority over the RCAB, which is the civil instrumentality recognized under Maryland law through which the mission of the Roman Catholic Church is administered within the Archdiocese.

5.      Archbishop Lori has had authority over the RCAB since he was installed as Archbishop on May 16, 2012.

6.      As more fully set forth in this Informational Brief, the RCAB has faced and continues to face numerous claims by survivors of childhood sexual abuse.

7.      While the RCAB has settled many claims through a voluntary program, the RCAB still faces potentially significant exposure from remaining claimants, including as a result of certain changes in law by the State of Maryland.

8.      Recognizing the potentially significant exposure from remaining claimants, the RCAB commenced this chapter 11 proceeding to:

    a.      provide compensation for the unresolved claims of survivors of abuse, including those survivors who have not yet come forward;

    b.      continue outreach to and support of survivors as an ongoing ministry;

    c.      preserve the ability to carry on the essential ministries and services provided by the RCAB, so the RCAB can continue to meet the needs of the Catholic faithful within the Archdiocese, the Parishes, the Schools, the Related Entities, and others who rely on the foregoing for spiritual, pastoral, and human assistance; and

    d.      fairly allocate the RCAB's remaining income and assets among the legitimate competing interests for such property, recognizing that it is not possible to pay all alleged claims in full.

9.      Based upon the experience of other dioceses around the country, the RCAB believes failure to commence this chapter 11 proceeding would have resulted in: (a) some

#226572016_v7

survivors who have not yet brought claims failing to receive compensation or assistance; and (b) cessation of substantial portions of the RCAB's ministry, education, and charitable outreach, upon which so many within the Archdiocese rely.

10.    To assist in understanding the RCAB's need for bankruptcy protection, this informational brief is organized into six sections: (i) the first section describes the history of the Archdiocese and RCAB; (ii) the second section details the work done by the RCAB within the Archdiocese; (iii) the third section describes the relationship between and property of the RCAB, the Parishes (as defined below), the Schools (as defined below), and certain Related Entities (as defined below); (iv) the fourth section details the childhood sexual abuse crisis and the RCAB's response to address said crises; (v) the fifth section describes the circumstances surrounding the commencement of this chapter 11 case; and (vi) the sixth section details the purpose of this chapter 11 case and the RCAB's goals in this chapter 11 case.

### HISTORY AND STRUCTURE OF THE ROMAN CATHOLIC CHURCH, ARCHDIOCESE, AND RCAB[4]

11.    The supreme authority of the Roman Catholic Church is vested in the Pope, the Bishop of Rome, who by virtue of his office possesses supreme, full, immediate and universal ordinary power in the Roman Catholic Church.

12.    The Roman Catholic Church follows an episcopal governance structure led by bishops who preside over geographic areas decreed as dioceses.

13.    The Pope exercises such power in concert with the College of Bishops of which he is the head.

---

[4] All discussion of Canon Law and Church doctrines and belief is a general summary and is qualified in its entirety by the actual Code of Canon Law as interpreted and applied by the Church.

I.    **The Archdiocese of Baltimore as a canonical entity.**

14.    Catholic activity in the territory of the Archdiocese has a rich history, extending back more than two hundred years to the seventeenth century.

15.    After the Revolutionary War, Father John Carroll was appointed superior of the American missions in 1784.

16.    On November 6, 1789, the Archdiocese was established as the first Catholic Diocese in the United States, originally as the "Diocese of Baltimore" and encompassing the territories East of the Mississippi River, including the original thirteen colonies.

17.    In 1808, the then "Diocese of Baltimore" became an Archdiocese with suffragan sees at New York, Philadelphia, Boston, and Bardstown (now Louisville).

18.    Today, the ecclesiastical district of the Archdiocese is comprised of the City of Baltimore and Allegany, Anne Arundel, Baltimore, Carroll, Frederick, Garrett, Harford, Howard, and Washington Counties and:

a.    has two co-cathedrals both of which are located in Baltimore City: (i) the Cathedral of Mary Our Queen; and (ii) the National Shrine of the Basilica of the Assumption of the Blessed Virgin Mary, which was this country's first cathedral and was dedicated by Archbishop Ambrose Marechal in 1821;

b.    includes a geographic area encompassing approximately 4,800 square miles;

c.    contains close to 503,000 Catholics served by one hundred fifty-three (153) parishes and missions (the "*Parishes*") throughout nine (9) counties of the State of Maryland; and

d.     provides education to thousands of students through forty (40) elementary and middle schools and eighteen (18) high schools spread throughout the Archdiocese (collectively, the "*Schools*").

19.     On March 20, 2012, Pope Benedict XVI appointed then Bishop William E. Lori to be the sixteenth Archbishop of Baltimore ("*Archbishop Lori*").

20.     As the Archbishop, Archbishop Lori carries out his canonical duties in accordance with Canon Law, assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Archdiocese with loyalty to the Holy Father.

## II.     The Archdiocese as organized under and recognized by applicable civil law.

21.     While the Archdiocese of Baltimore was created under, is governed by, and is administered pursuant to Canon Law, Maryland law recognizes the Archdiocese as the RCAB, which is the debtor and debtor in possession in this chapter 11 case.

22.     More specifically, in 1833, the Maryland General Assembly first enacted a law permitting: (a) any Roman Catholic Church to convey to the Most Reverend James Whitfield, the then present Archbishop of Baltimore, and his successors, any lot or lots of ground whereon any Roman Catholic Church was erected, according to the discipline and government of the Roman Catholic Church, forever; and (b) any person or persons or body corporate to convey unto the Roman Catholic Archbishop of Baltimore, and his successors, any lot, piece, or parcel of ground for the purpose of having a church erected thereon, for worship according to the discipline and government of the Roman Catholic Church, or for a graveyard. *See* Chapter 308 of the Acts of the General Assembly of 1832. *See also* Chapter 268 of the Acts of the General Assembly of 1868.

23.     Subsequently, in 1874, the Maryland General Assembly enlarged the powers granted unto the Archbishop of Baltimore, permitting the Archbishop of Baltimore, as a

5

corporation sole, to dispose of, lease, sell and convey from time to time, the whole or any portion of any lots or parcel of land, which corporation sole, now has, or hereafter may acquire, in the same manner, and to the same extent, that any private person or other corporate body, could or might dispose of, lease, sell or convey property by him held or possessed. *See* Chapter 398 of the Acts of 1874.

24.     While the foregoing have subsequently been further amended to expand their scope and permissive powers in 1894 and 1927, respectively, the RCAB has existed and operated since at least 1833 under Maryland law, and continues to exist and operate to this day under Maryland law, as a corporation sole, governed by and under the discipline and government of the Roman Catholic Church (*i.e.*, Canon Law).

25.     As so organized and recognized, the RCAB is the civil instrumentality of the Archdiocese through which the mission of the Roman Catholic Church is administered within the Archdiocese (i.e., within the geographic area decreed to be the ecclesiastical district known as the Archdiocese of Baltimore).

### THE WORK OF THE RCAB WITHIN THE ARCHDIOCESE

26.     The primary role of the RCAB is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development, and other services to members of the Roman Catholic faith, the Parishes, the Schools, and the Related Entities (as defined below) within the Archdiocese.

27.     The mission and ministry of the Roman Catholic Church within the Archdiocese, as administered by the RCAB, are extremely important to the people within the Archdiocese.

28.     There are many within the Archdiocese, including non-Catholics, who depend on the services the RCAB administers or delivers, both monetary and spiritual, in furtherance of the mission and ministry of the Roman Catholic Church within the Archdiocese.

6

29.     The RCAB and the workers throughout the Archdiocese who minister to the Catholic faithful and promote and administer programs that benefit the people in Maryland are stable, enriching elements in the lives of all the people served in these communities.

30.     There are two (2) active and one (1) retired auxiliary bishops, one hundred nineteen (119) active priests of the Archdiocese, all but two of which are serving within the Archdiocese, and twenty (20) priests from other (arch)dioceses ministering within the Archdiocese.

31.     In addition to the priests of the Archdiocese and from other (arch)dioceses, one hundred ninety-five (195) religious order priests minister and provide other services within the Archdiocese.

32.     In addition, there are one hundred twelve (112) active permanent deacons, fifty-four (54) retired deacons, nineteen (19) external permanent deacons (ordained for other dioceses), and fifty-six (56) seminarians in formation for the priesthood, all of which are ministering or otherwise have faculties in the Archdiocese.

33.     Finally, additional Catholic entities operate within the Archdiocese, including the Parishes, Schools, and Related Entities, which are supported by the RCAB but remain separate and distinct entities from the RCAB.

### RELATIONSHIP BETWEEN AND PROPERTY OF THE RCAB, PARISHES, SCHOOLS, AND CERTAIN RELATED ENTITIES

34.     There are many Roman Catholic ecclesiastical, and corresponding civil, entities that operate within the Archdiocese, including the RCAB, Parishes, Schools, and other non-profit entities, funds, and trusts (such other non-profit entities, funds, and trusts collectively, the "***Related Entities***").

#226572016_v7

35.     Every administrator of the property of an ecclesiastical entity, such as Archbishop Lori or the priest of a parish, is entrusted with certain property and obligated to acquire, hold, administer, and alienate such property in accordance with Canon Law.

36.     To ensure that these tenets of Canon Law are followed and recognized under civil law, the RCAB, Parishes, Schools, and Related Entities have implemented or caused to be implemented certain civil legal structures to memorialize and reflect Canon Law's dictates in accordance with and pursuant to applicable Maryland law.

## I.     **The RCAB**

37.     Under Canon Law, RCAB property is entrusted to Archbishop Lori for the exclusive use and benefit of the Roman Catholic Church within the Archdiocese.

38.     Under Maryland law, the Archbishop and his successors were originally authorized to hold property as a corporation sole for only the purposes of erecting a church for worship or a graveyard according to the discipline and government of the Roman Catholic Church, provided that such property be improved, enjoyed, and used only for a church, parsonage, or burial ground.

39.     Through a series of amendments to Maryland law, the Archbishop and his successors are now authorized to hold property as a corporation sole (i.e., the Debtor in this Chapter 11 Case) for the purposes of erecting a church, parsonage, burial ground, or school house according to the discipline and government of the Roman Catholic Church, with such property to be improved, enjoyed, and used only for such purposes.

40.     Consistent with Maryland law, the RCAB today holds as a corporation sole property for the purposes of erecting churches, parsonages, burial grounds, or schools according to the discipline and government of the Roman Catholic Church, with all such property to be used only for such purposes.

II.    **Archbishop of Baltimore Annual Appeal Trust**

41.    The Archbishop of Baltimore Annual Appeal Trust was established as a perpetual and irrevocable trust on September 11, 1992 and collects specific gifts for the Annual Appeal for Catholic Ministries.

42.    The funds raised by the Annual Appeal for Catholic Ministries are used to support over one hundred life-affirming ministries within the Archdiocese through various entities located within the Archdiocese.

43.    No assets of the Archbishop of Baltimore Annual Appeal Trust are assets of the RCAB.

III.   **Route 175 East, LLC**

44.    Route 175 East, LLC was formed in 2010 to purchase and develop property for the parish community of St. Lawrence the Martyr Parish.

45.    Route 175 East, LLC currently owns the land on which St. Lawrence Martyr Catholic Church is located.

46.    The assets of Route 175 East, LLC are not assets of the RCAB.

IV.    **Catholic Community School Land, Inc.**

47.    Catholic Community School Land, Inc. ("***CCSL***") was formed to purchase and build a new Catholic high school in Baltimore city.

48.    CCSL currently owns the land and fixed assets of the Mother Mary Lange School and is an obligor under a New Market Tax Credit financing transaction entered to finance the construction of the Mother Mary Lange School.

49.    The assets of CCSL are not assets of the RCAB.

9

## V.    Parishes Within the Archdiocese

50.    As set forth above, there are one hundred fifty-three Parishes within the Archdiocese, whose priests are assigned by the Archbishop.

51.    A listing of the Parishes may be located on the website maintained by the RCAB at https://www.archbalt.org/parishes/directory-of-parishes/.

52.    Canonically, each Parish: (a) is a territorially defined ecclesiastical entity, comprising a certain geographical area within the Archdiocese and consisting of an established stable community of the Christian faithful whose pastoral care is entrusted to a priest; (b) is a separate public juridic person within the Roman Catholic Church; and (c) has the right to acquire, retain, administer, and alienate ecclesiastical goods in its own name, with the priest for each Parish serving as the administrator such ecclesiastical goods in accordance with and subject to Canon Law.

53.    In accordance with Maryland law, each Parish is organized as a separate and distinct non-profit corporation.

54.    Both canonically and under Maryland law, each Parish is a distinct and separate entity and no Parish assets are assets of the RCAB.

## VI.    Inter-Parish Loan Fund, Inc.

55.    Prior to March 28, 2011, consistent with Canon Law, the Archbishop held in trust certain funds belonging to Parishes, Schools, and Related Entities as part of what was called the Interparish Deposit and Loan Program (the "***Deposit and Loan Program***").

56.    On March 28, 2011, the Inter Parish Loan Fund, Inc. (the "***IPLF***") was incorporated under Maryland law, for the purpose of replacing the Deposit and Loan Program and providing a standalone program of depository, investment, and financing services (the "***IPLF Program***") to Eligible Participants (as defined in the IPLF's organizational and governing documents).

10

57.     Upon the formation of the IPLF, all funds held in trust as part of the Deposit and Loan Program for the benefit of Parishes, Schools, and Related Entities were transferred to the IPLF, pursuant to individual Deposit and Loan Transfer Agreements (each, a "***DLT Agreement***") and a certain Transfer and Transition Agreement (the "***IPLF Transition Agreement***").

58.     Pursuant to the IPLF Program, in accordance with Canon Law, funds of Parishes, Schools, and Related Entities in excess of amounts for ordinary needs are required to be deposited into the IPLF.

59.     All assets deposited in the IPLF pursuant to the IPLF Program are held in trust, with legal title to all assets in the IPLF Program vested at all times in the IPLF.

60.     Assets held by the IPLF are not subject in whole or in part to voluntary or involuntary assignment, anticipation, legal process or claims of creditors of the IPLF or any participant in the IPLF Program.

61.     Each participant in the IPLF Program receives a Certificate of Participation evidencing their fractional undivided beneficial ownership interest in the investments and other assets held by the IPLF in an amount equal to: (a) the sum of the amounts deposited by the participant with the IPLF to be held in trust as part of the IPLF Program; (b) less all amounts withdrawn by the Participant in accordance with the IPLF Program; (c) plus interest accruing on the amounts held in trust from time to time, at the rates and in the manner provided by the IPLF Program's guidelines.

62.     While the IPLF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the IPLF are assets of the RCAB.

## VII.    Schools and Other Educational Institutions Within the Archdiocese

63.    As set forth above, thousands of students are provided Catholic education through the Schools, consisting of eighteen (18) secondary schools and forty (40) elementary and middle schools.

64.    Thirty-four (34) of the forty (40) elementary and middle schools are associated with Parishes (either individually or regionally) within the Archdiocese, with the remaining six (6) being independent Catholic schools.

65.    Six (6) of the eighteen (18) high schools are regionally operated by Parishes or as separate corporations, with the remaining twelve (12) being independent Catholic high schools.

66.    A listing of the Schools may be located on the website maintained by the RCAB at https://www.archbalt.org/schools/.

67.    Each of the Schools is either separately incorporated or is operated through an existing Parish.

68.    In either instance, while some Schools receive varying levels of support from, among others, the RCAB, each School is a distinct entity separate and apart from the RCAB.

69.    Accordingly, as with the Parishes, no School's assets are assets of the RCAB.

## VIII.    Other Related Catholic Entities, Funds, and Trusts Within the Archdiocese

70.    In addition to the foregoing, other Catholic organizations and institutions operate within the Archdiocese with varying levels of connection to or interaction with the RCAB.[5]

---

[5] This section of the Informational Brief describes most of the Related Entities but may not describe every Related Entity. In particular, the RCAB holds and manages certain custodial or trust funds that are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the RCAB or otherwise available to satisfy the RCAB's general obligations.

#226572016_v7

A.      **The Catholic Community Foundation of the Archdiocese of Baltimore, Inc.**

71.     The Catholic Community Foundation of the Archdiocese of Baltimore, Inc. (the "***CCF***") is a Maryland non-profit corporation, which was incorporated on April 21, 1999.

72.     The purpose of the CCF is to support the spiritual, educational and social needs of the Catholic community within the Archdiocese of Baltimore.

73.     The CCF fulfills this mission by establishing fund agreements which provide ongoing support to fund the mission and ministries of Parishes, Schools, Related Entities, and other Catholic institutions located within the Archdiocese.

74.     At present, there are approximately five hundred fifty separate fund agreements in the CCF, which generally fall into one of four categories:

      a.      Field of Interest Funds that are established to support a particular area of need such as Catholic Education or Vocations;

      b.      Organizational Funds that are established for individual Parishes, Schools, or Other Entities;

      c.      Individual Community Funds that are established by individual donors with specific donor restrictions; and

      d.      Donor Advised Funds that are established by individuals who wish to remain active in their philanthropy and have access to the CCF's professional advice and management.

75.     Most of the CCF funds are restricted endowments and all CCF funds are managed by an external investment management firm.

76.     The CCF distributes investment proceeds on an annual basis, in accordance with distribution parameters approved by CCF's Board of Trustees and consistent with applicable donor gift agreements and appliable law.

77.     While the CCF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the CCF are assets of the RCAB.

**B.      Roman Catholic Foundation in the Archdiocese of Baltimore, Inc.**

78.     The Roman Catholic Foundation in the Archdiocese of Baltimore, Inc. (the "***RCF***") is a Maryland non-profit corporation, which was incorporated on April 3, 1978.

79.     Since its incorporation, the RCF's sole and specific purposes have been to: (a) further the Roman Catholic religion, including its charitable and educational activities within the Archdiocese; (b) aid and assist other charitable and educational organizations outside of the framework of the Archdiocese but sponsored or approved by it; and (c) assist in programs of the Holy See and institutions enjoying its recognition and approval.

80.     The RCF is governed by a board of directors, which is elected by the members of the RCF.

81.     No assets of the RCF are assets of the RCAB.

**C.      The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc.**

82.     The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc. (the "***JCF***") is a Maryland non-profit corporation, which was incorporated on January 18, 1993.

83.     Since its incorporation, the JCF's purposes are to: (a) support and promote pre-school, primary, and secondary Catholic education within the Archdiocese; (b) provide financial support to establish and maintain Catholic-sponsored community schools and educational services in the Archdiocese; (c) support the youth ministry within the Archdiocese by providing financial resources for retreats, social activities, field trips and similar activities; (d) foster and strengthen the charitable programs and services within the Archdiocese; and (e) support pastoral services, facilities, and programs within the Archdiocese.

84.     The JCF is governed by a self-perpetuating board of trustees.

85.     At all times the Archbishop is also a member of the board of trustees.

86.     No assets of the JCF are assets of the RCAB.

**D.     Associated Catholic Charities, Inc.**

87.     Associated Catholic Charities Inc. ("*Catholic Charities*") is a Maryland non-profit corporation, which was incorporated on September 25, 1947.

88.     Catholic Charities is a faith-based agency, acting as a nondenominational social service provider affiliated with the RCAB and the Roman Catholic Church.

89.     Catholic Charities focuses upon providing: (a) mental and behavioral health services for children and families, including residential-, community, and school-based programs, resources, and referrals; (b) apartment communities and life care options for seniors; (c) programs aimed at (i) assisting immigrants earn citizenship, visas, and other statuses and (ii) providing access to legal services, health care, and other vital resources; (d) meals, shelter, case management, and access to resources for individuals experiencing homelessness and poverty; (e) support, skills training, resources, and job placement services for individuals who are unemployed or underemployed; and (f) meal services, shelter, case management, and access to resources for children and families experiencing poverty and homelessness.

90.     Most services provided by Catholic Charities are offered at modest or no cost and all services are provided without regard to the religious affiliation of the recipient.

91.     While Catholic Charities receives various types of support from the RCAB, no assets of Catholic Charities are assets of the RCAB.

**E.     Maryland Catholic Conference, LLC**

92.     Maryland Catholic Conference, LLC (the "*MCC*") is the public policy voice for the Catholic Church in Maryland.

15

93.     The MCC is focused on state-level advocacy, providing opportunities for Catholic to live out their responsibility to engage in public and political life on behalf of the dignity of the human person and for the common good.

94.     The MCC is governed by a Board of Governors, which is comprised of Maryland's bishops and advised by an administrative board composed primarily of lay leaders from across Maryland.

95.     While MCC receives various types of support from the RCAB, no assets of MCC are assets of the RCAB.

**F.      Cemeteries**

96.     Within the Archdiocese, Parishes operate fifty-three cemeteries and a single cemetery is operated by a separate corporation, The New Cathedral Cemetery Corporation (collectively, the "*Cemeteries*").

97.     Each cemetery has its own cemetery administrator, who is responsible for ensuring effective cemetery operations.

98.     Each of the Cemeteries receives varying levels of support from the Office of Cemetery Management and, pursuant to the Archdiocese's policies and procedures, all Cemeteries must maintain funds in a CCF endowment that will produce a steady flow of earning sufficient to cover the costs of maintaining the grounds after income diminishes or ceases.

99.     No assets of the Cemeteries are assets of the RCAB.

**G.      Catholic Review Media**

100.     Catholic Review Media ("*Catholic Review*") is the official Catholic newspaper within the Archdiocese.

101.     The predecessor to the Catholic Review, the Catholic Mirror, was established in 1850.

102.    Catholic Review offers complimentary subscriptions to members of Parishes within the Archdiocese and are also offered to non-members for minimal cost.

103.    In 2017, the Catholic Review, legally organized as The Cathedral Foundation, Inc., was merged into the RCAB, and its operations became part of the RCAB's Department of Communication.

**H.    Insurance Programs and Corresponding Trusts**

104.    The Debtor maintains and operates a centralized insurance program, which provides, among other things, the Archdiocesan General Insurance Program (the "***General Insurance Program***"), Archdiocesan Sexual Misconduct Self-Insurance Program (the "***Self-Insurance Program***"), and Archdiocesan Health Benefits Program (the "***Health Benefits Program***" and collectively with the General Insurance Program and Self-Insurance Program, the "***Insurance Programs***").

105.    The General Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintain a program of risk protection; (b) obtaining contracts of insurance to provide risk protection as documents in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured bases, as documents in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; and (e) operating and funding the risk protection and risk management initiatives offered under the General Insurance Program.

106.    The General Insurance Program is funded through the Archdiocesan General Insurance Program Trust (the "***General Insurance Trust***"), which in turn is funded through contributions from the RCAB, Parishes, Schools, and Related Entities.

107.    The Self-Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of risk protection that provides a

17

documented level of protection in connection with claims relating to sexual misconduct; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; (e) provide risk protection, risk management, and related services and funds, which may include criminal background screening, counseling assistance and pastoral outreach to victims of sexual misconduct, providing investigative services in connection with allegations of sexual misconduct, or funding sexual misconduct prevention efforts; and (f) operating and funding the risk protection and risk management initiatives offered under the Self-Insurance Program.

108.   The Self-Insurance Program is funded through the Archdiocesan Sexual Misconduct Self-Insurance Program Trust (the "***Self-Insurance Trust***"), which in turn is funded through contributions from the RCAB, Parishes, Schools, and Related Entities.

109.   The Health Benefits Program is operated exclusively for the purposes of: (a) designing, implementing, and maintain a program of health benefits coverage that covers Participating Employers (as defined by the Health Benefits Program); (b) obtaining contracts of insurance, if desired, on behalf of Participating Employers to provide health benefits as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage to Participating Employers on a self-insured basis, as documented in plan documents; (d) obtaining contracts of stop loss insurance to cover any or all risks provided under any plan documents; and (e) operating and funding the health benefits initiatives offered under the Health Benefits Program.

110.   The Health Benefits Program is funded through the Archdiocesan Health Benefits Program Trust (the "***Health Benefits Trust***" and together with the General Insurance Trust and

18

Self-Insurance Trust, the "***Insurance Trusts***"), which in turn is funded through contributions from the RCAB, Parishes, Schools, Related Entities, and their respective employees.

111.    While the RCAB provides administrative services for each of the Insurance Programs, the funds held by the RCAB on behalf of each Insurance Program are held in trust to be used solely for each respective Insurance Program.

112.    Similarly, all funds in the Insurance Trusts are assets solely of the respective Insurance Trusts.

113.    The assets of the Insurance Programs are not assets of the RCAB.

114.    The assets of the Insurance Trusts are not assets of the RCAB.

## I.    Priest Pension Plan

115.    Consistent with Canon Law and Church custom, the RCAB maintains the Archdiocese of Baltimore Priests' Pension Plan, which was established on July 1, 1972 (the "***Priest Pension Plan***").

116.    The Priest Pension Plan is funded through contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Pension Plan.

117.    The Priest Pension Plan provides defined monthly benefit payments for retired priests, in accordance with Canon Law requirements.

118.    Assets of the Priest Pension Plan, including the assets maintained in the Priest Pension Trust, are not assets of the RCAB.

## J.    Postretirement Health and Auto Plan for Priests of the Archdiocese of Baltimore

119.    Consistent with Canon Law and Church custom, the RCAB provides certain employee benefits for retired priests of the Archdiocese of Baltimore (the "***Priest Benefit Plan***").

#226572016_v7

120.    The Priest Benefit Plan is funded by contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Benefit Plan.

121.    Priests who retire from the Archdiocese of Baltimore, are not in active ministry, and maintain no current assignments are considered eligible for benefits under the Priest Benefit Plan.

122.    For those eligible, the Priest Benefit Plan provides (a) medical, vision, prescription drug, and dental benefits and (b) full cost auto insurance.

123.    As of July 1, 2022, the Priest Benefit Plan had one hundred twenty-nine (129) active participants (i.e., active priests making contributions), sixty-nine (69) retired priests receiving medical, vision, prescription drug, and dental benefits, and fifty-eight (58) retired priests receiving auto insurance.

124.    Assets of the Priest Benefit Plan, including assets maintained in the Priest Benefit Plan Trust, are not assets of the RCAB.

**K.    Retirement Plan for Lay Employees of the Archdiocese of Baltimore**

125.    The RCAB maintains the Retirement Plan for Lay Employees of the Archdiocese of Baltimore (the "*Lay Pension Plan*").

126.    The Lay Pension Plan is funded from the contributions from the RCAB, Parishes, Schools, and Certain Related Entities, which contributions are held in trust and utilized pursuant to and in accordance with the Lay Pension Plan.

127.    The Lay Pension Plan provides defined monthly benefit payments for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

128.    Assets of the Lay Pension Plan, including assets maintained in the Lay Pension Plan Trust, are not assets of the RCAB.

**L.**      <u>Lay Employees Retiree Medical Plan</u>

129.      The RCAB provides certain employee benefits for retired lay employees of the RCAB, Parishes, Schools, and Related Entities (the "***Lay Benefit Plan***").

130.      The Lay Benefit Plan is funded from contributions by the RCAB, Parishes, Schools, and certain Related Entities, with such contributions held in trust and utilized pursuant to and in accordance with the Lay Benefit Plan.

131.      The Lay Benefit Plan provides certain health insurance benefits for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

132.      Asset of the Lay Benefit Plan, including assets of the Lay Benefit Plan Trust, are not assets of the RCAB.

**M.**      <u>Mercy Ridge, Inc. Joint Venture</u>

133.      Mercy Ridge, Inc. ("***Mercy Ridge***") is a continuing care retirement community and joint venture between the RCAB and Mercy Health Services, Inc.

134.      Mercy Ridge holds all legal title to all of the real and personal property utilized in the continuing care retirement community.

135.      While the RCAB has certain governance and other rights based upon its partial ownership interest in Mercy Ridge, no assets of Mercy Ridge are assets of the RCAB.

THE CLERGY SEX ABUSE CRISIS AND THE RCAB'S RESPONSE

136.      A tragedy contrary to every teaching and tradition of the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and within the Archdiocese in particular— that is, some members of clergy and others took advantage of positions of trust and respect to sexually abuse children.

#226572016_v7

137.    The Roman Catholic Church and the RCAB are committed to: (a) providing for all survivors of abuse, known and yet to be known, in a fair, just, and equitable manner; and (b) providing a safe environment for the children they serve.

138.    To that end, numerous steps and actions have been taken within the Roman Catholic Church and Archdiocese.

## I.    Archdiocesan Child Protection Policies and Efforts; Charter for the Protection of Children and Young People.

139.    While no amount of action can completely atone for the harm done as a result of the clergy abuse crisis, significant efforts have been undertaken within the Church and Archdiocese to reasonably assure such events are not repeated.

140.    In 1993, the RCAB formalized its policies designed to prevent and respond to incidents of child sexual abuse in a written document.  In addition to reporting allegations of abuse when the child was still a minor, the RCAB started reporting all allegations of child abuse even when the abuse victim was now an adult and even when the alleged perpetrator was deceased.  In 1993, the RCAB also established an Independent Review Board made up of lay community leaders from various faith traditions in order to review the policies and actions taken by the RCAB to prevent and respond to allegations of child sexual abuse.

141.    In spring of 2002, the United States Conference of Catholic Bishops adopted the *Charter for the Protection of Children and Young People* (the "**Charter**"), adopting a zero-tolerance policy with regard to clergy serving in any active, public ministry.

142.    The Charter also included: (a) permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor; (b) requirement of criminal background checks for adults, including clergy, who work with children and youth; (c) implementation of educational programs for the prevention of child sexual abuse for both adults

22

and children; (d) provision of behavioral guidelines and ethical standards for ministry; (e) establishing outreach for survivors; and (f) creation of review boards to make recommendations to the diocesan Bishop about substantiation of accusations against clergy and to oversee policy implementation.

143.    Around the same time the Charter was adopted, the RCAB issued an apology for the abuse committed by ministers of the Church and disclosed the names of accused priests and brothers and money spent as a result of clergy abuse, in a letter sent to all registered parishioners and on the RCAB's website.

144.    An updated list of accused priests and brothers may be viewed on the RCAB's website at https://www.archbalt.org/child-and-youth-protection/priests-and-brothers-accused-of-abuse/.

145.    In 2003, the RCAB: (a) implemented policies requiring mandatory screening and training policies for employees and volunteers and safe environment education for children; and (b) established a new Office of Child & Youth Protection, hiring the first lay Director and Victim Assistance Coordinator.

146.    In 2004, the RCAB conducted a healing and atonement service in acknowledgement of the pain and harm caused to survivors.

147.    In 2007, the RCAB began offering mediated financial settlements to survivors regardless of how long ago the abuse had occurred.

148.    In 2017, the RCAB supported legislation allowing survivors more time in which to file civil lawsuits in cases of child sexual abuse (passed in 2017) and legislation for child protection education in all schools (passed in 2018).

149.    In 2019, the RCAB became the first diocese in the United States to implement a third-party reporting system for allegations against its own bishops.

150.    Subsequently in 2020, the RCAB adopted a new reporting system of the United States Conference of Catholic Bishops for the handling of allegations against bishops, appointing a retired law enforcement officer in Maryland to independently receive reports against its bishops and to ensure compliance with the new reporting system.

151.    During the entirety of this time, the RCAB has undertaken to continually update its training protocols and disclosures of accused clergy.

152.    As of 2022, Voice of the Faithful released rankings showing the RCAB ranked third out of one hundred seventy-seven diocese in its annual report measuring abuse prevention and safe environment programs in the United States.

153.    The RCAB remains steadfast in its commitment to the principles enunciated in the Charter and the protection of youth more generally.[6]

## II.    The RCAB's Voluntary Mediation Program (the "*VMP*")

154.    As set forth above, in 2007, the RCAB began offering mediated financial settlements to survivors regardless of how long ago the abuse had occurred.

155.    In this program, the RCAB works with the survivor and a retired, non-Catholic judge, to see if an agreement can be reached on a cash payment and often continued counseling assistance.

156.    The RCAB asks that survivors be represented by an attorney of their choosing to protect their rights, given that releases are executed in exchange for the cash payments.

---

[6] *See* https://www.archbalt.org/promise-protect-promote-healing/.

157.     As part of the process, the RCAB apologizes, acknowledges its belief in the allegations made by the survivor, and offers a personal meeting with the Archbishop.

158.     The RCAB does not require survivors to agree to confidentiality, only agreeing to confidentiality if expressly requested by the survivor.

159.     To date, the RCAB has entered into settlement agreements with approximately one hundred thirty-two (132) survivors, resulting in excess of thirteen million dollars ($13,000,000) being paid to survivors, with one hundred six (106) of those settlements resulting from the VMP.

### EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

160.     Like other similar situated Catholic dioceses across the country, (a) the RCAB faces potentially catastrophic liability because of the forthcoming changes in Maryland law and (b) correspondingly expects to struggle financially while balancing the need to compensate survivors for the harms occasioned upon them in the past with the funding demands of the RCAB's present missions and ministries within the Archdiocese.

161.     In April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "*CVA*"), which Governor Moore approved on April 11, 2023.

162.     The CVA becomes effective October 1, 2023, and by its terms provides that, among other things, "notwithstanding any time limitation under a statute of limitations, a statute of repose, . . . or any other law, an action for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor may be filed at any time."

163.     While the RCAB has made and continues to make significant effort to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the RCAB has reached consensual settlements, the RCAB believes additional unsettled claims and liabilities remain outstanding.

164.    In particular, the Maryland Office of the Attorney General conducted an investigation and issued a report in April 2023, stating over six hundred children are known to have been abused by the 156 people included in this Report, but the number is likely far higher.

165.    While the RCAB is unable to verify the statement by the Maryland Office of the Attorney General, the liability from such claims would far exceed the financial means of the RCAB to satisfy claims.

166.    While the RCAB carried insurance during many periods in which abuse is alleged to have occurred, and while the RCAB believes such insurance provides coverage for the claims that would be asserted against the RCAB, to date, the RCAB has been largely unsuccessful in obtaining any coverage for claims asserted against the RCAB or any commitment to provide coverage without reservation.

167.    As a result, the RCAB faces claims in the aggregate amount far exceeding the RCAB's economic ability to pay, in which circumstance (a) survivors of abuse could be left with no compensation or other support, and (b) those within the Archdiocese (including non-Catholics) who depend on the services of the Roman Catholic Church delivered through the RCAB would be left without the material, monetary, and spiritual support which has, to date, been a necessary, stable, and enriching element in their lives.

168.    Faced with this prospect, the RCAB concluded seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to seek to assure: (a) equitable compensation to those harmed by those who took advantage of their position of authority and respect as a priest (or other position of authority) in Catholic communities within the Archdiocese; (b) continuation of the counseling and other services provided through the RCAB to those who have been harmed; (c) continuation of the essential programs for the protection of children; and

(d) continuation of the mission and ministry of the Roman Catholic Church within the Archdiocese.

169.     Through this process, it is the intent and desire of the RCAB to be able to: (a) provide for the equitable and ratable compensation of those harmed by those who took advantage of their position of authority and respect as a priest (or other position of authority) in Catholic communities within the Archdiocese; (b) provide for the continuation of the counseling and other services provided to those who were harmed; (c) provide for the continuation of the programs the RCAB has put into place to educate and screen people working within the Archdiocese, to ensure that the children in the Archdiocese are protected; and (d) maintain funding for the programs within the Archdiocese that are essential to the mission and ministry of the Roman Catholic Church and wellbeing of those within the Archdiocese who depend on the services of the Roman Catholic Church.

### PURPOSE AND GOALS FOR THIS CHAPTER 11 CASE

170.     With the foregoing intent and desire, the RCAB commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of the RCAB to continue providing essential ministries and services within the Archdiocese.

171.     Absent the commencement of this chapter 11 case, the RCAB believes that many survivors would not receive compensation or assistance and that the RCAB may be forced to cease providing some or all of the services upon which so many within the Archdiocese rely.

172.     In order to achieve the goals set forth above, the RCAB expects to:

a.       establish a deadline for the filing of claims in this case, along with confidentiality procedures for those filing claims relating to abuse;

27

b.      commence an adversary proceeding against its insurers (the "*Insurers*") as soon as possible following the filing of this chapter 11 case, seeking to establish that claims related to clergy sexual abuse are covered by certain policies of insurance issued to the RCAB by the Insurers or their predecessors and certain related relief;[7] and

c.      upon the expiration of the deadline to file claims in this case, mediating with any official committee appointed to represent survivors and the Insurers, to reach a global and consensual resolution through which reasonable and equitable compensation can be provided to survivors.

173.    As a result of the foregoing, the RCAB fully expects to file and seek confirmation of a consensual joint plan of reorganization that will **both**: (a) provide fair compensation to survivors of clergy sexual abuse pursuant to streamlined trust distribution procedures without the cost, uncertainty, and delay of litigation; and (b) allow the RCAB to successfully emerge from bankruptcy and continue its charitable missions and ministries with the benefit of a full and final resolution of the claims related to clergy sexual abuse.

<u>CONCLUSION</u>

174.    The piecemeal adjudication of the claims of survivors presents a significant risk that many survivors may not be compensated and that the RCAB may be forced to cease central and integral components of the RCAB's mission and ministry.

175.    In marked contrast to such piecemeal adjudication, filing this chapter 11 case and confirming a plan of reorganization is the best mechanism to fairly and equitably address the claims of survivors while ensuring that the mission and ministry of the RCAB continues.

*[Remainder of Page Intentionally Left Blank]*

---

[7] Consistent with other similar chapter 11 cases, the RCAB anticipates seeking an order referring the parties to the adversary proceeding to mediation, together with the representatives of the survivors of clergy sexual abuse.

#226572016_v7

Dated: September 29, 2023          Respectfully submitted,

                                         _____/s/ Catherine K. Hopkin_____

Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:    443.569.0788
Facsimile:    410.571.2798
Email: chopkin@yvslaw.com

*-and-*

Blake D. Roth (*pro hac vice* pending)
Tyler N. Layne (*pro hac vice* pending)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    615.244.6380
Facsimile:    615.244.6804
Email: blake.roth@hklaw.com
            tyler.layne@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:    202.457.7043
Email: philip.evans@hklaw.com

*Proposed Attorneys for the Debtor and Debtor In Possession*

<u>**CERTIFICATE OF SERVICE**</u>

Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

                                                              /s/ Catherine K. Hopkin
                              Catherine K. Hopkin (Fed. Bar No. 28257)
                              **YVS LAW, LLC**
                              185 Admiral Cochrane Drive, Suite 130
                              Annapolis, MD 21401
                              Telephone:    443.569.0788
                              Facsimile:     410.571.2798
                              Email: chopkin@yvslaw.com

                              *Proposed Attorneys for the Debtor and Debtor*
                              *In Possession*

#226572016_v7