# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | Case No. [_____] |
| Debtor.[1] | |

## DECLARATION OF JOHN MATERA
## IN SUPPORT OF FIRST DAY MOTIONS

I, John Matera, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an adult person of sound mind and a resident of Baltimore, Maryland.

2.      I am the Executive Director of Management Services and Chief Financial Officer of the Roman Catholic Archbishop of Baltimore (the "***RCAB***" or "***Debtor***") in the Fiscal Services Division located at 320 Cathedral Street, Baltimore, Maryland 21201.

3.      I have been employed by the RCAB since November 29, 1999. I have held my current position with the RCAB since November 8, 2018.

4.      I have been a Certified Public Accountant since 1989. I received a Master of Business Administration degree from Loyola University Maryland in 2005.

5.      As part of the preparation for this chapter 11 case, my staff and I assisted in compiling financial and other information necessary for the filing of the chapter 11 petition on behalf of the RCAB and the motions filed contemporaneously with the chapter 11 petition (collectively, the "***First Day Motions***").

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

6.      As a result of my position with the RCAB and these efforts in preparing the First Day Motions, I am familiar with RCAB's accounting systems, financial information, and overall operations.

7.      I am submitting this declaration in support of the chapter 11 petition filed in this case and the First Day Motions.

8.      This declaration is based upon my personal knowledge, the books and records of the RCAB, publicly available information, information obtained from persons within the RCAB, and information obtained from other persons upon whom I regularly rely in the ordinary course of business and to whom I have delegated certain responsibilities.

9.      If called upon to testify, I could and would testify competently to the facts set forth herein.

10.      This declaration is organized into two sections: (i) the first section describes the financial position of the RCAB and details the circumstances surrounding the commencement of this chapter 11 case; and (ii) the second section sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## Corporate Form and Financial Position of the RCAB

11.      The RCAB is a non-profit religious institution and maintains its principal place of business at 320 Cathedral Street, Baltimore, Maryland 21201.

12.      The structure of the RCAB is detailed in the *Informational Brief of the Roman Catholic Archbishop of Baltimore* (the "***Informational Brief***").[2]

13.      The RCAB has limited assets and generally operates on a break-even basis.

---

[2] Capitalized terms used by not defined herein, other than in the section hereof named "Evidentiary Support for First Day Motions" shall have the meanings ascribed to them in the Informational Brief.

14.     Consistent with Canon Law and Maryland law, the RCAB holds property, including real property, as a corporation sole for the purposes of erecting churches, parsonages, burial grounds, or schools according to the discipline and government of the Roman Catholic Church, with all such property to be used only for such purposes.

### Events Leading to this Chapter 11 Case

15.     Like other similarly situated Catholic dioceses across the country, (a) the RCAB faces potentially catastrophic liability because of the forthcoming changes in Maryland law and (b) correspondingly expects to struggle financially while balancing the need to compensate survivors for the harms occasioned upon them in the past with the funding demands of the RCAB's present missions and ministries within the Archdiocese.

16.     Specifically, in April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "*CVA*"), which Maryland Governor Wes Moore signed into law on April 11, 2023. The CVA becomes effective October 1, 2023, and by its terms provides that, among other things, "notwithstanding any time limitation under a statute of limitations, a statute of repose, . . . or any other law, an action for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor may be filed at any time."

17.     While the RCAB has made and continues to make significant effort to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the RCAB has reached consensual settlements, the RCAB believes additional unsettled claims and liabilities remain outstanding. In particular, while the RCAB is unable to verify the information, the Maryland Attorney General has asserted that there are in excess of six hundred (600) known survivors of clergy abuse.

18.     Even though the RCAB carried insurance during many periods in which abuse is alleged to have occurred, and even though the RCAB believes such insurance provides coverage

for the claims that would be asserted against the RCAB, to date, the RCAB has been largely unsuccessful in obtaining any coverage for claims asserted against the RCAB or any commitment to provide coverage without reservation.

19.    As a result, the RCAB faces claims in an aggregate amount exceeding the RCAB's economic ability to pay, in which circumstance (a) survivors of abuse could be left with no compensation or other support and (b) those within the Archdiocese (including non-Catholics) who depend on the services of the Roman Catholic Church delivered through the RCAB would be left without the material, monetary, and spiritual support which has, to date, been a necessary, stable, and enriching element in their lives.

20.    Faced with this prospect, the RCAB concluded that seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to seek to assure (a) equitable compensation to those harmed by the sins of the past within the Archdiocese, (b) continuation of the counseling and other services provided through the RCAB to those who have been harmed, (c) continuation of essential programs for the protection of children, and (d) continuation of the mission and ministry of the Roman Catholic Church within the Archdiocese.

## Evidentiary Support for the First Day Motions[3]

21.    The RCAB has filed the First Day Motions seeking various forms of relief on an emergency bases.

22.    The First Day Motions seek relief aimed at, among other things, facilitating a smooth transition in this chapter 11 case, maintaining employee compensation, maintaining the good will and morale of priests, lay employees, and others who rely on the programs and services

---

[3] Capitalized terms used in this section of the declaration and not otherwise defined shall have the meanings ascribed to them in the applicable First Day Motion.

4

provided by the RCAB, and preserving and maximizing the property available to satisfy the RCAB's creditors.

23.     All of the First Day Motions are vital to the RCAB's reorganization efforts, and expedited approval of the First Day Motions is important to the RCAB's success in this chapter 11 case.

24.     I have reviewed the First Day Motions, including the exhibits and other attachments to the First Day Motions.

25.     I believe the RCAB has satisfied the applicable standards for the relief requested in each of the First Day Motions and this Court's grant of the requested relief is in the best interests of the RCAB, the RCAB's estate, its creditors, and other parties in interest.

26.     Moreover, in the absence of expedited approval of the First Day Motions and relief sought in same, the RCAB and its estate could suffer immediate and irreparable harm.

27.     A description of the relief sought and the facts supporting each of the First Day Motions is set forth below. Based upon the foregoing and the facts below, I respectfully submit that the First Day Motions should be granted.

I.      **Debtor's Emergency Application for Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent and (II) Granting Related Relief (the "*Claims Agent Retention Application*").**

28.     Pursuant to the Claims Agent Retention Application, the RCAB seeks entry of an order appointing Epiq as the claims agent (the "*Claims Agent*") for the RCAB in this chapter 11 case, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim in the chapter 11 case. The RCAB submits that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

29.     Although the RCAB has not filed its schedules of assets and liabilities, the RCAB anticipates there will be in excess of one thousand persons and entities to be noticed.

30.     Further, this chapter 11 case presents unique issues related to the confidential nature of many claimants' identities, and Epiq will be able to provide the services as described in the Epiq Agreement while ensuring that the confidentiality of survivors is maintained.

31.     In view of the foregoing and the complexity of the RCAB's business, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the RCAB and the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes and is in the best interests of the RCAB, the RCAB's estate, its creditors, and other parties in interest.

32.     I, therefore, believe appointing Epiq as the claims, noticing, and balloting agent in the chapter 11 case will maximize the value of the RCAB's estate for all stakeholders and should be approved by the Court.

## II.     Debtor's Emergency Motion for an Order Authorizing the Debtor to File Under Seal Portions of Schedule E/F, the Creditor Matrix, and Other Pleadings and Documents (the "*Motion to Seal*").

33.     Many of the unsecured creditors in this chapter 11 case are individuals whose claims against the Debtor are premised on allegations of childhood sexual abuse ("*Abuse Claimants*"). While many Abuse Claimants may have come forward publicly, others have maintained the confidentiality of their identity as an Abuse Claimant. In addition, while the Debtor is currently unaware of any Abuse Claimants who are minors, in other similar cases there have been instances in which minors asserted claims or otherwise had claims asserted on their behalf. Further, the Debtor expects more individuals who are not currently known Abuse Claimants to come forward with claims of abuse who may wish for their identities to remain out of the public realm.

34.     In addition to the identities of potential Abuse Claimants, the pleadings in this chapter 11 case will have personally identifiable information of individual creditors who are also

6

employees of the Debtor (the "***Employee Creditors***") who likely wish to remain anonymous for security purposes related to identity theft or other reprisals, but not for purposes related to concealment of any alleged perpetrator of abuse.

35.      In light of the delicate nature of the claims of Abuse Claimants and others who may come forward with similar claims during the chapter 11 case, to avoid causing unnecessary additional anguish or embarrassment, to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, to guard against potential identity theft, and, with regard to minors, as required by Bankruptcy Rule 9037, I submit that it would be inappropriate and potentially harmful to require the public disclosure of: (a) identifying information relating to individuals who have notified or who will notify, either informally, formally, or through filing a lawsuit, the Debtor of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to the Debtor's supervision; (b) information relating to the specific allegations of abuse asserted by any Abuse Claimants; (c) information relating to confidential settlements of abuse claims; or (d) any personal, identifying information of Employee Creditors (collectively, the "***Confidential Information***").

36.      Therefore, on behalf of the RCAB, I submit the Motion to Seal should be granted.

III.   **Debtor's Emergency Motion for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief (the "*Motion to Extend*").**

37.      Pursuant to the Schedules/SOFAs Extension Motion, the RCAB requests entry of an order (a) granting the RCAB thirty (30) days from the Petition Date (the "***Extension Period***") to file the Schedules and Statements, without prejudice to the RCAB's ability to request an additional extension of time should it become necessary and (b) granting such other and further relief as is just and proper.

38.     I anticipate that there will be many more creditors and interested parties involved in this chapter 11 case, including a multitude of individuals whose claims relate to alleged instances of abuse and whose names and other identifying information will be filed under seal to protect their privacy, pursuant to the relief sought in Motion to Seal filed contemporaneously with this declaration. Given the need for confidentiality, preparing the Schedules and Statements accurately and with sufficient detail and adherence to confidentiality requires significant attention from the Debtor's professionals and advisors.

39.     In addition to the reasons set forth above, I respectfully submit that the size and complexity of the Debtor's operations, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational and mission stabilization matters that the Debtor's personnel must address in the early days of this chapter 11 case, and the pressure incident to the commencement of this chapter 11 case provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements. Although the Debtor and its professionals have been working diligently on completing the Schedules and Statements, it would be extremely challenging to complete this undertaking prior to the expiration of the Initial Deadline.

40.     I submit that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this chapter 11 case will help the Debtor make a smoother transition into bankruptcy and, therefore, will ultimately maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest. Consequently, I believe that it is in the best interests of the Debtor and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Debtor with a total of thirty (30) days from the Petition Date to file the Schedules and Statements.

8

41.     Therefore, on behalf of the RCAB, I submit the Motion to Extend should be granted.

**IV.     Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies under Section 366 of the Bankruptcy Code, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "*Utilities Motion*").**

42.     The Debtor's ongoing operations require the Debtor to maintain uninterrupted utility services from myriad utility service providers (each, a "*Utility Company*" and collectively, the "*Utility Companies*"), for electricity, natural gas, telephone, water, waste removal, internet, and other services (the "*Utility Services*"). The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as **Exhibit C** (the "*Utility Companies List*"). The Debtor has consistently made payments to the Utility Companies on a regular and timely basis. To my knowledge, there are no material defaults or arrearages with respect to the Debtor's undisputed invoices for Utility Services, other than the payment interruptions that may be caused by the commencement of the chapter 11 case.

43.     Uninterrupted Utility Services are essential to the continued operation of the Debtor and, consequently, to the success of the chapter 11 case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's operations could be severely disrupted, and such disruption would jeopardize the Debtor's reorganization efforts. Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to its Utility Companies without hindering the Debtor's ability to function as a going concern.

44.     The Debtor receives Utility Services from the Utility Companies for multiple facilities. On average, the Debtor pays approximately **$27,500** each month for the Utility Services, calculated as a historical average for fiscal year 2023. The Debtor estimates, and I concur, that the

cost for the Utility Services during the next two (2) weeks (not including any deposits to be paid) will be approximately **$13,500**, based upon the historical average.

45.     As of the Petition Date, the Debtor has cash sufficient to make postpetition payments to the Utility Companies.

46.     The Debtor intends to pay its undisputed postpetition obligations to the Utility Companies on a timely basis, in accordance with its prepetition practices, and has the ability to do so.

47.     The Debtor proposes to deposit an amount equal to two (2) weeks of Utility Services, calculated as a historical average for fiscal year 2023 (each, an "***Adequate Assurance Deposit***"), into a segregated bank account designated for the Adequate Assurance Deposit (the "***Adequate Assurance Deposit Account***"). The Adequate Assurance Deposit will be held in the Adequate Assurance Deposit Account for the duration of the chapter 11 case and may be applied to any postpetition defaults with respect to payments to the Utility Companies.

48.     I submit that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business and any deposits held by the Utility Companies, constitutes sufficient adequate assurance of future payment to the Utility Companies, to satisfy the requirements of section 366 of the Bankruptcy Code. Nonetheless, if any Utility Company believes additional assurance is required, the Debtor requests that the Court approve the Adequate Assurance Procedures and Objection Procedures as described in the Utilities Motion.

49.     Therefore, on behalf of the RCAB, I submit the Utilities Motion should be granted.

**V.    Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage (the "*Insurance Motion*").**

50.    In the ordinary course of business, the Debtor maintains and operates a centralized insurance program, which provides, among other things, the Archdiocesan General Insurance Program (the "*General Insurance Program*"), Archdiocesan Sexual Misconduct Self-Insurance Program (the "*Self-Insurance Program*"), and Archdiocesan Health Benefits Program (the "*Health Benefits Program*" and collectively with the General Insurance Program and Self-Insurance Program, the "*Insurance Programs*").

51.    Through the Insurance Programs, the Debtor provides insurance coverage for itself, Parishes, Schools, and Related Entities, through a combination of self-insurance programs and the purchase of third party insurance.

52.    Attached to the Insurance Motion as **Exhibit C** is a schedule depicting the coverage layers and sources of coverage comprising the Insurance Programs.[4]

53.    The Debtor requests authority to continue honoring all obligations under the Insurance Policies on a postpetition basis, in the ordinary course of business.

54.    Continuation of the Debtor's Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtor's operations and property of the estate. Further, the Parishes, Schools, Related Entities, and other related non-debtor Catholic entities are additional insureds under the Insurance Policies and contribute amounts to the Debtor for such coverage. The inclusion of additional insureds under the Insurance Policies and coinciding

---

[4] In addition to the Insurance Policies listed on **Exhibit C**, the Debtor maintains numerous insurance policies with respect to, among other things, employee health, dental, disability and life insurance benefits, and worker's compensation. These programs are described, and relief is requested with respect to such programs, in the Wage Motion (as defined below).

contributions by those additional insureds reduces the cost of the Insurance Policies for the Debtor. If the Debtor failed to maintain the Insurance Policies: (a) additional insureds may cease making contributions to the Debtor or otherwise withdraw their participation from the Insurance Policies, thereby unnecessarily increasing the cost of insurance for the Debtor; and (b) additional insureds may have claims against the Debtor and the Debtor's estate, as a result of any nonpayment or resulting cancellation of insurance.

55.     Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's activities, including the Office of the United States Trustee's (the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage and continuation of payment plans and schedules between the Debtor and other non-debtor entities covered by the Insurance Policies, the Debtor requests authority to maintain its existing Insurance Policies, pay any prepetition obligations related to the Insurance Policies, and enter into new Insurance Policies, in the ordinary course of business.

56.     Pursuant to the Insurance Policies, the Debtor may be required to pay various deductibles or retention amounts (the "**_Insurance Deductibles_**"), depending upon the type of claim and insurance policy involved. Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtor for any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtor. While neither the Debtor nor I are aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtor seeks authority to honor any amounts owed to the Insurance Carriers, to ensure uninterrupted coverage under its Insurance Policies.

57.     The Debtor utilizes an insurance broker, Porter & Curtis, LLC (the "***Insurance Broker***"), to obtain its Insurance Policies. The Insurance Broker primarily assists the Debtor with the procurement and negotiation of the Insurance Policies, enabling the Debtor to obtain the Insurance Policies on advantageous terms and at competitive rates. The Debtor pays fees (the "***Brokerage Fees***") to the Insurance Broker in an annual amount of **$446,876**. The Brokerage Fees are paid to the Insurance Broker in equal monthly payments. While the Debtor nor I are aware of any Brokerage Fees that are due and owing as of the Petition Date, the Debtor seeks authority to honor any amounts owed to the Insurance Broker, to ensure uninterrupted coverage under its Insurance Policies.

58.     Therefore, on behalf of the RCAB, I submit the Insurance Motion should be granted.

**VI.     Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief (the "*Wage Motion*").**

59.     The Debtor currently employs approximately 197 employees, 25 of whom are seasonal, 14 of whom are part-time, hourly employees, 15 of whom are clergy, and 143 of whom are salaried full-time lay employees (collectively, the "***Employees***"). In addition to its own Employees, Parishes, Schools, and Related Entities (collectively, the "***Non-Debtor Employers***") employ approximately three thousand five hundred (3,500) individuals (the "***Non-Debtor Employees***"). UKG Inc. ("***UKG***" or the "***Payroll Processor***") processes payroll for both the Debtor's Employees as well as the Non-Debtor Employees; however, the payments for Non-Debtor Employees come only from Non-Debtor Employer deposit accounts. With respect to the Debtor's Employees, the Debtor causes UKG to disburse all payroll funds from a single account (the "***Payroll Account***") in the Debtor's name to each of the Employees. With respect to the Non-

13

Debtor Employees, each Non-Debtor Employer causes UKG to disburse payroll funds from each Non-Debtor Employer's accounts. By utilizing a single payroll processor for the Debtor's and Non-Debtor Employers' payroll processing services, the Debtor is able to provide a streamlined payment system for all wages as well as administrative cost savings to the Debtor and Non-Debtor Employers; however, at no time are payroll funds disbursed from the Payroll Account to Non-Debtor Employees.

60.     In addition to utilizing a standardized payroll system, the Employees and Non-Debtor Employees are enrolled into consolidated benefit plans (as more fully described below) in order to take advantage of economies of scale. Like with the payroll processing, the Debtor funds all amounts due for Employee benefits from the Debtor's deposit accounts and the Non-Debtor Employers fund all amounts due for Non-Debtor Employees benefits from Non-Debtor Employer deposit accounts.

61.     The Employees perform a variety of critical functions for the Debtor, working in numerous ministries and other operations, providing ecclesiastical, managerial, financial, clerical, religious, and pastoral services to individuals and families living within the Debtor's territorial jurisdiction. The Employees' knowledge, skills, and understanding of the Debtor's ministries, mission, business operations, and relationships are essential to the success of the Debtor and this chapter 11 case. Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to effectively implement the Debtor's chapter 11 strategy.

62.     Thus, to successfully accomplish the foregoing, minimize the personal hardship that the Employees—and ultimately, the beneficiaries of the services provided by such Employees—will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical

time, I believe it is necessary and in the best interest of the Debtor's estate and all stakeholders to seek the relief requested by the Wage Motion.

63.     The Debtor's aggregate monthly compensation for the Employees, including wages and salaries, is approximately **$1,180,000**. Most of the Debtor's payroll payments are made by direct deposit through the electronic transfer of funds directly to the Employees, while the remaining payments are made via check. The Debtor's Employees are paid on a bi-weekly basis.

64.     On September 20, 2023, the Debtor issued payroll to the Employees for the pay period ending September 9, 2023. Since that date and prior to the Petition Date, the Employees have continued to provide services to the Debtor and are thus entitled to receive pre-petition wages and benefits payable during that interim period prior to the Petition Date. Additionally, compensation may be due and owing as of the Petition Date because: (a) some discrepancies may exist between the amounts paid and the amounts Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not yet been honored and paid as of the Petition Date.

65.     As of the Petition Date, the aggregate amount of accrued wages, salaries, overtime pay, commissions, and other compensation (excluding, without limitation, the amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)) earned prior to the Petition Date that remains unpaid to the Debtor's Employees is approximately **$814,657** (the "***Unpaid Compensation***"). By this Motion, the Debtor requests authority to pay all such Unpaid Compensation to the Employees in the ordinary course of business in an amount not to exceed **$825,000**. The Debtor submits, and

I concur, that no Employee is owed more than $15,150 for Unpaid Compensation or Employee Benefits (as defined below).

66.    In the ordinary course of its business and pursuant to its obligations under Canon Law, the Debtor maintains housing for Archbishop William E. Lori (the "***Archbishop***") as well as certain other clergy Employees. Specifically: (a) the Archbishop lives in the residential quarters of the Basilica of the National Shrine of the Assumption of the Blessed Virgin Mary (the "***Basilica Residence***");[5] (b) Bishop Adam J. Parker is provided with an annual housing allowance, which is adjusted each year, with the most recent annual housing allowances being **$13,400** for fiscal year 2023 and **$14,070** for fiscal year 2024 (which is ongoing); (c) Bishop Bruce A. Lewandowski and retired Bishop Denis J. Madden reside in what is known as the Sulpician House, for which the Debtor pays total annual rent of **$28,800**; and (d) the Debtor maintains sixteen (16) apartments at Mercy Ridge, a continuing-care retirement community in Timonium, Maryland, which the Debtor reserves as a housing option for retired priests.[6]

67.    During each applicable pay period, the Debtor routinely deducts certain amounts from the Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums) and charitable contributions (collectively, the "***Deductions***") and forwards those amounts, through UKG, to various third-party recipients. For the pay period ending September 9, 2023, these Deductions were approximately **$63,432**. I believe that these

---

[5] Because the Archbishop lives in the Basilica Residence, he does not receive a housing allowance, as do some other of the Debtor's clergy Employees. The Debtor does, however, pay for various expenses of the Basilica Residence.

[6] Priests who decide to reside in a Mercy Ridge apartment agree to pay a fixed amount determined by taking 80% of the cost of rent at the time of move-in. Though rent for the Mercy Ridge apartments generally increases over time, the Debtor pays for these rent increases such that retired priests living at Mercy Ridge pay a consistent amount of rent for the remainder of their lives or until they move into assisted living. When a priest enters assisted living, the priest pays for 50% of the cost until he no longer has any assets, at which point the Debtor pays for 100% of the cost for the remainder of the priest's life.

Deductions were remitted to the various third party recipients prior to the Petition Date; however, in the event that such amounts have not been remitted, the Debtor has sought authority to continue to forward these prepetition Deductions, in an amount not to exceed **$65,000**, on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date.

68.    Further, the Debtor is required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "***Withheld Amounts***") for remittance to the appropriate taxing authorities. The Debtor must then make matching payments from its own funds for social security and Medicare taxes (the "***Employer Payroll Taxes***," and together with the Withheld Amounts, the "***Payroll Taxes***"). The Debtor's Payroll Taxes for the pay period ending September 9, 2023, were approximately **$160,311**. I believe these Payroll Taxes were remitted to the various taxing authorities before the Petition Date, however, in the event that such amounts were not remitted, the Debtor seeks authority to continue to forward these prepetition Payroll Taxes, in an amount not to exceed **$165,000**, to the applicable taxing authorities on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date.

**Prepetition Employee Benefits**

69.    In the ordinary course of business, eligible[7] Employees and Non-Debtor Employees are provided with a number of employee benefits, including, but not limited to (a) health, dental, and vision insurance, (b) paid time off, and (c) group long-term disability insurance, described in greater detail below (collectively, the "***Employee Benefits***").

---

[7] Employees and Non-Debtor Employees who work twelve months a year are eligible if they work twenty (20) or more hours per week. Employees and Non-Debtor Employees who work ten months per year are eligible if they work twenty-five (25) or more hours per week.

i.        **Group Health Insurance, Prescription Drug Insurance, and Employee Assistance Program.**

70.      Through the Archdiocese Health Benefits Program (the "***Health Benefits Program***"), Employees and Non-Debtor Employees are provided access to a health insurance program (the "***Health Insurance***"), prescription drug insurance (the "***Prescription Drug Insurance***"), and access to an employee assistance program (the "***Employee Assistance Program***").

71.      By covering the Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and allocation of the Plan, Prescription Drug Insurance, and Employee Assistance Program.

72.      In addition, I believe a health insurance plan, prescription drug plan, and employee assistance program for most of the Non-Debtor Employers alone would be prohibitively expensive (and possibly unavailable), due to the smaller number of employees that would be covered.

73.      The Debtor's portion of the contributions to the Health Benefits Program relating to Health Insurance, Prescription Drug Insurance, and Employee Assistance Program is funded in part by the Debtor and in part through Employee paycheck deductions.

74.      The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

75.      Similarly, the portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by each applicable Non-Debtor Employer from their payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

76.    Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Health Insurance, Prescription Drug Insurance, and the Employee Assistance Program cover the cost of each for the Non-Debtor Employees, such that the Debtor's contributions are not funding benefits for Non-Debtor Employees.

77.    As of the Petition Date, approximately **$23,747** has been withheld from Employees and Non-Debtor Employees but has yet to be remitted to the Health Benefits Program for Health Insurance, Prescription Drug Insurance, and the Employee Assistance Program.

**ii.        Health Savings Account Program.**

78.    Through the Health Benefits Program, the Debtor offers health savings accounts ("***HSAs***") for the benefit of Employees and Non-Debtor Employees.

79.    The HSA allows eligible Employees and Non-Debtor Employees to contribute tax-deferred wages towards the future cost of healthcare expenses.

80.    For Employees who have elected to make contributions to an HSA, the Debtor deducts appropriate amounts from each payroll and remits those amounts to the applicable participating Employee's HSA account on their behalf.

81.    For Non-Debtor Employees who have elected to make contributions to an HSA, the applicable Non-Debtor Employer deducts appropriate amounts from each payroll and remits those amounts to the applicable participating Non-Debtor Employee's HSA account on their behalf.

82.    These individual accounts are owned by the Employees and Non-Debtor Employees, as applicable, and are funded in accordance with the Health Benefits Program.

83.    As of the Petition Date, approximately **$1,195** has been withheld from Employees but is yet to be remitted to the applicable HSAs.

### iii.        Dental Insurance

84.    Through the Health Benefits Program, Employees and Non-Debtor Employees are provided access to dental insurance (the "***Dental Insurance***"),[8] providing coverage for preventative and basic dental services.

85.    By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Dental Insurance program.

86.    A dental insurance plan for most of Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

87.    The Debtor's portion of the contributions to the Health Benefits Program relating to Dental Insurance is funded in part by the Debtor and in part through Employee paycheck deductions.

88.    The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

89.    The portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by the Non-Debtor Employers from each participating Non-Debtor Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

90.    Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Dental Insurance cover the cost of Dental Insurance for the Non-

---

[8] The Health Benefits Program provides Dental Insurance by contracting with Cigna Healthcare and United Concordia Dental.

Debtor Employees, such that the Debtor's contributions are not funding Dental Insurance benefits for Non-Debtor Employees.

91.      As of the Petition Date, approximately **$2,676** has been withheld from Employees but has yet to be remitted to the Health Benefits Program for Dental Insurance.

### iv.      Vision Insurance.

92.      Through the Health Benefits Program, the Debtor provides Employees and Non-Debtor Employees vision insurance (the "***Vision Insurance***"),[9] providing coverage for examinations, frames, lenses, and contact lenses.

93.      Generally, Employees and Non-Debtor Employees who are enrolled in a Cigna Health Insurance Plan through the Health Benefits Program are automatically enrolled in the Vision Insurance; however, Employees and Non-Debtor Employees may also elect to obtain the Vision Insurance as a stand-alone option.

94.      By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Vision Insurance program.

95.      A dental insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

96.      The Debtor's portion of the contributions to the Health Benefits Program relating to Vision Insurance is funded in part by the Debtor and in part through Employee paycheck deductions.

---

[9] The Health Benefits Program provides Vision insurance by contracting with Cigna Healthcare.

97.    The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

98.    The portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by the Non-Debtor Employers from each participating Non-Debtor Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

99.    Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Vision Insurance cover the cost of Vision Insurance for the Non-Debtor Employees, such that the Debtor's contributions are not funding Vision Insurance benefits for Non-Debtor Employees.

100.    As of the Petition Date, approximately **$824** has been withheld from Employees but has yet to be remitted to the Health Benefits Program for Vision Insurance.

**v.    Life Insurance.**

101.    Through the Health Benefits Program, Employees and Non-Debtor Employees are provided with basic, employer paid life insurance (the "***Basic Life Insurance***") and voluntary, employee-paid life insurance (the "***Voluntary Life Insurance***" and together with the Basic Life Insurance, the "***Life Insurance Programs***").[10]

102.    By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Life Insurance Programs.

---

[10] The Health Benefits Program provides the Life Insurance Programs by contracting with New York Life Insurance Company.

103.    A life insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

104.    The Debtor's portion of the contributions to the Health Benefits Program relating to Basic Life Insurance is funded by the Debtor, and the Non-Debtor Employer's portion of the contributions to the Health Benefits Program relating to the Basic Life Insurance is funded by the Non-Debtor Employers.

105.    For the fiscal year ending in 2024, the total expense for Basic Life Insurance will be approximately **$869,231**.

106.    Contributions to the Health Benefits Program for Voluntary Life Insurance is funded through Employee and Non-Debtor Employee paycheck deductions from each participating Employee's and Non-Debtor Employee's payroll, which deductions are remitted to the Health Benefits Program on behalf of the appliable participating Employee or Non-Debtor Employee.

107.    Contributions by the Non-Debtor Employees to the Health Benefits Program for Voluntary Life Insurance cover the cost of Voluntary Life Insurance for the Non-Debtor Employees, such that Employees' contributions are not funding Voluntary Life Insurance benefits for Non-Debtor Employees.

108.    As of the Petition Date, approximately **$1,527** has been withheld from Employees and Non-Debtor Employees but has yet to be remitted to the Health Benefits Program for Voluntary Life Insurance.

### vi.        Long-Term Disability and Accident Insurance.

109.    Through the Health Benefits Program, Employees and Non-Debtor Employees are provided short term and long term disability insurance (together, the "***Disability Insurance***"),[11] which is designed to replace an Employee's or Non-Debtor Employee's take-home pay in the event that a disability prevents such Employee or Non-Debtor Employee from earning a salary for an extended period of time.

110.    Generally, eligible Employees and Non-Debtor Employees are automatically enrolled in the Disability Insurance program at no cost to the employee, with the Debtor making contributions sufficient for the Disability Insurance applicable to Employees and Non-Debtor Employers making contributions sufficient for the Disability Insurance applicable to Non-Debtor Employees.

111.    By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Disability Insurance.

112.    A short-term and long-term disability insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

113.    As of the Petition Date, the Debtor does not believe it owed any amounts for the payment of Disability Insurance benefits for Employees.

---

[11] The Health Benefits Program provides the Disability Insurance by contracting with New York Life.

###### vii.        403(b) Retirement Savings Plans.

114.    The Debtor offers a 403(b) Retirement Savings Plan (the "***403(b) Plan***") for the benefit of Employees and Non-Debtor Employees, which is administered by T. Rowe Price Group, Inc. ("***T. Rowe Price***").

115.    Pursuant to the 403(b) Plan, both benefit eligible and non-benefit eligible Employees and Non-Debtor Employees can make pre-tax employee contributions to the 403(b) Plan as soon as they are hired, either on a flat dollar or percentage basis.

116.    In addition, the Debtor and Non-Debtor Employers make on a quarterly basis an employer contribution in an amount equal to four percent of an eligible Employee's or Non-Debtor Employee's annual wages.

117.    By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from administrative cost savings.

118.    With respect to the Employee contributions to the 403(b) Plan, the Debtor deducts the Employee contributions from each participating Employee's payroll and remits the contributions to T. Rowe Price on behalf of each applicable participating Employee.

119.    With respect to the Non-Debtor Employee contributions to the 403(b) Plan, the applicable Non-Debtor Employer deducts their Non-Debtor Employee contributions from each participating Non-Debtor Employee's payroll and remits the contributions to T. Rowe Price on behalf of each applicable participating Non-Debtor Employee.

120.    As of the Petition Date, approximately **$59,856** has been withheld from Employees but is yet to be remitted to T. Rowe Price.

viii.        **Leave Pay.**

121.    The Employees are provided with paid time off ("***PTO***" or "***Leave Pay***"), including holidays, vacation, sick leave, personal leave, court duty, bereavement, military leave, and office closure.

122.    Employees are provided with approximately thirteen (13) paid holidays each year.

123.    The Debtor's vacation pay policy is based upon length of service and hours worked. To be eligible for the Debtor's vacation pay, an Employee must be scheduled to work 20 or more hours per week, 12 months per year, and must be a full-time employee. While annual leave begins to accrue upon with an Employee's first full pay period, vacation pay may not be utilized during an Employee's first three (3) months of employment. Unused vacation time may be carried over from year to year up to a maximum of two weeks for full-time Employees. In most instances, an Employee is entitled to receive compensation for unused vacation days upon termination.

124.    The Debtor also provides sick leave for Employees who are eligible for vacation pay, with eligible Employees accruing sick leave at the rate of one (1) day per month. Sick leave beings to accrue wit the first day of employment and may be taken as soon as leave is accrued. Sick leave may be carried over from year to year, but an eligible Employee may not accrue more than sixty (60) days of sick leave. Unused sick days are not paid out upon an Employee's resignation or termination.

125.    Employees eligible for vacation pay are also provided two personal leave days per calendar year. Personal leave does not carry over from year to year and is not compensable at the time of termination.

126.    In addition to the foregoing, the Debtor provides Employees with family and medical leave, bereavement leave, jury duty leave, and military leave.

127.   The cost to the Debtor for all of the foregoing the Leave Pay is included in gross payroll. Accordingly, and with the exception of amounts owing in connection with accrued but unused vacation and accrued but unused sick leave, I believe all prepetition amounts related to the Leave Pay are included in the aggregate amount of Unpaid Compensation.

      **ix.**      **Worker's Compensation Program.**

128.   Through the General Insurance Program, the Debtor maintains a self-insured workers' compensation program as well as excess coverage through Safety National Casualty Corporation (the "***Workers' Compensation Program***") for the Debtor and Non-Debtor Employers.

129.   By maintaining the Workers' Compensation Program as a single program for the Debtor and Non-Debtor Employers, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation of plan overhead. Indeed, obtaining workers' compensation insurance for the Debtor or any one of the Non-Debtor Employers alone would be more expensive due to the small number of employees that would be covered.

130.   Over the past twenty-five years, the Debtor's average claims under the Workers' Compensation Program are approximately **$25,000** per year.

131.   The payment of the Employee Wages and Benefits described above is critical to the ongoing operations of the Debtor's business, because the failure to pay the Employee Wages and Benefits will force the Debtor to risk tangible and intangible loss of the value derived from the Debtor's workforce and its knowledge of the Debtor's business operations.

132.   In addition, to the extent the Debtor is unable to maintain its workforce, considerable time, effort, and expense will be required to replace Employees who seek alternative employment.

133.   Therefore, on behalf of the RCAB, I submit the Wage Motion should be granted.

**VII.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Extending the Time to Comply with, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; (V) Authorizing the Debtor's Continued Use of Credit Cards; and (VI) Granting Related Relief (the "*Cash Management Motion*").**

134.    By the Cash Management Motion, the Debtor requests authority to continue to use its Cash Management System in the ordinary course and granting related relief.

135.    To maintain the efficient operation of the Cash Management System during this case, the Debtor also requests its Banks be authorized and directed to continue to administer, service, and maintain the Bank Accounts and Investment Accounts, as the Banks were prepetition, without interruption and in the Debtor's ordinary course of business. In that regard, the Debtor seeks to continue to receive, process, honor, and pay (or to reissue, as may be necessary) all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "*Disbursements*") on account of any claim this Court grants the Debtor approval to pay arising before, on, or after the Petition Date, and in reliance on the Debtor's representations of such authority, subject to the applicable Bank Accounts containing sufficient funds.

136.    Both in the Cash Management Motion and in other first-day motions, the Debtor seeks authority to pay certain prepetition obligations. For some of these obligations, the Debtor issued Disbursements before the Petition Date that have yet to clear. For others, the Debtor will issue a Disbursement once it has Court authority to do so. The Debtor requests that the Banks be authorized to accept and honor all representations from the Debtor as to which of these Disbursements should be honored. If any Banks nevertheless dishonor Court-approved Disbursements, the Debtor requests authority to issue replacement Disbursements consistent with the orders of this Court.

137.    Continuity of the Cash Management System is critical to the Debtor's operations, but so is flexibility. To that end, the Debtor also requests authority to implement reasonable changes to the Cash Management System that the Debtor may deem necessary or appropriate in the ordinary course, including closing any Bank Account and establishing new bank accounts, and that the applicable Banks be authorized to honor such changes.

138.    The Debtor maintains certain Bank Accounts that do not comply with the requirements of section 345(b) of the Bankruptcy Code and are maintained at a Bank that is not and authorized depository. Specifically, the Debtor maintains an account with each of Bank of America and WesBanco Bank (together, the "***Unapproved Banks***"). The Unapproved Banks are highly-rated financial institutions that is well-capitalized and financially stable, and is insured by the Federal Deposit Insurance Corporation (the "***FDIC***"). Requiring the Debtor to transfer these Bank Accounts to a designated authorized depository so early in the case would place a needless administrative burden on the Debtor that would unnecessarily divert the attention of the Debtor's management and advisors at a critical juncture in the chapter 11 case.

139.    In the ordinary course of business, the RCAB has made available for use "procurement cards" through American Express (the "***Credit Card***"), enabling certain of the RCAB's authorized employees (the "***Authorized Employees***") to pay for expenses related to the RCAB's business for which employees would be reimbursed (*e.g.*, office supplies, advertisement expenses, and appropriate meeting expenses). As of the Petition Date, the RCAB has thirty-four (34) Authorized Employees with a Credit Card. As of the Petition Date, the Credit Card has an approximate balance due of **$96,000**. It is consistent with the Debtor's practice that the Credit Card balance be paid in full on a monthly basis.

140.    The Cash Management System is an integrated network of bank accounts that is critical to the Debtor's operations during this case and, in turn, maximizing the value of the Debtor's estate. The Debtor has designed the Cash Management System to meet its operating needs, enable management to control and monitor funds, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances. The Debtor has maintained its Cash Management System for many years, and the cash management system has served as the primary funds flow mechanism for the Debtor's ordinary, usual, and essential business operations.

141.    As of the Petition Date, the Cash Management System includes the nine (9) bank accounts listed on **Exhibit C** to the Cash Management Motion located at four (4) commercial banks used in the ordinary course of the Debtor's business. The Debtor routinely deposits, withdraws, and otherwise transfers money to, from, and between the Bank Accounts by various methods (collectively, the "*Ordinary Transfer Methods*"), including by checks, drafts, ACH transfers, and other electronic funds transfers.

142.    The Debtor's primary operating accounts are held at PNC Bank, including a primary operating account, a payroll disbursement account, an insurance disbursement account, and an account used to transfer funds to employee health savings accounts. The Debtor also maintains three accounts with M&T Bank, including an account to collect restricted gifts from special mailings, an account used for restricted gifts from the Debtor's Embracing Our Mission Capital Campaign, and an account used for the Newman Center, a catholic student ministry at Towson University. The RCAB also maintains the accounts with the Unapproved Banks listed above. The Debtor's account with Bank of America is used to fund its school-lunch programs

related to the Debtor's child-nutrition mission, and the account with WesBanco Bank is used in relation to the Catholic Review.

143.    In the ordinary course of business, the Debtor uses a variety of checks, correspondence, and business forms. To minimize expenses to the Debtor's estate and avoid unnecessarily confusing the Debtor's employees and creditors, I believe it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "***Business Forms***") as such forms were in existence immediately before the Petition Date—without reference to the Debtor's status as debtor-in-possession—rather than disposing of the existing forms and delaying operations until new Business Forms are obtained, or requiring the Debtor to include a legend on Business Forms that would cause unnecessary confusion. After existing Business Forms are depleted, but no later than forty-five (45) days from the Petition Date, the Debtor's Business Forms will identify the Debtor's status as debtor-in-possession.

144.    The Debtor incurs periodic service charges and other fees in connection with the maintenance of the Cash Management System, which fees and services are generally paid each month (the "***Bank Fees***"). The Debtor has historically incurred Bank Fees of approximately **$7,500** per month, which are debited from the respective Bank Account for which the Bank Fee was incurred. As of the Petition Date, the Debtor estimates that approximately **$7,500** in Bank Fees have accrued and remain unpaid and seeks permission to pay these Bank Fees and continue paying the Bank Fees in accordance with past practices.

145.    In addition to its Bank Accounts, as of the Petition Date the Debtor, in the ordinary course of business, maintains 11 investment accounts (the "***Investment Accounts***") listed on **Exhibit D** to the Cash Management Motion with PNC Bank (the "***Investment Bank***"). The RCAB

also holds a beneficiary interest in three (3) trusts, though these trusts are not in the RCAB's name, and the funds from these trusts are listed in the RCAB's books as permanently restricted.

146.    Therefore, on behalf of the RCAB, I submit the Cash Management Motion should be granted.

**VIII.    Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief (the "*Cash Collateral Motion*").**

147.    By the Cash Collateral Motion, the Debtor seeks authority to use the cash collateral of its primary lender, PNC Bank, National Association ("*PNC*") on a consensual basis to allow the Debtor to continue its operations, pay its employees, provide essential ministries and services within the Archdiocese, and administer this chapter 11 case for the benefit of all survivors and other creditors, including PNC.

**A.    PNC Indebtedness**

148.    The RCAB's external indebtedness consists of (i) a term loan with PNC, (ii) a series of bonds issued by the Maryland Health and Higher Educational Facilities Authority used to fund non-collegiate educational projects, (iii) a series of interest rate swap transactions with PNC, and (iv) certain guaranty obligations assumed as part of a new market tax credit transaction related to the acquisition and construction of the Mother Mary Lange School. Each of these debts is explained in further detail below.

**i.    PNC Term Loans.**

149.    The RCAB and PNC are parties to that certain: (a) Third Amended and Restated Letter Agreement—Term Loan, dated as of May 16, 2014 (the "*PNC Loan Agreement*"); (b) Amended and Restated Replacement Term Note A, dated as of May 16, 2014, in the original principal amount of $7,000,000 (the "*PNC Note A*"); and (c) Amended and Restated Replacement

Term Note B, dated as of May 16, 2014, in the original principal amount of $5,028,466.36 (the "***PNC Note B***" and together with the PNC Loan Agreement and PNC Note A, as the same may have been amended, supplemented, or otherwise modified from time to time, the "***PNC Term Loan Documents***").

150.    As of the Petition Date, the aggregate principal amount outstanding under the PNC Loan Agreement was approximately **$4,097,988.62**, plus accrued interest and other fees (the "***PNC Obligations***").

151.    The PNC Obligations are secured by all of the RCAB's right, title, and interest in and to certain investment accounts, as more specifically described in that certain Amended and Restated Pledge Agreement (the "***Pledged Accounts***"), date May 16, 2014, by and between the RCAB and PNC Bank (the "***Pledge Agreement***") and certain Notification and Control Agreement, dated May 16, 2014, by and between the RCAB and PNC Bank (the "***Control Agreement***").

### ii.    PNC Bond Obligations.

152.    Pursuant to that certain Indenture of Trust, dated June 1, 2007 (the "***Indenture***") between the Maryland Health and Higher Educational Facilities Authority (the "***Issuer***") and U.S. Bank Trust Company, National Association (the "***Indenture Trustee***"), the Issuer issued certain Revenue Bonds, Archdiocese of Baltimore Schools Issue, Series 2007 (the "***Bonds***") to finance and refinance the costs of certain non-collegiate educational projects.

153.    To finance and refinance the costs of those certain non-collegiate educational projects, the proceeds of the Bonds were loaned by the Issuer to the RCAB pursuant to a Loan Agreement, dated as of June 1, 2007 (as subsequently amended and supplemented by the Supplements, the "***Bond Loan Agreement***").

154.    Pursuant to that certain First Supplemental Indenture of Trust and Supplemental Loan Agreement, dated December 8, 2010, by and between the Issuer, RCAB, Indenture Trustee,

and PNC Bank (the "***First Supplement***"), among other things, PNC Bank agreed to purchase the Bonds.

155.    In connection with PNC Bank's purchase of the Bonds, the RCAB executed and delivered to PNC Bank that certain Deed of Trust, Assignment, and Security Agreement, dated as of December 8, 2010 (the "***Deed of Trust***"), pursuant to which the RCAB granted first priority, senior liens on and security interest in the Property[12] (as defined in the Deed of Trust) (the "***Bond Collateral***").

156.    As of the Petition Date, PNC was the sole holder of the Bonds and the Bonds were outstanding in the aggregate amount of **$21,675,000**, plus accrued interest and other fees due and owing under the Bond Loan Agreement (the "***Bond Obligations***").

> ### iii.        PNC Swap Transactions.

157.     In connection with the foregoing, the RCAB entered into certain interest rate swap transactions with PNC pursuant to that certain ISDA Master Agreement, dated as of June 2007, by and between PNC and the RCAB (collectively, the "***Swap Agreements***," and the obligations thereunder, the "***Swap Obligations***").

158.    The first of these Swap Transactions, given the reference number MX_370037 ("***Swap Confirmation MX_370037***"), is in a notional amount of $1,860,000 with a fixed interest rate of 6.144% to be paid by the RCAB. Swap Confirmation MX_370037 has a trade date of April 6, 2023, an effective date of April 3, 2023, and a termination date of July 1, 2025.

159.    The second, given the reference number MX_370038 ("***Swap Confirmation MX_370038***"), is in a notional amount of $9,590,000 with a fixed interest rate of 2.75% to be paid

---

[12] The Property consists of the land, improvements, rents, and proceeds of the property on which Archbishop Spalding High School and the RCAB's Catholic Center reside, all as more specifically set forth in the Deed of Trust.

by the RCAB. Swap Confirmation MX_370038 has a trade date of April 6, 2023, an effective date of April 1, 2023, and a termination date of February 1, 2037.

160.    The third, given the reference number MX_370039 ("***Swap Confirmation MX_370039***"), is in a notional amount of $12,085,000 with a fixed interest rate of 3.973% to be paid by the RCAB. Swap Confirmation MX_370039 has a trade date of April 6, 2023, an effective date of April 1, 2023, and a termination date of July 1, 2037.

161.    As of September 25, 2023, the mark-to-market value of the Swap Obligations is approximately **$856,000** that would be owing by the Debtor.

162.    In addition, if the Swap Agreements are terminated, the Debtor would incur significant increased interest expense in connection with the Bond Obligations and the PNC Obligations.

### iv.    PNC Guaranty Obligations.

163.    The Debtor is also obligated as a guarantor in connection with that certain Guaranty and Suretyship Agreement, dated as of May 20, 2016 (the "***Guaranty***"), pursuant to which the Debtor guaranteed all obligations of the Church of the Nativity of our Lord Jesus Christ Roman Catholic Congregation, Incorporated, including, without limitation, a Standby and Commercial Letter of Credit (the "***Guaranty Obligations***," and, together with the PNC Obligations, Bond Obligations, and Swap Obligations, including costs and expenses thereunder for which the Debtor is liable for reimbursement in favor of PNC (*e.g.*, legal costs and fees), the "***Prepetition Obligations***").

### v.    Prepetition Liens and Collateral

164.    As of the Petition Date, PNC asserts security interests in and liens upon (collectively, the "***Prepetition Liens***") the following as collateral for the Prepetition Obligations, (collectively, the "***Prepetition Collateral***"): (a) the Bond Collateral, including, among other things,

the Debtor's primary business location; (b) the Pledged Accounts; and (c) certain deposit and investment accounts maintained by the Debtor at PNC, including the Debtor's primary operating account (together with the Pledged Accounts, the "***Cash Collateral***").[13]

165.    Subject to entry of a final order on the Cash Collateral Motion, and to a third-party challenge period to be provided for in such final order, the Debtor acknowledges that, as of the Petition Date: (a) the Prepetition Obligations are valid and enforceable; (b) the Prepetition Liens are valid, enforceable, perfected, and non-avoidable pursuant to the Bankruptcy Code or other applicable law; and (c) the Debtor does not possess any claim, counterclaim, setoff, or defense of any kind or nature that would affect the validity, enforceability, or non-avoidability of the Prepetition Obligations or Prepetition Liens.

### vi.        Immediate Need for Cash Collateral

166.    The Debtor cannot operate without access to Cash Collateral, and failure to obtain access now will cause immediate and irreparable harm to the Debtor, its followers, suppliers, employees, and other creditors and parties-in-interest, as well as the communities that the Debtor serves.

167.    In addition, the termination of the Swap Agreements would cause an immediate detrimental effect to the Debtor, with further long-term carry-on negative effects as a result of higher interest rate expenses.

168.    In exchange for the consensual use of Cash Collateral and continuation of the Swap Agreements, the Debtor proposes to grant the following adequate protection (the "***Adequate Protection***") to PNC: (a) the continued servicing of the Prepetition Obligations (including legal fees and costs of PNC), in the ordinary course of business (including via direct debit); and (b)

---

[13] As of the Petition Date, the Debtor's operating account had a balance of approximately **$15,100,000**.

solely to the extent of the postpetition diminution in value which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Cash Collateral (any such diminution, "***Diminution in Value***"): (i) replacement and preservation of any and all liens, security interests, and setoff rights held by PNC prior to the Petition Date and continuing in the proceeds of thereof (including sweep accounts to which funds may be transferred) (the "***Adequate Protection Liens***"); and (ii) allowed superpriority administrative expense claims against the Debtor (the "***507(b) Claims***").

169.    The Debtor submits that the proposed adequate protection will sufficiently protect PNC from any Diminution in Value of the Prepetition Collateral during the pendency of the chapter 11 case while simultaneously preventing (a) disruption of the Debtor's operations and administration of this chapter 11 case and (b) diminution of the Debtor's estate and ability to reorganize.

170.    Therefore, on behalf of the RCAB, I submit that the Cash Collateral Motion should be granted.

## IX.    Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay (the "*Stay Motion*").

171.    By the Stay Motion, the Debtor seeks for a limited extension of the automatic stay imposed by section 362 of the Bankruptcy Code to all related entities included as additional insureds under the Debtor's various current and legacy insurance programs, including but not limited to the one hundred fifty-three (153) parishes, each of the schools within the Archdiocese covered under the Debtor's insurance program, Catholic Community School Land, Inc., Inter-Parish Loan Fund, Inc., Catholic Community Foundation of the Archdiocese of Baltimore, Inc., Roman Catholic Foundation in the Archdiocese of Baltimore, Inc., John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc., Associated Catholic Charities, Inc., and Maryland

Catholic Conference, LLC (collectively with all other related entities covered by the Debtor's current and legacy insurance programs, the "**Covered Parties**"), to stay the prosecution of all sexual abuse actions (the "**Abuse Actions**") during this Chapter 11 Case.

172.    The issues presented by this chapter 11 case constitute special or unusual circumstances such that immediate adverse consequences for the Debtor's estate will occur if the relief requested in this Motion is not granted. The Debtor has historically maintained and currently maintains a centralized insurance program, which is administered by the Debtor and arranges for or provides high quality risk protection and risk management services for the Debtor and all Covered Parties (the "**General Insurance Program**"). The legacy portion of the General Insurance Program has historically provided robust general liability insurance for the Debtor and Covered Parties, including coverage for liability arising from Abuse Actions.

173.    Under the General Insurance Program, Abuse Actions will be satisfied from a finite group of insurance policies which provide coverage for the Debtor and Covered Parties, regardless of whether such claims are brought against the Debtor or a Covered Party.

174.    As a result, the Debtor and Covered Parties are intertwined such that a judgment against a Covered Party in any Abuse Action would effectively be a judgement against a Debtor, the Debtor may face issues of collateral estoppel and claim preclusion, and recovery against a Covered Party would have an adverse impact on the Debtor's estate, all of which would prejudice the Debtor's creditors and impact negatively the Debtor's ability to reorganize in this Chapter 11 Case.

175.    If the automatic stay is not extended to the Covered Parties, the Debtor and its estate will be irreparably harmed and the purposes and policies of the Bankruptcy Code will be frustrated.

176.    In particular, (a) the continued collection by creditors of debts owed to them by a Covered Party will deplete the estate's assets, namely insurance coverage; (b) key Debtor personnel will be diverted from the Debtor's reorganization efforts and be required to monitor and participate in any action in connection with any Covered Party; (c) judgments against any Covered Party would increase the likelihood of a judgment against the Debtor—not only because of collateral estoppel issues, but also because of the possibility for a Covered Party to assert claims for contribution or indemnification against the Debtor; and (e) any claim against a Covered Party is essentially a claim against the Debtor and will directly reduce the amount of proceeds available to the Debtor's estate to the detriment of other creditors.

177.    Absent a stay of the Covered Actions against all Covered Parties, the Debtor—and its prospects of successful reorganization—would suffer crushing and irreparable injury. The Debtor's management would be forced to dedicate ever increasing time and effort to defending any action against a Covered Party rather than operating the business to maximize the value of the Debtor's estate. Moreover, any actions against Covered Parties would further consume the Debtor's resources, divert the Debtor's management, and significantly impact the Debtor's contributions to any trust established for the purpose of providing payments to Claimants. Any fund established for victims of sexual abuse—as well as any concept of equitable distribution among like creditors—would be undermined at every turn by the inevitable races to the courthouse. Every party in interest—whether supporting a trust, opposing it, or on the fence—would lose if this value-destroying and inequitable dynamic is allowed.

178.    With respect to the Abuse Actions and insurance coverage, because the Debtor and Covered Parties share finite insurance resources, any recovery against a non-debtor will diminish

39

those finite insurance resources. As such, any Covered Action seeking damages from a Covered Party is essentially seeking to recover money from the Debtor's estate.

179.    Simply put, the stay requested in the Stay Motion is essential to preserve key assets of the Debtor and Debtor's estate, the orderly conduct of this chapter 11 bankruptcy proceeding, and achieving a global resolution in this chapter 11 bankruptcy proceeding.

180.    Therefore, on behalf of the RCAB, I submit that the Stay Motion should be granted.

Dated: September 29, 2023

John Matera
Chief Financial Officer

40