# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | Case No. [_____] |
| Debtor.[1] | |

## <u>NOTICE:</u>

> MOVANT HAS ALSO FILED A MOTION TO SHORTEN THE TIME FOR RESPONSE AND/OR FOR AN EXPEDITED HEARING. IF THAT MOTION TO SHORTEN OR EXPEDITE IS GRANTED, THE TIME TO OBJECT AND/OR DATE FOR HEARING WILL BE CHANGED AS PROVIDED IN SUCH ORDER.

## DEBTOR'S <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTOR TO (A) PAY CERTAIN PREPETITION WAGES, BENEFITS, AND OTHER COMPENSATION AND (B) CONTINUE EMPLOYEE COMPENSATION AND <u>BENEFITS PROGRAMS; AND (II) GRANTING RELATED RELIEF</u>

The Roman Catholic Archbishop of Baltimore (the "***Debtor***") in the above-captioned chapter 11 case (the "***Chapter 11 Case***") files this motion (this "***Motion***"), pursuant to sections 105(a), 363(b), 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), for entry of interim and final orders, substantially in the forms attached to this Motion as **<u>Exhibit A</u>** (the "***Interim Order***") and **<u>Exhibit B</u>** (the "***Final Order***," and together with the Interim Order, the "***Proposed Orders***"): (i) authorizing the Debtor to (a) pay certain prepetition wages, benefits, and other compensation and (b) continue employee compensation and employee benefits programs; and (ii) granting related relief. In support of the Motion, the Debtor relies on and

---

[1] The last four digits of the Debtor's federal tax identification number are: 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

incorporates by reference the *Informational Brief of the Roman Catholic Archbishop of Baltimore* (the "**Informational Brief**") and the *Declaration of John Matera in Support of First Day Motions* (the "**Matera Declaration**" and, with the Informational Brief, collectively, the "**First Day Informational Pleadings**"), and respectfully represents as follows:

<u>JURISDICTION AND VENUE</u>

1.      The Court has jurisdiction to consider this Motion, pursuant to 28 U.S.C. §§ 157 and 1334 and *Standing Order 2012-05* from the United States District Court for District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 9013-6 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "**Local Bankruptcy Rules**"), the Debtor consents to the entry of a final judgment or order with respect to the Motion, if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>BACKGROUND</u>

3.      On the date of this Motion (the "**Petition Date**"), the Debtor commenced this Chapter 11 Case. The Debtor is operating its business and managing its property as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case, and no committees have been appointed or designated.

4.      A description of the Debtor's history, business operations, operational structure, the reasons for commencing the Chapter 11 Case, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Informational Pleadings.

## REQUEST FOR EMERGENCY CONSIDERATION

5.      Pursuant to Local Rule 9013-7 and Bankruptcy Rule 6003, the Debtor requests emergency consideration of this Motion. Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As discussed in detail below and in the First Day Informational Pleadings, any delay in granting the relief requested could hinder the Debtor's operations and cause immediate and irreparable harm. As such, the Debtor believes that emergency consideration is necessary and requests that this Motion be heard at the Debtor's first day hearing.

## THE DEBTOR'S EMPLOYEES

6.      As further set forth in the First Day Informational Pleadings, the Debtor is a nonprofit religious institution and the civil law instrumentality through which the mission of the Roman Catholic Church is administered within the Archdiocese of Baltimore. In addition to providing resources, spiritual leadership, direction and support to the parishes on spiritual matters, the Debtor provides financial and certain limited "back-office" support for Parishes, Schools and Related Entities operating within the Debtor's territorial jurisdiction, as more fully described in the First Day Informational Pleadings. The Debtor also holds and manages certain funds (including, but not limited to, funds held in trust) received via grant, gift, devise, or bequest to be used for Catholic religious, educational, or other charitable purposes.

7.      The Debtor currently employs approximately 197 employees, 25 of whom are seasonal, 14 of whom are part-time, hourly employees, 15 of whom are clergy, and 143 of whom are salaried full-time lay employees (collectively, the "***Employees***").

8.      The Parishes, Schools, and Related Entities (collectively, the "***Non-Debtor Employers***") collectively employ over Three Thousand Five Hundred (3,500) individuals (the "***Non-Debtor Employees***").

3

9.     UKG Inc. ("**UKG**" or the "**Payroll Processor**") processes payroll for both the Debtor's Employees as well as the Non-Debtor Employees; however, the payments for Non-Debtor Employees come only from Non-Debtor Employer deposit accounts.

10.     With respect to the Debtor's Employees, the Debtor causes UKG to disburse all payroll funds from a single account (the "**Payroll Account**") in the Debtor's name to each of the Employees.

11.     With respect to the Non-Debtor Employees, each Non-Debtor Employer causes UKG to disburse payroll funds from each Non-Debtor Employer's accounts.

12.     By utilizing a single payroll processor for the Debtor's and Non-Debtor Employers' payroll processing services, the Debtor is able to provide a streamlined payment system for all wages as well as administrative cost savings to the Debtor and Non-Debtor Employers; however, at no time are payroll funds disbursed from the Payroll Account to Non-Debtor Employees.

13.     In addition to utilizing a standardized payroll system, the Employees and Non-Debtor Employees are enrolled into consolidated benefit plans (as more fully described below) in order to take advantage of economies of scale.

14.     Like with the payroll processing, the Debtor funds all amounts due for Employee benefits from the Debtor's deposit accounts and the Non-Debtor Employers fund all amounts due for Non-Debtor Employees benefits from Non-Debtor Employer deposit accounts.

15.     The Employees perform a variety of critical functions for the Debtor, working in numerous ministries and other operations, providing ecclesiastical, managerial, financial, clerical, religious, and pastoral services to individuals and families living within the Debtor's territorial jurisdiction. The Employees' knowledge, skills, and understanding of the Debtor's ministries, mission, business operations, and relationships are essential to the success of the Debtor and this

Chapter 11 Case. Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to effectively implement the Debtor's chapter 11 strategy.

16.     Thus, to successfully accomplish the foregoing, minimize the personal hardship that the Employees—and ultimately, the beneficiaries of the services provided by such Employees—will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, the Debtor believes it is necessary and in the best interest of its estate and all stakeholders to seek the relief requested in this Motion.

## RELIEF REQUESTED

17.     By this Motion, the Debtor requests entry of the Proposed Orders, pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code: (a) authorizing, but not directing, the Debtor, in accordance with its ordinary business practices and in its sole discretion, to: (i) pay all prepetition employee wages, salaries and other accrued compensation; (ii) disburse prepetition Deductions and Payroll Taxes (each as defined below); (iii) make all contributions to prepetition benefit programs and continue such programs in the ordinary course of business; (iv) honor workers' compensation obligations; (v) make all payments for which prepetition payroll deductions were made; (vi) pay all processing costs and administrative expenses relating to the foregoing payments and contributions; and (vii) make all payments to third parties incident to the foregoing payments and contributions (collectively, and as described in greater detail below, the "**_Employee Wages and Benefits_**"); and (b) authorizing and directing applicable banks and other financial institutions to receive, process and honor all checks and electronic payment requests relating to the foregoing.

#228738268_v5

**I.      Prepetition Employee Wages, Housing Costs, and Payroll Taxes.**

      **A.      Wages, Salaries, and Other Compensation.**

18.     The Debtor's aggregate monthly compensation for the Employees, including wages and salaries, is approximately **$1,180,000**. Most of the Debtor's payroll payments are made by direct deposit through the electronic transfer of funds directly to the Employees, while the remaining payments are made via check. The Debtor's Employees are paid on a bi-weekly basis.

19.     On September 20, 2023, the Debtor issued payroll to the Employees for the pay period ending September 9, 2023. Since that date and prior to the Petition Date, the Employees have continued to provide services to the Debtor and are thus entitled to receive pre-petition wages and benefits payable during that interim period prior to the Petition Date. Additionally, compensation may be due and owing as of the Petition Date because:

      (a)     some discrepancies may exist between the amounts paid and the amounts Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and

      (b)     some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not yet been honored and paid as of the Petition Date.

20.     As of the Petition Date, the aggregate amount of accrued wages, salaries, overtime pay, commissions, and other compensation (excluding, without limitation, the amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)) earned prior to the Petition Date that remains unpaid to the Debtor's Employees is approximately **$814,657** (the "***Unpaid Compensation***"). By this Motion, the Debtor requests authority to pay all such Unpaid Compensation to the Employees in the ordinary course of business in an amount not to exceed **$825,000**. The Debtor submits that

no Employee is owed more than $15,150 for Unpaid Compensation or Employee Benefits (as defined below).[2]

### B.    Archbishop's Housing.

21.    In the ordinary course of its business and pursuant to its obligations under Canon Law, the Debtor maintains housing for Archbishop William E. Lori (the "***Archbishop***") as well as certain other clergy Employees.

22.    Specifically: (a) the Archbishop lives in the residential quarters of the Basilica of the National Shrine of the Assumption of the Blessed Virgin Mary (the "***Basilica Residence***");[3] (b) Bishop Adam J. Parker is provided with an annual housing allowance, which is adjusted each year, with the most recent annual housing allowances being $13,400 for fiscal year 2023 and $14,070 for fiscal year 2024 (which is ongoing); (c) Bishop Bruce A. Lewandowski and retired Bishop Denis J. Madden reside in what is known as the Sulpician House, for which the Debtor pays total annual rent of $28,800; and (d) the Debtor maintains sixteen (16) apartments at Mercy Ridge, a continuing-care retirement community in Timonium, Maryland, which the Debtor reserves as a housing option for retired priests.[4]

### C.    Prepetition Deductions and Withholdings

23.    During each applicable pay period, the Debtor routinely deducts certain amounts from the Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to

---

[2] To the extent that the Debtor discovers that an Employee does have a section 507(a)(4) claim for Unpaid Compensation that exceeds the $15,150 cap, the Debtor, by this Motion, only seeks authority to honor such claim up to the $15,150 statutory cap. However, the Debtor reserves the right to request authority to honor any such section 507(a)(4) claims that exceed the $15,150 cap after notice and a hearing.

[3] Because the Archbishop lives in the Basilica Residence, he does not receive a housing allowance, as do some other of the Debtor's clergy Employees. The Debtor does, however, pay for various expenses of the Basilica Residence.

[4] Priests who decide to reside in a Mercy Ridge apartment agree to pay a fixed amount determined by taking 80% of the cost of rent at the time of move-in. Though rent for the Mercy Ridge apartments generally increases over time, the Debtor pays for these rent increases such that retired priests living at Mercy Ridge pay a consistent amount of rent for the remainder of their lives or until they move into assisted living. When a priest enters assisted living, the priest pays for 50% of the cost until he no longer has any assets, at which point the Debtor pays for 100% of the cost for the remainder of the priest's life.

certain of the benefit plans discussed in this Motion (such as the employee portion of health care benefits and insurance premiums) and charitable contributions (collectively, the "***Deductions***") and forwards those amounts to various third-party recipients.

24.     For the pay period ending September 9, 2023, these Deductions were approximately **$63,432**.

25.     The Debtor believes that these Deductions were remitted to the various third party recipients prior to the Petition Date; however, in the event that such amounts have not been remitted, the Debtor seeks authority to continue to forward these prepetition Deductions, in an amount not to exceed **$65,000**, to the applicable third party recipients on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date.

26.     The Debtor also seeks authority to forward any Deductions that have accrued between September 9, 2023 and the Petition Date, to the applicable third party recipients in the ordinary course of business.

27.     Further, the Debtor is required by law to withhold from wages amounts related to, among other things, federal, state, and local income taxes, social security and Medicare taxes (collectively, the "***Withheld Amounts***") for remittance to the appropriate taxing authorities.

28.     The Debtor must then make matching payments from its own funds for social security and Medicare taxes relating to the Employees (the "***Employer Payroll Taxes***," and together with the Withheld Amounts, the "***Payroll Taxes***").

29.     The Debtor's Payroll Taxes for the pay period ending September 9, 2023 were approximately **$160,311**.

30.     The Debtor believes that these Payroll Taxes were remitted to the various taxing authorities before the Petition Date; however, in the event that such amounts were not remitted, the Debtor seeks authority to continue to forward these prepetition Payroll Taxes, in an amount

8

not to exceed **$165,000**, to the applicable taxing authorities on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date.

31.     Between September 9, 2023 and the Petition Date, the Debtor's Employees have continued to provide services to the Debtor and are thus entitled to receive prepetition wages upon which Payroll Taxes have been withheld.

32.     As of the Petition Date, the Debtor's accrued and outstanding prepetition obligations with respect to the Payroll Taxes on those wages are approximately **$240,466**, which represents approximately nineteen (19) days of accrued Payroll Taxes.

33.     The Debtor seeks authority, in its sole discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, including forwarding the Payroll Taxes to the appropriate taxing authorities, in the ordinary course of business.

**II.     Prepetition Employee Benefits.**

34.     In the ordinary course of business, eligible[5] Employees and Non-Debtor Employees are provided with a number of employee benefits, including, but not limited to (a) health, dental, and vision insurance, (b) paid time off, and (c) group long-term disability insurance, described in greater detail below (collectively, the "***Employee Benefits***").

    **A.     Group Health Insurance, Prescription Drug Insurance, and Employee Assistance Program.**

35.     Through the Archdiocese Health Benefits Program (the "***Health Benefits Program***"), Employees and Non-Debtor Employees are provided access to a health insurance program (the "***Health Insurance***"), prescription drug insurance (the "***Prescription Drug***

---

[5] Employees and Non-Debtor Employees who work twelve months a year are eligible if they work twenty (20) or more hours per week. Employees and Non-Debtor Employees who work ten months per year are eligible if they work twenty-five (25) or more hours per week.

*Insurance*"), and access to an employee assistance program (the "***Employee Assistance Program***").[6]

36.     By covering the Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and allocation of the Plan, Prescription Drug Insurance, and Employee Assistance Program.

37.     In addition, the Debtor believes that a health insurance plan, prescription drug plan, and employee assistance program for most of the Non-Debtor Employers alone would be prohibitively expensive (and possibly unavailable), due to the smaller number of employees that would be covered.

38.     The Debtor's portion of the contributions to the Health Benefits Program relating to Health Insurance, Prescription Drug Insurance, and Employee Assistance Program is funded in part by the Debtor and in part through Employee paycheck deductions.

39.     The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

40.     Similarly, the portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by each applicable Non-Debtor Employer from their payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

41.     Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Health Insurance, Prescription Drug Insurance, and the Employee

---

[6] The Health Benefits Program contracts with Cigna Healthcare to provide the Health Insurance, Prescription Drug Insurance, and Employee Assistance Program.

Assistance Program cover the cost of each for the Non-Debtor Employees, such that the Debtor's contributions are not funding benefits for Non-Debtor Employees.

42.     As of the Petition Date, the Debtor estimates that approximately **$23,747** has been withheld from Employees and Non-Debtor Employees but has yet to be remitted to the Health Benefits Program for Health Insurance, Prescription Drug Insurance, and the Employee Assistance Program.

43.     By this Motion, the Debtor seeks authority to (a) continue to provide the Health Insurance, Prescription Drug Insurance, and Employee Assistance Program for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions to such programs, (c) continue paying any claims and administrative fees related to the programs, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**B.     Health Savings Account Program.**

44.     Through the Health Benefits Program, the Debtor offers health savings accounts ("***HSAs***") for the benefit of Employees and Non-Debtor Employees.

45.     The HSA allows eligible[7] Employees and Non-Debtor Employees to contribute tax-deferred wages towards the future cost of healthcare expenses.

46.     For Employees who have elected to make contributions to an HSA, the Debtor deducts appropriate amounts from each payroll and remits those amounts to the applicable participating Employee's HSA account on their behalf.

47.     For Non-Debtor Employees who have elected to make contributions to an HSA, the applicable Non-Debtor Employer deducts appropriate amounts from each payroll and remits

---

[7] Only those Employees and Non-Debtor Employees enrolled in the so-called High Deductible Health Plan offered under the Health Benefits Program are eligible to participate in the HSA.

#228738268_v5

those amounts to the applicable participating Non-Debtor Employee's HSA account on their behalf.

48.     These individual accounts are owned by the Employees and Non-Debtor Employees, as applicable, and are funded in accordance with the Health Benefits Program.

49.     As of the Petition Date, the Debtor estimates that approximately **$1,195** has been withheld from Employees but is yet to be remitted to the applicable HSAs.

50.     By this Motion, the Debtor seeks authority to (a) continue to provide the HSA program for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions on behalf of the participating Employees and Non-Debtor Employees in the ordinary course of business, (c) continue to pay any claims and administrative fees related to the HSA program, (d) remit all Employee and Non-Debtor Employee funds to their applicable HSA, to the extent they remain unpaid on the Petition Date, and (e) pay any and all claims and administrative fees relating to the HSA program, to the extent that they remain unpaid on the Petition Date.

**C.     Dental Insurance.**

51.     Through the Health Benefits Program, Employees and Non-Debtor Employees are provided access to dental insurance (the "***Dental Insurance***"),[8] providing coverage for preventative and basic dental services.

52.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Dental Insurance program.

---

[8] The Health Benefits Program contracts with Cigna Healthcare and United Concordia Dental to provide Dental Insurance options to Employees and Non-Debtor Employees.

53.     The Debtor believes that a dental insurance plan for most of Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

54.     The Debtor's portion of the contributions to the Health Benefits Program relating to Dental Insurance is funded in part by the Debtor and in part through Employee paycheck deductions.

55.     The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

56.     The portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by the Non-Debtor Employers from each participating Non-Debtor Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

57.     Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Dental Insurance cover the cost of Dental Insurance for the Non-Debtor Employees, such that the Debtor's contributions are not funding Dental Insurance benefits for Non-Debtor Employees.

58.     As of the Petition Date, the Debtor estimates that approximately **$2,676** has been withheld from Employees but has yet to be remitted to the Health Benefits Program for Dental Insurance.

59.     By this Motion, the Debtor seeks authority to (a) continue to provide the Dental Insurance for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions relating to the Dental Insurance, (c) continue paying any

claims and administrative fees related to the Dental Insurance, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

### D.     Vision Insurance.

60.     Through the Health Benefits Program, the Debtor provides Employees and Non-Debtor Employees vision insurance (the "***Vision Insurance***"),[9] providing coverage for examinations, frames, lenses, and contact lenses.

61.     Generally, Employees and Non-Debtor Employees who are enrolled in a Cigna Health Insurance Plan through the Health Benefits Program are automatically enrolled in the Vision Insurance; however, Employees and Non-Debtor Employees may also elect to obtain the Vision Insurance as a stand-alone option.

62.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Vision Insurance program.

63.     The Debtor believes that a dental insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

64.     The Debtor's portion of the contributions to the Health Benefits Program relating to Vision Insurance is funded in part by the Debtor and in part through Employee paycheck deductions.

65.     The portion of the Debtor's contributions paid by Employees is deducted by the Debtor from each participating Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Employee.

---

[9] The Health Benefits Program contracts with Cigna Healthcare to provide Vision Insurance to Employees and Non-Debtor Employees.

#228738268_v5

66.     The portion of the Non-Debtor Employers' contributions paid by Non-Debtor Employees is deducted by the Non-Debtor Employers from each participating Non-Debtor Employee's payroll and remitted to the Health Benefits Program on behalf of the applicable participating Non-Debtor Employee.

67.     Contributions by the Non-Debtor Employers and Non-Debtor Employees to the Health Benefits Program for Vision Insurance cover the cost of Vision Insurance for the Non-Debtor Employees, such that the Debtor's contributions are not funding Vision Insurance benefits for Non-Debtor Employees.

68.     As of the Petition Date, the Debtor estimates that approximately **$824** has been withheld from Employees but has yet to be remitted to the Health Benefits Program for Vision Insurance.

69.     By this Motion, the Debtor seeks authority to (a) continue to provide the Vision Insurance for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions relating to the Vision Insurance, (c) continue paying any claims and administrative fees related to the Vision Insurance, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**E.      Life Insurance.**

70.     Through the Health Benefits Program, Employees and Non-Debtor Employees are provided with basic, employer paid life insurance (the "***Basic Life Insurance***") and voluntary, employee-paid life insurance (the "***Voluntary Life Insurance***" and together with the Basic Life Insurance, the "***Life Insurance Programs***").[10]

---

[10] The Health Benefits Program provides the Life Insurance Programs by contracting with New York Life Insurance Company.

71.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Life Insurance Programs.

72.     The Debtor believes that a life insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

73.     The Debtor's portion of the contributions to the Health Benefits Program relating to Basic Life Insurance is funded by the Debtor, and the Non-Debtor Employer's portion of the contributions to the Health Benefits Program relating to the Basic Life Insurance is funded by the Non-Debtor Employers.

74.     For the fiscal year ending in 2024, the Debtor estimates the total expense for Basic Life Insurance will be **$869,231**.

75.     Contributions to the Health Benefits Program for Voluntary Life Insurance is funded through Employee and Non-Debtor Employee paycheck deductions from each participating Employee's and Non-Debtor Employee's payroll, which deductions are remitted to the Health Benefits Program on behalf of the appliable participating Employee or Non-Debtor Employee.

76.     Contributions by the Non-Debtor Employees to the Health Benefits Program for Voluntary Life Insurance cover the cost of Voluntary Life Insurance for the Non-Debtor Employees, such that Employees' contributions are not funding Voluntary Life Insurance benefits for Non-Debtor Employees.

77.     As of the Petition Date, the Debtor estimates that approximately **$1,527** has been withheld from Employees and Non-Debtor Employees but has yet to be remitted to the Health Benefits Program for Voluntary Life Insurance.

78.    By this Motion, the Debtor seeks authority to (a) continue to provide the Life Insurance Programs for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions relating to the Life Insurance Programs, (c) continue paying any claims and administrative fees related to the Life Insurance Programs, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**F.    Long-Term Disability and Accident Insurance.**

79.    Through the Health Benefits Program, Employees and Non-Debtor Employees are provided short term and long term disability insurance (together, the "***Disability Insurance***"),[11] which is designed to replace an Employee's or Non-Debtor Employee's take-home pay in the event that a disability prevents such Employee or Non-Debtor Employee from earning a salary for an extended period of time.

80.    Generally, eligible Employees and Non-Debtor Employees are automatically enrolled in the Disability Insurance program at no cost to the employee, with the Debtor making contributions sufficient for the Disability Insurance applicable to Employees and Non-Debtor Employers making contributions sufficient for the Disability Insurance applicable to Non-Debtor Employees.

81.    By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation with the Disability Insurance.

82.    The Debtor believes that a short-term and long-term disability insurance plan for most of the Non-Debtor Employers alone would be prohibitively expensive and possibly unavailable due to the small number of employees that would be covered.

---

[11] The Health Benefits Program provides the Disability Insurance through New York Life.

#228738268_v5

83.     As of the Petition Date, the Debtor does not believe it owed any amounts for the payment of Disability Insurance benefits for Employees.

84.     By this Motion, the Debtor seeks authority to (a) continue to provide the Disability Insurance for the Employees and Non-Debtor Employees, in the ordinary course of business, (b) continue making all contributions relating to the Disability Insurance, (c) continue to pay administrative fees related Disability Insurance, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**G.      403(b) Retirement Savings Plans**

85.     The Debtor offers a 403(b) Retirement Savings Plan (the "***403(b) Plan***") for the benefit of Employees and Non-Debtor Employees, which is administered by T. Rowe Price Group, Inc. ("***T. Rowe Price***").

86.     Pursuant to the 403(b) Plan, both benefit eligible and non-benefit eligible Employees and Non-Debtor Employees can make pre-tax employee contributions to the 403(b) Plan as soon as they are hired, either on a flat dollar or percentage basis.

87.     In addition, the Debtor and Non-Debtor Employers make on a quarterly basis an employer contribution in an amount equal to four percent of an eligible[12] Employee's or Non-Debtor Employee' annual wages.

88.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor benefits from administrative cost savings.

89.     With respect to the Employee contributions to the 403(b) Plan, the Debtor deducts the Employee contributions from each participating Employee's payroll and remits the contributions to T. Rowe Price on behalf of each applicable participating Employee.

---

[12] Employees and Non-Debtor Employees become eligible for the 403(b) Plan upon the first July 1st or January 1st following their date of hire or change to benefit eligible status. Employees and Non-Debtor Employees must also be twenty-one years of age or older to be eligible.

18

90.     With respect to the Non-Debtor Employee contributions to the 403(b) Plan, the applicable Non-Debtor Employer deducts their Non-Debtor Employee contributions from each participating Non-Debtor Employee's payroll and remits the contributions to T. Rowe Price on behalf of each applicable participating Non-Debtor Employee.

91.     As of the Petition Date, the Debtor estimates that approximately **$59,856** has been withheld from Employees but is yet to be remitted to T. Rowe Price.

92.     By this Motion, the Debtor seeks authority to (a) continue to provide the 403(b) Plan for Employees and Non-Debtor Employees in the ordinary course of business, (b) continue making all contributions to the 403(b) Plan, (c) continue to pay any claims and administrative fees related to the 403(b) Plan, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**H.     Leave Pay.**

93.     The Employees are provided with paid time off ("***PTO***" or "***Leave Pay***"), including holidays, vacation, sick leave, personal leave, court duty, bereavement, military leave, and office closure.

94.     Employees are provided with approximately thirteen (13) paid holidays each year.

95.     The Debtor's vacation pay policy is based upon length of service and hours worked. To be eligible for the Debtor's vacation pay, an Employee must be scheduled to work 20 or more hours per week, 12 months per year, and must be a full-time employee. While annual leave begins to accrue upon with an Employee's first full pay period, vacation pay may not be utilized during an Employee's first three (3) months of employment.  Unused vacation time may be carried over from year to year up to a maximum of two weeks for full-time Employees. In most instances, an Employee is entitled to receive compensation for unused vacation days upon termination.

96.     The Debtor also provides sick leave for Employees who are eligible for vacation pay, with eligible Employees accruing sick leave at the rate of one (1) day per month. Sick leave beings to accrue wit the first day of employment and may be taken as soon as leave is accrued. Sick leave may be carried over from year to year, but an eligible Employee may not accrue more than sixty (60) days of sick leave. Unused sick days are not paid out upon an Employee's resignation or termination.

97.     Employees eligible for vacation pay are also provided two personal leave days per calendar year. Personal leave does not carry over from year to year and is not compensable at the time of termination.

98.     In addition to the foregoing, the Debtor provides Employees with family and medical leave, bereavement leave, jury duty leave, and military leave.

99.     The cost to the Debtor for all of the foregoing the Leave Pay is included in gross payroll. Accordingly, and with the exception of amounts owing in connection with accrued but unused vacation and accrued but unused sick leave, all prepetition amounts related to the Leave Pay should be included in the aggregate amount of Unpaid Compensation.

100.    By this Motion, the Debtor requests authority to continue to honor its Leave Pay policies in the ordinary course of business, and to honor and pay, in its sole discretion, any and all prepetition amounts related thereto subject to the statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.

III.    **Worker's Compensation Program.**

101.    Through the General Insurance Program, the Debtor maintains a self-insured workers' compensation program as well as excess coverage through Safety National Casualty Corporation (the "***Workers' Compensation Program***") for the Debtor and Non-Debtor Employers.

102.     By maintaining the Workers' Compensation Program as a single program for the Debtor and Non-Debtor Employers, the Debtor benefits from significant cost savings as a result of the pooled risk and the allocation of plan overhead. Indeed, obtaining workers' compensation insurance for the Debtor or any one of the Non-Debtor Employers alone would be more expensive due to the small number of employees that would be covered.

103.     Over the past twenty-five years, the Debtor's average claims under the Workers' Compensation Program are approximately **$25,000** per year.

104.     By this Motion, the Debtor seeks authority, to be exercised in its sole discretion, to continue to maintain its Workers' Compensation Program in the ordinary course of business and to pay any and all prepetition amounts related to the Workers' Compensation Program, including, without limitation, any payments for workers' compensation claims, deductibles and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtor's business.

**IV.     Request for Authority for Banks to Honor or Reissue Checks.**

105.     The Debtor also requests that the Court authorize the Debtor's banks and financial institutions (the "***Banks***"), when requested by the Debtor in the Debtor's sole discretion, to process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtor's bank accounts to pay all prepetition obligations described in this Motion, whether such checks or other requests were submitted prior to or after the Petition Date.

106.     A listing of the Debtor's relevant or otherwise applicable accounts is attached to the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Extending the Time to Comply with, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the*

#228738268_v5

*Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; and (V) Granting Related Relief* filed contemporaneously with this Motion.

107.   Accordingly, by this Motion, the Debtor seeks (a) authorization for, and/or ratification of, its Banks' honoring of prepetition payroll and employee benefit checks and transfers on or after the Petition Date, (b) authorization for its Banks to process and honor all other checks issued for payments approved by this Motion, and (c) authorization for the Debtor to reissue checks for payments approved by this Motion where the applicable check is dishonored postpetition.

**BASIS FOR REQUESTED RELIEF**

**I.      Payment of the prepetition wages and benefits is necessary appropriate under the Bankruptcy Code.**

108.   Courts generally acknowledge that it is appropriate to authorize the payment or other special treatment of prepetition obligations in appropriate circumstances, such as when necessary to preserve the going concern value of a debtor's business, thus facilitating its reorganization. *See, e.g., In re Lehigh & New England Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (noting that the "'necessity of payment' doctrine . . . permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid") (citations and internal quotations omitted); *In re Chateaugay Corp.,* 80 B.R. 279, 285–87 (S.D.N.Y. 1987) (finding that a court's equitable powers include the authority to authorize a debtor to pay prepetition debts).

109.   In authorizing payments of certain prepetition obligations, courts rely on several legal theories rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts have routinely approved orders that allow payment of prepetition debt, which is necessary for the debtors to

22

reorganize and restructure their debts and maximize the value of the bankruptcy estate); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (finding that a debtor is entitled to pay certain prepetition creditors upon a showing that the payment is "essential to the continued operation of the business.") (citations omitted); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

110.    The Debtor believes that payment of the Employee Wages and Benefits described in this Motion is critical to the ongoing operation of the Debtor's business. If the Employee Wages and Benefits are not paid, the Debtor will risk tangible and intangible loss of the value of the Debtor's business, including, among other things, losses relating to the cost of replacing Employees who seek alternative employment and losses related to the disruption of, and lower productivity in, the Debtor's business operations resulting from low employee morale and high turnover.

### A.    A Significant Portion of the Employee Wages and Benefits are Entitled to Priority Treatment.

111.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle all of the unpaid Employee Wages and Benefits to priority treatment. To confirm a chapter 11 plan, the Debtor must pay priority claims in full. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, commissions, including vacation, severance and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the vast majority of the relief sought in this Motion only affects the timing of payments to Employees, and does not negatively impact recoveries for general unsecured creditors. Indeed,

the Debtor submits that payment of Employee Wages and Benefits at this time enhances value for the benefit of the creditors and all interested parties.

112.    Amounts that are paid on account of priority claims for Employee Wages and Benefits would not otherwise be available for distribution to unsecured creditors. Therefore, no prejudice would be caused to the Debtor's unsecured creditors by permitting priority obligations to be satisfied in the ordinary course of business during the Chapter 11 Case rather than at the conclusion of the case pursuant to a plan of reorganization.

### B.    Payment of Certain Employee Wages and Benefits is Required by Law.

113.    The Debtor also seeks authority to pay the Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent the Employees' earnings that governments, the Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain deductions and withheld taxes are not property of the Debtor's estate, because the Debtor has withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541; *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *Wolff v. United States (In re FirstPay, Inc.)*, 773 F.3d 583, 590 (4th Cir. 2014) (holding that a debtor lacked an equitable interest in tax funds held in trust for other parties and that these funds were thus not property of the estate); *see generally In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1060 (3d Cir. 1993) (indicating that even if a statute does not establish an express trust, a constructive trust may be found). Because the Deductions and Payroll Taxes are not property of the Debtor's estate, the Debtor requests that the Court authorize the Debtor to transmit these amounts to the appropriate parties in the ordinary course of business.

C.    **The Court May Authorize Payment of the Employee Wages and Benefits Pursuant to Section 363 of the Bankruptcy Code.**

114.    The Court may grant the relief requested in this Motion pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code). In addition, section 363(c) allows a debtor in possession to enter into transactions involving property of the estate in the ordinary course of business without an order of the court. *See, e.g., Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* 29 B.R. 391, 395 n.2 (S.D.N.Y. 1983) ("Insofar as transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval.").

115.    The majority of the Debtor's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses and maintain their health and well-being. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid Employee Wages and Benefits. Moreover, if the Debtor is unable to satisfy such obligations, Employee morale and loyalty would be jeopardized at a time when Employee support is critical. Furthermore, if the Court does not authorize the Debtor to honor the various Employee Benefit obligations, the Employees' health coverage could be threatened, potentially burdening individual Employees with the costs of health care. At minimum, the loss of health care coverage, or uncertainty regarding coverage, would result in considerable anxiety for Employees at a time when the Debtor needs Employees to perform their jobs at peak efficiency.

#228738268_v5

116.    For all of the foregoing reasons, a sound business purpose exists to pay the Employee Wages and Benefits. In the absence of such payments, the Debtor believes that Employees may seek alternative employment opportunities. Such a development would deplete the Debtor's workforce, hinder the Debtor's ability to meet obligations, and likely diminish creditors' confidence in the Debtor. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtor should be focusing on successfully navigating this Chapter 11 Case. Accordingly, the Debtor must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor all wages, benefits, and related obligations, including those that accrued prior to the Petition Date.

117.    In addition, because the Debtor pays the Employee Wages and Benefits in the ordinary course of business, the Debtor submits that Court approval to continue existing policies, programs, and related payments postpetition is not necessary, because of the authority granted by section 363(c) of the Bankruptcy Code. Nonetheless, in an abundance of caution, the Debtor requests that the Court grant the relief requested in this Motion and enter an order authorizing payment of the Employee Wages and Benefits, as consistent with the Debtor's compensation and other benefit policies and plans, and to permit, but not require, the Debtor, in its discretion, to continue the Debtor's practices, programs, policies, and plans for Employees as those practices, programs, policies, and plans were in effect as of the Petition Date, as may be modified, terminated, amended, or supplemented from time to time hereafter.

**D.     The Court May Authorize Payment of the Employee Wages and Benefits Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity.**

118.    The Debtor's proposed payment of the Employee Wages and Benefits should also be authorized, pursuant to section 105(a) of the Bankruptcy Code and the "doctrine of necessity."

#228738268_v5

119.    Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court may use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs,* 98 B.R. at 175. "Under [section] 105 the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs,* 98 B.R. at 177); *accord In re Just for Feet, Inc.,* 242 B.R. 821, 826 (D. Del. 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is 'critical to the debtor's reorganization.'" (quoting *In re Fin. News Network, Inc.*, 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991))); *see also In re Eagle-Picher Indus., Inc.,* 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process."); *In re Chateaugay Corp.,* 80 B.R. at 279 (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

120.    The "doctrine of necessity" or the "necessity of payment" doctrine functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested in this Motion. *See In re Lehigh & New England Ry. Co., 657* at 581 (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of debtor); *In re Just for Feet,* 242 B.R. at 824 ("[C]ourts have used their equitable power under section 105(a) of the Code to authorize the payment of prepetition claims

when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization."). The doctrine is frequently invoked early in a chapter 11 case.

121.    Taken together, the nature of the Employee Wages and Benefits, the substantial harm to the Debtor's operations that would be caused if those obligations were not honored, the related potential for loss of value in the Debtor's estate, and the fact that a significant portion of the obligations in question relates either to priority wage claims or to funds held in trust for the benefit of Employees, lead to the Debtor's conclusion that the Employee Wages and Benefits fall well within the scope of obligations whose payments may be authorized pursuant to the doctrine of necessity.

**II.    The Court should authorize the Debtor's banks to honor and pay checks and make other transfers to pay the employee wages and benefits.**

122.    In connection with the relief requested in this Motion, the Debtor requests that the Court authorize: (a) the Banks to receive, process, honor, and pay all checks and transfers issued by the Debtor in connection with payment of the claims the Debtor requests authority to pay in this Motion, without regard to whether any check or transfer was issued before or after the Petition Date; (b) the Banks to rely on the representations of the Debtor with respect to whether any check or transfer issued or made by the Debtor before the Petition Date should be honored pursuant to this Motion, and that the its Banks shall not have any liability to any party for relying on such representations by the Debtor; and (c) the Debtor to issue replacement checks or transfers, to the extent any check or transfer in relation to the claims the Debtor requests authority to pay in this Motion is dishonored or rejected by the Banks.

### REQUESTED RELIEF SATISFIED BANKRUPTCY RULE 6003

123.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation

regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003(b).

124.    The Debtor submits that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth in this Motion, Bankruptcy Rule 6003 has been satisfied and the relief requested in this Motion should be granted.

125.    Courts have routinely approved the payment of prepetition claims of employee wages, salaries, expenses, and benefits in various chapter 11 cases. *See, e.g., In re the Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn. 2015) [Dkt. No. 47] (order authorizing the debtors to pay prepetition wages and compensation and to maintain and continue benefits in the ordinary course); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (Bankr. D. Del. 2009) [Dkt. No. 4] (same); *see generally, In re Advanced Elecs., Inc.,* 107 B.R. 503 (Bankr. M.D. Pa. 1989) (authorizing the payment of wages for employees operating in the ordinary course of business).

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

126.    To implement the foregoing immediately, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a). Furthermore, to implement the foregoing immediately, the Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the immediate payment of any amounts owing to or on account of Employees is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

127.    Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. If this Court grants the relief requested in this Motion, any Court-authorized payment is not an admission of the validity of any claim or a waiver of the Debtor's or any other party's rights to subsequently dispute such claim. In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtor to pay such claims.

## REQUEST FOR WAIVER OF MEMORANDUM OF LAW

128.    Pursuant to Local Bankruptcy Rule 9013-2, and because there are no novel issues of law presented in the motion and all applicable authority is set forth in this Motion, the Debtor respectfully requests that the Court waive the requirement that a motion be accompanied by a separate written memorandum of fact and law.

## NOTICE

129.    The Debtor has provided notice of the filing of the Motion to: (a) the Debtor's secured creditors; (b) the Debtor's 20 largest unsecured creditors; (c) those persons filing a notice of appearance and request for service as of the filing of this Motion; (d) the Office of the United States Trustee for the District of Maryland; (e) the Debtor's cash management banks; and (f) all required governmental agencies. Notice of this Motion and any order entered in connection with this Motion will be served on all parties required by Local Rule 9013-1. Due to the urgency of the circumstances surrounding this Motion and the nature of relief sought in it, the Debtor respectfully submits that no further notice of this Motion is required.

WHEREFORE, the Debtor respectfully requests entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested in this Motion and such other and further relief as the Court may deem just and proper.

Dated: September 29, 2023

Respectfully submitted,


_____/s/ Catherine K. Hopkin_____
Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:     443.569.0788
Facsimile:     410.571.2798
Email: chopkin@yvslaw.com

*-and-*

Blake D. Roth (*pro hac vice* pending)
Tyler N. Layne (*pro hac vice* pending)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:     615.244.6380
Facsimile:     615.244.6804
Email: blake.roth@hklaw.com
             tyler.layne@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:     202.457.7043
Email: philip.evans@hklaw.com

*Proposed Attorneys for the Debtor and Debtor In Possession*

## CERTIFICATE OF SERVICE

Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

/s/ Catherine K. Hopkin
Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:    443.569.0788
Facsimile:    410.571.2798
Email: chopkin@yvslaw.com

*Proposed Attorneys for the Debtor and Debtor
In Possession*

#228738268_v5