# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | Case No. [_____] |
| Debtor.[1] | |

## NOTICE:

> MOVANT HAS ALSO FILED A MOTION TO SHORTEN THE TIME FOR RESPONSE AND/OR FOR AN EXPEDITED HEARING. IF THAT MOTION TO SHORTEN OR EXPEDITE IS GRANTED, THE TIME TO OBJECT AND/OR DATE FOR HEARING WILL BE CHANGED AS PROVIDED IN SUCH ORDER.

## DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (I) CONTINUE ADMINISTRATION OF INSURANCE PROGRAMS, (II) CONTINUE PARTICIPATION IN INSURANCE PROGRAMS, AND (III) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE COVERAGE

The Roman Catholic Archbishop of Baltimore, the debtor and debtor in possession (the "***Debtor***") in the above-captioned chapter 11 case (the "***Chapter 11 Case***"), by and through its undersigned counsel, files this motion (this "***Motion***") pursuant to sections 105, 363, 1107(a), 1108 and 1112(b) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "***Interim Order***") and **Exhibit B** (the "***Final Order***," and together with the Interim Order, the "***Proposed Orders***"), authorizing the Debtor to (i) continue administration of the Insurance Programs (as defined below), (ii) continue the Debtor's participation in the Insurance Programs (as defined below), and

---

[1] The last four digits of the Debtor's federal tax identification number are: 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

(iii) renew, amend, supplement, extend, or purchase insurance coverage. In support of the Motion, the Debtor relies on and incorporates by reference the *Informational Brief of the Roman Catholic Archbishop of Baltimore* (the "***Informational Brief***")[2] and the *Declaration of John Matera in Support of First Day Motions* (the "***Matera Declaration***" and, with the Informational Brief, collectively, the "***First Day Informational Pleadings***"), and respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion, pursuant to 28 U.S.C. §§ 157 and 1334, and the *Standing Order 2012-05* from the United States District Court for the District of Maryland. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b), and the Debtor consents to the entry of a final judgment or order with respect to this Motion, if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      On the date of this Motion (the "***Petition Date***"), the Debtor commenced the Chapter 11 Case. The Debtor is operating its business and managing its property as a debtor-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case, and no committees have been appointed or designated.

4.      A description of the Debtor's history, business operations, operational structure, the reasons for commencing the Chapter 11 Case, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Informational Pleadings.

---

[2] Capitalized terms used in this Motion and not otherwise defined have the meanings ascribed to them in the Informational Brief.

## REQUEST FOR EMERGENCY CONSIDERATION

5.     Pursuant to Local Rule 9013-7 and Bankruptcy Rule 6003, the Debtor requests emergency consideration of this Motion. Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As discussed in detail below and in the First Day Informational Pleadings, any delay in granting the relief requested could hinder the Debtor's operations and cause immediate and irreparable harm. As such, the Debtor believes that emergency consideration is necessary and requests that this Motion be heard at the Debtor's first day hearing.

## RELIEF REQUESTED

6.     By this Motion, the Debtor requests entry of the Proposed Orders, pursuant to sections 105, 363, and 1112(b) of the Bankruptcy Code, authorizing, but not directing, the Debtor, in the ordinary course of business, to (i) continue administration of the Insurance Programs (as defined below), (ii) continue the Debtor's participation in the Insurance Programs (as defined below), and (iii) renew, amend, supplement, extend, or purchase insurance coverage.

## THE DEBTOR'S ADMINISTRATION OF THE INSURANCE PROGRAMS

7.     In the ordinary course of business, the Debtor maintains and operates a centralized insurance program, which provides, among other things, the Archdiocesan General Insurance Program (the "*General Insurance Program*"), Archdiocesan Sexual Misconduct Self-Insurance Program (the "*Self-Insurance Program*"), and Archdiocesan Health Benefits Program (the "*Health Benefits Program*" and collectively with the General Insurance Program and Self-Insurance Program, the "*Insurance Programs*").

8.   Through the Insurance Programs, the Debtor provides insurance coverage for itself, Parishes, Schools, and Related Entities, through a combination of self-insurance programs and the purchase of third party insurance.

9.    Attached to this motion as **<u>Exhibit C</u>** is a schedule depicting the coverage layers and sources of coverage comprising the Insurance Programs.

**I.    The General Insurance Program.**

10.    The General Insurance Program is that part of the Debtor's overall centralized insurance program, which is administered by the Debtor and arranges for or provides high quality risk protection and risk management services for the Debtor, Parishes, Schools, and Related Entities (but excludes the Self-Insurance Program and Health Benefits Program).

11.    The General Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintain a program of risk protection; (b) obtaining contracts of insurance to provide risk protection as documents in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured bases, as documents in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; and (e) operating and funding the risk protection and risk management initiatives offered under the General Insurance Program.

12.    Annually each year, the General Insurance Program establishes contributions to be made by those covered by the General Insurance Program that are sufficient to fund: (a) retained losses; (b) insurance and reinsurance premiums; (c) general operating expenses, including risk management programs and service fees; (d) contributions to net worth; and (e) any amounts dedicated to debt service.

13.    All funds of the General Insurance Program are to be held in one or more trusts expressly created to support the General Insurance Program, except as otherwise authorized in writing.

14.    To that end, with respect to the General Insurance Program, all long-term funds or other assets are held in the Archdiocesan General Insurance Program Trust (the "***General***

*Insurance Trust*"), which consists of property transferred by the Archbishop, contributions, if any, paid by or on behalf of those covered by the General Insurance Program, interest income and investment gains, and any other contributions or payments to the General Insurance Program.

15.    Any and all disbursements from the General Insurance Trust are to be used exclusively for the payment of: (a) benefits, premiums, claims, administration charges, and other liabilities as may be described in a written agreement pursuant to the terms of the General Insurance Program, including any memoranda of coverage or insurance contracts; (b) administrative expenses of the Archdiocesan General Insurance Program Trust or of the Debtor with respect to the General Insurance Program; (c) employer contributions with respect to the General Insurance Program; and (d) other losses, claims, or expenses in connection with the General Insurance Program, including legal fees, counseling fees, third party administrator fees, and other risk management expenses.

16.    The General Insurance Trust additionally provides:

> Neither the income of the [General Insurance Trust] nor the [General Insurance Trust] itself shall be liable for the debts of the Grantor or any covered person described in the [General Insurance Program], nor shall the same be subject to seizure by a creditor of the Grantor or any covered person described in the [General Insurance Program] under any writ of proceedings at law or in equity, nor shall any direct action be brought against the [General Insurance Trust] on account of any cause of action against the Grantor or any covered person described in the [General Insurance Program], and the Grantor and any covered person described in the [General Insurance Program] shall not have the power to sell, assign, transfer, borrow, encumber, hypothecate, or in any other manner anticipate or dispose of its interest in the same.

(General Insurance Trust, § 3.8.)

17.    To provide for the administration of the General Insurance Program and General Insurance Trust, each has entered into an Administrative Services Agreement (the "*General*

*Insurance Services Agreement*") with the Debtor, pursuant to which the Debtor provides certain services to the General Insurance Program and General Insurance Trust.

18.     Specifically, the General Insurance Services Agreement provides that:

(a)     all funds relating to the General Insurance Program are acknowledged to be assets of the General Insurance Trust and are to be held in a trust account titled in the name of the General Insurance Trust;

(b)     the Debtor is authorized to collect on behalf of the General Insurance Program and General Insurance Trust funds relating to the General Insurance Program (such funds, the "*General Insurance Trust Funds*");

(c)     the Debtor is authorized to use the General Insurance Trust Funds for the purposes permitted by the General Insurance Trust; and

(d)     the General Insurance Trust may deposit with the Debtor in an escrow account funds to be used by the Debtor solely for the purposes of paying expenses of the General Insurance Program or General Insurance Trust.

19.     Pursuant to and in accordance with the foregoing, (a) all General Insurance Trust Funds in the possession of the Debtor are accounted for in the name of the General Insurance Program separately from the Debtor's general operating funds; (b) the Debtor's Office of Risk Management administers the General Insurance Program on a daily basis; (c) the Debtor utilizes the General Insurance Trust Funds in its possession to satisfy the obligation of the General Insurance Program; and (d) at regular intervals, excess General Insurance Trust Funds in the Debtor's possession are remitted to the General Insurance Trust.

20.     To the extent General Insurance Trust Funds in the Debtor's possession are inadequate to meet the obligations of the General Insurance Program, the Debtor requests

additional funding from the General Insurance Trust, such that the Debtor's assets are not utilized to satisfy obligations of the General Insurance Program or General Insurance Trust.

## II.    The Self-Insurance Program.

21.    The Self-Insurance Program is part of the Debtor's centralized insurance program, which is operated by the Debtor to voluntarily self-insure certain uninsured claims exposure in an effort to provide a source of funds to claimants under the conditions and within the limits described in the Self-Insurance Program documents and, if appropriate, obtain insurance to cover risks associated with sexual misconduct (but excludes the General Insurance Program and Health Benefits Program).

22.    The Self-Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of risk protection that provides a documented level of protection in connection with claims relating to sexual misconduct; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; (e) provide risk protection, risk management, and related services and funds, which may include criminal background screening, counseling assistance and pastoral outreach to victims of sexual misconduct, providing investigative services in connection with allegations of sexual misconduct, or funding sexual misconduct prevention efforts; and (f) operating and funding the risk protection and risk management initiatives offered under the Self-Insurance Program.

23.    Annually each year, the Self-Insurance Program establishes contributions to be made by those covered by the Self-Insurance Program that are sufficient to fund: (a) retained losses; (b) insurance and reinsurance premiums; (c) general operating expenses, including risk

management programs and service fees; (d) contributions to net worth; and (e) any amounts dedicated to debt service.

24.     All funds of the Self-Insurance Program are to be held in one or more trusts expressly created to support the Self-Insurance Program, unless otherwise authorized in writing.

25.     To that end, with respect to the Self-Insurance Program, all funds are held in the Archdiocesan Sexual Misconduct Self-Insurance Program Trust (the "***Self-Insurance Trust***"), which consists of property transferred by the Archbishop, contributions, if any, paid by or on behalf of those covered by the Self-Insurance Program, interest income and investment gains, and any other contributions or payments to the Self-Insurance Program.

26.     Any and all distributions from the Self-Insurance Trust shall be used exclusively for the payment of: (a) benefits, premiums, claims, administration charges, and other liabilities as may be described in a written agreement pursuant to the terms of the Self-Insurance Program, including any memoranda of coverage or insurance contracts; (b) administrative expenses of the Self-Insurance Trust or Debtor with respect to the Self-Insurance Program; (c) employer contributions with respect to the Self-Insurance Program; and (d) other losses, claims, or expenses in connection with the Self-Insurance Program, including legal fees, counseling fees, third party administrator fees, and other risk management expenses.

27.     The Self-Insurance Trust additionally provides:

> Neither the income of the [Self-Insurance Trust] nor the [Self-Insurance Trust] itself shall be liable for the debts of the Grantor or any covered person described in the [Self-Insurance Program], nor shall the same be subject to seizure by a creditor of the Grantor or any covered person described in the [Self-Insurance Program] under any writ of proceedings at law or in equity, nor shall any direct action be brought against the [Self-Insurance Trust] on account of any cause of action against the Grantor or any covered person described in the [Self-Insurance Program], and the Grantor and any covered person described in the [Self-Insurance Program] shall not

have the power to sell, assign, transfer, borrow, encumber, hypothecate, or in any other manner anticipate or dispose of its interest in the same.

(Self-Insurance Trust, § 3.8.)

28.    To provide for the administration of the Self-Insurance Program and Self- Insurance Trust, each has entered into an Administrative Services Agreement (the "***Self-Insurance Services Agreement***") with the Debtor, pursuant to which the Debtor provides certain services to the Self-Insurance Program and Self-Insurance Trust.

29.    Specifically, the Self-Insurance Services Agreement provides that:

(a)    all funds relating to the Self-Insurance Program are acknowledged to be assets of the Self-Insurance Trust and are to be held in a trust account titled in the name of the Self-Insurance Trust;

(b)    the Debtor is authorized to collect on behalf of the Self-Insurance Program and Self-Insurance Trust funds relating to the Self-Insurance Program (such funds, the "***Self-Insurance Trust Funds***");

(c)    the Debtor is authorized to use the Self-Insurance Trust Funds for the purposes permitted by the Self-Insurance Trust; and

(d)    the Self-Insurance Trust may deposit with the Debtor in an escrow account funds to be used by the Debtor solely for the purposes of paying expenses of the Self-Insurance Program or Self-Insurance Trust.

30.    Pursuant to and in accordance with the foregoing, (a) all Self-Insurance Trust Funds in the possession of the Debtor are accounted for in the name of the Self-Insurance Program separately from the Debtor's general operating funds; (b) the Debtor's Office of Risk Management administers the Self-Insurance Program on a daily basis; (c) the Debtor utilizes the Self-Insurance Trust Funds in its possession to satisfy the obligation of the Self-Insurance Program; and (d) at

regular intervals, excess Self-Insurance Trust Funds in the Debtor's possession are remitted to the Self-Insurance Trust.

31.     To the extent Self-Insurance Trust Funds in the Debtor's possession are inadequate to meet the obligations of the Self-Insurance Program, the Debtor requests additional funding from the Self-Insurance Trust, such that the Debtor's assets are not utilized to satisfy obligations of the Self-Insurance Program or Self-Insurance Trust.

**III.     The Health Benefits Program.**

32.     The Health Benefits Program is part of the Debtor's centralized insurance program, which is operated by the Debtor to arrange and/or provide health benefits for the Debtor, Parishes, Schools, and Related Entities.

33.     The Health Benefits Program is a component plan, among other component plans, of the overall Archdiocese of Baltimore Health and Other Welfare Benefits Plan (the "***Comprehensive Plan***").[3]

34.     The Health Benefits Program is operated exclusively for the purposes of: (a) designing, implementing, and maintain a program of health benefits coverage that covers Participating Employers (as defined by the Health Benefits Program); (b) obtaining contracts of insurance, if desired, on behalf of Participating Employers to provide health benefits as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage to Participating Employers on a self-insured basis, as documented in plan documents; (d) obtaining

---

[3] The component parts of the Comprehensive Plan are described, and relief is requested with respect to the Comprehensive Plan, in the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Employee Benefits Programs; and (II) Granting Related Relief* filed contemporaneously with this Motion.

contracts of stop loss insurance to cover any or all risks provided under any plan documents; and (e) operating and funding the health benefits initiatives offered under the Health Benefits Program.

35.     Annually each year, the Health Benefits Program establishes contributions to be made by those covered by the Health Benefits Program that are sufficient to fund: (a) retained losses; (b) insurance and stop loss insurance premiums; (c) general operating expenses, including health benefits programs and service fees; (d) contributions to net worth; (e) any amounts dedicated to debt service; and (f) reserves for claims incurred but not yet paid.

36.     All funds of the Health Benefits Program are to be held in one or more trusts expressly created to support the Health Benefits Program, unless otherwise authorized in writing.

37.     To that end, with respect to the Health Benefits Program, all funds are held in the Archdiocesan Health Benefits Program Trust (the "***Health Benefits Trust***"), which consists of property transferred by the Archbishop, contributions, if any, paid by or on behalf of Participating Employers in the Health Benefits Program, interest income and investment gains, and any other contributions or payments to the Health Benefits Program.

38.     Any and all distributions from the Health Benefits Trust shall be used exclusively for the payment of: (a) benefits, premiums, claims, administration charges, and other liabilities as may be described in a written agreement pursuant to the terms of the Health Benefits Program, including any plan documents or insurance contracts; (b) administrative expenses of the Health Benefits Trust or Debtor with respect to the Health Benefits Program; and (c) other losses, claims, or expenses in connection with the Health Benefits Program, including legal fees, counseling fees, third party administrator fees, and other risk management expenses.

39.     The Health Benefits Trust additionally provides:

> Neither the income of the [Health Benefits Trust] nor the [Health Benefits Trust] itself shall be liable for the debts of the Grantor or

> any covered person described in the [Health Benefits Program], nor shall the same be subject to seizure by a creditor of the Grantor or any covered person described in the [Health Benefits Program] under any writ of proceedings at law or in equity, nor shall any direct action be brought against the [Health Benefits Trust] on account of any cause of action against the Grantor or any covered person described in the [Health Benefits Program], and the Grantor and any covered person described in the [Health Benefits Program] shall not have the power to sell, assign, transfer, borrow, encumber, hypothecate, or in any other manner anticipate or dispose of its interest in the same.

(Self-Insurance Trust, § 3.8.)

40.      To provide for the administration of the Health Benefits Program and Health Benefits Trust, each has entered into an Administrative Services Agreement (the "***Health Benefits Services Agreement***") with the Debtor, pursuant to which the Debtor provides certain services to the Health Benefits Program and Health Benefits Trust.

41.      Specifically, the Health Benefits Services Agreement provides that:

(a)      all funds relating to the Health Benefits Program are acknowledged to be assets of the Health Benefits Trust and are to be held in a trust account titled in the name of the Health Benefits Trust;

(b)      the Debtor is authorized to collect on behalf of the Health Benefits Program and Health Benefits Trust funds relating to the Health Benefits Program (such funds, the "***Health Benefits Trust Funds***");

(c)      the Debtor is authorized to use the Health Benefits Trust Funds for the purposes permitted by the Health Benefits Trust; and

(d)      the Health Benefits Trust may deposit with the Debtor in an escrow account funds to be used by the Debtor solely for the purposes of paying expenses of the Health Benefits Program or Health Benefits Trust.

42.     Pursuant to and in accordance with the foregoing, (a) all Health Benefits Trust Funds in the possession of the Debtor are accounted for in the name of the Health Benefits Program separately from the Debtor's general operating funds; (b) the Debtor's Office of Risk Management administers the Health Benefits Program on a daily basis; (c) the Debtor utilizes the Health Benefits Trust Funds in its possession to satisfy the obligation of the Health Benefits Program; and (d) at regular intervals, excess Health Benefits Trust Funds in the Debtor's possession are remitted to the Health Benefits Trust.

43.     To the extent Health Benefits Trust Funds in the Debtor's possession are inadequate to meet the obligations of the Health Benefits Program, the Debtor requests additional funding from the Health Benefits Trust, such that the Debtor's assets are not utilized to satisfy obligations of the Health Benefits Program or Health Benefits Trust.

**IV.     Recurring Administrative Costs of the Debtor's Insurance Programs.**

44.     As set forth above, the Debtor administers each of the Insurance Programs on a daily basis.

45.     As part of the Debtor's daily administration of the Insurance Programs: (a) all funds of each respective Insurance Program in the possession of the Debtor are accounted for in the name of the applicable Insurance Program separately from the Debtor's general operating funds; (b) the Debtor's Office of Risk Management administers each of the Insurance Programs on a daily basis; (c) the Debtor utilizes the funds of each respective Insurance Program in its possession to satisfy the obligation of each applicable Insurance Program; and (d) at regular intervals, excess funds in the Debtor's possession relating to each Insurance Program are remitted to the applicable Insurance Program Trust.

46.     The expenses and other costs of administering the Insurance Program are paid from accounts maintained by the Debtor on behalf of each of the General Insurance Trust, Self-Insurance Trust, and Health Benefits Trust.

47.     The expenses and other costs of administering the Insurance Programs are necessary for the continuation of each of the Insurance Programs and the coverages each provides to the Debtor and other participants in the Insurance Programs.

48.     If the Debtor ceased administering the Insurance Programs, significant damages could arise, the Insurance Programs likely would have claims against the Debtor, and participants in each of the Insurance Programs likely would have claims against the Debtor.

49.     Accordingly, by this Motion, the Debtor seeks authority to continue administering each of the Insurance Programs, including the payment of the expenses and other costs associated with such administration, pursuant to and in accordance with each Insurance Program.

### THE INSURANCE BROKER

50.     On behalf of the Insurance Programs, the Debtor utilizes an insurance broker, Porter & Curtis, LLC (the "***Insurance Broker***"), to obtain insurance, reinsurance, and stop loss insurance as and when appropriate and pursuant to an in accordance with each of the Insurance Programs (collectively, the "***Insurance Policies***"). The Insurance Broker primarily assists the Debtor with the procurement and negotiation of the Insurance Policies, enabling the Debtor to obtain the Insurance Policies on advantageous terms and at competitive rates. The Debtor causes to be paid fees on behalf of the Insurance Programs (the "***Brokerage Fees***") to the Insurance Broker in an annual amount of **$446,876**. While the Debtor is not aware of any Brokerage Fees that are due and owing as of the Petition Date, the Debtor seeks authority to honor any amounts owed to the Insurance Broker, to ensure uninterrupted coverage under the Insurance Policies.

### THE DEBTOR'S PARTICIPATION IN THE INSURANCE PROGRAMS

51.     The Debtor participates in each of the Insurance Programs and, correspondingly, is required to make contributions to the Insurance Programs on a monthly basis in the approximate aggregate amount of **$385,295** as follows:

| | |
|---|---|
| Health Benefits Program | $308,863 |
| General Insurance Program (Basic Life, Short Term Disability, Long Term Disability, Worker's Compensation, and Unemployment) | $37,713 |
| General Insurance Program (Property, Casualty, and Auto) | $32,933 |
| Self-Insurance Program | $5,786 |

52.     In addition to the contributions above, the Debtor may be required to pay various deductibles or retention amounts (the "***Insurance Deductibles***") from time to time, depending upon the type of claim and insurance coverage involved.

53.     Under certain coverage types within the Insurance Programs, payments may be made to claimants, with the Debtor later being invoiced for any Insurance Deductible.

54.     In such situations, the Insurance Programs or third-party insurance carriers may have prepetition claims against the Debtor.

55.     As of the Petition Date, the Debtor is unaware of any Insurance Deductible obligations.

56.     The Debtor's contributions to each of the Insurance Programs is a prerequisite to having and maintaining the Debtor's insurance coverage.

57.     Continuation of the Debtor's participation in the Insurance Programs is essential to the preservation of the value of the Debtor's operations and property of the estate.

58.     In many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's activities, including the Office of the United States Trustee's

(the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

59.     Moreover, the Debtor's participation in the Insurance Programs with related non-debtor Catholic entities, such as the Parishes, Schools, and Related Entities, and coinciding contributions by those additional insureds reduces the cost of obtaining and maintaining insurance coverage for the Debtor.

60.     If the Debtor failed to participate in the Insurance Programs, there would be no other reasonable alternative for the same or less expense to the Debtor.

61.     Accordingly, to ensure uninterrupted coverage for the Debtor under each of the Insurance Programs, the Debtor requests authority to maintain its existing participation in each of the Insurance Programs, pay any prepetition obligations related to the Insurance Programs, and enter into new coverage as necessary under the Insurance Programs, in the ordinary course of business.

## BASIS FOR REQUESTED RELIEF

**I.     Continuation of the Insurance Programs is Required by the Bankruptcy Code and U.S. Trustee Operating Guidelines.**

62.     Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. In addition, in many instances, the coverage provided under the Insurance Programs is required by the regulations, laws, and contracts that govern the Debtor's commercial activities, including the operating guidelines issued by the U.S. Trustee (the "**U.S. Trustee Operating Guidelines**"). Accordingly, the Debtor believes it is essential to its estate and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines that it continue to satisfy all obligations related to the Insurance Programs and have the authority to

supplement, amend, extend, renew, or replace its insurance coverage as needed, in its judgment, without further order of the Court.

## II.    Satisfying Obligations Under the Insurance Programs in the Ordinary Course of Business is Warranted.

*63.*    Section 363(c)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession may enter into transactions, including the use, sale, or lease of property in the ordinary course of business, without notice or a hearing. In the alternative, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted) (requiring only that the debtor "show that a sound business purpose" justifies the proposed use of property); *see also Grochal v. Baltimore Marine Indus., Inc.*, No. CV WDQ-07-0028, 2007 WL 9780497, at *3 (D. Md. July 3, 2007); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use of property under section 363(b) of the Bankruptcy Code). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also F.D.I.C. ex rel. Co-op. Bank v. Rippy*, 799 F.3d 301, 312 (4th Cir. 2015)(the business judgment rule is "a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.")

64.    Furthermore, section 105(a) of the Bankruptcy Code provides that, pursuant to the "doctrine of necessity," a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code]." The "doctrine of necessity"

functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested in this Motion. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts are authorized to approve orders allowing payment of prepetition claims, which is necessary for the debtors to have a successful reorganization); *see also In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

65.    In a long line of well-established cases, federal courts consistently have permitted postpetition payment of prepetition obligations, where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport C. & S. W. Ry. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [indispensable] business relations"); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. at 985 (2017); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

66. Based on the foregoing, this Court may grant the relief requested in this Motion. The Insurance Programs provide for an efficient, cost-effective way to procure necessary insurance for the Debtor. Satisfying possible outstanding or future obligations related to the Insurance Programs is warranted under section 363(b) of the Bankruptcy Code and the doctrine of necessity. Continuation of the Insurance Programs is essential to preserving uninterrupted operations and the value of the Debtor's estate, and is in the best interest of the estate and its creditors. Failing to maintain the Insurance Programs and the Debtor's participation in the Insurance Programs would impair—if not altogether halt—the Debtor's ability to operate, resulting in a material adverse effect on the Debtor and the value of its estate.

## III. Cause Exists to Authorize the Debtor's Banks to Honor Checks and Electronic Funds Transfer.

67. The Debtor has sufficient funds to pay the amounts described in this Motion in the ordinary course of business. Under the Debtor's cash management system, the Debtor can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Insurance Programs, as applicable. Accordingly, the Debtor believes there is minimal risk that checks or wire transfer requests the court has not authorized will be made inadvertently. Therefore, the Debtor respectfully requests that this Court authorize and direct all banks, when requested by the Debtor, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### REQUESTED RELIEF SATISFIES BANKRUPTCY RULE 6003

68. Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within twenty-one (21) days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that

arose before the filing of the petition …." Fed. R. Bankr. P. 6003(b). The Debtor submits that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth in this Motion, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

### REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

69.     To implement the foregoing immediately, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a). Furthermore, to implement the foregoing immediately, the Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the immediate payment of any amounts related to the Insurance Programs is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

70.     Nothing contained in this Motion is intended or should be construed as an admission of the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code, nor does it waive the Debtor's rights under the Code of Canon Law, or any applicable State or Federal law. The Debtor expressly reserves its rights to contest any claim relating to the Insurance Programs in accordance with applicable non-bankruptcy law. Likewise, if this Court grants the relief sought in this Motion, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any

claim or a waiver of the Debtor's rights to subsequently dispute such claim. In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtor to pay such claims.

<u>**NOTICE**</u>

71.     The Debtor has provided notice of the filing of this Motion to: (a) the Debtor's secured creditors; (b) the Debtor's 20 largest unsecured creditors; (c) those persons filing a notice of appearance and request for service as of the filing of this Motion; (d) the Office of the United States Trustee for the District of Maryland; (e) the Debtor's cash management banks; and (f) all required governmental agencies. Notice of this Motion and any order entered in connection with this Motion will be served on all parties required by Bankruptcy Rule 2002 and Local Rule 2002-1. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice of this Motion is required.

<u>**REQUEST FOR WAIVER OF MEMORANDUM OF LAW REQUIREMENT**</u>

72.     Pursuant to Local Bankruptcy Rule 9013-2, and because there are no novel issues of law presented in the motion and all applicable authority is set forth herein, the Debtor respectfully requests that the Court waive the requirement that a motion be accompanied by a separate written memorandum of fact and law

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the Interim Order, (ii) pending a final hearing, enter the Final Order, and (iii) grant the relief requested in this Motion and such other and further relief as the Court may deem just and proper.

Dated: September 29, 2023

Respectfully submitted,

_____/s/ Catherine K. Hopkin_____
Catherine K. Hopkin (Fed. Bar. No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:     443.569.0788
Facsimile:     410.571.2798
Email: chopkin@yvslaw.com

*-and-*

Blake D. Roth (*pro hac vice* pending)
Tyler N. Layne (*pro hac vice* pending)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:     615.244.6380
Facsimile:     615.244.6804
Email: blake.roth@hklaw.com
         tyler.layne@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:     202.457.7043
Email: philip.evans@hklaw.com

*Proposed Attorneys for the Debtor and Debtor In Possession*

### CERTIFICATE OF SERVICE

Epiq Corporate Restructuring, LLC will cause a true and correct copy of the foregoing to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

/s/ Catherine K. Hopkin

Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:443.569.0788
Facsimile: 410.571.2798
Email: chopkin@yvslaw.com

*Proposed Attorneys for the Debtor and Debtor In Possession*
