UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

In re:

ROMAN CATHOLIC ARCHBISHOP OF
BALTIMORE,

Debtor.

Chapter 11

Case No. 23-16969

**PRELIMINARY OBJECTION OF EVA DITTRICH
TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER,
PURSUANT TO SECTIONS 105(A) AND 362 OF THE
BANKRUPTCY CODE, EXTENDING THE AUTOMATIC STAY**

Eva Dittrich ("Ms. Dittrich"), by and through her undersigned counsel, respectfully

submits this objection (the "Objection") to the Debtor's *Motion For Entry Of An Order*, *Pursuant*

*To Sections 105(A) And 362 Of The Bankruptcy Code*, *Extending The Automatic Stay* (the

"Motion"). In support of the Objection, Ms. Dittrich states as follows:

I.       **PRELIMINARY STATEMENT**

1.       For decades, the Debtor obscured, obstructed, and hindered attempts by survivors

of childhood sexual abuse ("Abuse Survivors"), like Ms. Dittrich, to hold those responsible for the

sexual abuse perpetrated on children accountable. The Motion, like the Debtor's underlying

bankruptcy filing, is yet another sad and despicable attempt by the Debtor to avoid responsibility

for the undue horror caused by it, its clergy members, its supporters and enablers. The Debtor, and

the predators that prowled under the color of its banner caused countless years of suffering by

Abuse Survivors like Ms. Dittrich, and those similarly situated. Absent the Debtor's Chapter 11

filing, Ms. Dittrich would have initiated an action against the Debtor, like the one she initiated

against St. Clement, in pastorate with St. Phillip Neri, Lansdowne, Roman Catholic Congregation,

Incorporated, potentially a Covered Party, seeking some measure of justice for the horrendous

1

abuse she endured and the emotional, physical, spiritual, and financial harm she has suffered over the ensuing decades.

2.     The Motion is a gross abuse of process, with no real notice to or due process for Abuse Survivors. The Motion is designed to protect non-debtor wrongdoers, who the Debtor would have this Court award the protections of Chapter 11, without submitting to the Court's supervision as a debtor seeking relief under the Bankruptcy Code. Here, the Motion seeks to protect disclosed and undisclosed non-debtor wrongdoers, against whom Ms. Dittrich and other Abuse Survivors have *direct sexual abuse claims.*

3.     Without even filing an adversary proceeding, the Debtor seeks a permanent injunction to prevent the prosecution of all Abuse Actions against the "Covered Parties". The Debtor seeks this broad relief on a mere one (1) business day-notice, without providing proper notice to the affected Abuse Survivors. The Court should deny the relief sought in the Motion outright, without prejudice to the Debtor's right to refile the Motion, with proper notice and giving the Abuse Survivors the opportunity to fairly contest the Motion seeks.

4.     The Debtor deliberately seeks to deny Abuse Survivors due process. The Debtor is advised by competent and experienced counsel, Blake Roth, of the Holland & Knight law firm. Mr. Roth also represented the *Roman Catholic Diocese of Harrisburg*, in its bankruptcy case. *See In re Roman Catholic Diocese of Harrisburg*, No. 20-bk-00599 (Bankr. M.D. Pa.). In that case, the debtor filed a similar stay extension motion five days after it filed its bankruptcy petition, and set an objection deadline on that motion for four weeks later. *See Diocese of Harrisburg*, No. 20-bk-00599, Dkt. No. 53. There was no emergency motion. There was no expedited timetable. And a review of the *Harrisburg* court's docket reveals there were no formal objections filed to the stay extension motion. This is in stark contrast to the Debtor's efforts here, where the Debtor is

attempting to deprive Abuse Survivors of due process and impose a permanent stay on an emergency basis.

5.      Beyond due process infirmities, the Motion is presented *ipsi dixit*, without real evidentiary support. "In support of th[e] Motion, the Debtor relies on and incorporates by reference the *Informational Brief of the Roman Catholic Archbishop of Baltimore* [Dkt. No. 5]." Motion at 1. But the so-called '*Informational Brief*' is not a sworn declaration, made under penalty of perjury under 28 U.S.C. § 1746. Rather, it was written by the Debtor's attorneys, on behalf of the Debtor. Thus, the statements made in the 'Informational Brief' *have no evidentiary value.* Moreover, the so-called 'Informational Brief' does not contain a single exhibit to support the truth of any of the statements contained therein. Additionally, there are no citations to evidence to support the statements made in the so-called 'Informational Brief.'

6.      The Motion also lacks precision and clarity on key points,[1] which is unexpected given the importance of the Debtor's request.  If granted, the Motion will have a profound impact on Abuse Survivors.

7.      Further, the Motion fails based on the legal justification for the relief sought therein. The extension of Bankruptcy Code section 362(a)(1) to non-debtors under Bankruptcy Code section 105(a) is only granted in the presence of "unusual circumstances." Here, no such unusual

---

[1]   The Motion contains vague factual allegations where precision is absolutely necessary. For instance, the Debtor claims that "commencement and prosecution of an Abuse Claim against a Covered Party will necessarily divert key Debtor personnel from the reorganization process." Motion  ¶ 33. But neither the Motion nor the Matera Declaration identifies the "key Debtor personnel" by name.

Similarly, while the Debtor asks the Court to order that "[t]he Debtor's insurance policies are property of the Debtor's estate," (*see* Dkt. No. 12-1, ¶ 2), the Debtor never defines the "Debtor's insurance policies." Is the Debtor talking about the "Insurance Policies" listed on Exhibit C to their 'Insurance Motion', Dkt. No. 10-3? Is the Debtor talking about so-called 'legacy and current insurance coverage for Abuse Actions'? *See* Motion ¶ 39. The Survivor Coalition and other Abuse Survivors subject to the relief sought in the Motion should not be left guessing who is covered by the relief sought. Moreover, the Court cannot and should not make that finding, based on the record contained in the Motion, the Matera Declaration (*see* Dkt. No. 12-1), and the so-called unsworn 'Information Brief'.

circumstances are present. The Motion argues that the automatic stay extends to the 'Covered Parties' based on (i) shared insurance policies (but not the proceeds of those policies) that are property of the Debtor's estate, (ii) the Abuse Actions may expose the Debtor to "collateral estoppel, adverse precedent, vicarious liability, or imputed admission if litigation continues," (iii) the commencement and prosecution of Abuse Claims against Covered Parties "will necessarily divert key Debtor personnel from the [Debtor's] reorganization process and, as a result, undermine the administration of the [Debtor's] estate and the ability of the Debtor to successfully consummate a plan of reorganization, and (iv) allowing the Abuse Claims to move forward against Covered Parties "would  expose the Debtor to the risk of cross-claims for indemnification and contribution, which in turn would necessarily require the Debtor's participation in any Abuse Claim against a Covered Party." Motion ¶ 34.

8.      The Debtor fails to meet its burden of proof on any of these grounds. The Debtor offers no evidence that prosecution of non-debtor 'Covered Parties' will impede a restructuring. The Debtor offers no evidence that such allegedly shared insurance policies will be significantly depleted by defense costs. The Debtor offers no evidence sufficient to warrant a sweeping permanent injunction to stay the entirety of the Abuse Actions. By the Debtor's own admission, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "CVA"), only became effective on October 1, 2023. Thus, no Abuse Action is anywhere close to a monetary recovery by Abuse Survivors, let alone trials to adjudicate Abuse Survivors' claims.

9.      The Debtor cannot show any immediate threat of inconsistent judgments, collateral estoppel, or res judicata.

10.     The Debtor offers no evidence to support its contention that a permanent injunction is necessary to avoid a burden on, and distraction of, unidentified, but identifiable Debtor

employees. The Debtor instead relies on conclusory allegations of John Matera, the Debtor's Executive Director of Management Services & Chief Financial Officer, that the Abuse Actions against Covered Parties "will deplete the estate's assets, namely insurance coverage," and "key Debtor personnel will be diverted from the Debtor's reorganization efforts and be required to monitor and participate in any action in connection with any Covered Party." Matera Decl. (Dkt. No. 6) ¶ 176. Matera's statements hardly constitute an evidentiary basis for the Court to make findings that the pursuit of the Abuse Actions will interfere with the Debtor's reorganization. Similarly, Matera's statements fail to meet Debtor's burden of showing irreparable harm to the Debtor's estate or that the alleged harm of initiation and/or continuation of the Abuse Actions against non-debtors outweighs the harm that Abuse Survivors, like Ms. Dittrich, will suffer if the Motion is granted.

11.    The Debtor offers no evidence to support the contention that the initiation and/or continuation of the Abuse Actions against the Covered Parties will actually deplete an asset of the Debtor's estate. The Debtor offers no evidence about the features of the Debtor's insurance policies, including the so-called 'legacy' insurance policies. The Debtor offers no evidence that the insurance policies are "wasting policies," requiring the payment of defense costs, whether the payment of defense costs is separate from the total limits on liability, and whether the insurance policies are subject to aggregate limits of liability.

12.    Additionally, the Motion fails because the Debtor cannot meet its burden to show that enjoining the Abuse Actions is necessary to further a successful restructuring of the Debtor, and that the traditional factors are met to support a preliminary injunction to preclude further prosecution of the Abuse Actions.

13.     The Debtor asks this Court for the extraordinary relief of granting the Covered Parties the protections afforded to a debtor in possession under the Bankruptcy Code, without the related obligations that a debtor must undertake in exchange for such protections, such as limitations on asset transfers and transparency regarding pre- and post-petition transactions. A permanent stay of the Abuse Actions for the duration of the Debtor's chapter 11 case, coupled with the absence of any commitment by the Debtor to limit asset transfers by the Covered Parties, will not accelerate settlement discussions at the outset of the Debtor's bankruptcy case. Rather, the Motion appears to be an inappropriate attempt to shield the Covered Parties from any discovery or liability to Abuse Survivors by stopping all pending litigation in its tracks.

14.     The sheer breadth of the requested permanent injunction, sought on an emergency basis, only increases mistrust of the Debtor, and has the practical effect of impeding the Debtor's reorganization efforts. The Debtor is seeking to accomplish what they could not do through lobbying at the Maryland State House. The Debtor's bankruptcy case involves issues of high public importance and prominence, novel in nature, and will be hard fought. It is just sad that the Motion is one of the Debtor's first-day motions, designed to exploit a lack of due process.

15.     For all the reasons set forth herein, the Court should deny the Motion, and the relief sought therein.

## II.     **FACTUAL BACKGROUND**

### A.     *The Child Victims Act*

16.     On April 11, 2023, Maryland Governor Wes Moore signed the Child Victims Act of 2023 into law (the "CVA"). This landmark legislation eliminates the legal time limits on filing

civil lawsuits against institutions for child sexual abuse. Previously, Maryland law barred adult survivors of sex abuse from filing suit once they turned 38.[2]

17.    In February 2023, after the bill's introduction, more than 60 survivors of childhood sexual abuse testified before the Maryland General Assembly in support of the CVA. Many of the brave survivors were abused by Catholic clergy. Despite the traumatic stories shared during the legislative hearings, the Catholic Church adamantly opposed the bill.

18.    The CVA becomes effective October 1, 2023, and by its terms provides that, among other things, "notwithstanding any time limitation under a statute of limitations, a statute of repose, . . . or any other law, an action for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor may be filed at any time."

19.    To bolster their efforts to kill the CVA and inoculate the Church from civil liability, insider lobbyists to whom the Church paid hundreds of thousands of dollars, worked tirelessly to further silence  survivors' voices. This lobbying effort is part of a nationwide assault on similar bills across the country.

20.    Notwithstanding these objections, the House passed the Act (House Bill 1), on a vote of 132-2. The Act's was some eight years in the making.

21.    Reforming Maryland's civil child sex abuse statute of limitations has always been paramount to survivors and their advocates. But building enough support to pass the CVA only happened in the wake of the Maryland Attorney General's investigation into the Archdiocese of Baltimore revealed the true scope of the problem.

---

[2]    A valuable timeline of events leading up to the release of the Attorneys General Report can be found in in The Baltimore Banner.  Timeline: Events leading to Archdiocese of Baltimore child sex abuse investigation. https://www.thebaltimorebanner.com/community/religion/child-sex-abuse-investigation-timeline-baltimore-archdiocese-6LDPUVCCKFGFZGIRWWMF6BBQ3I/, last accessed on October 1, 2023.

22.     In 2018, the Maryland Attorney General launched a four-year Grand Jury investigation into the Archdiocese of Baltimore, examining criminal allegations of child sexual abuse by clergy, seminarians, deacons, and employees of the Archdiocese. The investigated efforts by Church leadership to cover-up rampant, unchecked occurrences of sexual abuse and physical and emotional torture.

23.     In April 2023, the Attorney General released its 500-page report documenting a long history of widespread child sex abuse and systemic cover-ups of that abuse by the Church. The report points to more than 600 child clergy abuse victims.  The report implicated more than 156 clergy members (with more to be identified later), spanning an eight-decade effort by the Archdiocese to cover up or minimize the abuse.

24.     While publicly telling its members that the Archdiocese did not oppose the release of this scathing report, the Archdiocese retained attorneys to represent certain individual clergy named in the report in an effort to halt its release.[3]

25.     After months of legal proceedings, a revised version of the report revealing additional high-ranking Church officials engaged in the cover up of abuse was released in September 2023.

26.     The CVA and the Attorney General's Report gave Maryland's survivors and their advocates for justice and accountability.

27.     The CVA's importance to survivors cannot be overstated.  Clergy members and other trusted adults violated them in the most horrific way during the most vulnerable time of their

---

[3]   "Five years after 'The Keepers,' Abuse Survivors still hoping for justice, transparency."  The Baltimore Banner, Published 12/6/2022      6:00      a.m.      EST, Updated 5/3/2023      2:45      p.m.      EDT). https://www.thebaltimorebanner.com/community/religion/the-keepers-netflix-abuse-catholic-church-investigation-5I52OBHDDBCONBPQNDUNPUDC2U/

lives., Researchers on child sex abusers widely agree that, due to the shame and stigma associated with sexual abuse, most survivors do not come forward for decades or longer. The CVA gives those survivors a chance to seek some measure of justice and accountability.

28.     The CVA became effective on October 1, 2023. Shortly before survivors had their first opportunity to seek justice against their abusers and the institution that enabled the decades of abuse, the Archdiocese of Baltimore declared bankruptcy on the afternoon of Friday, September 29, 2023.

### B.     The Bankruptcy

29.     On September 29, 2023, the Debtor filed a voluntary petition for bankruptcy under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is authorized to continue to operate its business and remains in possession of its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the case.

30.     The Debtor commenced its bankruptcy before a single case was filed under the CVA.

### C.     The Motion

31.     Filed on the first day of the Debtor's case, the Motion seeks to permanently enjoin sexual abuse actions against:

all related entities included as additional insureds under the Debtor's various current and legacy insurance programs, including but not limited to:

- the Debtor's one hundred fifty-three (153) parishes,

- each of the schools within the Archdiocese covered under the Debtor's insurance program,

- Catholic Community School Land, Inc.,

- Inter-Parish Loan Fund, Inc.,

9

- Catholic Community Foundation of the Archdiocese of Baltimore, Inc.,

- Roman Catholic Foundation in the Archdiocese of Baltimore, Inc.,

- John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc.,

- Associated Catholic Charities, Inc.,

- Maryland Catholic Conference, LLC, and

- all other related entities covered by the Debtor's current and legacy insurance programs.

Motion at 1.

32.     The Motion defines the foregoing persons as the "Covered Parties." *See id.*

## III.     THE PERMANENT INJUNCTION MOTION SHOULD BE DENIED

33.     The Debtor seeks permanent injunctive relief to stay initiation and prosecution of the Abuse Actions against the Covered Parties pursuant to Bankruptcy Code section 362(a)'s automatic stay. Additionally, the Debtor seeks permanent injunctive relief to stay initiation and prosecution of the Abuse Actions against the Covered Parties pursuant to the Court's equitable authority under Bankruptcy Code section 105(a). The Debtor fails to meet its burden for the relief it seeks.

### A.     The Debtor Fails To Meet Its Burden To Establish A Factual Basis For Extending The Automatic Stay Under § 362(a)(1) to the Non-Debtor Covered Parties

34.     The Motion is predicated on Section 362(a)(1). There is no doubt about that. And the Debtor's main argument, that "[t]he automatic stay can be extended under 'unusual circumstance" (*see* Motion at 8), is one that relies on the "unusual circumstances" test articulated by the Fourth Circuit in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). *See* Motion ¶ 26. So, the objection starts there.

10

35.     By its terms, Bankruptcy Code section 362(a)(1) automatically stays the commencement or continuation of any proceeding "***against the debtor*** that arose before the commencement of the case." 11 U.S.C. § 362(a)(1) (emphasis added).

36.     Courts agree that there is no automatic extension of Bankruptcy Code section 362(a) with respect to co-defendants named in a lawsuit. *See, e.g., Teachers Ins. & Annuity Assn v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankruptcy co-defendants;" stay of appeal as to individual partners of debtor denied); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544 (5th Cir. 1983) ("[W]e conclude that [Bankruptcy Code section] 362 does not operate as an automatic stay of claims against the co-defendants of Johns-Manville and Unarco;" mandatory and discretionary stay of litigation under sections 362 and 105 rejected).

37.     Under controlling Fourth Circuit precedent cited by the Debtor, the Covered Parties are entitled to the protections of § 362(a)(1) only where "unusual circumstances" exist, such as "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant." *A.H. Robins*, 788 F.2d at 999; *see also In re DBMP LLC*, No. 2030080, Adv. Pro. No. 20-03004, 2021 WL 3552350, at *27 (Bankr. W.D.N.C. Aug. 11, 2021); *In re Aldrich Pump LLC*, No. 20-30608, Adv. Pro. No. 20-03041, 2021 WL 3729335, at *31 (Bankr. W.D.N.C. Aug. 23, 2021).

38.     Here, the Debtor cannot demonstrate such "unusual circumstances" here. The Motion and the Matera Declaration do not evidence that there are shared insurance policies, let alone that the proceeds of those policies are property of the Debtor's estate. Further, the Motion and the Matera Declaration do not specifically identify which 'insurance policies' they contend are assets of the Debtor's estate. The Motion uses the phrase "insurance policies" a single time,

11

but does not define it. *See* Motion ¶ 12. If the Debtor had intended to refer to the "Insurance Policies" listed on Exhibit C to their 'Insurance Motion,' Dkt. No. 10-3, it would have said so. If the Debtor is talking about the so-called 'legacy and current insurance coverage for Abuse Actions' referred to in paragraph 39 of the Motion, it would have said so. Ms. Dittrich and other abuse survivors should not be left guessing about the Motion's factual predicate.

39.    Moreover, the Court cannot and should not enter an order using the phrase "insurance policies" without defining it. Yet, that is precisely what the Debtor wants the Court to do. *See* Dkt. No. 12-1, ¶ 2 (the proposed order filed with the Motion states that the Court is to order that "[t]he Debtor's insurance policies are property of the Debtor's estate."). It is unfathomable that the Court could enter the Debtor's proposed order, without actually defining the "Debtor's insurance policies." While Ms. Dittrich does not cast dispersions on the Debtor's counsel, the proposed order here appears to be a re-tread of the same text that was used in *Diocese of Harrisburg*'s stay extension order. *See* No. 20-bk-00599 (Bankr. M.D. Pa. April 2, 2020), Dkt. No. 222. However, imprecise drafting in the Harrisburg case does not mean that this Court should adopt it here.

40.    Additionally, as stated more fully in Section III.B *supra*, the Debtor offers no evidence that some or all of the Covered Parties:

- are 'insured' persons under the 'insurance policies,'

- will make 'claims' under the 'insurance policies,'

- will make 'claims' for 'losses' related to the Abuse Claims under the 'insurance policies' that will cause a reduction in the proceeds available from such 'insurance policies,' and

- Will seek reimbursement for defense costs related to the Abuse Claims under the 'insurance policies' that will cause a reduction in the proceeds available from such 'insurance policies.'

41.    In short, the Debtors offer no admissible evidence that the estate's property will be harmed, much less face "immediate adverse consequences" (Motion at ¶ 8; Matera Decl., at ¶ 172), if Abuse Actions are initiated and prosecuted against the Covered Parties. Moreover, the Debtor offers no evidence to identify the entire universe of those who will be protected, or affected, by the permanent injunction.

42.    The trend in recent cases is to deny an extension of the stay when there is no detailed evidentiary basis proffered by the debtor from which the court can find that actions against non-debtors would diminish insurance proceeds that are shared with the debtor. *See In re Diocese of Buffalo, NY*, 618 B.R. 400, 406–407 (Bankr. W.D.N.Y. 2020) (holding that there was not adequate evidentiary support for the applicability of section 362(a)(3), however, noting that the debtor "has supplied only an outline of insurance coverage. While this presentation is helpful, it falls far short of proof sufficient to establish that litigation against Affiliated Entities would necessarily affect property of the bankruptcy estate."); *In re Diocese of Rochester*, 2022 WL 1638966, *5 (Bankr. W.D.N.Y. May 23, 2022) (same); *see also In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 641 (Bankr. S.D.N.Y. 2023). In fact, in *Diocese of Rochester*, the court stated that "the Diocese made no effort to provide evidence showing that a *specific* CVA case would have a materially adverse impact on the per-occurrence limits of a specific policy of insurance." *Diocese of Rochester*, 2022 WL 1638966, *5. Here, a cursory review of the Motion and the Matera Declaration reflect that these cases follow the ill-fated playbook from *Diocese of Buffalo* and *Diocese of Rochester,* and this Court should deny the Motion on this ground alone.

43.    The Motion and the Matera Declaration do not evidence that the Abuse Actions may expose the Debtor to "collateral estoppel, adverse precedent, vicarious liability, or imputed admissions if the litigation continues" (*see* Motion, at ¶ 32).   There is no risk to the Debtor of

Collateral Estoppel, adverse precedent, vicarious liability, or imputed admission if an Abuse Action against one or more Covered Parties is commenced and continues.

44.     It is well settled that collateral estoppel may not be applied against a party in a subsequent proceeding where the party did not have a full and fair opportunity to litigate the claim or issue in the prior proceeding. *Allen v. McCurry*, 449 U.S. 90, 96–97 (1980); *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006). Here, the automatic stay precludes the commencement or continuation of any action *against the Debtor*. Thus, the Debtor will not be a party to litigation against the Covered Parties and cannot be collaterally estopped from later litigating any issue in those actions. *See, e.g.*, In re *Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984) (concluding that outcome of asbestos litigation involving non-debtor entity would "in no way bind [Debtor], in that it could not determine any rights, liabilities, or course of action of the debtors. Since Manville is not a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel.").

45.     The Debtor cites *A.H. Robins* to support its argument that "any Abuse Action against a Covered Party may expose the Debtor to collateral estoppel, adverse precedent, vicarious liability, or imputed admission if litigation continues." *See* Motion, at ¶32 (citing *A.H. Robins*, 788 F.2d 994 [sic.], at 1007-08). But *A.H. Robins* says no such thing. Paragraph 32 of the Motion also cites *In re Plan 4 College, Inc.*, No. 09-17952DK, 2009 WL 3208285 (Bankr. D. Md. Sept. 24, 2009). But in *In re Plan 4 College*, Bankruptcy Judge Keir wrote "[t]o the extent that courts may have held that collateral estoppel may bind a debtor where an adverse judgment is entered against non-debtor parties in an action which has been stayed by the automatic stay, this court must respectfully disagree." 2009 WL 3208285, at *2.

14

46.     Lastly, the Debtor makes no effort whatsoever to explain how, as to each and every Covered Party, the commencement and continuation of an Abuse Action presents a risk of Collateral Estoppel, adverse precedent, vicarious liability, or imputed admission to the Debtor. If the Debtor wants the relief it seeks, it should be required to explain this.

47.     The Motion and the Matera Declaration do not evidence that the commencement and prosecution of Abuse Claims against Covered Parties "will necessarily divert key Debtor personnel from the reorganization process and, as a result, undermine the administration of the estate and the ability of the Debtor to successfully consummate a plan of reorganization." *See* Motion at ¶ 33. Neither the Motion nor the Matera Declaration actually identify, by name, who the "key Debtor personnel" are, nor do they bother to explain why each such person will be diverted from the Debtor's reorganization process if the Motion is denied, and Abuse Actions are commenced and prosecuted against Covered Parties.

48.     The Motion and the Matera Declaration do not evidence why allowing the Abuse Claims to move forward against Covered Parties "would expose the Debtor to the risk of cross-claims for indemnification and contribution, which in turn would necessarily require the Debtor's participation in any Abuse Claim against a Covered Party." *See* Motion ¶ 34. Even if the Debtor could produce admissible evidence to support such an allegation, which it does not, the Debtor cites no case law that would support the Court's consideration there. *Id.*

**B.      The Debtor Fails To Meet Its Burden To Establish A Factual Basis For Extending The Automatic Stay Under Section 362(a)(3) Because Section 362(a)(3) Does Not Apply to Claims Against the Covered Parties, and the Debtor Fails to Demonstrate Any Immediate Harm to Estate Property**

49.     While the Motion does not mention Section 362(a)(3) a single time, the sole basis for statutory relief explicitly ordered in the Proposed Order attached to the Motion (Dkt. No. 12-1)

15

specifically references Bankruptcy Code Section 362(a)(3). To the extent the Debtor's argument is rooted in Bankruptcy Code section 362(a)(3), it must fail for several reasons.

50.     <u>First</u>, the Debtor offers no evidence that some or all the Covered Parties are 'insured' persons under the 'insurance policies.' Therefore, there is no evidentiary support for the Debtor's argument that some or all Covered Parties will make 'claims' under the 'insurance policies.' Moreover, there is no evidence that some or all Covered Parties will make 'claims' for 'losses' related to the Abuse Claims under the 'insurance policies' that will cause a reduction in the proceeds available from such 'insurance policies.' Similarly, there is no evidence that some or all Covered Parties will seek reimbursement for defense costs related to the Abuse Claims under the 'insurance policies' that will cause a reduction in the proceeds available from such 'insurance policies.'

51.     However, none of the facts presented by the Debtor in the Matera Declaration support the Debtor's assertion that property of the Debtor's estate will be harmed, much less face "immediate adverse consequences" (Motion, at ¶ 8, Matera Decl., at ¶ 172), if Abuse Actions are initiated and prosecuted against the Covered Parties.

52.     Moreover, Section 362(a)(3) of the Bankruptcy Code operates as a stay "of any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." There is no dispute that insurance policies held by a debtor are property of the debtor's estate. That *does not* mean that *the proceeds* of those insurance policies are assets of the Debtor's estate.

**C.**     **The Debtor Fails to Satisfy Traditional Factors For Issuance of a Preliminary Injunction Under Bankruptcy Code Section 105(a) and Bankruptcy Rule 7065**

53.     The Debtor recognizes that its request for an injunction under section 105(a) requires satisfaction of the traditional preliminary injunction factors. *See* Motion ¶ 36. But the Debtor fails to meet its burden of demonstrating that it can satisfy these factors.

54.     A preliminary injunction may be awarded "only . . . upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The United States Supreme Court described the four-element standard for imposing preliminary injunctions as follows.

> A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest.

*Id.,* at 20.

55.     Courts considering preliminary injunctions in the context of a bankruptcy proceeding generally apply the usual preliminary injunction standard. *A.H. Robins*, 788 F.2d at 1008. Each of the four elements must be met. *In re Bestwall LLC*, 606 B.R. 243, 253 (Bankr. W.D.N.C. 2019). For the reasons explained below, the Debtor fails to prove each of the four elements.

**1.**     **The Debtor has not demonstrated a reasonable likelihood of success on the merits.**

56.     In the context of a bankruptcy case, likelihood of success on the merits has been understood as likelihood of a successful reorganization. *See Aldrich*, 2021 WL 3729335, at *30–32; *DBMP*, 2021 WL 3552350, at *39; *Bestwall*, 606 B.R. at 253.

57.     There is simply no way to know, at the inception of this case, whether the Debtor will be able to successfully reorganize. In fact, the Matera Declaration does not say anything on the

topic. The Matera Declaration does not say that the Debtor's goal is to negotiate, obtain approval

of and ultimately consummate a plan of reorganization, let alone state that the Debtor intends on

establishing and funding a trust to resolve and pay Abuse Survivors. The only statement that is

close to that is Matera's statement that "any actions against Covered Parties would … significantly

impact the Debtor's contributions to any trust established for the purpose of providing payments

to Claimants." Matera Decl. at ¶ 177. That statement is simply not enough for the Court to find

that there is a reasonable prospect of a successful reorganization.

> 2. **There is no evidence that the Debtor will suffer irreparable harm in the absence of preliminary relief.**

58.     Irreparable harm requires a demonstration by the movant that it is *likely*—not just

possible—in the absence of an injunction. *Winter*, 555 U.S. at 22. As the Supreme Court noted,

"[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

with our characterization of injunctive relief as an extraordinary relief that may only be awarded

upon a clear showing that the plaintiff is entitled to such relief." *Id*. (citing *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997)). The Debtor fails to demonstrate that the commencement and/or

continuation of an Abuse Action against Covered Parties will cause the Debtor irreparable harm.

59.     The Debtor argues that "Actions against a non-debtor should be stayed where

allowing them to proceed would adversely impact the debtor's reorganization." Motion at ¶ 41

(citations omitted). The Debtor states, without evidentiary support, that

> in the absence of the relief requested, there will be an uncontrollable scramble for
> one of the Debtor's most significant assets—its current and legacy insurance
> assets—with the very likely prospect of a few creditors recovering at the expense
> of all similarly situated creditors, irreparably harming the Debtor's prospects of
> reorganizing under the Bankruptcy Code and all creditors' prospects of obtaining
> an orderly, reasonable, and equitable outcome under a plan of reorganization.

Motion at ¶ 43.

60.    But there is no legitimate basis for this argument. There is no race to collect on a judgment for the mysterious "current and legacy insurance assets." *Id.* In fact, the filing window under the CVA just opened, permitting the filing of Abuse Actions. There is no "race to the courthouse." *Id.*, at ¶ 59. Even Matera doesn't bother to go near this one.

### 3.    The relative harm to Abuse Survivors From a Permanent Injunction Outweighs Any Unspecified Harm to the Debtor's Estate in the Absence of an Injunction.

61.    The Debtor has the audacity to argue that the balance of equities favors the Debtor because "it would … be to the detriment of any potential sexual abuse claimants" to deny an extension of the automatic stay to the Covered Parties. *See* Motion ¶ 45. The Debtor then retreads its prior argument that "Permitting the Abuse Actions to proceed will divert Debtor's key personnel from their duties and obligations in this Chapter 11 Case." *See* Motion at 13. For the reasons addressed above (*see* Section III.A, supra), this argument fails as the Debtor does not identify who the Debtor's key personnel are, and how such individuals (if they actually exist), would be diverted from their duties and obligations in the Debtor's chapter 11 case.

62.    The Debtor also argues that "[t]he Debtor would likely be forced to participate in any Abuse Actions to protect its own interests" (*see* Motion at  14) absent the relief sought in the Motion. This is another retread of Debtor's argument that the Abuse Actions may expose the Debtor to "collateral estoppel, adverse precedent, vicarious liability, or imputed admission if the litigation continues." *See* Motion at ¶ 32.  But there is no risk to the Debtor of Collateral Estoppel, adverse precedent, vicarious liability, or imputed admission if Abuse Actions are commenced and continue (*see* Section III.A, *supra*), and the Debtor's argument in paragraph 49 of the Motion does not change that fact.

63.     Moreover, the Debtor complains that "any Abuse Action against a Covered Party could substantially prejudice the Debtor by precluding it from relitigating any issues of fact or law determined in such a case regarding any Abuse Claim, including those issues that would be critical to the Debtor's defense." Motion at ¶ 50. The Debtor then argues that it "may be denied the opportunity to present its own defenses should it need to litigate any cross-claims for contribution and indemnification." *Id*. But the Debtor conveniently forgets that if the Abuse Actions proceed unimpeded, then the Debtor will still be able "to litigate any cross-claims for contribution and indemnification." *Id*. The Debtor currently has that right, and the Court's refusal to approve the Motion will not change that.

64.     The Debtor argues that even with the imposition of a permanent injunction, the "Abuse Claimants would still be permitted to pursue and recover upon Abuse Actions." Motion at 16. It is impossible to fathom how the Debtor can think the Abuse Actions against Covered Parties would be an integral part of the Debtor's chapter 11 cases, when the Debtor is seeking to deny Abuse Survivors, who the Debtor has the nerve to label "Abuse Claimants," the right to sue the Covered Parties.

65.     The balancing of relative harms that each party may suffer from the grant or denial of an injunction is "arguably, the most critical element" of the four-prong injunction test. 2 *COLLIER ON BANKRUPTCY,* ¶ 105.03[1]. Courts recognize that the analysis is fact intensive. In *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369 (Bankr. E.D. Pa. 2009), the bankruptcy court engaged in an extensive analysis of the facts and parties in connection with a motion to stay litigation against various individuals and entities associated with the debtor. The court observed: "The determination whether to grant or deny a §105 injunction is intensely fact driven. . . . As with any request for entry of a traditional injunction, the outcome tends to be driven by the debtor's

ability or inability to marshal facts demonstrating that the pending nonbankruptcy proceedings against the nondebtors pose a serious risk to its reorganization and the court's assessment of the relative harms each side may suffer from the grant or denial of the injunction request." *Id.* at 380.

66.     The imposition of a permanent injunction to prevent the filing and prosecution of Abuse Actions will inflict substantial harm on Abuse Survivors. Abuse Survivors are entitled to bring their legitimate tort claims against non-debtor Covered Parties. That right will be eliminated by a permanent injunction. Many of the Abuse Survivors experienced sexual abuse decades ago and are now elderly or ill. A stay of their litigation against the Covered Parties in some cases means that Abuse Survivors will never see the perpetrators of their abuse held accountable. Any litigation delay, let alone a permanent one, will create a risk of further loss of memory, testimony, and available evidence. A broad, permanent injunction will prejudice the Abuse Survivors by precluding critical discovery from solvent non-debtors. A broad, permanent injunction protecting the Covered Parties will deprive the Abuse Survivors' of a day in court, where they can directly name and accuse their abusers.

### 4.     The Public Interest Weighs Against an Injunction.

67.     The Debtor contends "that it and this chapter 11 Case meet the "unusual circumstances" requirement." *See* Motion, at ¶ 54 (citing *In re Cornus Montessori*, LLC, No. 21-10213-KHK, 2021 WL 1521530, at *3 (Bankr. E.D. Va. Apr. 16, 2021); *In re Qimonda AG*, 482 B.R. 879, 896 (Bankr. E. D. Va. 2012)). But as detailed in Section III.A, *supra*, the Debtor cannot prove that their chapter 11 case meets the "unusual circumstances" requirement. The Debtor then falls back upon broad platitudes of the paramount goals of the Bankruptcy Code. *See* Motion ¶¶ 56-57.

68.    The Debtor completely misses the point about the public interest and how it relates to the requested injunctive relief. While facilitating a successful reorganization may be a factor that courts consider, it is not the determining or sole factor. Some courts considering the public interest factor have required a balancing of the public interest in a successful reorganization with other competing societal interests. *See, e.g., In re Pick-Your-Own, Inc.*, No. 19-20821, 2019 WL 7945869, at *3 (Bankr. W.D.N.Y. Nov. 21, 2019); *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. at 379.

69.    The competing societal interests are self-evident in the enactment of the CVA, permitting the commencement and continuation of decades old sexual Abuse Claims. There was a compelling policy reason why the Maryland General Assembly enacted the CVA and Governor Wes Moore signed it into law. Only in a perverse, parallel universe is the societal interest of protecting child abusers among the Covered Parties more important than the interest of Abuse Survivors in pursuing legal remedies against their abusers.

70.    Thus, the imposition of a permanent injunction is not in the public interest.

## IV.    CONCLUSION

For the reasons set forth above, Eva Dittrich respectfully requests that the Court enter an order denying the Motion.

DATED: OCTOBER 2, 2023

RESPECTFULLY SUBMITTED,

/s/ Steven J. Kelly
Steven J. Kelly (Fed. Bar No. 27386)
M. Elizabeth Graham (application for admission *pro hac vice* forthcoming)
Suzanne Sangree (Fed. Bar No. 26130)
Cynthia B. Morgan (application for admission *pro hac vice* forthcoming)
**GRANT & EISENHOFER, P.A.**
3600 Clipper Mill Road, Suite 240

Baltimore, Maryland 21211
Phone: (443) 531-1474
skelly@gelaw.com
egraham@gelaw.com
ssangree@gelaw.com
cmorgan@gelaw.com

Gordon Z. Novod (application for admission
*pro hac vice* forthcoming)
**GRANT & EISENHOFER, P.A.**
485 Lexington Avenue
29th Floor
New York, NY 10017
Telephone: (646) 722-8523
gnovod@gelaw.com

Robert K. Jenner (Fed. Bar No. 04165)
Kathleen R. Kerner (Fed. Bar No. 18955)
**JENNER LAW, P.C.**
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland 21211
Phone: (410) 413-2155
Fax: (410) 982-0122
rjenner@jennerlawfirm.com
kkerner@jennerlawfirm.com

**BAIRD MANDALAS BROCKSTEDT &
FEDERICO, LLC**
Philip C. Federico (Fed. Bar No. 01216)
Brent P. Ceryes (Fed. Bar No. 19192)
Wray Fitch (Fed. Bar No. 19722)
Catherine M. Cramer (application for
admission *pro hac vice* forthcoming)
pfederico@bmbfclaw.com
bceryes@bmbfclaw.com
wfitch@bmbfclaw.com
ccramer@bmbfclaw.com

*COUNSEL FOR EVA DITTRICH*

## CERTIFICATE OF SERVICE

The undersigned will cause a true and correct copy of the foregoing to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

/s/ Steven J. Kelly
Steven J. Kelly (Fed. Bar No. 27386)