**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>   Debtor. | Case No. 23-16969-MHH<br>Chapter 11 |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINDER AND RESPONSE IN OPPOSITION TO  MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE, EXTENDING THE AUTOMATIC STAY**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Roman Catholic Archbishop of Baltimore's (the "**Debtor**") bankruptcy case joins in the *Preliminary Objection of Eva Dittrich to Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay Preliminary Objection of Eva Dittrich to Debtor's Motion for Entry of an Order, Pursuant to Sections 105(A) and 362 of the Bankruptcy Code, Extending the Automatic Stay,* and subsequent follow on objection,[1] (together, the "**Dittrich Objection**") and files this further response (the "**Response**") in opposition to the Debtor's *Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (the "**Injunction Motion**").[2] Prior to the October 30, 2023 deadline to object to the Injunction Motion, counsel for the Debtor granted the Committee an extension of the deadline to respond, through and including Thursday, November 2, 2023. In support of the Response, the Committee respectfully states as follows:

---

[1] [Dkt. Nos. 27; 129].

[2] [Dkt. No. 12].

## FACTUAL BACKGROUND

1.    The Debtor filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code on September 29, 2023 (the "**Petition Date**").[3] The Debtor is operating as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2.    Pursuant to 11 U.S.C. § 1102, the Office of the United States Trustee appointed the Committee on October 11, 2023.[4]

3.    In April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "**CVA**"), which Governor Moore approved on April 11, 2023 and became effective on October 1, 2023, effectively removing the deadline for survivors of child sexual assault (the "**Survivors**") to file civil law claims related to child sexual assault. The Committee is comprised of seven (7) of these Survivors.

4.    According to the Debtor, "the Maryland Office of the Attorney General conducted an investigation and issued a report in April 2023, stating over six hundred children are known to have been abused by the 156 people included in this Report, but the number is likely far higher."[5]

---

[3] [Dkt. No. 1].

[4] [Dkt. No. 81].

[5] [*Informational Brief of the Roman Catholic Archbishop of Baltimore* (the "**Informational Brief**"), Dkt. No. 5 at ¶ 164.]

5.      In support of the Injunction Motion, the Debtor filed its unsworn Informational Brief[6] and the *Declaration of John Matera in Support of First Day Motions* (the "**Matera Declaration**").[7]

6.      By the Injunction Motion, the Debtor seeks to extend the automatic stay and impose an injunction[8] that protects:

> related entities included as additional insureds under the Debtor's various current and legacy insurance programs, including but not limited to the one hundred fifty-three (153) parishes, each of the schools within the Archdiocese covered under the Debtor's insurance program, Catholic Community School Land, Inc., Inter-Parish Loan Fund, Inc., Catholic Community Foundation of the Archdiocese of Baltimore, Inc., Roman Catholic Foundation in the Archdiocese of Baltimore, Inc., John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc., Associated Catholic Charities, Inc., and Maryland Catholic Conference, LLC (collectively with all other related entities covered by the Debtor's current and legacy insurance programs, the "**Covered Parties**") . . .[9]

7.      The Debtor's requested injunction would "stay the prosecution of all sexual abuse actions (the '**Abuse Actions**')."[10]

---

[6] The Informational Brief has no evidentiary weight and is simply the argument of the Debtor's counsel. *See* Fed. R. Evid. 401(a); *U.S. v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) (holding statements and argument of counsel are not evidence).

[7] [Dkt. Nos. 5, 6]. The Injunction Motion makes general reference to the Matera Declaration but does not cite the Matera Declaration as supporting a single fact or assertion made in the Injunction Motion.

[8] The Fourth Circuit Court of Appeals has made clear that a request to extend the automatic stay to protect non-debtors is a request for an injunction: "Beyond these statutory powers under section 362 and section 105 **to enjoin other actions** whether against the debtor or third-parties and in whatsoever court, the bankruptcy court under its comprehensive jurisdiction as conferred by section 1334, 28 U.S.C., has the 'inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief' to grant a stay." *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986) (citations omitted) (emphasis added); *id. at* 1008 ("The district court in this case applied the test for a grant of preliminary injunctive relief.").

[9] [Injunction Motion, at 1].

[10] [*Id.*].

8.      The Debtor's proposed injunction applies, without limitation, to all persons, regarding *any act* in any way related to prosecuting the Abuse Actions against the Covered Parties, none of whom are debtors in bankruptcy, and without regard to whether the actions are filed against the Debtor.[11]

9.      The Debtor requests this extraordinary relief because it allegedly needs the "full attention of its key personnel, the participation of Covered Parties and [their] current and legacy insurance carriers in funding a compensation trust, and breathing spell granted by the automatic stay to permit the time and space for meaningful negotiations."[12]

10.     The Committee does not believe imposing such an injunction, against the will of Survivors, would have a positive impact on negotiations with the Debtor.

11.     The Debtor further claims that prosecution of cases against non-debtors would (i) divert the Debtor's resources; (ii) divert the Debtor's key personnel; (iii) prejudice the Debtor through collateral estoppel and give rise to indemnification obligations; and (iv) dissipate the Debtor's insurance coverage that may cover the Abuse Actions (the "**General Insurance Program**").[13]

12.     The Debtor suggests that under the General Insurance Program, "Abuse Actions will be satisfied from a finite group of insurance policies which provide coverage for the Debtor and Covered Parties, regardless of whether such claims are brought against the Debtor or a Covered Party."[14]

---

[11] [*See Injunction Motion*, at p.1 and ¶23].

[12] [*Id.* at ¶2].

[13] [*See id.* at ¶3].

[14] [*Id.* at ¶ 12].

13.     The Debtor does not explain the nature of the Covered Parties' alleged interest in these insurance policies. [15]

14.     The Committee is unaware, for example, whether any of the at-issue insurance policies have aggregate policy limits, will be eroded by the insurer's duty to defend, or otherwise would be affected by the prosecution of Abuse Actions against the Covered Parties. As of the time of the filing of this Response, the policies at issue are not before the Court, and the Committee has not been provided copies of the insurance policies or otherwise had an opportunity to review them. Further, beyond the Debtor's unsupported averments in the Injunction Motion and its first-day filings, the Committee has not been provided a copy of any agreement or other documentation detailing (i) the Debtor's obligation to indemnify any of the Covered Parties, or (ii) the nature of the operation of the General Insurance Program or the participants' rights with respect thereto.

15.     The Debtor has made no record as to whether any Abuse Actions have been filed since the CVA became effective on October 1, 2023.[16]

16.     Pursuant to Local Rules 7012-2(b) and 9013-6, to the extent it is determined the Bankruptcy Court does not have the ability to enter final orders and judgments in connection with

---

[15] *See Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage* (the "**Insurance Program Motion**") [Dkt. No. 10] at ¶¶ 10-20, 52] ("In addition to the contributions above, the Debtor may be required to pay various deductibles or retention amounts (the 'Insurance Deductibles') from time to time, depending upon the type of claim and insurance coverage involved.") (making no mention of the obligation to pay deductibles for any Covered Parties). The Insurance Program Motion also contains a list of insurance policies, but only those policies the Debtor currently has as active and in place but not historic policies. Dkt. No. 10-3.  Because the Debtor does not define "insurance policies" in the instant Motion, the Committee can only assume the insurance policies at issue in the Injunction Motion include any insurance policy or contract ever issued to or by the Debtor, as more fully described in the Insurance Motion as the "Insurance Programs."

[16] [*See* Injunction Motion at ¶ 16].

the Injunction Motion, the Committee does not consent to entry of final orders by the Bankruptcy

Court in connection with the Injunction Motion.

## **RESPONSE**

The automatic stay "is generally said to be available only to the debtor, not third party

defendants or co-defendants."[17] "The bankruptcy court under **unusual circumstances** may expand

the effect of the automatic stay to non-debtor parties by injunctive relief."[18]

> Such unusual circumstances might arise where "there is such identity between the
> debtor and the third-party defendant that the debtor may be said to be the real party
> defendant and that a judgment against the third-party defendant will in effect be a
> judgment or finding against the debtor," or where proceedings against non-debtor
> codefendants would reduce or diminish "the property of the debtor [such as the
> debtor's insurance fund or pool] to the detriment of the debtor's creditors as a
> whole."[19]

The Debtor argues that this chapter 11 case is one of those unusual circumstances because

(1) Abuse    Actions    prosecuted    against    the    Covered    Parties    would    "inevitably"

diminish the General Insurance Program to the detriment of the Debtor's estate;[20] and (2) the

Abuse Actions should be enjoined pursuant to section 105(a) to avoid irreparable harm to the

---

[17] *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007) (citing *A.H. Robbins,* 788 F.2d at 999). *See also Credit All. Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988) ("Congress knew how to extend the automatic stay to non-bankrupt parties when it intended to do so.").

[18] *In re Plan 4 College, Inc.*, No. 09-17952DK, 2009 WL 3208285, at *2 (Bankr. D. Md. Sept. 24, 2009) (citing A.*H. Robbins,* 788 F.2d at 994 (emphasis added)); *A.H. Robbins Company, Inc. v. Aetna Casualty and Surety Company*, 828 F.2d 1023 (4th Cir. 1987); *American Film Technologies, Inc. v. Taritero,* 175 B.R. 847 (Bankr. D. Del. 1994); *see also Biltmore Investments, Ltd. v. TD Bank, N.A.*, 626 Fed. Appx. 390, 391 (4th Cir. 2015) (unpublished) (articulating the "unusual circumstances" standard from A.*H. Robbins Company, Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986).

[19] *Credit All. Corp*, 851 F.2d at 121 (citing A.*H. Robbins,* 788 F.2d at 999). *See also In re Cornus Montessori, LLC*, No. 21-10213-KHK, 2021 WL 1521530, at *2 (Bankr. E.D. Va. Apr. 16, 2021) ("An absolute indemnity right, for example, could suffice.") (citations omitted).

[20] [Injunction Motion at ¶ 31].

Debtor's estate.[21] For the reasons described herein, the Debtor has not met its legal or evidentiary burdens with respect to each argument, and the Injunction Motion should be denied.

## I. THE DEBTOR HAS NOT ESTABLISHED THAT ABUSE ACTIONS PROSECUTED AGAINST COVERED PARTIES WILL DIMINISH THE ESTATE'S INTERESTS IN THE GENERAL INSURANCE PROGRAM

The Debtor argues that the Abuse Actions implicate all of the insurance policies and related funds generically described as the General Insurance Program,[22] and therefore the Covered Parties' alleged shared interests in these policies and assets serve as sufficient justification for an order extending the automatic stay to enjoin the Abuse Actions.[23] To succeed on that argument, the Debtor, at the very least, must establish (i) that the policies and funds comprising the General Insurance Program are actually property of its estate and (ii) that an action against the Covered Parties would affect the Debtor's interest in that property.[24] The Debtor has not established either of these conditions, and the Injunction Motion should be denied.

Recently, Judge Glenn, in *In re Roman Catholic Diocese of Rockville Centre, New York* ("**Rockville Centre**"), found that even when a sufficient evidentiary showing was made regarding

---

[21] [*Id.* at ¶¶ 31-34; 41-44; 59-61].

[22] [*Id.* at ¶¶ 3, 31, 39, 43, 59-61].

[23] [*See* Dkt. 12-1 (Proposed Order) at ¶¶ 3-4].

[24] *See* 11 U.S.C. § 541; *see e.g., In re Diocese of Rochester* ("**In re Diocese of Rochester**"), Bankruptcy Case No. 12-20905-PRW, 2022 WL 1638966, at *5 (Bankr. W.D.N.Y. May 23, 2022) (denying the Diocese of Rochester's request to stay litigation against related non-debtor entities because it could not establish that such litigation would affect estate property); *In re Diocese of Buffalo*, 618 B.R. 400, 406 (Bankr. W.D.N.Y 2020) (denying the Diocese of Buffalo's request to stay litigation against related non-debtor entities because the insurance coverage outline it submitted was insufficient to prove estate assets would be affected); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (requiring a party seeking injunctive relief to "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original). *See also* 11 U.S.C. § 541(a)(1) (providing that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case") and 11 U.S.C. § 541(a)(6) (indicating that property of the estate includes all "[p]roceeds, product, offspring, rents of or from property of the estate.").

the potential reduction of shared insurance proceeds, Abuse Actions naming solely Covered Parties were not "themselves . . . actions to obtain . . . insurance proceeds under section 362(a)(3)."[25] Put differently, "the *mere threat to the policy does not implicate the automatic stay,* and . . . the Court should not extend the automatic stay if that is the only 'injury' that the debtor can show."[26] The Debtor does not meet it burden here, as neither the Abuse Actions themselves nor the Injunction Motion "establis[h] that the relief sought [in the Abuse Actions] must be satisfied from insurance proceeds."[27] In fact, the Debtor takes the position that the General Insurance Trust Self-Insurance Trust cannot be used to pay the debts of their respective, covered parties, and that creditors cannot bring direct lawsuits against either Trust:

> Neither the income of the [Self-Insurance Trust] nor the [Self Insurance Trust] itself shall be liable for the debts of the Grantor or any covered person described in the [Self-Insurance Program], nor shall the same be subject to seizure by a creditor of the Grantor or any covered person described in the [Self-Insurance Program] under any writ of proceedings at law or in equity, nor shall any direct action be brought against the [Self-Insurance Trust] on account of any cause of action against the Grantor or any covered person described in the [Self-Insurance Program], and the Grantor and any covered person described in the [Self-Insurance Program] shall not have the power to sell, assign, transfer, borrow, encumber, hypothecate, or in any other manner anticipate or dispose of its interest in the same.[28]

According to the Debtor's own filings, neither the General Insurance Trust nor the Self-Insurance Trust would be implicated directly by Abuse Actions. To borrow Judge Glenn's term, the insurance trusts would at worst be "threatened" by such lawsuits. Of course, if a covered party were, in turn, to submit a claim to the General Insurance Trust or the Self-Insurance Trust, that

---

[25] 651 B.R. 622, 642 (Bankr. S.D.N.Y.).

[26] *Id.* at 644 (emphasis in original) (quoting *In re Granite Partners, L.P.*, 194 B.R. 318, 337 (S.D.N.Y. 1996)).

[27] *Id.* at 645.

[28] [Insurance Programs Motion, at ¶ 27; *see also id.* at ¶ 16].

action *might* implicate the automatic stay, depending on facts that the Debtor has not yet provided

to the Court, the Committee, or any other party in interest to the Committee's knowledge. In any

event, consistent with Judge Glenn's sound reasoning, unless and until the Covered Parties seek

to recover from the insurance policies or to deplete the estate's interest in the General Insurance

Program, there is no basis for section 362(a) to be invoked.[29] The Debtor has made no showing

that this scenario is at play in this case.

The Court should follow Judge Glenn's guidance and determine that, while some portion

of the insurance policies' proceeds or the General Insurance Program *may* constitute property of

the estate,[30] the Abuse Actions (or the hypothetical threat of the future filing of Abuse Actions)

against the Covered Parties, do not automatically constitute actions to obtain control over any

portion of those assets that constitute estate property.[31] The Court should likewise reiterate that,

based on the record before it, the mere pendency of the Abuse Actions (or the threat of future filing

of Abuse Actions) does not obligate the Debtor to fund the Covered Parties using any of *estate*'s

interest in the General Insurance Program. If and when the Covered Parties seek relief that *could*

---

[29] *Id.* (citing *In re Adelphia Comm. Corp.*, 285 B.R. 580, 587 (Bankr. S.D.N.Y. 2002), *overruled on other grounds*, *In re Adelphia Comm. Corp.*, 298 B.R. 49 (S.D.N.Y. 2003)) ("To the extent that the DRVC Related Parties contend that *they* will need to first access the insurance proceeds to defend against these claims, they may bring a lift stay motion . . ..") (emphasis in original).

[30] It is premature to address whether the insurance policies' proceeds are in fact the property of the estate because there is not sufficient evidence before the Court. Even under the Debtor's account of the operative facts, whether or not the Insurance Policies' proceeds constitute the estate property is an open fact question. *See Injunction Motion* at ¶ 12; *see also In re MF Global Holdings Ltd.*, 515 B.R. 193, 203 (Bankr. S.D.N.Y. 2014) (observing that the proceeds of liability policies that provide coverage to both a Debtor and non-debtor entities are only "property of the estate" where the depletion of the proceeds allegedly at issue concerns policy proceeds that "actually protec[t] the estate's other assets from diminution").

[31] *See Rockville Centre,* 651 B.R. at 642-45.

place estate property at issue, the Court can address such requests as it deems appropriate.[32]

The Debtor, at this point, has failed even to identify which insurance policies it is seeking to protect or otherwise establish that the insurance policies or funds comprising the General Insurance Program constitute estate assets.[33] The Debtor explicitly disclaimed ownership of many of these assets in its Informational Brief:

> While [the Debtor] provides administrative services for each of the Insurance Programs, the funds held by [the Debtor] on behalf of each Insurance Program are held in trust to be used solely for each respective Insurance Program. Similarly, all funds in the Insurance Trusts are assets solely of the respective Insurance Trusts. The assets of the Insurance Programs are not assets of [the Debtor]. The assets of the Insurance Trusts are not assets of [the Debtor].[34]

Therefore, according to the Debtor, and due to the Debtor's failure to affirmatively prove otherwise, pursuant to its burden, the General Insurance Program cannot and should not be protected by the automatic stay.[35]

The Debtor and the record are also silent as to the nature of the Covered Parties' interests in relevant insurance policies. In connection with its Injunction Motion, the Debtor did not (1) provide the insurance policies to the Court or place them into the record in any way; (2) provide

---

[32] *See id.*, 651 B.R. at 645 ("To the extent that the DRVC Related Parties contend that *they* will need to first access the insurance proceeds to defend against these claims, they may bring a lift stay motion . . ."); s*ee, e.g., In re MF Global Holdings Ltd.*, 515 B.R. 193, 203-04 (Bankr. S.D.N.Y. 2014) (addressing lift stay request initiated by non-debtor co-insureds concerning the reimbursement of defense costs under liability policy).

[33] The Committee recognizes that at least some portion of insurance proceeds are estate property under some circumstances. *See MacArthur v. Johns-Manville Corp.*, 837 F.2d 89, 92-93 (2d. Cir. 1988). *But see In re MF Global Holdings Ltd.*, 515 B.R. 193, 203 (Bankr. S.D.N.Y. 2014) (discussing certain exceptions to this rule). The Debtor, however, has failed to show which policies are shared with the Covered Parties or at risk of diminution as a result of the Abuse Actions.

[34] [Informational Brief, at ¶¶ 111-114]. The Committee takes no position as to the accuracy or validity of any of the Debtor's statements in the Informational Brief and reserves all rights to investigate and challenge the Debtor's positions and assertions.

[35] *See* 11 U.S.C. § 362(a)(3) (automatic stay protects property of the estate).

the insurance policies to the Committee or any other party in interest, so the relief sought could be appropriately understood or scrutinized; or (3) produce any evidence regarding the Debtor's or the Covered Parties' interests in any insurance policies. The Debtor presumes that the Abuse Actions will erode recoveries for its estate and calls such a result inevitable, but such argument is not a valid substitute for proof, particularly when written proof of the Debtor's position would presumably exist, and there are myriad scenarios in which such a result would *not* occur. For example, if one or more of the insurance policies do not contain a policy aggregate, or contain a per-insured aggregate, then an action against a Covered Party would not automatically erode coverage for the Debtor; or, if cost of defense is outside of the insurance policy limits, then prosecuting the Abuse Actions up until entry of judgment would not necessarily erode coverage for the Debtor.

The Debtor cannot ask the Court simply to rely on the Debtor's baseless assertions or, worse, self-serving *assumptions* regarding complex factual circumstances and insurance coverage issues to impose extraordinary injunctive relief. The Debtor must instead provide verifiable factual and legal evidence for the extraordinary relief it seeks and, at this point, the Debtor has not even come close to doing so.

The Debtor has also failed to define the scope of the relief it seeks with any specificity. The Debtor defines the Covered Parties in an improperly vague and circular fashion as any of its "related entities included as additional insureds under the Debtor's various current and legacy insurance programs." [36] The Debtor's definition is not supported by a comprehensive list of parties that would benefit from the proposed expansion of the automatic stay. As a result, there is no way for Survivors to ascertain the breadth of the relief that the Debtor is seeking, let alone evaluate the

---

[36] [Injunction Motion, at 1].

potential extent of its impact or prejudice. The Debtor's vague definition of "Covered Parties" also makes complying with its requested injunction practically impossible.[37]

The Debtor has sufficient information within its control to identify by name its "related entities included as additional insureds under the Debtor's various current and legacy insurance programs." Nevertheless, the Debtor elected not to do so in connection with its Motion. If the Debtor wishes to obtain extreme injunctive relief for potentially hundreds of non-debtor parties, at the very least, it should identify such parties by name. And in fact, fairness and due process would require the Debtor to do much more: the Debtor should be required to provide *evidence* of the need to extend the stay *as to each party* it believes requires injunctive protection.

Because the Debtor has failed to meet its burden to establish that its own interest in the proceeds of the insurance policies, or its own interest in the funds in the General Insurance Program would be diminished if the extraordinary relief it seeks were not granted, the Debtor has no basis to extend the automatic stay under Section 362, and the Motion should be denied.[38]

## II.  THE DEBTOR IS NOT ENTITLED TO INJUNCTIVE RELIEF UNDER 11 U.S.C. § 105(a)

The Court should deny the Debtor's request for injunctive relief because the Debtor (a) failed to follow the proper procedure to obtain injunctive relief and (b) has not met its burden to establish that the four injunction factors warrant the imposition of a preliminary injunction

---

[37] *CPC Intern., Inc. v. Skippy Inc.*, 214 F.3d 456, 461 (4th Cir. 2000) ("Injunctions must be narrowly tailored and should prohibit only unlawful conduct. An 'order must be tailored as precisely as possible to the exact needs of the case.'" (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968)).

[38] *See Rochester*, 2022 WL 1638966, at *5; *In re Diocese of Buffalo*, 618 B.R. at 406.

enjoining the prosecution of the Abuse Actions.[39]

     **a.**     **The Debtor's Request for an Injunction Violates Survivors' Due Process Rights**

Constitutional due process and the Federal Rules of Bankruptcy Procedure require any proceeding to obtain an injunction or other equitable relief to be filed as an adversary proceeding.[40] Where the Federal Rules of Bankruptcy Procedure require a matter to be resolved by adversary proceeding, creditors have a constitutional due process right to have the issued resolved as such.[41]

Here, the Debtor filed a motion in its main bankruptcy proceeding seeking an order enjoining all persons from filing or otherwise pursuing any Abuse Actions against the Covered Parties, regardless of whether the Debtor is also named in the litigation. Survivors will be materially prejudiced if the Court grants the Injunction Motion, including as to any determination of the Covered Parties' joint interests in the insurance policies,[42] and their respective entitlement to an injunction protecting them from the Abuse Actions. Here, Survivors have not been afforded

---

[39] While disguised as a motion regarding the extent of the automatic stay, the practical effect of the Injunction Motion is not to protect estate assets, *see* Section I, *supra*, but instead to protect the interest of the Debtor's Catholic affiliates and is a simple request for an injunction. *See In re A.H. Robins Co. Inc.*, 828 F.2d 1023, 1026 (4th Cir. 1987) ("Because we have already determined that these actions pose no direct threat to Robins' property, we confine our analysis to other kinds of harm. In the context of this case, that harm would be the burden placed on Robins' officers, directors, and employees, which would exhaust their energies and thus interfere with the debtor's reorganization.").

[40] *See* U.S. CONST., AMEND. V; Fed. R. Bankr. P. 7001(7).

[41] *See In re E-Z Serve Convenience Stores, Inc.*, 318 B.R. 631, 636 (M.D.N.C. 2004); *PAPCO, Inc. v. Oleum Expl., LLC*, 3:19-CV-00589, 2019 WL 3252416, at *4 (M.D. Pa. July 19, 2019) (citing *In re Mansaray-Ruffin*, 530 F.3d 230, 237 (3d Cir. 2008) ("By way of analogy, if a plaintiff were to attempt to 'commence' a civil litigation by filing a motion with the district court ..., and the defendant were to fail to file a pleading in response, we surely would not uphold the entry of default judgment on behalf of the plaintiff.... [The plaintiff's affirmative duty to file and serve a complaint] is not lessened or negated by the defendant's inaction."); and *Mansaray-Ruffin,* 530 F.3d at 242 ("[W]e hold only that, where the Rules require an adversary proceeding ... to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one.")).

[42] *See* Fed. R. Bankr. P. 7001(2).

the critical due process protections of heightened notice, adequate time to respond, discovery, a trial, or the myriad of other procedural protections required by the Federal Rules of Bankruptcy Procedure.[43] Because the Injunction Motion seeks to enjoin creditors from taking actions against the Debtor's Catholic affiliates, the Debtor was required to file its request for relief as an adversary proceeding and afford Survivors adequate due process.[44] To preserve Survivors' rights to due process, the Court should deny the Injunction Motion.

###   b.    The Debtor Has Not Established its Right to a Preliminary Injunction

Bankruptcy courts overseeing diocesan bankruptcy cases largely agree that section 362(a) is inapplicable to Abuse Actions against a debtor's Catholic affiliates in instances where diocesan debtors have failed to demonstrate the impact of such actions on the estate.[45] The Court should deny the Motion because the Debtor fails to establish entitlement to an injunction, including that prosecution of the Abuse Actions will have a binding collateral effect on the Debtor or its estate,

---

[43] *See In re Banks*, 299 F.3d 296, 301 (4th Cir. 2002), *abrogated on other grounds by United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (noting the various procedural safeguards guaranteed through an adversary proceeding); *accord In re E-Z Serve Convenience Stores, Inc.*, 318 B.R. at 636.

[44] Other diocesan cases seeking similar relief have filed their requests as motions in adversary proceedings. *See e.*g., *The Diocese of Buffalo v. Doe*, Adv. No. 20-01016 at Dkt. 4 (Bankr. W.D.N.Y); *The Roman Catholic Diocese of Rockville Centre, New York v. ARK 320 Doe*, Adv. No. 20-01226, Dkt. 2 (Bankr. S.D.N.Y.); *The Roman Catholic Diocese of Syracuse, New York, v. LG 35 Doe*, Adv. No. 21-50005-5,(Bankr. N.D.N.Y); *The Roman Catholic Diocese of Albany, New York v. Doe*, Adv. No. 23-90005-1 (Bankr. N.D.N.Y) and this approach is consistent with the procedural history of the cases where the Fourth Circuit has approved extending the automatic stay to third parties. *See also e.g., A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d at 996-97 (noting the debtor filed an adversary proceeding and sought the injunction as a motion therein).

[45] *See In re Diocese of Buffalo*, 618 B.R. at 406 ("The Diocese has supplied only an outline of insurance coverage. While this presentation is helpful, it falls far short of proof sufficient to establish that litigation against the Affiliated Entities would necessarily affect property of the estate."); *Rochester*, 2022 WL 1638966, at *5 (holding that "the Diocese . . . failed to carry its burden of proving that a specific CVA case would materially erode coverage under a specific policy of insurance" because it "made no effort to provide evidence that a specific CVA case would have a materially adverse impact on the per-occurrence limits of a specific policy of insurance").

divert the Debtor's resources away from these chapter 11 cases, or give rise to indemnification obligations by the Covered Parties.

"A preliminary injunction is an extraordinary remedy never awarded as of right."[46] A motion for preliminary injunction must be supported by facts, and where essential facts are in dispute, there must be a hearing and the Court must make sufficient fact findings.[47] A party seeking a preliminary injunction must establish: (1) likelihood of success on the merits, (2) they are likely to suffer irreparable harm absent the injunction, (3) the balance of equities tips in their favor, and (4) the injunction is in the public interest.[48] The recent decisions by bankruptcy courts in assessing similar relief sought by diocesan debtors each applied these four "traditional" factors, declined to afford the diocesan debtor such extraordinary relief.[49]

### 1. The Debtor Has Not Demonstrated That It Can Successfully Reorganize

In the bankruptcy context, "likelihood of success," means likelihood of a successful reorganization.[50] The Committee acknowledges that determining whether the Debtor will

---

[46] *Winter*, 555 U.S. at 24.

[47] *See Visual Sciences, Inc. v. Integrated Comms. Inc.*, 660 F.2d 56, 58 (2d. Cir. 1981) (vacating a preliminary injunction because the underlying court did not make adequate findings of fact).

[48] *See Winter*, 555 U.S. at 20; *A.H. Robins Co.,* 788 F.2d at 1008 (noting relevant factors include "the likelihood of success by the debtor under these circumstances appeared indisputable. The hardships which would be suffered irreparably by the debtor and by its creditors generally in permitting these plaintiffs to secure as it were a preference in the distribution of the insurance pool herein to which all creditors were entitled, together with the unquestioned public interest in promoting a viable reorganization of the debtor can be said to outweigh any contrary hardship to the plaintiffs.").

[49] *See Rochester*, 2022 WL 1638966, at *6; *In re Diocese of Buffalo* 618 B.R. at 406; *The Roman Catholic Diocese of Syracuse, New York,* 628 B.R. 571, 580 (Bankr. N.D.N.Y. 2021); *Rockville Centre*, 651 B.R. at 638; *see* Injunction Motion at ¶ 45; *see also* 2 COLLIER ON BANKRUPTCY ¶105.03 (16th ed. 2022) ("Unlike the automatic stay, a request for relief under section 105 must meet traditional requirements for an injunction, and *must be presented and prosecuted in traditional formats*.")(emphasis added).

[50] *See Rockville Centre*, 651 B.R. at 651 (citing *In re Calpine Corp.*, 365 B.R. 401, 409 (Bankr. S.D.N.Y. 2007)).

ultimately be able to reorganize is difficult in the "earliest weeks of the case" and the focus should be on whether the Debtor is meeting challenges and proceeding on track.[51] The Committee also recognizes that the Debtor has taken numerous actions at the outset of this case and that various parties have represented as such to the Court.

The Debtor, however, will not be able to reorganize without the support of the Covered Parties. The Debtor will likely seek, as have numerous other Catholic dioceses, releases and a channeling injunction for the Covered Parties.[52] The Committee (and likely all Survivors in general) will not support a plan that provides releases and a channeling injunction for non-Debtor parties unless those non-Debtor parties are making a substantial contribution. This is but one of the factors considered by Fourth Circuit courts when evaluating whether a plan of reorganization providing for nonconsensual third-party releases is appropriate.[53] At minimum, any plan proposed in this case that provides releases to the Covered Parties must provide for a substantial contribution by such parties.[54]

The Debtor has not demonstrated that it can propose a plan that includes a substantial contribution by Covered Parties, in connection with the Injunction Motion. The Debtor has provided no information to the Committee or the Court regarding Covered Parties' assets or their ability to provide a substantial contribution in exchange for the releases the Debtor will be seeking

---

[51] *See In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009).

[52] [*See, e.g.*, *Injunction Motion* ¶¶ 51-53 (implying Survivors could pursue Abuse Actions against Covered Parties as part of this bankruptcy proceeding)].

[53] *See Behrmann v. Natl. Heritage Found.*, 663 F.3d 704, 711 (4th Cir. 2011) (noting overwhelming support from creditors is a critical factor in deciding to approve a plan containing nonconsensual third-party releases); *Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641, 696 (E.D. Va. 2022).

[54] *See Natl. Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 348 (4th Cir. 2014) (upholding the district court's conclusion requiring a substantial contribution).

for them. Further, the Debtor has provided no evidence of its ability to secure the necessary substantial contribution from the Covered Parties or that the prosecution of the Abuse Actions will harm its ability to do so.

In reality, allowing the Abuse Actions to proceed will actually prompt the Debtor, the Covered Parties, and their insurers to participate in settlement meaningful negotiations with greater focus and urgency.[55] Abuse Action lawsuits or similar actions against non-Debtors will force parties to consider the implications of potentially adverse decisions on claim valuation and discovery issues, increasing their motivation to engage and contribute to a global resolution through mediation in this case. Engagement by, and offers of contributions from non-Debtor parties, will enhance the Debtor's ability to propose an acceptable plan (*i.e.*, a plan that contains substantial contributions from non-Debtors in exchange for their anticipated releases) much earlier in the case.

Conversely, without pressure from the Abuse Actions or similar actions, the Debtor, the Covered Parties, and the Debtor's insurers will likely engage in familiar delay and stonewalling tactics, seeking to extract a windfall despite making settlement offers that do not reflect the true extent of their exposure. If allowed to occur, these proceedings will languish for years as Survivors continue to wait for acknowledgement and justice that they have been denied of for decades.

Various iterations of this scenario have unfolded in diocesan bankruptcy cases. Cases have been stalled unnecessarily and this is responsible for the creation of tremendous, avoidable

---

[55] For instance, the denial of similar relief requested by the Diocese of Rochester led to a swift settlement with the creditors' committee. In *Rochester,* after two and a half years of little progress, the Court permitted litigation against non-debtor affiliates to proceed. *See In re Diocese of Rochester,* 2022 WL 1638966, at *7-8. Five months later, the Debtor and the creditors' committee entered into a restructuring support agreement. *See Motion for Entry of an Order (I) Approving the RSA, (II) Authorizing the Diocese to Enter into and Perform Under the RSA; (III) Approving the Committee Settlement, and (IV) Granting Related Relief. Rochester,* Bankr. W.D.N.Y. 19-20905, Dkt. No. 1790 (Nov. 3, 2022).

expense.[56] By means of its Injunction Motion, the Debtor seeks to plant the same strategic seeds in this case, making it probable that the stay will actually impede, rather than facilitate, the Debtor's expeditious reorganization.

Additionally, the lack of important actions taken by the Debtor to date indicates it may not have made as much progress toward reorganization as it suggests. The Debtor filed its bankruptcy petition approximately one month ago, the section 341 meeting of creditors has not yet been held, the Debtor has not initiated an adversary proceeding against its insurers to set the parameters for a global mediation of this proceeding, and the Debtor has not made progress on any of its substantive goals its states are necessary reorganization, as set forth in the Informational Brief.[57]

As this case passes the one-month anniversary of its filing, the likelihood of the Debtor successfully reorganizing remains speculative at best. The Debtor has failed to provide any support regarding its ability to reorganize. As Judge Glenn noted in his analysis of a similarly-sought preliminary injunction in *Rockville Centre*, "the more important question is whether the harm in absence of the requested injunction poses a threat to the possibility of reorganization."[58]

The Debtor has simply not met its burden to prove that the prosecution of the Abuse Actions will threaten its ability to reorganize. Conversely, as detailed above, the prosecution of the Abuse Actions **will aid** in the reorganization process, as it will prompt the Debtor, Covered

---

[56] *See generally In re Diocese of Rochester* (Bankr. W.D.N.Y., Case No. 19-20905) (nearing its 4-year anniversary); *In re the Diocese of Buffalo, N.Y.* (Bankr. W.D.N.Y., Case No. 20-10322) (nearly 3.5-years old); *In re The Roman Catholic Diocese of Syracuse, New York* (Bankr. N.D.N.Y., Case No. 20-30663) (3-years old); *In re The Roman Catholic Diocese of Rockville Centre* (Bankr. S.D.N.Y., Case No. 20-12345) (nearing its 3-year anniversary).

[57] [*See Informational Brief* at ¶¶ 170-73].

[58] 651 B.R. at 653.

Parties, and the Debtor's insurers to participate with greater focus and urgency in a global mediation. This factor weighs against the imposition of the proposed injunction.

### 2. There is No Risk of Imminent, Irreparable Harm to the Debtor's Estate

"A plaintiff seeking a preliminary injunction must establish that ... [it] is likely to suffer irreparable harm in the absence of preliminary relief."[59] While the Debtor initially argues that a section 105(a) injunction is warranted if the action to be enjoined is one that threatens the reorganization process,[60] courts consider more certain "illustrative harms" in assessing this factor.[61] One such example was provided by the Fourth Circuit in the *A.H. Robinson* case:

> Where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor ... [a]n illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case.[62]

The Debtor goes on to point to three ways it claims the Abuse Actions will harm its reorganization process: (1) judgments entered against Covered Parties will necessarily prejudice the Debtor in its defense of the Abuse Actions, (2) the Debtor's employees will be distracted and diverted from their efforts to reorganize the Debtor, and (3) the Debtor will be forced to indemnify the Covered Parties from judgments in the Abuse Actions.[63] As discussed below, because the Debtor's positions are not supported by the record evidence or by applicable law, this factor weighs against the injunction.

---

[59] *Winter*, 555 U.S. at 20.

[60] *See Injunction Motion,* ¶¶ 41-42 (citing cases).

[61] *See Rockville Centre*, 651 B.R. at 654 (citing *1031 Tax Grp.*, 397 B.R. at 684).

[62] *A.H. Robins Co.*, 788 F.2d at 998-99.

[63] [*See Injunction Motion,* ¶¶ 31-34; 41-44; 59-61].

### i. The Debtor has Not Shown that Judgments Against the Covered Parties will have a Collateral Effect

The Debtor argues that prosecution of Abuse Actions against any of the Covered Parties would necessarily bind the Debtor to certain legal and factual findings in those actions and that "[j]udgment against a Covered Party would be tantamount to judgment against the Debtor…because the allegations arise out of the same operative factual allegations."[64] Based on the fact that the Debtor filed this chapter 11 case prior to the effective date of the CVA, it is highly unlikely that any Abuse Actions were in fact filed prior to the filing of the Debtor's Injunction Motion, and the Debtor cited no examples that were. The Debtor's assertions as to the nature of the factual allegations in the Abuse Actions are, therefore, mere speculation. Beyond this supposition, the Debtor provides no context or reasonable hypotheticals for how any collateral or preclusive effect could manifest and prejudice the Debtor. Bankruptcy Courts in this district are indeed skeptical that any judgment entered during the pendency of the automatic stay could legally have such a collateral effect on a debtor.[65]

As in *Rockville Centre*, the Debtor here has failed to articulate "any scenario or theory under which events in the Abuse Actions could effectively lead to a 'judgment or finding against the Debtor.'"[66] The Debtor must affirmatively explain how "a stay would help avoid inconsistent

---

[64] [*Injunction Motion,* ¶¶ 48-53].

[65] *See In re Plan 4 College, Inc.*, No. 09-17952DK, 2009 WL 3208285, at *2 (Bankr. D. Md. Sept. 24, 2009) ("To the extent that courts may have held that collateral estoppel may bind a debtor where an adverse judgment is entered against non-debtor parties in an action which has been stayed by the automatic stay, this court must respectfully disagree.").

[66] 651 B.R. at 649 (citing *A.H. Robins Co.*, 788 F.2d at 999).

judgments,"[67] and mere "apprehension" of collateral estoppel is not a basis for staying litigation against non-debtors.[68]

The Debtor has failed to articulate an identity of interest or other nexus between the Covered Parties and the kind of preclusive findings that might logically follow from continued litigation against a non-debtor; e.g., a case filed against the Archbishop or a former archbishop in his personal capacity.[69] This factor does not support the issuance of the proposed injunction because the Abuse Actions will not result in the risk of inconsistent judgments or other collateral effects for the Debtor.

### ii. The Debtor Has Not Shown that Abuse Actions will divert the Debtor's Key Personnel from their Duties in this Chapter 11 Case

The Debtor asserts that prosecution of Abuse Actions against the Covered Parties will divert the attention of the Debtor's key employees and cause irreparable harm. As with most of the allegations in the Injunction Motion, the Debtor provides no evidence for this assertion.

The Debtor does not offer any specific examples of employees who would participate in or monitor Abuse Actions filed against any of the Covered Parties: who among the debtor's staff will be required to respond to the Abuse Actions filed against Covered Parties; what role will those individuals would play; how much time or expense will be associated with their participation? The Debtor does not say. The Debtor states these employees would be "forced" into such outcomes,

---

[67] *Id.* at 659.

[68] *Queenie Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (addressing the issue in the automatic stay context).

[69] *See In re Granite Partners, L.P.*, 194 B.R. 318, 338 (Bankr. S.D.N.Y. 1996) (refusing to extend section 105(a) relief in part because non-debtor co-insureds are "individually liable" for claims). Thus, any factual or legal determinations entered in these actions will not impact the Debtor because they do not implicate the Debtor, but instead the Covered Parties. *See id.* at 338 (refusing to extend section 105(a) relief in part because Debtor had not advanced credible collateral estoppel scenario).

but does not state who or what would compel them to act.[70]  In addition, the Debtor is taking the position in this case that its parishes and, presumably, the other Covered Parties are entirely separate and distinct from the Debtor.[71] It is not clear why the Debtor's employees would engage meaningfully in litigation against separate and distinct entities. Even if the Debtor could offer some examples, courts have rejected even more concrete explanations in similar cases.[72] Accordingly, this factor does not support the issuance of the proposed injunction.

### iii.   The Debtor Has Not Shown It Would Be Forced to Indemnify the Covered Parties

The Debtor has failed to provide evidence that it would be irreparably harmed on account of any Covered Parties' entitlement to absolute indemnity from the Debtor or on account of any judgment. The Fourth Circuit Court of Appeals cites such indemnity obligations as the type of commonality of identity or interest that must be shown before courts can issue an injunction extending the automatic stay.[73] The Debtor has neither provided indemnity agreements between it and any of the Covered Parties, nor has the Debtor even suggested that it has such an obligation or that such obligation is enforceable in bankruptcy.[74] Because there is no evidence that a judgment

---

[70] [*See* Injunction Motion, at ¶ 46].

[71] [*E.g.*, Informational Brief, at ¶¶ 43; 46; 49; 54; 62; 69; 77; 81; 86; 91; 95; 99].

[72] *See Rockville Centre,* 651 B.R. 622 at 649 (noting that "the fact that the Debtor may have some involvement in producing documents or shares a 'charitable mission' with the DRVC Related Parties clearly does not move the needle on this point, either.").

[73] *See A.H. Robins Co.*, 788 F.2d at 998-99; *In re Republic Technologies Int'l, LLC*, 275 B.R. 508, 515-16, 520 (Bankr. N.D. Oh. 2002) (rejecting identical argument advanced by a debtor arising out of alleged effect of self-insured retention provisions in an insurance policy in part on the grounds that "this Court is without any evidence that [the debtor] has an obligation to indemnify [non-debtor defendant co-insureds)".

[74] *See also* 11 U.S.C. § 502(e) (disallowing certain claims for contribution and indemnity).

against the Covered Parties is in effect a judgment against the Debtor, this factor weighs against granting an injunction.

### C.      The Balance of Equities Weighs in Favor of Denying the Motion

If the Abuse Actions are enjoined, Survivors will suffer concrete and significant harm. The Debtor's request for an injunction in favor its Catholic affiliates is an attempt to extend bankruptcy protection to Debtor-affiliated parties while, at the same time, shielding such parties from the disclosure requirements and other obligations that come along with, and also balance bankruptcy protections. Further, after extending the automatic stay to these affiliates at the beginning of this case, at the end of the case, the Debtor is virtually certain to seek a "fresh start" for the affiliates by means of third-party releases. This approach would provide a complete end-run around the Bankruptcy Code for the benefit of what appears to be approximately 200 Catholic affiliates.

The Bankruptcy Code is designed to balance the rights of creditors and debtors. Depriving Survivors of the material creditor rights that Congress bestowed, while at the same time extending debtor protections to non-debtor parties at the beginning and end of the case, would be profoundly inequitable and unjustifiable—particularly on a record that lacks material evidentiary support for such extreme relief.  The extension of the stay would also silence Survivors and prevent them from seeking justice. Survivors have waited decades for recognition of the horrendous abuse they suffered as children. If an injunction is issued, not only will the waiting and denial of justice continue against the Debtor, it will prevent Survivors from seeking acknowledgement and justice against other culpable parties. The likelihood that Survivors will die without exercising their rights will materially increase, their rights to a jury trial will be impaired, and their cases will be

weakened from an evidentiary perspective.[75] These concrete, certain, and serious outcomes vastly outweigh the unsupported concerns of inconvenience and speculative harm cited by the Debtor in support of its Motion.[76]

The Debtor, in its analysis of this factor, does not even acknowledge that the Defendants will suffer any harm if an injunction is entered.[77] While the Debtor's silence on this point can be considered a tacit acknowledgement that it does not contest these harms exist, its failure to recognize the harms that it has, and continues to cause Survivors, is troubling given its history with Survivors of abuse and the overall context of this case.

If the Abuse Actions are not enjoined, the Debtor suggests that the only harm it would suffer is its inability to protect estate assets that *could* be used to fund a settlement.[78] As detailed above, there is no threat to estate assets if the Abuse Actions proceed and the Court "need not enter

---

[75] *See e.g., Rockville Centre* 651 B.R. at 666 ("For every day the injunction lasts, the [Survivors] are not only prevented from pursuing recovery on their claims, but their ability to prove their underlying case is weakened. For many Survivors, allowing time to pass means that they simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims."); *Rochester*, 2022 WL 1638966 at *7 (reasoning that if the survivors lost the chance to seek justice in the court of law by an injunction, "it is likely that more will be denied the chance to seek justice because the sands of time are working against them."); *see also Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) ("[T]he clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard . . . [P]laintiffs and crucial witnesses are dying . . ..").

[76] *See Rockville Centre,* 651 B.R. at 666 (finding that time-sensitive concerns regarding survivors' ability to prosecute their cases weighed heavier than the inconvenience of the Diocese of Rockville Centre participating in litigation against its related entities); *Rochester*, 2022 WL 1638966 at *7 (finding that the balance of harms to abuse survivors by a continued litigation stay "is substantially greater than the speculative harms imagined by the Diocese") and (reasoning that "[a]buse [s]urvivors are entitled to have juries hear their cases [against non-debtor entities]—an option rarely available in bankruptcy courts" and that "state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court.").

[77] [*See Injunction Motion*, ¶¶ 41-44]; *Rockville Centre,* 651 B.R. at 666 (finding it important that the debtor did not contest that harms existed as to survivors the debtor sought to enjoin from litigating against non-debtor entities).

[78] [*See Injunction Motion* at ¶ 57].

an order to enforce what is already barred by statute."[79] Moreover, as described above, the continued prosecution of the Abuse Actions will compel all parties to focus on settlement and will in turn, hasten the pace of this proceeding.

This Court should follow *Rockville Centre* and *In re Diocese of Rochester*, and determine that the balance of harms weighs in favor of the Survivors and, by extension, all parties interested in resolution of this proceeding.

### D.    The Public Interest Will Be Served by Denying the Injunction

In the context of evaluating an injunction of the Abuse Actions, the public interest is best served by considering (1) that the public's interest in accountability and resolution aligns with Survivors' interests; and (2) "promoting a viable reorganization of the debtor."[80] Denying the proposed injunction serves both of these considerations. Allowing the Abuse Actions to proceed will afford the Survivor Defendants the opportunity to hold those that harmed them accountable and for the long-awaited resolution of their claims. Further, as described above, denying the injunction is likely to expedite this Chapter 11 case.

In support of the public interest factor, the Debtor argues that preserving estate assets will enhance its reorganization prospects and allow the debtor to continue its mission and ministry.[81] For the aforementioned reasons, any argument that the prosecution of the Abuse Actions will impact estate assets should be disregarded, as the Debtor has failed to satisfy its evidentiary burden to show that continued prosecution of the Abuse Actions will impact estate assets in any way. Further, to the extent the Covered Parties seek access to estate assets in connection with the Abuse

---

[79] *Rockville Centre,* 651 B.R. at 645.

[80] *Id.* at 666 (citations omitted).

[81] [*See Injunction Motion,* ¶ 57].

Actions, they should be required to seek relief from the automatic stay first.[82] Even assuming, strictly for the sake of argument, that the Abuse Actions threaten estate assets in some way, the Debtor still does not explain, let alone demonstrate, how the depletion of such assets would impact its mission and ministry. As it stands, the Debtor is operating as a debtor-in-possession and continuing its religious practices and services. The possibility of the bankruptcy case looming as a specter over the Debtor's continued operations is all the more reason it should swiftly show accountability. Seeking to enjoin Survivors from pursuing actions against Covered Parties does not send that message; nor does allowing Survivors to continue Abuse Actions against Covered Parties impair **the Debtor's** mission and ministry.

As stated, this Court should follow *Rockville Centre* and *In re Diocese of Rochester*, and determine that the public interest is best served by denying the proposed injunction and allowing the Abuse Actions to proceed.

## **CONCLUSION**

The record does not support a finding that the prosecution of Abuse Actions will have any deleterious effect on the assets of the estate and the Debtor cannot meet its factual or legal burdens on the four factors necessary to obtain an injunction. For these reasons, and others stated above, the Committee respectfully requests that the Court enter an order denying the Motion.

---

[82] *See Rockville Centre,* 651 B.R. at 641-642 (reasoning that a stay relief motion is the proper mechanism for a non-debtor to access insurance proceeds that are estate property for defense costs, settlement, or to satisfy a judgment).

Dated: November 2, 2023.                    Respectfully Submitted,


                                            /s/ Richard L. Costella
                                            Richard L. Costella (MD # 14095)
                                            Alan M. Grochal (MD # 01447)
                                            **Tydings & Rosenberg LLP**
                                            1 East Pratt Street, Suite 901
                                            Baltimore, MD 21202
                                            Main: 410-752-9700
                                            Email: rcostella@tydings.com
                                                        agrochal@tydings.com

                                            *Proposed Counsel to the Official Committee of Unsecured Creditors*

                                             And

                                            Robert T. Kugler (MN # 194116)
                                            Edwin H. Caldie (MN # 388930)
                                            Andrew J. Glasnovich (MN # 398366)
                                            Nicole Khalouian (NY # 5755681)
                                            Stinson LLP
                                            50 South Sixth Street, Suite 2600
                                            Minneapolis, MN 55402
                                            Main: 612-335-1500
                                            Facsimile:  612-335-1657
                                            Email:      robert.kugler@stinson.com
                                                        ed.caldie@stinson.com
                                                        drew.glasnovich@stinson.com
                                                        nicole.khalouian@stinson.com


                                            *Proposed Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of November, 2023, a true and correct copy of the foregoing **OPPOSITION** was filed and served via the Court's CM/ECF e-filing system on all parties of record:

Blake D. Roth, Esquire: blake.roth@hklaw.com
Catherine Keller Hopkin, Esquire: chopkin@yvslaw.com
Hugh M. (UST) Bernstein, Esquire: hugh.m.bernstein@usdoj.gov
Gary R. Greenblatt, Esquire: grg@cooncolelaw.com
Andrew D. Freeman, Esquire: adf@browngold.com
Geoffrey Grivner, Esquire: geoffrey.grivner@bipc.com
Nathan D. Adler, Esquire: nda@nqgrg.com
Diane C. Bristow, Esquire: dcb@nqgrg.com
James P. Ruggeri, Esquire: jruggeri@ruggerilaw.com
Tyler N. Layne, Esquire: Tyler.Layne@hklaw.com
Christopher Scott Kunde, Jr., Esquire: scott.kunde@hklaw.com
Steven J Kelly, Esquire: skelly@gelaw.com
Joshua D Weinberg, Esquire: jweinberg@ruggerilaw.com
Annette Rolain, Esquire: arolain@ruggerilaw.com
Nicholas R. Miller, Esquire: nick.miller@hklaw.com
Timothy P. Palmer, Esquire: timothy.palmer@bipc.com
Gordon Z. Novod, Esquire: gnovod@gelaw.com
Philip Tucker Evans, Esquire: philip.evans@hklaw.com,
Megan Harmon, Esquire: megan.harmon@bge.com
Annette Rolain, Esquire; arolain@ruggerilaw.com
Joshua D Weinberg, Esquire: jweinberg@ruggerilaw.com
Anthony May, Esquire; amay@browngold.com
Gordon S. Young, Esquire; gyoung@silvermanthompson.com,
Robert Keith Jenner, Esquire: rjenner@jennerlawfirm.com


/s/ Richard L. Costella
Richard L. Costella