## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## <u>(Baltimore Division)</u>

| | |
|---|---|
| In re: | Case No. 23-16969-MMH |
| Roman Catholic Archbishop of Baltimore, | (Chapter 11) |
| Debtor. | |

| | |
|---|---|
| The Official Committee of Unsecured Creditors, | |
| Plaintiff, | Adv. Proc. No. 25-00084-MMH |
| v. | |
| Roman Catholic Archbishop of Baltimore, | |
| Defendant. | |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## MOTION FOR SUMMARY JUDGMENT

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 case (the "Bankruptcy Case"), hereby moves the Court (this "Motion") for an order and judgment pursuant to Fed. R. Bank. P. 7056: **(i)** declaring that the Roman Catholic Archbishop of Baltimore (the "Debtor") cannot rely upon charitable immunity in the Bankruptcy Case as a defense to paying Survivors' claims, because (a) the Debtor's filing of the Bankruptcy Case constituted an affirmative waiver of the defense, and/or because the defense is incompatible with the objectives and purpose of title 11 of the United States Code; (b) the Maryland Child Victims Act of 2023 (the "CVA") abrogated the charitable immunity defense for the Debtor with respect to CVA claims; and (c) the defense is unavailable to a defendant, such as the Debtor, whose mission includes providing support and compensation for individuals, such as Survivors, who have

suffered harms while in the care of the Catholic Church in Maryland; **(ii)** finding that to be eligible for charitable immunity, the Debtor must establish with clear and convincing evidence (a) (1) it is a charitable trust or (2) it holds some or all of its assets in a charitable trust, and (b) the use of those trust assets to pay Survivors would be inconsistent with the charitable purpose(s) of that trust(s); and/or **(iii)** dismissing all of the Debtor's counterclaims and affirmative defenses. Pursuant to Local Rule 9013-2, the Committee will not file a separate memorandum in support, but will rely on the facts and law set out in this Motion. In support of the Motion, the Committee states as follows:

<u>**INTRODUCTION**</u>

The Debtor cannot wield charitable immunity as a shield, protecting its assets from Survivors, while simultaneously using the equitable powers of the bankruptcy court as a sword, eliminating all liability for Survivors' claims against the Debtor and all its Catholic affiliates. Congress did not intend this result when it adopted the Bankruptcy Code. The Maryland General Assembly did not intend this result when it enacted the CVA. Nor did the Debtor intend this result when it embraced Survivors as part of its charitable mission and resolved to pay Survivors fairly and equitably by filing this Bankruptcy Case. Instead, the Bankruptcy Code, the CVA, and the Debtor's words and actions before it filed bankruptcy, all undermine the Debtor's reliance on charitable immunity as justification to withhold its non-insurance assets from paying Survivors.

No one could mistake the reasons the Debtor filed this case. For more than a half-century, the Debtor failed to protect at least 1,000 children from horrific sexual abuse at the hands of priests, teachers, and other of the Debtor's employees. For decades, the Debtor paid Survivors de minimis settlements in exchange for their silence. After mounting public outcry for action and transparency, in 2023, the Maryland Attorney General's office issued a comprehensive report detailing the

Debtor's involvement in the child sexual abuse crisis in Maryland. The report spurred the Maryland General Assembly to act against institutions, like the Debtor, who bear responsibility and liability for these acts of child sexual abuse. The result was the 2023 Maryland Child Victims Act, which became effective on October 1, 2023, and revived time-barred claims arising out of child sexual abuse. Two days before the CVA became effective, the Debtor filed for chapter 11 protections, citing the anticipated wave of claims that the Debtor and its parishes, schools, and affiliates, would have to defend against in state court. The Debtor voluntarily sought bankruptcy protection solely to avoid paying Survivor claims, but that election is inconsistent with the position that Survivor claims were already barred by charitable immunity. If the Debtor had not waived its immunity argument by electing to file bankruptcy, the Bankruptcy Code would have nonetheless rejected the use of charitable immunity to effect unjust outcomes on creditors.

Despite the Archbishop's public statements about healing and fair treatment for Survivors, the millions of dollars in voluntary settlements paid to hundreds of Survivors over decades, the clear intentions of the Maryland General Assembly to give Survivors access to justice, and the Bankruptcy Code's strong policy of providing fair and equitable treatment to creditors, the Debtor has acted in this Bankruptcy Case as if charitable immunity protects it from abiding by any of these missions, policies, or obligations. In the Debtor's view, it can never be held accountable for its wrongful actions because of its status as a religious institution, and as a result Survivors must acquiesce to the Debtor's plan to reorganize, denying Survivors both fair compensation and their day in court. The Maryland General Assembly did not intend for an uninsured charity to totally escape liability and deny Survivors justice. To the contrary, the legislature considered and accepted that the CVA might cause churches and schools to go bankrupt, and offered statutory liability caps (and not charitable immunity) as the means to limit this potential harm. Allowing this Debtor to

escape all liability for uninsured or underinsured Survivor claims prevents a Survivor of child sexual abuse from seeking justice. Relying on charitable immunity to avoid liability and responsibility for Survivors' claims is not only morally wrong, but it is wrong under both federal bankruptcy law and Maryland state law.

The Court should grant the Committee summary judgment because (i) the Debtor waived charitable immunity by electing the Bankruptcy Code as the system to resolve Survivor claims, instead of relying on Maryland's state courts, (ii) the Maryland General Assembly created an indisputable policy of accountability for the Debtor and other institutions liable for child sexual abuse that preempts the charitable immunity defense, and (iii) the Debtor's words and actions show that paying Survivors has always been part of its mission and so it cannot avail itself of the charitable immunity defense. If the Court does not find undisputed facts that justify the foregoing relief, then (iv) the Debtor must prove at trial, with clear and convincing evidence, that its assets are held in a charitable trust to be eligible for the charitable immunity defense. If the Court awards summary judgment in favor of the Committee, the Court should likewise (v) dismiss the Debtor's counterclaims, which seek to affirm the validity of its charitable immunity defense.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The Debtor is a corporation sole, organized under the laws of the State of Maryland. [Compl. ¶ 2 , Ans. ¶ 2.]

2.      In 2023, the Maryland Attorney General's office released a report documenting the epidemic of sexual abuse by Catholic priests and the ensuing cover-up of those crimes by the Debtor.[1] [Declaration of Andrew J. Glasnovich in Support of Motion for Summary Judgment

---

[1] The Court does not need to base its ruling on the truth or not of the facts stated in the Attorney General's report. Instead, the Court need only consider evidence that the report was publicly available at the time the Maryland General Assembly considered the CVA. *See* Fed. R. Evid. 201(b); *Megaro v. McCollum*, 66 F.4th

("Glasnovich Dec.") ¶ 3, Ex. A, Attorney General of Maryland, REPORT OF CHILD SEXUAL ABUSE IN THE ARCHDIOCESE OF BALTIMORE, REDACTED (April 2023) (the "AG Report").]

3.      The report detailed a "history of repeated dismissal or cover up" of abuse by the Catholic Church hierarchy and found that since the 1940's more than 600 young people had been abused by at least 156 clergy members within the Archdiocese of Baltimore. [*Id.* at 1, 9.]

4.      In the report, the Attorney General observed:

The duration and scope of the abuse perpetrated by Catholic clergy was only possible because of the complicity of those charged with leading the Church and protecting its faithful . . . They focused not on protecting victims or stopping the abuse, but rather on ensuring at all costs that the abuse be kept hidden. The costs and consequences of avoiding scandal were borne by the victimized children.

[*Id.* at 11].

5.      The report also highlighted that "over half of victims of child sexual abuse do not report it until they are over the age of 50," and noted that many victims "suffer[] lifelong effects from" their abuse, including "vulnerability to substance abuse, challenges in emotionally connecting to spouses or other people close to them, depression, anxiety, anger, eating disorders and even chronic physical pain." [*Id.* at 19-20.]

6.      Following the Attorney General's report, the Maryland General Assembly passed the Maryland Child Victims Act of 2023, which was signed into law on April 11, 2023. *See* 2023 Session Senate Bill 686, Acts 2023, c. 5, § 1, eff. Oct. 1, 2023 (the "CVA").

7.      The CVA was passed to hold "entities liable and responsible for their negligent activity" related to the childhood sexual abuse crisis. [Glasnovich Dec. ¶ 4, Ex. B, Transcript of

---

151, 158 (4th Cir. 2023) (state commission's decision was an appropriate matter of public record for district court to have considered by judicial notice).

Audio-Recorded Hearing of the Maryland State Senate, Floor Actions, March 14, 2023 at 158:16-158:40; 129:15-22—130:1-2 ("March 14 Senate Transcript").]

8.　　　The CVA was sponsored in the Senate by Senator Smith. [Glasnovich Dec. ¶ 5, Ex. C, Maryland General Assembly, Civil Actions - Child Sexual Abuse - Definition, Damages, and Statute of Limitations (The Child Victims Act of 2023), https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/SB0686/?ys=2023rs.]

9.　　　In the House, 2023 Session House Bill 0001 was sponsored by Delegates Wilson, Clippinger, Arikan, Conaway, Crutchfield, Embry, Grammer, Kaufman, Moon, Pasteur, Phillips, Simmons, Simpson, Taylor, Toles, Williams, and Young. [Glasnovich Dec. ¶ 6, Ex. D, Maryland General Assembly, Civil Actions - Child Sexual Abuse - Definition, Damages, and Statute of Limitations (The Child Victims Act of 2023), https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/HB0001?ys=2023RS&search=True.]

10.　　　The CVA eliminated the then-existing statute of limitations for all civil claims arising out of a claim of sexual abuse that occurred when the victim was a minor. *See* Md. Code Ann. Cts., & Jud. Proc. § 5-117(b) (2025).

11.　　　Sexual abuse under the CVA includes,

　　　(1) An adult allowing or encouraging a child to engage in:

　　　　　(i) Obscene photography, films, poses, or similar activity;

　　　　　(ii) Pornographic photography, films, poses, or similar activity; or

　　　　　(iii) Prostitution;

　　　(2) Incest;

　　　(3) Rape;

　　　(4) Sexual offense in any degree; or

(5) Any other sexual conduct that is a crime.

Md. Code Ann., Cts. & Jud. Proc. § 5-117(a) (2025).

12.    The CVA further imposed a cap on non-economic damage awards to Survivors[2] of child sexual abuse of $1,500,000.00 per defendant, per incident or occurrence for claims revived under the CVA. Md. Code Ann., Cts. & Jud. Proc. § 5-117(a), (c) (2023).

13.    Subsequently, the Maryland General Assembly passed amendments to the CVA, Acts 2025, c. 104, § 1, eff. June 1, 2025 (the "2025 Amendments"), which redefined the cap to apply now only once per defendant regardless of the number of incidents or occurrences, lowered the non-economic damages cap to $700,000 per defendant for lawsuits initiated after May 31, 2025, and maintained the $1,500,000 cap for lawsuits filed prior to June 1, 2025. Md. Code Ann., Cts. & Jud. Proc. § 5-117(a), (c) (2025).

14.    The Maryland Catholic Conference, which is the public policy and lobbying arm of the Debtor and other Catholic entities in Maryland, [Glasnovich Dec. ¶ 7, Ex. E],[3] also advocated for the 2025 Amendments, specifically the change in "incident and occurrence" language and the lowering of the $1.5 million liability cap. [Glasnovich Dec. ¶ 9, Ex. G, HB 1378 Child Sexual Abuse Claims Against the Statement – Time Limitation, House Judiciary Committee, Position: Favorable with Amendments.]

_____

[2] Individuals who have filed claims related to "sexual abuse" in this chapter 11 case are "Survivors".

[3]    Glasnovich Dec. ¶ 7, Ex. E, Maryland Catholic Conference, *Who We Are*, *https://www.mdcatholic.org/about/ (last accessed August 14, 2025)* ("The Maryland Catholic Conference is the official public policy entity for the Catholic Church, including the Archdiocese of Baltimore, Archdiocese of Washington and Diocese of Wilmington."); Glasnovich Dec. ¶ 8, Ex. F, *Maryland Catholic Conference: HB 1378, https://www.mdcatholic.org/mcc-hb1378/* ("The overtly unequal treatment in HB 1378 is not only poor policy for victim-survivors, but also **unfairly targets nonprofit and religious organizations** that have long served children in this state and have implemented strong safeguards for youth protection.") (emphasis added).

15.    The CVA became effective on October 1, 2023, meaning Survivors' claims for sexual abuse against the Debtor would no longer be time-barred on or after that date.

16.    On September 29, 2023 (the "Petition Date"), the Debtor filed its petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). [Bky. No. 23-16969, Doc. 1.]

17.    The Debtor has repeatedly acknowledged that its decision to file for bankruptcy was necessitated by the "catastrophic" liabilities it faced due to its history with child sexual abuse and the revival of those claims by the CVA. [Counterclaim ¶ 14; *see also* Informational Brief, Bky. No. 23-1696, Dkt. 5 at ¶¶160-173 ("The [Debtor] commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of [the Debtor] to continue providing essential ministries and services within the Archdiocese.").]

18.    Consistent with its decision to file for bankruptcy, the Debtor has publicly acknowledged its mission and commitment to compensating Survivors:

> Since the 1980s, the Archdiocese has invested more than $13.2 million into the care and monetary compensation for 301 victim-survivors. This includes $6.8 million toward 105 voluntary settlements under a mediation program … Regardless of how long ago abuse occurred, our offer to pay for counseling is available to all victim-survivors. Also, since 2007, the Archdiocese's financial mediation program has been available for victim-survivors, *regardless of legal liability*, including for those whose legal claims are barred by the statute of limitations.

[Glasnovich Dec. ¶ 11, Ex. I, Apology, Healing & Action, Archbishop William J. Lori, https://www.archbalt.org/apology-healing-action/ (April 3, 2023) (emphasis added).]

19.    Prior to filing for bankruptcy, the Debtor paid out more than $6.8 million in settlements to no fewer than 105 Survivors. [*Id*.]

20.    At the Section 341 meeting of creditors, the Debtor testified under oath that it is its mission and responsibility to compensate Survivors:

Q. Thank you. And also in paragraph B, it says "Chapter 11 proceedings commenced to continue outreach in support of survivors in an ongoing ministry." … Given that statement, is it fair to say that outreach in support of survivors is part of the archdiocese's mission?

**A. Yes, I would say that's correct.**

Q. I'm jumping ahead to paragraph 9. Based on the reading from the informational brief, based upon the experience of other diocese from around the country, the Roman Catholic archbishop of Baltimore believes failure to commence this chapter 11 proceeding would have resulted in some survivors who have not yet brought claims failing to receive compensation. Is providing compensation to survivors, does that fall within the archdiocese's mission?

**A: Yes.**

[Glasnovich Dec. ¶ 12, Ex. J, Transcript of *Meeting of Creditors*, November 15, 2023 at 147:4-19 ("November 341 Transcript").][4]

21.    Nearly 1,000 Survivors have filed claims against the Debtor in its chapter 11 case.

[Counterclaim ¶ 15; *see generally* Claims Register, Bky. No. 23-16969.]

22.    If not for these nearly 1,000 claims, the Debtor would not require bankruptcy relief.

[Glasnovich Dec. ¶ 13, Ex. K (bankruptcy schedules showing assets exceed liabilities, other than unliquidated tort claims).]

23.    Despite its stated mission to compensate and provide for the general welfare of Survivors, and its decision to seek bankruptcy relief to avoid lawsuits on CVA claims, the Debtor asserts that it cannot be compelled to use its non-insurance assets to pay sexual abuse claims asserted in this chapter 11 case. [*See generally* Counterclaim, Dkt. 15.]

\*\*\*

---

[4] Glasnovich Dec. ¶ 12, Ex. J, November 341 Transcript, at 151:4-10 (**Q**: "'There are many within the archdiocese, including non-Catholic, who depend on the services that the Roman Catholic archbishop of Baltimore administers. It delivers both monetary and spiritual in furtherance of the mission and ministry of the Roman Catholic church within the archdiocese.'" Would survivors fall within the persons described in paragraph 28? **A**. Yes.") (internal citations omitted).

## ARGUMENT

This Court should grant summary judgment in favor of the Committee on three independent grounds, each sufficient to defeat the Debtor's charitable immunity defense. *First*, charitable immunity is incompatible with the Bankruptcy Code's objectives, and the Debtor's voluntary decision to seek Chapter 11 relief, and therefore is incompatible with federal law. *Second*, the CVA preempts the common law doctrine of charitable immunity, because the Maryland General Assembly's intent to hold non-profit entities like churches and schools "liable and responsible" for child sexual abuse directly conflicts with any court-made defense that would eliminate such liability for these entities entirely. *Third*, even if charitable immunity is a viable defense to CVA claims, the Debtor's mission includes compensating Survivors, making any use of assets for that purpose consistent with, rather than contrary to, its alleged charitable purposes.

*Alternatively*, if the Court does not find in favor of the Committee on the above grounds, the Committee is entitled to partial summary judgment on the basis that charitable immunity protects only assets held in trust, and so the Debtor must prove by clear and convincing evidence that its assets meet this standard. *Lastly*, because the Committee's claims and the Debtor's counterclaims are mirror images, summary judgment in favor of the Committee on any of the above grounds also requires dismissal of the Debtor's counterclaim.

## I.  STANDARD OF REVIEW.

Rule 56 of the Federal Rules of Civil Procedure, "made applicable to this adversary proceeding by Bankruptcy Rule 7056", governs motions for summary judgment.[5] "A moving party may be entitled to judgment as a matter of law under [] Rule 56 in the absence of any genuine issue

---

[5] *In re Star Development Group*, *LLC*, 660 B.R. 750, 752 (Bankr. D. Md. 2023).

of material fact." Fed. R. Civ. P. 56.[6] "When a party has submitted sufficient evidence to support

its request for summary judgment, the burden shifts to the nonmoving party to show that there are

genuine issues of material fact."[7] The non-movant "may not rest on mere allegations or denials,

but must set forth specific facts showing that there is a genuine issue for trial."[8] "When opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment."[9]

## II.    MARYLAND'S CHARITABLE IMMUNITY DOCTRINE.

The doctrine of charitable immunity was first recognized in Maryland in *Perry v. House of*

*Refuge*.[10] Maryland courts created the doctrine to protect certain charities from paying tort

victims.[11] The doctrine arises from the assumption that when a donor gives property to a charity,

she does so with the intention that the property is held in trust for a charitable purpose, and so

---

[6] *See In re Forest Capital,* LLC, 579 B.R. 56, 60 (Bankr. D. Md. 2017), *as amended* (Jan. 24, 2018) (citing *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008)).

[7] *Emmett*, 532 F.3d at 297.

[8] *In re Star Development Group*, *LLC*, 660 B.R. at 753.

[9] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Evans v. Schultz*, No. CV ELH-22-3073, 2024 WL 3568569, at *6 (D. Md. July 29, 2024).

[10] *Perry v. House of Refuge*, 63 Md. 20 (1885).

[11] *Montrose Christian School Corp. v. Walsh,* 363 Md. 565, 582 (2001); s*ee Ward v. Rebuilding Together Baltimore*, Inc., No. 1278 Sept. Term 2015, 2016 WL 3185134, at *2 (Md. Ct. Spec. App. June 8, 2016) ("[C]haritable immunity is an affirmative defense.").

those trust funds should not be diverted from the charity's mission to instead pay tort damages.[12] While courts and legislatures in the overwhelming majority of jurisdictions have limited or abolished charitable immunity,[13] the doctrine continues to act as a bar to tort damages for qualifying Maryland charities.[14]

Several limitations apply to the doctrine. For example, charitable immunity applies only when the assets of the charitable organization are held in trust for a charitable purpose.[15] The charitable immunity defense applies only to common law tort actions and not claims arising from contract theories, and charitable immunity cannot be used to shield liability where the common law has been modified by legislation.[16] The Maryland legislature has crafted a notable exception to charitable immunity doctrine, permitting liability for damages to the extent of a charity's insurance assets.[17]

---

[12] *Montrose Christian School Corp*, 363 Md. at 582; *see Perry v. H. of Refuge*, 63 Md. 20, 27 (1885) ("To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose.").

[13] *Tort liability of charitable corporation and of trustees for charity*, § 402 BOGERT'S THE LAW OF TRUSTS AND TRUSTEES.

[14] *See, e.g., Loeffler v. Trustees of Sheppard & Enoch Pratt Hosp.,* 130 Md. 265, 271 (1917).

[15] *James v. Prince George's Cnty.*, 288 Md. 315, 337 (1980).

[16] *Montrose Christian School Corp. v. Walsh*, 363 Md. 565, 583 (2001).

[17] *See* Md. Ins. Code § 19-103 ("Each policy issued to cover the liability of a charitable institution for negligence or any other tort shall provide that, for a claim covered by the policy, the insurer may not assert the defense that the insured is immune from liability because it is a charitable institution."); *Thomas v. Board of County Com'rs of Prince George's County*, 200 Md. 554, 560 (1952).

Maryland's highest court has stated that, despite its arcane origins and the unjust outcomes perpetuated by the doctrine, Maryland's courts cannot judicially repeal the charitable immunity doctrine because the legislature has assumed the existence of the doctrine.[18]

## III. CHARITABLE IMMUNITY IS INCOMPATIBLE WITH THE BANKRUPTCY CODE AND THE DEBTOR'S VOLUNTARY DECISION TO SEEK CHAPTER 11 RELIEF.

The Bankruptcy Code does not permit the Debtor to use the automatic stay to avoid the cost and scandal of defending against Survivor lawsuits, while simultaneously using the bankruptcy process to forever eliminate its responsibility to pay Survivors. By voluntarily electing chapter 11 protection to address "catastrophic" liabilities from CVA claims, the Debtor has elected a superior federal statutory framework and waived its charitable immunity defense. The Debtor cannot now invoke state law immunity to render Survivor claims uncollectible in bankruptcy. At least one bankruptcy court in Maryland embraced that conclusion when it afforded no value to a debtor's offer to waive charitable immunity:

> [t]he Court is perplexed by how a "waiver of charitable immunity" equates with a valuable, substantial contribution in the context of this Chapter 11. As regards the Debtors, if such immunity exists, it only applies to CHI, the single entity with IRS approved charitable status. Moreover, as the Debtors voluntarily sought relief under Chapter 11, their assets *must* be made subject to the superior Chapter 11 statutory scheme in order to exit by way of a confirmed plan. In other words, the Bankruptcy Code takes precedence now and the Court would not confirm a plan with assets and rights withheld under the veil of "charitable immunity" if it did not otherwise adhere to the strictures of Section 1129. Do the Plan Proponents contend that CHI could refuse to waive charitable immunity and still achieve a confirmed plan that shields the equity in its assets from creditor claims? If so, that would be a queer, losing argument. Hence, there is no value in the alleged "waiver" of charitable immunity.[19]

---

[18] *Howard v. Bishop Byrne Council Home, Inc.*, 249 Md. 233, 241-42 (1968); *see* Md. Courts & Jud. Proc. Code § 5-632 (abrogating charitable immunity for hospitals).

[19] *In re City Homes III LLC*, 564 B.R. 827, 871–72 (Bankr. D. Md. 2017) ("In re City Homes").

*In re City Homes* is significant. The court found no value in the debtor's waiver of a defense, which was incompatible with and preempted by the general objectives of the Bankruptcy Code. The court explained that a waiver of charitable immunity must be implied by the filing of the chapter 11 bankruptcy petition since: (1) the Bankruptcy Code becomes the governing scheme once a Debtor voluntarily seeks relief under Chapter 11,[20] and (2) a plan that shields assets from creditor claims could never be confirmed.[21] This is also why numerous other courts have held that a bankruptcy court may decline to uphold any variety of state-law affirmative defenses if the application of those defenses would frustrate Congress's policies in enacting the Bankruptcy Code, including resulting in a fundamentally unfair outcome for creditors.[22]

---

[20] *See, e.g., Matter of Batchelor*, 260 Md.App. 456, 464 (Md. App. Ct. 2024), *cert. granted sub nom. Matter of Isely*, 487 Md. 263 (2024) ("Conflict preemption occurs when 'the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'").

[21] *In re City Homes*, 564 B.R. 871-72.

[22] *In re Omegas Group, Inc.*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("**The equities of bankruptcy are not the equities of the common law**. Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor. 'Ratable distribution among all creditors' justifies the Code's placement of the trustee in the position of a first-in-line judgment creditor and bona fide purchaser for value, empowered to avoid certain competing interests (and even to nullify the debtor's "preferential" prepetition payments to otherwise entitled creditors) so as to maximize the value of the estate.") (emphasis added); *In re Foam Sys. Co.*, 92 B.R. 406, 409 (Bankr. App. 9th Cir. 1988), aff'd, 893 F.2d 1338 (9th Cir. 1990), and aff'd sub nom. *Ins. Co. of the W. v. Simon*, 893 F.2d 1338 (9th Cir. 1990) ("In light of the Bankruptcy Code's strong policy of ratable distribution among all creditors, the bankruptcy court properly declined to exclude the funds in the account from the debtor's estate by imposing a resulting trust") (citing *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419–1420 (9th Cir. 1985) (although equities as between debtor and one group of creditors favored imposition of a constructive trust, court would not impose constructive trust and deprive estate of property which could be distributed to other creditors as well)); *see In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1575 (9th Cir. 1985) (court reluctant to exercise relatively undefined equitable power, the imposition of a constructive trust, in favor of one group of potential creditors at the expense of other creditors, because **ratable distribution among all creditors is one of the strongest policies of bankruptcy law**) (emphasis added); *see also In re Short*, 625 B.R. 678, 689 (Bankr. E.D. Mich. 2021) (noting Bankruptcy Code's system of equitable distribution); *In re E.M. Williams & Sons, Inc*., No. 08-03055-KRH, 2009 WL 2211727, at *2, n. 7 (Bankr. E.D. Va. July 17, 2009), aff'd sub nom., No. CIV.A 3:09CV533, 2010 WL 1279094 (E.D. Va. Mar. 30, 2010) (same).

The Debtor here seeks to do exactly what the court in *In re City Homes* found impermissible: withhold assets under the veil of charitable immunity while obtaining the full benefits of bankruptcy protection. The Debtor must instead either pay Survivors in full or use the liquidation value of its assets to fund its plan for the benefit of Survivors.[23]

Any attempt to do otherwise breaches the obligations the Debtor voluntarily accepted when it filed its Chapter 11 case.[24] A Chapter 11 debtor-in-possession has similar duties to a chapter 11 trustee and must act in the best interest of the creditors of the estate.[25] In other words, "[t]he job of the debtor-in-possession is to make sure the creditors are paid."[26] The Debtor cannot obtain the benefits of bankruptcy for itself and for its affiliates, without assuming the obligations imposed on every other chapter 11 debtor. By seeking bankruptcy relief under Chapter 11 of the Bankruptcy Code, the Debtor assumed a fiduciary duty to pay its creditors—the vast majority of whom are Survivors.[27] By electing chapter 11 protections, the Debtor not only acknowledged that compensating Survivors is part of the Debtor's mission, but it recognized that Survivors are its

---

[23] 11 U.S.C. § 1129(a)(7).

[24] Upon the commencement of a Chapter 11 bankruptcy case, the debtor becomes a "debtor in possession" with a fiduciary duty to creditors. *See, e.g.*, 11 U.S.C. §§ 1101, 1107(a).

[25] *See In re Bowman,* 181 B.R. 836, 843 (Bankr. D. Md. 1995).

[26] *Id.* at 843.

[27] *See generally* Claims Register, Bky. No. 23-16969.

6435786.1

creditors to whom it owes certain fiduciary duties and has waived the right to assert any defense that would absolve the Debtor of that duty.[28]

It is for these reasons that the Debtor cannot invoke the Bankruptcy Court's broad equitable powers to perpetrate a further injustice on Survivors. Instead, this Court should require that the Debtor do what all debtors must and pay its creditors fairly and equitably. The Court should disallow the Debtor's charitable immunity defense, because the defense conflicts with the letter and spirit of the Bankruptcy Code and would render meaningless both the bankruptcy process and the Debtor's own stated purpose in filing this chapter 11 case, which is the fair compensation of Survivors. For these reasons the Court should enter summary judgment in favor of the Committee.

## IV. CHARITABLE IMMUNITY IS PREEMPTED BY THE CVA AS A MATTER OF LAW.

The common law doctrine of charitable immunity cannot bar claims related to child sexual abuse, because the policies and provisions of the CVA preempt the charitable immunity doctrine. A statute overrides the common law if it "deals with an entire subject-matter," (field preemption), or if "a statute and the common law are in conflict" (conflict preemption).[29] In those circumstances, even if "the language ... contain[s] no specific words of repeal or abrogation," a statute will be

---

[28] *See In re City Homes III LLC*, 564 B.R. 827, 871–72 (Bankr. D. Md. 2017) ("[A]s the Debtors voluntarily sought relief under Chapter 11, their assets *must* be made subject to the superior Chapter 11 statutory scheme in order to exit by way of a confirmed plan").

[29] *Antoine v. State*, 245 Md.App. 521, 558 n. 15 (Md. Ct. Spec. App. 2020). *See State v. North*, 356 Md. 308, 313 (Md. 1999) ("Neither § 287B, as codified, nor the session law that enacted it (1991 Md. Laws, ch. 362) expressly declares an intent to circumscribe the attachment to § 287 of the common law offense of attempt. They are, indeed, entirely silent in that regard. If the common law offense was narrowed, therefore, the narrowing was accomplished by implication, not by expression, and to determine whether the Legislature had such an intent, we turn to the legislative history of the enactment.").

"construed as abrogating the common law as to that subject."[30] "Conflict preemption occurs when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist."[31]

The CVA eliminated charitable immunity as a defense to child sexual abuse claims by establishing a statutory framework that conflicts with the common law doctrine. The legislature's explicit goal of holding organizations like the Debtor "**liable and responsible**" for the damages caused to Survivors cannot coexist with a defense that would render such entities neither liable nor responsible.[32] There is no plausible reading of the CVA and its accompanying legislative history that indicates the legislature intended for entities like the Debtor to escape liability entirely or limit their liability only to the extent of their insurance. Instead, the legislature plainly stated the opposite.[33] The Maryland General Assembly abrogated charitable immunity because:

---

[30] *Id.* (quoting *Robinson v. State*, 353 Md. 683, 693-94 (Md. Ct. App. 1999)).

[31] *Harris v. State*, 479 Md. 84, 101 (Md. 2022).

[32] Glasnovich Dec. ¶ 4, Ex. B, March 14 Senate Transcript, Senator Smith, 158:16-158:40; 129:15-22—130:1-2 ("It's about holding those entities liable and responsible for their negligent activity.") (emphasis added).

[33] Glasnovich Dec. ¶ 15, Ex. M, Transcript of the Judicial Proceedings Committee February 23, 2023, SB0686 ("February 23 Senate Transcript") at 01:22:35 – 02:22:35; 116:9-22—117:1-20 (emphasis added):

> Senator West: But, is it fair to say that under your Bill, your Bill's not just limited to **suits that might be brought against the Catholic church**. Your Bill would enable suits to be filed **against churches of any denomination, synagogues**, the Boy Scouts, the Girl Scouts, private businesses, including dental practices, brokerage firms, large corporations, small corporation, law firms, medical practices, private schools, private hospitals, religious schools, private colleges, any other private institutions in the state of Maryland, as well as any public institutions you could think of, from elementary schools to middle schools to high schools to community colleges, to public hospitals, to governments who might have harbored a sex predator in the government and it is preying on people employed by the government. That's true, isn't it?
>
> Senator Smith: **That's 100% accurate**, but emphasis added on who may be harboring someone who's committed child sex abuse. **But yes, that's absolutely true, and everyone**

(1) it intended entities like the Debtor to be liable and responsible for CVA claims, as evidenced by the legislative record specifically addressing this Debtor's specific actions that perpetuated the child sexual abuse crisis in Maryland, and the establishment of damage caps that presuppose defendant liability up to $1.5 million per occurrence; and (2) permitting charitable immunity to cap Survivor claims at $0.00 would render the CVA's $1.5 million damage caps superfluous and create an unintended windfall for insurance companies—outcomes inconsistent with the legislature's remedial purpose of ensuring Survivors can obtain meaningful compensation from responsible entities.

### a.    The General Assembly Intended the Debtor to be "Liable and Responsible" for CVA Claims.

Prompted by the Attorney General's report,[34] and with an explicit goal of addressing the crisis of sexual abuse dwelling within the Archdiocese of Baltimore,[35] the Maryland General Assembly overwhelmingly passed the CVA to allow Survivors to proceed with litigation against

---

**has been consistent with that, I think that's true**. No, absent misrepresentations or, of, on the press. Everyone here has been consistent that that is the case.

Senator West: **So, anyone is fair game**. So, if someone can allege that 50, 60, 70 years ago, someone in any institution in the state of Maryland abused them sexually, that person, if this Bill's passed, can file a lawsuit in the courts to recover large damages from any institution in the state, **not just the Catholic church**.

Senator Smith: **Subject to the caps, yes**.

[34] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 193:18-22—194:1-3 (Mr. Percy: "The attorney general's report says there's over 600 people in just the archdiocese of Baltimore alone who came forward. That doesn't count the hundreds who didn't come forward. And we've got to ask ourselves, what can we do better to get these folks to come forward and tell their stories so that everybody knows how bad things are.").

[35] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 116:4-8: (Senator West: So, in past years when we've been talking about this and when the press has been writing about this, almost entirely the focus has been on the Catholic church. Senator Smith: That's right.").

the Catholic Church and other organizations who bear responsibility for child sexual abuse.[36]

During the discussions, the Judicial Proceedings Committee for the Maryland Senate noted that

"[t]he goal of this legislation is relatively simple, its access to civil justice for survivors of child

sex abuse.…"[37] Allowing an uninsured or underinsured charity to totally escape liability prevents

a Survivor of child sexual abuse from seeking this justice. This is why the testimony before the

legislature expressed a clear intention to allow Survivors to achieve justice against entities who

bear responsibility for child sexual abuse by pursuing and collecting judgments against those

entities in court.[38]

     To achieve these goals, the CVA significantly altered the legal landscape of prosecuting

civil actions related to child sexual abuse claims. Along with the clearly espoused goal of bringing

healing for Survivors, the CVA contains an important compromise,[39] whereby Survivors' claims

were permitted to proceed regardless of their timeliness, but Survivors' recovery on these claims

---

[36]Glasnovich Dec. ¶ 16, Ex. N, Maryland Senate Bill 686, LegiScan, https://legiscan.com/MD/votes/SB686/2023 (last accessed Sept. 28. 2024) (Passed G.A. 133-0-4-3. Passed Senate 42-5-0-0).

[37] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 123:48-123:57; 79:1-3.

[38] Glasnovich Dec. ¶ 17, Ex. O, Transcript of Audio-Recorded Hearing of the Maryland State Senate, Floor Actions, March 13, 2023 ("March 13 Senate Transcript") at 44:15—44:25; 47:16-22—48:1-6: Senator West ("Now, there are lots of private schools around. Has any assessment been made of how many of Maryland's private schools would have to close their doors if this bill were to be passed."); Glasnovich Dec. at Ex. B, March 14 Senate Transcript, Senator Smith, 158:16-158:40; 130:1-2 ("It's about holding those entities liable and responsible for their negligent activity."); Glasnovich Dec. at Ex. P, March 28, 2023, The Maryland House of Delegates Judiciary Committee Hearing at 32:15-33:35 ("March 28 House Transcript") at 32:15-33:35; 30:18-22—31:1-14 (discussing bankruptcy awards to Survivors and the range of settlements paid by charitable institutions in other contexts).

[39] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 117:13-20 (emphasis added) ("Senator West: **So, anyone is fair game**. So, if someone can allege that 50, 60, 70 years ago, someone in any institution in the state of Maryland abused them sexually, that person, if this Bill's passed, can file a lawsuit in the courts to recover large damages from any institution in the state, **not just the Catholic church**. Senator Smith: **Subject to the caps, yes**").

were limited to $1.5 million per incident or occurrence.[40] This specific provision of the CVA, along with the general goals of the statute, evidences the General Assembly's intention to permit claims against charities notwithstanding charitable immunity.

The General Assembly expressly considered that CVA claims would proceed against charities,[41] most especially the Debtor, and offered the damages cap as protection[42] for these charities in return for the potential consequences to the charitable mission that might result from a flood of CVA actions.[43] The compromise specifically crafted by the Maryland General Assembly

---

[40] Md. Cts. & Jud. Proc. Code Ann. § 5-117(c) (2023) (later reduced to $700,000 by the 2025 Amendments).

[41] Glasnovich Dec. ¶ 17, Ex. O, March 13 Transcript at 44:15—44:49; 47:16-22—48:1-6:

> Senator West:   Now, there are lots of private schools around. Has any assessment been made of how many of Maryland's private schools would have to close their doors if this bill were to be passed.

> Smith:  Um, I don't know that there's been an assessment or registry of how many independent schools have a long and lengthy record of child sex abuse.

> West:   So, um, for private schools without endowments—isn't it fair to say that just one or two judgments of a million and a half dollars each, uh, could bankrupt the schools?

> Smith:  I'm sure that's a possibility.

[42] Glasnovich Dec. ¶ 4, Ex. B, March 14 Senate Transcript 1:45:06—1:45:54; 114:20-22—115:1-16 (Senator Smith: "I don't think it's possible to quantify the cost, because I don't know how many cases there are out there, or people that are out there, that could potentially have cases. And that's essen—that's why, again, we talked about the caps. **That's why we put in caps in the committee. It's why—ensured that we cap that liability for the state and locals and the school boards at $850,000 and on the private side at 1.5.** And across the nation—I think the 22 states that have done this—there are no caps. And they have not seen the type of radical exposure to **fiscal liability and trouble that I think we're all very rightfully thinking about in this body**. And so if those states' examples can be instructive to what we do here, I think I would just point to those as examples.").

[43] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 117:13-20 (emphasis added) ("Senator West: **So, anyone is fair game**. So, if someone can allege that 50, 60, 70 years ago, someone in any institution in the state of Maryland abused them sexually, that person, if this Bill's passed, can file a lawsuit in the courts to recover large damages from any institution in the state, **not just the Catholic church**. Senator Smith: **Subject to the caps, yes.** "); Glasnovich Dec. at Ex. O, March 13 Senate Transcript 44:15—44:49; 49:2-6 (discussing the possible closure of private schools after one or two verdicts under the CVA); Glasnovich Dec. at Ex. P, March 28 House Transcript at 32:15-33:35; 30:18-

was to remove the prior procedural hurdles (i.e. the statute of limitations) and allow CVA claims to proceed, but to cap the liability for those revived claims. [44] The CVA represents a clear statement of policy by the legislature to permit CVA claims up to a $1.5 million **per defendant per occurrence/incident** limit. And the 2025 Amendments further evidenced that policy when the General Assembly reduced the cap to $700,000 and made it applicable only per defendant. Any common law rule that **both** (i) excuses liability against the exact category of defendants towards whom the law was aimed and (ii) imposes a lower ceiling of liability for those defendants, including a ceiling (at its highest) based on the amount of their insurance and (at the lowest) at

---

22—31:1-14 (discussing bankruptcy awards to Survivors and the range of settlements paid by charitable institutions in other contexts).

[44] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 116:9-22—117:1-20 (emphasis added):

> Senator West: But, is it fair to say that under your Bill, your Bill's not just limited to suits that might be brought against the Catholic church. Your Bill would enable suits to be filed **against churches of any denomination, synagogues**, the Boy Scouts, the Girl Scouts, private businesses, including dental practices, brokerage firms, large corporations, small corporation, law firms, medical practices, private schools, private hospitals, religious schools, private colleges, any other private institutions in the state of Maryland, as well as any public institutions you could think of, from elementary schools to middle schools to high schools to community colleges, to public hospitals, to governments who might have harbored a sex predator in the government and it is preying on people employed by the government. That's true, isn't it?

> Senator Smith: **That's 100% accurate**, but emphasis added on who may be harboring someone who's committed child sex abuse. **But yes, that's absolutely true, and everyone has been consistent with that, I think that's true**. No, absent misrepresentations or, of, on the press. Everyone here has been consistent that that is the case.

> Senator West: **So, anyone is fair game**. So, if someone can allege that 50, 60, 70 years ago, someone in any institution in the state of Maryland abused them sexually, that person, if this Bill's passed, can file a lawsuit in the courts to recover large damages from any institution in the state, **not just the Catholic church**.

> Senator Smith: **Subject to the caps, yes**.

*See generally*, Glasnovich Dec. ¶ 17, Ex. O, March 13 Senate Transcript at 39:06—39:47; 42:8-22—43:1-10.

$0.00, directly conflicts with the legislative intent and makes the per defendant damages cap superfluous.[45]

Similarly, nothing in the legislative history suggests that the damages cap in the CVA was intended as a windfall for insurance companies, who would be the only entities to reap the reward of liability caps for their non-profit insureds.[46] Indeed, the legislature considered that the CVA might bankrupt non-profit entities and took express actions to mitigate this harm to churches and schools in the form of per-defendant liability caps.[47] The legislature clearly stated the damages cap was intended as a means to mitigate the possibility that non-profits would face financial catastrophe.[48] The purpose of the caps is therefore inconsistent with the proposition that the

---

[45] *See Cecil v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 261 Md.App. 228, 264-66 (Md. App. Ct. 2024) (finding the duty of care imposed under common law negligence was in conflict with the duty of fair representation enacted by the legislature because the common law shifted burdens, imposed new duties, and discouraged actions all in contravention of the policy underlying the statute).

[46] *In re K.K.*, 266 Md. App. 161, 192 (Md. Ct. Spec. App. 2025) ("When conducting a historical review of a statute, we focus initially on archival legislative history. 'Archival legislative history includes legislative journals, committee reports, fiscal notes, amendments accepted or rejected, the text and fate of similar measures presented in earlier sessions, testimony and comments offered to the committees that considered the bill, and debate on the floor of the two Houses[.]" We consider views expressed by individual members of the General Assembly during debate "subject to the critical caveat that those views may not have been shared by anyone else and, to that extent, may be irrelevant.' Sponsor testimony, committee bill analyses, and committee floor reports "are likely to be especially reliable evidence of the purpose or goal underlying a statute" because they 'reflect the views of those most likely to know something about the legislation and to whom other members, for a variety of reasons, tend to defer.' Where legislatively-created work groups lead to proposed legislation, 'their sources can be invaluable in determining legislative intent.' Further, 'material provided by people or organizations at committee hearings' consist generally of "advocacy statements that may have a more limited purpose[,]' but such material 'is useful when it addresses controversial provisions in the legislation and thus provides insights on amendments offered during the legislative process.'").

[47] *Cf.* Md. Code, Cts. & Jud. Proc. § 5-117 (allowing claims to proceed against any "defendant" and not just insurers).

[48] Glasnovich Dec. ¶ 4, Ex. B, March 14 Senate Transcript 1:45:06—1:45:54; 114:20-22—115:1-16 (emphasis added) (Senator William Smith: "I don't think it's possible to quantify the cost, because I don't know how many cases there are out there, or people that are out there, that could potentially have cases. And that's essen—that's why, again, we talked about the caps. **That's why we put in caps in the**

legislature further intended for charitable immunity to limit non-profit liability only to the extent of insurance.[49]

By acting as a complete bar to recovery against the Debtor, charitable immunity is in direct conflict with the goal of allowing Survivors to seek justice and healing against all entities responsible for child sexual abuse in Maryland. The legislative history and plain language of the statute shows that the clear purpose of the CVA was to allow the filing of child sexual abuse claims against institutions like churches and schools who are responsible for the epidemic of child sexual abuse in Maryland, even if that exposed the Debtor's non-insurance assets to collection and bankruptcy. The legislative history also shows that the Maryland General Assembly passed the CVA with the intention of responding to the horrific crisis of child sexual abuse and to provide Survivors a genuine opportunity to access the courts when previously the law had not.[50] Because the Maryland legislature intended to shine a light on decades of child sexual abuse, indifference, and coverup perpetrated by non-profits in Maryland, most especially the actions and coverup

---

committee. **It's why—ensured that we cap that liability for the state and locals and the school boards at $850,000 and on the private side at 1.5.** And across the nation—I think the 22 states that have done this—there are no caps. And they have not seen the type of radical exposure to **fiscal liability and trouble that I think we're all very rightfully thinking about in this body**. And so if those states' examples can be instructive to what we do here, I think I would just point to those as examples.").

[49] Glasnovich Dec. ¶ 17, Ex. O, March 13 Senate Transcript 44:15—44:49 ; 47:16-22—48:1:

Senator West:   Now, there are lots of private schools around. Has any assessment been made of how many of Maryland's private schools would have to close their doors if this bill were to be passed.

Senator Smith: Um, I don't know that there's been an assessment or registry of how many independent schools have a long and lengthy record of child sex abuse.

[50] Glasnovich Dec. ¶ 17, Ex. O, March 13 Senate Transcript 123:48-123:57; 38:10-15 (Senator Smith: "That's what this bill seeks to do is provide that access to civil justice for children of sex abuse."); Glasnovich Dec. at Ex. B,  March 14 Senate Transcript at 158:16-158:40; 130:1-2 ("It's about holding those entities liable and responsible for their negligent activity.").

perpetrated by this Debtor, the Court should find that the CVA abrogated charitable immunity for claims related to child sexual abuse and grant summary judgment in favor of the Committee.

### b. The Purpose and Provisions of the CVA Are in Irreconcilable Conflict with Charitable Immunity.

Conflict preemption applies in this instance because charitable immunity and the CVA cannot operate simultaneously. Any common law rule that totally excuses liability against the same exact category of defendants towards whom the CVA was aimed and replaces the maximum liability award under that law with a cap of $0.00, directly and irreconcilably conflicts with the Maryland General Assembly's intention in passing the CVA.  By acting as a complete bar to liability against charities responsible for sexual abuse, the doctrine of charitable immunity completely undermines both the general purpose[51] and key provisions of the CVA.[52] The doctrine of charitable immunity and the statute cannot be harmonized and so the common law has been preempted as to CVA related claims.[53]

Because any legislative action necessarily implicates existing common law, the Court must examine the Maryland General Assembly's intention to decide the scope of the preemption.[54] "It

---

[51] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 123:48-123:57; 79:1-3. ("The goal of this legislation is relatively simple, its access to civil justice for survivors of child sex abuse . . . ").

[52] Glasnovich Dec. ¶ 4, Ex. B, March 14 Senate Transcript 1:45:06—1:45:54; 115:3-13 (Senator William Smith) (**"That's why we put in caps in the committee. It's why—ensured that we cap that liability for the state and locals and the school boards at $850,000 and on the private side at 1.5.** And across the nation—I think the 22 states that have done this—there are no caps. And they have not seen the type of radical exposure to **fiscal liability and trouble that I think we're all very rightfully thinking about in this body.**").

[53] *See Antoine v. State*, 245 Md. App. 521, 558 n. 15 (Md. Ct. Spec. App. 2020).

[54] *Harrison v. John F. Pilli & Sons, Inc.*, 321 Md. 336, 341 (1990) ("First, that Court held that the statute must be strictly construed because it is in contravention of common law. The canon of construction relied on by the Court of Special Appeals may have efficacy in appropriate cases. **It must be recognized, however, that most statutes have the effect of changing existing law, and therefore the canon 'has**

is a cardinal rule of statutory construction to give effect to the intent of the Legislature."[55] Courts

look primarily to the intention of the legislature to determine whether the policy of the statute and

the effect of the common law are in conflict.[56] It is often stated that statutes are not presumed to

repeal the common law "further than is expressly declared, and … a statute, made in the affirmative

without any negative expressed or implied, does not take away the common law."[57] Nonetheless,

Maryland courts are directed to consider legislative intent rather than adhere to a narrow textual

---

**been most commonly employed where the statute threatens to invade an existing property or contract right, or tends to interfere substantially with a cherished personal liberty.'** Moreover, as Chief Judge Murphy pointed out for this Court in *State v. Fabritz,* 276 Md. 416, 422 (1975), *cert. denied,* 425 U.S. 942 (1976), **even in the case of statutes ordinarily calling for strict construction, it is the intention of the legislature that governs and, like other statutes they 'are to be fairly and reasonably construed, and courts should not, by narrow and strained construction, exclude from their operation, cases plainly within their scope and meaning.'"**) (emphasis added) (citing 3 SUTHERLAND STATUTORY CONSTRUCTION, § 61.06 (4th ed. 1986 rev.)).

[55] *Robinson v. State*, 353 Md. 683, 694 (Md. 1999) (citing *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471, 474 (Md. 1988)) ("To be sure, the language of the 1996 assault statutes contain no specific words of repeal or abrogation, nor is there any conflict between those statutes and the common law. We have determined, however, that the statutes as adopted represent the entire subject matter of the law of assault and battery in Maryland, and as such, abrogate the common law on the subject.") (emphasis added). *See also Operation of the strict-construction rule*, 3 SUTHERLAND STATUTORY CONSTRUCTION § 61:2 (8th ed.) ("Thus, the essential inquiry turns on legislative intent. In this sense, interpretation of a statute in derogation of the common law is no different from the interpretation of any ambiguous statute. Courts routinely draw upon the full array of familiar interpretive tools and look to a law's plain text; employ maxims such as *ejusdem generis* and *expressio unius est exclusio alterius*; consider legislative history; invoke the rules disfavoring absurd, retroactive, and unconstitutional interpretations; seek to promote a law's policy and purpose; appeal to whole-statute and *in pari materia* principles; and rely on all the other traditional intrinsic and extrinsic maxims, rules, canons, and principles of construction.").

[56] *Cecil v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 261 Md.App. 228, 264-66 (Md. App. Ct. 2024) ("Because abrogation (or not) depends on legislative intent, policy often provides further insight into a legislature's intended purpose in enacting a statute."); *see Matter of Batchelor*, 260 Md.App. 456, 464 (Md. App. Ct. 2024), *cert. granted sub nom. Matter of Isely*, 487 Md. 263 (2024) ("Conflict preemption occurs when 'the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'").

[57] *Lutz v. State*, 167 Md. 12, 15 (1934) (quoting 25 R.C.L. 1054).

reading of a statute.[58] Maryland's courts,[59] like courts in other states, have recognized that the legislature may abrogate the common law in ways other than the inclusion of precise language of repeal:

> These appraisals of the strict-construction rule … show why it may have outlived its rationale, describe difficulties created by its continuing application, and indicate its limitations to reveal much, if anything, about legislative intent or a law's meaning… True enough that legislation merely may restate and codify the common law for the purposes of clarity and uniformity. Generally, though, as was the case here, statutes seek to remedy a defect in the common law, to make some change in the existing legal order. The question for courts then becomes not whether, but how much, a statute changes the common law. And Minnesota's approach is sensible because it recognizes that the traditional presumption against change is not helpful to answer that question. Indeed, the presumption likely just complicates a court's interpretive obligation.[60]

---

[58] *Harrison*, 321 Md. at 341–42 (citing SUTHERLAND STATUTORY CONSTRUCTION, § 61.06 (4th ed. 1986 rev.)); s*ee also Operation of the strict-construction rule*, 3 SUTHERLAND STATUTORY CONSTRUCTION § 61:2 (8th ed.) ("Instead, the rule really reflects a substantive policy presumption courts should make, if at all, only where legislative intent remains unknowable. Additionally, the rule may obscure the point that statutes generally do seek to remedy a defect in the common law, to make some change in the existing legal order. Thus the better question usually is not whether, but how much, a statute changes the common law. Including a presumption against change at any point during interpretation necessarily forestalls the proper inquiry and produces an answer to the wrong question. Finally, as Section 61:1 explains more fully, the circumstances that shaped and rationalized this substantive policy presumption are themselves now obsolete. Statutes have been the primary engine of American social and economic reform for close to a century and a half. To presume they derogate anything other than, perhaps, other statutes merely perpetuates hackneyed dogma, enervates the whole endeavor of statutory interpretation, and perverts the separation of powers premise of representative democracy.").

[59] *Harrison*, 321 Md. at 341–42.

[60] *In general (strict construction)*, 3 SUTHERLAND STATUTORY CONSTRUCTION § 61:1 (8th ed.) (quoting *Teders v. Rothermel*, 205 Minn. 470 (1939)) (citations omitted); *Teders v. Rothermel*, 205 Minn. 470, 472 (1939) ("Too much judicial indulgence in 'strict construction' of statutes has heretofore disguised 'extraconstitutional obstacles to, or hindrances of, legislative purpose.' However radical the change, we do not permit ourselves, because it is an innovation, so to limit a statute by construction as to defeat or even hinder its purpose. Our effort is rather to give any statute 'a fair construction, with the purpose of its enactment in view, not narrowed or restricted because it is a substitute for the discarded common law.' It is with that rule, rather than any notion either of duty or right to construe strictly, as a guide, that we attempt interpretation of the Florida statute.") (citations omitted).

Maryland courts have long recognized that the legislature is aware of and has legislated around charitable immunity in various ways.[61] The landscape of facts relating to the passage of the CVA show that the legislature did so again here when it permitted Survivors to sue, among other charities, the Debtor and its Catholic affiliates.[62] The Maryland General Assembly abrogated the court-made doctrine of charitable immunity as to claims asserted under the CVA, because the purpose of the CVA conflicts with the application of immunity in this instance. Here, by acting as a complete bar to liability against charities responsible for sexual abuse, the doctrine of charitable immunity completely undermines both the general purpose[63] and key provisions of the CVA.[64] The doctrine and the statute cannot be harmonized and so the common law has been preempted as to CVA related claims.[65]

---

[61] *E.g., Howard v. Bishop Byrne Council Home, Inc.*, 249 Md. 233, 241-42 (1968) ("We again restate our opinion that the General Assembly has completely investigated the immunity question, and the present statutes are tangible evidence that the Legislature arrived at a solution which it deemed satisfactory.").

[62] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 01:22:35 – 02:22:35; 116:4-7 ("Senator West: So, in past years when we've been talking about this and when the press has been writing about this, almost entirely the focus has been on the Catholic church. Senator Smith: That's right.").

[63] Glasnovich Dec. ¶ 15, Ex. M, February 23 Senate Transcript at 123:48-123:57; 79:1-3. ("The goal of this legislation is relatively simple, its access to civil justice for survivors of child sex abuse . . . ").

[64] Glasnovich Dec. ¶ 4, Ex. B, March 14 Senate Transcript 1:45:06—1:45:54; 115:3-16 (Senator William Smith) ("**That's why we put in caps in the committee. It's why—ensured that we cap that liability for the state and locals and the school boards at $850,000 and on the private side at 1.5.** And across the nation—I think the 22 states that have done this—there are no caps. And they have not seen the type of radical exposure to **fiscal liability and trouble that I think we're all very rightfully thinking about in this body**.").

[65] *See Antoine v. State*, 245 Md. App. 521, 558 n. 15 (Md. Ct. Spec. App. 2020).

## V.   THE DEBTOR'S CHARITABLE MISSION INCLUDES SURVIVOR COMPENSATION, ELIMINATING ANY BASIS FOR CHARITABLE IMMUNITY.

No judge-made doctrine can immunize the Roman Catholic Church from its own mission. The Debtor has repeatedly admitted under oath and in public statements that paying Survivors is part of its charitable mission. Even though Maryland courts often assume that paying tort victims is anathema to a charity's purpose and so use charitable immunity to protect against the misuse of donated funds,[66] that assumption is misapplied in this case. Charitable immunity cannot protect the Debtor's assets from Survivors' claims because the Debtor's mission embraces Survivors.

The Debtor has rightly adopted the mission to compensate Survivors for the wrongs perpetrated by the Roman Catholic Church. In contrast to a private trust, which is "devoted to the use of specified" and designated beneficiaries of the trust, "charitable trust property is **devoted to purposes beneficial to the community**."[67] The Debtor has stated that its purpose is "only to advance the general welfare of inhabitants of the state of Maryland professing the Catholic faith, to promote the Catholic faith." [Counterclaim ¶ 10].

While the Debtor has shamelessly and inexplicably denied that any Survivor is a resident of Maryland proclaiming the Catholic faith [Glasnovich Dec. at Ex. L, Resp. RFA No. 4.], Survivors were not only a part of the Catholic community when they were abused, but the Debtor

---

[66] *Cf. Perry v. H. of Refuge*, 63 Md. 20, 27 (1885) ("To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose.").

[67] The Committee does not agree or admit that the Debtor is a charitable trust and reserves all rights on this issue. Restatement (Second) of Trusts, Introductory Note to Ch. 11 (emphasis added); *see Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292, 316–18 (2013).

has made it clear from its public statements that promoting Survivor welfare is consistent its stated mission. The Debtor's assets may therefore be used to benefit Survivors.

Further, the Debtor has demonstrated through its explicit conduct that compensating Survivors is one of its core charitable purposes. For decades, the Debtor has been using assets allegedly held in a charitable trust to pay Survivors.[68] The Debtor's actions are consistent with its pre-bankruptcy public statements. Anticipating the April 2023 Attorney General's Report on Child Sexual Abuse in the Archdiocese of Baltimore, Archbishop William E. Lori published a letter entitled "Apology, Healing & Action." This letter communicates the Archdiocese's pastoral priorities which, among other things, detail the Church's actions to help those impacted grapple with the way that the sexual abuse epidemic "hinders the Church's mission of faith, worship and service."[69] Among those actions, Archbishop Lori explains:

> Since the 1980s, the Archdiocese has invested more than $13.2 million into the care and monetary compensation for 301 victim-survivors. This includes $6.8 million toward 105 voluntary settlements under a mediation program … Regardless of how long ago abuse occurred, our offer to pay for counseling is available to all victim-survivors. Also, since 2007, the Archdiocese's financial mediation program has been available for victim-survivors, *regardless of legal liability*, including for those whose legal claims are barred by the statute of limitations.[70]

When it filed for bankruptcy days before the CVA went into effect, the Debtor expressed its intention to address the Catholic community's liability for Survivors' claims, including through securing potential insurance recoveries and providing for the equitable distribution of settlement

---

[68] *Id.*

[69] Glasnovich Dec ¶ 11, Ex. I, Apology, Healing & Action, Archbishop William J. Lori https://www.archbalt.org/apology-healing-action/ (April 3, 2023).

[70] *Id.*

funds to Survivors.[71] The Debtor acknowledges in its *Informational Brief*, filed on the first day of the Bankruptcy Case, that it intends to "fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of the [Debtor] to continue providing essential ministries and services within the Archdiocese."[72] As explained in the Debtor's *Informational Brief*, the goal of this bankruptcy is to ensure those "within the Archdiocese, including non-Catholic, who depend on the services that the [Archdiocese] administers, both monetary and spiritual, in furtherance of the [Archdiocese's] mission" can continue to depend of such services.[73]

To that end, John Matera, the Debtor's Chief Financial Officer, testified at the Section 341 meeting of creditors that Survivors fall within the category of those who depend on the Debtor's services.[74] During the 341 meeting, the Debtor conceded on multiple occasions that Survivors are beneficiaries of the Church's mission and must be included in those who benefit from its services:

> Q. Thank you. And also in paragraph B, it says "Chapter 11 proceedings commenced to continue outreach in support of survivors in an ongoing ministry." … Given that statement, is it fair to say that outreach in support of survivors is part of the archdiocese's mission?
>
> **A. Yes, I would say that's correct.**
>
> Q. I'm jumping ahead to paragraph 9. Based on the reading from the informational brief, based upon the experience of other diocese from around the country, the Roman Catholic archbishop of Baltimore believes failure to commence this chapter 11 proceeding would have resulted in some survivors who have not yet brought claims failing to receive compensation. Is providing compensation to survivors, does that fall within the archdiocese's mission?

---

[71] *See* Glasnovich Dec. ¶ 12, Ex. J, *Declaration of John Matera in Support of First Day Motions* at ¶¶ 15-20.

[72] *See* Glasnovich Dec. ¶ 10, Ex. H, *Informational Brief* at ¶ 170.

[73] *See* Glasnovich Dec. ¶ 10, Ex. H, *Informational Brief* at ¶ 28.

[74] *See* Glasnovich Dec. ¶ 12, Ex. J, *November 341 Transcript* at p. 151.

**A: Yes.** [75]

More recently, in a message published ahead of the deadline for Survivors to file claims in the bankruptcy proceeding, Archbishop Lori acknowledged that the "goals in filing for Chapter 11 include compensating those individuals with the aim of helping to provide a possible path toward healing."[76]

The Debtor's mission to compensate Survivors regardless of legal liability is reflected in its pre-CVA practice of paying sexual abuse settlements.[77] For purposes of this litigation, however, the Debtor has disclaimed this mission. [Glasnovich Dec. at Ex. L, Resp. RFA No. 4.] The Debtor cannot, however, explain how its past statements and decision to pay Survivors using alleged trust-assets, can be reconciled with its current position that its charitable mission excludes such payments[78]: Either the Debtor previously breached its fiduciary duties to its charitable mission by paying out settlements to Survivors, or Survivors have always been proper beneficiaries of the Debtor's charitable purpose.

---

[75] *See* Glasnovich Dec. ¶ 12, Ex. J, *November 341 Transcript* at 147:4-19; *id.* at 151:4-10 (**Q**: "There are many within the archdiocese, including non-Catholic, who depend on the services that the Roman Catholic archbishop of Baltimore administers. It delivers both monetary and spiritual in furtherance of the mission and ministry of the Roman Catholic church within the archdiocese." Would survivors fall within the persons described in paragraph 28? **A**. Yes.") (internal citations omitted).

[76] Glasnovich Dec. ¶ 20, Ex. R, A Message from Archbishop Lori on May 31 Chapter 11 Deadline, Archdiocese of Baltimore, *https://www.archbalt.org/a-message-from-archbishop-lori-on-may-31-chapter-11-deadline/#:~:text=As%20part%20of%20the%20Archdiocese,to%20participate%20in%20the%20process* (May 30, 2024).

[77] Glasnovich Dec. ¶ 11, Ex. I, Apology, Healing & Action, Archbishop William J. Lori https://www.archbalt.org/apology-healing-action/ (April 3, 2023).

[78] *Johnson v. Hines*, 61 Md. 122, 131 (1883) ("Even in the case of a conventional trust, if the trustee goes beyond the scope of the power conferred by the deed or other instrument creating the trust, a court of equity will declare his acts to be *ultra vires* and legally inoperative.").

In this unique scenario, paying Survivors does not divert charitable assets from the Debtor's charitable mission, but it instead fulfils that mission.[79] Accordingly, charitable immunity cannot protect the Debtor's assets from being used for their intended purposes, which include paying Survivors. For these reasons, the Court should find that charitable immunity is not a defense to Survivors' claims.

## VI.    CHARITABLE IMMUNITY IS ONLY AVAILABLE TO CHARITABLE TRUSTS.

If the Court does not grant summary judgment on any of the above grounds, it should enter partial summary judgment clarifying the legal standard the Debtor must satisfy at trial. This is because not every nonprofit entity in Maryland is entitled to charitable immunity.[80] Instead, to invoke the doctrine, a nonprofit must first show that "the assets of the charitable organization are held in trust …."[81] If the Court does not grant summary judgment on any of the above-grounds, the Court should enter partial summary judgment clarifying that, to prevail at trial, the Debtor must show (**a**) either (i) it is a charitable trust or (ii) it holds specific assets in a charitable trust and so is entitled to immunity as to those assets, and (**b**) the use of those trust assets to pay Survivors would be inconsistent with the charitable purpose(s) of that trust(s).

---

[79] *See Inasmuch Gospel Mission v. Mercantile Trust Co. of Baltimore*, 184 Md. 231, 239 (1945) (even if a charitable donation is made with specific donor intent, the trust still vests in the main society to apply that donation **in anyway it sees fit as long as it is within the charitable purposes of the institution**) (emphasis added).

[80] *James v. Prince George's Cnty.*, 288 Md. 315, 336–37 (1980) ("The fire company is a nonprofit corporation does not mean that it is entitled to charitable immunity.").

[81] *Id.*

Because a charitable trust is an express trust, the person seeking to establish the trust has the burden to prove, by clear and convincing evidence, that a charitable trust exists.[82] A charity can show its assets are held in a charitable trust in one of two ways.

*First*, courts look to the organizational documents of the nonprofit to determine whether the organization has limited the use of its assets to a specific, as opposed to discretionary, purpose(s).[83] Without a sweeping declaration in its articles of incorporation, "[i]t is imprecise to characterize any gifts to [a charity] as creating a charitable trust."[84] Notwithstanding a general statement in its articles that its assets are held for a charitable purpose, a charity might not hold assets in trust if it holds both legal and equitable title to the property,[85] including by holding the at-issue property to support its general corporate expenses as opposed to support specific charitable ones.[86]

*Second*, a charity can show that it holds specific assets in charitable trust if those specific assets were transferred to the charity with sufficient trust intent. To create an express charitable

---

[82] *Heart Church Ministries, Inc. v. African M.E. Zion Church*, 370 Md. 152, 183 (2002) (citing *Kelley v. Kelley*, 178 Md. 389, 399 (1940) ("an express, resulting or constructive trust must be proven by clear and convincing evidence"); *Masters v. Masters*, 200 Md. 318, 332 (1952)).

[83] *James v. Prince George's Cnty.*, 288 Md. 315, 337 (1980) ("Without examining the articles of incorporation of the fire company or taking evidence concerning the form of ownership of its assets, it is impossible to determine the validity of a claim of charitable immunity."); *see Annapolis v. W. Anna. Fire & Imp. Co.*, 264 Md. 729, 737 (1972) (volunteer fire company, although possibly a charitable corporation, not necessarily a charitable trust).

[84] *City of Annapolis v. W. Annapolis Fire & Imp. Co.*, 264 Md. 729, 739 (1972).

[85] *Brandt, Inc. v. Y.W.C.A. of Baltimore City*, 169 Md. 607, 182 A. 452, 455 (1936).

[86] *Inasmuch Gospel Mission*, 184 Md. at 239; *Baltzell v. Church Home*, 110 Md. 244, 73 A. 151, 155 (1909); *see also Mayor and Aldermen of City of Annapolis v. W. Annapolis Fire & Imp. Co.*, 264 Md. at 739 (citing *Gordon v. City of Baltimore*, 258 Md. 682, 702-703 (1970)); HOWARD, CHARITABLE TRUSTS IN MARYLAND, 1 Md.L.Rev. 105, 121 (1937)).

trust in this way, (1) a fiduciary relationship must exist between the parties; (2) the trust must identify a trustee(s)' duties; (3) a property must be held in trust; (4) a manifestation of intention to create a charitable trust must be present; and, (5) the trust must have a charitable purpose.[87] A charitable trust is "[a] fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it …"[88] The person who holds the property in trust must abide by "equitable duties to deal with the property for a charitable purpose."[89] Critically, however, the grantor of any trust asset must intended for the charity to "deal with [the] property for the benefit of other persons[,]—a required element of a valid charitable trust."[90] So, where a conveyance does not expressly state that the property was intended for use for a charitable purpose, courts do not look to extrinsic evidence to impute a trust.[91]

Because only funds held in a charitable trust are protected by the doctrine of charitable immunity, Survivors may properly seek recovery from the Debtor's non-insurance assets to which

---

[87] RESTATEMENT (SECOND) OF TRUSTS § 348; *see Rosser v. Prem*, 52 Md.App. 367, 377 (Md. Ct. Spec. App. 1982).

[88] RESTATEMENT (SECOND) OF TRUSTS § 348 (1959) (emphasis added); *see Rosser*, 52 Md.App. at 374.

[89] RESTATEMENT (SECOND) OF TRUSTS § 348 (emphasis added).

[90] *Long Green Valley Ass'n*, 432 Md. at 319 (quoting *From the Heart Church Ministries*, 370 Md. at 181–82) (internal quotations omitted).

[91] *Long Green Valley Ass'n*, 432 Md. at 320 ("We need not resort to extrinsic evidence in parsing the plain meaning of the Respondents' intent because the language of the Bellevale Easement demonstrates clearly that the Respondents did not intend for the Easement to impose a charitable trust."); *see e.g.*, Md. Code Ann., Corps. & Ass'ns, § 5-317 ("In addition to the requirements of § 5-305 of this subtitle, if a congregation forms a religious corporation under this part, any gift, devise, or bequest made to and intended to enure to the benefit of the congregation enures to the benefit of the religious corporation, whether or not the religious corporation was designated or described accurately in the gift, devise, or bequest.").

the Debtor holds both legal and equitable title. It is then the Debtor's obligation to delineate what assets are trust assets eligible for charitable immunity. For these reasons, the Court should determine that the Debtor may not rely solely on its asserted religious mission as sufficient grounds for the application of charitable immunity and instead must produce clear and convincing evidence at trial that establishes that all assets it intends to shield from Survivors are held in a charitable trust(s).

## VII.    THE DEBTOR'S COUNTERCLAIMS SHOULD BE DISMISSED.

The Debtor's sole counterclaim seeks a declaratory judgment that charitable immunity protects it from Survivor claims—the mirror image of the Committee's affirmative claims. Because the Committee's claims and the Debtor's counterclaim present identical legal issues with opposite requested outcomes, summary judgment in favor of the Committee on any ground necessarily requires dismissal of the Debtor's counterclaim.[92]

## <u>CONCLUSION</u>

For the foregoing reasons, the Committee requests that this Court grant its Motion for Summary Judgment and enter an order and judgment: **(i)** declaring that the Debtor cannot rely upon charitable immunity as a defense to uninsured or underinsured Survivors' claims; **(ii)** finding, alternatively, that to be eligible for charitable immunity, the Debtor must establish with clear and convincing evidence that (a) it is a charitable trust or holds assets in a charitable trust, and (b) the use of those trust assets to pay Survivors would be inconsistent with the charitable purpose(s) of

---

[92] However, the converse is not true. The Debtor bears the burden of proving charitable immunity by clear and convincing evidence, and the Debtor's failure to meet this burden would result in dismissal of its counterclaim even if the Committee does not prevail on all of its affirmative theories.

that trust; and/or **(iii)** entering judgment dismissing all of the Debtor's counterclaims and affirmative defenses.

Date: August 28, 2025.                                    Respectfully submitted,


                                          /s/ Richard L. Costella
                                          Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
**Tydings & Rosenberg LLP**
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
            agrochal@tydings.com

*Local Counsel to the Official Committee of Unsecured Creditors*

-and-

Robert T. Kugler (MN # 194116)
Edwin H. Caldie (MN # 388930)
Andrew Glasnovich (MN # 0398366)
Christopher Sevedge (MO # 68383)
Nicole Khalouian (NY #5755681)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile: 612-335-1657
Email: robert.kugler@stinson.com
            ed.caldie@stinson.com
            drew.glasnovich@stinson.com
            chris.sevedge@stinson.com
            nicole.khalouian@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of August, 2025, a copy of the foregoing ***MOTION FOR SUMMARY JUDGMENT*** was served via the Court's CM/ECF e-filing system, and where indicated by electronic mail, on the following:

Philip Tucker Evans, Esquire; philip.evans@hklaw.com
Catherine Keller Hopkin, Esquire; chopkin@yvslaw.com
Christopher Scott Kunde, Jr., Esquire; scott.kunde@hklaw.com
Blake Daniel Roth, Esquire; blake.roth@hklaw.com
Hugh M. (UST) Bernstein, Esquire; hugh.m.bernstein@usdoj.gov (by email)


/s/ Richard L. Costella
Richard L. Costella

6435786.1