## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## <u>(Baltimore Division)</u>

| | |
|---|---|
| In re: | Case No. 23-16969-MMH |
| THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | Chapter 11 |
| Debtor. | Judge Michelle M.  Harner |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## CONTINGENT MOTION TO DISMISS THE BANKRUPTCY CASE

The Official Committee of Unsecured Creditors (the "Committee") appointed in the Roman Catholic Archbishop of Baltimore's (the "Debtor") chapter 11 bankruptcy case moves this Court (the "Motion"), contingent on the outcome of litigation in the pending Adversary Proceeding, No. 25-00084 (the "Adversary Proceeding"), for an order dismissing this chapter 11 case. In support of the Motion, the Committee respectfully states as follows:

## <u>INTRODUCTION</u>

The Debtor's purported reasons for filing this chapter 11 case were to serve its mission, provide some measure of healing and fair compensation to Survivors, and obtain a fresh start for the Catholic Church in Maryland.[1] These words are well-crafted and, if true, honorable. Unfortunately, the Debtor's actions appear to have departed from its stated objectives. While enjoying the many benefits of the automatic stay, such as extending the stay to the Debtor's parishes and schools, the avoidance of public relations difficulties, costs, embarrassment, and the profound distraction that would attend its simultaneous defense of more than 900 Survivor

---

[1] Apology, Healing & Action, Archbishop William J. Lori, https://www.archbalt.org/apology-healing-action/ (April 3, 2023).

lawsuits, the Debtor is also hiding behind the shield of charitable immunity to argue that it has no legal responsibility for the payment of Survivor claims.

The Debtor cannot have it both ways. The Debtor cannot use the automatic stay to protect its parishes and schools, stave off public scrutiny, and sidestep acknowledged, extreme liability, while simultaneously hiding behind charitable immunity to argue that it has no liability at all. If this is permitted, the purposes of this chapter 11 case will be reduced to (i) shielding the Debtor from facing any shame or expense for its complicity in the sexual abuse of more than 900 children, and (ii) forcing Survivors to settle their claims from a no-win, Catch-22 posture, notwithstanding their decades of trauma, alienation, involuntary patience, and pain.

If the Debtor is truly insulated from liability under Maryland's charitable immunity doctrine, this chapter 11 case must be dismissed for two independent reasons.[2] *First*, if the Debtor never actually faced financial jeopardy from Survivor claims, as it stated publicly, then the Debtor was never in financial distress and had no legitimate reason to file for bankruptcy or avail itself of the protections of the automatic stay. *Second*, the Committee will not endorse a plan that releases the Debtor or any of its parishes, schools, or other affiliates, if the Debtor (and any other party seeking a release) refuses to commit to paying the liquidation value of its assets. In dozens of diocesan bankruptcies filed over the past two decades, not one diocese or archdiocese has confirmed a plan over the objection of a committee of Survivors. Recent decisions from the Supreme Court have made the prospect of confirming a "cramdown" plan in a diocesan bankruptcy

---

[2] *See Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989) ("Evidence of subjective bad faith in filing may tend to prove objective futility, and *vice versa.* Indeed it could be that some of the courts ostensibly holding that dismissal is warranted upon a finding of either have considered that proof of either implicitly proves both.").

even more challenging. As such, without the Committee's support, this Debtor cannot confirm a reorganization plan, rendering this case futile.

## BACKGROUND

1. On September 29, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").[3]

2. The Petition Date is two days prior to the effective date of the 2023 Maryland Child Victims Act (the "CVA"), which eliminated the statute of limitations to bring civil action arising from the sexual assault of a child.[4]

3. Shortly after the Petition Date, the Roman Catholic Archbishop of Washington, a Roman Catholic archdiocese with parishes located in Maryland (just like this Debtor), brought an unsuccessful constitutional challenge, seeking to invalidate the CVA.[5]

4. The Court extended the automatic stay in this case to cover not only the Debtor, but also parishes, schools, and other entities that might share insurance with the Debtor related to Survivor claims.[6]

5. In the years preceding the Petition Date, the Maryland Office of the Attorney General conducted an investigation and issued a report in April 2023, stating over six hundred children were known at that time to have been abused by at least 156 priests, teachers, lay-

---

[3] *See* Petition, Dkt. 1.

[4] Md. Code Ann., Courts & Judicial Proceedings § 5-117.

[5] *Roman Catholic Archbishop of Washington v. Doe*, 489 Md. 514, 575 (2025) ("The [Roman Catholic Archbishop of Washingtons]' as-applied challenges to the constitutionality of the Child Victims Act of 2023 therefore fail.").

[6] *See* Second Interim Order Extending the Automatic Stay, Dkt. 173.

employees, and/or other individuals employed, supervised, or otherwise associated with the Debtor.[7]

6.      The Maryland General Assembly enacted the Child Victims Act of 2023 (the "CVA"), which eliminated the statute of limitations in Maryland for survivors of childhood sexual assault (collectively, "Survivors") to bring claims against individuals and institutions who may be civilly liable for the atrocities perpetrated upon Survivors.[8]

7.      As evidenced by the Survivor claims filed in this case, as children, nearly all Survivors were, and many remain still as adults, part of the Debtor's congregation of faithful Catholics.

8.      Survivors trusted the Debtor to not only minister to them spiritually, but protect their physical wellbeing at times when they were entrusted to the Debtor's care. Survivors allege that the Debtor failed them in all respects by prioritizing the Catholic Church's reputation, influence, finances, and power, over the physical safety of children, resulting in decades of egregious harm and suffering to Survivors—physically, mentally, emotionally, and spiritually.

9.      The Debtor filed this chapter 11 case because it purported to have faced potentially catastrophic liabilities from hundreds of Survivors' claims following the passage of the CVA.[9]

---

[7] Attorney General of Maryland, Report of Child Sexual Abuse in the Archdiocese of Baltimore, Redacted (April 2023) (the "AG Report") at 1,9; *see also* Informational Brief, Dkt. 5 at ¶ 164.

[8] 2023 Session Senate Bill 686, Acts 2023, c. 5, § 1, eff. Oct. 1, 2023.

[9] Counterclaim, Adv. Proc. No. 25-00084, Dkt. 15, p.10 at ¶14 ("The Debtor filed the Petition for Relief based upon the unknown, and potentially catastrophic, liabilities it might face as a result of claims brought by Survivors under the CVA".); *see also* Informational Brief, Dkt. 5 at ¶¶ 160-173 ("The [Debtor] commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of [the Debtor] to continue providing essential ministries and services within the Archdiocese.").

10.     The Debtor also purports to have filed this chapter 11 case to compensate Survivors for the harms occasioned upon them in the past by the Debtor and its priests, teachers, lay-employees, and other individuals employed, supervised, or otherwise associated with the Debtor.[10]

11.     More than 1,000 proofs of claim have been filed in this chapter 11 case alleging that the Debtor is liable for negligent acts resulting in or arising from child sexual assault and/or other sexual abuse encompassed by the CVA.[11]

12.     If not for the claims filed by Survivors, the Debtor's assets would greatly exceed its liabilities.[12]

13.     If not for the claims filed by Survivors, the Debtor would not require reorganization under the Bankruptcy Code.[13]

14.     Other than Survivors' tort claims, the Debtor's monthly operating reports show that it has sufficient cash-flow and other liquid assets to pay all of its accrued pre-Petition Date debts in full, and has generated millions of dollars of net income during the pendency of this chapter 11 case. [*See, e.g.*, Dkt. 1251.]

---

[10]     *See* Declaration of John Matera in Support of First Day Motions, Dkt. No. 6 at ¶¶ 15-20; *see also* Informational Brief, Dkt. 5 at ¶¶ 169-170.

[11]     *See generally* Claims Register; *see also* Counterclaim, Adv. Proc. No. 25-00084, Dkt. 15 at ¶ 15.

[12]     Debtor's Schedules A/B, D, E/F, Dkt. 146 (schedules showing assets exceed liabilities, other than unliquidated tort claims, by nearly ten-fold).

[13]     *See generally id.*; Counterclaim, Adv. Proc. No. 25-00084, Dkt. 15, p.10 at ¶14 ("The Debtor filed the Petition for Relief based upon the unknown, and potentially catastrophic, liabilities it might face as a result of claims brought by Survivors under the CVA".); *see also* Informational Brief, Dkt. 5 at ¶¶ 160-173 ("The [Debtor] commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of [the Debtor] to continue providing essential ministries and services within the Archdiocese.").

15.     The Debtor's purpose in filing this chapter 11 case was to reorganize the liabilities associated with Survivors' claims, for the Debtor and also for the Debtor's affiliated entities, such as parishes, schools, and charities located within the Archdiocese of Baltimore.[14]

16.     Prior to the Petition Date, the Debtor asserted that the doctrine of charitable immunity provides a complete legal defense under Maryland law to pay Survivor claims that are not covered, or to the extent the claim exceeds the limits provided, by third-party insurance.[15]

17.     The Debtor continues to assert that the doctrine of charitable immunity provides a meritorious defense under Maryland law to paying Survivor claims filed in this chapter 11 case that are not covered, or to the extent the claim exceeds the limits provided, by third-party insurance.[16]

18.     The Committee initiated the Adversary Proceeding, Adv. P. 25-00084 (Bankr. D. Md.), seeking a declaratory judgment on several counts that the Debtor is not entitled to charitable immunity as to Survivor claims in this case. The Debtor filed a counterclaim seeking the opposite finding.[17]

19.     Contemporaneously with this Motion, the Committee filed a Motion for Summary Judgment in the Adversary Proceeding, Adv. Dkt. 43 (the "Summary Judgment Motion"), seeking an order from the Court finding in favor of the Committee on several counts in the Complaint.

---

[14] *E.g.*, Second Interim Order Extending the Automatic Stay, Dkt. 173.

[15] Complaint, Adv. Proc. No. 25-00084, Dkt. 1 at ¶ 22.

[16] Counterclaim, Adv. Proc. No. 25-00084, Dkt. 15 at ¶¶ 11-18.

[17] Complaint, Adv. Proc. No. 25-00084, Dkt. 1; Counterclaim, Adv. Proc. No. 25-00084, Dkt. 15.

20.     By filing this chapter 11 case knowing it would rely on the defense of charitable immunity, the Debtor could not have intended this chapter 11 process to protect the Debtor's assets because charitable immunity already provided comprehensive protection.

21.     If the Debtor is permitted to maintain its charitable immunity defense, it is in the best interests of creditors to dismiss the Debtor's chapter case, because without dismissal, the automatic stay continues to prohibit Survivors with insured claims from taking action to access the Debtor's insurance and strings along Survivors with uninsured claims preventing them from obtaining a resolution, even if that resolution does not come with **any** financial compensation.

22.     Despite mediating for more than one year, Survivors and the Debtor's insurers have not reached a settlement on the payment of any Survivor claims filed in this chapter 11 case. Without a voluntary settlement to access insurance, Survivors must liquidate their claims against the Debtor, obtain a judgment, and seek garnishment against insurance companies.

23.     If the Debtor is permitted to maintain its charitable immunity defense, the Committee requests an order and judgement pursuant to 11 U.S.C. § 1112(b) dismissing the Debtor's chapter 11 case.

***

## REQUEST FOR RELIEF

24.     If the Debtor prevails on its Counterclaim asserted in the Adversary Proceeding, the Committee cannot support the Debtor's efforts to reorganize and so respectfully requests that the Court dismiss this chapter 11, as a bad faith filing, pursuant to 11 U.S.C. § 1112(b), and consistent with *In re Premier Automotive Services, Inc.*, 492 F.3d 274, 280 (4th Cir. 2007).[18]

25.     The Committee requests a hearing within 30 days of the filing of this Motion as required by 11 U.S.C. § 1112(b)(3). The Committee consents to the extension of the time for the Court to decide the Motion through and including December 1, 2025.

26.     For the avoidance of doubt, the Committee withdraws this motion if the Court issues a judgment in favor of the Committee on any of its claims in Adversary Proceeding, No. 25-00084 and that judgment becomes a final non-appealable order.

*** 

---

[18] The Fourth Circuit's recent 2025 decision on bad faith filings is inapposite to this case, as the Committee does not argue in this Motion that the Court lacks subject matter jurisdiction on account of the Debtor's solvency. *Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, No. 24-1493, 2025 WL 2177391, at *4 (4th Cir. Aug. 1, 2025) ("[W]e face a narrow question—do federal courts have subject-matter jurisdiction over bankruptcy cases filed by debtors who may be able to pay their obligations?").

## **ARGUMENT**

A bankruptcy court shall dismiss a chapter 11 case for cause.[19] Bankruptcy Code section 1112(b)(4) sets out a non-exhaustive list of examples of cause. In the Fourth Circuit, "cause" exists if a debtor both[20] (i) filed in bad faith (subjective test) and (ii) has no realistic chance to reorganize (objective test).[21] Because the Debtor filed this case knowing it would keep its non-insurance assets out of the reach of creditors and creditors will not consent to a plan that perpetuates such an unjust outcome, the Debtor has failed both the subjective and objective tests, and this case must be dismissed.[22] "When attacking a debtor's good faith in filing a petition, the creditor must establish a prima facie showing of the debtor's lack of good faith. Once this prima facie showing is made, the debtor has the burden of proving that the petition was filed in good faith."[23]

---

[19] 11 U.S.C. § 1112(b).

[20] *Carolin Corp*, 886 F.2d at, 700–01 ("Upon consideration, we agree with those courts that require that *both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing.").

[21] *In re Premier Automotive Services, Inc.*, 492 F.3d 274, 279–80 (4th Cir. 2007) (citing *Carolin Corp. v. Miller,* 886 F.2d 693, 698 (4th Cir.1989)) ("The right to file a Chapter 11 bankruptcy petition is conditioned upon the debtor's good faith—the absence of which is cause for summary dismissal. Indeed, the ability of a bankruptcy court to conduct a threshold inquiry into the good faith of a petitioner is 'indispensable to proper accomplishment of the basic purposes of Chapter 11 protection.' As this court has explained, 'a good faith requirement prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.' The good faith standard also 'protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those debtors and creditors with clean hands.'") (internal quotations and citations omitted).

[22] This case cannot be converted to a chapter 7 case. 11 U.S.C. 1112(c) ("The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is…a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

[23] *In re Paolini*, 312 B.R. 295, 305 (Bankr. E.D. Va. 2004) (citations omitted).

## I.   IF THE DEBTOR IS CHARITABLY IMMUNE, IT FILED BANKRUPTCY IN BAD FAITH.

The Court must dismiss this bankruptcy unless the Debtor was "motivated by an honest intent to effectuate reorganization … ."[24] A debtor acts contrary to this requirement if it is "instead motivated by some improper purpose. Subjective bad faith is shown where a petition is filed 'to abuse the reorganization process,' or 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay.'"[25] The Debtor filed in bad faith (i) because it is financial solvent and has no need to reorganize, and (ii) intended to use chapter 11 as a litigation tactic that perpetuated a further harm on Survivors.

---

[24] *In re Premier Automotive Services, Inc.*, 492 F.3d 274, 280 (4th Cir. 2007) (citing *Carolin*, 886 F.2d at 698). *Cf In re Wilson*, No. 12-32715-WIL, 2016 WL 1254637, at *5 (Bankr. D. Md. Mar. 30, 2016) (analyzing dismissal under Section 707(a)) (listing multiple factors courts consider for a bad faith filing under chapter 7) (citations omitted); *McDow v. Smith*, 295 B.R. 69, 76n. 13 (E.D. Va. 2003) ("The *Carolin* analysis is instructive here because the enumerated grounds in § 707(a) are akin to those found in § 1112(b), and it follows thus that the *Carolin* reasoning is applicable to the Chapter 7 context and supports the conclusion that lack of good faith is a "cause" for dismissal under § 707(a). While § 1112(b) lists more illustrative grounds for "cause" applicable only to the Chapter 11 reorganization context, two of the grounds articulated in § 707(a) are also contained in § 1112(b): unreasonable delay by a debtor and the failure to pay required fees. As the listed factors were considered evidence of subjective bad faith in the Chapter 11 context, so too would the presence of the same factors in § 707(a) evidence a debtor's lack of good faith in filing for Chapter 7 protection. A debtor who delays in filing his Chapter 7 petition to the detriment of his creditors, or omits submitting required information with his petition, or fails to pay the requisite fees—further delaying the bankruptcy process—can fairly be said to have filed his bankruptcy petition in bad faith.").

[25] *In re Premier Automotive Services, Inc.*, 492 F.3d at 280; *see In re SB Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) ("Courts have identified the following recurrent factors that circumstantially bear on whether subjective bad faith in filing and/or objective futility in legitimately reorganizing exists: (1) the debtor has few or no unsecured creditors; (2) there has been a previous bankruptcy petition by the debtor or a related entity; (3) the prepetition conduct of the debtor has been improper; (4) the petition effectively allows the debtor to evade court orders; (5) there are few debts to non-moving creditors; (6) the petition was filed on the eve of foreclosure; (7) the foreclosed property is the sole or major asset of the debtor; (8) the debtor has no ongoing business or employees; (9) there is no possibility of reorganization; (10) the debtor's income is not sufficient to operate; (11) there was no pressure from non-moving creditors; (12) reorganization essentially involves the resolution of a two-party dispute; (13) a corporate debtor was formed and received title to its major assets immediately before the petition; and (14) the debtor filed solely to create the automatic stay.").

### a.   If Charitable Immunity Applies, the Debtor Was Solvent and Faced No Financial Peril When It Filed This Chapter 11 Case.

The Debtor did not enter bankruptcy to reorganize or fend off financial peril and so it cannot meet the subjective good faith requirement to be a debtor in bankruptcy.[26] Apart from Survivors' claims, the Debtor is financially solvent. It reports $204,962,748.36 in assets and $24,933,882.44 in liabilities. [Dkt. 146 at 6.] Its monthly operating reports demonstrate a positive cash flow, even with the burden of chapter 11 professionals. [Dkt. 1251 at 2 ($26,518,681 profit during this chapter 11 case)]. The Debtor has identified no other financial constraints other than Survivor cases as a basis for its chapter 11 filing.

Without the threat of financial catastrophe from billions of dollars in verdicts from Survivor claims, the Debtor is not entitled to the protections of the Bankruptcy Code, and this case should be dismissed.

### b.   The Debtor Has Invoked Charitable Immunity to Coerce a Self-Serving and Profoundly Inequitable Global Settlement.

In addition to the debtor's financial condition, courts find subjective bad faith if a debtor uses the automatic stay as a litigation tactic or for some other improper purpose. In *Premier Automotive Services, Inc.*, the Fourth Circuit concluded that a debtor uses the bankruptcy stay improperly if it filed (i) to circumvent state law remedies to resolve the dispute;[27] (ii) to create

---

[26] *In re Premier Automotive Services, Inc.*, 492 F.3d at 280 ("Premier's bankruptcy filings reveal a solvent business entity with no unsecured creditors and few, if any, secured creditors. This fact alone may justify dismissal of Premier's Chapter 11 petition. As one of our sister circuits has noted, courts 'have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11.'") (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir.1999) (citing cases)).

[27] *In re Premier Automotive Services, Inc.*, 492 F.3d at 280–81 ("The bankruptcy court found that Premier's 'only nemesis' was MPA and that it was 'not the failure of the State to negotiate in good faith that created the impasse between the parties, but the inability of the parties to come to terms on a new lease.' The court further found that Premier's adversary claims against MPA were dependent upon its right to a lease of Lot

leverage in future litigation; and/or (iii) on the eve of a deadline or trial.[28] The automatic stay, extended to the Debtor's affiliates, had prevented lawsuits from being filed against the Debtor and its parishes and schools until only recently.[29] Even then, those suits were stayed shortly after they were filed.[30] The Debtor's actions and the circumstances of its filings show that it has sought to use the automatic stay for improper purposes, and have thus filed this chapter 11 case in bad faith.

First, the Debtor's only creditor dispute is with Survivors, who the Debtor would rather silence by availing itself of the automatic stay than permit to present evidence of their abuse in open court. Invoking the automatic stay also allows the Debtor (and its Catholic affiliates) to sidestep the enduring public relations nightmare that would undoubtedly and understandably arise from its defense of more than 900 Survivor lawsuits. This misuse of the automatic stay by an entity now arguing that it has no liability for Survivor claims is an offensive and untenable basis for filing for bankruptcy. While Survivors must wait years in bankruptcy limbo, the Debtor's parishes,

---

90—a matter of state contract law. Premier did not, however, choose to avail itself of the obvious state law remedies before bringing its Chapter 11 petition, providing further evidence of bad faith.").

[28] *In re Premier Automotive Services, Inc.*, 492 F.3d at 281. ("[T]he bankruptcy court concluded that 'Premier filed the instant bankruptcy case for the sole purpose of halting and/or delaying its ultimate eviction from the Terminal by MPA,' 'to compel the Maryland Port Administration to execute a new lease to the debtor on terms more favorable than those the State found acceptable,' and as a '"means to the end of tying up the State in endless, fruitless litigation.' Holding an asset hostage is not a permissible use of the bankruptcy process, however. Chapter 11 is not a procedural vehicle which may be commandeered solely for 'the purpose of invoking [its] automatic stay.' The bankruptcy court properly assessed Premier's Chapter 11 filing under the *Carolin* criteria and properly found it wanting.").

[29] See *In re Paolini*, 312 B.R. 295, 306–07 (Bankr. E.D. Va. 2004) ("[D]ecisions where a bad faith dismissal was found justified generally have 'dealt with smaller judgments where the debtor had the ability to satisfy the judgment without losing the ability to stay in business.' In at least one dismissal, the inability of the debtor to post a bond was found nonetheless not influential to the court as the debtor was not insolvent but for the judgment entered against it and the debtor was unable to propose a meaningful plan of reorganization until the litigation was complete, which illustrated the bankruptcy filing was not for rehabilitative purposes.") (citations omitted).

[30] *Order Modifying Automatic Stay Solely For Purposes Of Filing And Serving Certain Civil Complaints Under Maryland Law On Or Before May 31, 2025*, Dkt. 1127.

schools, and associated charities have enjoyed protection from confronting the reality of the sexual abuse crisis for which they bear tremendous responsibility. These facts alone warrant dismissal.

Second, the Debtor has employed the automatic stay to create negotiating leverage that it would not be entitled to in state court, or even in a normal bankruptcy proceeding.[31] By filing this case without the intention of paying Survivors fairly and equitably, the Debtor has once again victimized Survivors by depriving them of the right to healing, justice, and accountability that can be uniquely available in civil litigation. Aiming to avoid the public scrutiny from thousands of lawsuits alleging its complicity in child sexual assault, the Debtor has employed the automatic stay to undermine Survivor's resolve, delay justice, and ultimately force Survivors to settle *en masse*.[32] In a normal chapter 11 case, creditors have many options at their disposal, including to force liquidation of assets or file a competing plan. But here, the Debtor's bad faith strategy to weaponize simultaneously both the automatic stay as a sword and charitable immunity as a shield has left Survivors with only one choice: accept whatever the Debtor feels is a reasonable settlement.

The Debtor relies on charitable immunity to avoid its legal and moral obligations to pay a reasonable settlement to Survivors. Instead of fulfilling its duties, the Debtor argues it will only pay what it unilaterally feels is reasonable, because no one can make it pay anything more. As this

---

[31] *In re Premier Automotive Services, Inc.*, 492 F.3d at 280 (quoting *Chesapeake Bank,* 166 Md.App. 695, 891 A.2d 384, 391 (2006)) ("Quite apart from the fact that Premier had no cognizable property interest in its expired lease of Lot 90, and no right to judicially compelled negotiations, its reorganization-qualitigation strategy was, as the bankruptcy court found, 'wholly illusory.' Indeed, even if Premier were somehow to get the relief it requests, that relief would not lead to an effective reorganization. Thus, the bankruptcy court concluded that Premier's lease dispute belonged in 'the State [of Maryland's] Courts' and there is 'no possible mechanism in bankruptcy by which the debtor can achieve a legitimate reorganization.'").

[32] Likewise, its appears the Debtor anticipated the CVA would be declared unconstitutional in the *Roman Catholic Archbishop of Washington v. Doe*, 489 Md. 514, 575 (2025), and hoped to gain additional leverage against Survivors by delaying litigation until that case resolved in its favor.

bankruptcy court has already observed, a debtor cannot seek chapter 11 relief if it does not intend

to pay its creditors:

> Do the Plan Proponents contend that [the debtor] could refuse to waive charitable
> immunity and still achieve a confirmed plan that shields the equity in its assets from
> creditor claims?  If so, that would be a queer, losing argument.[33]

By engineering a one-sided negotiation scheme that coerces creditors to settle or wait years while

the Debtor fights and delays, the Debtor has violated its fiduciary duties[34] to creditors, and

evidenced its bad faith in seeking bankruptcy relief.[35]

---

[33] *In re City Homes III LLC*, 564 B.R. 827, 872 (Bankr. D. Md. 2017).

[34] *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995) ("A debtor-in-possession is a fiduciary. As such, Debtor would owe the same duties as a trustee. The fiduciary duties of the debtor-in-possession, like the trustee, extend to all parties interested in the bankruptcy estate. A debtor-in-possession does not act in its own interest but must act in the best interest of the creditors of the estate. The job of the debtor-in-possession is to make sure the creditors are paid. The fiduciary duties include a duty of care to protect the assets, a duty of loyalty and a duty of impartiality. …The duties to avoid self-dealing, conflicts of interest and the appearance of impropriety are encompassed within the concept of duty of loyalty. The duty of impartiality is sometimes not separately classified but swept within the duty of loyalty.") (citations omitted); Although not included in the enumerated list in Section 1112(b)(4), the UST urges the court to find Landmark's failure to act as a fiduciary to its creditors as cause for dismissal or conversion."); *In Landmark Atlantic Hess Farm*, LLC, 448 B.R. 707, 716 (Bankr. D. Md. 2011) ("Citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985), the UST notes that Landmark owes a fiduciary duty to its creditors and has failed to satisfy that obligation in favor of his own best interests. The court agrees with the UST.").

[35] *See Premier*, 492 F.3d at 280-82; *In re Auto Money N. LLC*, 650 B.R. at 260–61 ("On the issue of the Debtor's subjective bad faith, as a solvent company with almost 50 employees, numerous assets with significant equity, no cash flow issues, and reliable sources of income, Debtor does not resemble a typical bad faith debtor as in a *Carolin*-type case. However, Debtor does resemble the debtors in *Premier* and *LTL* that were so financially healthy that there was essentially nothing to reorganize and filed for bankruptcy merely as a litigation tactic. While the Debtor does have debt, the vast majority is either owed to AMI or is the result of guaranteeing the debt of the Debtor's affiliates. At filing, it appeared that Debtor could have easily repaid all liquidated, non-contingent, non-disputed debt. The fact that the Derbyshires own both Debtor and AMI and that Debtor was able to decrease its debt on the twenty-year APA note to AMI by over 86% in just three years evidences a Debtor that did not need bankruptcy relief at the time of filing, and a filing motivated by something other than financial need.").

14

Third, the Debtor's abuse of the automatic stay is evidenced by the timing of its bankruptcy petition, filing two days prior to the CVA's effective date.[36] By preempting the October 1, 2023 CVA effective date, the Debtor prevented Survivors from filing public complaints and facing discovery in state court. This bankruptcy process also imposed artificial deadlines on all Survivors, forcing them to elect to assert their claims against the Debtor within the time prescribed by the relevant bankruptcy rules. This had the effect of needlessly invading the agency of Survivors, who without this bankruptcy, would have had the right to decide whether or not to act upon their potential claims under Maryland's more permissive time limits (i.e., there is no deadline to file a complaint under the CVA). The artificial deadline, meanwhile, benefited the Debtor by defining the universe of potential claimants and legitimizing the Debtor's attempt to dispose of these claims cheaply and efficiently. While not always dispositive, given the context of this case, it is clear the Debtor filed its petition to prevent lawsuits from hitting court dockets, to dictate the terms and conditions upon which Survivors could assert their claims, and to force Survivors to come forward, not as voluntary plaintiffs in litigation, but on the Debtor's unilateral terms in the Debtor's chosen forum.

Because the Debtor filed this chapter 11 case to avoid justice and accountability and to instead coerce a settlement using the automatic stay and threaten years of stalled and one-sided negotiations, the Court should dismiss this chapter 11 case.

---

[36] *In re Kelly*, 656 B.R. 541, 599 (Bankr. D. Md. 2023), *aff'd sub nom. Kelly v. Naples Prop. Holding Co., LLC*, No. CV DLB-24-184, 2025 WL 974345 (D. Md. Mar. 31, 2025) ("This timeline highlights that every one of the nine bankruptcy cases filed by Ms. Kelly and Mr. Myers were filed on the eve of a foreclosure sale or soon after a state court entered an order permitting a foreclosure proceeding to continue. Without question, Ms. Kelly and Mr. Myers have manipulated the bankruptcy system to thwart attempts by Specialized Loan Servicing and U.S. Bank to execute on their security interests since 2015.").

## II.    THE DEBTOR CANNOT CONFIRM ITS PLAN WITHOUT THE SUPPORT OF SURVIVORS AND THE COMMITTEE.

"The objective futility inquiry is designed to insure that there is embodied in the petition 'some relation to the statutory objective of resuscitating a financially troubled [debtor].'"[37] A chapter 11 debtor cannot reorganize without the support of its creditors.[38] When faced with a motion to dismiss, creditor support for the debtor's reorganization attempt is a critical factor in deciding whether cause exists under Section 1112.[39] This Debtor is no typical chapter 11 debtor. The Debtor contends in the adversary proceeding that it faces no risk of financial responsibility for Survivor claims and so faces no financial distress and has no need for rehabilitation.[40] Even if the Debtor were financially distressed, it cannot reorganize without the unanimous consent of Survivors, and Survivors will not provide their unanimous consent.[41] The Debtor does not seek to simply address claims asserted against it, but intends to seek bankruptcy relief related to all Survivor claims filed against the Debtor's affiliates, including parishes, charities, foundations, and other entities the Debtor claims are entitled to immunity from those very Survivor claims.[42] In other words, the Debtor wants a full resolution of thousands of known and unknown Survivor claims, asserted against the Debtor as well as hundreds of its affiliated Catholic entities, but does not want to pay Survivors fair consideration in exchange for this extraordinary relief.

---

[37] *Carolin Corp. v. Miller*, 886 F.2d 693, 701–02 (4th Cir. 1989) (citations omitted).

[38] 11 U.S.C. § 1129(a)(7),(8); *id.* § 1129(b).

[39] *In re Park*, 436 B.R. 811, 822 (Bankr. W.D. Va. 2010) ("The Court finds that cause exists under 11 U.S.C. § 1112(b)(4)(A) and (I) to grant the Motion to Dismiss pursuant to § 1112(b)(1). The Court further finds that dismissal, rather than conversion of Lakewatch's case, is the more appropriate relief. In finding that dismissal is the most appropriate relief, the Court finds that Lakewatch lacks creditor support, has little to no sustainable income, cannot pay its expenses and that the granting of the Motion for Relief leaves little in the way of assets for a Chapter 7 Trustee to administer.").

[40] See *Premier*, 492 F.3d at 280. ("Indeed, even if Premier were somehow to get the relief it requests, that relief would not lead to an effective reorganization. Thus, the bankruptcy court concluded that Premier's

The Committee will not support such an inequitable proposal, and the Bankruptcy Code prohibits it.[43] Because the Debtor cannot reorganize without obtaining relief for its parishes, schools, and insurers, and because Survivors will never consent to third party relief unless all parties—including the Debtor—pay a reasonable settlement and negotiate on fair terms, this case is futile and should be dismissed.

---

lease dispute belonged in "the State [of Maryland's] Courts" and there is "no possible mechanism in bankruptcy by which the debtor can achieve a legitimate reorganization.").

[41] *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 227 (2024) ("[W]e hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

[42] E.g., *Debtor's Motion For Entry Of An Order, Pursuant To Sections 105(A) And 362 Of The Bankruptcy Code, Extending The Automatic Stay*, Dkt. 12.

[43] *In re City Homes III LLC*, 564 B.R. at 868 ("As for whether the satisfaction process is equal, Insurance Covered Claimants will have the opportunity to have their claims paid at full value (minus attorneys' fees and costs) through the resumption of state court litigation. Article 4.5 specifically limits the claims of claimants who opt for state court litigation to 'the proceeds of Lead–Paint Insurance Policies applicable to their Lead–Paint Claim'. Conversely, Uninsured Claimants are limited to a *pro rata* payment from the $300,000 fund and then only if they have knowledge of this case and file a claim that beats the two year deadline. For the same reason, the Insurance Covered Claimants and the Uninsured Claimants do not receive 'equal value' under the Final Plan as it is proposed that they receive vastly different distribution or, 'payment percentage procedures'—insurance covered recovery by way of litigation *vs.* a *pro rata* share of $300,000. As for the last factor, an honest evaluation of the degree of consideration given up is irreparably marred by the lack of any knowledge regarding, (a) the identities of the Uninsured Claimants, (b) the nature and extent of their injuries, (c) a reasonable estimate of their damages and (d) any potential liability of the Debtors or the Protected Parties. However, what is certain is that Insurance Covered Claimants are giving up relatively little—mainly the delay and any prejudice caused by this reorganization proceeding commenced at the behest of the Protected Parties—by comparison. *See In re Aov Indus.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("It is disparate treatment when members of a common class are required to tender more valuable consideration ... in exchange for the same recovery."). In short, the Insurance Covered Claimants are to be paid something that approximates one hundred percent of their claims while the Uninsured Claimants are not."). When a plan proponent has wrongfully classified claimants substantially similar to other, separately classified claimants in order to override the anticipated impact of a controlling creditor who will likely vote in the negative, and thus secure an affirmative, impaired voting class, the conduct is called gerrymandering and Section 1122(a) should be applied as a bar. *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991); *In re Hyatt,* 509 B.R. 707, 718 (Bankr. D.N.M. 2014); *In re Bloomingdale Partners,* 170 B.R. 984, 995 (Bankr. N.D. Ill. 1994). The Plan Proponents here have engaged in a reverse, inclusive version of this tactic.") (original citations included).

## **CONCLUSION**

The Debtor must be held accountable for the wrongs it perpetuated on Survivors. If the Roman Catholic Archbishop of Baltimore will not accept accountability in this chapter 11 case by treating Survivors fairly and equitably, then Survivors should immediately be given their day in state court. For the foregoing reasons, the case should be dismissed.

***

Date: September 3, 2025

Respectfully submitted,

/s/Alan M. Grochal
Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
**Tydings & Rosenberg LLP**
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
        agrochal@tydings.com

*Local Counsel to the Official Committee of*
*Unsecured Creditors*

-and-

Robert T. Kugler (MN # 194116)
Edwin H. Caldie (MN # 388930)
Andrew Glasnovich (MN # 0398366)
Christopher Sevedge (MO # 68383)
Nicole Khalouian (NY #5755681)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile:  612-335-1657
Email: robert.kugler@stinson.com
        ed.caldie@stinson.com
        drew.glasnovich@stinson.com
        chris.sevedge@stinson.com
        nicole.khalouian@stinson.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September 2025, a copy of the ***OFFICIAL COMMITTEE OF UNSECURED CREDITORS' CONTINGENT MOTION TO DISMISS THE BANKRUPTCY CASE*** was served by CM/ECF on those parties identified on the attached service list.

/s/ Alan M. Grochal
Alan M. Grochal

**The following parties received CM/ECF notice of the filing:**

Nathan D. Adler, Esquire: nda@nqgrg.com
Philip D. Anker, Esquire: philip.anker@wilmerhale.com
Sam Alberts, Esquire: sam.alberts@dentons.com
Monique D. Almy, Esquire: malmy@crowell.com
G. Calvin Awkward, III, Esquire: cawkward@goldbergsegalla.com
Gary Bahena, Esquire: garybahena@bahenalaw.com
Hugh M. Bernstein, Esquire: hugh.m.bernstein@usdoj.gov
Diane C. Bristow, Esquire: dcb@nqgrg.com
Edwin H. Caldie, Esquire: ed.caldie@stinson.com
Richard L. Costella, Esquire: rcostella@tydings.com
PhilipTucker Evans, Esquire: philip.evans@hklaw.com
Kevin Foreman, Esquire: kforeman@carltonfields.com
Andrew Freeman, Esquire: adf@browngold.com
Andrew Glasnovich, Esquire: drew.glasnovich@stinson.com
Gary R. Greenblatt, Esquire: grg@cooncolelaw.com
Geoffrey Grivner, Esquire: geoffrey.grivner@bipc.com
Alan M. Grochal, Esquire: agrochal@tydings.com
Megan Harmon, Esquire: megan.harmon@bge.com
Catherine Keller Hopkin, Esquire: chopkin@yvslaw.com
Robert Keith Jenner: rjenner@jennerlawfirm.com
Steven J. Kelly, Esquire: skelly@gelaw.com
Nicole Khalouian, Esquire: nicole.khalouian@stinson.com
Robert T. Kugler, Esquire: robert.kugler@stinson.com
C. Scott Kunde, Jr., Esquire: scott.kunde@hklaw.com
Anthony May, Esquire: amay@browngold.com
Gordon Z. Novod, Esquire: gnovod@gelaw.com
Timothy P. Palmer, Esquire: timothy.palmer@bipc.com
Mark David Plevin, Esquire: mplevin@crowell.com
David Kendall Roberts, Esquire: droberts2@omm.com
Annette Rolain, Esquire: arolain@ruggerilaw.com
Blake D. Roth, Esquire: blake.roth@hklaw.com
James P. Ruggeri, Esquire: jruggeri@ruggerilaw.com
Jonathan Schapp, Esquire: jschapp@goldbergsegalla.com
U.S. Trustee – Baltimore: ustpregion04.ba.ecf@usdoj.gov
Irving Edward Walker, Esquire: iwalker@coleschotz.com
Jonathan Schochor, Esquire; jschochor@sfspa.com
Kerry Staton, Esquire; kstaton@sfspa.com
Joshua F. Kahn, Esquire; jkahn@sfspa.com
Thomas F. Yost, Esquire; tyost@yostlaw.com
Desirae Krislie C. Tongco, Esquire; dtongco@omm.com

Joshua D. Weinberg, Esquire: jweinberg@ruggerilaw.com
Adam R. Dunst, Esquire, adunst@goldbergsegalla.com
Samantha J. Hanson-Lenn, Esquire, Samantha.hansonlenn@stinson.com
Eric G. Korphage, Esquire, korphagee@whiteandwilliams.com
Robert H. Kline, Esquire, kliner@whiteandwilliams.com
Matthew M. Weiss, Esquire, mweiss@phrd.com
John E. Bucheit, Esquire, jbucheit@phrd.com
Matthew G. Roberts, Esquire, mroberts@phrd.com
John Grossbart, Esquire, john.grossbart@dentons.com
Siobhain P. Minarovich, Esquire, manarovics@whiteandwilliams.com
Justin P. Fasano, Esquire, jfasano@mhlawyers,com
Matthew C. Nelson, Esquire, matthew.nelson@kennedyslaw.com
Jillian G. Dennehy, Esquire, jillian.dennehy@kenedyslaw.com
James R. Murray, Esquire, jim.murray@blankrome.com
James D. Carter, Esquire, james.carter@blankrome.com
Robyn L. Michaelson, Esquire, robyn.michaelson@blankrome.com
Sara G. Klein, Esquire, sklein@manlystewart.com
Gary P. Seligman, Esquire, gseligman@wiley.law
Ezhan S. Hasan, Esquire, ahasan@wiley.com
Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com
Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com
Isabella R. Sayyah, Esquire, isayyah@gibsondunn.com
Matthew A. Hoffman, Esquire, mhoffman@gibsondunn.com
Ryan S. Appleby, Esquire, rappleby@gibsondunn.com
Michael A. Rosenthal, Esquire, mrosenthal@gibsondunn.com
Todd C. Jacobs, Esquire, tjacobs@phrd.com
Jesse J. Bair, Esquire, jbair@burnsbair.com
Timothy W. Burns, Esquire, tburns@burnsbair.com
Jared Zola, Esquire, jared.zola@blankrome.com
Anthony J.M. Kikendall, Esquire, kikendalla@whiteandWilliams.com
Eileen King Bower, Esquire,  Eileen.kingbower@clydeco.us
Robert M. Westra, Esquire, rwestra@ppsrlaw.com
Kevin A. Clasing, Esquire, kclasing@ppsrlaw.com
Morgan K. Stippel, Esquire, mstippel@burnsbair.com
Justine M. Daniels, Esquire, jdaniels@omm.com
Ryan S, Perlin, Esquire, perlin@mdtrialfirm.com
Emily C. Malarkey, Esquire, malarkey@mdtrialfirm.com
Jodie E. Bekman, Esquire, jbekman@gfrlaw.com
Timothy Karcher, Esquire, tkarcher@proskauer.com
Paul Possinger, Esquire, ppossinger@proskauer.com
Christopher White, Esquire, Christopher.white@clydeco.us
Clinton Cameron, Esquire, Clinton.cameron@clydeco.us
Bret Kabacinski, Esquire, bret.kabacinski@clydeco.us
Douglas McGill, Esquire, dmcgill@webbermcgill.com
Christopher Sevedge, Esquire; Christopher.Sevedge@Stinson.com