## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

In re:

ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,

Debtor.[1]

Chapter 11

Case No. 23-16969-MMH

**Related to Docket No. 1278**

### DEBTOR'S OBJECTION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR DERIVATIVE STANDING TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE

The Roman Catholic Archbishop of Baltimore (the "***Debtor***"), by and through its undersigned counsel, files this objection to the *Motion of the Official Committee of Unsecured Creditors for Derivative Standing to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* (Dkt. No. 1278) (the "***Motion***"). In support of this objection, the Debtor has simultaneously submitted the *Declaration of John Matera* (the "***Matera Declaration***"). In opposition to the Motion, the Debtor respectfully states as follows:

### INTRODUCTION

1.      The Motion presents precisely the type of request that requires this Court to exercise what the Fourth Circuit recognized as a critical gatekeeping function to prevent creditor action that would harm and undermine rather than help a bankruptcy estate.

2.      This Court's gatekeeping function is essential to ensure that derivative suits do not merely advance the interests of a particular creditor at the expense of other parties to the bankruptcy proceeding or otherwise only recover enough to pay professionals.

3.      Here, the Committee's proposed litigation fails this fundamental test and should not be permitted through the proverbial gate—the Committee has spent months investigating

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

claims at an expense of untold tens of thousands of dollars already while seeking to pursue claim that would, at best, yield minimal net recoveries while creating new administrative burdens and prejudicing creditors.

4.      The proposed actions against the USCCB and Commissariat involve trust funds that were never property of the estate, while the remaining claims face substantial defenses that reduce their realistic value to a fraction of the Committee's estimates, which is likely no more than **$152,395.48**.

5.      Most critically, any recovery would generate dollar-for-dollar section 502(h) claims, increasing the general unsecured creditor pool by up to 177% without meaningfully improving recoveries for any creditor constituency.

6.      This Court's gatekeeping role exists precisely to prevent such inefficient and counterproductive litigation that would undermine not only the efficiency, but also the efficacy and fairness, of the bankruptcy proceeding.

7.      This Court should exercise that function here to deny the Committee's request and prevent the waste of estate resources on litigation that serves no material bankruptcy purpose in the context of this case.

## RELEVANT BACKGROUND

8.      On September 29, 2023 (the "***Petition Date***"), the Debtor commenced the above-captioned chapter 11 proceeding by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (this "***Chapter 11 Case***").

9.      On October 11, 2023, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "***Committee***") (Dkt. No. 81).

10.     On August 18, 2025, the Committee filed its Motion seeking derivative standing to pursue certain pre-petition transfers it believes are avoidable under title 11 of the United States

Code (the "***Bankruptcy Code***") and the Maryland Uniform Fraudulent Conveyance Act (the "***UFCA***").

11.      More specifically, the Motion attaches five (5) Complaints, identifying alleged claims against:

a.      the United States Conference of Catholic Bishops and Office of National Collections (together, the "***USCCB***"), seeking to recover **$355,247.25** relating to national collections undertaken by parishes and other related entities within the Archdiocese of Baltimore;

b.      the Commissariat of the Holy Land for the United States of America (the "***Commissariat***"), seeking to recover **$131,413.82** relating to national collections undertaken by parishes and other related entities within the Archdiocese of Baltimore;

c.      Maryland Catholic Conference, LLC (the "***MCC***"), seeking to recover **$166,554.00** relating to prepaid expenses pursuant to and in connection with the MCC's operating agreement;

d.      St. Mary's Seminary & University ("***St. Mary's***"), seeking to recover **$106,315.08** relating to various meeting expenses, including meetings of the Debtor's Office of Child Protection and Youth Services; and

e.      Ayers Saint Gross Architecture, PC ("***Ayers***", together with the USCCB, the ONC, the Commissariat, the MCC, and St. Mary's, collectively, the "***Proposed Defendants***"), seeking to recover **$255,009.55** relating to payments for professional services rendered in connection with the Debtor's Seek the City initiative.

12.      While the Committee states the "expected benefits to the estate . . . will far outweigh the costs of pursuing" the foregoing claims, analysis reveals the claims are: (a) of dubious value; (b) likely have already been outweighed by the professional costs associated with the

Committee's actions in connection with the claims; and (c) are not integral to the resolution of this Chapter 11 Case (nor would recovery meaningfully move the needle for any creditors in this case).

13.     As a result, and as set forth below in greater detail, the Debtor was fully justified in refusing to pursue the alleged claims against the Proposed Defendants, and this Court should deny the Committee derivative standing with respect to same.

## OBJECTION

14.     Acknowledging derivative standing has been permitted in other circuits, the United States Court of Appeals for the Fourth Circuit has never decided whether creditor derivative suits are permitted in the bankruptcy courts within the Fourth Circuit. *Scott v. Nat'l Century Fin. Enters., Inc. (In re Baltimore Emergency Servs. II, Corp.)*, 432 F.3d 557, 562 (4th Cir. 2005).

15.     The United States Court of Appeals for the Fourth Circuit has also noted that the question is one of significance, because limitations on standing are of paramount importance in bankruptcy proceedings because there is a public policy interest in reducing the number of ancillary suits that can be brought in the bankruptcy context so as to advance the efficient administration of a bankruptcy estate, which public policy is achieved primarily by narrowly defining who has standing in a bankruptcy proceeding. *Id.* (citing *Richman v. First Woman's Bank (In re Richman)*, 140 F.3d 654, 656-57 (4th Cir. 1997)).

16.     The Debtor agrees, particularly in situations where the pursuit of the claims identified by the Committee are likely to have no meaningful impact aside from the accrual of professional fees.

## I.     The Bankruptcy Code does not expressly authorize derivative standing.

17.     "Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

18.     "Analysis of any statute, **including the Bankruptcy Code**, must not begin with external sources, but with the text itself." *Bank of Am. Nat'l Trus & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 459 (1999) (Thomas, J., concurring) (emphasis added).

19.     As recognized by the Supreme Court, where a statute names the parties granted the right to invoke its provisions, only those parties may do so. *Hartford Underwriters Ins. Co.*, 530 U.S. at 6–7.

20.     Similarly, where a statute authorizes specific action and designates a particular party empowered to take it, that is among the least appropriate situations in which to presume non-exclusivity. *Id.* at 6.

21.     Here, the Committee seeks derivative standing pursuant to statutes that do not grant the Committee (or any constituent represented by the Committee) standing to take any action but do grant specific other persons such authority.

22.     Section 544 of the Bankruptcy Code provides, in relevant part:

> **The trustee** shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . ..
>
> **The trustee** may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(a), (b) (emphasis added).

23.     Section 547(b) of the Bankruptcy Code provides, in relevant part:

> **The trustee** may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property . . . ..

11 U.S.C. § 547(b) (emphasis added).

24.     Section 548 of the Bankruptcy Code provides:

> ***The trustee*** may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . ..

11 U.S.C. § 548 (emphasis added).

25.    Section 550 of the Bankruptcy Code provides:

> ***The trustee*** may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . ..

11 U.S.C. § 550 (emphasis added).

26.    While Congress has granted standing to a debtor in possession, no provision of the Bankruptcy Code (including section 1103 of the Bankruptcy Code) grants such standing to the Committee. *Compare* 11 U.S.C. § 1103 *with* 11 U.S.C. § 1107.

27.    By including the provisions of section 1107(a) of the Bankruptcy Code while excluding any similar provision in section 1103 of the Bankruptcy Code, Congress has made clear that Congress: (a) knew how to confer standing to additional persons under sections 544, 547, 548, and 550 of the Bankruptcy Code; and (b) nevertheless omitted such standing from the enumerated powers and duties of a committee appointed under section 1102 of the Bankruptcy Code. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

28.    Based upon the foregoing, the Bankruptcy Code does not confer standing—derivative or otherwise—to the Committee, it would be inappropriate to override Congress' exclusive grant of standing to particular persons, and the Committee therefore lacks standing—derivatively or otherwise—to pursue the claims against the Proposed Defendants.

II.    **Even if derivative standing is authorized, it is not warranted here.**

29.    As the Fourth Circuit has recognized, even if permitted under the Bankruptcy Code,

derivative standing is the exception rather than the rule:

> If the former were to swallow the latter, creditors could usurp the
> central role that the trustee or debtor-in-possession plays as the
> representative of the estate. This state of affairs would be
> problematic, because the interests of a creditor or creditors'
> committee may not always align with those of the estate. Though
> the dealings between a debtor and its creditors "may be supportive
> and friendly," the fact that the interests are "necessarily different"
> means that the relationship "must necessarily be adversarial in a
> sense." Moreover, the interests of one creditor may not align
> precisely with those of another, since they are competing with each
> other to recover from the limited resources of the estate.
>
> A bankruptcy court must therefore ensure that a would-be derivative
> suit would not simply advance the interests of a particular plaintiff
> at the expense of other parties to the bankruptcy proceeding. The
> court's approval acts as a critical check upon creditor actions that
> might, for example, "prejudice the estate and rival creditors," or
> would "recover only enough to pay the lawyers." Although the
> debtor-in-possession or trustee must also have approved the suit, the
> additional disinterested evaluation of the bankruptcy court can
> prevent well-intentioned oversights or situations where a debtor is
> for some reason predisposed to favor particular creditors. Permitting
> a creditor to sue in such a circumstance would undermine not only
> the efficiency, but also the efficacy and fairness, of the bankruptcy
> proceeding.

*Baltimore Emergency Services II, Corp.*, 432 F.3d at 562.

30.    With the foregoing caution provided, and without deciding whether derivative

standing can be granted in a bankruptcy case, the Fourth Circuit has signaled that evaluation of

requests for derivative standing should apply the so-called *Commodore* test, which requires: (a) the

debtor's consent (not applicable in this Chapter 11 Case); or (b) the court to find that the proposed

actions are (i) in the best interest of the bankruptcy estate **_and_** (ii) are necessary and beneficial to

the fair and efficient resolution of the bankruptcy proceedings. *See id.* (citing *In re Commodore*

*Int'l, Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001)).

31.     Notably, the Fourth Circuit emphasized that the bankruptcy court serves an important gatekeeper role, ensuring that a would-be derivative suit would not simply advance the interests of a particular party at the expense of other parties to the bankruptcy proceedings:

> The court's approval acts as a critical check upon creditor actions that might, for example, prejudice the estate and rival creditors, or would recover only enough to pay the lawyers. . . . Permitting a creditor to sue in such a circumstance would undermine not only the efficiency, but also the efficacy and fairness, of the bankruptcy proceeding.

*Id.* at 562 (internal quotations and citations omitted).

32.     Acknowledging that the Debtor has not consented to the Committee having derivative standing for the issue at hand, the Committee in this case is required to demonstrate that pursuit of the claims against the Proposed Defendants is: (a) in the best interest of the bankruptcy estate; ***and*** (b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *Id.*

33.     Here, the totality of the circumstances demonstrates that the Committee cannot meet this burden, and pursuit of the claims against Proposed Defendants would do little more than advance the interests of one class of creditors at the expense of another class of creditors while likely recovering only enough to "pay the lawyers" (if even that).

**A.     The claims against the Proposed Defendants are of dubious merit and value.**

34.     Notwithstanding the Committee's assertions regarding the merit and value of the claims identified against the Proposed Defendants, analysis of the claims (which analysis the Debtor is required to undertake as a fiduciary before determining to bring any such claims) reveals that the claims are of dubious merit and value.

> *i.     **USCCB and Commissariat.***

35.     Each of the claims identified by the Committee with respect to the USCCB and Commissariat require as a threshold requirement that there has been a transfer of an interest of the Debtor in property.

36.    Property held in trust by a debtor is not property of the estate under section 541 of the Bankruptcy Code. *See, e.g.*, *Begier*, 496 U.S. at 59 (finding that because the debtor did not hold an equitable interest in property, he held that property in trust for another, and so that interest was not "property of the estate"); *In re Walt Robbins, Inc.*, 129 B.R. 452 (Bankr. E.D. Va. 1991) ("property comes into the estate only to the extent of the debtor's legal title"); *In re Veatch*, 232 B.R. 346 (Bankr. E.D. Va. 1999).

37.    Maryland law[2] recognizes that all general donations made by parishioners are held in trust by the receiving church. *See Inasmuch Gospel Mission, Inc. v. Mercantile Trust Co.*, 184 Md. 231, 239 (Md. 1945); *see also From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 183 (2002).

38.    In addition, donations by parishioners for specific purposes are further restricted by the donor's intent. *See Rosser v. Prem*, 52 Md. App. 367, 377-78 (1982); *see also Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 662 (2012); Md. Code, Estates & Trusts Code § 15-402(a).

39.    Similar to Maryland law, (a) the Code of Canon Law mandates that "offerings given by the faithful for a certain purpose can be applied only for that same purpose"; and (b) the USCCB's Complementary Norms, which are equally binding upon United States dioceses, provides that "the relationship of trust between donor and fund-raiser requires that . . . funds collected be used for their intended purposes." Canon 1267, § 3; USCCB, *Complementary Norms to the Code of Canon Law, Canon 1262 Fund-Raising*, Norms 3a and 4.

40.    The claims alleged against each of the USCCB and Commissariat do not relate to transfers of an interest of the Debtor in property; rather, the claims relate to amounts held in trust by the Debtor pursuant to Maryland law, Canon law, and the USCCB's Complementary Norms

---

[2] For purposes of determining the existence of a trust, state law applies in bankruptcy cases. See *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.")

that were: (a) first received in trust by parishes and other related entities as part of national collections for specific purposes known as "Second Collections"; and (b) subsequently transferred to the Debtor by the parishes and other related entities for further transfer to the USCCB or other appropriate party, pursuant to and in accordance with the USCCB's Guidelines for Administering USCCB National Collections in Dioceses (the "***USCCB Guidelines***"),[3] Code of Canon Law, USCCB's Complementary Norms, and Maryland law.

41.    "Second Collections" are one among the various forms of donations solicited from parishioners within the Church and are governed by, among other things, the USCCB Guidelines, Canon Law, and Maryland law.

42.    Canon 1266 of the Code of Canon Law states, "In all churches and oratories which are, in fact, habitually open to the Christian faithful . . . the local ordinary can order the taking up of a special collection for specific parochial, diocesan, national, or universal projects; this collection must be diligently sent afterward to the diocesan curia."

43.    Consistent with this dictate, universal collections have been established by the Holy See and, on other occasions, by a two-thirds vote of the diocesan and eparchial bishops and their equivalents of the United States.

44.    Once a universal collection has been established, it is assigned a national date and an education and awareness-building campaign is developed around that date explaining why the special collection is being taken, for what the proceeds will be used, and how past resources have been utilized.

45.    The USCCB annually posts a schedule of national collections—i.e., the "Second Collections"—setting forth the dates for each national collection effort, an explanation regarding

---

[3] A true and correct copy of the USCCB Guidelines is attached to this objection as **Exhibit A** and is incorporated in this paragraph by reference.

the uses of the funds raised for that particular national collection effort, and the specific beneficiary(ies) of the particular national collection effort.

46.     In advance of the determined dates, parishioners are informed of the specific charitable causes and the purpose for which the donated funds will be used.

47.     The schedule of national collections for 2023 and 2024 is attached to this objection as **Exhibit B** and incorporated by reference.

48.     On the dates set forth on the schedule, after the "passing of the plate" for general donations by parishioners in each parish, a second "passing of the plate" occurs during which donations are solicited for the specific purpose.

49.     As set forth in this schedule, "Second Collections" included the: (a) The Catholic Relief Services Collection on the Fourth Sunday of Lent; (b) Collection for the Church in Latin America on the fourth Sunday in January; (c) Pontifical Good Friday Collection for the Holy Land (i.e., the Commissariat); and (d) Collection for Aid to the Church in Central and Eastern Europe on Ash Wednesday.

50.     In addition, from time to time, special requests for donations are made in connection with the Bishops Emergency Disaster Fund.

51.     In August 2023, one such special request for donations was made for the victims of the wildfires in Maui, with donations being solicited for this specific purpose by parishes and other related entities similar to other "Second Collections."

52.     Consistent with the requirements imposed by Maryland law, Canon Law, and the USCCB Guidelines, upon receipt by the Debtor of funds collected as part of "Second Collections," the Debtor separately accounts for the funds in its custody as restricted assets until remitted to the USCCB or other appropriate entity.

53.     Consistent with Maryland law, Canon Law, and the USCCB Guidelines, at no time does the Debtor or any related entity view the donations received as part of a "Second Collection" as property of its own.

54.     Also consistent with Maryland law, Canon Law, and the USCCB Guidelines, at no time does the Debtor have any discretion as to the application of those funds collected for a specific purpose as part of a "Second Collection."

55.     At all times, the Debtor separately accounts for any amounts remitted to and within the Debtor's custody as part of "Second Collections."

56.     At no time relevant to the claims alleged by the Committee did the Debtor's deposit accounts have funds in an amount less than those funds held in trust as part of "Second Collections" undertaken by parishes and other related entities.

57.     Based upon the foregoing, all of the funds identified with respect to the USCCB and Commissariat were funds held in trust whose transfer was not a transfer of an interest of the Debtor in property. See *Begier v. I.R.S.*, 496 U.S. 53, 58–59 (1990) ("Of course, if the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated.").

58.     For this reason, none of the alleged transfers to the USCCB or Commissariat are avoidable or even reasonably likely to be avoidable.

### ii.    *Maryland Catholic Conference, LLC.*

59.     The Committee seeks to pursue claims against MCC for actual and constructive fraudulent transfers; however, each claim fails.

60.     The MCC is a limited liability company organized under the laws of Maryland and serves as the public policy voice for the Catholic Church in Maryland.

61.     Pursuant to the MCC's articles of organization, it is organized for, among others, the following purposes: (a) to give witness to spiritual values in public affairs, to provide an agency

for corporate Catholic service to the people of Maryland, and to promote the spiritual and material well being of the people of Maryland; (b) to provide moral leadership and vision to Catholics and other people of good will, particularly in the area of public policy; (c) to help identify the needs of the people of Maryland in the areas of morality, social welfare, health, education, and human and civil rights, and to help plan the orderly development of resources to meet them; (d) to represent and speak officially for the dioceses of Maryland before the legislative, executive, and judicial branches of government, and before voluntary associations and private organizations; (e) to formulate and advance policy positions regarding government policies, programs, and legislation which affect the common good and the interest of the Church; (f) to develop and coordinate interdiocesan programs and projects which address statewide pastoral needs; (g) to work with other institutions and organizations, including the United States Conference of Catholic Bishops, to promote the material and spiritual well being of the people of Maryland and to prevent and eliminate conditions which threaten justice, human dignity, and the human prospect; and (h) to foster public understanding of Gospel values and Church teachings.

62.     The operations of the MCC are funded pursuant to a budget, which is established and to be funded by the Maryland dioceses pursuant to and in accordance with the Operating Agreement—i.e., the Maryland dioceses have a contractual obligation to fund the MCC pursuant to the Operating Agreement.

63.     Consistent with the foregoing, since at least 1999, the RCAB has prepaid on a quarterly basis the RCAB's portion of the expenses budgeted by the MCC, to satisfy and otherwise discharge the RCAB's obligations pursuant to the MCC's operating agreement.

64.     Satisfaction of contractual obligations is reasonably equivalent value. *See* 11 U.S.C. § 548(d)(2)(A) (defining value to include satisfaction of a present or antecedent debt of the debtor); *Cox v. Nostaw, Inc. (In re Central Ill. Energy Coop.)*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) (stating the payment of obligations under a contract discharge the obligation under the contract

and therefore "are, by definition, for reasonably equivalent value."); *In re Tanglewood Farms, Inc.*, 487 B.R. 705, 710 (E.D. N.C. 2013); *In re Fitzpatrick Container Co.*, 670 B.R. 425, 441 (E.D. Pa. 2025).

65.    This is true even if the debtor fails to receive the full benefit of the contract. *See, e.g.*, *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126–27 (5th Cir. 1993), *abrogated on other grounds*, *In re Dunham*, 110 F.3d 286 (5th Cir. 1997).

66.    As a result, the Committee would be unable to successfully maintain an action to recover a constructive fraudulent transfer from the MCC.[4]

67.    Similarly, given consideration to the (a) the absence of any badges of fraud,[5] (b) RCAB's longstanding and consistent practice of payments to the MCC, and (c) the RCAB's contractual obligations to make such payments, the Committee would be unable to successfully maintain an action to recover an actual fraudulent transfer from the MCC.

68.    For these reasons, the claims with respect to the MCC do not have any meaningful value.

### iii.    *St. Mary's Seminary & University.*

69.    While the Committee asserts there are claims to recover not less than **$106,315.08** in alleged transfers from St. Mary's, the Committee has failed to undertake any analysis as is required by section 547(b) to reflect the maximum amounts potentially recoverable.

---

[4] With respect to any alleged constructive fraudulent transfer claim, the Committee must allege facts supporting the conclusion that, among other things, the Debtor received less than "reasonably equivalent value in exchange" for such transfer or that such transfer will cause the transferor to "incur debts beyond [its] ability to pay". 11 U.S.C. §§ 544(b) & 548(a)(1)(B); Md. Commercial Law Code §§ 15-204 and 15-206.

[5] The "badges of fraud" include: (a) insolvency or indebtedness of the transferor at the time of the transfer; (b) lack of consideration for the conveyance; (c) a close relationship between the transferor and transferee; (d) pendency or threat of litigation at the time of the transfer; (e) secrecy or concealment of the transaction; (f) departure from the usual method of business; (g) Transfer of the debtor's entire estate; (h) reservation of benefit to the transferor; and (i) retention by the debtor of possession of the property after the transfer. *Berger v. Hi-Gear Tire Auto*, 257 Md. 470 (Md. 1970).

70.     Had the Committee undertaken such an analysis, the Committee would have revealed that no more than **$37,768.48** is potentially avoidable, based solely upon analysis of the invoices identified by the Committee:

| Invoice Date | Invoice Amount | Transfer Date | Transfer Amount | Prepay? | Liability | Liability Tracker | SNV Amt | Inv. Date | Inv. No. |
|---|---|---|---|---|---|---|---|---|---|
| 6/29/2023 | $35,286.50 | 7/13/2023 | $35,286.50 | | $35,286.50 | $35,286.50 | | | |
| | | | | | | $0.00 | $36,231.40 | 7/17/2023 | Avoided |
| 7/11/2023 | $555.00 | 8/3/2023 | $555.00 | | $555.00 | $555.00 | | | |
| 7/17/2023 | $36,231.40 | 8/10/2023 | $36,231.40 | | $36,231.40 | $36,786.40 | | | |
| | | | | | | $19,457.20 | $17,329.20 | 8/10/2023 | Avoided |
| | | | | | | $7,917.30 | $11,539.90 | 8/14/2023 | Avoided |
| 8/14/2023 | $11,539.90 | 8/17/2023 | $11,539.90 | | $11,539.90 | $19,457.20 | | | |
| 12/30/2022 | $515.00 | 8/24/2023 | $515.00 | | $515.00 | $19,457.20 | | | |
| | | | | | | $16,364.20 | $3,093.00 | 8/24/2023 | Avoided |
| 6/1/2023 | $982.08 | 8/29/2023 | $982.08 | | $982.08 | $17,346.28 | | | |
| | | | | | | $16,711.28 | $635.00 | 9/7/2023 | Avoided |
| 8/10/2023 | $17,329.20 | 9/8/2023 | $17,329.20 | | $17,329.20 | $34,040.48 | | | |
| 9/7/2023 | $635.00 | 9/12/2023 | $635.00 | | $635.00 | $34,675.48 | | | |
| 10/9/2023 | $148.00 | 9/15/2023 | $148.00 | Yes | $0.00 | $34,675.48 | | | |
| 8/24/2023 | $3,093.00 | 9/22/2023 | $3,093.00 | | $3,093.00 | $37,768.48 | | | |
| | | | $106,315.08 | | | $37,768.48 | | | |

71.     If unpaid invoices due and owing to St. Mary's are included in the analysis, not more than **$20,274.20** is potentially avoidable:

| Invoice Date | Invoice Amount | Transfer Date | Transfer Amount | Days to Pay | OCB? | Prepay? | Liability | Liability Tracker | SNV Amt | Inv. Date | Inv. No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/29/2023 | $35,286.50 | 7/13/2023 | $35,286.50 | 14 | | | $35,286.50 | $35,286.50 | | | |
| | | | | | | | | $0.00 | $36,231.40 | 7/17/2023 | Avoided |
| | | | | | | | | $0.00 | $555.00 | 7/31/2023 | SMS3527 |
| 7/11/2023 | $555.00 | 8/3/2023 | $555.00 | 23 | | | $555.00 | $555.00 | | | |
| 7/17/2023 | $36,231.40 | 8/10/2023 | $36,231.40 | 24 | | | $36,231.40 | $36,786.40 | | | |
| | | | | | | | | $555.00 | $36,231.40 | 8/10/2023 | SMS3529 |
| | | | | | | | | $0.00 | $17,329.20 | 8/10/2023 | Avoided |
| | | | | | | | | $0.00 | $11,539.90 | 8/14/2023 | Avoided |
| | | | | | | | | $0.00 | $11,539.90 | 8/16/2023 | SMS3538 |
| 8/14/2023 | $11,539.90 | 8/17/2023 | $11,539.90 | 3 | | | $11,539.90 | $11,539.90 | | | |
| | | | | | | | | $11,024.90 | $515.00 | 8/23/2023 | SMS53441 |
| 12/30/2022 | $515.00 | 8/24/2023 | $515.00 | 237 | | | $515.00 | $11,539.90 | | | |
| | | | | | | | | $8,446.90 | $3,093.00 | 8/24/2023 | *SMS3545 |
| | | | | | | | | $5,353.90 | $3,093.00 | 8/24/2023 | Avoided |
| | | | | | | | | $4,371.82 | $982.08 | 8/28/2023 | SMS3511 |
| 6/1/2023 | $982.08 | 8/29/2023 | $982.08 | 89 | | | $982.08 | $5,353.90 | | | |
| | | | | | | | | $0.00 | $17,329.20 | 8/31/2023 | SMS3537 |
| | | | | | | | | $0.00 | $635.00 | 9/7/2023 | Avoided |
| 8/10/2023 | $17,329.20 | 9/8/2023 | $17,329.20 | 29 | | | $17,329.20 | $17,329.20 | | | |
| 9/7/2023 | $635.00 | 9/12/2023 | $635.00 | 5 | | | $635.00 | $17,964.20 | | | |
| | | | | | | | | $17,329.20 | $635.00 | 9/12/2023 | SMS3553 |
| | | | | | | | | $17,181.20 | $148.00 | 9/13/2023 | *SMS3551 |
| 10/9/2023 | $148.00 | 9/15/2023 | $148.00 | -24 | | Yes | $0.00 | $17,181.20 | | | |
| 8/24/2023 | $3,093.00 | 9/22/2023 | $3,093.00 | 29 | | | $3,093.00 | $20,274.20 | | | |
| | | | | $106,315.08 | | | | $20,274.20 | | | |

72.     Based upon the foregoing, the most the RCAB could expect to recover from St. Mary's Seminary and University would be **$20,274.20** after application of only section 547(c)(4) of the Bankruptcy Code.

73.     St. Mary's would also have substantial defenses pursuant to section 547(c)(2) of the Bankruptcy Code, because all amounts paid to St. Mary's were payments for meeting or other similar expenses incurred in the ordinary course of business of the Debtor and St. Mary's.

74.     By way of example, the transfer identified on:

a.     July 13, 2023, in the approximate amount of Thirty-Five Thousand Two Hundred Eighty-Six Dollars ($35,286) was payment for room charges and food and beverage expenses incurred in connection with the Archdiocese of Baltimore's Annual Priest's Retreat;

b.     August 3, 2023, in the amount of Five Hundred Fifty-Five Dollars ($555) was payment for room charges and food and beverage expenses incurred in connection with a meeting of the Archdiocese of Baltimore's Facilities and Real Estate Management Division;

c.     August 10, 2023, in the approximate amount of Thirty-Six Thousand Two Hundred Thirty-One Dollars ($36,231) was payment for room charges and food and beverage expenses incurred in connection with the Archdiocese of Baltimore's Quo Vadis, which is an annual four-day event hosted by the seminarians of the Archdiocese of Baltimore;

d.     August 17, 2023, in the approximate amount of Eleven Thousand Five Hundred Thirty-Nine Dollars ($11,539) was payment for room charges and food and beverage expenses incurred in connection with the Archdiocese of Baltimore's Canonical Retreat for Deacon Candidates, which is a required element of the Spiritual Formation of Deacon Candidates;

e.      August 24, 2023, in the amount of Five Hundred Fifteen Dollars ($515) was payment for security, food, and beverage expenses incurred in connection with the Archdiocese of Baltimore Vocations Christmas / Advent Event;

f.      August 29, 2023, in the approximate amount of Nine Hundred Eighty-Two Dollars ($982) was payment for conference room space, food, and beverages for meetings conducted by the Archdiocese of Baltimore's Independent Review Board;

g.      September 8, 2023, in the approximate amount of Seventeen Thousand Three Hundred Twenty-Nine Dollars ($17,329) was payment for room charges and food and beverage expenses incurred with the Archdiocese of Baltimore's annual Seminarian Days of Prayer and Fraternity

h.      September 12, 2023, in the amount of Six Hundred Thirty-Five Dollars ($635) was payment for room charges and food and beverage expenses incurred in connection with a meeting of the Archdiocese of Baltimore's Facilities and Real Estate Management Division;

i.      September 15, 2023, in the amount of One Hundred Forty-Eight Dollars ($148) was an advance payment for room charges to be incurred in connection with a meeting of the Archdiocese of Baltimore's Hispanic Family Day Committee; and

j.      September 22, 2023, was payment for in the amount of Three Thousand Ninety-Three Dollars ($3,093) was payment for room charges and food and beverage expenses incurred in connection with a meeting conducted as part of the Archdiocese of Baltimore's Seek the City to Come Initiative.

75.     These transactions very clearly fall within the scope of customary credit transactions that are incurred and paid in the ordinary course of the Debtor's business. *See In re Merry-Go-Round Enters., Inc.*, 272 B.R. 140, 146–47 (Bankr. D.M.D. 2000).

76.     While this defense is factually intensive and the burden of St. Mary's, the Debtor was and continues to be (as is the Committee) bound by section 547(b) of the Bankruptcy Code to evaluate all known or reasonably knowable affirmative defenses available to St. Mary's.

77.     Based upon the Debtor's knowledge, the transfers were unquestionably made in ordinary course of business of the Debtor and St. Mary's *and* according to ordinary business terms.

### iv.     *Ayers Saint Gross Architecture, PC.*

78.     While the Committee asserts there are claims to recover not less than **$255,009.55** in alleged transfers from Ayers, the Committee's assertion fails to account for any analysis of potential affirmative defenses as is required by section 547(b) of the Bankruptcy Code.

79.     Had the Committee undertaken such an analysis, the Committee would have revealed that no more than **$132,121.28** is potentially avoidable, solely based upon a subsequent new value analysis of the invoices identified by the Committee as being paid in the 90-day period prior to this Chapter 11 Case:

| Vendor Name | Inv. Date | Inv. No. | Payment Date | Doc. No. | Amt. Paid | Agg. Liability | SNV Amt. | SNV Inv. Date | SNV. Inv. No. |
|---|---|---|---|---|---|---|---|---|---|
| Ayers Saint Gross | 7/10/2023 | 2220008.00-16 | 7/13/2023 | 0521718 | 51,322.25 | $51,322.25 | | | |
| Ayers Saint Gross | 6/9/2023 | 2220008.00-15 | 8/29/2023 | 0522187 | 57,067.01 | $108,389.26 | | | |
| | | | | | | $0.00 | $132,121.28 | 9/1/2023 | 2220008.00-17 |
| Ayers Saint Gross | 9/1/2023 | 2220008.00-17 | 9/19/2023 | 0522415 | 132,121.28 | $132,121.28 | | | |
| | | | | | | $117,622.27 | $14,499.01 | 9/20/2023 | 2220008.00-18 |
| Ayers Saint Gross | 9/20/2023 | 2220008.00-18 | 9/22/2023 | 0522435 | 14,499.01 | $132,121.28 | | | |

80.     Moreover, all but one of the payments identified by the Committee were made according to and within the terms provided by Ayers' terms and conditions, providing a substantial defense under section 547(c)(2)(B) of the Bankruptcy Code.

81.     Finally, a review of the entire payment history between the Debtor and Ayers reveals that the Debtor's payment practices before and during the preference period did not vary in any material manner:

| Vendor Name | Invoice Date | Document Number | Amount | Check Date | Amount Paid | Days to Pay | Payment Type |
|---|---|---|---|---|---|---|---|
| Ayers Saint Gross | 4/8/2022 | INV#2220008.00-1 | $4,588.50 | 4/14/2022 | $4,588.50 | 6 | Historical Payment |
| Ayers Saint Gross | 5/11/2022 | 2220008.00-2 | $11,388.59 | 5/19/2022 | $11,388.59 | 8 | Historical Payment |
| Ayers Saint Gross | 6/8/2022 | 2220008.00-3 | $11,862.66 | 6/16/2022 | $11,862.66 | 8 | Historical Payment |
| Ayers Saint Gross | 9/2/2022 | 222008.00-6 | $39,929.64 | 9/30/2022 | $39,929.64 | 28 | Historical Payment |
| Ayers Saint Gross | 7/7/2022 | 2220008-04 | $12,425.13 | 10/7/2022 | $49,511.75 | 92 | Historical Payment |
| Ayers Saint Gross | 8/10/2022 | 2220008-05 | $37,086.62 | 10/7/2022 | | 58 | Historical Payment |
| Ayers Saint Gross | 11/15/2022 | 2220008.00-8 | $31,146.45 | 12/21/2022 | $67,217.21 | 36 | Historical Payment |
| Ayers Saint Gross | 12/12/2022 | 2220008.00-9 | $36,070.76 | 12/21/2022 | | 9 | Historical Payment |
| Ayers Saint Gross | 1/11/2023 | 2220008.00-10 | $19,265.26 | 1/20/2023 | $19,265.26 | 9 | Historical Payment |
| Ayers Saint Gross | 10/6/2022 | 2220008.00-7 | $20,726.25 | 2/17/2023 | $51,539.65 | 134 | Historical Payment |
| Ayers Saint Gross | 2/6/2023 | 2220008.00-11 | $30,813.40 | 2/17/2023 | | 11 | Historical Payment |
| Ayers Saint Gross | 3/6/2023 | 2220008.00-12 | $30,277.63 | 3/10/2023 | $30,277.63 | 4 | Historical Payment |
| Ayers Saint Gross | 4/6/2023 | 2220008.00-13 | $45,332.58 | 4/14/2023 | $45,332.58 | 8 | Historical Payment |
| Ayers Saint Gross | 5/9/2023 | 2220008.00-14 | $54,905.01 | 5/23/2023 | $54,905.01 | 14 | Historical Payment |
| Ayers Saint Gross | 7/10/2023 | 2220008.00-16 | $51,322.25 | 7/13/2023 | $51,322.25 | 3 | Alleged Preference |
| Ayers Saint Gross | 6/9/2023 | 2220008.00-15 | $57,067.01 | 8/29/2023 | $57,067.01 | 81 | Alleged Preference |
| Ayers Saint Gross | 9/1/2023 | 2220008.00-17 | $132,121.28 | 9/19/2023 | $132,121.28 | 18 | Alleged Preference |
| Ayers Saint Gross | 9/20/2023 | 2220008.00-18 | $14,499.01 | 9/22/2023 | $14,499.01 | 2 | Alleged Preference |

82.    As a result of the foregoing, Ayers has a substantial defense under section 547(c)(2)(A) of the Bankruptcy Code.

83.    Given the substantial defenses, the Debtor believes any potential recovery with respect to Ayers would be *de minimis*.

**B.    Pursuit of the Alleged Claims is not in the best interest of the estate.**

84.    To determine what is in the "best interest" of the estate, courts typically look to four factors, including: (a) the probability of success on the merits in the litigation; (b) possible difficulties of collecting any judgment which might be obtained; (c) the complexity, expense, and likely duration of any ensuing litigation; and (d) the interests of the creditors, giving proper deference to their reasonable views. *In re Bullis*, 515 B.R. 284, 288 (Bankr. E.D. Va. 2014); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).

85.    Of particular importance in this case are factors (a) and (c), both of which clearly fail.

86.    As set forth above, the Committee faces a low probability of success on the merits in litigation, given that the alleged fraudulent transfers are protected by varying legal theories, case law and statutes.

87.     In fact, the true value of the claims against the Proposed Defendants is very likely not more than **$152,395.48**:

| **Alleged Defendant** | **Cmte. Value** | **Likely Value** |
|---|---|---|
| USCCB/ONC (Church in Central & Eastern Europe) | $184,747.25 | $0 |
| USCCB/ONC (Catholic Relief Services) | $67,750.00 | $0 |
| USCCB/ONC (Church in Latin America) | $67,750.00 | $0 |
| USCCB/ONC (Hawaii Disaster Relief Fund) | $35,000.00 | $0 |
| Commissariat | $131,413.82 | $0 |
| MCC | $166,554.00 | $0 |
| St. Mary's | $106,315.08 | $20,274.20 |
| Ayers | $255,009.55 | $132,121.28[6] |
| **TOTAL** | **$1,014,539.70** | **$152,395.48** |

88.     Moreover, the complexity, expense, and likely duration of any potential litigation far outweighs any potential benefit to the estate (particularly given consideration to the very likely meager recoveries).

89.     The Committee notes in it Motion that it "has spent months investigating transfers made by the Debtor" which may be subject to avoidance actions. See Motion, p. 13.

90.     From the Petition Date through June 30, 2025, the Committee has amassed approximately $2,998,994.50 in legal fees, which equates to approximately $142,000 per month.

91.     Understanding that the Committee does not spend all of its time on this singular issue, but recognizing that they have already spent "months" looking into this issue and that any future litigation would take at least several more months to resolve, the Committee's fees alone greatly eat into the one million dollar recovery they hope to achieve and would vastly exceed the more likely lower amount set forth above.

92.     While the Committee has not responded to the Debtor's informal discovery requests regarding the Committee's analysis regarding costs already incurred, likely costs to be incurred,

---

[6] Likely closer to nuisance value.

and anticipated recoveries, the Debtor struggles to believe that the fees incurred and to be incurred would not outstrip the likely recoveries on the claims sought to be pursued.

93.     Based upon the foregoing, the Debtor submits the pursuit of the claims is not in the best interest of the Debtor's estate.

       **C.**     **Pursuit of the Alleged Claims is not necessary or beneficial to resolution of this case.**

94.     Considering the doctrine of charitable immunity and its application in this Chapter 11 Case, and further considering the Committee has on the table a substantial settlement offer from the Debtor exclusive of the Debtor's insurance assets (and has had such offer for more than six months), the pursuit of the claims against the Proposed Defendants is neither necessary nor beneficial to resolution of the Chapter 11 Case.

95.     First, for every dollar that is recovered from an Alleged Defendant based upon the claims alleged by the Committee, each Alleged Defendant will be provided with a claim for a dollar pursuant to section 502(h) of the Bankruptcy Code—that is, if $255,009.55 is recovered from Ayers, for example, Ayers will receive a claim in the amount of $255,009.55 in the Chapter 11 Case.

96.     As a result, assuming the Committee's valuations are correct (they are not), the Committee's actions would increase the claims against the Debtor by **$1,014,539.70**.

97.     As of: (a) August 28, 2025, there are claims in the approximate aggregate amount of **$573,000**, exclusive of secured claims and tort claims implicating the Debtor's insurance program; and (b) the Debtor's last monthly operating report for the period ending June 30, 2025, showed the Debtor had a cash balance in the amount of **$25,911,112**.

98.     As a result, if the Committee is one hundred percent successful (it will not be) and assuming no professional fees are incurred (not reality), the Committee would increase the Debtor's cash by approximately four percent (4%) while increasing the general unsecured creditor

pool by approximately one hundred seventy-seven percent (177%) while not materially improving recoveries for general unsecured creditors.

99.    Second, the Debtor's non-insurance assets are subject to charitable immunity, meaning the Debtor's non-insurance assets cannot be compelled to the payment of tort claims.

100.    Accordingly, the proposed claims against the Proposed Defendants would not inure to the benefit of anyone other than the professionals tasked with pursuing and collecting such claims.

101.    Based upon the foregoing, the actions proposed by the Committee: (a) do not increase the amounts available for the settlement of tort claims arising from abuse; and (b) harm general unsecured creditors who the Committee *also represents*.

102.    Even if the Debtor assumes the Committee is correct regarding both charitable immunity and the value of claims filed in this case (they are not), the analysis does not improve:

| Category | Without Recovery | With Recovery |
|---|---|---|
| Survivor Claims[7] | $80,000,000 | $80,000,000 |
| General Unsecured Claims | $573,000 | $573,000 |
| Non-Survivor Tort Claims[8] | $32,065,942 | $32,065,942 |
| 502(h) Claims | $0 | $1,014,540 |
| **TOTAL Claims** | **$112,638,942** | **$113,653,482** |
| Debtor Cash on Hand | $25,911,112 | $25,911,112 |
| Recovered Assets | $0 | $1,014,540 |
| **TOTAL Cash** | $25,911,112 | $26,925,652 |
| **Recovery Percentage** | 23.00% | 23.69% |

103.    Based upon the foregoing, the Debtor submits that the pursuit of claims against the Proposed Defendants is neither necessary nor beneficial to resolution of this case and should not be permitted.

---

[7] This is the value alleged by the Committee, which is adopted here solely for the sake of argument.
[8] This is the aggregate value as stated on the various proofs of claim, which values are adopted here solely for the sake of argument.

### III.   <u>The Debtor was justified in refusing to bring the Identified Claims.</u>

104.   As set forth above, given the totality of the circumstances, the Debtor was and continues to be justified in exercising its reasonable business judgment and refusing to pursue the claims identified against the Proposed Defendants.

#### CONCLUSION

105.   The Debtor submits that its decision to not pursue the alleged preferential transfers was not "unreasonable" and well within the business judgment of the Debtor.

106.   Accordingly, the Debtor respectfully requests that the Court deny the relief requested in the Motion and grant such other or further relief as this Court deems just and proper.

Dated: September 3, 2025                   Respectfully submitted,


      /s/ Catherine Keller Hopkin
Catherine Keller Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:    443.569.0788
Facsimile:    410.571.2798
Email: chopkin@yvslaw.com

*-and-*

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    615.244.6380
Facsimile:    615.244.6804
Email: blake.roth@hklaw.com
          scott.kunde@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:    202.457.7043
Email: philip.evans@hklaw.com

*Attorneys for the Debtor and Debtor in Possession*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of September 2025, notice of filing the Debtor's Objection to the Motion of the Official Committee of Unsecured Creditors for Derivative Standing to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate (the "Objection") was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list.  In addition, Epiq Corporate Restructuring, LLC will cause a true and correct copy of the Objection to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

      /s/ Catherine Keller Hopkin      
Catherine Keller Hopkin

**The following parties received CM/ECF notice of the filing:**

Nathan D. Adler, Esquire
(nda@nqgrg.com)
Counsel for Luminace Solar MC, LLC
Neuberger Quinn Gielen Rubin & Gibber
1 South Street, 27th Floor
Baltimore, Maryland  21202

Sam Alberts, Esquire
(sam.alberts@dentons.com)
Counsel for Travelers Indemnity, et al.
Dentons US LLP
1301 K Street NW, Suite 600, East Tower
Washington, D.C.  20005

Monique D. Almy, Esquire
(malmy@crowell.com)
Counsel for American Casualty Company
Crowell & Moring, LLP
1001 Pennsylvania Ave. NW, 10th Floor
Washington, D.C.  20004

Philip D. Anker, Esquire
(philip.anker@wilmerhale.com)
Counsel for Hartford Accident&Indemnity
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York  10007

G. Calvin Awkward, III, Esquire
(cawkward@goldbergsegalla.com)
Counsel for Employers Ins. of Wausau
Goldberg Segalla LLP
111 South Calvert Street, Suite 2000
Baltimore, Maryland  21202

Gary Bahena, Esquire
(garybahena@bahenalaw.com)
Counsel for HBC LLC
Bahena & Associates LLC
428 North Street
Portsmouth, Virginia  23704

Hugh M. Bernstein, Esquire
(hugh.m.bernstein@usdoj.gov)
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Diane C. Bristow, Esquire
(dcb@nqgrg.com)
Counsel for Luminace Solar MC, LLC
Neuberger Quinn Gielen Rubin & Gibber
1 South Street, 27th Floor
Baltimore, Maryland  21202

Edwin H. Caldie, Esquire
(ed.caldie@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Richard L. Costella, Esquire
(rcostella@tydings.com)
Counsel for Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Robert W. DiUbaldo, Esquire
(rdiubaldo@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Philip Tucker Evans, Esquire
(philip.evans@hklaw.com)
Counsel for Debtor
Holland and Knight
800 17th Street, Ste. 1100
Washington, D.C.  20006

Justin Philip Fasano, Esquire
(jfasano@mhlawyers.com)
Counsel for General Star Indemnity Co.
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  22070

Kevin Foreman, Esquire
(kforeman@carltonfields.com)
Counsel for Epiq Corporate Restructuring
Carlton Fields, P.A.
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, D.C.  20007

Andrew Freeman, Esquire
(adf@browngold.com)
Counsel for Committee Chair
Brown Goldstein & Levy
120 East Baltimore Street, Suite 2500
Baltimore, Maryland  21202

Andrew Glasnovich, Esquire
(drew.glasnovich@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Gary R. Greenblatt, Esquire
(grg@cooncolelaw.com)
Counsel for St. Mary's Seminary
Coon & Cole, LLC
305 West Chesapeake Avenue, Suite 510
Towson, Maryland  21204

Geoffrey Grivner, Esquire
(geoffrey.grivner@bipc.com)
Counsel for PNC Bank, N.A.
Buchanan Ingersoll & Rooney PC
500 Delaware Avenue, Suite 720
Wilmington, Delaware  19801

Alan M. Grochal, Esquire
(agrochal@tydings.com)
Counsel for Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Samantha Hanson-Lenn, Esquire
(samantha.hansonlenn@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Megan Harmon, Esquire
(megan.harmon@bge.com)
Baltimore Gas & Electric Company
110 West Fayette Street, 12th Floor
Baltimore, Maryland  21201

Catherine Keller Hopkin, Esquire
(chopkin@yvslaw.com)
Co-Counsel for Debtor
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Robert Keith Jenner
(rjenner@jennerlawfirm.com)
Jenner Law, P.C.
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland  21211

Steven J. Kelly, Esquire
(skelly@gelaw.com)
Grant & Eisenhofer P.A.
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland  21211

Nicole Khalouian, Esquire
(nicole.khalouian@stinson.com)
Counsel for Committee
Sinson LLP
100 Wall Street, Suite 201
New York, New York  10005

Robert H. Kline, Esquire
(kline@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Eric George Korphage, Esquire
(korphagee@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Robert T. Kugler, Esquire
(robert.kugler@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Siobhain P. Minarovich, Esquire
(minarovichs@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams LLP
7 Times Square, Suite 2900
New York, New York  10036

Mark D. Plevin, Esquire
(mplevin@plevinturner.com)
Plevin & Turner LLP
580 California Street, 12th Floor
San Francisco, California  94105
Counsel for American Casualty Company
of Reading, Pennsylvania

Annette Rolain, Esquire
(arolain@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K St NW, Suite 600
Washington, D.C.  20006

Jonathan Schapp, Esquire
(jschapp@goldbergsegalla.com)
Counsel for Employers Ins. of Wausau
Goldberg Segalla LLP
665 Main Street
Buffalo, New York  14203

U.S. Trustee – Baltimore
(ustpregion04.ba.ecf@usdoj.gov)
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Joshua D. Weinberg, Esquire
(jweinberg@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K Street NW, Suite 600
Washington, D.C.  20006

C. Scott Kunde, Jr., Esquire
(scott.kunde@hklaw.com)
Counsel for Debtor
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee  37219

Gordon Z. Novod, Esquire
(gnovod@gelaw.com)
Counsel for Debtor
Grant & Eisenhofer PA
485 Lexington Avenue, 29th Floor
New York, New York  10017

David Kendall Roberts, Esquire
(droberts2@omm.com)
Counsel for Federal Insurance Co.
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, D.C.  20006

Blake D. Roth, Esquire
(blake.roth@hklaw.com)
Counsel for Debtor
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee  37219

Alex B. Silverman, Esquire
(asilverman@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Nora Anne Valenza-Frost, Esquire
(nvalenza-frost@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Matthew Michael Weiss, Esquire
(mweiss@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree, NE, Suite 3600
Atlanta, Georgia  30308

Anthony May, Esquire
(amay@browngold.com)
Counsel for Committee Chair
Brown Goldstein & Levy
120 East Baltimore Street, Suite 2500
Baltimore, Maryland  21202

Timothy P. Palmer, Esquire
(timothy.palmer@bipc.com)
Counsel for PNC Bank, N.A.
Buchanan Ingersoll & Rooney PC
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania  15219-4413

Matthew Roberts, Esquire
(mroberts@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree Street, NE, Ste 3600
Atlanta, Georgia  30308

James P. Ruggeri, Esquire
(jruggeri@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K Street NW, Suite 600
Washington, D.C.  20006

Miranda H. Turner, Esquire
(mturner@plevinturner.com)
Plevin & Turner LLP
1701 Pennsylvania Ave NW, 2nd Floor
Washington, D.C.  20006
Counsel for American Casualty Company
of Reading, Pennsylvania

Irving Edward Walker, Esquire
(iwalker@coleschotz.com)
Counsel for Ad Hoc Committee
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland  21231

Harris B. Winsberg, Esquire
(hwinsberg@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia  30308