## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, | Case No. 23-16969-MMH |
| Debtor.[1] | **Related to Docket No. 1320** |

## DEBTOR'S OBJECTION TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' CONTINGENT MOTION TO DISMISS BANKRUPTCY CASE

The Roman Catholic Archbishop of Baltimore (the "***Debtor***"), by and through its undersigned counsel, files this objection to the *Official Committee of Unsecured Creditors' Contingent Motion to Dismiss the Bankruptcy Case* (Dkt. No. 1320) (the "***Motion***"). In opposition to the Motion, the Debtor respectfully states as follows:

### INTRODUCTION

1.      The Motion is an aggressive and flawed attempt by the Committee to force this Court to rule in its favor in pending litigation.

2.      Realizing the Committee is unable to prevail on the merits in the Charitable Immunity Adversary Proceeding (as defined below), the Committee has engaged in a transparent tactical maneuver, seeking to coerce a favorable result through threats of dismissal.

3.      Revealing the Committee's true intentions, the Motion expressly seeks relief solely contingent on unknown future events unfavorable to the Committee while in the same contingent filing stating the Committee will support ***no plan of reorganization*** if it does not prevail in the Charitable Immunity Adversary Proceeding (as defined below).[2]

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

[2] The Debtor believes the filing of the Charitable Immunity Adversary Proceeding was itself a litigation tactic, seeking to put the Debtor in a dilemma—(a) completely assert in public a defense it was not asserting as a complete defense

4.      This litigation tactic should not be countenanced, and the Motion should be denied because it is not ripe (depriving this Court of subject matter jurisdiction), the Committee has not and cannot meet the Fourth Circuit's stringent bad faith standard, the Debtor's bankruptcy proceeding serves a legitimate purpose recognized by extensive precedent, and the Debtor has not acted with anything but good faith throughout the course of this bankruptcy proceeding.

<u>**RELEVANT BACKGROUND**</u>

5.      On September 29, 2023 (the "***Petition Date***"), the Debtor commenced the above-captioned chapter 11 proceeding by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (this "***Chapter 11 Case***").

6.      On the Petition Date, the Debtor caused to be filed the *Informational Brief of the Roman Catholic Archbishop of Baltimore* (Dkt. No. 5) and *Declaration of John Matera in Support of First Day Motions* (Dkt. No. 6) in which the Debtor set forth both the events leading to the commencement of the Chapter 11 Case and the Debtor's beliefs and intentions behind the Debtor's decision to commence the Chapter 11 Case—"the RCAB concluded that seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to seek to assure (a) equitable compensation to those harmed by the sins of the past within the Archdiocese, (b) continuation of the counseling and other services provided through the RCAB to those who have been harmed, (c) continuation of essential programs for the protection of children, and (d) continuation of the mission and ministry of the Roman Catholic Church within the Archdiocese." (Dkt. No. 6, ¶ 20. *See also* Dkt. No. 6, ¶¶ 15–19, 177; Dkt. No. 5, ¶¶ 6–9 136–173.)

7.      On October 11, 2023, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "***Committee***") (Dkt. No. 81).

---

prior to the commencement of the Charitable Immunity Adversary Proceeding or (b) waive the defense by failing to assert it as a compulsory counterclaim in the Charitable Immunity Adversary Proceeding.

#527162680_v5

8.      On April 1, 2025, the Committee filed a *Complaint for Declaratory Judgment* (Dkt. No. 1033; Adv. Pro. Dkt. No. 1), commencing adversary proceeding number 25-00084 (the "***Charitable Immunity Adversary Proceeding***") and seeking certain declaratory relief regarding the applicability of charitable immunity under Maryland law.

9.      On May 2, 2025, the Debtor filed the *Answer, Affirmative Defenses and Counterclaim of the Roman Catholic Archbishop of Baltimore* (Adv. Pro. Dkt. No. 15).

10.     On May 22, 2025, the Committee filed the *Official Committee of Unsecured Creditors' Answer to the Roman Catholic Archbishop of Baltimore's Counterclaim* (Adv. Pro. Dkt. No. 17).

11.     On June 5, 2025, this Court entered the *Scheduling Order and Rule 26(f) Report Approval* (Adv. Pro. Dkt. No. 23), scheduling December 15, 16, and 17, 2025, for trial in the Charitable Immunity Adversary Proceeding.

12.     On August 28, 2025, the Committee filed the *Official Committee of Unsecured Creditors' Motion for Summary Judgment* (Adv. Pro. Dkt. No. 43).

13.     On September 3, 2025, the Committee filed the Motion requesting the following relief:

> **If the Debtor prevails on its Counterclaim asserted in the Adversary Proceeding, the Committee cannot support the Debtor's efforts to reorganize** and so respectfully requests that the Court dismiss this chapter 11, as a bad faith filing, pursuant to 11 U.S.C. § 1112(b), and consistent with *In re Premier Automotive Services, Inc.*, 492 F.3d 274, 280 (4th Cir. 2007)**.**
>
> ***
>
> For the avoidance of doubt, the Committee withdraws this motion if the Court issues a judgment in favor of the Committee on any of its claims in Adversary Proceeding, No. 25-00084 and that judgment becomes a final non-appealable order.

(Motion, at 8, ¶ 24 (emphasis added).)

3

<u>**OBJECTION**</u>

14.     As an initial matter, the Motion should be denied because this court lacks subject matter jurisdiction over the Motion at this time.

15.     Second, the premise for the Motion is flawed—(a) even with application of charitable immunity, the Debtor had and continues to have valid, good faith justifications for utilizing the chapter 11 process to provide for the reasonable and equitable compensation of Survivors; and (b) the Committee's preemptive rejection of any plan that does not meet the Committee's demands, while shining light on the Committee's tactics, does not have any bearing on the good faith of the Debtor in this Chapter 11 Case or the Debtor's ability to achieve a successful reorganization.[3]

I.     <u>**This court lacks subject matter jurisdiction, because the Motion is not ripe.**</u>

16.     The ripeness doctrine is a question of subject matter jurisdiction. *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019).

17.     As the United States Court of Appeals for the Fourth Circuit has noted, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

18.     When considering whether a claim is ripe, a court must determine whether the claim is substantially definite to be fit for judicial decision and whether hardship will result from withholding consideration. *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 602 (4th Cir. 1997).

---

[3] The Debtor also notes that while the Committee certainly has influence over creditors in this Chapter 11 Case, the Committee does not ultimately vote or have any standing to vote to accept or reject a plan of reorganization proposed by the Debtor, and the Debtor is unaware of any confirmation requirements that include endorsement by a debtor's official committee of unsecured creditors.

#527162680_v5

19.     Under the substantially definite prong, "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

20.     Under the hardship prong, a court must consider the immediacy of the threat and burdens imposed on the party seeking relief, which may include the cost to the parties of delaying judicial review. *See id.* (quoting *Charter v. Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)).

21.     The party asserting a claim has the burden of demonstrating ripeness and, if such party fails to demonstrate their claim is ripe, a court must dismiss the claim for lack of subject matter jurisdiction. *Am. Fed'n of Gov't Employees v. U.S. Office of Special Counsel*, 476 F.Supp. 3d 116, 121 (D. Md. 2020).

22.     Here, the Committee's motion fails on its face, because it is ***expressly conditioned*** upon the occurrence of some uncertain, future event.

23.     Therefore, the Motion must be denied for lack of subject matter jurisdiction.

## II.     The Committee's bad faith argument lacks support.

24.     Even if this Court determines the motion is ripe (it is not), the motion should still be denied because the Committee has failed to satisfy the standard for dismissal for lack of good faith.[4]

25.     The standard for dismissal of a bankruptcy case for lack of good faith in the Fourth Circuit is one of the most stringent, requiring ***both*** objective futility and subjective bad faith to be demonstrated in order to warrant dismissals for want of a good faith filing. *Carolin Corp. v. Miller*, 886 F.2d 693, at 700–01 (4th Cir. 1989).

---

[4] The Committee has not moved to dismiss the Chapter 11 Case for any other "cause" set forth in section 1112 of the Bankruptcy Code.

26.    Under the "objective futility requirement," a movant must demonstrate by the preponderance of the evidence that there is no going concern to preserve **and** no hope of rehabilitation other than the debtor's "terminal euphoria." *Carolin*, 886 F.2d at 701–02.

27.    Under the "subjective bad faith requirement," the inquiry is whether the debtor actually intends to use the chapter 11 process to reorganize or rehabilitate a going concern or otherwise preserve the value of a viable or existing business. *Carolin*, 886 F.2d at 702.

28.    The Committee has the burden of proof to establish each of the foregoing causes for dismissal. *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707 (Bankr. Md. 2011).

**A.    The Committee cannot demonstrate objective futility.**

29.    The Committee has not and cannot demonstrate that reorganization of the Debtor is unrealistic or futile.[5]

30.    Indeed, the Committee has produced no evidence to support an assertion that reorganization of the Debtor is unrealistic, beyond stating without evidence that creditors will not support a plan that does not meet the Committee's vague demands.

31.    Similarly, the Committee has produced no evidence to support the assertion that the Debtor is unwilling or unable to propose a plan of reorganization that satisfies the Committee's demands or is otherwise confirmable over the objection of creditors in this case.

32.    As the Committee well knows, the Debtor has at no time taken the position that the Debtor and related entities would not contribute meaningful and substantial assets to a plan of reorganization, ***notwithstanding the Debtor's beliefs regarding the applicability of charitable immunity under Maryland law***.

---

[5] The Committee seems to have conceded that the Debtor is a going concern. Therefore, the Debtor has not addressed this prong of the objective futility requirement.

#527162680_v5

33.    In addition, as the Committee is well aware, the largest asset available to provide equitable compensation for Survivors in this Chapter 11 Case is the Debtor's legacy insurance coverage, which is available ***notwithstanding the applicability of charitable immunity under Maryland law***. *See* Md. Code Ann., Ins. § 19-103.

34.    While the Debtor certainly prefers an entirely consensual plan in this Chapter 11 Case and is working hard to achieve that result, the Debtor does not believe that is the only path forward to confirming a plan of reorganization.

35.    While the Debtor is unable to ascertain what the Committee means or believes "fair consideration" to be in the Chapter 11 Case, the Committee has put forth no evidence that reorganization is objectively futile in the Chapter 11 Case and, therefore, cannot satisfy the objective futility requirement for dismissal.

**B.    The Committee cannot demonstrate subjective bad faith.**

36.    The Committee has misused mediation privilege, making false and self-serving claims about the Debtor's positions, knowing well that the Debtor cannot reveal the contents of mediation communications to defend itself. (*See, e.g.*, Motion at 13 ("Instead of fulfilling its duties, the Debtor argues it will only pay what it unilaterally feels is reasonable, because no one can make it pay anything more.")).

37.    Nevertheless, the premise of the Committee's argument lacks merit even if the Committee's statements were true—(a) the Debtor continues to work toward achieving its dual goals in this Chapter 11 Case, (b) resolving mass tort claims through a single, streamlined process is an acceptable use of the chapter 11 process, (c) the Debtor believes the chapter 11 process is the most efficient and equitable process available for compensating survivors, and (d) the deadlines imposed by the bankruptcy process have no bearing on the Debtor's good faith.

#527162680_v5

i. **The Debtor continues to work toward its dual goals in the Chapter 11 Case—compensation of Survivors and preservation of the Debtor's ability to continue its missions and ministries.**

38.     While the Motion is full of unsupported and unwarranted ad hominem attacks on the Debtor and Debtor's principals, the Debtor has been consistent and clear that it sought protection under chapter 11 of the Bankruptcy Code to, among other things, provide reasonable and equitable compensation for Survivors:

> [T]he RCAB commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of the RCAB to continue providing essential ministries and services within the Archdiocese.
>
> Absent the commencement of this chapter 11 case, the RCAB believes that many survivors would not receive compensation or assistance and that the RCAB may be forced to cease providing some or all of the services upon which so many within the Archdiocese rely.

(Dkt. No. 5, ¶¶ 170–71.)

39.     The Debtor similarly has been clear the Debtor believed (and continues to believe) that Survivors were at significant risk of not being compensated in the absence of the Debtor commencing a case under chapter 11 of the Bankruptcy Code:

> [T]he Maryland Office of the Attorney General conducted an investigation and issued a report in April 2023, stating over six hundred children are known to have been abused by the 156 people included in [the] Report, but the number is likely far higher.
>
> While the RCAB is unable to verify the statement by the Maryland Office of the Attorney General, the liability from such claims would far exceed the financial means of the RCAB to satisfy claims.
>
> While the RCAB carried insurance during many periods in which abuse is alleged to have occurred, and while the RCAB believes such insurance provides coverage for the claims that would be asserted against the RCAB, to date, the RCAB has been largely unsuccessful in obtaining any coverage for claims asserted against the RCAB or any commitment to provide coverage without reservation.

#527162680_v5

As a result, the RCAB faces claims in the aggregate amount far exceeding the RCAB's economic ability to pay, in which circumstance (a) survivors of abuse could be left with no compensation or other support, and (b) those within the Archdiocese (including non-Catholics) who depend on the services of the Roman Catholic Church delivered through the RCAB would be left without the material, monetary, and spiritual support which has, to date, been a necessary, stable, and enriching element in their lives.

\*\*\*

The piecemeal adjudication of the claims of survivors presents a significant risk that many survivors may not be compensated and that the RCAB may be forced to cease central and integral components of the RCAB's mission and ministry.

In marked contrast to such piecemeal adjudication, filing this chapter 11 case and confirming a plan of reorganization is the best mechanism to fairly and equitably address the claims of survivors while ensuring that the mission and ministry of the RCAB continues.

(Dkt. No. 5, ¶¶ 164–67, 174–75; *see also* Dkt. No. 6, ¶¶ 17–19. 176–79.)

40.     Consistent with these beliefs, and consistent with the Debtor's beliefs regarding the most significant source of recovery for Survivors—the Debtor's legacy insurance coverage—the Debtor has engaged in mediation with the Committee, the Debtor's parishes, schools, and other related entities, and every entity the Debtor believes has provided insurance coverage that could provide compensation to Survivors.

41.     At the same time, the Debtor has consistently committed to participating in funding any settlement in this case, while recognizing (as the Debtor must) defenses available to the Debtor like charitable immunity. *See Wolf v. Weinstein*, 372 U.S. 633, 649 (1963) ("[S]o long as the Debtor remains in possession, it is clear that the [Debtor] bears essentially the same fiduciary obligation to the creditors as does the trustee . . .."); *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he fiduciary duty of the trustee runs to shareholders as well as to creditors."); *Chevy Chase Sav. & Loan, Inc. v. State*, 509 A.2d 670, 679 (Md. 1986) (stating member-beneficiaries of non-

profit are analogous to shareholders in an ordinary business corporation). *See also* Nancy A. Petterman & Sheri Morisette, *Directors' Duties in the Zone of Insolvency: The Quandary of the Nonprofit Corp.*, 23 Am. Bankr. Inst. J., Mar. 2004, at 12, 50 ("The charitable mission and its beneficiaries are akin to the shareholders of a public corporation.").

42.    Under any circumstances, let alone the circumstances in this case, it would strain credulity to argue that the Debtor maintaining an affirmative defense expressly provided by Maryland law and preserved by the Bankruptcy Code while seeking to maximize other available assets could possibly amount to subjective bad faith.

43.    The Committee's position is legally wrong and unnecessarily disparaging, particularly where the Debtor has offered, and continues to offer, to provide substantial contributions, **in addition to proceeds of legacy insurance coverage**, under any plan of reorganization filed in this case that would enable reasonable and equitable compensation to survivors while preserving the Debtor's ability to carry on with its mission and ministries.

###### ii.    Resolving mass tort claims in a single venue is an acceptable justification for seeking bankruptcy protection.

44.    While the Committee makes light of the assertion that the Debtor's only dispute is with Survivors, the Committee at the same time notes there are more allegedly more than nine hundred (900) Survivor lawsuits.

45.    As recognized by numerous courts, a debtor need not be insolvent to seek voluntary relief under the Bankruptcy Code. *See, e.g.*, *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21 (1st Cir. 2007) (citing cases); *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074–75 (9th Cir. 2002) (in the context of finding good faith under section 1129(a)(3) of the Bankruptcy Code, stating "insolvency is not a prerequisite to a finding of good faith").

46.     Indeed, the policy and purpose behind chapter 11 proceedings is to give a debtor a respite from impending litigation—the so-called "breathing spell." H. Rep. No. 95–595, 95th Cong. 1st Sess. 340 (1977); S. Rep. No. 95–989, 95th Cong. 2d Sess. 54 (1978), U.S. Code Cong. & Admin. News 5787, 5840, 6296.

47.     And consideration of the destructive effect on a debtor's everyday business operations by the sudden immersion into the world of mass tort is a significant factor evidencing the good faith of a debtor's filing. *See In re Muralo Co., Inc.*, 301 B.R. 690, 697 (Bankr. D.N.J. 2003) (citing Resnick, *Bankruptcy As a Vehicle for Resolving Enterprise—Threatening Mass Tort Liability,* 18 U. Pa. L.Rev. 2045 (2000)).

48.     Not surprisingly then, courts have recognized that resolution of mass tort liability is a valid and justified use of the chapter 11 process. *See In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) (affirming confirmation of A.H. Robins' plan of reorganization resolving mass tort liabilities); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) (affirming decision to extend automatic stay to prevent diminution in value of insurance coverage available for payment of tort claims); *McArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) (stating the underlying principle of preserving the debtor's estate for the creditors and funneling claims to one proceeding in the bankruptcy remains the same and such principle is a fundamental part of the bankruptcy law); *In re Red River Talc LLC*, 670 B.R. 251, 305 (Bankr. S.D. Tex. 2025) (stating "resolving mass tort claims in bankruptcy is a valid bankruptcy purpose"); *In re Bestwall LLC*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) (attempting to resolve asbestos cases through the chapter 11 process); *In re Dow Corning Corp.*, 244 B.R. 673, 677 (Bankr. E.D. Mich. 1999) (in the context of good faith under 1129(a)(3), stating it was a legitimate effort to rehabilitate a solvent but financially-distressed corporation, besieged by massive pending and potential future product

11

liability litigation against it); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (finding bereft of merit the argument that it was bad faith to seek to orchestrate nationwide tort litigation through its chapter 11 filing) (citing *In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y 1984));[6] *In re Johns-Manville Corp.*, 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984) (stating "the drafters of the Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition."). *See also* Findings of Fact, Conclusions of Law, and Order (I) Confirming Modified Chapter 11 Plan of Reorganization Proposed by the Roman Catholic Diocese of Rockville Centre, New York and Additional Debtors, *In re The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (Bankr. S.D.N.Y. Dec. 4, 2024); Order Confirming Third Modified Eighth Amended Plan of Reorganization, *In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Mar. 15, 2024); Findings of Fact, Conclusions of Law and Order Confirming the Amended Joint Plan of Reorganization for the Roman Catholic Diocese of Harrisburg, *In re Roman Catholic Diocese of Harrisburg*, No. 1:20-bk-00599 (Bankr. M.D. Pa. Feb. 17, 2023).

49.     Moreover, a debtor is not required to await the arrival of catastrophic liability when a debtor can see such liability on the horizon.

50.     Here, the Debtor saw the likely, and now confirmed, significant number of complex abuse claims on the horizon.

51.     The Debtor similarly had little to no success in obtaining coverage responses from insurers other than reservations of rights.

---

[6] Of note, each of these decisions predate the adoption of section 524(g) of the Bankruptcy Code.

#527162680_v5

52.     While the Debtor believed and continues to believe charitable immunity is a valid *affirmative* defense, the defense of charitable immunity is just that.

53.     As a result, the Debtor was faced with the almost certain prospect of facing an avalanche of tort claims, *potentially* having insurance coverage for such tort claims, and litigating in hundreds of cases the issue of charitable immunity to preserve itself as a going concern, all while managing hundreds of scheduling orders, hundreds of sets of discovery requests, and the other burdens necessarily attendant hundreds of civil actions.

54.     In short, the Debtor saw the coming storm and sought relief appropriately under chapter 11 of the Bankruptcy Code, in an effort to preserve the Debtor as a going concern and successfully reorganize in a way that provides equitable compensation to Survivors.

> **iii.     The bankruptcy process is the most efficient way to provide reasonable and equitable compensation to Survivors—a primary goal of the Debtor.**

55.     The Committee states without evidence that the process in this Chapter 11 Case is somehow depriving Survivors of the right to healing, justice, and accountability, while ignoring (a) the actions in this Chapter 11 Case to provide a forum for Survivors to come forward, (b) all actions under the CVA have been stayed in Baltimore City, and (c) the practical reality surrounding administration of such a volume of cases in state courts.

56.     First, every Survivor in this Chapter 11 Case has been provided with the opportunity to file a proof of claim and make that proof of claim public on a free-to-access, publicly facing website maintained by the Debtor in this Chapter 11 Case, which is substantially similar to the ability to file a complaint in a civil court and more accessible to the public than any such complaint would be.

#527162680_v5

57.     Second, the Debtor has consented to three separate hearings for the presentation of statements by Survivors, including making such statements off the record so as to have no prejudice to any Survivor's claim asserted in the Chapter 11 Case.

58.     Third, at no point has anyone taken any action to prevent or otherwise prohibit any Survivor in this Chapter 11 Case from coming forward and telling their story.

59.     Fourth, the Committee has provided no support to demonstrate that resolution of all Survivor Claims would be more expedient in an alternative forum.

60.     Against this backdrop, the Chapter 11 Case has provided at least as much opportunity to come forward and confront the Debtor as would be provided in any state court venue.

61.     This Chapter 11 Case is proceeding toward a global resolution of the historical claims against the Debtor so finality and compensation may be provided to all those harmed and, fully recognizing this Chapter 11 Case has been pending for nearly two years, such finality and compensation in this Chapter 11 Case will come years—***if not decades***—before such a resolution could be reached in state courts and without the risk of non-recovery faced by Survivors in the tort system.[7]

        **iv.     Deadlines imposed by the bankruptcy process are not indicative of the Debtor's good or bad faith.**

62.     Finally, the Committee argues there is "abuse of the automatic stay" without pointing to any actual such abuse other than the imposition of deadlines by the bankruptcy process.

---

[7] Assuming the Committee's allegation that more than 900 claims exist in this case, and assuming the state court system and the Debtor's witnesses could handle three trials per month, it would take nearly thirty (30) years to conduct the trials alone, before consideration of any appeals, the delay before any trials actually began, and the time to initiate and conclude any subsequent actions to enforce any judgments obtained (and any appeals from same). In addition, the Debtor and plaintiffs in those hundreds of state court actions may face separate insurance coverage disputes.

63. It is not bad faith to take advantage of the provisions of the Bankruptcy Code. *See, e.g.*, *Sylmar Plaza*, 314 F.3d at 1075 ("In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights.").

<u>CONCLUSION</u>

64. The Committee has asked this Court to prejudge issues that are not ripe before this Court and punish the Debtor for asserting defenses that Maryland law provides and the Bankruptcy Code expressly preserves, while the Debtor has consistently stated its intention to provide substantial compensation for Survivors ***in addition to the proceeds of its insurance coverage***.

65. This Court should decline the Committee's invitation to abandon fundamental jurisdictional principles and deny the facially defective Motion.

66. The Debtor has proceeded in good faith to address the tragic legacy of abuse while preserving its ability to serve those populations who depend on the Debtor's charitable work.

67. That balance is precisely what the chapter 11 process—and the Chapter 11 Case—is intended to achieve.

68. Accordingly, the Debtor respectfully requests that the Court deny the relief requested in the Motion and grant such other or further relief as this Court deems just and proper.

Dated: September 29, 2025                Respectfully submitted,

Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:     443.569.0788
Facsimile:      410.571.2798
Email: chopkin@yvslaw.com

*-and-*

#527162680_v5

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    615.244.6380
Facsimile:    615.244.6804
Email:  blake.roth@hklaw.com
          scott.kunde@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:    202.457.7043
Email:  philip.evans@hklaw.com

*Attorneys for the Debtor and Debtor In Possession*

16

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of September, 2025, notice of filing the Debtor's Objection to Official Committee of Unsecured Creditors' Contingent Motion to Dismiss Bankruptcy Case (the "Objection") was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list. In addition, Epiq Corporate Restructuring, LLC will cause a true and correct copy of the Objection to be served on all parties required to be served, with a certificate or affidavit of service to be filed subsequently, all in accordance with Local Rule 9013-4.

/s/ Blake D. Roth
Blake D. Roth (admitted *pro hac vice*)

17