Entered: October 14th, 2025
Signed: October 14th, 2025

**SO ORDERED**



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| *In re:*<br><br>Roman Catholic Archbishop of<br>Baltimore,<br><br>           Debtor. | Chapter 11<br><br>Case No.  23-16969-MMH |

**STIPULATION AND CONSENT ORDER**
**<u>RESOLVING NOTICES OF DISPOSITION OF PROPERTY</u>**

**WHEREAS**, this Stipulation is entered into by the Roman Catholic Archbishop of Baltimore (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned bankruptcy case (collectively, the "Parties") for the purpose of reaching resolution on the Debtor's pending Notice of Disposition of Leased Property (Dkt.1255) (the "Belfast Notice").

**WHEREAS**, the Committee filed an Objection to the Belfast Notice (Dkt. 1318).

**WHEREAS**, the Debtor also filed a pending Notice of Disposition of Real Property (Dkt. 1303) (the "Anne Arundel Notice").

**WHEREAS**, the Committed filed an Objection to the Anne Arundel Notice (Dkt. 1360).

**AND WHEREAS**, the parties, by their undersigned attorneys, hereby agree and stipulate as follows,

**NOW THEREFORE**, it is hereby Ordered by the United States Bankruptcy Court for the District of Maryland:

1.      With respect to the Belfast Notice and the disposition of leased real property described therein, the Debtor is authorized to enter into the proposed Lease that is attached in redacted form hereto as **Exhibit A** (the "Lease" or "Belfast Lease").

2.      The Debtor's lease of the real property shall be deemed to be in accordance with its sound business judgment.

3.      The parties stipulate and agree to other terms governing the Lease and any subsequent disposition of real property that are attached hereto as **Exhibit B,** and which are a material part of this Order and incorporated fully herein.

4.      With respect to the proposed dedication of a portion of the real property described in the Anne Arundel Notice (the "Anne Arundel Property"), the Debtor is authorized to dedicate that portion of the Anne Arundel Property to Anne Arundel County, Maryland, as is more fully described in the Anne Arundel Notice and in the legal description of the portion to be dedicated that is attached hereto as **Exhibit C**.

5.      The Debtor's proposed dedication of a portion of the Anne Arundel Property shall be deemed to be in accordance with the Debtor's sound business judgment.

6.      Notwithstanding the dedication or improvement of the Anne Arundel Property described in the Anne Arundel Notice; for purposes of any plan confirmation proposed by the Debtor, any analysis as to the necessity of the property to the Debtor's mission and current operations shall be based on the character, use and nature of the portion of the Anne Arundel Property as it existed prior to the dedication to Anne Arundel Count, Maryland, with respect to the auxiliary sports/baseball field located currently on the Anne Arundel Property[1].  If, however, the Anne Arundel Property undergoes any change in character, use, or nature other than with respect to the improvements described in the Anne Arundel Notice, any such change in character, use or nature shall be considered for purposes of any such liquidation analysis.

---

[1]  For the avoidance of doubt, the only portion of the Anne Arundel Property that will retain the same character, use and nature despite any change thereof is the portion of land that is currently used as an auxiliary sports field by Spalding High School, and which is proposed to be converted to a parking lot in connection with the project that requires the dedication to Anne Arundel County, Maryland; and which is reflected on **Exhibit D**.

CONSENTED TO:

| | |
|---|---|
| _/s/ Catherine Keller Hopkin_ | _/s/ Edwin H. Caldie_ |
| Catherine Keller Hopkin, 28257 | Edwin H. Caldie |
| Corinne Donohue Adams, 18768 | Andrew Glasnovich |
| YVS Law, LLC | Robert T. Kugler |
| 185 Admiral Cochrane Drive, Suite 130 | Stinson LLP |
| Annapolis, Maryland 21401 | 50 South Sixth Street, Suite 2600 |
| (443) 569-0788 | Minneapolis, Minnesota 55402 |
| chopkin@yvslaw.com | (612) 335-1500 |
| | ed.caldie@stinson.com |
| _Local Counsel and Conflicts Counsel for Debtor_ | drew.glasnovich@stinson.com |
| | robert.kugler@stinson.com |
| Blake D. Roth (admitted pro hac vice) | |
| C. Scott Kunde (admitted pro hac vice) | Alan M. Grochal |
| Holland & Knight LLP | Tydings and Rosenberg |
| 511 Union Street, Suite 2700 | 1 East Pratt Street, Suite 901 |
| Nashville, Tennessee 37219 | Baltimore, Maryland 21202 |
| (615) 244-6380 | (410) 752-9700 |
| blake.roth@hklaw.com/scott.kunde@hklaw.com | agrochal@tydingslaw.com |
| _Counsel for the Debtor_ | Nicole Khalouian |
| | Stinson LLP |
| | 100 Wall Street, Suite 201 |
| | New York, New York 10005 |
| | (631) 974-2938 |
| | nicole.khalouian@stinson.com |
| | _Counsel for the Official Committee of Unsecured Creditors_ |

I HEREBY CERTIFY that the terms of the copy of the Stipulation and Consent Order submitted to the Court are identical to those set forth in the original; and the signatures represented by the /s/ on this copy reference the signatures of consenting parties on the original consent order.

_/s/ Catherine Keller Hopkin_
Catherine Keller Hopkin

cc:    Catherine Keller Hopkin, Esquire
       YVS Law, LLC
       185 Admiral Cochrane Drive, Suite 130
       Annapolis, Maryland 21401

       Attached Service List

**END OF ORDER**

**The following parties received CM/ECF notice of the filing:**

Nathan D. Adler, Esquire
(nda@nqgrg.com)
Counsel for Luminace Solar MC, LLC
Neuberger Quinn Gielen Rubin & Gibber
1 South Street, 27th Floor
Baltimore, Maryland  21202

Philip D. Anker, Esquire
(philip.anker@wilmerhale.com)
Counsel for Hartford Accident&Indemnity
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York  10007

Hugh M. Bernstein, Esquire
(hugh.m.bernstein@usdoj.gov)
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Richard L. Costella, Esquire
(rcostella@tydings.com)
Counsel for Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Justin Philip Fasano, Esquire
(jfasano@mhlawyers.com)
Counsel for General Star Indemnity Co.
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  22070

Andrew Glasnovich, Esquire
(drew.glasnovich@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Alan M. Grochal, Esquire
(agrochal@tydings.com)
Counsel for Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Catherine Keller Hopkin, Esquire
(chopkin@yvslaw.com)
Co-Counsel for Debtor
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Nicole Khalouian, Esquire
(nicole.khalouian@stinson.com)
Counsel for Committee
Sinson LLP
100 Wall Street, Suite 201
New York, New York  10005

Sam Alberts, Esquire
(sam.alberts@dentons.com)
Counsel for Travelers Indemnity, et al.
Dentons US LLP
1301 K Street NW, Suite 600, East Tower
Washington, D.C.  20005

G. Calvin Awkward, III, Esquire
(cawkward@goldbergsegalla.com)
Counsel for Employers Ins. of Wausau
Goldberg Segalla LLP
111 South Calvert Street, Suite 2000
Baltimore, Maryland  21202

Diane C. Bristow, Esquire
(dcb@nqgrg.com)
Counsel for Luminace Solar MC, LLC
Neuberger Quinn Gielen Rubin & Gibber
1 South Street, 27th Floor
Baltimore, Maryland  21202

Robert W. DiUbaldo, Esquire
(rdiubaldo@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Kevin Foreman, Esquire
(kforeman@carltonfields.com)
Counsel for Epiq Corporate Restructuring
Carlton Fields, P.A.
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, D.C.  20007

Gary R. Greenblatt, Esquire
(grg@cooncolelaw.com)
Counsel for St. Mary's Seminary
Coon & Cole, LLC
305 West Chesapeake Avenue, Suite 510
Towson, Maryland  21204

Samantha Hanson-Lenn, Esquire
(samantha.hansonlenn@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Robert Keith Jenner
(rjenner@jennerlawfirm.com)
Jenner Law, P.C.
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland  21211

Robert H. Kline, Esquire
(kliner@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Monique D. Almy, Esquire
(malmy@crowell.com)
Counsel for American Casualty Company
Crowell & Moring, LLP
1001 Pennsylvania Ave. NW, 10th Floor
Washington, D.C.  20004

Gary Bahena, Esquire
(garybahena@bahenalaw.com)
Counsel for HBC LLC
Bahena & Associates LLC
428 North Street
Portsmouth, Virginia  23704

Edwin H. Caldie, Esquire
(ed.caldie@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Philip Tucker Evans, Esquire
(philip.evans@hklaw.com)
Counsel for Debtor
Holland and Knight
800 17th Street, Ste. 1100
Washington, D.C.  20006

Andrew Freeman, Esquire
(adf@browngold.com)
Counsel for Committee Chair
Brown Goldstein & Levy
120 East Baltimore Street, Suite 2500
Baltimore, Maryland  21202

Geoffrey Grivner, Esquire
(geoffrey.grivner@bipc.com)
Counsel for PNC Bank, N.A.
Buchanan Ingersoll & Rooney PC
500 Delaware Avenue, Suite 720
Wilmington, Delaware  19801

Megan Harmon, Esquire
(megan.harmon@bge.com)
Baltimore Gas & Electric Company
110 West Fayette Street, 12th Floor
Baltimore, Maryland  21201

Steven J. Kelly, Esquire
(skelly@gelaw.com)
Grant & Eisenhofer P.A.
3600 Clipper Mill Road, Suite 240
Baltimore, Maryland  21211

Eric George Korphage, Esquire
(korphagee@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Robert T. Kugler, Esquire
(robert.kugler@stinson.com)
Counsel for Committee
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota  55402

Siobhain P. Minarovich, Esquire
(minarovichs@whiteandwilliams.com)
Counsel for Fireman's Fund Insurance
White and Williams LLP
7 Times Square, Suite 2900
New York, New York  10036

Mark D. Plevin, Esquire
(mplevin@plevinturner.com)
Plevin & Turner LLP
580 California Street, 12th Floor
San Francisco, California  94105
Counsel for American Casualty Company
of Reading, Pennsylvania

Annette Rolain, Esquire
(arolain@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K St NW, Suite 600
Washington, D.C.  20006

Jonathan Schapp, Esquire
(jschapp@goldbergsegalla.com)
Counsel for Employers Ins. of Wausau
Goldberg Segalla LLP
665 Main Street
Buffalo, New York  14203

U.S. Trustee – Baltimore
(ustpregion04.ba.ecf@usdoj.gov)
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Joshua D. Weinberg, Esquire
(jweinberg@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K Street NW, Suite 600
Washington, D.C.  20006

C. Scott Kunde, Jr., Esquire
(scott.kunde@hklaw.com)
Counsel for Debtor
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee  37219

Gordon Z. Novod, Esquire
(gnovod@gelaw.com)
Grant & Eisenhofer PA
485 Lexington Avenue, 29th Floor
New York, New York  10017

David Kendall Roberts, Esquire
(droberts2@omm.com)
Counsel for Federal Insurance Co.
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, D.C.  20006

Blake D. Roth, Esquire
(blake.roth@hklaw.com)
Counsel for Debtor
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee  37219

Alex B. Silverman, Esquire
(asilverman@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Nora Anne Valenza-Frost, Esquire
(nvalenza-frost@carltonfields.com)
Counsel for Lexington Ins. and NH Ins.
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York  10174-0002

Matthew Michael Weiss, Esquire
(mweiss@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia  30308

Anthony May, Esquire
(amay@browngold.com)
Counsel for Committee Chair
Brown Goldstein & Levy
120 East Baltimore Street, Suite 2500
Baltimore, Maryland  21202

Timothy P. Palmer, Esquire
(timothy.palmer@bipc.com)
Counsel for PNC Bank, N.A.
Buchanan Ingersoll & Rooney PC
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania  15219-4413

Matthew Roberts, Esquire
(mroberts@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree Street, NE, Ste 3600
Atlanta, Georgia  30308

James P. Ruggeri, Esquire
(jruggeri@ruggerilaw.com)
Counsel for Hartford and Twin City
Ruggeri Parks Weinberg LLP
1875 K Street NW, Suite 600
Washington, D.C.  20006

Miranda H. Turner, Esquire
(mturner@plevinturner.com)
Plevin & Turner LLP
1701 Pennsylvania Ave NW, 2nd Floor
Washington, D.C.  20006
Counsel for American Casualty Company
of Reading, Pennsylvania

Irving Edward Walker, Esquire
(iwalker@coleschotz.com)
Counsel for Ad Hoc Committee
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland  21231

Harris B. Winsberg, Esquire
(hwinsberg@phrd.com)
Counsel for Fireman's Fund Insurance
Parker Hudson Rainer & Dobbs LLP
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia  30308

# EXHIBIT A

# SOLAR ENERGY LEASE AND EASEMENT AGREEMENT

**Belfast Road Property**

**Sparks Glencoe, Baltimore County, Maryland 21152**

**By and Between**

**Roman Catholic Archbishop of Baltimore, a corporation sole, as Owner**

**and**

**CI Renewables IV Holdco LLC, a Maryland limited liability company, as Tenant**

**_____, 2025**

#957131

# TABLE OF CONTENTS

1.  Lease and Grant of Easements.................................................................................. 4

2.  Purpose and Scope of Agreement; Easements. ....................................................... 5

3.  Uses Reserved by Owner.......................................................................................... 8

4.  Term of Lease. .......................................................................................................... 8

5.  Rent............................................................................................................................ 10

6.  Owner of Project Facilities. ..................................................................................... 11

7.  Taxes and Assessments. ........................................................................................... 12

8.  Owner's Representations, Warranties and Covenants.............................................. 13

9.  Tenant's Representations, Warranties and Covenants. ............................................ 17

10.  Indemnities................................................................................................................ 21

11.  Assignment; Right to Encumber; Division of Lease. .............................................. 22

12.  Mortgagee and Financing Party Protection............................................................. 23

13.  Termination................................................................................................................ 26

14.  Easements. ................................................................................................................ 29

15.  Condemnation........................................................................................................... 30

16.  Force Majeure. .......................................................................................................... 31

17.  Miscellaneous Provisions......................................................................................... 31

**SOLAR ENERGY LEASE AND EASEMENT AGREEMENT**

THIS SOLAR ENERGY LEASE AND EASEMENT AGREEMENT (this "**Lease**") is made and entered into as of _____, 2025 ("**Effective Date**"), by and between Roman Catholic Archbishop of Baltimore, a corporation sole ("**Owner**") and CI Renewables IV Holdco LLC, a Maryland limited liability company ("**Tenant**"). Owner and Tenant are sometimes referred to herein each individually as a "**Party**" and collectively as the "**Parties**." The Basic Terms Summary below contains a brief summary of some of the provisions of this Lease. The provisions mentioned in the Basic Terms Summary may be more specifically defined in other portions of this Lease and those more specific definitions govern and control the meaning of the provisions referred to in the Basic Terms Summary.

BASIC TERMS SUMMARY

| | |
|---|---|
| **Owner's Address** | 320 Cathedral Street, Baltimore, Maryland 21201 |
| **Tenant's Address** | 2 Village Square, Suite 252, Baltimore, Maryland 21210 |
| **Property** | All that area of land owned by Owner and identified as Tax Account No. 08-1900003386 in Sparks Glencoe, Baltimore County, Maryland 21152. The Property is more specifically described in Exhibit A1 attached hereto and incorporated herein. |
| **Premises** | No more than fifty-three (53) acres of land in an area of the Property that complies with local zoning requirements, is free of required zoning setbacks, environmental restrictions, shading obstacles, and any other factor under applicable law that would inhibit the development of the Project Facilities as defined in Section 2.1. The initial Premises is more specifically described in Exhibit A2 attached hereto and incorporated herein. Tenant may elect to reduce the size of the Premises leased by Tenant in accordance with Section 2.7 of this Lease. The Premises contains 53 acres as of the Effective Date. |
| **Exclusivity Period** | The initial Exclusivity Period will be twenty-four (24) months, beginning on the Effective Date (the "**Initial Exclusivity Period**"), and may be extended pursuant to the terms of this Lease. |
| **Exclusivity Period Extension(s)** | Prior to the Construction Commencement Date (as defined in Section 4.1(c)), the Exclusivity Period may be extended by Tenant up to two (2) consecutive periods of six (6) months each, as more specifically described in Section 4.1 of this Lease. In addition, as described in Section 4.1 of this Lease, upon the Construction Commencement Date, the Exclusivity Period shall extend automatically to the date that is twenty-four (24) months after the Construction Commencement Date. |
| **Exclusivity Period Rent** | First payment of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), paid in accordance with Section 5.1 of this Lease.<br><br>Upon Tenant exercising an extension of the Exclusivity Period, Tenant shall pay Owner an extension fee of $▮▮▮▮▮ to be payable upon delivering the Extension Notice. |

| Construction Commencement Fee | Within five (5) Business Days of the Construction Commencement Date, Tenant shall pay owner a one-time fee in the amount of $▮▮▮▮▮ |
|---|---|
| Operating Term | The Operating Term shall initially be for five (5) years, beginning on the Commercial Operations Date, subject to extension in accordance with Section 4.3. |
| Operating Extension Term(s) | The Operating Term may be extended by Tenant up to three (3) consecutive periods of five (5) years each at the option of Tenant, as more specifically described in Section 4.3 of this Lease. In addition, the Operating Term may be extended by Tenant up to two (2) additional consecutive periods of five (5) years each at the mutual agreement of the Parties, as more specifically described in Section 4.4 of this Lease. |
| Operating Term Rent | Operating Term Rent amounts will be dependent upon the Project Facilities' ultimate qualification percentage for federal investment tax credits (the "**ITC**") as of the Commercial Operations Date. A table of ITC percentages and corresponding annual Operating Term Rent per acre for the First Operating Year is immediately below: |

| ITC Percentage | First Operating Year – Annual Rent/Acre |
|---|---|
| ▮▮▮ | ▮▮▮ |
| | |
| | |

After the first Operating Year, Operating Term Rent will automatically increase by 1% annually as provided in Section 5.2 below.

| Project Facilities | Solar generating facilities which shall produce and deliver electricity to off-site purchasers of electricity, including all necessary equipment to deliver such electricity to the distribution grid, as more specifically defined below in Section 2.1. |
|---|---|

Owner is the fee simple owner of the Property as more particularly described in Exhibit A1 attached hereto and made a part of this Lease. Tenant desires to lease the Premises to develop and operate the Project Facilities and Owner desires to lease the Premises to Tenant for such purpose and use in accordance with this Lease.

IN CONSIDERATION OF THE AGREEMENTS, COVENANTS AND PROMISES set forth in this Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed by the Parties, Owner and Tenant hereby agree as follows:

1.        **Lease and Grant of Easements**.  Owner hereby leases to Tenant the Premises, and grants (or shall grant, as herein provided) to Tenant the easements specified herein, subject to the terms in this Lease. Tenant shall have the quiet use and enjoyment of the Premises in accordance with the terms of this Lease, without any manner of hindrance or interference of any kind by Owner or any person claiming through Owner.

2.    **Purpose and Scope of Agreement; Easements**.

2.1    <u>Project Facilities</u>.  Tenant shall have the exclusive right to use the Premises for the Project Facilities.  The Project Facilities shall include any and all uses associated with or related to converting solar energy into electrical energy, collecting and transmitting the electrical energy so converted, and together with any and all activities related to such uses, including, without limitation: (a) constructing, installing, using, replacing, relocating, repowering and removing from time to time, and maintaining, operating and monitoring: (1) energy generating facilities, including but not limited to modules, inverters, cables, foundations, panels, mounting units and all necessary ancillary improvements and equipment providing support or otherwise associated therewith; (2) photovoltaic solar power generating equipment or such other solar-powered generating equipment as determined in Tenant's reasonable judgment to be used to capture and convert solar radiation to produce electricity ("**Generating Units**"); and (3) overhead and underground electrical transmission, collection and communications lines and cables, electric transformers, switching stations, substations, energy storage facilities (including battery storage facilities), telecommunications equipment, concrete batch plants, power generation facilities to be operated in conjunction with large solar array installations, roads, control buildings, operation and maintenance buildings and yards, construction laydown and staging areas, and related facilities and equipment necessary and/or convenient for the construction, operation and maintenance of the solar facility (collectively, "**Project Facilities**", which includes Generating Units, Transmission Facilities, defined below, Interconnection Facilities, defined below, and the construction and ownership of other solar energy projects in the general vicinity of the Project Facilities) on the Premises or elsewhere; and (b) undertaking any other activities on the Premises whether accomplished by Tenant or a third party authorized by Tenant, that Tenant reasonably determines are necessary, useful or appropriate to accomplish any of the foregoing. Tenant shall directly pay for all costs in connection with the construction, installation, operation, maintenance, repair, replacement, and removal of the Project Facilities.  Tenant, at its sole expense, shall comply with all federal, state and local laws, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Project Facilities, or to the Premises to the extent arising from or applicable to this Lease or Tenant's activities at the Premises, including, without limitation, municipal by-laws, land use and zoning laws building and construction codes, occupational health and safety laws and Environmental Law (as defined below in Section 9.5(c)) (collectively, "**Legal Requirements**").

2.2    <u>Easements and Related Rights</u>.  The rights hereby granted by Owner to Tenant in this Lease include, without limitation, the following easements and related rights for the Term of this Lease:

(a)    the exclusive right to erect, construct, reconstruct, replace, relocate, remove, operate, maintain and use the following from time to time, on, under, over and across the area of the Property owned or controlled by Owner that does not include the Premises ("**Adjacent Property**"), in connection with Project Facilities, whether such Project Facilities are located on the Premises or elsewhere (at such time and place within such specified sections as Tenant shall determine from time to time in the exercise of its sole discretion after notice to Owner): (i) a line or lines of towers, with such wires and cables as from time to time are suspended therefrom, and/or underground wires and cables, for the transmission of electrical energy and/or for communication purposes, and all necessary and proper foundations, footings, crossarms and other appliances and fixtures for use in connection with said towers, wires and cables (collectively "**Transmission Facilities**"); (ii) facilities consisting of one or more substations for electrical collection, to step up the voltage, interconnect to transmission line or lines, and meter electricity, together with the right to perform all other ancillary activities normally associated with such a facility as may be necessary or appropriate to service the Project Facilities, regardless where located (collectively "**Interconnection Facilities**"), and with all necessary easements therefore;

5

(b)      an easement and right over and across the Property for any audio, visual, view, light, shadow, noise, vibration, electromagnetic or other effect of any kind or nature whatsoever resulting, directly or indirectly, from the Project Facilities, including but not limited to rights to cast shadows and reflect glare onto all areas of the Property, from the Project Facilities and/or any and all other related facilities, wherever located;

(c)      an exclusive easement and right to capture, use and convert the unobstructed solar resources over and across the Property, with any obstruction to the receipt of and access to sunlight throughout the entire area of the Property being prohibited, and accordingly, Owner may not create or permit to be created on the Adjacent Property any structures or improvements, including cell towers, or plant any trees or other vegetation which may, in Tenant's sole judgment, impede or interfere with solar insolation on the Project Facilities;

(d)      an exclusive easement for the installation, use, operation, maintenance, repair, replacement and removal of the Project Facilities on the Property which shall include the designation of a construction laydown and staging areas and parking areas in a location reasonably determined by Owner and Tenant for use by Tenant and Tenant Parties during the Lease Term;

(e)      an exclusive easement from the Project Facilities to connect with any existing utility facilities on the Adjacent Property and to relocate, at Tenant's cost, any existing utility facilities if necessary for Tenant's construction of the Project Facilities or its use of access roads;

(f)      a non-exclusive easement providing unlimited access to and from and ingress and egress to and from the Premises over any existing roads, drives, or access paths on the Adjacent Property, and any such roads, drives, or access paths to be constructed by Tenant on the Property; and

(g)      an exclusive easement on, over, and across the Adjacent Property for the installation and maintenance (including, but not limited to, replacement) of landscape buffers and planting areas.

2.3      <u>Easements in Gross</u>.  The easement rights granted by Owner under this Lease constitute EASEMENTS IN GROSS, personal to and for the benefit of Tenant, its successors and assigns, as owner of such easements, and the Parties expressly agree that such easement rights shall be transferable in accordance with the assignment provisions of this Lease.  The Parties expressly intend for all easement rights herein to be, and for this Lease to create EASEMENTS IN GROSS in Tenant, and neither such easements nor this Lease shall be appurtenant to any other property or interest.  Notwithstanding the foregoing, if Owner conveys the Property during the Term, Owner agrees that any granting document, including the deed, shall include within the property description, the existence of the easements contained herein.

2.4      <u>Utility Easements</u>.  If requested by the applicable electric utility, Owner shall grant to such utility an exclusive right to construct, operate, maintain, reconstruct, relocate, remove, and/or repair the electric utility service infrastructure and associated wires, lines and poles and other infrastructure necessary and convenient to interconnect the Project Facilities to the electrical distribution and/or transmission system, in the location determined by Tenant before the Commercial Operations Date.

2.5      <u>Forest Conservation Easements</u>.  If required by any Governmental Authority (as defined in <u>Section 9.5(d)</u>) in connection with Tenant's development of the Project Facilities, Owner shall establish and grant to Tenant or the applicable governmental entity one or more perpetual forest conservation easements on the Property in the location(s) as required by such governmental entity.  Notwithstanding any provision of this Lease to the contrary, the term of such forest conservation easement(s) shall be perpetual

and shall not expire or be terminable by Owner under any circumstances. Upon Tenant's request, Owner shall execute, for no additional consideration, a forest conservation easement agreement in the form required by such governmental entity and such other documents as may be required by Tenant's title company or governmental entity in connection with the grant of the forest conservation easements.

2.6    <u>Stand-Alone Easements</u>. Upon Tenant's request at any time during the Lease Term, Owner shall execute, for no additional consideration, stand-alone easements in recordable form, documenting the easements and rights granted to Tenant under this Lease. Owner shall execute any such separate easement agreement within ten (10) business days of demand.

2.7    <u>Reduction in Premises Area</u>.

(a)    If Tenant determines, in Tenant's sole discretion, at any time during either the Exclusivity Period or Operating Term that only a part of the Premises is suitable, required and appropriate for development of the Project Facilities, then, at any time prior to the end of the Exclusivity Period or Operating Term, as applicable, Tenant may deliver a written notice to Owner of Tenant's election to reduce the size of the Premises (a "**Reduction Notice**"); provided, however, that if as a result of the reduction in the size of the Premises described in the Reduction Notice, the total resulting Premises would be less than thirty-five (35) acres, then Owner shall have the right to terminate this Lease by written notice to Tenant delivered within thirty (30) days after the date of the Reduction Notice (a "**Reduction Termination Notice**"). If Owner delivers a Reduction Termination Notice, then Tenant may elect to withdraw the Reduction Notice and thereby keep this Lease in effect. If Tenant delivers a Reduction Notice and Owner does not elect to terminate this Lease, then Tenant shall, at the Tenant's sole cost, obtain and provide to Owner, a boundary survey prepared by a surveyor licensed in the State of Maryland ("**Survey**") showing the location of the land and new boundary lines located within the Property and is otherwise sufficient to constitute a legal description of the reduced area of the Premises (and any related easements) that identifies the precise area to be used for the Project Facilities thereafter ("**Lease Area**"). Tenant's Survey shall show the number of acres contained in the Lease Area to not less than the nearest one hundredth (1/100) of an acre. Upon receipt of such Survey, (a) <u>Exhibit A2</u> shall be replaced with the amended acreage and legal description of the Lease Area as shown on the Survey, (b) such acreage shown on the Survey shall thereafter be used for all purposes under this Agreement, including the calculation of Rent payments under <u>Section 5</u>, (c) the term "Premises" shall thereafter mean the Lease Area described on the revised <u>Exhibit A2</u>, together with all appurtenances described in this Lease, and (d) the "Adjacent Property" shall thereafter mean any remainder of the original Premises plus any other Adjacent Property.

(b)    Notwithstanding the foregoing, if the Project Facilities ultimately qualify for the 0% ITC Percentage, then (i) the minimum size of the Premises will be thirty-nine (39) acres; and (ii) Tenant shall have the right to develop Project Facilities on less than the entire Premises, and to leave a portion of the Premises undeveloped, and to elect to expand the Project Facilities to additional areas of the Premises at any time and from time to time during the Term.

2.8    <u>Acceptance and Use of Leased Premises.</u> Tenant shall accept the Premises in its condition as of the Effective Date. The Premises shall be, and Tenant shall accept, in its As-Is, Where-as condition, and Owner has no obligations to make any improvements, repairs, replacements or otherwise under this Lease. Notwithstanding anything to the contrary in this Agreement, Owner has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's use as provided herein, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. The taking of possession of the Premises on the Effective Date shall be conclusive evidence that Tenant accepts the Premises.

7

3.    **Uses Reserved by Owner**.  After the Construction Commencement Date (as defined in <u>Section 4.1(c)</u>), Owner acknowledges that neither Owner nor any of any Owner's lessees or grantees (other than Tenant) shall have any right to occupy or use the Premises until this Lease terminates or expires. Owner and any of its other lessees or grantees shall immediately cease all activity and presence on the Premises as of the Construction Commencement Date. Without limiting the generality of the foregoing, Owner acknowledges and agrees that Owner shall not and shall not allow any other person to use the Property for solar energy development or the installation or use of any facilities related to solar energy development or generation (which rights and uses are exclusively granted to Tenant in this Lease throughout the Term of this Lease).

4.    **Term of Lease**.  The term of this Lease and the easements contained in this Lease shall be as follows:

4.1    <u>Exclusivity Period</u>.  The Exclusivity Period shall commence on the Effective Date and shall end on the earlier of: (a) the date that construction of the Project Facilities is complete and the Project Facilities generate and are capable of delivering electrical power to purchasers of such power ("**Commercial Operations Date**"); (b) the date Tenant gives Owner notice of termination of this Lease in accordance with <u>Section 4.5</u>, or (c) the end of the number of months set forth in the Basic Terms Summary, as the same may be extended by Tenant in accordance with Section 4(c) below.  Tenant will promptly notify Owner when the Project Facilities have achieved the Commercial Operations Date.

(a)    During the Exclusivity Period, Tenant and its agents, contractors, employees, invitees and licenses (collectively, "**Tenant's Agents**") shall have the right to enter upon the Premises for the purpose of conducting such studies, inspections, surveys, assessments, and investigations of the Premises as Tenant may deem necessary or desirable to determine the suitability of the Premises for the Project Facilities (collectively, "**Due Diligence**").  During the Exclusivity Period, Tenant shall have the right to make such plans and apply for and obtain all Permits (as defined in <u>Section 8.10</u>) necessary for the construction and operation of the Project Facilities as Tenant deems appropriate.

(b)    Tenant shall comply with all Legal Requirements while conducting its Due Diligence.  If Tenant elects to terminate this Lease during the Exclusivity Period, Tenant shall repair any physical damage to the Property to the extent caused by Tenant in conducting its Due Diligence.  Tenant shall indemnify Owner from and against all liability and claims for damage to property or injury to persons to the extent caused by the negligence or intentional misconduct of Tenant or Tenant's Agents on or about the Property in conducting the Due Diligence.

(c)    If Tenant has not commenced construction of the Project Facilities by the end of the Initial Exclusivity Period Tenant shall have the option to extend the Exclusivity Period for the up to two consecutive 6-month periods (each an "**Exclusivity Period Extension Term**") pursuant to this <u>Section 4.1(c)</u>.  To exercise Tenant's option to extend the Exclusivity Period for either of the two consecutive 6-month Exclusivity Period Extension Terms, Tenant shall (i) give written notice to Owner prior to the then-applicable expiration of the Exclusivity Period (as the same may be extended) and (ii) pay the Owner an extension fee of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (an "**Exclusivity Period Extension Fee**") prior to the applicable expiration of the Exclusivity Period.  In addition, prior to the then-applicable expiration of the Exclusivity Period (as the same may be extended), Tenant shall provide written notice to Owner specifying the date construction of the Project Facilities is anticipated to commence (the "**Construction Commencement Date**"), and upon such notice, the Exclusivity Period shall automatically extend to the date that is twenty-four (24) months from the Construction Commencement Date.  In addition, in the event of Force Majeure, the Exclusivity Period shall automatically be extended on a day for day basis for the duration of the Force Majeure event.  Notwithstanding anything to the contrary contained herein, under no

circumstances shall the Exclusivity Period (including any extensions thereof that take effect) extend more than seven (7) years after the Effective Date.

(d)    Notwithstanding anything to the contrary contained herein, if the Construction Commencement Date does not occur by the date that is thirty-six (36) months after the Effective Date, Owner, in its sole discretion, may terminate this Lease by delivering a written notice of termination to Tenant by the date that is thirty-seven (37) months after the Effective Date, whereupon (I) the Owner shall continue to have the right to receive and retain (i) the Exclusivity Period Rent referenced in Section 5.1 hereof; (ii) any Exclusivity Period Extension Fees referenced in Section 4.1(c) hereof and (iii) all Owner Costs referenced in Section 17.18 hereof; and (II) this Lease shall terminate, and neither party shall have any further rights and obligations except for those rights and obligations set forth in (I) of this Section 4.1(d) and any other rights and obligations that expressly survive the termination of this Lease.

4.2    Operating Term.  Prior to the expiration of the Exclusivity Period, Tenant shall give Owner written notice of its election to commence the Operating Term and such notice shall specify the Commercial Operations Date. The Operating Term, if it occurs, shall commence on the Commercial Operations Date and continue for an initial period of five (5) years. Tenant shall have the right to extend the Operating Term by giving Owner written notice in accordance with Section 4.3.  The Operating Term shall be on the same terms set forth in the Lease.

4.3    Operating Extension Term – Tenant Option.  Tenant shall have the option to extend the Operating Term for three (3) consecutive periods of five (5) years each (each an "**Operating Extension Term**") on the same terms and conditions set forth in the Lease upon written notice to Owner ("**Extension Notice**") not less than ninety (90) days prior to the expiration of the Operating Term or any Operating Extension Term, as applicable.

4.4    Operating Extension Term – Mutual Agreement.  Provided that all of Tenant options for Operating Extension Terms have been exercised pursuant to Section 4.3 above, then the Parties shall have the option to mutually agree to extend the Operating Term for up to two (2) additional consecutive periods of five (5) years each on the same terms and conditions set forth in the Lease, each of which periods shall also be an Operating Extension Term under this Lease. The Parties may elect an Operating Extension Term pursuant to this Section 4.4 if one Party delivers to the other Party, not less than six (6) months prior to the expiration of the then-applicable Operating Extension Term, written notice electing an Operating Extension Term. Within thirty (30) days after receipt of such notice, the receiving Party may elect in writing to accept or decline the additional Operating Extension Term in its sole discretion, and if no written response is given within such time period then the extension option shall be deemed to have been declined.  If the receiving Party affirmatively elects in writing to accept the proposed additional Operating Extension Term, then upon such acceptance the Lease Term shall be automatically extended for the duration of the Operating Extension Term.

4.5    Extension Protection.  The Parties intend that Tenant not lose any right to extend the Operating Term through inadvertence or mistake.  Accordingly, if Tenant fails to timely deliver an Extension Notice, Owner shall deliver notice of Tenant's failure to timely exercise the Extension Option ("**Reminder Notice**") to Tenant and to any Mortgagee (as defined in Section 12.1) that has delivered to Owner notice of its name and address. The Reminder Notice shall state the following in its subject line, in 14-point, bold and capitalized lettering: "NOTICE OF TENANT'S FAILURE TO EXERCISE EXTENSION OPTION; FAILURE TO RESPOND MAY RESULT IN EXPIRATION OF LEASE TERM."  After Owner gives the Reminder Notice, either Tenant or any Mortgagee shall have the right to deliver an Extension Notice to Owner prior to the expiration of the initial Operating Term or then-current Operating Extension Term, as applicable, and such notice shall be deemed timely given.  If neither Tenant

9

nor any Mortgagee provides Owner with an Extension Notice in accordance with the preceding sentence, then this Lease shall expire pursuant to the terms herein.

      4.6    <u>Early Termination</u>.  Notwithstanding anything in this Lease to the contrary, Tenant shall not be obligated to commence construction of the Project Facilities.  Tenant shall have the right to terminate the Lease early as to all or any part of the Property, at any time prior to the end of the Exclusivity Period, by giving not less than thirty (30) days prior written notice to Owner, if Tenant determines, in Tenant's sole discretion, that construction and/or operation of the Project Facilities on the Property is no longer feasible. If less than thirty (30) days remain in the Exclusivity Period when Tenant provides such termination notice to Owner, the 30-day notice requirement is hereby waived, and the Lease shall terminate on the last day in the Exclusivity Period.  Tenant shall have no further duties under this Lease or obligations to Owner after the effective date of such early termination, except for such obligations that expressly survive in accordance with the terms of this Lease.

      4.7    <u>Lease Term</u>.  The Exclusivity Period (as extended if applicable), and the Operating Term (as may be extended by each Operating Extension Term, if applicable) collectively constitute the "**Lease Term**" of this Lease.

5.    **Rent**.

      5.1    <u>Exclusivity Period Rent</u>.  Owner acknowledges receipt of ████████████ ██████████ from the Tenant as the initial payment of the Exclusivity Period Rent, subject to additional payments for extensions of the Exclusivity Period pursuant to Section 4.1(c).  Within five (5) Business Days of the Construction Commencement Date, Tenant shall pay Owner ████████████ ██████████ as an additional payment of Exclusivity Period Rent.

      5.2    <u>Operating Term Rent</u>.  During the Operating Term and any Operating Extension Term, if applicable, Tenant shall pay Owner the Operating Term Rent in accordance with this Section.  The Operating Term Rent for the first Operating Year is set forth in the Basic Terms Summary above.  At the commencement of the second Operating Year, and at the commencement of each Operating Year thereafter during the Lease Term, the Operating Term Rent shall automatically increase by one percent (1%) over the amount of the Operating Term Rent for the prior Operating Year..

      (a)    Within thirty (30) days after the first day of the first Operating Year (defined below), Tenant shall pay to Owner the Operating Term Rent due for the first three (3) months of the Operating Year, prorated to the first day of the next calendar quarter and thereafter, for each succeeding quarter, Tenant shall pay to Owner, in advance on the first day of each calendar quarter, the full one quarter of the annual Operating Term Rent calculated according to the rates set forth in the Basic Terms Summary for the Operating Term.

      (b)    In each subsequent Operating Year during the Operating Term (and during the Operating Extension Term, if applicable), Tenant shall continue to make quarterly payments (every three (3) months) of the Operating Term Rent to Owner, in advance on the first day of each calendar quarter.

      (c)    An "**Operating Year**" shall consist of twelve (12) months.  The first Operating Year shall begin on the Commercial Operations Date and end on the date which is twelve (12) months thereafter, and each consecutive twelve (12) month period thereafter shall also constitute an Operating Year. For purposes of clarity, if the Commercial Operations Date commences on March 12, then the first Operating Year will begin on March 12 and end on March 11 in the following year.

5.3    <u>Change in Property Ownership</u>.  In accordance with <u>Section 11.5</u>, Owner shall notify Tenant in writing of any sale, assignment or transfer of any of Owner's interest in the Property, or any part thereof, and shall deliver to Tenant the new Owner's written acknowledgement and acceptance of this Lease.  Until such notice and acceptance are received, Tenant shall have no duty to any successor Owner, and Tenant shall not be in default under this Lease if Tenant continues to make all payments to the original Owner before notice of sale, assignment or transfer is received.  All Owners shall provide Tenant with their certified taxpayer identification numbers simultaneously with the execution and delivery of this Lease via a W-9 Form (or its equivalent).  No payments under this Lease shall be due or payable to any Owner until Tenant has received such taxpayer identification information.

5.4    <u>Lump Sum Rent Payment</u>.  Owner may, by written notice to Tenant delivered no later than June 30, 2026, request that Tenant provide proposed pricing for a lump-sum payment of Operating Term Rent for the initial Operating Term and the first three (3) Operating Extension Terms (the "**Lump Sum Rent Period**"), which would result in Tenant paying a single lump-sum payment at the commencement of the first Operating Year in lieu of the quarterly payments of Operating Term Rent provided for herein for the Lump Sum Rent Period (the "**Lump Sum Rent Option**").  If Owner delivers such request, then Tenant shall use commercially reasonable efforts to obtain proposed pricing for the Lump Sum Rent Option, which the Parties acknowledge and agree would be financed by a third-party financing partner and would be based on an estimate of the discounted net present value of the Operating Term Rent for the Lump Sum Rent Period, and other applicable fees and taxes.  Owner may decline the Lump Sum Rent Option, in its sole discretion.  If Owner exercises the Lump Sum Rent Option, then Owner and Borrower will enter into an amendment to this Lease that memorializes the terms and conditions of the Lump Sum Rent Option.  If the Lump Sum Rent Option results in the imposition of transfer and recordation taxes on this Lease that would not be applicable if the Lump Sum Rent Option were not elected, then Owner shall be responsible for the payment of such taxes.

5.5    <u>Interconnection Costs and Capacity</u>.  The Parties acknowledge and agree that Tenant has budgeted One Million Five Hundred Thousand Dollars ($1,500,000) (the "**Budgeted Interconnection Costs**") for the costs of connecting the Project Facilities to the local utility grid (the "**Interconnection Costs**") as set forth in the interconnection report issued by Baltimore Gas & Electric Company (the "**Interconnection Report**") for Project Facilities, and is assuming a minimum project capacity to make the project at the Property economically feasible.  If (a) the actual Interconnection Costs are greater than the Budgeted Interconnection Costs, or (b) project capacity is restricted such that the project at the Property is no longer economically feasible, as determined by Tenant in its sole discretion, then in either such case, Tenant shall have the right to terminate this Lease provided that it delivers written notice of termination to Owner within thirty (30) days of receipt of the Interconnection Report.

6.    **Owner of Project Facilities**.  Owner shall have no ownership or other interest in any part of the Project Facilities and Tenant may remove or substitute any or all Project Facilities or parts thereof at any time.  No part of the Project Facilities or other equipment installed by Tenant on the Property shall be considered part of the Property, or fixtures, or an improvement to real property.

6.1    The Project Facilities shall at all times be considered tangible personal property owned exclusively by Tenant.

6.2    Owner acknowledges and agrees that Tenant is the exclusive owner of all utility credits generated by the Project Facilities, and that Owner shall have no ownership or other interest in any of the Project Facilities or any attributes produced therefrom, including, without limitation, any and all credits (including tax credits, carbon credits, renewable energy credits), rebates, incentives, benefits, emissions reductions, entitlements, offsets and allowances of any kind, howsoever entitled, attributable to the Project Facilities ("**Energy Tax Credits**"), whether in effect as of the Effective Date or as may come into effect in

11

the future.  For the avoidance of doubt, Tenant's right to benefit from any such Energy Tax Credit, existing or in the future, shall always be superior to any right of Owner.

6.3     For purposes of this Section only, the term "Tenant" shall include all direct and indirect subsidiaries and Affiliates of Tenant.

6.4     Notwithstanding anything herein to the contrary, Owner acknowledges that Tenant shall have no obligation to construct any Project Facilities on the Property.  Subject to the payment of Term Rent, Owner hereby waives and relinquishes: (a) any landlord's lien Owner may now or hereafter have (whether granted by statute or contract) with respect to the Project Facilities, (b) any right of distraint or execution Owner may have against the Project Facilities, and (c) any other present or future claim to the Project Facilities.

7.     **Taxes and Assessments**.

7.1     <u>Taxes</u>.  Tenant shall pay all real and personal property taxes, assessments and charges, general and specific (collectively, "**Taxes**"), that may be levied or assessed solely by reason of Tenant's use or ownership of the Project Facilities installed on the Property.  Owner shall pay when due any Taxes attributable to: (a) improvements or facilities installed by Owner or others (excluding Tenant) on the Property, and (b) the underlying value of the Property; provided, however, that if the Taxes against the underlying value of the Property are increased by reason of a change of use determination by a taxing entity or increased assessment of the Property resulting solely from Tenant's Project Facilities thereon, then Tenant shall pay the entire amount of such increase.  Owner and Tenant shall negotiate in good faith to determine the amount of increase attributable solely to Tenant's Project Facilities on the Property as opposed to increases due to changes in market and other conditions.  Tenant may, in its sole discretion, but shall not be obligated to, pay directly to the relevant taxing authority, any Taxes with respect to the Property which under this Lease are the responsibility of Owner, in order to remove any tax lien or other restriction placed on the Property due to non-payment; in which case Tenant shall receive a credit on its Rent of any amounts so paid plus interest at a rate equal to the lesser of (i) ten percent per annum or (ii) the maximum rate allowed by applicable law on the amount so paid from the date of payment to the time the Rent being credited is due.  Furthermore, any such payment of Taxes by Tenant which are the responsibility of Owner under this Lease shall not obligate Tenant to make any further payments of such Taxes.

7.2     <u>Real Property Taxes</u>.  Subject to the provisions of Section 7.1, if any taxes payable by Tenant under this Lease are levied or assessed in the name of Owner as part of the real property taxes payable by Owner, then, promptly after Owner timely submits the real property tax bill to Tenant, Tenant shall reimburse Owner for all such taxes payable by Tenant under this Lease in the amount due without interest or penalties; provided, however, that if penalties and interest are incurred as a result of any failure or omission on Tenant's part to reimburse the Owner in accordance with this <u>Section 7.2</u>, then Tenant shall be responsible for the same.  It is a condition to Owner's right to payment or reimbursement of any penalties or interest relating to Taxes under this Lease that Owner submits the real property tax bill (and any other communication from any government authority regarding the same) to Tenant not less than forty-five (45) days before the tax bill is due.

7.3     <u>Contesting Taxes</u>.  Each Party may contest the validity or amount of any levied taxes, assessments or other charges for which each Party is responsible under this Lease as long as such contest is pursued in good faith and with due diligence and the Party contesting the tax, assessment or charge has paid the obligation in question or established adequate reserves to pay the obligation in the event of an adverse determination.  Owner shall in all respects cooperate with Tenant in any such contest.

8.    **Owner's Representations, Warranties and Covenants**.  Owner represents, warrants and covenants as follows:

8.1    <u>Owner's Authority</u>.  Owner is the sole fee simple owner of the Property and has the unrestricted right and authority to execute this Lease and to grant to Tenant the rights granted under this Lease.  Each person signing this Lease on behalf of Owner is authorized to do so, and all persons having any ownership interest in the Property are signing this Lease as Owner.  When signed by Owner, this Lease constitutes a valid and binding agreement enforceable against Owner in accordance with the terms hereof.

8.2    <u>No Interference</u>.  Owner's activities and any grant of rights Owner makes to any person or entity, whether located on the Premises or elsewhere, shall not, currently or prospectively, interfere with: (a) the construction, installation, maintenance or operation of the Project Facilities as contemplated by the terms of this Lease; (b) access over the Property to the Project Facilities; and (c) the undertaking of any other activities permitted under this Lease. Without limiting the generality of the foregoing, Owner shall not interfere with solar resources, solar irradiation, direction of light, or sunlight over the Property by engaging in any activity on the Property or elsewhere that might cause a decrease in the output or efficiency of the Project Facilities. Tenant shall have the right to remove any obstructions to the light on the Property that materially and adversely affect the operations of the Project Facilities if this covenant is violated.  There are no circumstances known to Owner or commitments to third parties that may interfere with, damage, impair or otherwise adversely affect the development of the Project Facilities or the operation of any Project Facilities (including activities that may adversely affect the Project Facilities' exposure to sunlight).

8.3    <u>Ownership and Mineral Estate</u>.  Owner owns all of the fee simple interest in the Property. Owner owns all of the oil, gas and other minerals in, on, under or that may be produced from the Property howsoever drilled, mined or produced ("**Mineral Estate**").  Notwithstanding any provision of this Lease, after the Effective Date, Owner shall not utilize the surface of the Property to explore for, develop, or produce oil, gas, or other minerals from the Mineral Estate underlying the Property nor enter into any agreement permitting a third party to utilize the surface of the Property to explore for, develop, or produce, oil, gas or other minerals from the Mineral Estate underlying the Property.

8.4    <u>Liens</u>.  Except as set forth on <u>Exhibit B</u> attached hereto, as of the Effective Date, to the best of Owner's knowledge, there are no liens, encumbrances, leases, mortgages, deeds of trust, security interests, licenses or other exceptions (collectively, "**Liens**") encumbering or affecting all or any portion of the Property.  There are no currently existing options, rights of refusal, sales contracts, or other rights in favor of any third parties relating to the Property, or any interest therein ("**Third Party Rights**"), that could materially interfere with the development, construction, installation, maintenance or operation by Tenant of the Project Facilities or that allow any party other than Tenant to exploit the solar rights, develop the Project Facilities or that could adversely affect Tenant's use of the Premises or obtaining the benefits intended under this Lease.  Owner shall not cause, create, incur, assume or suffer to exist any mortgage, pledge, lien (including, without limitation, lender's, mechanics', labor or materialman's lien), charge, security interest, encumbrance or claim on or with respect to the Project Facilities or any interest therein. Owner shall pay promptly before a fine or penalty may attach to the Project Facilities any taxes, charges or fees of whatever type of any relevant Governmental Authority (defined below) for which Owner is responsible.  Owner shall indemnify Tenant against all costs (including reasonable attorneys' fees and court costs at trial and on appeal) incurred in discharging and releasing such Liens.  If Owner breaches Owner's obligations under this Section, Tenant may, in its sole option, cause such Liens to be discharged and released or pay any such taxes, charges, or fees, including any accrued interest and penalties, and deduct the amount of such payments from Rent or other payment obligations otherwise due to Owner from Tenant.

8.5    <u>Property Documents</u>. Within ten (10) days after the Effective Date, Owner shall deliver to Tenant or make available to Tenant for Tenant's review copies of the following documents related to the

Property to the extent in Owner's possession or control: site plans, surveys, soil studies, phase one environmental reports, other inspection reports, architectural drawings, plans and specifications, studies, and investigations, government notices or agreements, title policies, commitments and reports, rent rolls, insurance policies, instruments and agreements relating to mineral rights, mineral reservations or conveyances, and mineral leases, agreements regarding third party rights and leases, surveys, lien documents, site assessments, ad valorem property tax applications, appraisals, and any and all notices or correspondence from any Governmental Authority which indicates that the Property is not in compliance with any applicable ordinance or otherwise addresses any pending or threatened condemnation, planned public improvement, special assessment, or zoning or subdivision change which affects the Property. Tenant shall have the right to obtain, at Tenant's expense, a current title report relating to the Property to determine the condition of Owner's title and all of the recorded rights of way and easements benefiting or encumbering the Property. Tenant shall also have the right to obtain, at Tenant's expense, a title insurance policy insuring Tenant's interest in the Property. Owner shall fully cooperate with Tenant and the title insurance company in obtaining such policy, including, without limitation, promptly providing to the title insurance company all necessary approvals, consents, customary affidavits, estoppels, organizational documents and agreements. Tenant may also obtain a Survey of the Premises. Upon receipt of the Survey, Owner and Tenant, shall, at Tenant's election, amend this Agreement to replace Exhibit A2 with the description of the Premises set forth in the Survey.

       8.6      Treatment of Liens; Third Party Rights. As of the Execution Date there are no Liens or Third Party Rights except as disclosed on Exhibit B. If at any time during the Lease Term, any Lien or any Third Party Right is found, exists or is claimed to exist against the Premises or any portion thereof (inclusive of Exhibit B), that creates rights superior to those of Tenant, and Tenant determines that the existence, use, operation, implementation or exercise of such Lien or such Third Party Right could reasonably be inconsistent with or delay, interfere with, impair or prevent the exercise of any of Tenant's rights under this Lease or the financing of the Project Facilities, Tenant shall be entitled to obtain a Subordination and Non-Disturbance Agreement (defined below) from the holder of such Lien or such Third Party Right, and Owner shall use best efforts and diligence in helping Tenant obtain the same at no out of pocket expense to Owner (unless Owner caused the Lien or Third Party Right to exist in violation of this Agreement). Owner agrees that any right, title or interest created by or through Owner, or resulting from the acts or omissions of Owner, from and after the Effective Date in favor of or granted to any third party shall be subject to: (a) this Lease and all of Tenant's rights, title and interests created in this Lease, and (b) any and all documents executed or to be executed by and between Tenant and Owner in connection with this Lease. A **Subordination and Non-Disturbance Agreement**" shall mean an agreement between Tenant, Owner, and the holder of a Lien or a Third Party Right that provides that the holder of such Lien or such Third Party Right: (i) subordinates such Lien or such Third Party Right to Tenant's interest under this Lease, (ii) agrees not to disturb Tenant's possession or rights under this Lease, (iii) agrees to provide notice of defaults under the Lien or Third Party Right documents to Tenant and agrees to allow Tenant and its lenders a reasonable period of time following such notice to cure such defaults on behalf of Owner, and (iv) agrees to comply with such other requirements as may be reasonably required by Tenant or its lenders to ensure the interests of Tenant or its lenders are not interfered with. All Subordination and Non-Disturbance Agreements obtained by Owner pursuant to this Section shall be in a form reasonably acceptable to Tenant and Tenant's lenders, if any, and shall be in a form that may be recorded by Tenant, at Tenant's cost, following their execution.

       8.7      Hazardous Materials.

       (a)      To the best of Owner's knowledge, as of the Effective Date, (i) there are no Hazardous Materials (defined below) located on the Property, (ii) the Property has not been used for the generation, treatment, storage or disposal of Hazardous Materials, (iii) no underground storage tanks have ever been located on the Property, and (iv) there are no underground storage tanks presently located on the

Property.  Owner shall not violate and shall indemnify Tenant Parties (defined below) as set forth below against any violation by Owner or any Owner Party (defined below) of, any Environmental Law (defined below) in connection with or related to Owner's ownership or use of the Property, including without limitation any such violation which may have occurred by Owner, Owner Parties or any other person prior to the Effective Date.  Owner's violation of the foregoing prohibition shall constitute a material breach and default under this Lease.  In conformance with the requirements of applicable law, Owner shall clean up, remove, remedy and repair any soil or ground water contamination and damage caused by the release or disposal of any Hazardous Materials by Owner or any Owner Party in, on, under, or about the Property.

(b)     Owner shall indemnify, defend, and hold harmless Tenant Parties from and against any suit, action, notice of violation or non-compliance, consent order, consent decree or proceeding before any Governmental Authority, or otherwise brought or made by a Governmental Authority or other third party, resulting from the actions of Owner Parties in, on, under or about the Property or in connection with Owner's ownership and/or use of the Property (i) arising pursuant to any Environmental Law, (ii) in connection with any actual or alleged violation of, or liability pursuant to, any Environmental Law, (iii) in connection with any Hazardous Materials (defined below), including the presence or spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, abandoning or migrating into the environment of, or exposure to, any Hazardous Materials or (iv) in connection with any actual or alleged damage, injury, threat or harm to (1) health or safety regulated under any Environmental Law, (2) natural resources, (3) endangered, threatened, listed or protected species or habitat or (4) the environment.

(c)     Tenant shall have no liability or responsibility whatsoever with respect to the existence or remediation of any Hazardous Materials in, on or under the Property, except with respect to Hazardous Materials brought onto the Property by Tenant.

8.8     <u>No Litigation</u>. Other than the Bankruptcy Case, Owner is not a party to any, and to Owner's best knowledge, there are no pending or threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental or regulatory investigations of any kind or nature whatsoever against Owner: (a) that challenge the validity or propriety of this Lease, and/or transactions contemplated in this Lease, or (b) which could reasonably be expected to have a material adverse effect on the ownership or operation of the Property or any part thereof or interest therein.

8.9     <u>Consents</u>. Owner shall cooperate with Tenant in the execution and delivery of such consents, estoppel certificates and other documents as a Mortgagee (defined below), hedge provider, power purchaser, tax equity investor, or title insurance company (collectively, "**Requestor**") may request, including, without limitation, any instruments required to evidence such Requestor's rights under this Lease.

8.10     <u>Requirements of Governmental Agencies</u>. Owner shall assist and fully cooperate with Tenant, so long as Owner is reimbursed for its reasonable out-of-pocket expenses, in complying with or obtaining any land use permits and approvals, building permits, development permits, construction permits, subdivision and platting permits, environmental impact reviews or any other approvals required for the financing, construction, installation, replacement, relocation, maintenance, operation or removal of the Project Facilities (collectively, "**Permits**"), including execution of applications for such approvals.  Tenant shall reimburse Owner for Owner's reasonable actual evidenced out-of-pocket expenses incurred in connection with such cooperation promptly after Tenant's receipt of a request for such payment including third party invoices.  Owner consents to and authorizes Tenant to sign and file for Permits on Owner's behalf so long as Owner is given a copy of the Permits at least ten (10) days prior to such execution.  Owner shall not make or cause to be made any statements that may disparage or damage the reputation of Tenant

15

or the Project Facilities or challenge any prospective or existing Permits or third party agreements in connection with the Project Facilities.

8.11    <u>Subdivision of Property</u>.  If required by applicable law for the Project Facilities to be constructed, Tenant may elect to cause the Property to be subdivided so that the Property forms a separate legal parcel.  Tenant shall bear the costs of preparing and filing the subdivision plan and obtaining any other required approvals and permits for such subdivision.  Owner shall cooperate with Tenant in obtaining such subdivision approval including executing any reasonable and necessary documentation required for such process. Upon completion of the subdivision, the newly subdivided parcel on which the Project Facilities are located shall become the "Property" under this Lease; and in such event, Tenant and Owner shall execute an amendment to this Lease with a revised <u>Exhibit A1</u> and shall execute and record an amended memorandum in recordable form under applicable law describing the new Property.

8.12    <u>Estoppel Certificates</u>.  Within ten (10) business days of actual receipt from Tenant or from any existing or proposed Requestor, Owner shall execute an estoppel certificate: (a) certifying that this Lease is in full force and effect and has not been modified (or, if the same is not true, stating the current status of this Lease), (b) certifying that to the best of Owner's knowledge there are no uncured events of default under this Lease (or, if any uncured events of default exist, stating with particularity the nature thereof) and (c) containing any other certifications as may reasonably be requested.  Any such statements may be conclusively relied upon by Tenant or any Requestor.  The failure of Owner to deliver such statement within such time shall be conclusive evidence upon Owner that this Lease is in full force and effect and has not been modified, and there are no uncured events of default by Tenant under this Lease.

8.13    <u>Confidentiality and Publicity</u>.

(a)    Subject to the disposition of the Notice of Disposition referenced in <u>Section 8.13(c)</u> hereof, to the fullest extent allowed by law, Owner shall maintain in the strictest confidence, for the benefit of Tenant, all solar data, all information pertaining to the financial terms of or payments under this Lease, Tenant's site or product design, methods of operation, methods of construction, power production or availability of the Project Facilities, and the like, whether disclosed by Tenant, or discovered by Owner, unless such information either: (a) is in the public domain by reason of prior publication through no act or omission of Owner or any Owner Party, or (b) was already known to Owner at the time of disclosure and which Owner is free to use or disclose without breach of any obligation to any person or entity.  Owner shall not use such information for its own benefit, publish or otherwise disclose it to others, or permit its use by others for their benefit or to the detriment of Tenant.  Notwithstanding the foregoing, Owner may disclose such information to: (i) Owner's lenders, attorneys, accountants and other personal advisors, (ii) any prospective purchaser of the Property that has entered into a contract of sale with Owner for the sale for the Property, or (iii) pursuant to lawful process, subpoena or court order; provided that Owner, in making such disclosure, advises the party receiving the information of the confidentiality of the information and obtains a signed written agreement of said party not to disclose the information.  Owner shall return all material containing confidential information to Tenant promptly upon Tenant's request or if such materials are in a digital format, a statement to Tenant that Owner has deleted all confidential information from Owner's systems.  Owner agrees that Tenant will have no adequate remedy at law if Owner violates any of the terms of Section.  In such event, Tenant will have the right, in addition to any other rights Tenant may have, to obtain injunctive relief to restrain any breach or threatened breach by specific enforcement of such terms plus reimbursement of reasonable attorneys' fees, court costs and all associated expenses.  The provisions of this Section shall survey the expiration or any earlier termination of this Lease.

(b)    Subject to the disposition of the Notice of Disposition referenced in Section 8.13(c) hereof, neither Owner nor Tenant will issue any press release, make any public statement, or undertake any community outreach activities or community meetings with respect to this Lease or the installation and

operation of the Project Facilities on the Property (the "**Project**") without the prior consent of the other Party, which consent shall not be unreasonably, withheld, conditioned or delayed. Notwithstanding the foregoing, applications and public filings related to the Project and made in the ordinary course of business, and testimony and statements at public hearing and meetings made in connection with any Permits or governmental approvals required for the Project, may be made by Tenant without the prior consent of Owner. Owner and Tenant will work cooperatively and collaboratively to plan and execute a public engagement program with respect to the Project that will provide information about the Project and will solicit input from neighbors and other community members and stakeholders. The Parties expect that Tenant will lead public engagement activities.

(c)    Owner and Tenant acknowledge that on August 5, 2025, Owner filed a Notice of Disposition of Leased Property (Unimproved Acreage Located in Baltimore County, MD) (the "**Notice of Disposition**") in the matter of in re: Roman Catholic Archbishop of Baltimore, Case No. 23-16969-MMH in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Case**"). A copy of the Notice of Disposition is attached hereto as Exhibit D. Owner and Tenant will work cooperatively and collaboratively to provide information and documents to the Bankruptcy Court and the parties in the Bankruptcy Case in connection with the Notice of Disposition, including but not limited to, providing information, documentation and persons to testify at any hearings, court proceedings, depositions and discovery related to the Notice of Disposition.

8.14    Waivers.  To the extent permitted by law, Owner waives any and all setbacks and setback requirements, whether imposed by law or by any person or entity, including, without limitation, any setback requirements described in the zoning ordinance of the county in which the Property is located or in any governmental entitlement or permit issued to Tenant, its permitted successor, assign or Affiliate ("**Setback Requirements**"). Owner further waives any Setback Requirements which may apply to the installation of Project Facilities on the Property. Further, if so requested by Tenant, its subsidiaries, Affiliates, permitted successor or assignee, Owner shall promptly, without demanding additional consideration therefore, execute, and if appropriate cause to be acknowledged and recorded, any setback waiver or other document or instrument required by any Governmental Authority.

8.15    Road Use; Fences.  Owner acknowledges that Tenant shall be entitled to construct extensions to the existing roads and any culverts, bridges and related improvements on and adjacent to the Property, and to improve and upgrade any roads, culverts, bridges and related improvements from time to time existing on and adjacent to the Property. Tenant shall have the right to remove fences, gates, cattle guards and any other improvements on structures on the Property which interfere with Tenant's operations. In no event shall Tenant be responsible for any acts or omissions, any removal of fences, roads and other improvements, any damage to the Property, any improvements or other property placed thereon, or any nuisance caused by, any third person who is not a Tenant Party (defined below) or is not otherwise acting on behalf of Tenant, including any Owner Party. If Tenant crosses or cuts an existing fence line, Tenant shall install a temporary brace during construction and as appropriate a fence corner, line brace, cattle guard, and/or gate thereafter which meets commercially reasonable industry standards.

8.16    No CRP. Owner is not a party to a Conservation Reserve Program contract with the U.S. Department of Agriculture pursuant to 7 C.F.R. Part 1410 regarding the Property.

9.    **Tenant's Representations, Warranties and Covenants**.

9.1    Insurance. Tenant shall, at its expense, obtain and maintain throughout the Lease Term and shall require Tenant's consultants, agents, contractors, and subcontractors to obtain insurance coverage for liabilities arising out of the performance of any Due Diligence or authorized entry on the Property prior to and during performing work on or entering the Property (or any other property owned by Owner), including:

17

(a) comprehensive commercial general liability insurance written on an occurrence basis, including independent contractors liability coverage, with a combined single limit provision for bodily injury and/or property damage of at least One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate, which has a commercially reasonable deductible; (b) comprehensive automobile liability insurance with a single limit provision, written on an occurrence basis, covering all owned vehicles, hired vehicles, and non-owned vehicles for all personal injury, death, and property damage, of at least One Million Dollars ($1,000,000.00), (c) professional liability coverage, if applicable, including errors and omissions coverage of at least One Million Dollars ($1,000,000.00) for each claim and as an annual aggregate, (d) umbrella liability with a limit of Five Million Dollars ($5,000,000.00), (e) worker's compensation liability insurance within statutory limits, and (f) employer's liability insurance with annual limits no less than: Bodily Injury by Accident, each Accident: $1,000,000; Bodily Injury by Disease, each Employee: $1,000,000; Bodily Injury by Disease, Policy Limit: $1,000,000;.   All insurance coverage requires under this paragraph shall be primary and noncontributory to any insurance furnished by Owner and include a waiver of subrogation in favor of the Owner.  Owner shall be listed by endorsement as an additional insured on (i) all of Tenant's policies and (ii) all policies carried by Tenant's consultants, agents, contractors and subcontractors required hereunder, except for professional liability insurance. Tenant shall deliver a copy of Tenant's Certificate of Insurance to Owner prior to the start of any Due Diligence on the Property.  Thereafter, upon request by Owner made not more than once per year, Tenant shall deliver to Owner Certificates of Insurance evidencing the insurance coverages required by this Section.  All insurance policies required in this Lease shall be provided by carriers with AM Best rating of at least A-/VIII and the insurance coverage amounts shall be subject to increase, at Tenant's discretion, during the Term.  The commercial general liability insurance shall (1) not contain any specific exclusion for independent contractor's liability, (2) shall provide broad form contractual liability coverage, and (3), if available, shall not be cancelable unless thirty (30) days' prior written notice (except that only ten (10) days' notice shall be required for non-payment of premium) shall have been given to Owner.  The commercial general liability insurance policies furnished by Tenant, its consultants, agents, contractors and subcontractors shall also not contain an absolute warranty of underlying coverage for subcontractors, and not contain an exclusion for injury to contractors or employees of contractors, or for work performed by uninsured or underinsured contractors.

9.2    Requirements of Governmental Agencies. Tenant, at its expense, shall comply in all material respects with applicable laws of any governmental agency applicable to the Project Facilities and all Legal Requirements.  Tenant shall have the right in its sole discretion, to contest by appropriate legal proceedings, brought in the name of Tenant or in the names of both Tenant and Owner, the validity or applicability to the Premises or Project Facilities of any applicable law (including, but not limited to property assessment).  Owner shall fully cooperate in such contest, so long as Owner is reimbursed for Owner's out-of-pocket expenses incurred in such contest and cooperation.  Any such contest or proceeding, including any maintained in the name of Owner, shall be controlled and directed by Tenant, but Tenant shall protect Owner from Tenant's failure to observe or comply during the contest with the contested applicable law.

9.3    Liens. Tenant shall keep the Property free and clear of all liens and claims of liens for labor and services performed on, and materials, supplies or equipment furnished to the Property for Tenant's use or benefit; provided, however, that if such a lien does arise, Tenant has a right to contest such lien and Tenant, within forty-five (45) days after it receives notice of the filing of such lien, either bonds around such lien or establishes appropriate reserves therefore, or otherwise removes such lien from the Property pursuant to applicable law, in which case Tenant shall not be deemed to have breached this Section. Nothing in this Section or this Lease shall be construed to prohibit Tenant from granting one or more liens on all or any portion of Tenant's right, title or interest under this Lease as security for the repayment of any indebtedness and/or the performance of any obligation relating in whole or in part to any of the Project Facilities.  If Tenant fails to comply with its obligations set forth above in this Section 9.3, without limiting

18

Tenant's liability for failure to comply with this Section, Owner may, but shall not be required to, bond off or discharge any mechanic's or other lien upon Tenant's failure to do so, whereupon, in addition to the cost of such bonding or discharging and all other costs and disbursements which Tenant would owe to Owner in respect of same hereunder, Tenant shall also pay to Owner's reasonable legal fees incurred in connection therewith. Tenant, as its sole cost and expense, shall procure and deliver to Owner a final release of lien following completion of construction of the Project Facilities from the general contractor and any subcontractors who constructed the Project Facilities.

9.4 <u>Utilities</u>. Tenant shall be solely responsible for arranging and paying for all utilities necessary for the construction and operation of the Project Facilities.

9.5 <u>Hazardous Materials</u>.

(a) Except for "Hazardous Material" (defined below) contained in (i) products used by Tenant in de-minimis quantities for ordinary cleaning purposes and (ii) the Project Facilities, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Property or the Premises without Owner's prior written consent. Tenant at its sole cost and expense, shall operate its business in the Premises in strict compliance with all "Environmental Law" (defined below). Tenant shall not violate and shall indemnify Owner Parties (defined below) as set forth below against any violation by Tenant or any Tenant Party of any Environmental Law in connection with or related to Tenant's lease and use of the Premises. In conformance with the requirements of applicable law and to the reasonable satisfaction of the Owner, Tenant shall clean up, remove, remedy and repair any soil or ground water contamination and damage caused by the release or disposal of any Hazardous Materials by Tenant or any Tenant Parties in, on, under, or about the Property.

(b) Tenant shall indemnify, defend, and hold harmless Owner Parties from and against any claim, loss, demand, damages, (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees) which are brought or recoverable against, or suffered or incurred by Owner to the extent of any release of Hazardous Material for which the Tenant is obligated to remediate as provided in Section 9.5(a) hereof, or any other breach of the requirements under this Section 9.5 by the Tenant Parties, as applicable, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Section 9.5 shall survive any termination of this Lease. Tenant also shall indemnify, defend and hold harmless the Owner Parties from and against any suit, action, notice of violation or non-compliance, consent order, consent decree or proceeding before any Governmental Authority, or otherwise brought or made by a Governmental Authority or other third party, resulting from the actions of Tenant Parties in, on, under or about the Property or in connection with Tenant's lease and/or use of the Property (i) arising pursuant to any Environmental Law, (ii) in connection with any actual or alleged violation of, or liability pursuant to, any Environmental Law, (iii) in connection with any Hazardous Materials, including the presence or spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, abandoning or migrating into the environment of, or exposure to, any Hazardous Materials or (iv) in connection with any actual or alleged damage, injury, threat or harm to (1) health or safety regulated under any Environmental Law, (2) natural resources, (3) endangered, threatened, listed or protected species or habitat or (4) the environment.

(c) "**Environmental Law**" means all applicable laws of any Governmental Authority, including, without limitation, laws relating to consumer leasing and protection and any ordinances, judgments, decrees, injunctions, writs and orders or like actions of any Governmental Authority and rules and regulations of any Governmental Authority pertaining to the environment, human health or safety, or natural resources, including, but not limited to, the Comprehensive Environmental Response,

Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Superfund Amendments and Reauthorization Act of 1986 (26 U.S. Code § 9507), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act (also known as the Clean Water Act) (33 U.S.C. §§ 1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), the Endangered Species Act (16 U.S.C. §§ 1531 et seq.), the Migratory Bird Treaty Act (16 U.S.C. §§ 703 et seq.), the Bald and Golden Eagle Protection Act (16 U.S.C. §§ 668 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. §§ 2701 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101 et seq.), and the Occupational Safety and Health Act of 1970 (29 U.S.C. §§ 651 et seq.), to the extent that it relates to the handling of and exposure to hazardous or toxic materials or similar substances, and any similar or analogous state and local statutes or regulations promulgated thereunder, and decisional law of any Governmental Authority, as each of the foregoing may be amended or supplemented from time to time in the future, in each case to the extent applicable with respect to the property or operation to which application of the term "Environmental Law" relates.

(d)      "**Governmental Authority**" means any foreign, federal, state, tribal, local or other governmental, regulatory or administrative agency, court, commission, department, board, or other governmental subdivision, legislature, rulemaking board, tribunal, arbitrating body or other governmental authority having jurisdiction or effective control over a party or its property.

(e)      "**Hazardous Material**" means any hazardous or toxic material, substance or waste, pollutant or contaminant as defined or regulated under applicable Environmental Laws, including petroleum, petroleum products, asbestos, polychlorinated biphenyls and radioactive materials.

9.6      Fences and Security Measures.  Owner authorizes Tenant to take reasonable safety measures to reduce the risk of theft of or damage to the Project Facilities or the risk that the Project Facilities will cause damage, injury or death to people, livestock, other animals and property.  Tenant may construct fencing around the entire Property and take other security precautions if it is determined by Tenant, in its sole discretion, that such fencing and/or security measures will reduce such risks of theft, damage, death or injury.  The expense for any and all fencing constructed by Tenant, or other security measures taken by Tenant, shall be borne solely by Tenant and the construction of any such fencing shall comply with all applicable Legal Requirements.

9.7      Maintenance.    Tenant shall be solely responsible, at its cost and expense, for the maintenance of the Premises and the Project Facilities, including without limitation any required mowing and tree trimming on Premises.  In addition, Tenant shall provide the following maintenance services to the portion of the Property shown on Exhibit A-3 that is outside of the Premises (the "**Additional Maintenance Area**"):  mowing at least twice per year, and tree branch clearing as needed, but not more frequently than twice per year, sediment and erosion control, tree removal, and waste and debris removal.  Notwithstanding the foregoing, if the size of the Premises is reduced in accordance with Section 2.7 above, then the Additional Maintenance Area shall be limited to the area that is fifty (50) feet outside of the fence line around the Premises, and the Parties shall replace Exhibit A-3 with an updated exhibit that reflects the modified Additional Maintenance Area.

9.8      Priority Access to Community Solar Subscriptions.  On the terms and conditions described in this paragraph, affiliates of Owner and property owners in the vicinity of the Property who are current customers served by Baltimore Gas & Electric (the "**Priority Subscribers**") shall have a right of first offer to subscribe to up to 60% of the total capacity of any community solar project constructed on the Premises to be implemented as follows: Owner shall provide a list of Priority Subscribers (the "**Priority Subscriber List**") no later than the date that is three (3) months after the Construction Commencement Date.  As long

20

as the Priority Subscriber List is timely delivered to Tenant, Tenant shall provide the Priority Subscriber List to its subscriber management organization ("**SMO**"), which shall process subscription applications from the Priority Subscribers according to its standards and requirements for new subscriptions. Owner acknowledges and agrees that Tenant's SMO will determine whether or not any Priority Subscriber will be enrolled as a subscriber to the Project, and that Tenant cannot make any guarantees that any Priority Subscriber will be enrolled as a subscriber to the Project.

10. **Indemnities**.

    10.1 <u>Indemnity by Tenant</u>. Tenant shall defend, indemnify and hold harmless Owner and Owner's Affiliates, successors and assigns and all such parties' stockholders, members, partners, principals, officers, directors, employees, agents, representatives, contractors, licensees and invitees (collectively, the "**Owner Parties**" or individually an "**Owner Party**") from and against losses, liabilities, damages, costs, claims, expenses, suits and causes of action (including losses or claims for personal injuries or death and property damage and including reasonable attorneys' fees and costs of litigation (collectively, "**Losses**"), in each case to the extent arising out of or related to (a) any breach of this Lease by Tenant (including, but not limited to Tenant's obligations to perform decommissioning of the Project Facilities as referenced in Section 13 hereof and maintain bonding in accordance with Section 13.4 hereof), (b) any negligent or wrongfully intentional actions or omissions of Tenant or Tenant's employees, agents, representatives, contractors, consultants, subcontractors or invitees on, or the use or operation of, the Premises during the Lease Term, including any construction or operation of the Project Facilities, and (c) any use of the Premises, the Property and Project Facilities by a Tenant Party (all such Losses for which Tenant is obligated to indemnify the Owner Parties are collectively referred to as the "**Owner Losses**"). However, the Owner Losses exclude any Losses to the extent caused by any Owner Party's negligent actions or inactions and any losses caused by, or allegedly caused by, negligent or intentional interference with any electrical generating facilities. Notwithstanding the foregoing, any Owner Losses for which Tenant is obligated to indemnify any Owner Party under this Lease shall be reduced by any insurance proceeds actually recovered by such Owner Party for such Owner Losses. Tenant shall in no case be liable for lost business opportunities, lost profits, or any other special, punitive, incidental or consequential damages that may result from the conduct of Tenant or otherwise as a result of any exercise by Tenant of its rights under this Lease. For purposes of this Lease, the term "**Affiliate**" means any person or entity which directly or indirectly controls, or is under common control with, or is controlled by, Tenant or Owner, as applicable. As used in this definition, "control" (including, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interests, by contract or otherwise); any person or entity which owns directly or indirectly 10% or more of the securities having ordinary voting power for the election of directors or other governing body of an entity will be deemed to control such entity

    10.2 <u>Indemnity by Owner</u>. Owner shall defend, indemnify and hold harmless Tenant and Tenant's Affiliates, successors and assigns and all such parties' stockholders, members, partners, officers, directors, employees, agents, representatives, contractors, licensees and invitees (collectively, "**Tenant Parties**" or a "**Tenant Party**") from and against Losses to the extent arising out of or related to (a) any breach of this Lease by Owner, (b) any Owner or Owner's Party's negligent or wrongfully intentional actions on, or use, ownership or operation of the Property, and (c) any use of the Premises or the Property by an Owner Party, but excluding any Owner Losses and any Losses to the extent caused by any Tenant Party's negligent actions or inactions. Notwithstanding the foregoing, any Losses for which Owner is obligated to indemnify any Tenant Party under this Lease shall be reduced by any insurance proceeds actually recovered by such Tenant Party for such Losses.

    10.3 <u>Recognition of Dangers</u>. Owner recognizes the need to exercise extreme caution when in close proximity to any of the Project Facilities. Owner agrees to exercise caution at all times and to advise

the Owner Parties to do the same. Owner shall take reasonable measures to avoid all risks associated with electromagnetic fields resulting from the production and transmission of electricity and Owner waives any and all claims and causes of action whatsoever (whether currently existing or that may otherwise arise or accrued at any time in the future) that Owner possesses or otherwise may possess against Tenant Parties arising from or relating to such risks; provided, however, such waiver shall not be effective to the extent Tenant engages in gross negligence or willful misconduct.

11.    **Assignment; Right to Encumber; Division of Lease**.

11.1    Assignment by Tenant. Owner hereby consents and grants to Tenant the right, on an exclusive or non-exclusive basis, to grant, sell, lease, convey or assign all or a portion of Tenant's interest in this Lease or the Project Facilities, subleases, easements, sub-easements, licenses or similar rights to Tenant's interest in this Lease or the Project Facilities (collectively, "**Assignment**") to any Affiliate or Qualified Assignee (collectively, "**Assignee**"). A "**Qualified Assignee**" (a) must be a business organization for which said organization and its principals, in the judgment of the Owner, are not operating or acting in such a manner that is contrary to or in opposition to decency or good morals or the moral teachings and beliefs of the Catholic Church and (b)  must assume in writing all the obligations of the Tenant under this Lease and be a business organization with: (i) experience comparable with Tenant or its Affiliates in the operation and management of commercial renewable energy generating systems, (ii) the financial capability equal to or greater than Tenant at the time of the assignment, and (iii) the ability to maintain the Project Facilities in the manner required by this Lease.  Owner further hereby consents and grants to Tenant the right, on an exclusive or non-exclusive basis, to encumber, hypothecate, mortgage or pledge (including by mortgage, or personal property security instrument) all or any portion of Tenant's right, title or interest under this Lease and/or in any Project Facilities to any Mortgagee as security for the repayment of any indebtedness and/or the performance of any Mortgage.  If any additional consent is needed, Owner shall not unreasonably withhold, condition, or delay its consent to any assignment that is not allowed by the preceding portions of this Section.  All Assignees will be subject to all of the obligations, covenants and conditions applicable to Tenant under this Lease.  Upon Tenant's assignment of its entire interest under this Lease as to all or any portion of the Property, or as may otherwise be provided in the applicable grant, sale, lease, conveyance or assignment document, Owner shall recognize the Assignee as Tenant's proper successor, the Assignee shall have all of the assigned rights, benefits and obligations of Tenant under and pursuant to this Lease, and Tenant shall be relieved of all of its obligations relating to the assigned interests under this Lease that relate to acts or omissions which occur or accrue following the effective date of such grant, sale, lease, conveyance or assignment.  As clarification, and without prejudice to Tenant's right to encumber its interest in the Lease and the Project Facilities, as permitted herein, Tenant shall have no right to mortgage or encumber the underlying Property.

11.2    Notice to Owner. Following an assignment or the granting of a Mortgage as contemplated by Section 11.1 hereof, Tenant or the Mortgagee will give actual notice of the same (including the address of the Mortgagee for notice purposes) to Owner; provided, however, that the failure to give such notice shall not constitute a default but rather shall only have the effect of not binding Owner hereunder with respect to such Mortgagee until such notice is given.  Any Assignment by Tenant of its interests in this Lease shall release Tenant from all obligations accruing after the date that liability for such obligations is assumed by Assignee, but only if Tenant has complied with the Owner notification requirements set forth in this Section 11.2.

11.3    Cure. Each Assignee that holds a full or partial interest in, or a sublease under this Lease, shall have the same amount of time following delivery of written notice of a default, to cure said default as is given to Tenant pursuant to this Lease.  If Tenant or an Assignee holds an interest in less than all of this Lease, the Property or the Project Facilities, any default under this Lease shall be deemed remedied, as to Tenant's or such Assignee's partial interest only (and Owner shall not disturb such partial interest), if

22

Tenant or Assignee, as the case may be, shall have cured its pro rata portion of the default by paying the fees attributable to the Agreement, the Property or Project Facilities in which Tenant or the Assignee, as the case may be, holds an interest.

11.4    <u>Division into Separate Agreements</u>.  Tenant may divide the Premises into two or more separate solar energy projects or phases of development if such division becomes necessary to further the development of the Project Facilities.  If Tenant elects to divide the Premises into two or more solar energy projects or phases of development, then Owner shall, within twenty (20) days after written request from Tenant, and without demanding any additional consideration, bifurcate this Lease by entering into and delivering to Tenant two stand-alone new leases (which shall supersede and replace this Lease) that provide Tenant with separate leasehold estates in different portions of the Property, as designated by Tenant.  Each of such new leases shall: (a) specify the portion(s) of the Premises to be covered thereby (and the term "Premises", as used therein, shall refer only to such portion(s)), (b) contain the same terms as this Lease (except for any requirements that have been fulfilled by Tenant, any Assignee, or any other person or entity prior to the execution of such new leases, and except for any modifications that may be required to ensure that Tenant's and Owner's respective combined obligations under such new leases do not exceed their respective obligations under this Lease) and be in a form reasonably acceptable to Tenant and Owner; (c) be for a term equal to the then-remaining term of this Lease; (d) contain a grant of access, transmission, communications, utility and other easements for the benefit of the bifurcated leasehold estates, covering such portion or portions of the Property as Tenant may designate (but only to the extent permitted in this Lease); (e) require payment to Owner of only an acreage-proportionate part of the amounts hereof; and (f) to the extent permitted by law, enjoy the same priority as this Lease over any lien, encumbrance or other interest against the Premises.

11.5    <u>Assignments by Owner</u>.  The burdens of this Lease, easements and other rights contained in this Lease shall run with and against the Property and shall be a charge and burden thereon for the duration of this Lease and shall be binding upon and against Owner and its successors and assigns.  Owner, or the successor-in-interest to Owner, shall notify Tenant in writing in advance of any sale, assignment or transfer of any of Owner's interest in the Property, or any part thereof.  Until such notice is received, Tenant shall have no duty to any successor owner, and Tenant shall not be in default under this Lease if Tenant continues to make all payments to the original Owner before notice of sale, assignment or transfer is received.

12.    **Mortgagee and Financing Party Protection**.  Any Mortgagee of Tenant's interests in this Lease or the Project Facilities, or any portion thereof, shall, for so long as its Mortgage is in existence and until the lien thereof has been extinguished, be entitled to the following protections, upon delivery to Owner of notice of its name and address:

12.1    <u>Mortgagee's Right to Possession, Right to Acquire and Right to Assign</u>. A Mortgagee shall have the absolute right: (a) to assign its security interest; (b) to enforce its lien and acquire title to the leasehold estate by any lawful means; (c) to take possession of and operate the Premises or any portion thereof and to perform all obligations to be performed by Tenant or Assignee under this Lease, or to cause a receiver to be appointed to do so; and (d) to acquire the leasehold estate by foreclosure or by an assignment in lieu of foreclosure and thereafter to assign or transfer the leasehold estate to a third party. Owner's consent shall not be required for: (i) the pledge, mortgage or hypothecation of Tenant's rights in this Lease, the Project Facilities, or Tenant or the(ii) acquisition of Tenant's or Assignee's leasehold estate by a third party who acquires the same by foreclosure or assignment in lieu of foreclosure.  As used in this Lease, (1) the term "**Mortgagee**" means any financial institution or other person or entity that from time to time provides financing for some or all of Tenant's or an Assignee's interest in this Lease or Project Facilities, collectively with any security or collateral agent, indenture trustee,  trustee or participating or syndicated party involved in whole or in part in such financing, and their respective representatives, successors and

assigns, (2) the term "**Mortgage**" refers to the mortgage, deed of trust or other interest in this Lease and/or the Project Facilities given to a Mortgagee in connection with a loan and credit agreement, equity investment, tax equity investment, notes, bonds, indentures, security agreements, lease financing agreements, interest rate exchanges, tax equity agreements or swap agreements and any other documents relating to the development, construction or the permanent financing for the Project Facilities, including any credit enhancement, credit support, working capital financing or refinancing documents, and (3) the term "**Mortgaged Interest**" refers to the interest in this Lease and/or the Project Facilities that is held by the Mortgagee, including the easements and other rights granted hereunder.

12.2    Notice of Default; Opportunity to Cure. As a precondition to exercising any rights or remedies as a result of any alleged default by Tenant or Assignee, Owner shall give written notice of the default to each Mortgagee concurrently with delivery of such notice to Tenant or Assignee, as applicable, specifying in detail the alleged event of default; provided, however, that such Mortgagee shall have provided Owner with its current address.  If Owner gives such a written notice of default, the following provisions shall apply:

(a)    A "**Monetary Default**" means failure to pay when due any rent or other monetary obligation of Tenant or Assignee to Owner under this Lease; any other event of default is a "**Non-Monetary Default**."  Monetary Defaults and Non-Monetary Defaults are collectively referred to as "**Defaults**".

(b)    The Mortgagee shall have the same period after receipt of notice of default to remedy the default, or cause the same to be remedied, as is given to Tenant or Assignee (if any), plus, in each instance, the following additional time periods: (i) sixty (60) days after receipt of the notice of default in the event of any Monetary Default; and (ii) ninety (90) days after receipt of the notice of default in the event of any Non-Monetary Default, provided that such period shall be extended for the time reasonably required to complete such cure, including the time required for the Mortgagee to perfect its right to cure such Non-Monetary Default by obtaining possession of the Project Facilities or the Premises (including possession by a receiver) or by instituting foreclosure proceedings, provided the Mortgagee acts with reasonable and continuous diligence. The Mortgagee shall have the absolute right to substitute itself for Tenant or any Assignee and perform the duties of Tenant or any Assignee under this Lease for purposes of curing such defaults. Owner expressly consents to such substitution, agrees to accept such performance, and authorizes the Mortgagee (or its employees, agents, representatives or contractors) to enter upon the Project Facilities or the Premises to complete such performance with all the rights, privileges and obligations of the Tenant or any Assignee. Owner shall not terminate this Lease prior to expiration of the cure periods available to a Mortgagee as set forth above or as provided under Section 11.  If Tenant or Mortgagee fails to cure any Default within the time periods specified above in this Section 12.2(b), then Owner may exercise all rights and remedies available to Owner under this Lease, but subject to the limitations set forth herein, including the limits set forth in Section 13.1 below.

(c)    During any period of possession of the Mortgaged Interest by a Mortgagee (or a receiver requested by such Mortgagee) and/or during the pendency of any foreclosure proceedings instituted by a Mortgagee, the Mortgagee shall pay or cause to be paid the rent and all other monetary charges payable by Tenant or any Assignee under this Lease which have accrued and are unpaid at the commencement of said period and those which accrue thereafter during said period.  Following acquisition of Tenant's or any Assignee's Mortgaged Interest by the Mortgagee or its assignee or designee as a result of either foreclosure or acceptance of an assignment in lieu of foreclosure, or by a purchaser at a foreclosure sale, this Lease shall continue in full force and effect and the Mortgagee or party acquiring title to the Mortgaged Interest shall, as promptly as reasonably possible, commence the cure of all defaults under this Lease and thereafter diligently process such cure to completion, whereupon Owner's right to terminate this Lease based upon such defaults shall be deemed waived; provided, however, the Mortgagee or party acquiring title to the Mortgaged Interest shall not be required to cure those non-monetary defaults which are not capable of being

cured or performed by such party ("**Non-curable Defaults**"). Non-curable Defaults shall be deemed waived by Owner upon completion of foreclosure proceedings or acquisition of interest in this Lease by such party.

(d)     Any Mortgagee or other party who acquires the Mortgaged Interest pursuant to foreclosure or assignment in lieu of foreclosure shall not be liable to perform the obligations imposed on Tenant or an Assignee by this Lease incurred or accruing after such party no longer has ownership of the leasehold estate or possession of the Premises.

(e)     Neither the bankruptcy nor the insolvency of Tenant or any Assignee shall be grounds for terminating this Lease as long as the rent and all other monetary charges payable by Tenant or Assignee under this Lease are paid by the Mortgagee in accordance with the terms of this Lease.

(f)     Nothing in this Lease shall be construed to extend this Lease beyond the Lease Term or to require a Mortgagee to continue foreclosure proceedings after the default has been cured. If the default is cured and the Mortgagee discontinues foreclosure proceedings, this Lease shall continue in full force and effect.

12.3     <u>New Agreement to Mortgagee</u>.  If this Lease terminates because of Tenant's or Assignee's default or if the Mortgaged Interest is foreclosed, or if this Lease is rejected or disaffirmed pursuant to bankruptcy law or other law affecting creditors' rights, then Owner shall, upon written request from any Mortgagee, enter into a new lease of the Premises, on the following terms:

(a)     The terms of the new agreement shall commence on the date of termination, foreclosure, or rejection, and shall continue for the remainder of the Lease Term of this Lease, at the same rent and subject to the same terms set forth in this Lease.  Such new agreement shall be subject to all existing subleases, provided the subtenants are not then in default.

(b)     The new agreement shall be executed within thirty (30) days after receipt by Owner of written notice of the Mortgagee's election to enter a new agreement, provided said Mortgagee: (i) pays to Owner all rent and other monetary charges payable by Tenant or Assignee, as applicable, under the terms of this Lease up to the date of execution of the new agreement, as if this Lease had not been terminated, foreclosed, rejected or disaffirmed, less the rent and other income actually collected by Owner from subtenants or other occupants of the Premises; and (ii) performs all other obligations of Tenant and/or Assignee under the terms of this Lease, to the extent performance is then due and susceptible of being cured and performed by the Mortgagee; and (iii) agrees in writing to timely perform, or cause to be performed, all non-monetary obligations which have not been performed by Tenant or any Assignee and would have accrued under this Lease up to the date of commencement of the new agreement, except those obligations which constitute Non-curable Defaults as defined above; and (iv) reimburses Owner for Owner's reasonable attorney fees incurred in reviewing the same. Any new agreement granted the mortgagee shall enjoy the same priority as this Lease over any lien, encumbrance or other interest created by Owner.

(c)     At the option of the Mortgagee, the new agreement may be executed by a designee of such Mortgagee without the Mortgagee assuming the burdens and obligations of the Assignee thereunder.

(d)     If more than one Mortgagee makes a written request for a new agreement pursuant hereto, the new agreement shall be delivered to the Mortgagee requesting such new lease whose Mortgage is prior in lien, and the written request of any other Mortgagee whose lien is subordinate shall be void and of no further force or effect. Owner shall be reimbursed all reasonable expenses incurred in determining whose Mortgage is prior in lien.

12.4     <u>Mortgagee's Consent to Amendment, Termination or Surrender</u>. Notwithstanding any provision of this Lease to the contrary, the Parties agree that so long as there exists an unpaid Mortgage, this Lease shall not be modified or amended, and Owner shall not accept a surrender of the Premises or any part thereof or a cancellation or release of this Lease from Tenant or Assignee prior to expiration of the Lease Term without the prior written consent of the Mortgagee. This provision is for the express benefit of and shall be enforceable by such Mortgagee,

12.5     <u>No Waiver</u>.  No payment made to Owner by a Mortgagee shall constitute an agreement that such payment was, in fact, due under the terms of this Lease; and a Mortgagee having made any payment to Owner pursuant to Owner's wrongful, improper, or mistaken notice or demand shall be entitled to the return of any such payment.

12.6     <u>No Merger</u>. There shall be no merger of this Lease, or of the leasehold estate created by this Lease, with the fee estate in the Property by reason of the fact that this Lease or the leasehold estate or any interest therein may be held, directly or indirectly, by or for the account of any person or persons who shall own the fee estate or any interest therein, and no such merger shall occur unless and until all persons at the time having an interest in the fee estate in the Property and all persons (including Mortgagee) having an interest in this Lease or in the estate of Owner or Assignee shall join in a written instrument effecting such merger and shall duly record the same.

12.7     <u>Third Party Beneficiary</u>. Each Mortgagee is and shall be an express third party beneficiary of the provisions of this <u>Section 12</u>, and shall be entitled to compel the performance of the obligations of Owner under this Lease.

12.8     <u>Further Amendments</u>. Provided that no material default in the performance of Tenant's obligations under this Lease shall have occurred and remain uncured after the expiration of all applicable notice and cure periods, at Tenant's request, Owner shall: (a) amend this Lease to include any provision that may reasonably be requested by an existing or proposed Mortgagee, or by any entity that is proposing to directly or indirectly acquire the Project Facilities, and (b) shall execute such additional documents as may reasonably be required to evidence such Mortgagee's or other entity's rights hereunder; provided, however, that such amendment shall not materially impair the rights of Owner under this Lease, or extend the Lease Term of this Lease beyond the period of time stated in <u>Section 4</u> of this Lease.  Further, Owner shall, within ten (10) business days after written notice from Tenant or any existing or proposed Mortgagee, execute and deliver thereto a certificate to the effect that Owner (i) recognizes a particular entity as a Mortgagee under this Lease and (ii) will accord such entity all the rights and privileges of a Mortgagee hereunder.

13.     **Termination**.

13.1     <u>Owner's Right to Terminate</u>.  Except as qualified by <u>Section 12</u>, Owner shall have the right to terminate this Lease if: (a) Tenant fails to make any payments due under this Lease and such failure to pay remains uncured after all applicable notice and cure periods, (b) Owner simultaneously notifies Tenant and all Mortgagees and Assignees in writing of the default, which notice sets forth in detail the facts pertaining to the default, and (c) the default shall not have been remedied within ninety (90) days after Tenant receives the written notice, or, if such cure cannot, with the exercise of commercially reasonable diligence, be completed within such period of time, Tenant has not begun to diligently undertake the cure within the relevant time period or to thereafter prosecute the cure to completion. OWNER SHALL HAVE ALL RIGHTS AND REMEDIES AVAILABLE TO OWNER AT LAW AND IN EQUITY (EXCEPT AS LIMITED BY THIS LEASE); PROVIDED HOWEVER, THAT NOTWITHSTANDING ANY OTHER PROVISION OF THIS LEASE OR ANY RIGHTS OR REMEDIES WHICH OWNER MIGHT OTHERWISE HAVE AT LAW OR IN EQUITY, WITH RESPECT TO ANY NON-MONETARY

DEFAULT UNDER THIS LEASE THAT IS NOT REMEDIED WITHIN THE TIME PROVIDED IN THIS LEASE, OWNER SHALL BE LIMITED TO SEEKING DAMAGES AND OWNER SHALL NOT (AND OWNER WAIVES THE RIGHT TO) COMMENCE ANY ACTION OR PROCEEDING IN WHICH TERMINATION, CANCELLATION, RESCISSION OR REFORMATION OF THIS LEASE IS SOUGHT AS A REMEDY.

(a)    Any and all rights and remedies that Owner may have under this Lease, and at law and equity, shall be cumulative and shall not be deemed inconsistent with each other. No delay or omission of Owner to exercise any right or power accruing upon the occurrence of any Default shall impair any other or subsequent Default or impair any rights or remedies consequent thereto. Every power and remedy given under this Lease or by law or in equity to Owner may be exercised from time to time, and as often as may be deemed expedient, by Owner. Nothing contained in this Lease shall, however, limit or prejudice the right of Owner to prove and obtain in proceedings for bankruptcy or insolvency by reason of the termination of this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when and governing the proceedings in which the damages are to be proved, whether such amount be greater, equal to, or less than the amount of the loss or damages allowed under this Lease. If any law shall validly limit the amount of any damages provided for herein to an amount which is less than the amount agreed to herein, Owner shall be entitled to the maximum amount available under such law.

(b)    Any consent or permission by Owner to any act or omission which otherwise would be a breach of any covenant or condition, or any waiver by Owner of the breach of any covenant or condition, shall not in any way be held or construed to operate so as to impair the continuing obligation of such covenant or condition, or otherwise operate to permit other similar acts or omissions. No breach shall be deemed to have been waived unless and until such waiver be in writing and signed by the other party. The failure of Owner to seek redress for violation of or insist upon the strict performance of any covenant or condition of this Lease, or the receipt by Owner of rent with knowledge of any violation, shall not be deemed a consent to or waiver of such violation, nor shall it prevent a subsequent act, which would otherwise constitute a violation, from in fact being a violation.

(c)    Owner shall notify Tenant in writing of the occurrence or existence of any Default under this Lease.   With respect to Monetary Defaults, Tenant shall have five (5) calendar days from receipt of notice to cure any such Monetary Default.   With regard to Non-Monetary Defaults, Tenant shall cure such Non-Monetary Default within thirty (30) days after written notice thereof from Owner.  If Tenant shall neglect or fail to perform or observe any covenant or condition of this Lease and shall not cure such Default within the applicable cure period, Owner may, at its option, without waiving any claim for breach, at any time thereafter cure such Default for the account of Tenant, and any amount paid or any liability incurred by Owner in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant shall reimburse Owner therefor, on demand; and Tenant shall further indemnify and save Owner harmless in the manner elsewhere provided in this Lease in connection with all of Owner's actions in effecting any such cure. Notwithstanding any other provision herein concerning cure periods, Owner may cure any Default for the account of Tenant after such notice to Tenant, if any, as is reasonable under the circumstances (including telephone notice) if the curing of such Default prior to the expiration of the applicable cure period is reasonably necessary to prevent likely damage to the Premises or other improvements or possible injury to persons, or to protect Owner's interest in the Property or the Premises. Tenant shall pay to Owner on demand all of the costs and expenses of Owner, including such reasonable legal fees, incurred in enforcing any covenant or condition of this Lease.

(d)    In the event Tenant breaches any covenant or fails to observe any condition set forth in Section 7 of this Lease with respect to the insurance required to be maintained by Tenant, then and without limiting any other right or remedy, and notwithstanding any other provision herein concerning notice and cure of defaults or Events of Default, Owner may immediately and without notice to Tenant

27

obtain such insurance, and Tenant shall pay the cost thereof and Owner's expenses related thereto upon demand.

13.2    Effect of Termination. Upon termination of this Lease by Owner pursuant to Section 13.1, Tenant shall execute and record, at Tenant's cost, a release to Owner of all of Tenant's right, title and interest in and to the Premises; and, subject to Section 13.3, shall surrender the Premises back to Owner.

13.3    Restoration. Upon any surrender, termination or expiration of this Lease, Tenant shall, within six (6) months or such longer period of time as may be required by any Governmental Authority, perform the decommissioning the Project Facilities, which shall include (collectively, "**Restoration Requirements**"): (a) the restoration of the surface of the Premises to a condition and contour reasonably similar to that existing on the Premises as of the Effective Date, (b) removal of all of Tenant's above-grade and below-grade Project Facilities and other equipment, (c) burying of all foundations below grade with topsoil, and (d) reseeding areas where the pads were located with grasses and/or natural vegetation. Any access roads constructed by Tenant may remain on the Property at Tenant's option, unless Owner specifically requests their removal in writing. It is understood that it would not be reasonable to expect that any structures and mature trees removed in conjunction with the Project Facilities be replaced. No Rent or monetary consideration of any kind shall be due during the Restoration period. All Easements shall continue for the time necessary to perform the Restoration Requirements. During the six (6) month period after surrender, termination or expiration of this Lease (such period, the "**Restoration Period**"), Tenant shall not be required to pay any rent. Provided, however, if Tenant has not completed all Restoration Requirements by the end of the Restoration Period, Tenant shall pay rent (in the same amount paid as the Operating Term Rent paid by Tenant during the one-year period prior to the surrender, termination or expiration of this Lease, the "**Post-Restoration Period Rent**") for the period commencing on the day after the end of the Restoration Period and continuing through the date that Tenant actually completes all such Restoration Requirements (the "**Actual Restoration Requirements Period**"). Any such Post-Operating Period Rent shall be due and payable by Tenant to Owner on the first day of each month at the pro-rated, monthly amount of the applicable Operating Term Rent amount.

13.4    Bonding Requirements. In addition to the requirements set forth in this Lease, Tenant shall comply with all Legal Requirements related to decommissioning and bonding requirements for the Project Facilities (including, without limitation and to the extent applicable, Md. Code, Public Utilities Article § 7-218(g)). If, subsequent to the execution of this Lease, Tenant is no longer required to post a bond or other security for the decommissioning of the Project Facilities under applicable Legal Requirements, then Tenant shall immediately comply with the following requirements: (a) Tenant shall post a surety bond with the Owner for not more than 125% of the estimated future cost of decommissioning the Project Facilities, less any salvage value (the "**Decommissioning Security**"); (b) Tenant shall execute a securitization bond true up every five (5) years after the date the surety bond in Section 13.4(a) is posted, and (c) Tenant shall maintain such Decommissioning Security in place for the remainder of the Operating Term during any period in which Tenant is not required to post a bond or other security for the decommissioning of the Project Facilities under applicable Legal Requirements.

(a)    If Tenant furnishes Decommissioning Security and Tenant performs its decommissioning obligations as set forth in Section 13.3 hereof, then Owner shall release the Decommissioning Security to Tenant. If Tenant fails to perform its decommissioning obligations under Section 13.3 hereof, then upon five (5) business days' prior written notice to Tenant, Owner shall be entitled to utilize the Decommissioning Security to perform the decommissioning the Project Facilities. After such removal and disposal by Owner, any excess amounts from Decommissioning Security shall be released to Tenant. Notwithstanding the security required to be provided by Tenant under Section 13.4 hereof, Tenant shall remain liable and obligated to remove the Project Facilities and all costs in connection with removal and disposal of the Project Facilities.

14. **Easements**.

14.1    <u>Grant of Access Easements</u>.  Subject to <u>Section 14.5</u> and upon the request of Tenant during the Lease Term, Owner shall grant to Tenant or any Affiliate, or any other entity designated thereby that is involved or intends to be involved in the Project Facilities development or operation, one or more separate, stand-alone, recordable and assignable non-exclusive easements on, under, over and across the Adjacent Property, for access to and from, and ingress to and egress from, the Project Facilities, whether the Project Facilities are located on the Premises or on any other lands owned or controlled by Owner (each, an "**Access Easement**").  Among other things, such Access Easements shall contain all of the rights and privileges for access, ingress, egress and roads as are set forth in this Lease.

14.2    <u>Grant of Transmission Easements</u>.  Subject to <u>Section 14.5</u> and upon the request of Tenant, during the Lease Term, Owner shall grant to Tenant or any Affiliate, or any other entity designated thereby that is involved or intends to be involved in the Project Facilities development or operation, one or more separate, stand-alone, recordable and assignable exclusive easements on, under, over and across designated portions of the Property for Transmission Facilities, including, without limitation, for Transmission Facilities that benefit Project Facilities located on any other lands (each, a "**Transmission Easement**").  Among other things, such Transmission Easements shall contain all of the rights and privileges for Transmission Facilities as are set forth in this Lease, and includes the right of access and ingress to and egress from the Transmission Facilities on, under, over and across the Property by means of roads and lanes thereon existing or by such route or routes as Tenant, such holder or any other person or entity may construct from time to time.

14.3    <u>Grant of Facility Easements</u>.  Subject to <u>Section 14.5</u> and upon the request of Tenant during the Lease Term, Owner shall grant to Tenant or any Affiliate, or any other entity designated thereby that is involved or intends to be involved in the Project Facilities development or operation, one or more separate, stand-alone, recordable and assignable exclusive easements on, under, over and across designated portions of the Property for Interconnection Facilities, including, without limitation, for Interconnection Facilities that benefit Project Facilities and Transmission Facilities located on any other lands (each, a "**Facility Easement**").  Among other things, such Facility Easements shall contain all of the rights and privileges for Interconnection Facilities as are set forth in this Lease, including, without limitation the right of access and ingress to and egress from the Interconnection Facilities on, under, over and across the Property by means of roads and lanes thereon existing or by such route or routes as Tenant, such holder or any other person or entity may construct from time to time.

14.4    <u>Grant of Solar Easement</u>.  Subject to <u>Section 14.5</u>, and upon the request of Tenant during the Lease Term, Owner shall grant to Tenant or any Affiliate thereof, or any other entity designated thereby that is involved or intends to be involved in the Project Facilities development or operation, one or more separate, stand-alone, recordable and assignable exclusive easements on, over, across, and above the Property for the use of the Project Facilities for maximum solar exposure and irradiance ("**Solar Easement**").

14.5    <u>Provisions Applicable to all Easements</u>.  The following provisions shall apply to each Access Easement, Transmission Easement, Facility Easement and Solar Easement (each, an "**Easement**"), and to the extent applicable shall be incorporated therein:

(a)    Each Easement shall be for a term that is coterminous with the Lease Term. Notwithstanding any other provision of this Lease, no Easement shall be terminable by Owner upon a default under this Lease, unless there is also an uncured default by the holder of the Easement under such Easement.

(b)     Each Easement shall run with the Property, and shall inure to the benefit of and be binding upon Owner and the holder of such Easement, and their respective transferees, successors and assigns, and all persons claiming under them.

(c)     The holder of each Easement shall have the right, without the need for Owner's consent, and Owner hereby grants consent to Tenant, to freely hypothecate, mortgage, or finance such Easement on an exclusive or non-exclusive basis (including by mortgage, deed of trust or personal property security instrument) to any Mortgagee as security for the repayment of any indebtedness and/or the performance of any Mortgage, grant co-tenancy interests in such Easement, grant sub-easements under such Easement, or sell, convey, lease, assign, mortgage, encumber or transfer such Easement.

14.6    <u>Grant to Utility</u>. Tenant, in its sole discretion and without further act of Owner, shall have the right to grant to the transmitting utility the right to construct, operate and maintain on the Premises an electric substation and interconnection and switching facilities, pursuant to any lease, easement or other agreement used or proposed by the utility.  If requested by such utility or Tenant, Owner shall, for no additional consideration other than the Rent set in this Lease and within fifteen (15) days after such request, grant such easement, or enter into such other agreement, directly to or with such utility.  Tenant and Owner shall cooperate with transmitting utility to determine a mutually acceptable location for each substation.

15.    **Condemnation**.

15.1    <u>Taking</u>.  If all or part of the Property is proposed to be taken as a result of any action or proceeding in eminent domain, or is proposed to be transferred in lieu of condemnation to any authority entitled to exercise the power of eminent domain (collectively, "**Taking**"), Owner shall provide Tenant with reasonable advance notice of any impending proceeding or meeting related to such Taking and shall not in the absence of Tenant settle with the Taking authority or agree on compensation for such Taking. This Lease shall terminate as to any portion of the Property so condemned or taken (except in the case of a temporary Taking after the duration of which Tenant desires to continue this Lease, and the Lease Term shall be extended, in such event, by the duration of such temporary Taking).  Owner shall diligently work with Tenant to relocate any easements granted hereunder that are impacted by a Taking.  Tenant shall have the right to terminate this Lease if the Tenant determines, in its sole discretion, that a Taking has substantially impaired the Project Facilities, its construction or operations.

15.2    <u>Award</u>.  Subject to any applicable law or regulation, if any, any award or other compensation ("**Award**") payable as a consequence of such Taking shall be paid as follows:

(a)     Owner shall first be entitled to receive out of the Award the value of Owner's fee interest in the Property, valued as if no Project Facilities were on the Property;

(b)     Tenant shall next be entitled to receive out of the Award: (i) the value of the Project Facilities; (ii) any other compensation or benefits payable by law as a consequence of the loss or interruption of Tenant's business and the other costs incurred by Tenant as consequence of the Taking; and (iii) the remaining present value of Tenant's interest in the Property (determined at the time of the Taking), including the value of Tenant's interests under this Lease;

(c)     Owner shall then be entitled to receive out of the Award, taking into account the leasehold and easement estates created by this Lease, the estimated amounts that would have been paid to date of condemnation by Tenant hereunder; and

(d)     Owner shall be entitled to any remainder of the Award.

16.     **Force Majeure**.  If performance of this Lease or of any obligation under this Lease is prevented or substantially restricted or interfered with by reason of an event of Force Majeure (defined below), the affected party, upon giving notice to the other party, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference and the Lease Term shall be extended on a day for day basis for the duration of the Force Majeure event; provided, however, that nothing in this Section shall relieve Tenant of its obligations to pay any Rent amounts or other monetary obligation payable to Owner pursuant to this Lease. The affected party shall use its reasonable efforts to avoid or remove such causes of non-performance, and shall continue performance under this Lease whenever such causes are removed.  "**Force Majeure**" means flood, drought, earthquake, storm, fire, tornado, lightning, windstorm, unusually inclement weather or other natural catastrophe; pandemic; acts of God, casualty or accident; war, sabotage, vandalism, civil strife or other violence; strikes or labor disputes; any law, order, proclamation, regulation, ordinance, action, demand or requirement of any government agency or utility; a Regulatory Suspension (defined below); any delay in the issuance of any permit or approval necessary for the construction or operation of the Project Facilities beyond the time periods reasonably anticipated to obtain such permit or approval, litigation challenging the validity or content of any permit or approval necessary for the construction or operation of the Project Facilities; litigation by Owner, nearby landowners or third party interest groups challenging the validity or content of this Lease or any aspect of the Project Facilities; or any other act or condition beyond the reasonable control of a party hereto. A "**Regulatory Suspension**" shall mean the application of any local, state or federal law, order, rule, regulation or legal action which results in the delay, interruption, or suspension of the: (a) construction of the Project Facilities; or transmission(b), production or sale of electricity from the Project Facilities.

17.     **Miscellaneous Provisions**.

17.1     Notice of Lease. Owner and Tenant shall execute in recordable form and Tenant may then record a Memorandum of Lease and Easements substantially in the form attached to this Lease as Exhibit C.  Owner consents to the recordation of the interest of an Assignee in the Premises. The notice will be recorded by Tenant, at Tenant's sole cost, with the applicable Land Records in all counties in which the Property is located.  If requested by Tenant, Owner will execute amendment(s) to the Memorandum of Lease and Easements to include any updated descriptions of the Premises upon construction of the Project Facilities or if otherwise necessary in Tenant's reasonable discretion.  Tenant shall be entitled to, and is hereby authorized to, file one or more precautionary financing statements (and any amendments thereto), naming Owner as the party of record, in such jurisdictions as Tenant deems appropriate with respect to the Project Facilities in order to protect Tenant's rights in the Project Facilities or in connection with the grant of a security interest in the Project Facilities to any Mortgagee.

17.2     Notices.  All notices or other communications required or permitted by this Lease, including payments to Owner, shall be in writing and shall be deemed given when personally delivered to Owner, Tenant or an Assignee, if applicable, or in lieu of such personal service, five (5) business days after deposit in the United States mail, first class, postage prepaid, certified, or the next business day if sent by reputable overnight courier, provided receipt is obtained and charges prepaid by the delivering party, unless provided to the contrary in this Lease. Any notice shall be addressed to the Parties at the addresses set forth in the Basic Terms Summary.  Any Party may change its address for purposes of this Section by giving written notice of such change to the other parties in the manner provided in this Section.

17.3     Entire Agreement; Amendments. This Lease constitutes the entire agreement between Owner and Tenant respecting its subject matter. Any other agreement, understanding or representation respecting the Premises or any other matter not expressly set forth in this Lease or a subsequent writing signed by both parties is null and void.  This Lease shall not be modified or amended except in a writing signed by both Parties.  No purported modifications or amendments, including without limitation any oral

31

agreement (even if supported by new consideration), course of conduct or absence of a response to a unilateral communication, shall be binding on either Party.

17.4    <u>Further Assurances</u>.  Upon the receipt of a written request from the other Party, each Party shall execute such additional documents, instruments and assurances and take such additional actions as are reasonably necessary and desirable to carry out the terms and intent of this Lease, including any such documents as may be requested by a Mortgagee.  Neither Party shall unreasonably withhold, condition or delay its compliance with any reasonable request made pursuant to this Section.

17.5    <u>Governing Law</u>. This Lease shall be governed by and interpreted in accordance with the laws of the State of Maryland, without regard to any conflicts of law principles.  Venue shall be proper in the county where the Property is located.  If the Parties are unable to resolve amicably any dispute arising out of or in connection with this Lease, they agree that such dispute shall be resolved in the state courts located in the county in which the Property is located.  The Parties agree that any rule of construction to the effect that ambiguities are to be resolved in favor of either Party shall not be employed in the interpretation of this Lease and is hereby waived.

17.6    <u>Partial Invalidity</u>.  Should any provision of this Lease be held, in a final and un-appealable decision by a court of competent jurisdiction, to be either invalid or unenforceable, the remaining provisions hereof shall remain in full force and effect, unimpaired by the holding. Notwithstanding any other provision of this Lease, the Parties agree that in no event shall the Lease Term of this Lease or any Easement be longer than, respectively, the longest period permitted by applicable law.

17.7    <u>Tax Credits</u>. If under applicable law the holder of any interest under this Lease at any point becomes ineligible for any tax credit, benefit or incentive for alternative energy expenditure established by any Governmental Authority (including, without limitation, during the 5-year recapture period following the Commercial Operations Date), then, at Tenant's option, Owner and Tenant shall amend this Lease or replace it with a different instrument so as to convert Tenant's interest in the Property to a substantially similar interest that makes Tenant eligible for such tax credit, benefit or incentive; provided, however, that nothing in this Lease shall entitle Tenant to a fee interest in the Property, diminish Tenant's payment obligations under this Lease or extend the Lease Term of this Lease.

17.8    <u>Cooperation</u>. Owner shall cooperate with Tenant and its permitted successor, assignee or Affiliate in the conduct of their operations of the Project Facilities,  use of the Easements,  and in otherwise giving effect to the purpose and intent of this Lease, including, without limitation, in Tenant's or any permitted successor, assignee or Affiliate's efforts to obtain from any Governmental Authority or any other person or entity any environmental impact review, permit, entitlement, approval, authorization or other rights necessary or convenient in connection with Tenant's Project Facilities; and Owner shall promptly upon request, without demanding additional consideration therefore, execute, and, if appropriate, cause to be acknowledged and recorded, any map, application, document or instrument that is reasonably requested by Tenant, its permitted successor, assign or Affiliate in connection therewith.  Without limiting the generality of the foregoing, Owner agrees: (a) if requested by Tenant or its permitted successor, assign or Affiliate to support such application by filing a letter with the appropriate Governmental Authority in a form reasonably satisfactory to Tenant or its permitted successor, assign or Affiliate, and (b) not to oppose, in any way, whether directly or indirectly, any such valid, accurate application or approval at any administrative, judicial or legislative level. Tenant shall indemnify and hold Owner harmless with respect to any such application.

17.9    <u>Relationship</u>. Neither this Lease nor any other agreements or transactions contemplated in this Lease shall in any respect be interpreted, deemed or construed as constituting Owner, Tenant as partners or joint venturers, or as creating any partnership, joint venture, association or other relationship other than

of landlord and tenant; and Owner and Tenant agree not to make any contrary assertion, contention, claim or counterclaim in any action, suit or other proceeding involving either Owner and/or Tenant or the subject matter of this Lease.

17.10    Captions. The captions used in this Lease are for convenience and ease of reference only and do not limit or amplify the provisions hereof.

17.11    Joint and Several Liability. The obligations under this Lease imposed upon Owner shall be joint and several obligations of the individuals or entities comprising Owner.

17.12    WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY LAW, KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS THAT THEY MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE OR ANY TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO. IT IS INTENDED THAT THIS WAIVER SHALL APPLY TO ANY AND ALL CAUSES OF ACTION, DEFENSES, RIGHTS, CLAIMS AND/OR COUNTERCLAIMS, WHETHER IN CONTRACT, TORT OR OTHERWISE, IN ANY SUCH ACTION OR PROCEEDING.  THE PARTIES UNDERSTAND THAT THIS WAIVER IS A WAIVER OF A CONSTITUTIONAL SAFEGUARD, AND THE PARTIES BELIEVE THAT THERE ARE SUFFICIENT ALTERNATE PROCEDURAL AND SUBSTANTIVE SAFEGUARDS, INCLUDING A TRIAL BY AN IMPARTIAL JUDGE, THAT ADEQUATELY OFFSET THE WAIVER CONTAINED HEREIN.

17.13    Binding Effect.  The terms of this Lease, and the respective rights and obligations hereunder of each Party, shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and permitted assigns.

17.14    Attorneys' Fees. The prevailing Party in any action or proceeding for the enforcement, protection, or establishment of any right or remedy under this Lease or for the interpretation of this Lease shall be entitled to recover its reasonable attorneys' fees and court costs in connection with such action or proceeding from the non-prevailing Party.

17.15    Brokerage Commissions. Tenant and Owner hereby warrant to each other that they have had no dealings with any broker or agent in connection with the negotiation of this Lease and that they know of no other broker or agent who is entitled to a commission, consultant's fee, facilitation fee, or its equivalent in connection with this Lease.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims with respect to any commission or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any broker or agent. The terms of this Section shall survive the expiration or earlier termination of the Lease Term.

17.16    Counterparts. This Lease may be executed with counterpart signature pages and in duplicate originals, each of which shall be deemed an original, and all of which together shall constitute a single instrument. This Lease may be transmitted via facsimile or other similar electronic means and a signature of the undersigned transmitted via such means shall be deemed an original signature for all purposes and have the same force and effect as a manually-signed original.

17.17    Business Days.  Time shall be of the essence with this Lease, but if the last day for a Party to exercise a right or perform a duty hereunder is a Saturday, Sunday or any day observed by the State of Maryland as a legal holiday ("**Legal Holiday**"), it shall have until the next day other than such a day to do so.  In calculating any period of time pursuant to this Lease, the day of the act or event from which the

designated period of time begins to run shall not be included in the calculation of such period of time. Except for certain references made herein to "business days" which shall be construed as meaning each day except a Saturday, Sunday or Legal Holiday, all references to "days" herein shall mean calendar days.

17.18    Tenant Contribution to Owner Costs.  Tenant will reimburse Owner for a total of up to TWO HUNDRED THOUSAND DOLLARS ($200,000) in documented third-party expenses incurred by the Owner in reviewing, negotiating and entering into this Lease or related to the approval or construction of the Project Facilities, which may include, without limitation, legal fees, Permit costs, engineering expenses, the costs of retaining consultants and advisers, and accounting fees, but excluding the costs of Owner's own employees and in-house counsel (collectively, the "**Owner Costs**").  Owner may submit requests for reimbursement from time to time (but not more than once per month) after the Construction Commencement Date and prior to the Commercial Operations Date, which requests shall include reasonable back-up documentation of the expenses to be reimbursed.  Tenant shall make such reimbursements within thirty (30) days after receipt of each request.  Tenant shall not be required to reimburse any such expenses incurred after the Commercial Operations Date, or if the Construction Commencement Date does not occur.

17.19    Owner's Bankruptcy Proceeding.

(a)    This Lease shall be expressly contingent upon the occurrence of either of the following: (a) no objections being filed to this Lease by the deadline for filing such objections as set forth in the Notice of Disposition (as such objection deadline may be modified by the Bankruptcy Court or agreement of the parties in the Bankruptcy Case) (the "**Objection Deadline**"); or (b) if an objection to this Lease is filed in the Bankruptcy Case by any person by the Objection Deadline, and such objection (i) is withdrawn by such objector or resolved by the Owner to the satisfaction of Owner and Tenant, or (ii) is overruled or dismissed by a decision or order entered by the Bankruptcy Court to the satisfaction of Owner and Tenant, and any applicable appeal period has expired (the occurrence of (i) or (ii) being collectively referred to as a "**Lease Consent**").  If an objection is timely filed to this Lease and the Bankruptcy Court enters an order sustaining an objection to this Lease (an "**Objection Order**"), or no Lease Consent is obtained within sixty (60) days after such objection is filed, then this Lease shall automatically terminate on the earlier to occur of the expiration of such 60-day period or the date that such Objection Order becomes a non-appealable order, whereupon neither Owner nor Tenant shall have any further obligations to each other under this Lease.

(b)    Owner agrees to provide such further assurances and to execute and deliver such additional documents and take such other actions as are reasonably requested by Tenant to confirm the on-going validity of this Lease and the rights conferred herein against claims asserted by the parties in the Bankruptcy Case or otherwise arising under the Bankruptcy Case, and Owner will not take or consent to any action under the Bankruptcy Case that would adversely affect this Lease or the rights conferred herein.

(c)    If any matter related to or arising from the Bankruptcy Case, or any derivative matter or case (including, without limitation, any objection to the Notice of Disposition, or any filing, objection, claim, hearing, order, ruling, appeal or other matter) (each a "**Bankruptcy Matter**"), prevents, substantially restricts or interferes with performance of this Lease or of any obligation under this Lease, then such matter shall be Force Majeure event for all purposes under this Lease, and Tenant shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference and the Lease Term shall be extended on a day for day basis for the duration of the Bankruptcy Matter. Notwithstanding the foregoing, Landlord's obligations under this Lease shall not be excused or suspended as a result of any Bankruptcy Matter.

34

(d)      If any Bankruptcy Matter would (i) materially increase the cost of the installation or operation of the Project Facilities, or materially decrease the benefits of this Lease to Tenant; (ii) materially increase the cost of any financing to be obtained by Tenant in connection with the Lease or the Project Facilities; or (iii) introduce reasonable and substantial doubt as to whether Tenant will receive the full benefit of this Lease for the entire Term (including Extension Terms), the Tenant may, by written notice to Owner, elect to terminate this Lease in which event the Exclusivity Period Rent and all Owner Costs paid by Tenant shall be reimbursed by Owner to Tenant.  Provided, however, that if Tenant terminates this Lease pursuant to Section 17.9, Tenant shall remain obligated to comply with the decommissioning requirements set forth in Sections 13.4 and 13.4.1, which provisions shall survive the termination or expiration of this Lease.

17.20    <u>Survival</u>.  The terms of Sections 9.3, 10, 12.2, 13.4, 13.4.1 and 17.18 hereof shall survive the expiration or earlier termination of the Lease.

[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the Parties have caused this Lease to be executed and delivered by their duly authorized representatives as of the Effective Date.

**OWNER**:

Roman Catholic Archbishop of Baltimore, a corporation sole

By:_____
Name:
Title:

**TENANT**:

CI Renewables IV Holdco LLC

By:_____
Name:
Title:

## **EXHIBIT A1**

Legal Description of the Property

## **<u>EXHIBIT A2</u>**

Legal Description of the Premises

*[Pursuant to the terms of the Lease, the legal description of the Premises contained in this Exhibit A2 shall, upon Tenant's request, be replaced with a more detailed legal description approved by Tenant and its title company or surveyor]*

*Areas contained within the red shapes below are to be refined and eliminated from the leased premises upon environmental review and survey.*

## **EXHIBIT A3**

### **Maintenance Area**

## <u>EXHIBIT B</u>

Liens and Third Party Rights

1. Lease Agreement by and between Roman Catholic Archbishop of Baltimore, a corporation sole and Brandon Troy, dated January 1, 2025.  The term of this lease commences on April 1, 2025 and ends on December 31, 2025.  Owner does not intend to renew or extend this lease beyond December 31, 2025.

**EXHIBIT C**

Memorandum of Lease and Easements Form

Memorandum of Lease and Easements

After Recording, Return To:

_____

_____

_____

Attn: _____

_____

(Space Above for Recorder's Use Only)

MEMORANDUM OF LEASE AND EASEMENTS

      This Memorandum of Lease and Easements ("Memorandum") is made and dated as of _____, 2025 ("Effective Date") by and among Roman Catholic Archbishop of Baltimore, a corporation sole ("Owner") and CI Renewables IV Holdco LLC, a Maryland limited liability company ("Tenant").

      Owner and Tenant entered in that certain Solar Energy Lease and Easement Agreement, dated _____, 2025 ("Lease"), pursuant to which Owner has leased to Tenant a portion of the certain real property of Owner located in Baltimore County, Maryland, as more particularly described on the attached Exhibit A-1, incorporated herein and made a part hereof (the "Property"), which lease portion is shown on the attached Exhibit A-2 (the "Leased Premises"). Owner and Tenant have executed and acknowledged this Memorandum for the purpose of providing constructive notice of the Lease. Capitalized terms not otherwise defined in this Memorandum shall have the meanings provided in the Lease.

NOW THEREFORE, Owner and Tenant hereby agree as follows:

1.    Lease of Leased Premises; Easements. Owner has granted and leased the Leased Premises to Tenant, together with certain easements, on the terms stated in the Lease. Tenant shall have the exclusive right to use the Leased Premises for any lawful purpose as described in the Lease, together with all solar rights, all rights of ingress and egress, and all other rights and easements appurtenant to the Leased Premises. Reference is hereby made to the Lease for a complete description of the respective rights and obligations of the parties regarding the Leased Premises, the easements, and the covenants, conditions, and restrictions affecting the Leased Premises pursuant to the Lease.

2.    Information - 3-101(e) Requirements. Owner and Tenant have executed this Memorandum in accordance with Section 3-101(e) of the Real Property Article of the Annotated Code of Maryland for the

purpose of submitting it to be recorded among the Land Records of Baltimore County, Maryland and furnish the following information:

      A.     NAMES OF THE PARTIES:

Owner: Roman Catholic Archbishop of Baltimore, a corporation sole

Tenant: CI Renewables IV Holdco LLC

      B.     THE ADDRESSES OF THE PARTIES:

Owner's Address:

_____

_____

_____

Tenant's Address:

2 Village Square, Suite 252
Baltimore, Maryland 21210

      C.     REFERENCE TO THE LEASE:

The Lease was executed by and between Owner and Tenant as of _____.

      D.     THE PREMISES AS SET FORTH IN THE LEASE IS MORE FULLY DESCRIBED ON EXHIBIT A-2 ATTACHED HERETO AND MADE A PART HEREOF.

      E.     TERM OF THE LEASE:

Effective Date:  The Lease shall commence on _____.

The Lease contains two (2) terms that consecutively follow each preceding term as set forth below:

(i)    Exclusivity Period: Begins on Effective Date of Lease and continues for twenty-four (24) months thereafter.  The Exclusivity Period shall automatically be extended upon the commencement of the construction of the Project Facilities to the date that is twenty-four (24) months after the commencement of the construction of the Project Facilities.  Prior to commencement of construction, the Exclusivity Period may also be extended by Tenant up to two (2) consecutive periods of three (3) months each.  The total Exclusivity Period may not extend more than seven (7) years after the Effective Date of Lease.

(ii)    Operating Term: Begins when Tenant provides notice to Owner during the Exclusivity Period that Tenant intends to extend the Lease through the Operating Term. The Operating Term, if exercised, is for a period of five (5) years beginning on the Commercial Operations Date.  The Operating Term may be extended by Tenant by up to three (3) consecutive renewal periods consisting of five (5) years each renewal period.  In addition, the Operating Term may be extended by mutual

agreement of Owner and Tenant by up to two (2) additional consecutive renewal periods consisting of five (5) years each renewal period.

4.      <u>Ownership</u>.  Owner shall have no ownership or other interest in any Improvements (as defined in the Lease) installed on the Leased Premises.

5.      <u>Assignment</u>.  The Lease provides, among other things, that Tenant and any Assignee shall have the right, subject to certain conditions set forth in the Lease, to sell, convey, lease, assign, mortgage, encumber or transfer to one or more Assignees or Mortgagees the Lease, or any right or interest in the Lease, or any or all right or interest of Tenant in the Leased Premises, or any portion thereof, or in any or all of the Improvements that Tenant or any other party may now or hereafter install on the Leased Premises.

6.      <u>Successors and Assigns</u>.  This Memorandum and the Lease shall burden the Leased Premises and shall run with the land.  The Lease and this Memorandum shall inure to the benefit of and be binding upon Owner and Tenant and, to the extent provided in any assignment or other transfer under the Lease, any Assignee or Mortgagee, and their respective heirs, transferees, successors and assigns, and all persons claiming under them.

7.      <u>No Conflict</u>.  In the event of any conflict or inconsistency between the terms of this Memorandum and the terms of the Lease, the terms of the Lease shall control.  Nothing in this Memorandum shall be deemed to amend, modify, change, alter, amplify, limit, interpret or supersede any provision of the Lease or otherwise limit or expand the rights and obligations of the parties under the Lease and the Lease shall control over this Memorandum in all events.

8.      <u>Multiple Counterparts</u>.  This Memorandum may be executed by different parties on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall constitute one and the same instrument.

[SIGNATURES PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Memorandum as of the Effective Date.

**OWNER:**

**Roman Catholic Archbishop of Baltimore, a corporation sole**

By:

Name:

Title:

**TENANT:**

**CI Renewables IV Holdco LLC**

By:

Name:

Title:

[Acknowledgments Appear on Following Page]

**OWNER ACKNOWLEDGMENT**

STATE OF MARYLAND,

COUNTY OF _____, to wit:

I HEREBY CERTIFY that on this _____, 2025, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, a _____, and that he/she, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing, in my presence, the name of the said _____.

WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission Expires:_____

**TENANT ACKNOWLEDGMENT**

STATE OF MARYLAND,

COUNTY OF _____, to wit:


I HEREBY CERTIFY that on this _____, 2025, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, a _____, and that he/she, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing, in my presence, the name of the said _____.

WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission Expires:_____


ATTORNEY CERTIFICATION

    This is to certify that the within instrument was prepared by or under the supervision of the undersigned, an attorney duly admitted to practice before the Supreme Court of Maryland.


_____

EXHIBIT A-1

to

Memorandum of Lease

Legal Description of the Property

EXHIBIT A-2

to

Memorandum of Lease


Plan of the Leased Premises

EXHIBIT D

Notice of Debtor's Disposition of Leased Property

# EXHIBIT B

1.      Nothing in the Belfast Lease or the related transaction(s) (the "Solar Lease Transaction") shall materially impact:

    a.  The nature and/or ability of the real property that is subject to the Belfast Last (the "Leased Property") to be fully alienable, transferable and/or assignable, to the same extent that existed as of the commencement of the Belfast Lease.

    b.  Without the Debtor or Committee making any admissions or waiving any arguments, the Debtor shall place the proceeds from the Solar Lease Transaction into an interest-bearing account until further order of the Court.

    c.  During the pendency of this Chapter 11 case, the Solar Lease and/or title to the Lease Property shall not be materially altered, amended, modified, assigned, transferred, or otherwise changed without further notice to the Committee..

2.      The Debtor will promptly disclose to the Committee, all real estate agents, consultants, accountants, investment bankers, or any other professional engaged by the Debtor, to value, market, lease, sell, or otherwise transfer any real property in which the Debtor holds any legal or equitable title, since the petition date.

3.      The Debtor will promptly disclose all completed, pending, or other transactions where marketing, listing, or development is ongoing, for the sale, lease, use (but only to the extent that the proposed use is a change in nature of the current use of the real property, or would alienate the property), or transfer of any real property in which the Debtor holds any legal or equitable title (to the extent not already previously disclosed to the Committee). For the avoidance of doubt, the preceding sentence applies to the Debtor's equitable title only to the extent that the Debtor has discretion, approval, and/or consent rights as to the disposition of any such equitable interest.

4.      The Debtor will promptly seek to employ under Section 327 or 328 (as applicable) of the Bankruptcy Code any real estate agents, consultants, accountants, investment bankers, or any other professional engaged since the petition date to work on the Debtor's behalf. If the Debtor intends to employ any real estate agent, consultant, accountant, investment banker or other professional that it believes is a person who may be employed as an "ordinary course professional" in accordance with the Order Authorizing the Debtor to Employ Professionals Used in the Ordinary Course of Business [Dkt. 179] (the "Order"), the Debtor will (i) notify the Committee of the intention to engage such a professional at least five (5) business days prior to filing the requisite Declaration and Disclosure Statement required in accordance with the Order, (ii) as part of such notice, provide the Committee a statement of the basis or all bases for the Debtor's conclusion that the professional at issue can properly be retained in the ordinary course, and (iii) meet and confer with the Committee regarding any disagreement over the ordinary course nature of the professional at issue prior to making any filing with the Court seeking the retention.

5.     The Debtor will promptly consult with the Committee regarding the sale, lease, use (but only to the extent that the proposed use is a change in nature of the current use of the real property, or would alienate the property), or transfer of any real property in which the Debtor holds any legal or equitable title. For the avoidance of doubt, the preceding sentence applies to the Debtor's equitable title only to the extent that the Debtor has discretion, approval, and/or consent rights as to the disposition of any such equitable interest.

6.     The Debtor will provide the Committee with copies of all offers, proposals, letters of intent, or any similar documents within 3 business days after the Debtor receives any such material regarding real property in which the Debtor holds any legal or equitable title. For the avoidance of doubt, the preceding sentence applies to the Debtor's equitable title only to the extent that the Debtor has discretion, approval, and/or consent rights as to the disposition of any such equitable interest.

7.     For any transaction identified in any of the paragraphs above, upon a written request by the Committee, the Debtor will provide the Committee with copies of all data and documents provided to or by the transaction counterparty within 3 business days after any such written request. If so requested by the Committee, the Debtor will further provide any non-privileged written correspondence with the transaction party within a reasonable time following the Committee' request.

8.     The Debtor shall provide a copy of this Stipulation to all of its attorneys, real estate consultants, advisors, accountants, and other professional persons whether now employed or retained in the future in this chapter 11 case.

9.     Regarding the above-described transactions, the Committee will deem any such information received as "Confidential Material" under the Court's confidentiality order if so requested by the transaction counterparty, but shall not be required to execute any further agreement regarding confidentiality or non-disclosure.

10.    This Stipulation fully resolves the Committee's objection to the Solar Lease Transaction.

11.    This Stipulation shall be a material part of the order approving the Solar Lease Transaction and shall be attached as an exhibit thereto.

# EXHIBIT C



CIVIL ENGINEERS – LAND SURVEYORS

DESCRIPTION OF

RIGHT-OF-WAY DEDICATION
TO
ANNE ARUNDEL COUNTY
DEPARTMENT OF PUBLIC WORKS

BEING A PART OF THE PROPERTY OF
THE ROMAN CATHOLIC CHURCH
ARCHBISHOP OF BALTIMORE
LIBER RPD 01660 AT FOLIO 00512

TAX MAP 0015, GRID 0022, PARCEL 0696
TAX ACCOUNT NO. 04-000-01043356

Fourth (4th) ASSESSMENT DISTRICT
ANNE ARUNDEL COUNTY, MARYLAND

BEING a piece or parcel of land, hereinafter being described by metes and bounds, being a part of the same property acquired by THE MOST REVEREND LAWRENCE J. SHEHAN, ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, by deed dated May 28, 1963 and recorded among the Land Records of Anne Arundel County, Maryland in LIBER LNP 1660 at FOLIO 512, being more particularly described in the datum of NAD 83, as follows;

BEGINNING for the same at a point on the southerly Right of Way line of Stevenson Road, said point being the northeastern most corner of Parcel 696R as shown on a plat entitled ADMINISTRATIVE LOT LINE CHANGE – LANDS OF ROMAN CATHOLIC ARCHBISHOP AND MELVIN L. UPTON, ET AL recorded among the Land Records of Anne Arundel County, Maryland in Plat Book 252, Page 45, Plat 13172, thence departing said POINT OF BEGINNING, so fixed, and running

1.  South 25°03'33" West, 14.04 feet to an Iron Pipe Found, thence

2.  North 64°25'36" West, 437.50 feet to a point, thence

3.  North 25°03'33" East, 15.72 feet to a point on the existing Right of Way line of Stevenson Road, thence

4.  South 64°12'24" East, 437.52 feet to the Point of Beginning

CONTAINING 6,510 square feet or 0.15 acre of land, more or less.

Subject to all covenants, easements, Rights-of-Way and/or restrictions of record.

Archbishop Spaulding ROW Dedication
Part of Tax Parcel 0696
2/28/2025
Page 2

No Title Search provided to, or performed by this firm in connection with the preparation of this description.

5/20/2025  |  10:26

2/28/2025
_____
Date

_____
Jeffrey M. Blachly
Professional Land Surveyor
MD Reg. No. 22098 (Exp May 13, 2026)
Drum Loyka and Associates, LLC

*A licensee either personally prepared this metes and bounds description or was in responsible charge over its preparation and the surveying work reflected in it, all in compliance with requirements set forth in COMAR, title 09, Subtitle 13, Chapter 06 Minimum Standards of Practice*



# Exhibit "B"

Surveyor's name and address:
JEFFREY M. BLACHLY
PROF. LAND SURVEYOR
MD REG. No. 22098
(EXPIRES MAY 13, 2026)
DRUM LOYKA & ASSOC. LLC
1410 FOREST DRIVE, SUITE 35
ANNAPOLIS, MARYLAND 21403

5/20/2025  |  10:26 EDT

"A LICENSED EITHER PERSONALLY PREPARED THIS PLAT OR WAS IN RESPONSIBLE CHARGE OVER IT'S PREPARATION AND THE SURVEYING WORK REFLECTED IN IT, ALL IN COMPLIANCE WITH REQUIREMENTS SET FORTH IN COMAR, TITLE 09, SUBTITLE 13, CHAPTER 06 MINIMUM STANDARDS OF PRACTICE"

## VICINITY MAP
SCALE: 1" ≅ 2,000'

SEE INSET SHEET 2

PARCEL 0696
N/F LAWRENCE J. SHEHAN ROMAN CATHOLIC
ARCHBISHOP OF BALTIMORE
LIBER 01660 FOLIO 00512
TAX MAP 0015 GRID 0022 PARCEL 0696
TAX ACCT. NO. 04-000-01043356
801 STEVENSON ROAD
SEVERN, MARYLAND 21144

## OVERALL LOCATION PLAN
SCALE: 1" = 500'

0   250   500   1000

## LEGEND

| | |
|---|---|
| ———— | PROPERTY LINE |
| ▨ | RIGHT-OF-WAY DEDICATION AREA (FEE SIMPLE) |
| R-O-W | RIGHT-OF-WAY |
| N/F | NOW OR FORERLY |
| P.O.B. | POINT OF BEGINNING |
| BNCF | BAR & CAP FOUND |
| MON. FD. | MONUMENT FOUND |

EX. HARDWOOD OR EVERGREEN TREE

## Drum, Loyka & Associates, LLC
CIVIL ENGINEERS - LAND SURVEYORS
1410 Forest Drive, Suite 35
Annapolis, Maryland 21403
Phone: 410-280-3122
www.drumloyka.com

| | |
|---|---|
| DRAWN BY: | SAW |
| JOB. NO.: | NA17923 |
| CHECKED BY: | J.M.B. |
| SHEET NUMBER | 1 OF 2 |

ANNE ARUNDEL COUNTY
DEPARTMENT OF INSPECTIONS AND PERMITS
ARCHBISHOP SPALDING HIGH SCHOOL
PUBLIC R-O-W DEDICATION FOR STEVENSON ROAD
OWNER: ROMAN CATHOLIC ARCHDIOCESE OF BALTIMORE
LIBER 01660 FOLIO 00512
SDP NO. 2024-0036-00-NC TAX ACCT. NO. 04-000-01043356
T.M. 0015 GRID 0022 PARCEL 696R

SCALE: 1"=500'
PROJ. / CONTRACT NO. _____
FIELD WORK DATE: _____
EXHIBIT PLAT DATE: MAY 09, 2025

APPROVED: Robert Murphy  5/21/2025 | 17:45 E
ENGINEER MANAGER          DATE



# Exhibit "B"

**PARCEL 0275**
N/F ANNE ARUNDEL COUNTY BOARD OF ED.
761 STEVENSON ROAD
SEVERN, MARYLAND 21144
T.M. 0015, GRID 0016
TAX ACCT. NO. 04-000-90022687
LIBER 03223 FOLIO 00388

**PARCEL 0435**
N/F BOARD OF EDUCATION OF ANNE
ARUNDEL COUNTY
800 STEVENSON ROAD
SEVERN, MARYLAND 21144
T.M. 0015, GRID 0015
TAX ACCT. NO. 04-000-90036241
LIBER 02274 FOLIO 00442

**PARCEL 1059**
SPAULDING KNOLLS
PLAT BK. 0066, PAGE
0040, PLAT NO. 03515
SEVERN, MD 21144
T.M. 0015, GRID 0016

N.532,526.052
E.1,411,414.716
EX. CONC. CURB & GUTTER

BASELINE (FOLLOWS THE APPROX. CENTER
OF THE DOUBLE YELLOW LINE)

LOT 1  LOT 2
EX. CONC. CURB & GUTTER (TYP.)
N.532,335.675
E.1,411,808.646
P.O.B.

34' FROM BASELINE
S64°12'24"E 437.52'
22" HRDWD
5" HRDWD
8" HRDWD
4" HRDWD

EX. ASPHT. PAVING
31"HRDWD
EX. PARKING LOT

20"EVG.
16" EVG.
PIPE

**VARIABLE WIDTH
RIGHT-OF-WAY
DEDICATION**
6,510 S.F. (0.15 Ac.)

N.532,511.811
E.1,411,408.058

**STEVENSON ROAD**
(EX. PUBLIC VARIABLE WIDTH
RIGHT-OF-WAY)
COLLECTOR ROAD (CLOSED SECTION)
30 M.P.H.

EX. ASPHALT DRIVE (ENTRANCE)

N.532,250

E.1,411,750

**PARCEL 0279**
N/F SUSAN Z. RIDGLEY
827 STEVENSON ROAD
SEVERN, MARYLAND 21144
T.M. 0015, GRID 0015
TAX ACCT. NO.
04-000-90022686
LIBER 26724 FOLIO 00344

N25°03'33"E 1012.19'

**PARCEL 0696**
N/F LAWRENCE J. SHEHAN ROMAN
CATHOLIC ARCHBISHOP OF BALTIMORE
LIBER 01660 FOLIO 00512
TAX MAP 0015 GRID 0022 PARCEL 0696
TAX ACCT. NO. 04-000-01043356
801 STEVENSON ROAD
SEVERN, MARYLAND 21144

E.1,411,250

N.532,250

NAD 83

S25°03'33"W 495.59'

**PARCEL 0273**
N/F SUBLONG-CHAMBERS SYLVIA TRUSTEE
793 STEVENSON ROAD
SEVERN, MARYLAND 21144
T.M. 0015, GRID 0016
TAX ACCT. NO. 04-000-05681230
LIBER 34829 FOLIO 00295

E.1,411,500

N.532,000

**RIGHT-OF-WAY DEDICATION
LINE TABLE**

| LINE | BEARING | LENGTH |
|------|------------|---------|
| L1 | S25°03'33"W | 14.04' |
| L2 | N64°25'36"W | 437.50' |
| L3 | N25°03'33"E | 15.72' |
| L4 | S64°12'24"E | 437.52' |

**INSET PLAN**
SCALE: 1" = 100'

0   50   100   200

"A LICENSEE EITHER PERSONALLY PREPARED THIS PLAT OR
WAS IN RESPONSIBLE CHARGE OVER IT'S PREPARATION AND
THE SURVEYING WORK REFLECTED IN IT, ALL IN COMPLIANCE
WITH REQUIREMENTS SET FORTH IN COMAR, TITLE 09,
SUBTITLE 13, CHAPTER 06 MINIMUM STANDARDS OF
PRACTICE"

## Drum, Loyka & Associates, LLC
CIVIL ENGINEERS - LAND SURVEYORS
1410 Forest Drive, Suite 35
Annapolis, Maryland 21403
Phone: 410-280-3122
www.drumloyka.com

5/20/2025

STATE OF MARYLAND
JEFFREY M. BLACHLY
PROFESSIONAL LAND SURVEYOR
22098
Signed by:
Jeffrey Blachly
5/24...
10/14...

Surveyor's name and address:
JEFFREY M. BLACHLY
PROF. LAND SURVEYOR
MD REG. No. 22098
(EXPIRES MAY 13, 2026)
DRUM LOYKA & ASSOC. LLC
1410 FOREST DRIVE, SUITE 35
ANNAPOLIS, MARYLAND 21403

| DRAWN BY: SAW | ANNE ARUNDEL COUNTY | SCALE: 1"=100' |
| JOB. NO.: NA17923 | DEPARTMENT OF INSPECTIONS AND PERMITS | PROJ. / CONTRACT NO. |
| CHECKED BY: J.M.B. | ARCHBISHOP SPALDING HIGH SCHOOL | FIELD WORK DATE: |
| | FEE SIMPLE ACQUISITION (R-O-W DEDICATION) | EXHIBIT PLAT DATE: MAY 09, 2025 |
| SHEET NUMBER | OWNER: ROMAN CATHOLIC ARCHDIOCESE OF BALTIMORE | APPROVED: Robert Murphy 5/21/2025 | 17:45 E |
| 2 OF 2 | LIBER 01660 FOLIO 00512 | |
| | SDP NO. 2024-0036-00-NC TAX ACCT. NO. 4-000-01043356 | ENGINEER MANAGER           DATE |
| | T.M. 0015 GRID 0022 PARCEL 696R | |

# EXHIBIT D



SITE DEVELOPMENT PLAN

ARCHBISHOP SPALDING HIGH SCHOOL
ADDITIONAL PARKING LOT

TAX ACCT. NO. 04-000-01043356, SDP NO. C2024-0036-00 NC
TAX MAP    0015  GRID  0022  PARCEL  0696R        DISTRICT  4TH
8080 NEW CUT ROAD, SEVERN, MARYLAND 21144,  ANNE ARUNDEL COUNTY

DEVELOPMENT CONCEPT PLAN

SCALE: 1" = 40'    DATE: FEB. 27, 2025    PROJ. NO. NA17923    SHEET 4  OF  14

Drum, Loyka & Associates, LLC
CIVIL ENGINEERS - LAND SURVEYORS
1410 Forest Drive, Suite 35
Annapolis, Maryland 21403
Phone: 410-280-3122 • Fax: 410-280-1952
www.drumloyka.com  |  engineering@drumloyka.com

OWNER
ROMAN CATHOLIC ARCHDIOCESE OF BALTIMORE
218 N CHARLES STREET, SUITE 400
BALTIMORE, MARYLAND 21201-4070
ATTN: MATTHEW REGAN
DEVELOPER
ARCHBISHOP SPALDING HIGH SCHOOL
ATTN: SHANNON GILLIGAN, EMAIL: gilligans@spaldings.org
8080 NEW CUT ROAD
SEVERN, MARYLAND
PH: (410) 969-9105