**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

In re:

Roman Catholic Archbishop of Baltimore,

Debtor.

Case No. 23-16969-MMH
(Chapter 11)

# THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM IN SUPPORT OF STAY RELIEF MOTIONS

The Official Committee of Unsecured Creditors (the "Committee") appointed in The Roman Catholic Archbishop of Baltimore's (the "Debtor's") bankruptcy case respectfully submits this memorandum (the "Memorandum") in support of the motions for relief stay filed at Dkt. Nos. 2129, 2133, 2151, 2153, and 2155 (the "Stay Relief Motions") filed by certain survivors (the "Movants").

## PRELIMINARY STATEMENT

1. The Committee, along with the Debtor, the Debtor's affiliates, and their insurers, have been actively mediating this proceeding over the past 18 months. The parties each profess a desire to achieve a global resolution—one that *includes* a settlement with the insurers whose polices are implicated by survivor claims. Unfortunately, the bankruptcy process imposes structural barriers on survivors that the insurers may be relying upon to increase artificially their negotiating leverage, reduce their exposure, and delay resolution of this case.

2. Specifically, the automatic stay has relieved the insurers from the obligations and incentives that would have otherwise likely led to the timely resolution of survivor claims at a level reflective of the insurers' true exposure. Without the risk of verdicts and judgments available

in the tort system, the insurers can indefinitely avoid their responsibility to survivors. Knowing this, certain of the insurers exploit the bankruptcy process to their benefit and aggressively act to prolong cases and wear down survivors to the point that survivors break, and the insurers can achieve an outcome that would not be available to them but for the bankruptcy.

3. The misalignment of incentives caused by this bankruptcy filing has negatively impacted not only survivors, but also the Debtor, its affiliates, and the bankruptcy process as a whole. Lengthy cases diminish estate resources and distract debtors like the Archdiocese from carrying out their missions. They also burden bankruptcy courts, which are not designed to adjudicate survivor claims, but are nevertheless forced by the tactics of certain insurers to sift through a bevy of issues related to those claims.

4. Most importantly, the bankruptcy process inhibits survivors' ability to obtain a fair recovery on their claims from insurance companies who are not entitled to the bankruptcy protections they capitalize on. Bankruptcy courts overseeing diocesan bankruptcies across the country are beginning to recognize that this reality is causing diocesan bankruptcy cases to stall.[1] Fortunately, bankruptcy courts have the power to facilitate real progress by returning survivor cases to the trial court system and, with increasing frequency, are utilizing that power to jumpstart moribund diocesan bankruptcies.[2]

---

[1] *See, e.g.*, *In re The Roman Catholic Bishop of Sacramento*, No. 24-21326, *Memorandum Order on Motion to Authorize Presentation of Survivor Statements* (Dkt. No. 1153) at 4-5 (Bankr. E.D. Cal. Mar. 6, 2025) ("The first relevant point regarding the insurers is that they are now basking in the shelter of the automatic stay, without which, they would be paying for legions of defense counsel . . . The second relevant point is that the insurers during this case have sought to cadge as much information as possible about the individual plaintiffs while they are enjoying their free ride on the automatic stay."); *In re The Diocese of Buffalo*, No. 20-10322, *Decision and Order* (Dkt. No. 3345) at 6 (Bankr. W.D.N.Y. Nov. 11, 2024) ("Almost three years have transpired since this case was first referred to mediation, and more than twenty-two months have passed since the appointment of a second co-mediator. Nonetheless, the parties have yet to report even a partial settlement of the outstanding disputes.").

[2] *In re The Diocese of Buffalo*, No. 20-10322, *Decision and Order* (Dkt. No. 3345) at 9 (Bankr. W.D.N.Y. Nov. 11, 2024) ("[L]itigated disputes are often settled on the courthouse steps. By pushing litigants closer to a trial of tort claims, we hope that the parties may better appreciate their risks and the benefits of a consensual plan."); *In re Roman Catholic Archbishop of Portland*, 338 B.R. 414, 418 (Bankr. D. Or. 2006) ("settlement efforts with respect to

5. Modifying the stay to allow the Movants to proceed with their cases will force the insurers to take a seat at the table, and to negotiate fairly and in good faith or face the very real possibility of adverse trial verdicts.

6. Outside of bankruptcy, insurers face consequences for refusing to settle active cases. If the Stay Relief Motions are granted, recalcitrant insurers will be required to take positions on survivors' claims, decide whether to settle those claims within their policy limits, and will not be able to shield their actions behind the veil of bankruptcy mediation. In instances where insurers are failing to comply with their contractual obligations with the Debtor, that fact will be laid bare for all to see.

7. In this case, and particularly with regard to the Stay Relief Motions, the Movants have been thoughtful to limit the impact to the Debtor's estate in connection with the pursuit of the Debtor's insurance assets. Insurance Company of North America ("Chubb") and American Casualty Company of Reading, Pennsylvania ("CNA") (collectively the "Stay Relief Insurers") insured the Debtor with respect to each of the claims underlying the Stay Relief Motions.

---

individual claims have been tried and have largely failed, it is time to move forward with the liquidation of the claims for distribution purposes. . . . Trying a few of the claims will help solve that problem, and may cause some of the parties to reevaluate their position."); *In re Franciscan Friars of California, Inc.*, No. 23-41723 (Bankr. N.D. Cal.) April 1, 2025 Hr'g Tr. at 93:4-7, 95:7-11 (attached as Ex. 1 to the Declaration of Morgan Stippel Johnson in Support of the Official Committee of Unsecured Creditors' Memorandum in Support of Stay Relief Motions (the "Johnson Dec.")) (granting lift stay stipulation between debtor and committee over insurers' objections, finding it would incentivize parties to "realistically, productively, aggressively engag[e] in the mediation process on the theory that everybody could have something to lose" and was "an appropriate way to move the case forward."); *In re The Roman Catholic Bishop of San Diego*, 374 B.R. 756, 762-64 (Bankr. S.D. Cal. 2007); *The Roman Catholic Bishop of Sacramento*, No. 24-21326, *Order Granting Debtor's Motion to: (1) Approve Stipulation Modifying the Automatic Stay; and (2) Waiver of the 14-Day Stay Period* (Dkt. No. 1484) (Bankr. E.D. Cal. July 25, 2025); *In re: The Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113, *Order on Debtor's Motion to Approve Stipulation Modifying the Automatic Stay* (Dkt. No. 1480) (Bankr. N.D. Cal. Aug. 26, 2025). *See also Roman Cath. Diocese of Rockville Ctr. v. ARK 320 DOE (In re The Roman Cath. Diocese of Rockville Ctr.)*, Ch. 11 Case No. 20-12345, Adv. No. 20-01226, *Order Denying the Debtor's Mot. for a Prelim. Inj.* (Dkt. No. 203) (Bankr. S.D.N.Y. June 9, 2023) (permitting prosecution of 225 state court actions against non-debtor affiliates). *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.132 (2004) (test trials "may otherwise promote settlement in the remaining actions.").

8. Each of the Stay Relief Insurers has a duty to defend the Debtor and is required to pay the Debtor's defense costs in the first instance. The applicable insurance policies are also "non-wasting" policies, meaning that payments the Stay Relief Insurers make toward defense costs do not erode applicable policy limits. Moreover, none the Stay Relief Insurers' policies have aggregate limits that would apply to the sexual abuse claims at issue here, meaning that recovery by one survivor on their claim against a Stay Relief Insurer will not impact the recovery of any other survivor against that same insurer.[3] Finally, the Movants are seeking only to obtain monetary judgments and will not enforce any judgments against the Debtor absent further order from the Court. Thus, if the requested relief is granted, the financial impact on the Debtor's estate will be negligible, particularly in light of the benefits it will provide.

9. These bases, as expanded upon herein, provide more than adequate cause to grant the Stay Relief Motions.

## BACKGROUND

### A. Bankruptcy Filing and Automatic Stay

10. On April 11, 2023, the Maryland Child Victims Act (the "CVA") was signed into law. The CVA allowed survivors of sexual abuse to bring lawsuits that had previously been barred by Maryland statutes of limitations.

11. On September 29, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

[3] The Committee does not concede that the absence of cost to the Debtor is a dispositive factor in evaluating stay relief motions brought to recover estate assets and reserves all rights to support any stay relief action brought where the Debtor may have to incur upfront costs, particularly given that the Debtor is currently seeking to pursue hundreds of objections to survivor claims in this case. Here, the Committee believes that the approval of the limited relief sought will encourage the Stay Relief Insurers to meaningfully participate in the global mediation. The Committee remains willing to mediate during the pendency of any cases initiated as a result of approval of the Stay Relief Motions.

Because the Debtor filed for bankruptcy before the CVA went into effect, the Debtor's bankruptcy filing operated to prevent survivors from filing lawsuits against the Debtor under the CVA.

12. On September 29, 2023, the Debtor also filed a motion for entry of an order extending the automatic stay to all affiliated entities included as additional insureds under the Debtor's current and legacy insurance programs, (*see* Dkt. No. 12), which the Court granted on an interim basis on October 4, 2023, (*see* Dkt. No. 52).

13. On October 11, 2023, the Office of the United States Trustee appointed the Committee pursuant to 11 U.S.C. § 1102(a).

14. A bar date of May 31, 2024, was fixed by Court. (Dkt. No. 316).

**B. CVA Amendment**

15. In early 2025, the legislature voted to amend the CVA to lower the noneconomic damages cap for private defendants from $1.5 million to $700,000. This amendment was signed into law and took effect on June 1, 2025.

16. In anticipation of the amendment to the CVA's noneconomic damages cap for private defendants, on May 2, 2025, the Court modified the automatic stay for the limited purpose of allowing survivors to file and serve lawsuits against the Debtor and its affiliated entities to preserve the higher noneconomic damages cap. (*See* Dk. No. 1127).

**C. Mediation**

17. On July 29, 2024, the Court entered the *Agreed Order Directing Mediation, Appointing Mediators, and Ordering Mediation Discovery* (Dkt. No. 705) (the "Mediation Order").

18. The parties have been engaged in mediation efforts since. Unfortunately, achieving settlements with the Debtor and its insurers has been unduly and unnecessarily slow and difficult.

### D. Facts Pertaining to the Movants' Cases

19. Each of the Movants filed timely claims in this case.

20. Each of the Movants has commenced a case against the Debtor, the Debtor's affiliates, or the Debtor and its affiliates that has been stayed against the Debtor pursuant to 11 U.S.C. § 362 and against the Debtor's affiliates pursuant to the Court's October 4, 2023, order (Dkt. No. 52).

### E. Insurance

21. Relevant to the Lift Stay Motions, two insurers—Chubb and CNA—insured the Debtor at different times between 1965 and 1973 (the years in which the Lift Stay cases allege abuse).

22. First, Chubb issued primary and umbrella policies to the Debtor from 1963-1968.[4] The Chubb policies provide a duty to defend, which is outside the limits of the Chubb policies' per occurrence limits. The Chubb policies do not contain any aggregate limits that would apply to the sexual abuse claims at issue here.

23. Second, CNA issued primary and umbrella policies to the Debtor from 1968-1974. The CNA policies provide a duty to defend, which is outside the limits of the CNA policies' per occurrence limits. The CNA policies do not contain any aggregate limits that would apply to the sexual abuse claims at issue here.

24. The seven cases subject to the Lift Stay Motions all allege abuse during years covered by Chubb, CNA, or both Chubb and CNA.

[4] The Chubb excess policies issued after 1986 may include sexual abuse exclusions, but that issue is not relevant to the cases subject to the Lift Stay Motions.

## ARGUMENT

### I. LEGAL STANDARD

25. 11 U.S.C. § 362(a) provides for a stay of, among other things:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . .
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . .
>
> . . . .

11 U.S.C. § 362(a).

26. 11 U.S.C. § 362(d)(1) allows the Court to grant relief from the stay provided for by 11 U.S.C. § 362(a) for cause after notice and a hearing. 11 U.S.C. § 362(d)(1). If the moving party establishes cause, the burden shifts to the party opposing relief on all issues, except the existence of equity. *In re Abdul Muhaimin*, 343 B.R. 159, 169-70 (Bankr. D. Md. 2006).

27. The Fourth Circuit has set forth the following list of factors relevant to the determination of whether cause exists under 11 U.S.C. § 362(d)(1):

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary;
>
> (2) whether modifying the automatic stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and
>
> (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).

28. "No one factor is determinative, but a court should consider the totality of the circumstances." *In re McPherson*, 630 B.R. 160, 177 (Bankr. D. Md. 2021). The Court "must balance to the best of its ability the interests of the Debtor's estate, the interests of all creditors asserting claims against the estate, and the potential hardship to the litigants if the requested relief is denied." *Id.*

29. The *Robbins* factors as applied to the Stay Relief Motions are addressed below.

## II. CAUSE EXISTS TO MODIFY THE STAY

### a. The Issues in the Pending Litigation Only Involve State Law and Do Not Require the Bankruptcy Court's Expertise (*Robbins* Factor 1)

30. The Maryland state court system is the most appropriate forum to adjudicate the Movants' claims.

31. All of Movants' claims arise under Maryland state law with which the Maryland state courts are familiar. Although this Court is preeminently qualified to provide expertise in bankruptcy, bankruptcy expertise is not required to resolve the Movants' claims.[5]

### b. Modifying the Automatic Stay Promotes Judicial Economy (*Robbins* Factor 2)

32. The interests of judicial economy and the expeditious and economical resolution of litigation similarly weigh in favor of modifying the stay for several reasons.

33. First, the length and expense of Diocesan bankruptcies is trending in the wrong direction to the detriment of both survivors and dioceses, while benefitting insurers. Bankruptcy courts and higher courts are being inundated with filings from insurers designed to maintain their leverage and prolong cases. The only way to avoid that fate in this case is to allow survivors to

---

[5] *See In re McCullough*, 495 B.R. 692, 697 (Bankr. W.D.N.C. 2013) (". . . [C]laims governed by state law do not necessarily require bankruptcy expertise." (citing *In re Robbins*, 964 F.2d at 345)).

proceed in the Maryland court system now. A wait and see approach will only delay this case, resulting in wasted resources and more damage to survivors.[6] As described below, *infra* section II(d), action is needed to equalize the incentives for global settlement. The Stay Relief Motions offer the Court an opportunity to be proactive and mitigate the tremendous cost and delay of the status quo.

34. The relief sought will not interfere with the bankruptcy case.[7] To the contrary, the continued litigation of the claims filed by the Movants in Maryland state court is precisely what will promote progress in the bankruptcy case for the reasons detailed below, *infra* section II(d).

35. The Movants seek only limited relief: to obtain, *but not enforce*, judgments against the Debtor. Moreover, because the Stay Relief Insurers have an obligation to pay the Debtor's defense costs and these defense costs do not erode the available policy limits, neither the Debtor's estate nor the survivor creditors' recovery will be diminished because of defense costs. For these

[6] *See Roman Cath. Diocese of Rockville Ctr. v. ARK 320 DOE (In re The Roman Cath. Diocese of Rockville Ctr.)*, Ch. 11 Case No. 20-12345, Adv. No. 20-01226, *Memorandum Opinion and Order Denying Mot. for a Prelim. Inj.* (Dkt. No. 202) at 69 (Bankr. S.D.N.Y. June 9, 2023) ("For many Survivors, allowing time to pass means that they simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims. . . It is clear that these harms to the Survivors become more significant with each passing day in this case"); *see also The Diocese of Rochester v. AB 100 Doe, et al. (In re The Diocese of Rochester*), Ch. 11 Case No. 19-20905, Adv. No. 22-02075, *Decision and Order Denying Motion of Diocese Seeking to Enjoin the Prosecution of State Court Actions Against Independent Catholic Corporations and Dismissing Complaint* (Dkt. No. 48) at 14 (Bankr. W.D.N.Y. May 23, 2022) ("[T]he age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them. Additionally, given the Diocese's unequivocal threat to pursue a non-consensual Chapter 11 plan, the valuation of CVA claims becomes vitally important to the confirmation process. The state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court. And, the Abuse Survivors are entitled to have juries hear their cases—an option rarely available in bankruptcy courts.").

[7] *See In re Diocese of Buffalo, N.Y.*, 665 B.R. 198, 204 (Bankr. W.D.N.Y. Nov. 22, 2024) ("We reject the notion that stay relief and mediation are preclusive alternatives. Our decision to grant stay relief does not prevent concurrent discussions and may even create additional incentives for serious negotiation."); *In re Ewald*, 298 B.R. 76, 81 (Bankr. E.D. Va. 2002) ("Modifying the stay promotes judicial economy and will not interfere with the debtor's bankruptcy case as the state court is familiar with the facts and circumstances of the claims asserted as they have been pending there for almost three years."); *Kadlecek v. Schwank USA, Inc.*, 486 B.R. 336, 342 (M.D.N.C. 2013) (". . . [H]aving the Georgia court liquidate Schwank's claims against the debtor will prevent interference in the bankruptcy action, because otherwise the bankruptcy court would be forced to resolve these issues.").

reasons, there is no prejudice to other survivor creditors.[8] To the contrary, the Movants are taking action designed to promote progress in the bankruptcy proceeding for the benefit of all survivors. Lifting the automatic stay to permit the stay relief cases to move forward will drive resolution of this case, including with the insurers.

36. Second, the Movants seek to litigate their state law claims to conclusion, and the Maryland state courts will be able to completely resolve these claims via a system designed to move cases quickly to trial.[9] Indeed, one Maryland state court—where the bulk of the CVA cases against the Debtor and its affiliates are pending—already has procedures in place for handling CVA claims. On December 2, 2025, Baltimore City Circuit Court Judge Jeffrey M. Geller issued a Scheduling Order and a Protective Order governing non-bankrupt religious institution CVA cases (the "Order").[10] The Order sets forth an organized, streamlined procedure for handling CVA claims and establishes that the court is working to efficiently adjudicate CVA cases.

37. The Order provides for the expeditious resolution of survivor CVA cases against non-bankrupt religious institutions as follows: thirty days to answer the complaint or file a motion to dismiss, eight months to complete fact discovery (with an additional four months thereafter to complete expert discovery), and approximately thirty days to file dispositive motions after discovery is completed, with trial presumably scheduled shortly thereafter. This same framework, with the Protective Order already in place, can be readily and easily applied to the Movants' cases upon release.

---

[8] *See In re Mildred Deli Grocery, Inc.*, No. 18-10077, 2018 WL 1136017, at *11–12 (Bankr. S.D.N.Y. Feb. 28, 2018) (holding that stay relief tailored to establish the amount of a claim does not prejudice other creditors).

[9] *See Kadlecek*, 486 B.R. at 342 ("Because the claims at issue involve Georgia law (including some technical claims based on theft of trade secrets), it will promote judicial economy to have the claims liquidated in a forum with special expertise in that law.").

[10] *See* Johnson Dec., Ex. 2, *Baltimore City Circuit Court's Scheduling and Protective Order for (Non-Bankrupt) Religious Institution CVA Cases.*

38. Finally, the Debtor has experienced bankruptcy counsel and special litigation counsel capable of administering the Debtor's bankruptcy case while simultaneously attending to the defense of a small subset of survivor claims. If the stay relief cases lead to a global resolution, the Debtor will avoid further litigation costs associated with both its own claim objections and the gridlock imposed by certain of the estate's insurers which has—and will continue to—prolong the litigation of this bankruptcy case.

**c. The Debtor's Estate can be Protected by a Requirement that Creditors Seek to Enforce Judgments Through the Bankruptcy Court (*Robbins* Factor 3)**

39. As set forth above, *supra* section II(b), the Movants seek only to obtain—not enforce—judgments against the Debtor. Accordingly, the Committee does not oppose a requirement that Creditors be required to return to the bankruptcy court before seeking to enforce any judgment they obtain against the Debtor.

40. However, it is worth noting that the Debtor's Estate would be preserved if said judgments were enforced directly against the Stay Relief Insurers. The Movants' claims are fully insured, such that any judgment obtained is payable by the Stay Relief Insurers. None of the Stay Relief Insurers issued policies with aggregate limits that would apply to these claims, meaning that payment of any judgment by the Stay Relief Insurers would not deplete the estate resources from which other survivors may recover.

**d. Balancing the Debtor's Interests, the Creditors' Interests, and the Potential Hardships to the Movants Weighs in Favor of Stay Relief (Balancing Test)**

41. The insurers' ability to use the automatic stay as a shield from litigation pressure is a significant barrier to progress in this case. Unlike the Debtor, which, by filing for bankruptcy, conceded it must use its available assets to resolve survivor claims, the insurers contest their liability resulting from survivor claims. Yet the insurers benefit from the survivors' inability to

liquidate their claims against the Debtor as a result of the stay, providing the insurers with increased bargaining leverage that they would not possess in the state court tort system. With no possibility of an adverse consequence for the insurers, there is no incentive for the insurers to pay fair value to settle the abuse claims. Instead, the insurers are incentivized—and likely required by obligations to their stakeholders—to wield this power to the detriment of the survivors. Unless survivors are willing to settle for values far below their claims' fair worth, gridlock ensues.

42. The insurers' misuse of the automatic stay significantly harms survivors. The automatic stay restricts survivors to the bankruptcy forum, which affords the insurers unequal bargaining power in negotiations, and forces survivors to wade through the morass of bankruptcy process and procedure, watch time pass by, and sit on the sidelines as the insurers attack the validity of their claims. These real harms are directly traceable to the insurers' almost exclusive enjoyment of the automatic stay. And, unfortunately, these harms compound the damage that has already been done to survivors.

43. The harm done to survivors by a bankruptcy filing is amplified considering Maryland's strong public policy of protecting children and, as evidenced by the passage of the CVA, allowing those already harmed to have the right *to seek redress in the state court system*. As the U.S. Supreme Court has explained, the "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Specific to the childhood sexual abuse context, "there can be no real dispute that the controversy over the misconduct of priests, as well as the Church's responsibility for the misconduct and its alleged cover-up, is a 'public controversy.'" *New Life Ctr., Inc. v. Fessio*, 2000 WL 1157800, at *4 (4th Cir. Aug. 16, 2000). Unfortunately, the automatic stay

prohibits survivors from seeking full redress from insurance companies that have not even filed for bankruptcy, countervailing indisputable public policy to the contrary.

44. Modifying the stay to allow the Movants to proceed will begin to balance the harms that all survivors suffer as a result of the automatic stay. The Stay Relief Insurers will have to engage in good faith as the Movants' claims move forward to judgment or risk the consequences of failing to do so.[11] Similarly, an adjudicated or settled determination of the Movants' claims will aid the parties' efforts in resolving the insurers' exposure as to the remaining survivor claims.[12] The Debtor will likewise benefit from balanced negotiating leverage.[13]

45. As one court noted:

> The rationale for granting relief from the automatic stay for this purpose is that the prejudice to the debtor, who may suffer modest or even no adverse financial consequences but may only have to expend some time and effort in cooperating with his insurer in the defense of the litigation, is outweighed by the prejudice to the creditor whose ability to prosecute the action and reach the insurance benefits may be undermined by the "aging of evidence, loss of witnesses, and crowded court dockets."

*In re Glunk*, 342 B.R. 717, 740 (Bankr. E.D. Pa. 2006) (citations omitted).

---

[11] Under Mayland law, an insurer may not "refuse to [settle a claim within policy limits] in bad faith" and "has a duty to enter into good faith negotiations where reasonable and feasible to settle a claim within policy limits." *Allstate Ins. Co. v. Campbell*, 639 A.2d 652, 659 (Md. 1994) (internal quotations omitted). This duty is implicated when an insurer receives an "offer to settle within policy limits by the third-party claimant, or at least a reasonable opportunity to settle within policy limits." *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 341 (D. Md. 2012). An insurer breaches its duty when it "refuse[s] to [settle] in bad faith." *Johnson v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 447 F. Supp. 3d 372, 379 (D. Md. 2020). An insurer's refusal to settle is in bad faith when it was not "an informed judgment based on honesty and diligence." *Id.* at 379-80.

[12] *In re PG&E Corp.* 2019 WL 3889247, at *2 (Bankr. N.D. Cal. Aug. 16, 2019) ("First, relief from stay will definitively bring a resolution as to Debtors' liability in the [named wildfire], and provide an important data point that most likely will facilitate resolution of the wildfire tort claims in this case."); *See, e.g.*, Jonathan L. Goldberg, Note, *"Otherwise Consistent": A Due Process Framework for Mass-Tort Bankruptcies*, 98 N.Y.U. L. REV. 1696, 1748 (2023) (citing Sergio Campos & Samir D. Parikh, *Due Process Alignment in Mass Restructurings*, 91 FORDHAM L. REV. 325, 357-58 (2022)).

[13] *See In re Ewald*, 298 B.R. at 81 ("The conclusion of the state court litigation will assist with the administration of the debtor's bankruptcy case as the amount of any claim by debtor against NCMC, the validity and priority of NCMC's deed of trust, and the amount of NCMC's claims asserted in its cross-bill against the debtor will be certain.").

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests this Court grant the Stay Relief Motions.

Respectfully submitted,

Date: March 25, 2026

*/s/Alan M. Grochal*
Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
Tydings & Rosenberg LLP
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9715
Fax: (410) 727-5460
Email: rcostella@tydings.com
agrochal@tydings.com

*Local Counsel to the Official Committee of Unsecured Creditors*

-and-

*/s/ Edwin H. Caldie*
Robert T. Kugler (MN # 194116)
Edwin H. Caldie (MN # 388930)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile: 612-335-1657
Email: robert.kugler@stinson.com
ed.caldie@stinson.com

and

*/s/ Morgan Stippel Johnson*
BURNS BAIR LLP
Timothy W. Burns
tburns@burnsbair.com
Jesse J. Bair
jbair@burnsbair.com
Morgan Stippel Johnson
mjohnson@burnsbair.com
10 East Doty Street, Suite 600
Madison, Wisconsin 53703-3392
Telephone: (608) 286-2808

*Counsel for the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of March, 2026, a copy of the *Official Committee of Unsecured Creditors' Memorandum in Support of Stay Relief Motions in Support of Stay Relief Motions* was served electronically on D. Blake Roth, Esquire, Holland & Knight LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, blake.roth@hklaw.com; Catherine K. Hopkin, Esquire, YVS Law LLC, 185 Admiral Cochrane Drive, Suite 130, Annapolis, Maryland 21401, chopkin@yvslaw.com; and Hugh Bernstein, Esquire, Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, hugh.m.bernstein@usdoj.gov; and to all parties that are registered to receive electronic filing through the CM/ECF system on the attached list.

Dated: March 25, 2026

*/s/Alan M. Grochal*

Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
**Tydings & Rosenberg LLP**
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9715
Fax: (410) 727-5460
Email: rcostella@tydings.com
agrochal@tydings.com

*Local Counsel to the Official Committee of Unsecured Creditors*

**The following parties received CM/ECF notice of the filing:**

Nathan D. Adler, Esquire: nda@nqgrg.com
Philip D. Anker, Esquire: philip.anker@wilmerhale.com
Sam Alberts, Esquire: sam.alberts@dentons.com
G. Calvin Awkward, III, Esquire: cawkward@goldbergsegalla.com
Gary Bahena, Esquire: garybahena@bahenalaw.com
Hugh M. Bernstein, Esquire: hugh.m.bernstein@usdoj.gov
Diane C. Bristow, Esquire: dcb@nqgrg.com
PhilipTucker Evans, Esquire: philip.evans@hklaw.com
Kevin Foreman, Esquire: kforeman@carltonfields.com
Andrew Freeman, Esquire: adf@browngold.com
Andrew Glasnovich, Esquire: drew.glasnovich@stinson.com
Gary R. Greenblatt, Esquire: grg@cooncolelaw.com
Geoffrey Grivner, Esquire: geoffrey.grivner@bipc.com
Megan Harmon, Esquire: megan.harmon@bge.com
Catherine Keller Hopkin, Esquire: chopkin@yvslaw.com
Irving Edward Walker, Esquire: iwalker@coleschotz.com
Jonathan Schochor, Esquire; jschochor@sfspa.com
Kerry Staton, Esquire; kstaton@sfspa.com
Joshua F. Kahn, Esquire; jkahn@sfspa.com
Thomas F. Yost, Esquire; tyost@yostlaw.com
Robert Keith Jenner: rjenner@jennerlawfirm.com
Steven J. Kelly, Esquire: skelly@gelaw.com
Nicole Khalouian, Esquire: nicole.khalouian@stinson.com
C. Scott Kunde, Jr., Esquire: scott.kunde@hklaw.com
Anthony May, Esquire: amay@browngold.com
Timothy P. Palmer, Esquire: timothy.palmer@bipc.com
Mark David Plevin, Esquire: mplevin@crowell.com
David Kendall Roberts, Esquire: droberts2@omm.com
Annette Rolain, Esquire: arolain@ruggerilaw.com
Blake D. Roth, Esquire: blake.roth@hklaw.com
James P. Ruggeri, Esquire: jruggeri@ruggerilaw.com
Jonathan Schapp, Esquire: jschapp@goldbergsegalla.com
U.S. Trustee – Baltimore: ustpregion04.ba.ecf@usdoj.gov
Desirae Krislie C. Tongco, Esquire; dtongco@omm.com

Joshua D. Weinberg, Esquire: jweinberg@ruggerilaw.com
Adam R. Dunst, Esquire, adunst@goldbergsegalla.com
Samantha J. Hanson-Lenn, Esquire, Samantha.hansonlenn@stinson.com
Eric G. Korphage, Esquire, korphagee@whiteandwilliams.com
Robert H. Kline, Esquire, kliner@whiteandwilliams.com
Matthew M. Weiss, Esquire, mweiss@phrd.com
John E. Bucheit, Esquire, jbucheit@phrd.com
Matthew G. Roberts, Esquire, mroberts@phrd.com
John Grossbart, Esquire, john.grossbart@dentons.com
Siobhain P. Minarovich, Esquire, manarovics@whiteandwilliams.com
Justin P. Fasano, Esquire, jfasano@mhlawyers,com
Matthew C. Nelson, Esquire, matthew.nelson@kennedyslaw.com
Jillian G. Dennehy, Esquire, jillian.dennehy@kenedyslaw.com
James R. Murray, Esquire, jim.murray@blankrome.com
James D. Carter, Esquire, james.carter@blankrome.com
Robyn L. Michaelson, Esquire, robyn.michaelson@blankrome.com
Sara G. Klein, Esquire, sklein@manlystewart.com
Gary P. Seligman, Esquire, gseligman@wiley.law
Ezhan S. Hasan, Esquire, ahasan@wiley.com
Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com
Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com
Isabella R. Sayyah, Esquire, isayyah@gibsondunn.com
Matthew A. Hoffman, Esquire, mhoffman@gibsondunn.com
Ryan S. Appleby, Esquire, rappleby@gibsondunn.com
Michael A. Rosenthal, Esquire, mrosenthal@gibsondunn.com
Todd C. Jacobs, Esquire, tjacobs@phrd.com
Jesse J. Bair, Esquire, jbair@burnsbair.com
Timothy W. Burns, Esquire, tburns@burnsbair.com
Jared Zola, Esquire, jared.zola@blankrome.com
Anthony J.M. Kikendall, Esquire, kikendalla@whiteandWilliams.com
Eileen King Bower, Esquire, Eileen.kingbower@clydeco.us
Robert M. Westra, Esquire, rwestra@ppsrlaw.com
Kevin A. Clasing, Esquire, kclasing@ppsrlaw.com
Morgan K. Stippel, Esquire, mstippel@burnsbair.com
Justine M. Daniels, Esquire, jdaniels@omm.com
Ryan S, Perlin, Esquire, perlin@mdtrialfirm.com
Emily C. Malarkey, Esquire, malarkey@mdtrialfirm.com
Jodie E. Bekman, Esquire, jbekman@gfrlaw.com
Timothy Karcher, Esquire, tkarcher@proskauer.com
Paul Possinger, Esquire, ppossinger@proskauer.com

Christopher White, Esquire, Christopher.white@clydeco.us
Clinton Cameron, Esquire, Clinton.cameron@clydeco.us
Bret Kabacinski, Esquire, bret.kabacinski@clydeco.us
Douglas McGill, Esquire, dmcgill@webbermcgill.com
Christopher Sevedge, Esquire, Christopher.sevedge@stinson.com
Ysabelle G. Reyes, Esquire, yreyes@wiley.law
Jon P. Newton, Esquire, jnewton@reidand riege.com
Benjamin M. Fischer, Esquire, bfischer@coleschotz.com
Richard A. Galbo, Esquire, rgalbo@goldberg segalla.com
Sheldon N. Jacobs, Esquire, sjacobs@snjlaw.com
Nicholas A. Dellefave, Esquire, Nicholas.dellefave@hklaw,com
Elizabeth Connell, Esquire, elizabeth@connellcounsel.com
Jacob C. Cohn, Esquire, jcohn@plevinturner.com
E. Christopher Amos, Esquire, eChrisamos@gmail.com
Edward J. Kelley, Esquire, ed@constantllp.com
W. Charles Meltmar, Esquire, cmeltmar@cochranfirmdc.com
Nathaniel L. Foote, Esquire, nate@vca.law
Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com
Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com
Kathleen A. Parnow, Esquire, katie.parnow@stinson.com