**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>                  Debtor.[1] | Chapter 11<br><br>Case No. 23-16969 |

**DISCLOSURE STATEMENT IN SUPPORT OF THE JOINT CHAPTER 11**
**PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF**
**BALTIMORE, A CORPORATION SOLE, AND ADDITIONAL DEBTORS**

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:     615.244.6380
Facsimile:     615.244.6804
Email:  blake.roth@hklaw.com
       scott.kunde@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:     202.457.7043
Email:  philip.evans@hklaw.com

*-and-*

Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:     443.569.0788
Facsimile:     410.571.2798
Email:  chopkin@yvslaw.com

*Attorneys for the Debtor and Debtor In Possession*

Dated:  May 15, 2026

---

[1] The last four digits of the Debtor's federal tax identification number are: 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE AND THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "*DEBTOR*" OR THE "*RCAB*") AND CERTAIN PARISHES, SCHOOLS, AND OTHER ENTITIES LOCATED WITHIN THE ARCHDIOCESE AND CONTEMPLATED AS ADDITIONAL DEBTORS (THE "*ADDITIONAL DEBTORS*" AND TOGETHER WITH THE DEBTOR, THE "*PLAN PROPONENTS*") SEEK CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE, AND ADDITIONAL DEBTORS (THE "*PLAN*").

THIS DISCLOSURE STATEMENT ("*DISCLOSURE STATEMENT*"), THE PLAN, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENTS, PURSUANT TO SECTIONS 1125, 1126, AND 1190 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENTS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE **ARTICLE XII** OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTOR AND ADDITIONAL DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT INCLUDING UNDER "*RISK FACTORS TO BE CONSIDERED*" IN **ARTICLE VIII** OF THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR AND ADDITIONAL DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE PLAN OR THIS DISCLOSURE STATEMENT OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE THE ORDER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF THE SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND THE SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. THE PLAN PROPONENTS' RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, THE ADDITIONAL DEBTORS, THE DEBTOR'S OR ANY ADDITIONAL DEBTOR'S BUSINESS OPERATIONS, THE VALUE OF THE DEBTOR'S OR ANY ADDITIONAL DEBTOR'S ASSETS, OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENT MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, ANY ADDITIONAL DEBTOR, OR ANY OTHER PERSON, OR BE

DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR, ADDITIONAL DEBTORS, OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DEBTOR, ADDITIONAL DEBTORS, AND TRUSTS TO BE CREATED FOR THE BENEFIT OF HOLDERS OF SURVIVOR CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

TO OBTAIN, AT YOUR COST, ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT PLEASE CONTACT THE DEBTOR'S COUNSEL AT:

HOLLAND & KNIGHT LLP

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:  (615) 244-6380
Facsimile:  (615) 244-6804
Email:  blake.roth@hklaw.com
       scott.kunde@hklaw.com

HOLLAND & KNIGHT LLP

Philip T. Evans (Fed. Bar No. 11796)
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:  202.457.7043
Email: philip.evans@hklaw.com

*Counsel for the Debtor and Debtor in Possession*

YVS LAW, LLC

Catherine K. Hopkin (Fed. Bar No. 28257)
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:  (443) 569-0788
Facsimile:  (410) 571-2798
Email:  chopkin@yvslaw.com

**TABLE OF CONTENTS**

I. Introduction...................................................................................................................1
    A. Summary of the Plan.......................................................................................1
    B. Voting Procedures............................................................................................2
    C. Brief Explanation of Chapter 11.....................................................................3

II. Description of the Debtor...........................................................................................4
    A. Nature and History of the Debtor....................................................................4
    B. The Work of the Debtor within the Archdiocese.............................................5
    C. Relationship Between and Property of the Debtor, Parishes, Schools, and Certain Related Entities.................................................................................6
    D. The Clergy Sex Abuse Crisis and the Debtor's Response............................12
    E. Events Leading to the Chapter 11 Case.........................................................13

III. Events During the Chapter 11 Case........................................................................14
    A. Bankruptcy Filing and First Day Orders.......................................................14
    B. Procedural and Administrative Motions........................................................17
    C. Retention and Employment of the Debtor's Professionals............................18
    D. Appointment of Official Committee of Unsecured Creditors and Retention of Professionals.............................................................................................19
    E. Claims Process, Notice, and Deadlines.........................................................20
    F. Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities.....................................................................................................21
    G. Survivor Statement Hearings.........................................................................21
    H. Insurance Coverage Adversary Proceeding, Mediation, and Settlement Negotiations.................................................................................................22
    I. Seek the City Initiative..................................................................................24
    J. Charitable Immunity Adversary Proceeding.................................................25
    K. Amendments to the CVA and Commencement of Civil Actions...................25
    L. Data Security Incidents..................................................................................26
    M. Claim Objections With Respect to Survivor Claims.....................................26
    N. Committee's Motion to Dismiss Chapter 11 Case.........................................27

IV. Summary of the Plan................................................................................................27
    A. Overview of Classification and Treatment of Claims and Interests..............27
    B. Description of Classes and Treatment...........................................................28
    C. The Survivor Compensation Trust.................................................................33
    D. The Insurance Trust.......................................................................................38
    E. Survivor Claims.............................................................................................46
    F. Settling Insurers............................................................................................51

| | G. | Non-Settling Insurers. | 52 |
|---|---|---|---|
| | H. | Means for Implementation of the Plan. | 54 |
| | I. | Distributions and Claims Administration for Claims Other Than Survivor Claims. | 58 |
| | J. | Executory Contracts and Unexpired Leases. | 61 |
| | K. | Confirmation and Consummation of the Plan. | 64 |
| | L. | Effects of Confirmation. | 66 |
| | M. | Retention of Jurisdiction. | 72 |
| V. | | Tax Consequences of the Plan. | 74 |
| | A. | Federal Income Tax Consequences to Holders of Unsecured Claims. | 75 |
| | B. | Federal Income Tax Consequences to the Debtor. | 75 |
| | C. | Tax Consequences to the Trust. | 75 |
| VI. | | Alternatives to the Plan. | 76 |
| | A. | Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code. | 76 |
| | B. | Dismissal of the Debtor's Chapter 11 Case. | 76 |
| | C. | Chapter 7 Liquidation Not A Viable Alternative. | 76 |
| | D. | Appointment of a Chapter 11 Trustee Is Not A Viable Alternative. | 77 |
| VII. | | Acceptance and Confirmation of the Plan. | 77 |
| | A. | General Confirmation Requirements. | 77 |
| | B. | Best Interests Test. | 77 |
| | C. | Financial Feasibility Test. | 79 |
| | D. | Section 1129(b) or Section 1191 Alternative. | 79 |
| VIII. | | Risk Factors to Be Considered. | 79 |
| | A. | Failure to Satisfy Vote Requirement. | 80 |
| | B. | Non-Confirmation or Delay of Confirmation of the Plan. | 80 |
| | C. | Non-Consensual Confirmation. | 80 |
| | D. | Risk of Non-Occurrence of the Effective Date. | 80 |
| | E. | Classification and Treatment of Claims. | 80 |
| | F. | Review of Class 6 Claims. | 80 |
| | G. | General Insurance Coverage Risks. | 81 |
| | H. | Insurance Contributions. | 81 |
| | I. | Insurance Coverage Actions. | 81 |
| | J. | Duration and Expense of Insurance Coverage Litigation. | 81 |
| IX. | | Miscellaneous Provisions. | 81 |
| | A. | Modification of the Plan. | 81 |
| | B. | Revocation. | 82 |
| | C. | Controlling Documents. | 82 |

|  |  |  |  |
|---|---|---|---|
| **D.** | Filing of Additional Documents. | ...................................................................................... | 82 |
| **E.** | Direction to a Party. | ...................................................................................... | 82 |
| **F.** | Certain Actions. | ...................................................................................... | 82 |
| **G.** | Plan as Settlement Communication. | ...................................................................................... | 83 |
| **H.** | Other Rights. | ...................................................................................... | 83 |
| X. | Bankruptcy Rule 9019 Request. | ...................................................................................... | 83 |
| XI. | Confirmation Request. | ...................................................................................... | 83 |
| XII. | Recommendation and Conclusion. | ...................................................................................... | 83 |

**<u>EXHIBITS</u>**

EXHIBIT A – PLAN OF REORGANIZATION
EXHIBIT B – LIQUIDATION ANALYSIS
EXHIBIT C – CASH FLOW PROJECTIONS

# I.   INTRODUCTION.

On September 29, 2023 (the "***Filing Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The case is pending before the United States Bankruptcy Court for the District of Maryland (the "***Bankruptcy Court***").

The Plan sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan.

## A.   Summary of the Plan.

The Plan has been formulated by the Debtor, in consultation with the proposed Additional Debtors, following months of mediation efforts. As a result of the mediation efforts, the Debtor, in consultation with the proposed Additional Debtors, propose a plan providing for compensation to Survivor Claimants in an amount equal to the sum of the liquidation value of the Debtor, liquidation value of the Additional Chapter 11 Debtors, and three (3) years' net income of the Subchapter V Additional Debtors, in addition to the contribution of all insurance assets available for the payment of compensation to Survivor Claimants.

To facilitate evaluation of Survivor Claims, liquidation of insurance assets, and payment of compensation to Survivor Claimants, the Plan establishes a Survivor Compensation Trust and Insurance Trust, which initially will be funded in an aggregate amount of not less than **$168,939,502** by: (i) assets of and contributions from the Debtor; (ii) assets of and contributions from the Parishes, Schools, Related Non-Debtor Entities, and Other Insured Entities; and (iii) settlement proceeds from settlements with the Settling Insurers. The initial funds being contributed to the Trusts are as follows:

| | |
|---|---|
| Debtor | $43,939,502 |
| Additional Debtors | TBD[2] |
| Related Non-Debtor Entities | TBD[2] |
| Settling Insurers | $125,000,000 |

The contribution by each of the foregoing was reached by calculating the amount of liability faced by each entity, the ability of each entity to pay, and insurance coverage available for the types of claims being satisfied by the Trusts. In exchange for the contributions to the Trusts, (a) the Debtor and Reorganized Debtor, (b) the Additional Debtors and Additional Reorganized Debtors, (c) Related Non-Debtor Entities, (d) each of the foregoing Persons' respective predecessors in interest, successors, and assigns, and (e) solely to the extent of and in their capacity as such, all of the foregoing Persons' respective past and present Agents shall be deemed "***Protected Parties***" that, along with the Settling Insurers that are contributing to the Trusts, are entitled to the benefit of certain releases, exculpation, and injunctions, all as more specifically set forth

---

[2] Upon resolution of claim objections that have not yet been fully resolved (some of which are currently pending in the Debtor's case), the Additional Debtors and Related Non-Debtor Entities will be capable of calculating the proposed contribution. The Debtor is unable to provide this figure until that time, but it intends to promptly update the proposed contribution as soon as that is possible.

in this Disclosure Statement and the Plan. Similarly, in exchange for the contributions to the Trusts, the Settling Insurers will likewise be entitled to the benefit of certain releases, exculpation, and injunctions, all as more specifically set forth in this Disclosure Statement and the Plan.

The Survivor Compensation Trustee and Insurance Trustee will liquidate the Survivor Compensation Trust Assets and Insurance Trust Assets, respectively, and fairly distribute the proceeds to the Survivor Claimants, pursuant to the Plan and Survivor Compensation Trust Distribution Plan.

The Plan further provides that the holders of the General Unsecured Claims will be paid in full, that all Survivor Claims will be channeled to the Trusts, and that the Debtor and Additional Debtors will receive a discharge from all remaining Claims, permitting the Debtor and Additional Debtors to continue their missions, ministry, and other charitable activities after confirmation of the Plan.

**B.      Voting Procedures.**

1.      ***Ballots***.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class. If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

A ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted. You may not change your vote after the voting deadline passes.

To be counted, completed ballots must be actually received by the Debtor's solicitation and claims agent by 11:59 p.m. (prevailing Eastern time), on [_], 2026, using ***one*** of the following methods:

If by First Class mail:

> Roman Catholic Archbishop of Baltimore — [Ballot Processing]
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4420
> Beaverton, OR 97076-4420

If by overnight courier or hand delivery:

> Roman Catholic Archbishop of Baltimore — [Ballot Processing]
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97076

Or, if by electronic submission:

Please visit https://dm.epiq11.com/case/rcabaltimore/info. Click on the "*E-Ballot*" section of the Debtor's website and follow the directions to submit your E-Ballot. If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

**IMPORTANT NOTE: You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

**"*E-BALLOT*" IS THE SOLE MANNER IN WHICH BALLOTS WILL BE ACCEPTED VIA ELECTRONIC OR ONLINE TRANSMISSION. BALLOTS SUBMITTED BY EMAIL WILL NOT BE COUNTED.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY EMAIL BE ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTOR'S SOLICITATION AND CLAIMS AGENT, EPIQ CORPORATE RESTRUCTURING, LLC, BY EMAIL AT TABULATION@EPIQGLOBAL.COM WITH A REFERENCE TO "*ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE*" IN THE SUBJECT LINE, OR BY CALLING 1-877-337-1944 (US & CANADA, TOLL-FREE) OR 1-503-438-3079 (INTERNATIONAL) AND REQUESTING TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.**

      2.    ***Importance of Your Vote.***

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that vote.

Only the ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

**C.    Brief Explanation of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under chapter 11, section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims

and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek confirmation under section 1129(b) of the Bankruptcy Code. A plan proponent may confirm a plan notwithstanding a class voting to reject the plan only if another impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Debtor's solicitation and claims agent, Epiq Corporate Restructuring, LLC, by e-mail at tabulation@epiqglobal.com with a reference to "Roman Catholic Archbishop of Baltimore" in the subject line, or by calling 1-877-337-1944 (US & Canada, toll-free) or 1-503-438-3079 (international) and requesting to speak with a member of the solicitation team.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the chapter 11 process.

If the Plan is confirmed by the Bankruptcy Court, its terms are binding on the Debtor, all Creditors, and other parties in interest, regardless of whether they have voted to accept the Plan.

## II.   DESCRIPTION OF THE DEBTOR.

### A.   Nature and History of the Debtor.

The Archdiocese of Baltimore (the "*Archdiocese*") is the ecclesiastical district comprising a geographic area decreed by the Roman Catholic Church (the "*Church*") as the Archdiocese of Baltimore. Within the Archdiocese, Archbishop William E. Lori ("*Archbishop Lori*") is the diocesan bishop or ordinary for the Archdiocese (the "*Archbishop*"),[3] exercising ecclesiastical authority and jurisdiction in assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments

---

[3] All references to the defined term "Archbishop" in this Disclosure Statement refer to the position within the Archdiocese, including Archbishop Lori and all of his predecessors and successors, which is recognized under Maryland law as the ordinary of the archdiocese and under Canon Law as the diocesan bishop.

and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Archdiocese.

The Archbishop carries out his canonical duties in accordance with the Code of Canon Law ("*Canon Law*"), which is the ecclesiastical law of the Church. The Archbishop also has authority over the Debtor, which is a nonprofit religious institution and the civil law instrumentality through which the mission of the Church is administered within the Archdiocese. Archbishop Lori has had authority over the Debtor since May 16, 2012.

1. ***The Church.***

The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate and universal ordinary power in the Church. The Pope exercises such power in concert with the College of Bishops of which he is the head. A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy. As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds. A diocese is geographically divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop. As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds. Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church. Under Maryland law, the Debtor is a corporation sole and each parish is organized as a separate corporation, pursuant to and in accordance with the Maryland Corporations and Associations Code.

2. ***The Archdiocese and the Debtor.***

The Archdiocese's history extends back more than two hundred years to the eighteenth century. Today, the ecclesiastical district of the Archdiocese: (i) has two co-cathedrals both of which are located in Baltimore City: (a) the Cathedral of Mary Our Queen; and (b) the National Shrine of the Basilica of the Assumption of the Blessed Virgin Mary, which was this country's first cathedral and was dedicated by Archbishop Ambrose Marechal in 1821; (ii) includes a geographic area encompassing approximately 4,800 square miles across nine (9) counties of the State of Maryland; and (iii) contains close to 503,000 Catholics served by one hundred eight (108) (the "*Parishes*") and fifty-eight (58) schools (the "*Schools*"). The Debtor is the civil instrumentality through which the Archdiocese is recognized as a corporation sole, distinct from the Archbishop, Parishes, and other entities, pursuant to Maryland law.

**B. The Work of the Debtor within the Archdiocese.**

The primary role of the Debtor is to hold and administer the temporal goods of the Archdiocese and serve as the civil instrumentality through which services are provided to individuals of the Roman Catholic faith, the Parishes, the Schools, and the Related Non-Debtor Entities within the Archdiocese in furtherance of the mission and ministry of the Church within the Archdiocese. The mission and ministry of the Church within the Archdiocese, as administered by the Debtor, are extremely important to the people within the Archdiocese. Many within the Archdiocese, including non-Catholics, depend on the services that the Church, through the Debtor, delivers directly or otherwise supports, some of which services are material and monetary and others of which are purely spiritual.

5

**C.** **Relationship Between and Property of the Debtor, Parishes, Schools, and Certain Related Entities.**

As set forth above, there are many Roman Catholic ecclesiastical and civil entities that operate within the geographic territory of the Archdiocese, including the Parishes, the Schools, and other non-profit entities, funds, and trusts (collectively, the "***Related Entities***").

1. ***Parishes Within the Archdiocese.***

Under Canon Law, the parishes within a diocese are territorial, comprised of certain geographical areas within the applicable diocese. Once established by the bishop of a diocese, parishes are ecclesiastical entities in their own right and consist of communities of the Christian faithful whose pastoral care is entrusted to a priest. Within the Archdiocese, there are one hundred eight (108) Parishes for which pastors are appointed by the Archbishop. Each priest appointed as pastor by the Archbishop serves as the proper shepherd of the pastor's applicable Parish, under the Archbishop's authority.

In accordance with Maryland law, each Parish is organized as a separate and distinct non-profit corporation. Both canonically and under Maryland law, each Parish is a distinct and separate entity, and no Parish assets are assets of the Debtor.

2. ***Schools and Other Educational Institutions Within the Archdiocese.***

As set forth above, thousands of students are provided Catholic education through the Schools, consisting of eighteen (18) secondary schools and forty (40) elementary and middle schools. Thirty-four (34) of the forty (40) elementary and middle schools are associated with Parishes (either individually or regionally) within the Archdiocese, with the remaining six (6) being independent Catholic schools that are within the Archdiocese but are operated independently from, and without oversight by, the Debtor. Six (6) of the eighteen (18) high schools are regionally operated by Parishes or as separate corporations, with the remaining twelve (12) being independent Catholic high schools operated independently from, and without oversight by, the Debtor.

A listing of the Schools may be located on the website maintained by the RCAB at https://www.archbalt.org/schools/. Each of the Schools is either separately incorporated or is operated through an existing Parish. In either instance, while some Schools receive varying levels of support from, among others, the RCAB, each School is a distinct entity separate and apart from the RCAB.

Accordingly, no School's assets are assets of the RCAB.

3. ***Other Related Catholic Entities, Funds, and Trusts Within the Archdiocese.***

There are additional Related Entities within the Archdiocese.[4]

i. Archbishop of Baltimore Annual Appeal Trust.

The Archbishop of Baltimore Annual Appeal Trust was established as a perpetual and irrevocable trust on September 11, 1992 and collects specific gifts for the Annual Appeal for Catholic Ministries. The

---

[4] This section of the Disclosure Schedules describes most of the Related Entities but may not describe every Related Entity. In particular, the Debtor holds and manages certain custodial funds for the benefit of the Debtor which are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the Debtor.

funds raised by the Annual Appeal for Catholic Ministries are used to support over one hundred life-affirming ministries within the Archdiocese through various entities located within the Archdiocese.

No assets of the Archbishop of Baltimore Annual Appeal Trust are assets of the RCAB.

ii.     The Catholic Community Foundation of the Archdiocese of Baltimore, Inc.

The Catholic Community Foundation of the Archdiocese of Baltimore, Inc. (the "**CCF**") is a Maryland non-profit corporation, which was incorporated on April 21, 1999. The purpose of the CCF is to support the spiritual, educational and social needs of the Catholic community within the Archdiocese of Baltimore.

The CCF fulfills this mission by establishing fund agreements which provide ongoing support to fund the mission and ministries of Parishes, Schools, Related Entities, and other Catholic institutions located within the Archdiocese. At present, there are approximately five hundred fifty separate fund agreements in the CCF, which generally fall into one of four categories: (a) Field of Interest Funds that are established to support a particular area of need such as Catholic Education or Vocations; (b) Organizational Funds that are established for individual Parishes, Schools, or Other Entities;(c) Individual Community Funds that are established by individual donors with specific donor restrictions; and (d) Donor Advised Funds that are established by individuals who wish to remain active in their philanthropy and have access to the CCF's professional advice and management.

Most of the CCF funds are restricted endowments and all CCF funds are managed by an external investment management firm. The CCF distributes investment proceeds on an annual basis, in accordance with distribution parameters approved by CCF's Board of Trustees and consistent with applicable donor gift agreements and appliable law.

While the CCF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the CCF are assets of the RCAB.

iii.     Roman Catholic Foundation in the Archdiocese of Baltimore, Inc.

The Roman Catholic Foundation in the Archdiocese of Baltimore, Inc. (the "**RCF**") is a Maryland non-profit corporation, which was incorporated on April 3, 1978. Since its incorporation, the RCF's sole and specific purposes have been to: (a) further the Roman Catholic religion, including its charitable and educational activities within the Archdiocese; (b) aid and assist other charitable and educational organizations outside of the framework of the Archdiocese but sponsored or approved by it; and (c) assist in programs of the Holy See and institutions enjoying its recognition and approval. The RCF is governed by a board of directors, which is elected by the members of the RCF.

No assets of the RCF are assets of the RCAB.

iv.     The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc.

The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc. (the "**JCF**") is a Maryland non-profit corporation, which was incorporated on January 18, 1993. Since its incorporation, the JCF's purposes are to: (a) support and promote pre-school, primary, and secondary Catholic education within the Archdiocese; (b) provide financial support to establish and maintain Catholic-sponsored community schools and educational services in the Archdiocese; (c) support the youth ministry within the Archdiocese by providing financial resources for retreats, social activities, field trips and similar activities;

(d) foster and strengthen the charitable programs and services within the Archdiocese; and (e) support pastoral services, facilities, and programs within the Archdiocese.

The JCF is governed by a self-perpetuating board of trustees and at all times the Archbishop is also a member of the board of trustees.

No assets of the JCF are assets of the RCAB.

v.      <u>Associated Catholic Charities, Inc.</u>

Associated Catholic Charities Inc. ("***Catholic Charities***") is a Maryland non-profit corporation, which was incorporated on September 25, 1947. Catholic Charities is a faith-based agency, acting as a nondenominational social service provider affiliated with the RCAB and the Roman Catholic Church. Catholic Charities focuses upon providing: (a) mental and behavioral health services for children and families, including residential, community, and school-based programs, resources, and referrals; (b) apartment communities and life care options for seniors; (c) programs aimed at (i) assisting immigrants earn citizenship, visas, and other statuses and (ii) providing access to legal services, health care, and other vital resources; (d) meals, shelter, case management, and access to resources for individuals experiencing homelessness and poverty; (e) support, skills training, resources, and job placement services for individuals who are unemployed or underemployed; and (f) meal services, shelter, case management, and access to resources for children and families experiencing poverty and homelessness. Most services provided by Catholic Charities are offered at modest or no cost and all services are provided without regard to the religious affiliation of the recipient.

While Catholic Charities receives various types of support from the RCAB, no assets of Catholic Charities are assets of the RCAB.

vi.      <u>Inter-Parish Loan Fund, Inc.</u>

Prior to March 28, 2011, consistent with Canon Law, the Archbishop held in trust certain funds belonging to Parishes, Schools, and Related Entities as part of what was called the Interparish Deposit and Loan Program. On March 28, 2011, the Inter Parish Loan Fund, Inc. (the "***IPLF***") was incorporated under Maryland law, for the purpose of replacing the Interparish Deposit and Loan Program and providing a standalone program of depository, investment, and financing services (the "***IPLF Program***") to Eligible Participants (as defined in the IPLF's organizational and governing documents). Upon the formation of the IPLF, all funds held in trust as part of the Deposit and Loan Program for the benefit of Parishes, Schools, and Related Entities were transferred to the IPLF. Pursuant to the IPLF Program, and in accordance with Canon Law, funds of Parishes, Schools, and Related Entities in excess of amounts for ordinary needs are required to be deposited into the IPLF.

All assets deposited in the IPLF pursuant to the IPLF Program are held in trust, with legal title to all assets in the IPLF Program vested at all times in the IPLF. Assets held by the IPLF are not subject in whole or in part to voluntary or involuntary assignment, anticipation, legal process or claims of creditors of the IPLF or any participant in the IPLF Program. Each participant in the IPLF Program receives a Certificate of Participation evidencing their fractional undivided beneficial ownership interest in the investments and other assets held by the IPLF in an amount equal to: (a) the sum of the amounts deposited by the participant with the IPLF to be held in trust as part of the IPLF Program; (b) <u>less</u> all amounts withdrawn by the Participant in accordance with the IPLF Program; (c) <u>plus</u> interest accruing on the amounts held in trust from time to time, at the rates and in the manner provided by the IPLF Program's guidelines.

8

While the IPLF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the IPLF are assets of the RCAB.

vii.    Maryland Catholic Conference, LLC.

Maryland Catholic Conference, LLC (the "*MCC*") is the public policy voice for the Catholic Church in Maryland. The MCC is focused on state-level advocacy, providing opportunities for Catholics to live out their responsibility to engage in public and political life on behalf of the dignity of the human person and for the common good. The MCC is governed by a Board of Governors, which is comprised of Maryland's bishops and advised by an administrative board composed primarily of lay leaders from across Maryland.

While MCC receives various types of support from the RCAB, no assets of MCC are assets of the RCAB.

viii.    Route 175 East, LLC.

Route 175 East, LLC was formed in 2010 to purchase and develop property for the parish community of St. Lawrence the Martyr Parish. Route 175 East, LLC currently owns the land on which St. Lawrence Martyr Catholic Church is located.

The assets of Route 175 East, LLC are not assets of the RCAB.

ix.    Catholic Community School Land, Inc.

Catholic Community School Land, Inc. ("*CCSL*") was formed to purchase and build a new Catholic school in Baltimore City. CCSL currently owns the land and fixed assets of the Mother Mary Lange School and is an obligor under a New Market Tax Credit financing transaction entered to finance the construction of the Mother Mary Lange School.

The assets of CCSL are not assets of the RCAB.

x.    Mercy Ridge, Inc. Joint Venture.

Mercy Ridge, Inc. ("*Mercy Ridge*") is a continuing care retirement community and joint venture between the RCAB and Mercy Health Services, Inc. Mercy Ridge holds all legal title to all of the real and personal property utilized in the continuing care retirement community.

While the RCAB has certain governance and other rights based upon its partial ownership interest in Mercy Ridge, no assets of Mercy Ridge are assets of the RCAB.

xi.    Cemeteries.

Within the Archdiocese, Parishes operate fifty-three cemeteries and a single cemetery is operated by a separate corporation, The New Cathedral Cemetery Corporation (collectively, the "*Cemeteries*"). Each cemetery has its own cemetery administrator, who is responsible for ensuring effective cemetery operations. Each of the Cemeteries receives varying levels of support from the Office of Cemetery Management and, pursuant to the Archdiocese's policies and procedures, all Cemeteries must maintain funds in a CCF endowment that will produce a steady flow of earning sufficient to cover the costs of maintaining the grounds after income diminishes or ceases.

9

No assets of the Cemeteries are assets of the RCAB.

xii.     Catholic Review Media.

Catholic Review Media ("*Catholic Review*") is the official Catholic newspaper within the Archdiocese. The predecessor to the Catholic Review, the Catholic Mirror, was established in 1850. Catholic Review offers complimentary subscriptions to members of Parishes within the Archdiocese and are also offered to non-members for minimal cost. In 2017, the Catholic Review, legally organized as The Cathedral Foundation, Inc., was merged into the RCAB, and its operations became part of the RCAB's Department of Communication.

xiii.    Insurance Programs and Corresponding Trusts.

The Debtor maintains and operates a centralized insurance program, which provides, among other things, the Archdiocesan General Insurance Program (the "*General Insurance Program*"), Archdiocesan Sexual Misconduct Self-Insurance Program (the "*Self-Insurance Program*"), and Archdiocesan Health Benefits Program (the "*Health Benefits Program*" and collectively with the General Insurance Program and Self-Insurance Program, the "*Insurance Programs*").

The General Insurance Program is funded through the Archdiocesan General Insurance Program Trust (the "*General Insurance Trust*"), which in turn is funded through contributions from the RCAB, Parishes, Schools, and Related Entities. The Self-Insurance Program is funded through the Archdiocesan Sexual Misconduct Self-Insurance Program Trust (the "*Self-Insurance Trust*"), which in turn is funded through contributions from the RCAB, Parishes, Schools, and Related Entities. The Health Benefits Program is funded through the Archdiocesan Health Benefits Program Trust (the "*Health Benefits Trust*" and together with the General Insurance Trust and Self-Insurance Trust, the "*Insurance Trusts*"), which in turn is funded through contributions from the RCAB, Parishes, Schools, Related Entities, and their respective employees.

The General Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintain a program of risk protection; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; and (e) operating and funding the risk protection and risk management initiatives offered under the General Insurance Program.

The Self-Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of risk protection that provides a documented level of protection in connection with claims relating to sexual misconduct; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; (e) provide risk protection, risk management, and related services and funds, which may include criminal background screening, counseling assistance and pastoral outreach to victims of sexual misconduct, providing investigative services in connection with allegations of sexual misconduct, or funding sexual misconduct prevention efforts; and (f) operating and funding the risk protection and risk management initiatives offered under the Self-Insurance Program.

The Health Benefits Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of health benefits coverage that covers Participating Employers (as defined by the Health Benefits Program); (b) obtaining contracts of insurance, if desired, on behalf of

10

Participating Employers to provide health benefits as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage to Participating Employers on a self-insured basis, as documented in plan documents; (d) obtaining contracts of stop loss insurance to cover any or all risks provided under any plan documents; and (e) operating and funding the health benefits initiatives offered under the Health Benefits Program.

While the RCAB provides administrative services for each of the Insurance Programs, the funds held by the RCAB on behalf of each Insurance Program are held in trust to be used solely for each respective Insurance Program. Similarly, all funds in the Insurance Trusts are assets solely of the respective Insurance Trusts. The assets of the Insurance Programs and the Insurance Trusts are not assets of the RCAB.

xiv.    Priest Pension Plan.

Consistent with Canon Law and Church custom, the RCAB maintains the Archdiocese of Baltimore Priests' Pension Plan, which was established on July 1, 1972 (the "**Priest Pension Plan**"). The Priest Pension Plan is funded through contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Pension Plan. The Priest Pension Plan provides defined monthly benefit payments for retired priests, in accordance with Canon Law requirements.

Assets of the Priest Pension Plan, including the assets maintained in the Priest Pension Trust, are not assets of the RCAB.

xv.    Postretirement Health and Auto Plan for Priests of the Archdiocese of Baltimore.

Consistent with Canon Law and Church custom, the RCAB provides certain employee benefits for retired priests of the Archdiocese of Baltimore (the "**Priest Benefit Plan**"). The Priest Benefit Plan is funded by contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Benefit Plan.

Priests who retire from the Archdiocese of Baltimore, are not in active ministry, and maintain no current assignments are considered eligible for benefits under the Priest Benefit Plan. For those eligible, the Priest Benefit Plan provides (a) medical, vision, prescription drug, and dental benefits and (b) full cost auto insurance. As of July 1, 2022, the Priest Benefit Plan had one hundred twenty-nine (129) active participants (i.e., active priests making contributions), sixty-nine (69) retired priests receiving medical, vision, prescription drug, and dental benefits, and fifty-eight (58) retired priests receiving auto insurance.

Assets of the Priest Benefit Plan, including assets maintained in the Priest Benefit Plan Trust, are not assets of the RCAB.

xvi.    Retirement Plan for Lay Employees of the Archdiocese of Baltimore.

The RCAB maintains the Retirement Plan for Lay Employees of the Archdiocese of Baltimore (the "**Lay Pension Plan**"). The Lay Pension Plan is funded from the contributions from the RCAB, Parishes, Schools, and Certain Related Entities, which contributions are held in trust and utilized pursuant to and in accordance with the Lay Pension Plan. The Lay Pension Plan provides defined monthly benefit payments for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

Assets of the Lay Pension Plan, including assets maintained in the Lay Pension Plan Trust, are not assets of the RCAB.

11

xvii.    Lay Employees Retiree Medical Plan.

The RCAB provides certain employee benefits for retired lay employees of the RCAB, Parishes, Schools, and Related Entities (the "***Lay Benefit Plan***"). The Lay Benefit Plan is funded from contributions by the RCAB, Parishes, Schools, and certain Related Entities, with such contributions held in trust and utilized pursuant to and in accordance with the Lay Benefit Plan. The Lay Benefit Plan provides certain health insurance benefits for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

Assets of the Lay Benefit Plan, including assets of the Lay Benefit Plan Trust, are not assets of the RCAB.

**D.     The Clergy Sex Abuse Crisis and the Debtor's Response.**

In response to the clergy sex abuse crisis, numerous steps and actions have been taken within the Roman Catholic Church and Archdiocese to provide for all survivors of abuse, known and yet to be known, in a fair, just, and equitable manner.

1.     ***First Written Child Protection Policies Implemented.***

In 1993, the Debtor publicized its first written child protection policies and established an independent review board. The Debtor also began reporting all allegations of child sexual abuse, regardless of age, in response to the Maryland Attorney General's new guidance requiring mandatory reporting of historic allegations.

2.     ***Charter for the Protection of Children and Young People.***

In spring of 2002, the United States Bishops adopted the *Charter for the Protection of Children and Young People* (the "***Charter***"), adopting a "one strike" policy with regard to clergy serving in any active, public ministry. The Charter also included: (a) permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor; (b) requirement of criminal background checks for adults, including clergy, who work with children and youth; (c) implementation of educational programs for the prevention of child sexual abuse for both adults and children; (d) provision of behavioral guidelines and ethical standards for ministry; (e) establishing outreach for survivors; and (f) creation of review boards to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

That same year, the Debtor apologized for the abuse committed by ministers of the Church and disclosed the names of all credibly accused clergy, and money spent as a result of clergy abuse in a letter sent to all registered parishioners and on the Debtor's website. The most updated version of this list is maintained on the Debtor's website to this day.

3.     ***Debtor's Voluntary Mediation Program.***

In addition to the foregoing, in 2007 the Debtor launched the Survivor Mediation Program (the "***VMP***"). Under the VMP, the Debtor offers mediated financial settlements to survivors, regardless of how long ago the abuse had occurred. The Debtor works with the survivor and a retired, non-Catholic judge, to see if an agreement can be reached on a cash payment and often continued counseling assistance. As part of the process, the Debtor apologizes, acknowledges its belief in the allegations made by the survivor, and offers a personal meeting with the Archbishop.

12

The Debtor asks that survivors be represented by an attorney of their choosing to protect their rights, given that releases are executed in exchange for the cash payments. The Debtor does not require survivors to agree to confidentiality, only agreeing to confidentiality if expressly requested by the survivor.

To date, the Debtor has entered into settlement agreements with approximately one hundred thirty-two (132) survivors, resulting in excess of thirteen million dollars ($13,000,000) being paid to survivors, with one hundred six (106) of those settlements resulting from the VMP.

4.    ***Other and Continued Actions by the Debtor.***

In addition to implementation of the dictates of the Charter and establishing the VMP, the Debtor has taken the following additional steps: (i) in 2017, the Debtor contracted with Shield the Vulnerable for online training and compliance management, which training is updated every five (5) years; (ii) the Debtor supported legislation (a) allowing Survivors more time to file civil lawsuits in cases of child sexual abuse, which passed in 2017; and (b) for child protection education in all schools, which passed in 2018; (iii) in 2018, the Debtor began requiring all employees and clergy to complete child protection refresher training annually; (iv) in 2019, the Debtor became the first diocese in the United States to implement a third-party reporting system for allegations against its bishops; (v) in 2020, the Debtor adopted a new reporting system of the United States Conference of Catholic Bishops for allegations against bishops and appointed a retired law enforcement officer to independently receive reports against its bishops and ensure compliance with the new reporting system; and (vi) in 2022, the Debtor was ranked third out of one hundred seventy-seven dioceses by Voice of the Faithful in its annual report measuring abuse prevention and safe environment programs in the United States.

The Debtor has made—and continues to make—child protection and assistance to survivors and their families in their journey toward healing its top priorities.

## E.    Events Leading to the Chapter 11 Case.

For years, the Archdiocese has faced shifting demographics and a decline in church attendance, leading to declining revenues. In addition to the decline in attendance and revenues, the Debtor had borne increased expenses in connection with confronting issues regarding clergy sexual abuse. Like other similarly situated Catholic dioceses across the country, the Debtor struggled to balance the financial demands of meeting the needs of the Debtor's ongoing mission and ministry, on the one hand, and addressing the legal expenses and compensation arising from historical abuse committed by ministers of the Church. In addition, while the Debtor carried insurance during many periods in which abuse is alleged to have occurred, and while the Debtor believed and continues to believe such insurance provides coverage for Survivor Claims, the Debtor had been largely unsuccessful in obtaining any coverage for claims asserted against the Debtor.

In addition, in April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "*CVA*"), which Governor Moore approved on April 11, 2023. The CVA became effective October 1, 2023, and by its terms provides that, among other things, "notwithstanding any time limitation under a statute of limitations, a statute of repose, . . . or any other law, an action for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor may be filed at any time." While the Debtor has made and continues to make significant efforts to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the Debtor has reached consensual settlements, the Debtor believed additional unsettled claims and liabilities remained outstanding. With the passing of the CVA, and notwithstanding the Debtor's belief regarding the applicability of charitable immunity under Maryland law and the available insurance assets to satisfy Survivor Claims, reality dictated

13

that Survivor Claims would be brought against the Debtor in numbers likely to create legal expenses and other costs well beyond the Debtor's ability to pay.

As a result, the Debtor faced the prospect of legal expenses and other costs exceeding the Debtor's economic ability to pay, in which circumstance (a) survivors of abuse could have been left with limited or no compensation or other support, (b) the Debtor's ability to continue to support the mission and ministry of the Church within the Archdiocese would have been jeopardized, and (c) those within the Archdiocese (including non-Catholics) who depend on the services of the Church delivered through the Debtor could have been left without the material, monetary, and spiritual support the Debtor provides.

Faced with this prospect, the Debtor concluded seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to assure: (a) equitable compensation to survivors of Abuse within the Archdiocese; (b) marshaling of the assets—particularly insurance assets—available to compensate Survivors in an orderly and efficient process; (c) continuation of the counseling and other services provided through the Debtor to those who have been harmed; (d) continuation of the essential programs for the protection of children; and (e) continuation of the mission and ministry of the Church within the Archdiocese.

### III. EVENTS DURING THE CHAPTER 11 CASE.

### A. Bankruptcy Filing and First Day Orders.

The Debtor commenced the Chapter 11 Case on the Filing Date, by filing a voluntary petition under chapter 11 of the Bankruptcy Code. (Dkt. No. 1.) The Debtor has continued in possession of its assets and the management of its business as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On October 3, 2023, the Bankruptcy Court held an initial hearing (the "*First Day Hearing*") to consider certain "first day" matters, including the following:

1. ***Wages.***

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief* (Dkt. No. 7) (the "*Wage Motion*"), seeking to pay certain prepetition employee wages and benefit obligations. Following the First Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 43) on October 3, 2023, granting the Wage Motion on an interim basis and setting a final hearing to consider the relief requested in the Wage Motion for November 6, 2023 (the "*Second Day Hearing*").

On October 30, 2023, the Committee filed the *Limited Objection of the Official Committee of Unsecured Creditors to Debtor's Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief* (Dkt. No. 133). Following withdrawal of the foregoing objection (Dkt. No. 165) and the Second Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 169) on November 6, 2023, granting the relief sought in the Wage Motion on a final basis.

14

2.     *Utilities.*

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies Under Section 366 of the Bankruptcy Code, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (Dkt. No. 8) (the "***Utilities Motion***"), seeking to establish procedures for maintaining utility services for the Debtor. Following the First Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 46) on October 4, 2023, granting the Utilities Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Utilities Motion on a final basis.

On October 13, 2023, Baltimore Gas and Electric Company ("***BGE***") filed the *Objection of Baltimore Gas and Electric Company to the Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies Under Section 366 of the Bankruptcy Code, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (Dkt. No. 85). Following the Second Day Hearing and withdrawal of the foregoing objection (Dkt. No. 147), the Bankruptcy Court entered an order (Dkt. No. 170) on November 6, 2023, granting the relief sought in the Utilities Motion on a final basis.

3.     *Cash Collateral.*

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* (Dkt. No. 9) (the "***Cash Collateral Motion***"), seeking authority to continue using cash collateral and provide adequate protection to the Debtor's secured lender in exchange for the continued use of cash collateral. Following the First Day Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 50) on October 4, 2023, granting the relief sought in the Cash Collateral Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Cash Collateral Motion on a final basis. Following the Second Day Hearing, the Bankruptcy Court entered a second interim order (Dkt. No. 171) on November 6, 2023, granting the relief sought in the Cash Collateral Motion on an interim basis and setting a final hearing to consider the Cash Collateral Motion for December 4, 2023 (the "***Final Cash Collateral Hearing***"). On December 1, 2023, the Bankruptcy Court entered an order (Dkt. No. 226), granting the relief sought in the Cash Collateral Motion on a final basis.

4.     *Insurance Programs.*

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage* (Dkt. No. 10) (the "***Insurance Motion***"), seeking authority to continue administering the Debtor's Insurance Programs, continue participating in and obtaining coverage through the Debtor's Insurance Program, and authority to continue purchasing appropriate insurance coverage pursuant to the Debtor's Insurance Programs. Following the First Day Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 51) on October 4, 2023, granting the relief sought in the Insurance Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Insurance Motion on a final basis.

On October 30, 2023, the Committee filed *The Official Committee of Unsecured Creditors Limited Objection and Reservation of Rights as to the Motion for Entry of Interim and Final Orders Authorizing*

15

*the Debtor to: (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage* (Dkt. No. 137). Following the Second Day Hearing and consideration of the foregoing limited objection, the Bankruptcy Court entered an order (Dkt. No. 172) on November 6, 2023, granting the relief sought in the Insurance Motion on a final basis.

5.　　**_Retention of Claims and Noticing Agent._**

On the Filing Date, the Debtor filed the *Debtor's Emergency Application for Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent; and (II) Granting Related Relief* (Dkt. No. 11) (the "**_Claims Agent Application_**"), seeking authority to retain Epiq Corporate Restructuring, LLC as the claims and noticing agent in the Chapter 11 Case. Following the First Day Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 47) on October 4, 2023, granting the relief sought in the Claims Agent Application on an interim basis and setting the Second Day Hearing to consider the relief requested in the Claims Agent Application on a final basis.

On October 30, 2023, the Committee filed the *Objection of the Official Committee of Unsecured Creditors to Debtor's Emergency Application for Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent; and (II) Granting Related Relief* (Dkt. No. 136). Following the Second Day Hearing and consideration of the foregoing limited objection, the Bankruptcy Court entered a final order (Dkt. No. 180) granting the relief sought in the Claims Agent Application on a final basis.

6.　　**_Clarification of the Scope and Extent of the Automatic Stay._**

On the Filing Date, the Debtor filed the *Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (Dkt. No. 12) (the "**_Extend Stay Motion_**"), seeking entry of an order providing that the automatic stay applied to actions against related non-debtor parties that participated in the Debtor's Insurance Programs or otherwise shared insurance assets with the Debtor. On October 2, 2023, Eva Dittrich filed the *Preliminary Objection of Eva Dittrich to Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (Dkt. No. 27) (the "**_First Dittrich Objection_**"). Following the First Day Hearing and consideration of the First Dittrich Objection, the Bankruptcy Court entered an interim order (Dkt. No. 52) on October 4, 2023, granting the relief sought in the Extend Stay Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Extend Stay Motion on a final basis.

On October 30, 2023, Eva Dittrich filed the *Objection of Eva Ditrich to Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (Dkt. No. 129) (the "**_Second Dittrich Objection_**"). On November 2, 2023, the Committee filed *The Official Committee of Unsecured Creditors' Joinder and Response in Opposition to Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (Dkt. No. 162) (the "**_Committee Stay Objection_**"). Following the Second Day Hearing and consideration of the Second Ditrich Objection and Committee Stay Objection, the Bankruptcy Court entered a second interim order (Dkt. No. 173) on November 6, 2023, granting the relief sought in the Extend Stay Motion on an interim basis and holding in abeyance further consideration of the relief sought in the Extend Stay Motion.

7.　　**_Cash Management._**

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts;*

16

*(II) Extending the Time to Comply With, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; (V) Authorizing the Debtor's Continued Use of Credit Cards; and (VI) Granting Related Relief* (Dkt. No. 15) (the "**Cash Management Motion**"), seeking authority for the Debtor to continue using its prepetition cash management system investment practices in the ordinary course of business. Following the First Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 44) on October 3, 2023, granting the Cash Management Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Cash Management Motion on a final basis.

On October 30, 2023, the Committee filed *The Official Committee of Unsecured Creditors Limited Objection and Reservation of Rights as to the Motion for Entry of Interim and Final Orders: (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Extending the Time to Comply With, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; (V) Authorizing the Debtor's Continued Use of Credit Cards; and (VI) Granting Related Relief* (Dkt. No. 134). Following the Second Day Hearing and consideration of the foregoing limited objection, the Bankruptcy Court entered an order (Dkt. No. 174) on November 6, 2023, granting the relief sought in the Cash Management Motion on a final basis but reserving the U.S. Trustee's ability to request compliance with 11 U.S.C. § 345(b) on or before December 4, 2023.

On December 1, 2023, the U.S. Trustee filed *The United States Trustee's Objection to Waiving the Requirements of 11 U.S.C. § 345(b) With Respect to Debtor's Investment Accounts* (Dkt. No. 228). On January 22, 2024, the Debtor filed the *Debtor's Response to the United States Trustee's Objection to Waiving the Requirements of 11 U.S.C. § 345(b) With Respect to Debtor's Investment Accounts* (Dkt. No. 332). Following a hearing to consider the Cash Management Motion and objections to same on a final basis, the Bankruptcy Court entered the *Order Granting Waiver of Section 345(b) Requirements and Requirement Supplemental Disclosures on Investment Accounts* (Dkt. No. 345).

**B.      Procedural and Administrative Motions.**

To facilitate the efficient administration of the Chapter 11 Case and to reduce the administrative burden associated with the Chapter 11 Case, the Debtor filed the following procedural and administrative motions:

- *Debtor's Emergency Motion for an Order Authorizing the Debtor to File Under Seal Portions of Schedule E/F, the Creditor Matrix, and Other Pleadings and Documents* (Dkt. No. 2), which was granted by the Bankruptcy Court's *Order Authorizing the Debtor to File Under Seal Portions of Schedule E/F, the Creditor Matrix, and Other Pleadings and Documents* (Dkt. No. 168);

- *Debtor's Emergency Motion for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief* (Dkt. No. 13), which was granted by the Bankruptcy Court's *Notice and Order Extending Time to File Statement of Financial Affairs and Schedules* (Dkt. No. 48);

- *Debtor's Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Dkt. No. 87), which was granted by the Bankruptcy Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Dkt. No. 176); and

- *Debtor's Motion for Entry of an Order Authorizing the Debtor to Employ Professionals in the Ordinary Course of Business* (Dkt. No. 90), which was granted by the Bankruptcy Court's *Order Authorizing the Debtor to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* (Dkt. No. 179).

**C.      Retention and Employment of the Debtor's Professionals.**

During the Chapter 11 Case, the Debtor obtained approval to employ and retain a variety of professionals to assist it in fulfilling its duties and obligations as a debtor and debtor in possession in the Chapter 11 Case:

1.      ***Holland & Knight LLP as Lead Bankruptcy Counsel.***

On October 13, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Holland & Knight LLP as Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 88), seeking authority to retain Holland & Knight LLP ("***H&K***") to serve as the Debtor's lead bankruptcy counsel in the Chapter 11 Case. H&K's retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Approving Employment and Retention of Holland & Knight LLP as Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 177).

2.      ***Blank Rome as Special Insurance Counsel.***

On October 26, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Blank Rome, LLP as Special Insurance Counsel Effective as of the Petition Date* (Dkt. No. 109), seeking authority to retain Blank Rome, LLP ("***Blank Rome***") as the Debtor's insurance counsel in the Chapter 11 Case. Blank Rome's retention was approved on November 16, 2023, by the Bankruptcy Court's *Order Approving the Employment and Retention of Blank Rome, LLP as Special Insurance Counsel Effective as of the Petition Date* (Dkt. No. 199).

3.      ***YVS Law, LLC as Local Counsel and Conflicts Counsel.***

On October 2, 2023, the Debtor filed the *Application to Employ YVS Law, LLC as Local Counsel and Conflicts Counsel to the Debtor* (Dkt. No. 40), seeking authority to retain YVS Law, LLC ("***YVS***") to serve as local counsel and conflicts counsel to the Debtor in the Chapter 11 Case. YVS' retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Granting Application to Employ YVS Law, LLC as Local Counsel and Conflicts Counsel to the Debtor* (Dkt. No. 175).

4.      ***Keegan Linscott & Associates, PC as Financial Advisors.***

On October 13, 2023, the Debtor filed the *Debtor's Application to Retain Keegan Linscott & Associates, PC, as Financial Advisors, as of the Petition Date* (Dkt. No. 89), seeking authority to retain Keegan Linscott & Associates, PC ("***KLA***") to serve as the Debtor's financial advisor in the Chapter 11 Case. KLA's retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Authorizing the Debtor to Retain Keegan Linscott & Associates, PC, as Financial Advisors, as of the Petition Date* (Dkt. No. 178).

5.      ***Gallagher Evelius & Jones LLP as Special Counsel.***

On October 30, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Gallagher Evelius & Jones LLP as Special Counsel Effective as of the*

*Petition Date* (Dkt. No. 138), seeking authority to retain Gallagher Evelius & Jones LLP, now known as Gallagher LLP ("*Gallagher*") to continue providing all services it previously provided as the Debtor's general counsel and support the efforts of the Debtor in the Chapter 11 Case. Gallager's retention was approved on November 28, 2023, by the Bankruptcy Court's *Order Approving the Employment and Retention of Gallagher Evelius & Jones LLP as Special Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 216).

**D.      Appointment of Official Committee of Unsecured Creditors and Retention of Professionals.**

On October 11, 2023 the United States Trustee for the District of Maryland appointed the Official Committee of Unsecured Creditors (the "*Committee*") (Dkt. No. 81). Since the Committee's appointment, the Committee has sought to employ and retain a variety of professionals to assist it in fulfilling its duties and obligations in the Chapter 11 Case:

1.      ***Stinson LLP as Legal Counsel.***

On November 1, 2023, the Committee filed the *Application to Employ Stinson LLP as Legal Counsel for the Official Committee of Unsecured Creditors Effective as of October 25, 2023* (Dkt. No. 154), seeking authority to retain Stinson LLP ("*Stinson*") as the Committee's primary legal counsel in the Chapter 11 Case. Stinson's retention was approved on November 28, 2023, by the Bankruptcy Court's *Order Approving the Employment of Stinson LLP as Legal Counsel for the Official Committee of Unsecured Creditors Effective as of October 25, 2023* (Dkt. No. 217).

2.      ***Tydings & Rosenberg LLP as Local Counsel.***

On November 1, 2023, the Committee filed the *Application by the Official Committee of Unsecured Creditors for Authority to Employ Tydings & Rosenberg LLP, as Local Counsel Nunc Pro Tunc* (Dkt. No. 153), seeking authority to retain Tydings & Rosenberg LLP ("*Tydings*") as local counsel for the Committee in the Chapter 11 Case. Tydings' retention was approved on November 29, 2023, by the Bankruptcy Court's *Order Authorizing the Employment of Tydings & Rosenberg LLP as Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 220).

3.      ***Berkeley Research Group, LLC as Financial Advisor***

On February 2, 2024, the Committee filed the *Application to Employ Berkeley Research Group, LLC as Financial Advisor for the Official Committee of Unsecured Creditors* (Dkt. No. 355), seeking authority to retain Berkeley Research Group, LLC ("*BRG*") as financial advisor to the Committee. BRG's retention was approved on February 23, 2024, by the Bankruptcy Court's *Order Approving Application to Employ Berkeley Research Group, LLC as Financial Advisor for the Official Committee of Unsecured Creditors* (Dkt. No. 385).

4.      ***Stout Risius Ross, LLC as Valuation Expert***

On March 25, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Application to Employ Stout Risius Ross, LLC as Its Valuation Expert* (Dkt. No. 438), seeking authority to retain Stoute Risius Ross, LLC ("*Stout*") as a valuation expert with respect to Survivor Claims and insurance coverage for same. On April 8, 2024, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company (collectively, "*Hartford*") filed a response (Dkt. No. 454) to the Committee's application to retain Stout. On April 11, 2024, Employers Insurance Company of Wausau ("*Wausau*") filed a joinder (Dkt. No. 461) to Hartford's response. On April 17, 2024, Hartford filed a supplemental statement (Dkt. No. 467) to Hartford's response to the Committee's application to retain Stout. Stout's retention was

19

approved on May 1, 2024, by the Bankruptcy Court's *Order Approving the Official Committee of Unsecured Creditors' Application to Employ Stout Risius Ross, LLC as Its Valuation Expert* (Dkt. No. 502).

5. ***Burns Bair LLP as Special Insurance Counsel***

On April 1, 2024, the Committee filed the *Application to Employ Burns Bair LLP as Special Insurance Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 448), seeking authority to retain Burns Bair LLP ("***Burns***") as special insurance counsel for the Committee. On April 8, 2024, Hartford filed a response (Dkt. No. 454) to the Committee's application to retain Burns. On April 11, 2024, Wausau filed a joinder (Dkt. No. 461) to Hartford's response. On April 17, 2024, Hartford filed a supplemental statement (Dkt. No. 467) to Hartford's response to the Committee's application to retain Burns. Burns' retention was approved on May 1, 2024, by the Bankruptcy Court's *Order Approving Application to Employ Burns Bair LLP as Special Insurance Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 503).

**E.     Claims Process, Notice, and Deadlines.**

On October 30, 2023, the Debtor filed the *Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 139) (the "**Claims Motion**"), seeking entry of an order (i) establishing deadlines for the filing of proofs of claim in the Chapter 11 Case, (ii) approving forms for inclusion with proofs of claim filed by claimants asserting claims arising from sexual abuse, (iii) approving the form and manner of proposed notices of the deadline to file claims, and (iv) approving procedures pursuant to which claimants asserting claims arising from sexual abuse could file proofs of claim confidentially.

On November 13, 2023: (a) Hartford filed *Hartford Accident and Indemnity Company and Twin City Fire Insurance Company's Response in Support of Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 186) (the "***Hartford Response***"); (b) American Casualty Company (together with The Continental Insurance Company, "***CNA***") filed a joinder (Dkt. Nos. 190 and 194) to the Hartford Response; and (c) Pacific Employers Insurance Company and Federal Insurance Co. (collectively, "***Chubb***") filed the *Certain Insurers' Objection to Proposed Confidentiality Procedures in Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Service; and (IV) Approving Confidentiality Procedures* (Dkt. No. 193) (the "***Chubb Objection***").

On November 29, 2023, the Committee filed *The Official Committee of Unsecured Creditors' Response to Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 221) (the "***Committee Response***"). Replying to the Committee Response, on December 12, 2023, Hartford filed *Hartford Accident and Indemnity Company and Twin City Fire Insurance Company's Reply to the Official Committee of Unsecured Creditors' Response to Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 257).

On December 13, 2023, the Debtor filed the *Debtor's Omnibus Response in Support of Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 264).

On December 17, 2023, Chubb filed the *Joinder by Pacific Employers Insurance Company and Federal Insurance Company to the Insurers' Reply to the Official Committee of Unsecured Creditors' Response to Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures [ECF No. 257], and Partial Joinder to the Debtor's Omnibus Response in Support of Debtor's Motion [ECF No. 265]* (Dkt. No. 279).

On January 12, 2024, Chubb filed *Certain Insurers' Supplemental Objection to Proposed Confidentiality Procedures in Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Service; and (IV) Approving Confidentiality Procedures* (Dkt. No. 306).

On January 16, 2024, Chubb filed (a) *Line Attaching Redlined Proposed (A) Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; (IV) Approving Confidentiality Procedures; and (B) Form of Confidentiality Agreement* (Dkt. No. 314); and (b) *Pacific's Request for Judicial Notice in Support of Line Attaching Redlined Proposed (A) Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; (IV) Approving Confidentiality Procedures; and (B) Form of Confidentiality Agreement* (Dkt. No. 315).

On January 16, 2024, the Bankruptcy Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 316) (the "**Claims Procedures Order**"). Pursuant to the Claims Procedures Order, the Bankruptcy Court, among other things: (i) established May 31, 2024 as the deadline for filing proofs of claim against the Debtor and Estate; (ii) established certain confidentiality procedures for proofs of claim filed by Survivor Claimants; and (iii) approved the Debtor's proposed constructive notice procedures with respect to the deadline to file claims in the Chapter 11 Case.

**F.      Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities.**

On October 31, 2023, the Debtor filed the Debtor's statement of financial affairs (Dkt. No. 145) and schedules of assets and liabilities (Dkt. No. 146).

**G.      Survivor Statement Hearings.**

On March 15, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 418) (the "**First Survivor Statement Notice**"), requesting the Bankruptcy Court reserve time for Survivor Claimants to present statements off the record to the Bankruptcy Court on April 8, 2024, and May 20, 2024. On March 20, 2024, the Debtor filed the *Roman Catholic Archbishop of Baltimore's Statement in Support of the Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 423), endorsing the Committee's request and providing that Archbishop Lori would attend the hearings on both dates. On March 21, 2024, the Bankruptcy Court entered the *Order Granting Committee Request to Reserve Time for Presentation of Survivor Statements* (Dkt. No. 432), scheduling two, two-hour status conferences for the purposes of hearing statements from Survivor Claimants. Archbishop Lori and Bishop Parker attended both status conferences, hearing statements from six (6) Survivor Claimants on April 8, 2024 and eight (8) Survivor Claimants on May 20, 2024.

On April 7, 2025, the Committee filed *The Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 1036) (the "**Second Survivor Statement Notice**") requesting the Bankruptcy Court reserve additional time for Survivor Claimants to present statements off the record

to the Bankruptcy Court. On May 7, 2025, the Debtor filed the *Debtor's Request for Hearing* (Dkt. No. 1134), requesting a hearing be scheduled regarding the Second Survivor Statement Notice. Following an initial hearing regarding the Second Survivor Statement Notice, on June 30, 2025, Chubb filed *Century's Objection to the Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 1204).

**H.    Insurance Coverage Adversary Proceeding, Mediation, and Settlement Negotiations.**

On March 28, 2024, the Debtor commenced an adversary proceeding styled as *Roman Catholic Archbishop of Baltimore, et al., v. American Casualty Company of Reading, Pennsylvania, et al.*, Adv. Pro. No. 24-00072 (the "***Insurance Coverage Adversary Proceeding***"), seeking a declaratory judgment against the Debtor's insurers concerning the rights and duties of the Debtor and insurers under the applicable insurance contracts.

On May 14, 2024, certain defendants in the Insurance Coverage Adversary Proceeding filed the *Moving Insurers' Motion to Dismiss or for a More Definite Statement* (Adv. Pro. Dkt. No. 60) (the "***Motion to Dismiss Insurance Complaint***") and *Moving Insurers' Motion for Judicial Notice* (Adv. Pro. Dkt. No. 61). Each of General Star Indemnity Company ("***General Star***" or "***Berkshire Hathaway***"), Wausau, and CNA filed joinders to the Motion to Dismiss Insurance Complaint (Adv. Pro. Dkt. Nos. 63, 65, 79).

On May 23, 2024, the Debtor and Committee filed the *Joint Request for Mediation* (Dkt. No. 564), requesting assignment to mediation certain disputes regarding matters affecting the rights of the Committee's constituents and appointing the Honorable Robert J. Faris and Mr. Brian J. Nash as co-mediators. On June 4, 2024, the Debtor, Ad Hoc Committee of Parishes, Schools and Affiliates, and Committee filed a *Joint Request for Mediation* (Adv. Pro. Dkt. No. 89) in the Insurance Coverage Adversary Proceeding, requesting assignment to mediation certain disputes regarding liability under insurance policies issued to the Debtor.

On May 28, 2024, the Committee sought to intervene in the Insurance Coverage Adversary Proceeding (Adv. Pro. Dkt. No. 76) and Fireman's Fund Insurance Company and the American Insurance Company (collectively, "***Allianz***") sought to withdraw the reference of the Insurance Adversary Proceeding (Adv. Pro. Dkt. No. 80).

On June 6, 2024, Hartford filed the *Moving Insurers' Response to Joint Request for Mediation* (Dkt. No. 586), and Chubb filed the *Objecting Insurers' Omnibus Objection to Joint Requests for Mediation* (Dkt. No. 587).

On June 7, 2024, the Debtor filed the *Plaintiffs' Response in Opposition to Moving Insurers' Motion to Dismiss or for a More Definite Statement* (Adv. Pro. Dkt. No. 94), and the Committee filed the *Official Committee of Unsecured Creditors' Joinder to Plaintiffs' Response in Opposition to Moving Insurers' Motion to Dismiss or for a More Definite Statement* (Adv. Pro. Dkt. No. 95).

On June 11, 2024, the Debtor filed the *Plaintiffs' Response in Opposition to Fireman's Fund Insurance Company's and the American Insurance Company's Motion to Withdraw the Reference* (Adv. Pro. Dkt. No. 96), and Hartford filed *Defendants Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company and Twin City Fire Insurance Company's Objection to the Official Committee of Unsecured Creditors' Motion to Intervene* (Adv. Pro. Dkt. No. 98). Each of Chubb, Wausau, and CNA filed joinders to Hartford's objection to the Committee's request to intervene (Adv. Pro. Dkt. Nos. 99, 100, 108, 116).

On June 17, 2024, Chubb filed the *Moving Defendants' Motion to Withdraw the Reference of Insurance Coverage Adversary Proceeding From Bankruptcy Court to District Court* (Dkt. No. 607; Adv. Pro. Dkt. No. 128). On June 18, 2024, Chubb filed in the Chapter 11 Case the *Withdrawal of the Moving Defendants' Motion to Withdraw the Reference of Insurance Coverage Adversary Proceeding From Bankruptcy Court to District Court* (Dkt. No. 609).

On June 18, 2024, Hartford filed *Defendants Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company and Twin City Fire Insurance Company's Objection to the Joint Request for Mediation* (Adv. Pro. Dkt. No. 134).

On June 21, 2024, certain defendants in the Insurance Coverage Adversary Proceeding filed the *Moving Insurers' Reply in Support of Motion to Dismiss or for a More Definite Statement* (Adv. Pro. Dkt. No. 141). General Star joined in the reply (Adv. Pro. Dkt. No. 156).

On June 27, 2024, the Committee filed the *Reply of the Official Committee of Unsecured Creditors in Support of Motion to Intervene in Adversary Proceeding No. 24-00072* (Adv. Pro. Dkt. No. 149).

On June 28, 2024, the Committee filed the *Reply in Support of Joint Request for Mediation* (Adv. Pro. Dkt. No. 152).

On July 1, 2024, the Debtor filed the *Plaintiffs' Response in Opposition to Moving Defendants' Motion to Withdraw the Reference of Insurance Coverage Adversary Proceeding From Bankruptcy Court to District Court* (Adv. Pro. Dkt. No. 155).

On July 17, 2024, Hartford filed *Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company and Twin City Fire Insurance Company's Supplemental Response to Joint Requests for Mediation* (Dkt. No. 648), and Chubb filed the *Supplemental Objection to Objecting Insurers' Omnibus Objection to Joint Requests for Mediation [ECF No. 587 (23-16969)]* (Dkt. No. 649). On July 18, 2024, Lexington Insurance Company, New Hampshire Insurance Company and National Union Fire Insurance Company of Pittsburgh, P.A. (collectively, "**AIG**") filed a joinder (Dkt. No. 657) to Hartford's supplemental response.

Following multiple hearings and settlement discussions among the Debtor, Ad Hoc Committee of Parishes, Schools and Affiliates, Committee, and defendants in the Insurance Coverage Adversary Proceeding, the Bankruptcy Court entered the *Agreed Order Directing Mediation, Appointing Mediators, and Ordering Mediation Discovery* (Dkt. No. 705; Adv. Pro. Dkt. No. 196) (the "**Mediation Order**") on July 29, 2024, ordering certain parties to mediation, and providing for the appointment of three mediators. Pursuant to and in accordance with the Mediation Order:

- on August 5, 2024, Hartford filed the *Line Submitting Certain Insurers' Notice of Third Co-Mediator* (Dkt. No. 716; Adv. Pro. Dkt. No. 200), and Chubb filed the *Defendants Federal Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, and Westchester Fire Insurance Company's Notice of Selection of Third Mediator* (Dkt. No. 717; Adv. Pro. Dkt. No. 201);

- on August 13, 2024, the Debtor filed the *Notice of Voluntary Dismissal Without Prejudice* (Adv. Pro. Dkt. No. 204);

- on August 19, 2024, Hartford filed the *Line Submitting Certain Insurers' Notice Regarding Third Mediator Selection* (Dkt. No. 733);

23

- on August 21, 2024, Chubb filed *Federal Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, and Westchester Fire Insurance Company's Response to Line Submitting Certain Insures' Notice Regarding Third Mediator Selection* (Dkt. No. 762)

- on August 23, 2024, the Debtor, Ad Hoc Committee of Parishes, Schools and Affiliates, defendants in the Insurance Coverage Adversary Proceeding, and Committee filed the *Stipulation* (Adv. Pro. Dkt. No. 206) regarding the Committee's ability to intervene in any future adversary proceeding similar to the Insurance Coverage Adversary Proceeding;

- on August 23, 2024, the Bankruptcy Court entered the *Order Selecting Third Mediator* (Dkt. No. 766), appointing Mr. Marc Isserles as the third mediator pursuant to and in accordance with the Mediation Order; and

- on September 5, 2024, the Bankruptcy Court dismissed, without prejudice, the Insurance Coverage Adversary Proceeding (Adv. Pro. Dkt. No. 207).

The Debtor, Committee, the Ad Hoc Committee of Parishes, Schools and Affiliates, and the Debtor's insurers (the "***Mediation Parties***") have subsequently engaged in a number of mediation sessions in accordance with and subject to the Mediation Order. While the mediations have not resulted in a global resolution among the Mediation Parties, the contents of the Plan and the resulting Trusts are a product of the current state of mediation efforts and strenuous, arms'-length negotiations between all of the Mediation Parties.

## I.    Seek the City Initiative.

On March 10, 2025, the Debtor and Committee filed the *Joint Motion for Entry of an Order Approving Stipulation by and Between the Debtor and the Official Committee of Unsecured Creditors Regarding the Archdiocese of Baltimore's Seek the City to Come Plan* (Dkt. No. 1016). On April 1, 2025, the Bankruptcy Court entered an order (Dkt. No. 1031), approving the stipulation regarding the Archdiocese of Baltimore's Seek the City to Come Plan. The Debtor has been complying with the stipulation since entering into it with the Committee.

Notwithstanding the foregoing, on February 27, 2026, the Committee filed a *Complaint for Declaratory Judgment and Injunctive Relief Regarding Seek the City to Come* (Dkt. No. 2099), commencing adversary proceeding number 26-00041 (the "***Seek the City Adversary Proceeding***"). In the Seek the City Adversary Proceeding, the Committee sought to enjoin implementation of parish consolidation under the Seek the City Initiative and require the Debtor to seek court approval of the sale of any parish property in connection with the foregoing. On March 27, 2026, the Debtor filed a motion seeking dismissal of the Seek the City Adversary Proceeding and the Committee filed a motion for preliminary injunction. On April 2, 2026, the Bankruptcy Court entered the *Order Granting Preliminary Injunction With Limited Carveouts* (Adv. Pro. Dkt. No. 22) to maintain the status quo pending a final hearing on the Debtor's and Committee's competing motions. The Bankruptcy Court conducted hearings on April 16, April 20, and April 21 and has taken the competing motions under advisement as of the date of this Disclosure Statement.

On April 7, 2026, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Providing Real Estate Advisory Services, (II) Continue Collecting Elements of Cathedraticum in Connection With Real Estate Advisory Services, and (III) Granting Related Relief* (Dkt. No. 2196). On April 29, 2026, the Bankruptcy Court entered the *Interim Order Authorizing Debtor to Use Property in the Ordinary Course of Business Subject to Certain*

24

*Conditions* (Dkt. No. 2329) (the "***Interim Real Estate Services Order***"), permitting the Debtor to continue providing certain real estate advisory services to Parishes and Schools and requiring the Debtor to provide certain disclosures in connection with the provision of such services. In entering the Interim Real Estate Services Order, the Bankruptcy Court found, among other things, that the Debtor is a distinct and separate entity from each Parish and School corporation and the Archbishop in his capacity as the ordinary of the Archdiocese. (Dkt. No. 2329, at 9.)

**J.      Charitable Immunity Adversary Proceeding.**

On April 1, 2025, the Committee filed the *Notice of Limited Mediation Dispute* (Dkt. No. 1032) and commenced an adversary proceeding styled as *The Official Committee of Unsecured Creditors v. Roman Catholic Archbishop of Baltimore*, Adv. Pro. No. 25-00084 (the "***Charitable Immunity Adversary Proceeding***"), seeking a declaratory judgment against the Debtor concerning the applicability of charitable immunity to Survivor Claims under Maryland law. On January 6, 2026, the Court entered the *Order Granting the Joint Motion for Entry of an Order Approving Stipulation Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019* (Adv. Pro. Dkt. No. 170), approving a stipulation resolving the Charitable Immunity Adversary Proceeding. Pursuant to the stipulation resolving the Charitable Immunity Adversary Proceeding, the Debtor agreed the Debtor will not: (a) assert or otherwise rely upon the affirmative defense of charitable immunity in the Chapter 11 Case or any related chapter 11 case with respect to the allowance or disallowance of certain Survivor Claims or confirmation of a plan of reorganization not supported by the Committee; or (b) authorize any parish, school, or other Catholic affiliate within the geographic territory of the Archdiocese of Baltimore to seek bankruptcy protection unless such parish, school, or other Catholic affiliate agree to the same limitations on charitable immunity in their bankruptcy proceedings.

**K.      Amendments to the CVA and Commencement of Civil Actions.**

In April 2025, the Maryland legislature amended the CVA to, among other statutory changes, reduce the damages caps for any claims that had not been commenced by June 1, 2025. As a result of the foregoing amendment, the Committee filed *The Official Committee of Unsecured Creditors' Expedited Motion for (I) Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1043), seeking entry of an order (a) modifying the automatic stay to permit Survivor Claimants to file complaints in non-bankruptcy civil actions against the Debtor and non-debtor related parties and/or determining proofs of claim filed by Survivor Claimants constituted the filing of claims in "an action filed on or before May 31, 2025" for purposes of the CVA Amendment.

On April 30, 2025, the Ad Hoc Committee of Parishes, School and Affiliates filed the *Response of the Ad Hoc Committee of Parishes, Schools and Affiliates to the Official Committee of Unsecured Creditors' Expedited Motion for (I) Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1104), Hartford filed *Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company, and Twin City Fire Insurance Company's Response to the Official Committee of Unsecured Creditors' Expedited Motion for (I) Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1110), the Debtor filed the *Roman Catholic Archbishop of Baltimore's Response to the Official Committee of Unsecured Creditors' Expedited Motion for (I) Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1111), Wausau filed the *Employers Insurance Company of Wausau's Limited Objection to the Official Committee of Unsecured Creditors' Expedited Motion for (I)*

*Relief From the Automatic Stay and (II) an Order Establishing the Date on Which Profs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1112), Chubb filed the *Certain Insurers' Opposition to the Committee's Expedited Motion for (I) Relief From Automatic Stay and (II) an Order Establishing the Date on Which Proofs of Claim Initiated Commenced [sic] a Proceeding Under Maryland's CVA* (Dkt. No. 1113), American Casualty Company filed *Certain Insurers' Limited Objection to the Committee's Motion for Relief From the Automatic Stay and an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1116), and Travelers Indemnity Company, United States Fidelity and Guaranty Company, St. Paul Fire and Marine Insurance Company, and Northland Insurance Company (collectively, "***Travelers***") filed *Travelers' Joinder in Certain Insurers' Limited Objection to the Committee's Motion for Relief From the Automatic Stay and an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1118).

Following a hearing on May 1, 2025, the Bankruptcy Court entered on May 2, 2025, the *Order Modifying Automatic Stay Solely for Purposes of Filing and Serving Certain Civil Complaints Under Maryland Law on or Before May 31, 2025* (Dkt. No. 1127) ("***Stay Modification Order***"), modifying the automatic stay solely to the extent necessary to allow individuals to commence an action against the Debtor or any Covered Party (as defined in the order) by filing and serving a complaint for child sexual abuse claims under Maryland law on or before May 31, 2025.

### L.    Data Security Incidents.

During the pendency of the Chapter 11 Case, each of BRG and Stinson experienced data breaches (collectively, the "***Data Breaches***"). To date, the Debtor knows very little regarding the Data Breaches or whether any claims may exist in relation to or arising out of the Data Breaches; however, the exculpation provisions of the Plan do not provide for the exculpation of BRG or Stinson with respect to any claims arising out of or relating to the Data Breaches.

### M.    Claim Objections With Respect to Survivor Claims.

The Debtor filed: (a) on November 7, 2025, the: (i) *Debtor's First Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1525); (ii) *Debtor's Second Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1528); (iii) *Debtor's Third Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1530); and (iv) *Debtor's Fifth Omnibus Objection to Claims (Non-Substantive; Duplicate Claims)* (Dkt. No. 1535); and (b) on November 10, 2025, the *Debtor's Fourth Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1584) (collectively, the "***Non-Substantive Claim Objections***").

In addition to the Non-Substantive Claim Objections, the Debtor filed individual claim objections to two hundred two (202) proofs of claim on the following bases (collectively, the "***Substantive Claim Objections***"): (a) one hundred fourteen (114) because the proof of claim does not contain allegations regarding the Debtor, an affiliate of the Debtor, or an agent of the Debtor (the "***No Liability Claims***"); (b) thirty-nine (39) because the proof of claim form does not include a claim supplement or otherwise include information regarding an alleged Survivor Claim (as defined in the Claims Procedures Order) (the "***No Supplement Claims***"); (c) thirty-four (34) because the proof of claim is filed by an individual who has previously entered a settlement with the Debtor, which is documented in an executed settlement agreement containing releases of all claims against, among others, the Debtor (the "***Settled Claims***"); (d) nine (9) because the claimant alleges they were an adult at the time of the alleged abuse, which means the underlying claim is time-barred; and (e) six (6) because the proof of claim alleges the Survivor Claimant was deceased

26

at the time of filing the proof of claim, which means the underlying claim is time-barred (together with the claims identified in (d), the "***Time-Barred Claims***").

**N.      Committee's Motion to Dismiss Chapter 11 Case.**

On September 3, 2025, the Committee filed the *Official Committee of Unsecured Creditors' Contingent Motion to Dismiss the Bankruptcy Case* (Dkt. No. 1320) (the "***Motion to Dismiss***"). On January 15, 2026, the Bankruptcy Court entered the *Order Addressing Motion to Dismiss Case* (Dkt. No. 1855), denying the Motion to Dismiss.

**IV.      SUMMARY OF THE PLAN.**

The below summary is provided for the convenience of holders of Claims and Interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits.

**A.      Overview of Classification and Treatment of Claims and Interests.**

Following the requirements of the Bankruptcy Code, all Claims are placed in categories. Most are placed into separate classes, others are unclassified. These categories are described in detail in the Plan and later in this section of the Disclosure Statement.

The Plan proposes different "treatment" of Claims, depending on their classification under the Plan as follows:

| Class | Designation | Impaired | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | School Bond Claims | N | Deemed to Accept |
| 2 | PNC Secured Claims | N | Deemed to Accept |
| 3 | Other Priority Claims (Against the Debtor and Additional Debtors) | N | Deemed to Accept |
| 4 | Other Secured Claims (Against the Debtor and Additional Debtors) | N | Deemed to Accept |
| 5 | General Unsecured Claims (Against the Debtor) | Y | Yes |
| 6 | Survivor Claims (Against the Debtor and Additional Debtors) | Y | Yes |
| 7 | Non-Survivor Litigation Claims (Against the Debtor and Additional Debtors) | Y | Yes |
| 8 | Co-Insured Entity Claims | Y | Yes |
| 9 | Additional Debtors General Claims (Against Additional Debtors) | N | Deemed to Accept |

A class of claims or interests are "impaired" under a plan unless, with respect to each claim or interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. The holders of claims or interests that are classified and are "*impaired*" are entitled to vote on the Plan. The classes that are entitled to vote under the Plan are: (a) Class 5—General Unsecured Claims; (b) Class 6—Survivor Claims; (c) Class 7—Non-Survivor Litigation Claims; and (d) Class 8—Co-Insured Entity Claims. **All other classes are deemed to accept the Plan unless they timely file an objection to the Plan.**

B.      **Description of Classes and Treatment.**

The following is a description of Claims, classes, and treatment. The treatment is taken from the Plan, but additional information and descriptions regarding the claims and various estimates are provided in this Disclosure Statement. In case of inconsistency, the Plan controls.

1.      ***Allowed Administrative Expense Claims.***

i.      Administrative Expense Claims Generally.

Except to the extent a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive on account of and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtor's operations during the Chapter 11 Case or an Additional Debtor's operations during the applicable Additional Debtor Chapter 11 Case may be paid by the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.

ii.     Ordinary Course Liabilities.

Allowed Administrative Expense Claims based upon liabilities incurred by the Debtor or any Additional Debtor in the ordinary course of its business shall be satisfied by the Reorganized Debtor or applicable Additional Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claims, without any further action by the holders of such Administrative Expense Claims or further approval by the Bankruptcy Court.

iii.    Professional Fee Claims.

All Professionals or other Persons requesting the final allowance and payment of compensation or reimbursement of expenses pursuant to sections 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for allowance and payment of Professional Fee Claims on counsel to the Debtor and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtor or Reorganized Debtor, as applicable, and the Professional requesting allowance and payment of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full in Cash and in such amounts as are Allowed by the Bankruptcy Court on or as soon as reasonably practicable after the later of: (a) the date upon which an order relating to any such Allowed Professional Fee Claim is entered; and (b) such other date(s) as the holder of the Allowed Professional Fee Claim and the Debtor or Reorganized Debtor, as applicable, shall have agreed.

28

The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred by its Professionals after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### iv.    Statutory Fees and Court Costs.

Statutory Fees and Court Costs will be paid in full in Cash by the Reorganized Debtor and Additional Reorganized Debtors on the Effective Date or as soon as reasonably practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines. After the Effective Date, the Reorganized Debtor and Additional Reorganized Debtors will continue to pay quarterly fees to the Office of the United States Trustee and file quarterly reports with the Office of the United States Trustee until the Chapter 11 Case is closed, dismissed, or converted. In the event the Survivor Compensation Trustee or Insurance Trustee opposes the closure of the Chapter 11 Case, the applicable Trust will be responsible for the payment of all Statutory Fees and Court Costs from the date of the filing of any such opposition through the closure of the Chapter 11 Case. In the event the Chapter 11 Case is reopened, the Survivor Compensation Trust shall be responsible for the payment of Statutory Fees and Court Costs. If either Trust is responsible to pay Statutory Fees and Court Costs but fails to do so, the Reorganized Debtor or any Additional Reorganized Debtor may pay the applicable Statutory Fees and Court Costs and seek reimbursement from the applicable Trust.

### 2.    ***Unsecured Priority Claims.***

### i.    Priority Tax Claims.

Except to the extent a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after, the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; provided, however, that the Debtor, Additional Debtors, Reorganized Debtor, and Additional Reorganized Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

Notwithstanding the provisions of Section 2.4 of the Plan, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with, the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty shall be subject to treatment in Class 5 (General Unsecured Claims), if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtor, any Additional Debtor, the Reorganized Debtor, any Additional Reorganized Debtor, or their respective property.

### ii.    Employee Priority Claims.

The holder of an Allowed Employee Priority Claim will receive, in full satisfaction of such Allowed Employee Priority Claim: (a) payment in full of the unpaid amount of such Allowed Employee Priority Claim in cash as soon as practicable after the later of (i) the Effective Date and (ii) the date such Allowed Employee Priority Claim becomes Allowed; or (b) such other treatment as agreed in writing by the holder of such Allowed Employee Priority Claim or ordered by the Bankruptcy Court.

29

3.    ***Class 1: School Bond Claims.***

    i.    **Classification**: Class 1 consists of the School Bond Claims.

    ii.    **Treatment**: Except to the extent the holder(s) of the School Bond Claims agrees to less favorable treatment, on the Effective Date, the School Bond Claims shall be Reinstated and all loan documents and provisions relating to the School Bond Claims shall remain in full force and effect until all obligations of the Debtor have been indefeasibly paid in full.

    iii.    **Voting**: The School Bond Claims are Unimpaired. As a result, each holder of a School Bond Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of School Bond Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of School Bond Claims will not be solicited with respect to the School Bond Claims.

4.    ***Class 2: PNC Secured Claims.***

    i.    **Classification**: Class 2 consists of the PNC Secured Claims.

    ii.    **Treatment**: Except to the extent the holder(s) of the PNC Secured Claims agrees to less favorable treatment, on the Effective Date, the PNC Secured Claims shall be Reinstated and all loan documents and provisions relating to the PNC Secured Claims shall remain in full force and effect until all obligations of the Debtor have been indefeasibly paid in full.

    iii.    **Voting**: The PNC Secured Claims are Unimpaired. As a result, each holder of a PNC Secured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PNC Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of PNC Secured Claims will not be solicited with respect to the PNC Secured Claims.

5.    ***Class 3: Other Priority Claims.***

    i.    **Classification**: Class 3 includes all Other Priority Claims.

    ii.    **Treatment**: Except to the extent that a Class 3 Claimant agrees to less favorable treatment of its Class 3 Claim, in exchange for full and final satisfaction of its Class 3 Claim, at the sole option of the Reorganized Debtor or applicable Additional Reorganized Debtor, each Class 3 Claimant shall receive: (i) payment in Cash in an amount equal to such Allowed Class 3 Claim, payable on or as soon as reasonably practicable after the last to occur of (A) the Effective Date, (B) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, and (C) the date on which a Class 3 Claimant and the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, shall otherwise agree in writing; or (ii) satisfaction of its Allowed Class 3 Claim in any other manner that renders the Allowed Class 3 Claim Unimpaired, including Reinstatement.

    iii.    **Voting**: Other Priority Claims are Unimpaired. As a result, each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Other Priority Claims will not be solicited with respect to Other Priority Claims.

6.      ***Class 4: Other Secured Claims.***

i.      **Classification**: Class 4 includes all Other Secured Claims.

ii.      **Treatment**: Except to the extent a holder of an Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction of such Allowed Other Secured Claim, each holder of an Other Secured Claim will receive, at the sole option of the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable: (a) Cash in an amount equal to the Allowed amount of such Other Secured Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (iii) the date on which the holder of such Other Secured Claim and the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, shall otherwise agree in writing; (b) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (c) return of the applicable collateral on the Effective Date or as soon as reasonably practicable after the Effective Date.

iii.      **Voting**: Other Secured Claims are Unimpaired. As a result, each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Other Secured Claims will not be solicited with respect to Other Secured Claims.

7.      ***Class 5: General Unsecured Claims.***

i.      **Classification**: Class 5 includes all General Unsecured Claims.

ii.      **Treatment**: Except to the extent a holder of a General Unsecured Claim agrees to less favorable treatment of their General Unsecured Claim, in exchange for full and final satisfaction of such Allowed General Unsecured Claim, each holder of a General Unsecured Claim shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim (excluding interest), which shall be payable on or as soon as reasonably practicable after the later to occur of: (i) the Effective Date; (ii) the date on which the applicable General Unsecured Claim becomes an Allowed General Unsecured Claim; and (iii) the date on which the holder of such General Unsecured Claim and the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, shall otherwise agree in writing.

iii.      **Voting**: General Unsecured Claims are Impaired. As a result, each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

8.      ***Class 6: Survivor Claims.***

i.      **Classification**: Class 6 includes all Survivor Claims.

ii.      **Treatment**: The Plan creates a Survivor Compensation Trust and Insurance Trust to fund payments and pursue Insurance Claims relating to Survivor Claimants entitled to such payments under the Plan, the Survivor Compensation Trust Agreement, and Survivor Compensation Trust Distribution Plan. As of the Effective Date, the liability of Protected Parties and Settling Insurers for all Survivor Claims shall be: (i) assumed fully by the Insurance Trust and Survivor Compensation Trust, as applicable, without further act, deed, or court order; and (ii)

31

pursuant to the Discharge Injunction, Channeling Injunction, and Supplemental Settling Insurer Injunction, satisfied solely from the Survivor Compensation Trust and Insurance Trust as set forth in the Plan and the Confirmation Order. No Survivor Claimant shall receive any payment on account of their Survivor Claim unless and until such Survivor Claimant has executed a Survivor Claimant Release attached as **Exhibit H** to the Plan.

iii.     **Voting**: Survivor Claims are Impaired and, therefore, each holder of a Survivor Claim is entitled to vote to accept or reject the Plan.

9.     ***Class 7: Non-Survivor Litigation Claims.***

i.     **Classification**: Class 7 consists of Non-Survivor Litigation Claims.

ii.     **Treatment**: Except to the extent a holder of a Non-Survivor Litigation Claim agrees to less favorable treatment, in exchange for full and final satisfaction of Allowed Non-Survivor Litigation Claims, the holder of each Non-Survivor Litigation Claim shall seek to collect upon such Non-Survivor Litigation Claim solely from applicable insurance proceeds, other than any policies or proceeds of a Settling Insurer. No holder of a Non-Survivor Litigation Claim shall: (i) seek to compel the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors to pay any deductible, retention, or any other amount for or on account of any insurance carrier, provider, broker, or policy; or (ii) obtain any distribution from the Debtor, Additional Debtors, Estates, Reorganized Debtor, or Additional Reorganized Debtors, in or arising out of any Non-Survivor Litigation Claim.

iii.     **Voting**: Class 7 is Impaired, and each holder of a Non-Survivor Litigation Claim is entitled to vote to accept or reject the Plan.

10.     ***Class 8: Co-Insured Entity Claims.***

i.     **Classification**: Class 8 consists of Co-Insured Entity Claims.

ii.     **Treatment**: The Plan is intended to resolve all claims between the Debtor, on the one hand, and the other Co-Insured Entities, on the other hand. As a component of the Plan, and to maximize recovery for Survivor Claimants, the Co-Insured Entities have agreed to waive all rights to Distributions on account of their respective Claims, as applicable, and the Debtor has agreed to waive all Claims against any Co-Insured Entity. As a result, there will be no Distribution to the holders of Co-Insured Entity Claims.

iii.     **Voting**: Class 8 is Impaired, and each holder of a Co-Insured Entity Claim is entitled to vote to accept or reject the Plan.

11.     ***Class 9: Additional Debtors General Claims.***

i.     **Classification**: Class 9 consists of Additional Debtors General Claims.

ii.     **Treatment**: Except to the extent that a Claimant holding an Allowed Additional Debtors General Claim agrees to less favorable treatment of such Additional Debtors General Claim, each Reorganized Additional Debtor will pay each Allowed Additional Debtors General Claim of such Reorganized Additional Debtor in accordance with the terms and conditions otherwise governing such Allowed Additional Debtors General Claim so that such Allowed Additional Debtors General Claim is rendered Unimpaired by the Plan and will pass through after

the Effective Date for all purposes as if the Additional Debtor Chapter 11 Cases had never been filed.

iii.     **Voting**: Class 9 is Unimpaired. As a result, each holder of an Additional Debtors General Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Additional Debtors General Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Additional Debtors General Claims will not be solicited with respect to Additional Debtors General Claims.

**C.      The Survivor Compensation Trust.**

The Plan establishes the Survivor Compensation Trust to, among other things, evaluate Survivor Claims and administer compensation to Survivor Claimants.

1.      ***Establishment of Survivor Compensation Trust.***

On the Effective Date, or as soon as practicable after the Effective Date, the Survivor Compensation Trust shall be established in accordance with the Survivor Compensation Trust Documents for the exclusive benefit of Survivor Claimants. The Survivor Compensation Trust will assume all liability for and rights concerning all Insurance Settlement Agreements. The Survivor Compensation Trust will distribute all Survivor Compensation Trust Assets pursuant to and in accordance with the Survivor Compensation Trust Distribution Plan, the Survivor Compensation Trust Agreement, the Plan, and the Confirmation Order. The Survivor Compensation Trustee shall establish and maintain a reserve for expenses of the Survivor Compensation Trust, which shall be paid pursuant to the terms of the Survivor Compensation Trust Agreement.

2.      ***Funding of the Survivor Compensation Trust.***

The Survivor Compensation Trust initially will be funded by the Debtor, Additional Debtors, Related Non-Debtor Entities, and Settling Insurers in the following amounts:

| | |
|---|---|
| Debtor | $40,000,000 |
| Additional Debtors | TBD |
| Related Non-Debtor Entities | TBD |
| Settling Insurers | $125,000,000 |

Contributions being made by the Debtor, Additional Debtors, and Related Non-Debtor Entities are being made to the Survivor Compensation Trust notwithstanding, and without waiving, applicability of charitable immunity under Maryland Law with respect to Survivor Claims.

Contributions by the Debtor, Additional Debtors, and Related Non-Debtor Entities will be made within ten (10) Business Days of the Effective Date of the Plan. Contributions by Settling Insurers will be within the time set forth in the applicable Insurance Settlement Agreement, with all rights in each Insurance Settlement Agreement being assigned to the Survivor Compensation Trust.

i.      Transfers from Insurance Trust.

Upon the completion of all duties and obligations of the Insurance Trustee and Insurance Trust, any funds remaining in the Insurance Trust shall be distributed to the Survivor Compensation Trust for distribution in accordance with the Plan, the Survivor Compensation Trust Agreement, and the Survivor Compensation Trust Distribution Plan.

ii.      Outbound Contribution Claims.

On the Effective Date, all Outbound Contribution Claims are automatically and without further act or deed assigned to the Survivor Compensation Trust, including those Outbound Contribution Claims set forth in **Exhibit D** to the Plan.

iii.      Unknown Survivor Claims Reserve.

For a period of [_] months, the Survivor Compensation Trust shall be obligated to maintain in a segregated account for the benefit of Unknown Survivor Claimants an amount not less than the lesser of: (a) the aggregate amount of all awards to Unknown Survivor Claimants finally determined in accordance with the Plan, the Survivor Compensation Trust Documents, and other Plan Documents; and (b) $[_] (such amount, the "*Unknown Survivor Claims Reserve*"). The Unknown Survivor Claims Reserve shall be administered as provided in the Survivor Compensation Trust Documents. The Unknown Survivor Claims Reserve amount set forth above is the maximum amount to be contributed by the Debtor, Additional Debtors, Reorganized Debtor, Additional Reorganized Debtors, or Survivor Compensation Trust for any Unknown Survivor Claims.

3.      ***Vesting of Survivor Trust Assets in Survivor Compensation Trust.***

On the Effective Date, all Survivor Compensation Trust Assets shall vest in the Survivor Compensation Trust, and the Co-Insured Entities shall be deemed for all purposes to have transferred all of their respective Interests in the Survivor Compensation Trust Assets to the Survivor Compensation Trust. On the Effective Date, or as soon as practicable after the Effective Date, the Co-Insured Entities shall take all actions reasonably necessary to transfer any Survivor Compensation Trust Assets to the Survivor Compensation Trust. Upon the transfer of control of the Survivor Compensation Trust Assets in accordance with Section 4.3 of the Plan, the Co-Insured Entities shall have no further Interests in or with respect to the Survivor Compensation Trust Assets.

4.      ***Survivor Compensation Trust Liability for Survivor Claims.***

On the Effective Date, the Survivor Compensation Trust shall automatically and without further act or deed assume: (a) all liability, if any, of the Protected Parties and Settling Insurers with respect to Channeled Claims, to the extent such Channeled Claims do not relate to Non-Settling Insurer Policies; (b) responsibility for preserving, managing, and distributing Survivor Compensation Trust Assets pursuant to and in accordance with the Plan and the Survivor Compensation Trust Documents; and (c) the right to receive proceeds of Insurance Claims against Non-Settling Insurers after the payment of expenses of the Insurance Trust or otherwise from such proceeds in accordance with the Insurance Trust Agreement. Except as otherwise provided in the Plan, the Survivor Compensation Trust shall only assume the liabilities of the Protected Parties with respect to any particular Survivor Claims upon the occurrence of the Survivor Claim Discharge Date with respect to such Survivor Claims.

34

5.      *Appointment of Survivor Compensation Trustee.*

The initial Survivor Compensation Trustee has been identified in **Exhibit F** to the Plan. The Survivor Compensation Trustee shall commence serving as the Survivor Compensation Trustee on the Effective Date; provided, however, that the Survivor Compensation Trustee shall be permitted to act in accordance with the terms of the Survivor Compensation Trust Agreement from such earlier date, as authorized by the Debtor and Additional Debtors, and shall be entitled to seek compensation in accordance with the terms of the Survivor Compensation Trust Agreement and the Plan.

6.      *Rights and Responsibilities of Survivor Compensation Trustee.*

The Survivor Compensation Trust shall be established for the purposes described in Section 4.6 of the Plan. The Survivor Compensation Trust shall receive, and be deemed to be the sole recipient of, the transfer and assignment of the Survivor Compensation Trust Assets as set forth in Article 4 of the Plan. The Survivor Compensation Trustee shall be responsible for the evaluation of Survivor Claims and making Survivor Compensation Trust Distributions to the Survivor Claimants, pursuant to and in accordance with the Plan, the Survivor Compensation Trust Agreement, and Survivor Compensation Trust Distribution Plan. All costs and expenses in executing the obligations of the Survivor Compensation Trust shall be paid by the Survivor Compensation Trust. All obligations of the Survivor Compensation Trust shall be undertaken with the aim of maximizing Survivor Compensation Trust Assets available to make Survivor Compensation Trust Distributions to Survivor Claimants and with no objective to continue or engage in the conduct of any trade or business. The proposed Survivor Compensation Trust Agreement and Survivor Compensation Trust Distribution Plan are attached to the Plan as **Exhibit F** and **Exhibit G**, respectively.

Upon the Effective Date, the Survivor Compensation Trustee: (a) may take any action required to enforce the Insurance Settlement Agreements; (b) may seek enforcement of the Plan, Confirmation Order, or any other Final Order entered by the Bankruptcy Court in the Chapter 11 Case or the Additional Debtor Chapter 11 Cases that may affect the Survivor Compensation Trustee's administration of Survivor Compensation Trust Assets or otherwise perform its duties pursuant to the Plan; (c) shall liquidate and convert to Cash the Survivor Compensation Trust Assets, make timely Survivor Compensation Trust Distributions, and not unduly prolong the duration of the Survivor Compensation Trust; (d) may request an expedited determination of taxes of the Survivor Compensation Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Survivor Compensation Trust for all taxable periods through the dissolution of the Survivor Compensation Trust; and (e) may retain professionals on behalf of the Survivor Compensation Trust, at the Survivor Compensation Trust's sole expense, as reasonably necessary and to carry out the obligations of the Survivor Compensation Trustee under the Plan, the Survivor Compensation Trust Agreement, and Survivor Compensation Trust Distribution Plan. The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no Action shall be commenced in any forum other than the Bankruptcy Court against the Survivor Compensation Trustee in its official capacity relating to or otherwise arising out of the Survivor Compensation Trustee's duties, powers, acts, or omissions as Survivor Compensation Trustee.

7.      *Survivor Compensation Trust's Pursuit of Debtor and Co-Insured Entities.*

The Survivor Compensation Trust's pursuit of any Co-Insured Entities shall be limited to enforcing specific performance of Section 4.2.1 and Section 4.2.2 of the Plan.

8.      *Survivor Compensation Trust's Rights With Respect to Survivor Claims.*

The Survivor Compensation Trust retains the right to assert and liquidate Survivor Claims, including Litigation Claims, against the Insurance Trust to the extent such Survivor Claims relate to

Insurance Claims against Non-Settling Insurers. To the extent a settlement is achieved with the Insurance Trust or a Non-Settling Insurer as to any Survivor Claims, such recovery shall be distributed: (a) first, to the Insurance Trust in accordance with the terms of such settlement; (b) second, to the Survivor Compensation Trust pursuant to and in accordance with Section 5.7 and Section 6.4.2 of the Plan and the Insurance Trust Agreement; and (c) third, to Survivors and expenses of the Survivor Compensation Trust, pursuant to and in accordance with the Survivor Compensation Trust Agreement and Survivor Compensation Trust Distribution Plan.

9.    ***Investment Powers; Permitted Cash Expenditures.***

All funds held by the Survivor Compensation Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Survivor Compensation Trust Agreement. The Survivor Compensation Trustee may expend such Cash in a manner consistent with the terms of the Survivor Compensation Trust Agreement.

10.    ***Survivor Compensation Trust Tax Matters.***

The Survivor Compensation Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor and Additional Debtors are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Survivor Compensation Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Survivor Compensation Trust Documents, including the Survivor Compensation Trust Agreement, are incorporated in Section 4.12 of the Plan by reference. The Survivor Compensation Trust shall not be deemed to be the same legal entity as any Co-Insured Entity, but only the assignee of certain assets of the Co-Insured Entities and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Survivor Compensation Trust is expected to be tax exempt. The Survivor Compensation Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Maryland law and the regulations promulgated thereunder, and shall pay from the Survivor Compensation Trust all taxes, assessments, and levies upon the Survivor Compensation Trust or Survivor Compensation Trust Assets, if any.

11.    ***Immunity; Liability; Indemnification.***

i.    No Liability for Reorganized Debtor, Additional Reorganized Debtors, Related Non-Debtor Entities, or Survivor Compensation Trustee.

Neither the Reorganized Debtor, any Additional Reorganized Debtor, any Related Non-Debtor Entity, their respective Agents, nor the Survivor Compensation Trustee or its Agents shall be liable for the acts or omissions of the Survivor Compensation Trustee or its Agents, except that the Survivor Compensation Trustee shall be liable for its specific acts or omissions resulting from such Survivor Compensation Trustee's willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Survivor Compensation Trustee may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its Agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Agents. Notwithstanding such authority, the Survivor Compensation Trustee shall not be under any obligation to consult with its Agents, and its determination not to do so shall not result in the imposition of liability on the Survivor Compensation Trustee unless such determination is based on the Survivor Compensation Trustee's recklessness, gross negligence, willful misconduct, or fraud.

36

ii.     No Recourse Against Survivor Trustee.

No recourse shall ever be had, directly or indirectly, against the Survivor Compensation Trustee personally, or against any Agent retained in accordance with the terms of the Survivor Compensation Trust Agreement or the Plan by the Survivor Compensation Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Survivor Compensation Trustee in implementation of the Survivor Compensation Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Survivor Compensation Trustee under the Plan for any purpose authorized by the Survivor Compensation Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Survivor Compensation Trust Agreements of the Survivor Compensation Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Survivor Compensation Trust Assets. Notwithstanding the foregoing, the Survivor Compensation Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Survivor Compensation Trustee. The Survivor Compensation Trust shall not be covered by a bond.

iii.     Indemnification of Survivor Compensation Trust.

The Survivor Compensation Trust shall defend, indemnify, and hold harmless the Survivor Compensation Trustee and its Agents to the fullest extent permitted under the laws of Maryland in the performance of their duties under the Survivor Compensation Trust Agreement and the Plan.

Each Protected Party, and each of their respective Agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Survivor Compensation Trust or Survivor Compensation Trustee or their respective Agents, relating to (a) the assessment or liquidation of any Survivor Claims, (b) the administration of the Survivor Compensation Trust, or (c) any and all activities in connection with the Survivor Compensation Trust Agreement, shall be indemnified and defended by the Survivor Compensation Trust, to the fullest extent that a corporation or trust organized under the laws of Maryland is from time to time entitled to indemnify and defend its Agents against Claims.

Pursuant to and in accordance with the applicable Insurance Settlement Agreement, each Settling Insurer, and each of their respective Agents who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, relating to (a) any and all Claims that arise out of or are based on the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code, and parallel state laws, or (b) any and all Channeled Claims, including all such Claims made by any Person (i) claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurance Policy, (ii) who has made, will make, or can make a Survivor Claim that is or may be covered pursuant to, or is under, arises out of, relates (directly or indirectly) to, or connects in any way with a Settling Insurance Policy, or (iii) who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurance Policy (collectively, the "***Settling Insurer Indemnified Claims***"), shall be indemnified and defended by the Survivor Compensation Trust to the fullest extent that a corporation or trust organized under the laws of Maryland is from time to time entitled to indemnify and defend its Agents against Claims.

Each Settling Insurer: (a) shall have the right (but not the obligation) to defend any applicable Settling Insurer Indemnified Claim identified in Section 4.13.3 of the Plan and shall do so in good faith; (b) may (but is not required to) undertake the defense of any applicable Settling Insurer Indemnified Claim on receipt of such Settling Insurer Indemnified Claim; and (c) agrees to notify the Survivor Compensation Trust as soon as practicable of any additional Settling Insurer Indemnified Claims and, to the extent the

37

Settling Insurer intends to undertake the defense, its choice of counsel. If a Settling Insurer declines to defend any Settling Insurer Indemnified Claim, the Survivor Compensation Trust shall undertake the defense of such Settling Insurer Indemnified Claim.

The Survivor Compensation Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by a Settling Insurer in defending Settling Insurer Indemnified Claims. Each Settling Insurer may settle or otherwise resolve a Settling Insurer Indemnified Claim only with the prior consent of the Survivor Compensation Trust, which consent shall not be unreasonably withheld. The Survivor Compensation Trust may settle or otherwise resolve a Settling Insurer Indemnified Claim only with the prior consent of the applicable Settling Insurer, which consent shall not be unreasonably withheld. A Settling Insurer's defense, settlement, or other resolution of any Settling Insurer Indemnified Claim pursuant to Section 4.13.3 of the Plan shall not diminish the obligations of the Survivor Compensation Trust to indemnify the applicable Settling Insurer for such Settling Insurer Indemnified Claim(s) pursuant to and in accordance with Section 4.13.3 of the Plan.

### 12.     *Survivor Compensation Trust Liability.*

On the Effective Date, the Survivor Compensation Trust shall automatically and without further act or deed assume: (a) all liability, if any, of the Co-Insured Entities and Settling Insurers with respect to Channeled Claims, except to the extent a Channeled Claim is a Survivor Claim that is or may be related to an Insurance Claim against a Non-Settling Insurer; and (b) the responsibility for preserving, managing, and distributing Survivor Compensation Trust Assets.

### 13.     *Termination of the Survivor Compensation Trust.*

The Survivor Compensation Trust shall terminate after its liquidation, administration, and distribution of the Survivor Compensation Trust Assets in accordance with the terms of the Plan and the Survivor Compensation Trust's full performance of all other duties and functions set forth in the Plan and the Survivor Compensation Trust Agreement. Notwithstanding the foregoing, absent further order of the Bankruptcy Court, the Survivor Compensation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date.

### D.     The Insurance Trust.

### 1.     *Establishment of the Insurance Trust.*

On the Effective Date, or as soon as practicable after the Effective Date, the Insurance Trust shall be established in accordance with the Insurance Trust Documents. The Insurance Trust will assume all liability for and rights concerning: (a) all Channeled Claims, including the rights to settle Channeled Claims, solely to the extent such Channeled Claims relate to Insurance Claims against Non-Settling Insurers or Non-Settling Insurer Policies; (b) all Non-Settling Insurer Policies assumed, assigned, or otherwise transferred pursuant to Article 7 of the Plan; and (c) all Insurance Claims relating to Survivor Claims solely to the extent related to Non-Settling Insurers or Non-Settling Insurer Policies.

### 2.     *Funding of the Insurance Trust.*

The Survivor Compensation Trust will transfer or otherwise cause to be transferred to the Insurance Trust $[_] within ten (10) Business Days of the Effective Date.

3. ***Vesting of Insurance Trust Assets in the Insurance Trust.***

      i. <u>Insurance Contracts.</u>

On the Effective Date, the Non-Settling Insurer Policies shall be assumed and assigned to the Insurance Trust, pursuant to and in accordance with section 365 of the Bankruptcy Code.

      ii. <u>Transfer of Insurance Claims.</u>

In addition to the assumption and assignment of the Non-Settling Insurer Policies pursuant to <u>Section 5.3.1</u> of the Plan, and to the extent such assumption and assignment pursuant to <u>Section 5.3.1</u> of the Plan is otherwise ineffective for any reason, the Debtor, Additional Debtors, and Related Non-Debtor Entities, as applicable, shall transfer or otherwise cause to be transferred all Insurance Claims against any Non-Settling Insurer to the Insurance Trust as follows:

      (a)     On the Effective Date, and without further action by any Person, the Co-Insured Entities will be deemed to have assigned to the Insurance Trust the Co-Insured Entities' rights, if any, to all Insurance Claims, and recoveries on account of such Insurance Claims, against the Non-Settling Insurers.

      (b)     The transfer of rights to the Insurance Claims set forth in <u>Section 5.3.2(a)</u> and <u>Section 5.3.2(b)</u> of the Plan shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the Insurance Policies; or (ii) to entitle any Person to pursue Insurance Claims other than those Persons entitled to coverage under the terms of the Non-Settling Insurer Policies. For the avoidance of doubt, the Insurance Trust shall be solely responsible for satisfying, to the extent required under applicable law, any self-insured retention obligations on account of any Survivor Claim or arising out of any Non-Settling Insurer Policy. To the extent any Co-Insured Entity pays any self-insured retention, the Insurance Trust shall reimburse such Co-Insured Entity for any amounts actually paid. Unless otherwise required by applicable law, nothing in this paragraph shall obligate any Non-Settling Insurer or any Co-Insured Entity to advance any self-insured retention.

4. ***Retention of Insurance Claims by Debtor and Co-Insured Entities.***

In the event the transfers set forth in <u>Section 5.3.1</u>, <u>Section 5.3.2(a)</u> and <u>Section 5.3.2(b)</u> of the Plan are inconsistent with the Bankruptcy Code, then each applicable Co-Insured Entity shall retain their respective Insurance Claims and, to the extent reasonably requested by the Insurance Trust, will assert and pursue any such retained Insurance Claims. In the event a Co-Insured Entity asserts and pursues any Insurance Claims, the applicable Co-Insured Entity shall retain counsel reasonably acceptable to the Insurance Trustee to prosecute such Insurance Claims (subject to any defenses the Non-Settling Insurers may have under applicable law) and the Insurance Trust shall pay all attorney's fees, expert fees, and other costs and expenses incurred by the applicable Co-Insured Entity in prosecuting the Insurance Claims. For the avoidance of doubt, any efforts by a Co-Insured Entity to prosecute Insurance Claims shall be an accommodation to the Insurance Trust, and any costs and expenses incurred in connection with such accommodation shall be paid by the Insurance Trust in full. In addition, the Insurance Trust shall have a common interest with each applicable Co-Insured Entity in prosecuting Insurance Claims and may appear and be heard in connection with the prosecution of any Insurance Claims, at its own expense, unconditionally, subject only to any limitations of applicable law and equity. No Co-Insured Entity shall settle any retained Insurance Claims without the prior written consent of the Insurance Trustee, which consent shall not be unreasonably delayed or denied. All recoveries on account of retained Insurance Claims

will be paid to the Insurance Trust, net of any unreimbursed attorney's fees, expert fees, and other costs and expenses associated with the prosecution of such retained Insurance Claims.

5. ***Insurance Trust's Assumption of Risk.***

Except as specifically set forth in Section 5.3.2 and Section 8.2 regarding Post-Effective Date Insurance Obligations, no Co-Insured Entity makes any representations or warranties or shall have any duties or obligations whatsoever to the Insurance Trust. The Insurance Trust assumes all risks with respect to the Insurance Claims.

6. ***Insurance Trust Liability for Survivor Claims.***

On the Effective Date, the Insurance Trust shall automatically and without further act or deed assume: (a) all liability, if any, of the Protected Parties with respect to Channeled Claims, to the extent such Channeled Claims relate to Insurance Claims against Non-Settling Insurers; (b) responsibility for preserving, managing, and distributing Insurance Trust Assets pursuant to and in accordance with the Plan and the Insurance Trust Documents; and (c) the right to pursue Insurance Claims against Non-Settling Insurers.

7. ***Appointment of Insurance Trustee.***

The initial Insurance Trustee has been identified in **Exhibit E**. The Insurance Trustee shall commence serving as the Insurance Trustee on the Confirmation Date; provided, however, the Insurance Trustee shall be permitted to act in accordance with the terms of the Insurance Trust Agreement from such earlier date, as authorized by the Debtor and Additional Debtors, and shall be entitled to seek compensation in accordance with the terms of the Insurance Trust Agreement and the Plan.

8. ***Rights and Responsibilities of the Insurance Trustee.***

The Insurance Trust is established for the purposes set forth in the Insurance Trust Agreement and Article 5 of the Plan. The Insurance Trust shall receive, and be deemed to be the sole assignee or recipient of, the transfer or assignment of the Insurance Trust Assets as provided in Article 5 of the Plan. The Insurance Trust shall fund the costs and expenses in executing its functions in accordance with the Insurance Trust Agreement and the Plan with the aim of preserving, managing, and maximizing the Insurance Trust Assets and with no objective to continue or engage in the conduct of a trade or business. The proposed Insurance Trust Agreement is attached to the Plan as **Exhibit E**.

Upon the Effective Date, the Insurance Trust may take any action required to fulfill the Insurance Trust's purposes and comply with the terms of the Plan. The Insurance Trust may seek enforcement of the Plan, the Confirmation Order, or any other Final Order entered by the Bankruptcy Court in the Chapter 11 Case that may affect the Insurance Trust's administration of Insurance Trust Assets or fulfillment of the Insurance Trust's purposes. To that end, the Insurance Trustee: (a) shall liquidate and convert to Cash the Insurance Trust Assets and make distributions pursuant to and in accordance with the Insurance Trust Documents in a timely manner, and not unduly prolonging the duration of the Insurance Trust; (b) may request an expedited determination of taxes of the Insurance Trust under section 505(b) of the Bankruptcy Code for all returns filed on behalf of the Insurance Trust for all taxable periods through the dissolution of the Insurance Trust; and (c) may retain professionals, including Agents on behalf of the Insurance Trust, at the Insurance Trust's sole expense, as reasonably necessary to carry out the obligations of the Insurance Trustee under the Plan and the Insurance Trust Agreement. The Confirmation Order shall state that, absent permission from the Bankruptcy Court, no Action shall be commenced in any forum other than the

Bankruptcy Court against the Insurance Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Insurance Trustee.

9. ***Insurance Trust's Pursuit of Insurance Claims.***

i. Insurance Trust's Right to Pursue Insurance Claims.

Upon the assumption and assignment of the Non-Settling Insurer Policies to the Insurance Trust and the transfer of Insurance Claims pursuant to Section 5.3.1 and Section 5.3.2 of the Plan, the Insurance Trust: (a) shall assume all rights and obligations under each Non-Settling Insurer Policy pursuant to section 365 of the Bankruptcy Code; and (b) may act in its own name or in the name of any Co-Insured Entity(ies) to enforce any right, title, or interest in the Non-Settling Insurer Policies or Insurance Claims relating to the Non-Settling Insurer Policies. The Insurance Trust shall: (x) be entitled to assert or assign to any Survivor Claimant or combination of Survivor Claimants, to the extent permitted by the Non-Settling Insurer Policies and applicable non-bankruptcy law, any and all Insurance Claims that currently exist or may arise in the future against Non-Settling Insurers; and (y) have the right to pursue Insurance Claims against Non-Settling Insurers relating to or arising out of any Co-Insured Entity's liability for Survivor Claims or the Non-Settling Insurers' obligations with respect to or relating to such Survivor Claims. For the avoidance of doubt, the foregoing transfer shall not, and shall not be construed to, entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers or by Non-Settling Insurer Policies. Similarly, for the avoidance of doubt, the assignment or transfer of the Non-Settling Insurance Policies pursuant to Section 5.3.1 and Section 5.3.2 of the Plan does not affect any right of any Co-Insured Entity or any Non-Settling Insurer to contest any liability or amount of damages in respect to any Survivor Claim.

ii. Recoveries From or Arising Out of Insurance Claims.

Any recovery by the Insurance Trust on Insurance Claims against Non-Settling Insurers relating to any Co-Insured Entity's liability for Survivor Claims shall become an Insurance Trust Asset and shall be held by the Insurance Trust for: (a) payment of costs and expenses of pursuing Insurance Claims; and (b) distribution to the Survivor Compensation Trust. The Insurance Trust shall be entitled to all recoveries on account of Insurance Claims assigned to the Insurance Trust (which, for the avoidance of doubt, consist only of Insurance Claims against Non-Settling Insurers and excludes Insurance Claims against Settling Insurers), including the proceeds of any Insurance Claims relating to or arising out of any Litigation Claim. In addition, to the extent that the failure to defend or a separate agreement between any Co-Insured Entity, on the one hand, and a Non-Settling Insurer, on the other hand, gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Insurance Trust shall be entitled to the benefit of such monetary obligation or policy proceeds to the extent of any Protected Party's Post-Effective Date Costs actually paid by the Insurance Trust.

The Plan Proponents make no representations or warranties regarding the validity of the Insurance Claims against the Non-Settling Insurers, the Non-Settling Insurer Policies, or the defenses that the Non-Settling Insurers may have in connection with the Insurance Claims. Survivor Claimants should be aware that the amounts that Survivor Claimants will ultimately be paid on account of their Survivor Claims will depend on, among other things, the Insurance Trust's ability to liquidate and recover the proceeds of the Insurance Claims.

iii.     Insurance Trusts' Pursuit of Debtor and Co-Insured Entities.

The Insurance Trust's pursuit of the Co-Insured Entities shall be limited to specific performance of the assignment of Insurance Claims to the Insurance Trust and any other rights or interests expressly granted to the Insurance Trust under the Plan.

10.     ***Insurance Provisions.***

i.     Insurance Neutrality.

Nothing in the Plan, the Insurance Trust Documents, the Survivor Compensation Trust Documents, the Plan Documents, any Confirmation Order, or any judgment, order, finding of fact, conclusion of law, determination or statement made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over the Chapter 11 Case or the Additional Debtor Chapter 11 Cases, including in any judgment, order, writ, or opinion entered on appeal from any of the foregoing, shall in any Action against a Non-Settling Insurer:

(a)     constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing: (i) the liability (in the aggregate or otherwise) of any Co-Insured Entity or the Insurance Trust with respect to any Survivor Claims; (ii) the liability (in the aggregate or otherwise) of any Non-Settling Insurer with respect to any Insurance Claim; (iii) that the aggregate value of the Survivor Claims is equal to the amount to be paid into the Insurance Trust or Survivor Compensation Trust by the Co-Insured Entities; (iv) that it is reasonable, in good faith, or consistent with the terms and conditions of any Non-Settling Insurer Policy for any of the Co-Insured Entities, Insurance Trust, or Survivor Compensation Trust to settle, allow, assign any value to, liquidate, or pay (or present to any Non-Settling Insurer for payment) any Survivor Claim on any terms or conditions contemplated by the Plan, the Survivor Compensation Trust Distribution Plan, any other Plan Documents, or any other document or agreement; (v) that the Plan, any other Plan Document, or any other document or agreement are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Survivor Claims against the Co-Insured Entities prior to the Petition Date or Additional Debtor's Petition Date, as applicable, or under the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law; (vi) that the conduct of the Co-Insured Entities, the Committee, or the Survivor Claimants in connection with the negotiation, development, settlement, and implementation of the Plan, the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law; or (vii) that any Non-Settling Insurer was invited to participate in or participated in, consulted on, negotiated, or consented to the Survivor Compensation Trust Distribution Plan, the Insurance Trust Documents, the Survivor Compensation Trust Documents, or other Plan Documents;

(b)     have any res judicata, collateral estoppel, or other preclusive effect or otherwise prejudice, diminish, impair, or affect (under principals of waiver, estoppel, or otherwise) any defense, Claim, or right any Non-Settling Insurer may have under any Non-Settling Insurer Policy or applicable non-bankruptcy law with respect to same;

(c)     constitute a decision on any matter at issue or which may be raised as an issue in any Action against a Non-Settling Insurer, such that no judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court in this Chapter 11 Case or the Additional Debtor Chapter 11 Cases, or entered by any other court exercising jurisdiction over the Chapter 11 Case or Additional Debtor Chapter 11 Cases, including any Confirmation Order, Survivor Compensation Trust Distribution Plan, or other

Plan Documents and any finding, conclusion or determination entered in connection with same, is not intended and shall not be construed to constitute a finding, conclusion or determination for any insurance coverage purpose whatsoever;

(d)   impair: (i) any Non-Settling Insurer's legal, equitable, or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims; or (ii) any policyholder's legal, equitable or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims; or

(e)   impair any Non-Settling Insurer Contribution Claim, which may be asserted as a defense or counterclaim against the Co-Insured Entities, Survivor Compensation Trust, or Insurance Trust, as applicable, in any Action against any Non-Settling Insurer.

ii.   <u>Denial of Coverage as Sole Remedy.</u>

Notwithstanding anything to the contrary in <u>Section 5.6</u> of the Plan, the sole remedy of any Non-Settling Insurer for any failure by any Co-Insured Entity or the Insurance Trust to observe and perform any Post-Effective Date Insurance Obligations (if any) or any other duties or obligations that may exist under a Non-Settling Insurer Policy shall be limited to asserting any defenses to providing insurance coverage under the applicable Non-Settling Insurer Policy, and nothing in the Plan shall serve as a basis for any Non-Settling Insurer to seek or be granted any affirmative relief against any Co-Insured Entity.

iii.   <u>Non-Settling Insurer Insurance Contribution Claims.</u>

To the extent any Non-Settling Insurer Contribution Claims are determined to be valid, the liability, if any, of the applicable Non-Settling Insurer to the Insurance Trust shall be reduced by the amount of such Non-Settling Insurer Contribution Claims. For the avoidance of doubt, and notwithstanding anything to the contrary in <u>Section 5.6</u> of the Plan, all Non-Settling Insurer Contribution Claims shall be channeled to the Insurance Trust and no Non-Settling Insurer Contribution Claim shall be the basis for any affirmative recovery against any Co-Insured Entity.

iv.   <u>Post-Effective Date Costs Procedures.</u>

The Insurance Trust shall establish the Post-Effective Date Costs Reserve, which shall be funded in an initial amount of not less than $[_] from the contributions to the Survivor Compensation Trust from the Co-Insured Entities (the "***Post-Effective Date Costs Reserve***"). The Insurance Trustee shall provide the Co-Insured Entities with a written statement as to the balance of the Post-Effective Date Costs Reserve on a quarterly basis or as otherwise reasonably requested from time to time by any Co-Insured Entity.

If the Insurance Trustee does not maintain the Post-Effective Date Costs Reserve balance at or above $[_], the Insurance Trustee shall immediately report the same to the Co-Insured Entities, after which the Insurance Trustee shall schedule a meet and confer with same regarding the (a) Insurance Trustee's expectations with respect to the continued prosecution of Insurance Claims and Litigation Claims, (b) balance of Post-Effective Date Costs that are incurred but outstanding, and (c) parties' collective expectations as to any additional Post-Effective Date Costs that are likely to be incurred in order to comply with any remaining Post-Effective Date Insurance Obligations.

Professionals representing any Co-Insured Entity in connection with the observance and performance of their respective Post-Effective Date Insurance Obligations, including, without limitation, their participation in any post-Effective Date discovery or litigation regarding Insurance Claims or Survivor Claims, will charge rates and expenses that are no higher than their usual and customary rate for similar

43

work performed by such Professionals for clients generally at the time such services are provided, and such rates may be adjusted from time to time in accordance with the general practices of such Professionals.

Unless a Co-Insured Entity is reimbursed directly by any Non-Settling Insurer for any Post-Effective Date Costs contemporaneously with such Post-Effective Date Costs being incurred, all Post-Effective Date Costs shall be paid by the Insurance Trust from the Post-Effective Date Costs Reserve. The Insurance Trust's advancement or reimbursement of Post-Effective Date Costs shall not affect, diminish, or impair the Insurance Trust's right to bring any claims against any Non-Settling Insurers for refusing to defend or indemnify any Co-Insured Entity.

All invoices for Post-Effective Date Costs shall be submitted to the Insurance Trustee via e-mail within sixty (60) days following the end of the month in which Post-Effective Date Costs are incurred (such submission, a "*Fee Notice*"). All Fee Notices provided to the Insurance Trustee may be redacted to prevent the disclosure of privileged information or trial strategy. The Insurance Trustee shall keep all Fee Notices confidential and shall not share any information contained in any Fee Notices other than the amount of fees with any Litigation Claimant, counsel to any Litigation Claimant, any professional whose firm previously represented the Debtor, Additional Debtors, or Committee in the Chapter 11 Case or Additional Debtor Chapter 11 Cases, or any professional whose firm represents the Insurance Trust in connection with the litigation or assertion of any Insurance Claim or Litigation Claim.

The Insurance Trustee shall inform the Co-Insured Entities and any professional submitting a Fee Notice of any disputes regarding the requested fees and expenses within twenty-one (21) days of receipt of each applicable Fee Notice or shall pay the requested fees within such time. If a dispute regarding a Fee Notice cannot be resolved within twenty-one (21) days of notification of such dispute (or such other time agreed upon by the relevant parties), the dispute may be submitted to the Bankruptcy Court for adjudication upon at least twenty-one (21) days' notice, unless the relevant parties mutually agree otherwise.

If at any time the Insurance Trustee determines, in the Insurance Trustee's discretion, not to replenish the Post-Effective Date Costs Reserve before the balance of the Post-Effective Date Costs Reserve falls below $[_] (such determination, a "*Non-Replenishment Determination*"), the Insurance Trustee shall immediately (a) report such Non-Replenishment Determination to each Co-Insured Entity and (b) file an application with the Bankruptcy Court setting forth the basis for the Non-Replenishment Determination. If the Bankruptcy Court denies the Insurance Trustee's request to implement the Non-Replenishment Determination, the Insurance Trustee shall, subject to available funds, replenish the Post-Effective Date Costs Reserve to at least $[_]. If the Bankruptcy Court approves the Insurance Trustee's request to implement the Non-Replenishment Determination or the Insurance Trustee lacks sufficient funds to maintain the balance of the Post-Effective Date Costs Reserve above $[_], each Co-Insured Entity shall be irrevocably released from any further obligations they would otherwise have had under the Plan with respect to any Insurance Claims or Survivor Claims, including, without limitation, any obligations to comply with any Post-Effective Date Insurance Obligations or to assist in the administration of the Survivor Compensation Trust Distribution Plan.

For the avoidance of doubt: (a) the Insurance Trust shall remain responsible for the payment of all Post-Effective Date Costs incurred within one year following the date of such notice, to the extent such Post-Effective Date Costs are submitted in accordance with the procedures set forth in Section 5.10.4 of the Plan; (b) all Non-Settling Insurers shall retain any defenses to coverage they may have as a result of any failure of any Co-Insured Entity to observe and perform any Post-Effective Date Insurance Obligations; and (c) nothing in Section 5.10.4 shall be construed to address the rights of any Non-Settling Insurer or the Insurance Trust, as assignee of Insurance Claims, upon any withdrawal of cooperation in defense of Claims by any Co-Insured Entity.

44

11.     ***Investment Powers; Permitted Cash Expenditures.***

All funds held by the Insurance Trust shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Insurance Trust Agreement. The Insurance Trustee may expend such Cash in a manner consistent with the terms of the Insurance Trust Agreement.

12.     ***Insurance Trust Tax Matters.***

The Insurance Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtor and Additional Debtors are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Insurance Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Insurance Trust Documents, including the Insurance Trust Agreement, are incorporated in Section 5.14 of the Plan by reference. The Insurance Trust shall not be deemed to be the same legal entity as any Co-Insured Entity, but only the assignee of certain assets of the Co-Insured Entities and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Insurance Trust is expected to be tax exempt. The Insurance Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Maryland law and the regulations promulgated thereunder, and shall pay from the Insurance Trust all taxes, assessments, and levies upon the Insurance Trust or Insurance Trust Assets, if any.

13.     ***Immunity; Liability; Indemnification.***

i.      No Liability for Reorganized Debtor or Insurance Trustee.

Neither the Reorganized Debtor, Additional Reorganized Debtors, Related Non-Debtor Entities, their respective Agents, nor the Insurance Trustee or its Agents shall be liable for the acts or omissions of the Insurance Trustee or its Agents, except that the Insurance Trustee shall be liable for its specific acts or omissions resulting from such Insurance Trustee's willful misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Insurance Trustee may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its Agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Agents. Notwithstanding such authority, the Insurance Trustee shall not be under any obligation to consult with its Agents, and its determination not to do so shall not result in the imposition of liability on the Insurance Trustee unless such determination is based on the Insurance Trustee's recklessness, gross negligence, willful misconduct, or fraud.

ii.     No Recourse Against Insurance Trustee.

No recourse shall ever be had, directly or indirectly, against the Insurance Trustee personally, or against any Agent retained in accordance with the terms of the Insurance Trust Agreement or the Plan by the Insurance Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Insurance Trustee in implementation of the Insurance Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Insurance Trustee under the Plan for any purpose authorized by the Insurance Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Insurance Trust Agreement of the Insurance Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Insurance Trust Assets. Notwithstanding the

foregoing, the Insurance Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Insurance Trustee. The Insurance Trust shall not be covered by a bond.

iii.     <u>Indemnification of Insurance Trust.</u>

The Insurance Trust shall defend, indemnify, and hold harmless the Insurance Trustee and its Agents to the fullest extent permitted under the laws of Maryland in the performance of their duties under the Insurance Trust Agreement and the Plan.

Additionally, each Protected Party and Settling Insurer, and each of their respective Agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative, or arbitrative action, by reason of any act or omission of the Insurance Trust or Insurance Trustee or respective Agents, relating to (a) the assessment or liquidation of any Insurance Claims or Survivor Claims, (b) the administration of the Insurance Trust, or (c) any and all activities in connection with the Insurance Trust Agreement, shall be indemnified and defended by the Insurance Trust, to the fullest extent that a corporation or trust organized under the laws of Maryland is from time to time entitled to indemnify and defend its Agents against Claims.

14.     ***Insurance Trust Liability.***

On the Effective Date, the Insurance Trust shall automatically and without further act or deed assume: (a) all liability, if any, of the Co-Insured Entities and Settling Insurers with respect to Channeled Claims, to the extent a Channeled Claim is a Survivor Claim that is or may be related to an Insurance Claim against a Non-Settling Insurer; and (b) the responsibility for preserving, managing, and distributing Insurance Trust Assets.

15.     ***Termination of Insurance Trust.***

The Insurance Trust shall terminate after its liquidation, administration, and distribution of the Insurance Trust Assets in accordance with the terms of the Plan and the Insurance Trust's full performance of all other duties and functions set forth in the Plan and the Insurance Trust Agreement. Notwithstanding the foregoing, absent further order of the Bankruptcy Court, the Insurance Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date.

**E.    Survivor Claims.**

1.     ***Trust Liability for Survivor Claims.***

On the Effective Date, the Trusts shall automatically and without further act or deed assume all liability, if any, of the Protected Parties and Settling Insurers with respect to Channeled Claims, pursuant to and in accordance with <u>Section 4.4</u> and <u>Section 5.6</u> of the Plan.

2.     ***Assessment and Treatment of Survivor Claims.***

Survivor Claims will be assessed in accordance with the Survivor Compensation Trust Distribution Plan, which is designed to provide an expeditious, efficient, reasonable, and equitable method for determining whether a Survivor Claimant is entitled to a Distribution from the Survivor Compensation Trust. The Co-Insured Entities shall reasonably cooperate with the Survivor Claims Reviewer and the Survivor Compensation Trustee in connection with any inquiries related to the administration of the

46

Survivor Compensation Trust Distribution Plan but shall not be required to act in any way that violates any duty or prevents the satisfaction of any condition precedent under a Non-Settling Insurer Policy, if any. Under no circumstance shall the Survivor Claims Reviewer's review of a Survivor Claim or a distribution to a Survivor Claimant have any effect on the rights, defenses, or obligations of any Non-Settling Insurer.

3.      ***Survivor Claimant Election of Claim Treatment.***

No later than thirty (30) days after a Survivor Claimant is notified of the amount of their initial award under the Survivor Compensation Trust Distribution Plan, the Survivor Claimant shall elect in writing one of the following with respect to treatment of such Survivor Claimant's Survivor Claim:

(a)      ***Treatment as a Distribution Claimant.*** Any Survivor Claimant that is not a Litigation Claimant: (i) shall be considered a Distribution Claimant; and (ii) in full and final satisfaction and discharge of their Survivor Claim, will receive Distributions from the Survivor Compensation Trust in an amount determined pursuant to and in accordance with the Survivor Compensation Trust Distribution Plan. Each Distribution Claimant must execute and deliver to the Survivor Compensation Trustee a Survivor Claimant Release, in order to receive Distributions pursuant to and in accordance with the Survivor Compensation Trust Distribution Plan.

(b)      ***Treatment as a Litigation Claimant.*** Any Survivor Claimant that elects to have their Survivor Claim treated as a Litigation Claim: (i) shall be considered a Litigation Claimant; and (ii) in full and final satisfaction and discharge of their Survivor Claim, will receive (A) Distributions from the Survivor Compensation Trust, to the extent set forth in the Survivor Compensation Trust Distribution Plan and (B) the right, prior to the applicable Survivor Claim Discharge Date and subject to the Survivor Compensation Trustee granting authorization to pursue a Litigation Claim pursuant to Section 6.3(b)(i) of the Plan, to liquidate their Litigation Claim in the tort system in order to determine the liability of any Protected Party for purposes of the Insurance Trust seeking recovery from any Non-Settling Insurer that is or may be liable on the Litigation Claim or any Insurance Claim arising from same.

(i).      ***Survivor Compensation Trustee's Authorization to Pursue Litigation Claims.*** The Survivor Compensation Trustee shall have the sole discretion to: (i) authorize a Litigation Claimant to pursue a Litigation Claim; (ii) make a final decision as to whether a Litigation Claim is pursued; and (iii) make a final decision relating to the management and timing of litigation relating to Litigation Claims; provided, however, the Survivor Compensation Trust Agreement shall direct that in making such determination, the Survivor Compensation Trustee shall take into consideration and use reasonable efforts to minimize the cumulative impact of post-Effective Date litigation on the business operations and legal and personnel resources of the applicable Co-Insured Entity(ies) and Insurance Trust. Prior to authorizing a Survivor Claimant to be treated as a Litigation Claimant and to proceed with the applicable Litigation Claim, the Survivor Compensation Trustee shall consult with counsel for the Survivor Claimant, the applicable Co-Insured Entity(ies) against which such proposed Litigation Claim would be asserted, and the Insurance Trust, to coordinate, among other things, a mutually acceptable litigation schedule and require the Survivor Claimant to execute and deliver a Survivor Claimant Release and a Litigation Claimant Agreement. The Survivor Compensation Trustee shall provide a copy of each Survivor Claimant Release and Litigation Claimant Agreement to the Reorganized Debtor upon execution of same and to any other Co-Insured Entity or Settling Insurer upon request.

(ii).      ***Limitation of Remedies for Litigation Claims.*** For the avoidance of doubt: (i) no Settling Insurer shall be obligated to defend or indemnify any Person in

47

connection with a Litigation Claim or otherwise have any other duties or obligations to any Person in connection with a Litigation Claim; and (ii) except for the collection of proceeds from any Non-Settling Insurer Policy or other amounts for which a Non-Settling Insurer is deemed to be liable, under no circumstances will any Survivor Claimant or other Person be able to recover in connection with any Litigation Claim any amount from a Co-Insured Entity or Settling Insurer or to otherwise obtain any recovery, judgment or levy whatsoever against any assets of a Co-Insured Entity.

(c)     *Default Election.* If a Survivor Claimant does not elect to be treated as a Litigation Claimant pursuant to Section 6.3(b) or elects to be so treated but is not granted authority by the Survivor Compensation Trustee to pursue a Litigation Claim, the Survivor Claimant shall be treated as a Distribution Claimant prior to the occurrence of the applicable Survivor Claim Discharge Date.

4.     ***Trusts' Rights With Respect to Survivor Claims.***

i.     Insurance Trust and Insurance Claims.

The Insurance Trust shall retain the right to pursue all Insurance Claims with respect to Non-Settling Insurers and Non-Settling Insurer Policies.

ii.     Survivor Compensation Trust and Litigation Claims.

The Survivor Compensation Trust retains the right to pursue recovery from the Insurance Trust for any Protected Party's liability for Litigation Claims, to the extent such Litigation Claims relate to one or more Non-Settling Insurer Policies. To the extent a Litigation Claimant settles or otherwise obtains a judgment with respect to a Litigation Claim, any recovery from a Non-Settling Insurer with respect such settlement or judgment shall be added to the Insurance Trust Assets to be distributed in accordance with the Insurance Trust Documents; provided, however, such recovery shall first go to reimbursement for the reasonable costs: (a) of the Insurance Trust in connection with such Litigation Claim; and (b) incurred by the Litigation Claimant in pursuing the recovery against the Non-Settling Insurer relating to such Litigation Claim, so long as such costs were agreed upon by the Survivor Compensation Trust in advance.

iii.     Survivor Compensation Trust and Distribution Claims.

Notwithstanding a Survivor Claimant's election to have their Survivor Claim treated as a Distribution Claim, whether pursuant to Section 6.3(a) or Section 6.3(c) of the Plan, the Survivor Compensation Trust retains the right to pursue recovery from the Insurance Trust in accordance with Section 5.9 of the Plan with respect to Distribution Claims to the extent such Distribution Claims relate to Insurance Claims against one or more Non-Settling Insurers.

5.     ***Legal Effect of Estimation of Claims and Distributions Under Trust Distribution Plan.***

The Survivor Claim Reviewer's determinations are for estimation and Survivor Compensation Trust Distribution purposes only and shall not constitute findings as to, or the determination of, the reasonableness, facts, or liability concerning the Survivor Claims with any binding legal effect. The determination, qualification, estimation, and payment of Survivor Compensation Trust Distributions regarding Survivor Claims: (a) shall not be construed as an admission of liability by any Protected Party, any Settling Insurer, any Non-Settling Insurer, or the Trusts with respect to any Survivor Claim and shall not be entitled to any preclusive effect; (b) is not a settlement, release, accord, or novation of any Survivor Claim and cannot be used by any Joint Tortfeasor as a defense to any alleged liability; (c) does not impair a Litigation Claimant's right to obtain a judgment, including a judgment based on joint and several liability,

against any Co-Insured Entity or Non-Settling Insurer for purposes of establishing any Co-Insured Entity's or Non-Settling Insurer's liability with respect to such Litigation Claimant's Litigation Claim; provided, however, recourse on any such judgment shall be limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Survivor Claim or any Insurance Claim, and any proceeds from such judgment(s) or award(s) shall be distributed in accordance with the Plan; (d) shall not constitute or be deemed to constitute: (i) a trial, adjudication of a Survivor Claim, or evidence of liability or damages in any litigation with any Co-Insured Entities, Non-Settling Insurers, Settling Insurers, or any other Person; or (ii) a determination of the reasonableness of the amount of any Litigation Claim(s) in any litigation with Non-Settling Insurers; and (e) does not create an admission of the fact of liability or the extent of damages on behalf of any Co-Insured Entities.

The Survivor Compensation Trust's distribution of a Survivor Compensation Trust Distribution shall not be construed as, and shall not be, an admission by or determination any Protected Party's, any Settling Insurer's, any Non-Settling Insurer's, or the Insurance Trust's liability for or damages relating to any Survivor Claim.

6.      ***Release and Discharge of Survivor Claims.***

Notwithstanding anything to the contrary in the Plan, prior to receiving a Survivor Compensation Trust Distribution, each Survivor Claimant must execute and deliver to the Survivor Compensation Trustee a Survivor Claimant Release in the form attached to the Plan as **Exhibit H**; provided, however, to preserve coverage under Non-Settling Insurer Policies, each Survivor Claimant specifically reserves and does not release such Survivor Claimant's Survivor Claim to the extent such Survivor Claim implicates coverage under one or more Non-Settling Insurer Policy; provided, further, however, recourse on any such Survivor Claim is limited to any Survivor Compensation Trust Distributions made pursuant to and in accordance with the Plan, the Survivor Compensation Trust Agreement, Survivor Compensation Trust Distribution Plan, and proceeds of Insurance Claims and Extra-Contractual Claims against Non-Settling Insurers and Non-Settling Insurer Policies that may be recoverable by the Survivor Compensation Trust or Insurance Trust, as applicable.

Survivor Claims that implicate coverage under one or more Non-Settling Insurer Policies shall be released and enjoined only upon the occurrence of the applicable Survivor Claim Discharge Date, as set forth in the Plan; provided, however, such release and injunction of Survivor Claims pursuant to and in accordance with the Plan does not release and enjoin such Survivor Claim against Persons who are not Protected Parties or Settling Insurers. Joint Tortfeasors shall not be liable for any share of causal liability or fault attributable to any Protected Party, and no Protected Party shall be liable for their share of causal liability or fault attributable to any Joint Tortfeasor or other Person.

7.      ***Survivor Compensation Trust Distributions to Survivor Claimants.***

Survivor Claimants whom the Survivor Claims Reviewer determines to be entitled to a Survivor Compensation Trust Distribution pursuant to and in accordance with the Survivor Compensation Trust Distribution Plan will receive a Survivor Compensation Trust Distribution from the Survivor Compensation Trust in the amount(s) and at the time(s) provided for in the Survivor Compensation Trust Distribution Plan.

49

8.    ***Dismissal of Pending Litigation Regarding Survivor Claims.***

Each Survivor Claim asserted in any Action against any Protected Party pending in state or federal court shall be dismissed, with prejudice and without fees and costs being recoverable against the applicable Protected Party, upon the occurrence of the applicable Survivor Claim Discharge Date.

9.    ***Survivor Claim Withdrawal.***

A Survivor Claimant may withdraw their Survivor Claim at any time on written notice to the Survivor Compensation Trustee. Any withdrawal of a Survivor Claim shall be with prejudice, and such withdrawn Survivor Claim may not be reasserted, with the applicable Survivor Claimant still to be bound by the Discharge and the Plan, including the Channeling Injunction and Supplemental Settling Insurer Injunction.

10.    ***Medicare Procedures.***

It is the Debtor's and each Additional Debtor's position that none of the Protected Parties, Settling Insurers, Insurance Trust, or Survivor Compensation Trust will have any reporting obligations in respect of their contributions to the Survivor Compensation Trust or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Survivor Compensation Trust, under the reporting provisions of MSPA or MMSEA.

Prior to making any Survivor Compensation Trust Distributions, the Survivor Compensation Trustee may obtain in respect of any Channeled Claim a certification from the Survivor Claimant that said Survivor Claimant has or will provide for the payment or resolution of any obligations owing or potentially owing under MSPA relating to such Channeled Claim. If the Survivor Compensation Trust receives no such certification, the Survivor Compensation Trust shall: (a) withhold funds sufficient to assure that all obligations owing or potentially owing for Medicare Claims are paid to CMS; and (b) provide for the payment or resolution of any obligations owing or asserted under 42 U.S.C. § 1395y(b) or any related rules, regulations, or guidance, in connection with or relating to such Survivor Claimant's Channeled Claim.

The Survivor Compensation Trust shall indemnify and hold harmless the Protected Parties and the Settling Insurers from any Medicare Claims or similar reporting and payment obligations, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Survivor Compensation Trust's obligations under the Plan, the Survivor Compensation Trust Documents, and Plan Documents. The Survivor Compensation Trustee also shall have the obligation to cooperate with the Protected Parties and the Settling Insurers in the assertion of the Channeling Injunction with respect to any Medicare Claims asserted against the Protected Parties related to Channeled Claims. The Survivor Compensation Trustee shall not have personal liability for the obligations under Section 6.10, and the Survivor Compensation Trust shall not be required to create a reserve for these potential obligations. The Survivor Compensation Trust may seek recovery of any such payments from the applicable Survivor Claimant, including by withholding future Survivor Compensation Trust Distributions due to such applicable Survivor Claimant from the Survivor Compensation Trust.

The Survivor Compensation Trust Assets shall also be used for payment of indemnity and expenses relating to reimbursing the United States government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare Beneficiary on account of any Channeled Claim. The amount of such payment shall not exceed that Survivor Claimant's award under the Survivor Compensation Trust Documents. The Protected Parties shall not be responsible for and will not pay indemnity or expenses

50

relating to reimbursing the United States government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare Beneficiary on account of any Channeled Claim.

Upon the termination of the Survivor Compensation Trust in accordance with the Survivor Compensation Trust Agreement, the Survivor Compensation Trust shall have no further obligations under Section 6.10.

Notwithstanding anything to the contrary in the Plan, no Trust, Protected Party, or Settling Insurer shall have any reporting obligations with respect to Survivor Claims that arise from or relate to alleged Abuse occurring prior to December 5, 1980.

**F.      Settling Insurers.**

1.      ***Insurance Settlement Agreements.***

Each Insurance Settlement Agreement shall be effective and binding upon all Persons, and any such Person's successors and assigns, upon entry of an Insurance Settlement Approval Order that is a Final Order with respect to such Insurance Settlement Agreement and satisfaction of all of such Insurance Settlement Agreement's conditions precedent. Payments by the applicable Settling Insurer to the Survivor Compensation Trust and the releases by and between the Protected Parties of the applicable Settling Insurer shall occur and become effective according to the terms of each Insurance Settlement Agreement and Insurance Settlement Approval Order. Each Insurance Settlement Agreement and Insurance Settlement Approval Order shall survive the confirmation, effectiveness, and consummation of the Plan. The rights and obligations of the parties under any Insurance Settlement Agreement and Insurance Settlement Approval Order shall be determined exclusively under the applicable Insurance Settlement Agreement, Insurance Settlement Approval Order, the Plan, and the Confirmation Order.

2.      ***Sale Free and Clear of Interests of Settling Insurer Polices.***

Each Settling Insurer Policy shall be sold to the applicable Settling Insurer, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, Claims, and Interests of all Persons, to the extent provided in each applicable Insurance Settlement Agreement and Insurance Settlement Approval Order.

3.      ***Resolution of Claims Involving Settling Insurers.***

The Confirmation Order shall provide that upon payment of a Settling Insurer's Insurance Settlement Amount (either directly to the Survivor Compensation Trust and/or into an escrow account pursuant to the terms of the applicable Insurance Settlement Agreement), all: (a) releases set forth in the applicable Settling Insurer's Insurance Settlement Agreement shall be in full force and effect; and (b) all injunctive relief set forth in the applicable Insurance Settlement Approval Order shall become effective as set forth in such Insurance Settlement Agreement, Insurance Settlement Approval Order, and the Plan.

4.      ***Settling Insurer Payments.***

Each Settling Insurer shall pay to the Survivor Compensation Trust such Settling Insurer's Insurance Settlement Amount on the terms set forth in the applicable Insurance Settlement Agreement and Insurance Settlement Approval Order (either directly to the Survivor Compensation Trust and/or into an escrow account pursuant to the terms of the applicable Insurance Settlement Agreement).

51

5.      *Further Assurances; Non-Material Modifications.*

From and after the Effective Date, the Protected Parties and each Settling Insurer shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlement Agreements and Insurance Settlement Approval Orders without further order of the Bankruptcy Court. The Protected Parties and each Settling Insurer may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of any Insurance Settlement Agreement, subject to (a) the terms and conditions of the applicable Insurance Settlement Agreement and Insurance Settlement Approval Order and (b) the consent of the Insurance Trustee and Survivor Compensation Trustee, which consent shall not be unreasonably withheld.

6.      *Waiver/Consent.*

In consideration of the releases, Channeling Injunction, Supplemental Settling Insurer Injunction, and other covenants set forth in the Plan, subject to the occurrence of the Effective Date and satisfaction of the conditions precedent in the applicable Insurance Settlement Agreement, each of the Protected Parties: (a) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have now or in the future against the other Protected Parties and any Settling Insurers with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to Channeled Claims covered or alleged to be covered under any Settling Insurer Policy; (b) consents to the sale of the Co-Insured Entities' Claims, if any, related to the Settling Insurer Policies in accordance with each Insurance Settlement Agreement and Insurance Settlement Approval Order; (c) consents to the contribution of the proceeds of the sale of any Settling Insurer Policies to the Survivor Compensation Trust pursuant to and in accordance with the Plan, each Insurance Settlement Agreement, and each Insurance Settlement Approval Order. For the avoidance of doubt, nothing in Section 7.6 shall be construed to bar or otherwise prohibit: (x) a Claim based upon Abuse against a Person who is not a Protected Party; or (y) a Claim by such Person for insurance coverage under an Insurance Policy that is not a Settling Insurer Policy.

7.      *Timing.*

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to an Insurance Settlement Agreement, Insurance Settlement Approval Order relating to such Insurance Settlement Agreement, the Plan, the Confirmation Order, and the Bankruptcy Code shall become effective pursuant to and in accordance with the applicable Insurance Settlement Agreement and Insurance Settlement Approval Order.

**G.      Non-Settling Insurers.**

1.      *Preservation of Rights and Obligations.*

All obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and applicable non-bankruptcy law. In the event a Survivor Claim is liquidated through the Survivor Compensation Trust Distribution Plan or in any state or federal court as may be permitted pursuant to the Plan, the Survivor Compensation Trust Distribution Plan, or Survivor Compensation Trust Agreement: (a) the Debtor, Reorganized Debtor, Additional Debtors, Additional Reorganized Debtors, Related Non-Debtor Entities, Insurance Trust, and each Non-Settling Insurer shall retain the right to assert any and all rights and defenses with respect to such Survivor Claim; (b) the rights and obligations, if any, of the Debtor, Reorganized Debtor, Additional Debtors, Additional Reorganized Debtors, Related Non-Debtor Entities, Insurance Trust, and each Non-Settling Insurer under

52

the terms of the Non-Settling Insurer Policies and at law shall not be affected and shall be treated as though such liquidation had never occurred; (c) nothing in the Plan, the Confirmation Order, or other Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to any Survivor Claim; and (d) nothing in the Plan, the Confirmation Order, or other Plan Document shall grant to any Person any right to sue any Non-Settling Insurer directly with respect to a Survivor Claim.

2. ***Post-Effective Date Insurance Obligations.***

Notwithstanding the assumption and assignment of Non-Settling Insurer Policies pursuant to Section 5.3 of the Plan, subject to the payment of any Post-Effective Date Costs by the Insurance Trust, the Protected Parties shall (in addition to the Insurance Trust's obligations under Article 5 of the Plan) comply with and satisfy all Post-Effective Date Insurance Obligations, for the purposes of preserving and maintaining as much insurance coverage as possible for the benefit of the Insurance Trust and Survivor Compensation Trust.

If the Insurance Trust or Survivor Compensation Trust believes a Protected Party has failed to satisfy any Post-Effective Date Insurance Obligations, the Insurance Trust or Survivor Compensation Trust, as applicable, shall give the Reorganized Debtor and applicable Protected Party, if applicable, written notice identifying with specificity the Post-Effective Date Insurance Obligations such Trust believes have not been satisfied and the action(s) such Trust believes must be taken to satisfy same. The Reorganized Debtor and applicable Protected Party, as applicable, shall have not less than sixty (60) days from such notice to: (a) take the actions requested by the applicable Trust; or (b) seek a determination from the Bankruptcy Court as to whether the requested action is required to satisfy any Post-Effective Date Insurance Obligations; provided, however, such determination shall not be binding upon any Non-Settling Insurer. With the exception of willful misconduct by a Protected Party, the Trusts' sole remedy for any failure to satisfy any Post-Effective Date Insurance Obligations shall be specific performance as ordered by the Bankruptcy Court.

Nothing in the Plan shall impair, and each Non-Settling Insurer expressly retains, all contractual defenses to coverage, if any, available under any Non-Settling Insurer Policy arising from or relating to any actual or alleged failure by a Protected Party to satisfy their respective Post-Effective Date Insurance Obligations, if any.

3. ***Trust Powers With Respect to Abuse Claims and Non-Settling Insurers.***

Solely as set forth in the Plan, the Survivor Compensation Trust Distribution Plan, Survivor Compensation Trust Agreement, and Insurance Trust Agreement, the Trusts may enter into a settlement of any Insurance Claim, Extra-Contractual Claim, or Survivor Claim; provided, however, nothing in Section 8.3 prohibits or prevents a Non-Settling Insurer from raising any defense to such settlement or claim for coverage. For the avoidance of doubt, the Survivor Compensation Trustee and Insurance Trustee, as applicable, may use Survivor Compensation Trust Assets and Insurance Trust Assets, as applicable, to prosecute any Insurance Claim or Extra-Contractual Claim permitted by the Plan, the Survivor Compensation Trust Agreement, or Insurance Trust Agreement, as applicable. In the event of recovery from a Non-Settling Insurer or Non-Settling Insurer Policy based upon an Insurance Claim or Extra-Contractual Claim relating to any Survivor Claim, the proceeds of such recovery shall become assets of the Insurance Trust or Survivor Compensation Trust, pursuant to the Plan, the Insurance Trust Agreement, Survivor Compensation Trust Agreement, and Survivor Compensation Trust Distribution Plan.

**H.**      **Means for Implementation of the Plan.**

1.      *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims and Interests, including any controversies relating to the contractual, legal, and subordination rights that holders of a Claim or Interests might have with respect to any Claim or Interests under the Plan. Distributions made to holders of a Claim or Interests in any Class are intended to be final.

2.      *Plan Implementation.*

All Distributions on account of Allowed Claims other than Survivor Claims shall be paid by the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors, as applicable, pursuant to and in accordance with the Plan. All Distributions on account of Survivor Claims shall be paid solely from the Trusts, pursuant to and in accordance with the Plan, the Confirmation Order, the Insurance Trust Agreement, the Survivor Compensation Trust Agreement, and Survivor Compensation Distribution Plan.

3.      *Sources of Consideration for Distributions.*

The Debtor, Additional Debtors, Reorganized Debtor, Additional Reorganized Debtors, and other Protected Parties shall fund their obligations under the Plan using Cash on hand or otherwise available. Trust Distributions shall be funded solely from Survivor Compensation Trust Assets and Insurance Trust Assets, as applicable.

4.      *Payments Effective Upon Tender.*

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender of such payment by the Debtor, Additional Debtor, Reorganized Debtor, Additional Reorganized Debtor, Survivor Compensation Trustee, or Insurance Trustee, as applicable, to the applicable Creditor to whom payment is due. If a Creditor refuses a tender, the amount tendered and refused will be held by the Debtor, Additional Debtor, Reorganized Debtor, Additional Reorganized Debtor, Survivor Compensation Trustee, or Insurance Trustee, as applicable, for the benefit of such Creditor pending final adjudication of the dispute; provided, however, upon the adjudication of such dispute, the Creditor shall be obligated to apply the funds in accordance with the Plan as of the date of tender; provided, further, however, the Creditor shall not have the right to claim interest or other charges or to exercise any other rights while the dispute is pending.

5.      *Child Protection Protocols.*

On February 13, 2026, the Bankruptcy Court entered the *Order Approving Joint Application to Employ Guidepost as Child Protection Consultant* (Dkt. No. 2049). Subject to the occurrence of the Effective Date, the Debtor, Additional Debtors, Reorganized Debtor, and Additional Reorganized Debtors have agreed to undertake certain non-monetary obligations to further enhance the existing child safety and protection policies and procedures within the Archdiocese, all as set forth in **Exhibit L** to the Plan.

54

6. ***Corporate Action.***

All matters provided under the Plan involving the corporate structure of the Debtor, any Additional Debtor, or corporate action to be taken by or required by the Debtor, any Additional Debtor, Reorganized Debtor, or any Additional Reorganized Debtor shall be deemed to have occurred and be effective as provided by the Plan and shall be authorized and approved in all respects without any requirement for further approval by the Bankruptcy Court or any other governmental entity. For the avoidance of doubt, to the extent any corporate action or other transaction contemplated under the Plan would otherwise require approval under Maryland or other applicable law, the entry of the Confirmation Order shall constitute such approval.

7. ***Agreements, Instruments, and Documents.***

All agreements, instruments, and other documents required by or under the Plan or as may be necessary, useful, or otherwise desirable in order to effectuate the Plan shall be executed before, on, or as soon as reasonably practicable after the Effective Date.

8. ***Continuation of Insurance Policies.***

Except to the extent any Insurance Policy is sold pursuant to an Insurance Settlement Agreement and corresponding Insurance Settlement Approval Order or as otherwise provided by the terms of the Plan, all Insurance Policies shall be deemed: (a) assumed and assigned to the Insurance Trust, pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Debtor or any Additional Debtor; or (b) continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Debtor or an Additional Debtor, such that each of the parties' contractual, legal, and equitable rights under such Insurance Policy shall remain unaltered.

To the extent that any or all Insurance Policies are considered to be executory contracts (other than Insurance Policies sold pursuant to an Insurance Settlement Agreement and corresponding Insurance Settlement Approval Order or as otherwise provided by the terms of the Plan), the Plan shall constitute a motion to assume and assign or otherwise transfer such Insurance Policies to the Insurance Trust, pursuant to and in accordance with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption and assignment or other transfer of the Insurance Policies to the Insurance Trust.

9. ***Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.***

The Debtor, Additional Debtors, Reorganized Debtor, and Additional Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, or other similar tax: (a) the creation of any mortgage, deed of trust, lien, or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

10.    ***Additional Debtors Claims.***

i.    **Establishment of Additional Debtors' Claims Filing Deadline.**

Except for Additional Debtors Claims that are Previously Asserted Claims, all Proofs of Claim against any Additional Debtor, including those asserting Survivor Claims against one or more Additional Debtors, must be filed by no later than the Additional Debtors' Claims Filing Deadline.

Any Additional Debtors Claim, including any Additional Debtors Survivor Claim, that is not a Previously Asserted Claim and for which a timely Proof of Claim is not filed will automatically be disallowed, forever barred from assertion, and unenforceable against the Debtor, Reorganized Debtor, any Additional Debtors, any Reorganized Additional Debtors, their respective Estates, and their respective property, without the need for any objection by the Reorganized Debtor or any Reorganized Additional Debtor or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Additional Debtors Claim, including any Additional Debtors Survivor Claim, will be deemed fully satisfied, released, and discharged.

For the avoidance of doubt, the fact that any Additional Debtors Claim, including any Additional Debtors Survivor Claim, is or may be time-barred or subject to a statute of limitations or other defense under applicable non-bankruptcy law does not excuse the holder of such Additional Debtors Claim, including any Survivor Claimant, from compliance with the Plan, including Section 9.9.1, the Additional Debtors' Claims Filing Deadline, or the Confirmation Order.

ii.    **Procedures for Non-Survivor Claims Against Additional Debtors.**

The following procedures govern the Filing of Proofs of Claim that assert Additional Debtors Claims that do not qualify as Previously Asserted Claims:

(a)    All Proofs of Claim asserting Additional Debtors Claims, including Additional Debtors Survivor Claims, shall be submitted by mail, hand delivery, or electronically as follows:

***If by First Class Mail:***

Roman Catholic Archbishop of Baltimore,
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4420
Beaverton, OR 97076-4420

***If by Hand Delivery or Overnight Mail:***

Roman Catholic Archbishop of Baltimore,
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

56

*If Electronically:*

By utilizing the website established by the Claims Agent using the interface available on such website located at https://dm.epiq11.com/RCABaltimore and following the instructions provided.

Proofs of Claim asserting an Additional Debtors Claim, including an Additional Debtors Survivor Claim, will be deemed filed only when actually received at the addresses listed above or via the Electronic Filing System for Survivor Proofs of Claim submitted electronically. ***Any Proof of Claim asserting an Additional Debtors Claim, including any Additional Debtors Survivor Claim, and sent by facsimile, telecopy, or electronic mail transmission will not be accepted.***

(b)     Any Proof of Claim asserting an Additional Debtors Claim must (i) be signed by the Claimant or the Claimant's legal representative (including documentation confirming the legal ability of the signatory to act on behalf of the Claimant), (ii) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available, and (iii) be in the English language.

(c)     The Claims and Noticing Agent will assign to each Additional Debtors Claim, including each Additional Debtors Survivor Claim, a unique identifier code and will maintain a list of such Claimants, their corresponding identifier code, and the Proof of Claim associated with such Additional Debtors Claim.

iii.     **Special Procedures for Additional Debtors Survivor Claims.**

The following additional procedures govern the filing of Proofs of Claim asserting Additional Debtors Survivor Claims that do not constitute Previously Asserted Claims:

(a)     Persons asserting an Additional Debtors Survivor Claim shall include with their Proof of Claim sufficient information to substantiate the Additional Debtors Survivor Claim. **The failure to provide sufficient information to substantiate an Additional Debtors Survivor Claim may be a basis for an objection to such Additional Debtors Survivor Claim or otherwise result in a formal request for more information.** A Survivor Claimant may provide such information by completing (and attaching to the proof of claim form) a Sexual Abuse Claim Supplement. Alternatively, a Survivor Claimant may provide such information by including in the proof of claim form or an attachment thereto information substantially similar to the information requested by the Sexual Abuse Claim Supplement.

(b)     All Proofs of Claim asserting an Additional Debtors Survivor Claim shall be subject to the confidentiality procedures and treatment provided in *Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 316).

(c)     Any Proof of Claim asserting an Additional Debtors Survivor Claim must (i) be signed by the Survivor Claimant or the Survivor Claimant's legal representative (including documentation confirming the legal ability of the signatory to act on behalf of the Survivor Claimant), (ii) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available, and (iii) be in the English language.

(d)     Pursuant to Bankruptcy Rule 3003(c)(2), all Claimants holding an Additional

57

Debtors Survivor Claim who fail to comply with Section 9.9 of the Plan by timely Filing a Proof of Claim in appropriate form will not be treated as a Survivor Claimant with respect to such Survivor Claim for the purpose of Survivor Compensation Trust Distributions and automatically will be disallowed, forever barred from assertion, and unenforceable against the Debtor, Reorganized Debtor, any Additional Debtors, any Reorganized Additional Debtors, their respective Estates, and their respective property, without the need for any objection by the Reorganized Debtor or any Reorganized Additional Debtor or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Additional Debtors Claim, including any Additional Debtors Survivor Claim, will be deemed fully satisfied, released, and discharged.

Nothing in Section 9.9 of the Plan will (a) prejudice the right of the Additional Debtors, the Reorganized Additional Debtors, the Survivor Compensation Trust, the Survivor Compensation Trustee, any Covered Party, or any Non-Settling Insurers to dispute or assert offsets or defenses to any Survivor Claim, (b) limit the releases, discharges, and injunctions set forth elsewhere in the Plan or the Confirmation Order, or (c) be construed to modify, amend, or enlarge any Claimant's rights with respect to any Claim.

11. ***Continued Corporate Existence.***

As of the Effective Date: (a) the Debtor will continue, as the Reorganized Debtor, to exist as a legal entity, with all of the powers of such legal entity under applicable law and without prejudice to any right to alter or terminate such existence (by merger, dissolution or otherwise) under applicable law; (b) each Additional Debtor will continue, as a Reorganized Additional Debtor, to exist as a legal entity, with all of the powers of such legal entity under applicable law and without prejudice to any right to alter or terminate such existence (by merger, dissolution or otherwise) under applicable law, and (c) property of the respective Estates, and any property acquired by the Debtor, Reorganized Debtor, Additional Debtors, or Reorganized Additional Debtors, as applicable, will vest in the Reorganized Debtor or Reorganized Additional Debtors, as applicable, free and clear of all Claims, Liens, charges, and other interests, except as expressly provided in the Plan. Except as otherwise provided by the Plan, the Reorganized Debtor and Reorganized Additional Debtors may, on and after the Effective Date, operate, use, acquire, and dispose of property, and compromise or settle any Claims (other than Survivor Claims subject to the Plan), without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On and after the Effective Date, the Debtor as the Reorganized Debtor and the Additional Debtors as the Reorganized Additional Debtors will continue to operate in accordance with the principles of their respective missions, Canon Law, and applicable laws.

**I.     Distributions and Claims Administration for Claims Other Than Survivor Claims.**

1. ***Distributions.***

Unless otherwise provided in the Plan, Distributions for Claims other than Survivor Claims shall be made by the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors, as applicable.

2. ***Method of Payment.***

Except with respect to Survivor Claims, payments under the Plan will be made by check, mailed with first class postage prepaid, to the holder of each Claim at: (a) the address listed on its Proof of Claim as of the Record Date (or by such other method as may be agreed to by the Reorganized Debtor and holder of the applicable Claim); or (b) if no Proof of Claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules as of the Record Date. Holders of Claims as of the Record Date may contact the Reorganized Debtor and Additional Reorganized Debtors to amend their

addresses as follows: (a) by e-mailing RCABaltimore@epiqglobal.com; (b) by first class mail to Roman Catholic Archbishop of Baltimore Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4421 Beaverton, Oregon 97076-4421; or (c) by hand delivery or overnight mail to Roman Catholic Archbishop of Baltimore Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, Oregon 97005.

3. ***Reservation of Rights to Object to Claims.***

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor, Additional Reorganized Debtors, Insurance Trustee, or Survivor Compensation Trustee, as applicable, shall have and retain any and all objections to any and all Claims and motions or other requests for the payment of Claims, including any and all objections to the validity or amount of any and all alleged Administrative Expenses and Priority Tax Claims. The failure to object to any Claim in this Chapter 11 Case or the Additional Debtor Chapter 11 Cases shall be without prejudice to the Reorganized Debtor's, any Additional Reorganized Debtor's, Insurance Trustee's, or Survivor Compensation Trustee's, as applicable, right to contest or otherwise defend against such Claim in the Bankruptcy Court when or if such Claim is sought to be enforced by the holder of such Claim.

4. ***Filing of Objections.***

Except with respect to Survivor Claims or Administrative Expenses, any objections to Claims will be filed within ninety (90) days after the Effective Date, unless such day is not a Business Day in which case such deadline will be the next Business Day after the ninetieth (90th) day after the Effective Date, or at such later date as approved by the Bankruptcy Court upon request from the Reorganized Debtor or any Additional Reorganized Debtor. Any objections to Claims arising solely under section 502(d) of the Bankruptcy Code are not subject to the ninety (90) day deadline and may be pursued through an adversary proceeding asserting a Claim under Chapter 5 of the Bankruptcy Code. An objection to any Claim will be deemed properly served on the Claimant, if the Reorganized Debtor or Reorganized Additional Debtor, as applicable, effects service by any of the following methods: (a) in accordance with Bankruptcy Rule 7004; (b) by first class mail on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment to same; or (c) by first class mail on any counsel that has appeared on behalf of the holder of the Claim in the Chapter 11 Case.

5. ***Procedures for Treating and Resolving Disputed Claims.***

i.      No Distributions Pending Allowance.

Notwithstanding any other provision in the Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim, unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by a Final Order.

ii.      Claims Estimation.

Except with respect to Survivor Claims, the Debtor or the Additional Debtors may seek a Bankruptcy Court order requiring the estimation or limitation of any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code. Unless provided otherwise in an order of the Bankruptcy Court, the estimated amount shall constitute the Allowed amount of such Claim or a maximum limitation on such Claim, as the Bankruptcy Court may direct; provided, however, that if the estimate constitutes the maximum limitation on such Claim, the Debtor or Additional Debtor, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of such Claim; provided,

further, however, nothing in Section 10.5.2 shall limit the rights granted by section 502(j) of the Bankruptcy Code.

iii.    No Distribution if Cause of Action Asserted.

Notwithstanding any other provision of the Plan, no payment or Distribution will be made with respect to all or any portion of a Claim or Allowed Claim held by a claimant against whom an Avoidance Action is asserted unless and until such Avoidance Action has been settled or withdrawn or has been determined by a Final Order.

iv.    Payment Upon Allowance and Disallowance of Disputed Claims.

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Reorganized Debtor or Additional Reorganized Debtor, as applicable, shall distribute to the holder of such Allowed Claim the Distribution(s) to which the holder is then entitled under the Plan. Such Distribution, if any, shall be made as soon as reasonably practicable after entry of a Final Order allowing such Claim.

6.    ***Record Date.***

The Record Date for Claim transfers is the Confirmation Date. Claim transfers will not be recognized after the Confirmation Date. Payment under the Plan will be mailed to the address of the holder of the Claim as of the Record Date until the holder of the Claim as of the Record Date notifies the Reorganized Debtor or applicable Additional Reorganized Debtor in writing of a different address as follows: (a) by e-mailing RCABaltimore@epiqglobal.com; (b) by first class mail to Roman Catholic Archbishop of Baltimore Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4421 Beaverton, Oregon 97076-4421; or (c) by hand delivery or overnight mail to Roman Catholic Archbishop of Baltimore Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, Oregon 97005.

7.    ***De Minimis Distributions.***

The Reorganized Debtor and Additional Reorganized Debtors shall not be required to make any payment of less than fifty dollars ($50.00) with respect to any Allowed General Unsecured Claim.

8.    ***Unclaimed Payments.***

In the event a payment is returned to the Reorganized Debtor or an Additional Reorganized Debtor as unclaimed with no indication of the payee's forwarding address, the Reorganized Debtor or Additional Reorganized Debtor, as applicable, shall hold such payment for a period of one hundred eighty (180) days from the date of return. If not claimed by the payee by the end of the one hundred eighty (180) day period, the funds will be retained by the Reorganized Debtor or Additional Reorganized Debtor, as applicable, and the applicable claim shall be discharged and forever barred.

9.    ***Time Bar to Check Payments.***

Checks issued by the Reorganized Debtor or any Additional Reorganized Debtor shall be null and void if not negotiated within one hundred eighty (180) days from and after the date of issuance. Requests for reissuance of any check shall be made to the Reorganized Debtor or Additional Reorganized Debtor, as applicable, by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check must be made on or before two hundred ten (210) days after the date of issuance of such check. After two hundred ten (210) days after issuance of a non-negotiated

check for which the holder of the Allowed Claim did not request reissuance, all claims in respect of voided checks shall be discharged and forever barred.

10.    ***Compliance with Tax Requirements.***

Notwithstanding any other provisions of the Plan: (a) each recipient of a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any taxing authority, including income, withholding, and other tax obligations on account of such Distribution; and (b) no Distribution shall be made to or on behalf of such recipient unless and until such holder has made arrangements satisfactory to the Reorganized Debtor or applicable Additional Reorganized Debtor for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Reorganized Debtor or Additional Reorganized Debtor, as applicable, in connection with such Distribution.

11.    ***Setoffs and Recoupments.***

The Reorganized Debtor, Additional Reorganized Debtors, Insurance Trustee, or Survivor Compensation Trustee, as applicable, may, pursuant to applicable non-bankruptcy law, set off against or recoup from any Distribution(s) to be made pursuant to the Plan, any Cause of Action the Debtor, Additional Debtors, Reorganized Debtor, Additional Reorganized Debtors, Insurance Trustee, or Survivor Compensation Trustee, as applicable, may hold against the holder of such Allowed Claim that are not otherwise waived, released, or compromised pursuant to or in accordance with the Plan; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release of any such Causes of Action against a holder of a Claim.

**J.    Executory Contracts and Unexpired Leases.**

1.    ***Assumption or Rejection of Executory Contracts and Unexpired Leases.***

Each Assumed Agreement shall be assumed as of the Effective Date, to the extent that each such Assumed Agreement has not already expired, concluded, or terminated under its own terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code. All other executory contracts, unexpired leases, or other agreements that are not Assumed Agreements and were not previously assumed or rejected by order of the Bankruptcy Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, approval of the rejection of all such executory contracts and unexpired leases.

2.    ***Cure of Defaults.***

Not later than twenty-four (24) days prior to the confirmation hearing, the Debtor and Additional Debtors shall provide notices of proposed Cure Amounts to the counterparties to the Assumed Agreements proposed to be assumed under the Plan, which notices shall include a description of the procedures for objecting to the Cure Amount, the ability of the Debtor or applicable Additional Debtor to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Assumed Agreement, and any other matter pertaining to assumption.

**UNLESS OTHERWISE AGREED IN WRITING BY THE PARTIES TO THE APPLICABLE ASSUMED AGREEMENT, ANY OBJECTION BY A COUNTERPARTY TO AN ASSUMED AGREEMENT TO A PROPOSED ASSUMPTION OR RELATED CURE AMOUNT MUST BE FILED, SERVED, AND ACTUALLY RECEIVED BY COUNSEL TO THE DEBTOR AND ANY APPLICABLE ADDITIONAL DEBTOR WITHIN TWENTY-ONE (21)**

61

**DAYS OF THE SERVICE OF THE NOTICE OF PROPOSED ASSUMPTION AND CURE AMOUNT, OR SUCH SHORTER PERIOD AS AGREED TO BY THE PARTIES OR AUTHORIZED BY THE BANKRUPTCY COURT. ANY COUNTERPARTY TO AN ASSUMED AGREEMENT THAT FAILS TO TIMELY OBJECT TO THE PROPOSED ASSUMPTION OR CURE AMOUNT SHALL BE DEEMED TO HAVE CONSENTED TO SUCH ASSUMPTION AND CURE AMOUNT AND SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM CONTESTING THE DEBTOR'S OR APPLICABLE ADDITIONAL DEBTOR'S ASSUMPTION OF THE APPLICABLE ASSUMED AGREEMENT AND FROM REQUESTING PAYMENT OF A CURE AMOUNT THAT DIFFERS FROM THE AMOUNTS PAID OR PROPOSED TO BE PAID BY THE DEBTOR, ADDITIONAL DEBTOR, REORGANIZED DEBTOR, OR ADDITIONAL REORGANIZED DEBTOR, IN EACH CASE WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTOR, ADDITIONAL DEBTOR, REORGANIZED DEBTOR, OR ADDITIONAL REORGANIZED DEBTOR OR ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT. THE REORGANIZED DEBTOR OR APPLICABLE ADDITIONAL REORGANIZED DEBTOR MAY SETTLE ANY CURE AMOUNT WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

The Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors, as applicable, shall pay undisputed Cure Amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties may agree. If there is a dispute regarding the Cure Amount, the ability of the Debtor or an Additional Debtor, as applicable, to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the applicable Assumed Agreement, or any other matter pertaining to assumption, then the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtor, Additional Debtor, Reorganized Debtor, or Additional Reorganized Debtor, as applicable, and the counterparty to the Assumed Agreement. The payment of Cure Amounts required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption shall not prevent or delay implementation of the Plan or occurrence of the Effective Date.

The Debtor's and Additional Debtors' assumption of any Assumed Agreement pursuant to the Plan or otherwise and payment of the applicable Cure Amount shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Agreement at any time prior to the effective date of assumption.

**ANY AND ALL PROOFS OF CLAIM BASED UPON ASSUMED AGREEMENTS THAT HAVE BEEN ASSUMED IN THE CHAPTER 11 CASE OR THE ADDITIONAL DEBTOR CHAPTER 11 CASES, INCLUDING PURSUANT TO THE CONFIRMATION ORDER, SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE LATER OF (A) THE DATE OF ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (INCLUDING THE CONFIRMATION ORDER) APPROVING SUCH ASSUMPTION, (B) THE EFFECTIVE DATE OF SUCH ASSUMPTION, AND (C) THE EFFECTIVE DATE, IN WHICH CASE WITHOUT THE NEED FOR ANY OBJECTION BY THE DEBTOR, ADDITIONAL DEBTORS, REORGANIZED DEBTOR, OR ADDITIONAL REORGANIZED DEBTORS OR ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

3.     *Bar Dates for Rejection Damage Claims.*

To the extent not subject to a claim filing deadline set forth in any prior or subsequent order of the Bankruptcy Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 11.1 of the Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim.

62

**ANY CLAIM ARISING OUT OF THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT IS NOT TIMELY FILED SHALL BE AUTOMATICALLY DISALLOWED, FOREVER BARRED FROM ASSERTION, AND UNENFORCEABLE AGAINST THE DEBTOR, ADDITIONAL DEBTORS, REORGANIZED DEBTOR, ADDITIONAL REORGANIZED DEBTORS, ESTATES, OR ANY PROPERTY OF THE FOREGOING, WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTOR OR ADDITIONAL REORGANIZED DEBTORS OR FURTHER ACTION, ORDER, OR APPROVAL BY THE BANKRUPTCY COURT, AND ANY SUCH CLAIM SHALL BE DEEMED FULLY SATISFIED, RELEASED, AND DISCHARGED, NOTWITHSTANDING ANY CLAIM OR PROOF OF CLAIM TO THE CONTRARY.**

4.    ***Contracts and Leases Entered After the Petition Date.***

Contracts and leases entered into after the Petition Date by the Debtor or Additional Debtors, including any Assumed Agreement assumed by the Debtor or Additional Debtors, will be performed by the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors, as applicable, in the ordinary course of business. Accordingly, such contracts and leases, including any Assumed Agreements, shall survive and remain unaffected by entry of the Confirmation Order.

5.    ***Compensation and Benefits Programs.***

Other than any Compensation and Benefits Programs assumed by the Debtor or Additional Debtors prior to the entry of the Confirmation Order, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Assumed Agreements under the Plan and deemed assumed under sections 365 and 1123 of the Bankruptcy Code, and the Debtor's, Additional Debtors', Reorganized Debtor's, and Additional Reorganized Debtors' obligations under the Compensation and Benefits Programs survive and remain unaffected by entry of the Confirmation Order and will be fulfilled in the ordinary course of the Debtor's, Additional Debtors', Reorganized Debtor's, and Additional Reorganized Debtors' operations. Compensation and Benefits Programs assumed by the Debtor and Additional Debtors prior to the entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtor's, Additional Debtors', Reorganized Debtor's, and Additional Reorganized Debtors' operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Programs.

6.    ***Workers' Compensation Programs.***

As of the Effective Date, the Debtor, Additional Debtors, Reorganized Debtor, and Additional Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws; and (b) the Workers' Compensation Program. For the avoidance of doubt, all written contracts and agreements related to the Workers' Compensation Program shall be deemed executory contracts and assumed as of the Petition Date. No Insurer shall be required to file a Proof of Claim, and any amount due and owing under a written contract or agreement related to the Workers' Compensation Program shall be paid in the ordinary course under such written contract or agreement. All Proofs of Claim on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's, Additional Debtors', Reorganized Debtor's, or Additional Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Program; provided, further, however, that nothing in the Plan shall be deemed to impose any obligations on the Debtor, Additional Debtors, or their Insurers in addition to what is provided for under the terms of the Workers' Compensation Program and applicable state law.

7.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Assumed Agreement that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Assumed Agreement, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtor or an applicable Additional Debtor rejects or repudiates any of the foregoing agreements. Modifications, amendments, and supplements to, or restatements of, prepetition Assumed Agreements that have been executed by the Debtor during the Chapter 11 Case or the Additional Debtors during the Additional Debtor Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Assumed Agreement, or the validity, priority, or amount of any Claims that may arise in connection with such Assumed Agreement.

8.    *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtor or any Additional Debtor that a contract or lease is in fact an Assumed Agreement or that the Reorganized Debtor or any Additional Reorganized Debtor has any liability under any contract or lease. If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or applicable Additional Debtor, or, after the Effective Date, the Reorganized Debtor or applicable Additional Reorganized Debtor, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease, including by rejecting such contract or lease retroactive to the Confirmation Date.

**K.    Confirmation and Consummation of the Plan.**

1.    *Conditions Precedent to Confirmation.*

Confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied:

   (i).    the Confirmation Order is in form and substance acceptable to the Plan Proponents, Related Non-Debtor Entities, and any Settling Insurers;

   (ii).    the Confirmation Order shall approve and implement the Channeling Injunction and Supplemental Settling Insurer Injunction as set forth in the Plan and any other Insurance Settlement Approval Order,

   (iii).    any Insurance Settlement Approval Order related to any Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been entered; and

   (iv).    the Plan Documents shall be in form and substance acceptable to the Plan Proponents and any Settling Insurers.

2.    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until each of the following conditions have been satisfied:

   (i).    the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents, Related Non-Debtor Entities, and any Settling Insurers,

64

the Confirmation Order shall be a Final Order, and no stay of the Confirmation Order shall then be in effect;

(ii).    each Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been duly executed by all parties to such Insurance Settlement Agreement and filed with the Bankruptcy Court, in each case in form and substance satisfactory to the Plan Proponents and applicable Settling Insurers;

(iii).    the Survivor Compensation Trustee, Reorganized Debtor, and Additional Reorganized Debtors shall have executed the Survivor Compensation Trust Agreement;

(iv).    the Insurance Trustee, Reorganized Debtor, and Additional Reorganized Debtors shall have executed the Insurance Trust Agreement;

(v).    each Insurance Settlement Approval Order shall have become a Final Order;

(vi).    the payments described in Section 4.2.1 and Section 4.2.2 shall have been made to, and received by, the Survivor Compensation Trust;

(vii).    the payments described in Section 5.2.1 and Section 5.2.2 shall have been made to, and received by, the Insurance Trust;

(viii).    the Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with the consent of the Plan Proponents and any Settling Insurers;

(ix).    the Debtor and Additional Debtors shall have obtained any approvals required by or pursuant to the Code of Canon Law;

(x).    the Additional Debtor Petition Dates shall have occurred; and

(xi).    the Debtor shall have filed a notice of occurrence of the Effective Date.

3.    ***Waiver of Conditions Precedent to the Effective Date.***

Each of the conditions precedent to the occurrence of the Effective Date set forth in Section 12.2 of the Plan may only be waived in whole or in part by the Plan Proponents with the written consent of any Settling Insurers, and shall not require notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

4.    ***Effect of Non-Occurrence of Conditions.***

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects, and nothing in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Protected Parties or any Settling Insurer; (b) prejudice in any manner the rights of the Protected Parties, the Trusts, or any Settling Insurer; (c) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or any Settling Insurer in any respect, including in any Action against the Debtor or any Additional Debtor; or (d) be admissible in any Action against the Protected Parties or any Settling Insurer in any court or other forum.

65

**L.      Effects of Confirmation.**

1.      ***Binding Effect.***

As of the Effective Date, all provisions of the Plan Documents shall be binding upon the Debtor, the Additional Debtors, the Estates, the Reorganized Debtor, the Additional Reorganized Debtors, all holders of Claims or Interests, each such holder's respective successors and assigns, and all other Persons that are affected in any manner by the Plan, including the Insurers, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan. Except as otherwise expressly provided in the Plan, all Plan Documents shall be given full force and effect and shall bind all Persons referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered, or recorded on or after the Effective Date and whether or not such Persons have actually executed such agreement(s).

2.      ***Discharge.***

i.      Discharge of the Debtor.

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination, and release of, all Claims and Interests of any nature whatsoever against or in the Debtor or any of the Debtor's assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. As of the Effective Date and except as expressly provided in the Plan or the Confirmation Order, the Debtor shall be discharged and released, and each holder of a Claim or Interest (including any successor, assign, and Affiliate of such holder) shall be deemed to have forever waived, discharged, and released the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims and Interests based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a proof of claim with respect to such Claim or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a proof of claim with respect to such Claim or Interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim or Interest is deemed to have accepted the Plan.

ii.      Discharge of the Additional Debtors.

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination, and release of, all Claims and Interests of any nature whatsoever against or in the Additional Debtors or any of the Additional Debtors' assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. As of the Effective Date and except as expressly provided in the Plan or the Confirmation Order, the Additional Debtors shall be discharged and released, and each holder of a Claim or Interest (including any successor, assign, and Affiliate of such holder) shall be deemed to have forever waived, discharged, and released the Additional Debtors, to the fullest extent permitted by section 1141 or 1192 of the Bankruptcy Code, as applicable, of and from any and all Claims and Interests based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a proof of claim with respect to such Claim or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a proof of claim with respect to such Claim or Interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim or Interest is deemed to have accepted the Plan.

iii.     Discharge Injunction.

As of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtor, Additional Debtors, or any of their assets or properties based upon an act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date shall be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim or Interest against the Debtor, Additional Debtors, Reorganized Debtor, Additional Reorganized Debtors, or the property of the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors. In accordance with the foregoing, except as expressly provided in the Plan or Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims and Interests against or in the Debtor and Additional Debtors, pursuant to sections 105, 524, 1141, and 1192 of the Bankruptcy Code, as applicable, and such discharge shall void any judgment obtained against the Debtor or Additional Debtors to the extent such judgment relates to a discharged Claim or Interest.

3.     ***Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.***

**As set forth in each Insurance Settlement Agreement and each Insurance Settlement Approval Order, in consideration of the undertakings of the Protected Parties and Settling Insurers under each Insurance Settlement Agreement, and the Plan, including their contributions to the Insurance Trust, contributions to the Survivors Compensation Trust, and other consideration, to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as provided in sections 524 and 1141 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:**

**(a)     any and all Channeled Claims are channeled into the Trusts, as applicable, and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Plan, the Insurance Trust Agreement, and the Survivor Compensation Trust Agreement, as the sole and exclusive remedy for all holders of Channeled Claims;**

**(b)     any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly, indirectly, or derivatively, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:**

**(i).     commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any Action, suit, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world with respect to any Channeled Claim against or affecting any Protected Party, any Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer;**

**(ii).     enforcing, levying, attaching (including any prejudgment attachment), collecting, recovering, or seeking to accomplish any of the preceding by any manner or means with respect to, any judgment, award, decree, or order relating to a Channeled Claim against or affecting any Protected Party, any Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer;**

67

(iii).   **creating, perfecting, enforcing, or seeking to accomplish any of the preceding with respect to any lien or encumbrance of any kind relating to a Channeled Claim against or affecting any Protected Party, any Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer;**

(iv).   **asserting, implementing, or effectuating any Channeled Claim of any kind against: (A) any obligation due any Protected Party or Settling Insurer; (B) any Protected Party or Settling Insurer; or (C) the property of any Protected Party or Settling Insurer;**

(v).   **taking any act, in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, the Insurance Trust Documents, or the Survivor Compensation Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to the Survivor Compensation Trust; and**

(vi).   **asserting or accomplishing any setoff, right of indemnity or reimbursement, subrogation, contribution, or recoupment of any kind against an obligation owed to any Protected Party or Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer.**

**This Channeling Injunction is an integral part of: (y) each Insurance Settlement and the Plan; and (z) the implementation each Insurance Settlement Agreement and the Plan. It is intended that the channeling of the Channeled Claims provided in each Insurance Settlement Agreement, each Insurance Settlement Approval Order, and the Plan shall inure to the benefit of each Protected Party and Settling Insurer. The Channeling Injunction shall become effective with respect to: (a) each Settling Insurer as of the occurrence of all conditions to the effectiveness of such Settling Insurer's Insurance Settlement Agreement and the occurrence of the Effective Date; and (b) each Protected Party as of the occurrence of the Effective Date. In a successful Action to enforce the injunctive provisions of any Insurance Settlement Approval Order, or <u>Section 13.3</u> of the Plan in response to a willful violation of same, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorney's fees and costs, from the non-moving part, and such other legal or equitable remedies as are just and proper.**

4.   *<u>Supplemental Settling Insurer Injunction.</u>*

**As set forth in each Insurance Settlement Agreement and Insurance Settlement Approval Order, pursuant to sections 105(a), 363, and 1123 of the Bankruptcy Code, and in consideration of the undertakings of each Settling Insurer pursuant to the applicable Insurance Settlement Agreement and Insurance Settlement Approval Order, including each Settling Insurer's purchase of the applicable Settling Insurer Policies free and clear of all liens, Claims and Interests of all Persons pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Claims or Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax, and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, perpetrators, and all other holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements and Insurance Settlement Approval Orders) against any of the Settling Insurers arising out of or relating in any way to such Settling Insurer's Settling Insurer Policies, including (i) Survivor Claims, Indirect Claims, and Released Claims, (ii) the payment of any of the Claims identified in (i), including Contribution Claims, Non-Settling Insurer Contribution Claims, and Medicare Claims, and (iii) Extra-Contractual Claims are hereby permanently stayed, enjoined,**

barred, and restrained from taking any action, directly, indirectly, or derivatively, to assert, enforce or attempt to assert or enforce any such Claim or Interest against the Settling Insurers or Settling Insurer Policies, including:

(a). commencing, conducting, or continuing in any manner, whether directly, indirectly, or derivatively, any Action, suit, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world with respect to any Settling Insurer or any property or interest in property of any Settling Insurer;

(b). enforcing, levying, attaching (including any prejudgment attachment), collecting, recovering, or seeking to accomplish any of the preceding by any manner or means with respect to, any judgment, award, decree, or order against or affecting any Settling Insurer or any property or interest in property of any Settling Insurer;

(c). creating, perfecting, enforcing, or seeking to accomplish any of the preceding with respect to, any lien or encumbrance of any kind against or affecting any Settling Insurer or any property or interest in property of any Settling Insurer;

(d). asserting, implementing, or effectuating any setoff, right of indemnity or reimbursement, subrogation, contribution, or recoupment of any kind against any obligation due any Settling Insurer or any property or interest in property of any Settling Insurer; or

(e). taking any act, in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, the Insurance Trust Documents, or the Survivor Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to the Survivor Compensation Trust.

This Supplemental Settling Insurer Injunction is an integral part of: (y) each Insurance Settlement Agreement and the Plan; and (z) the implementation of each Insurance Settlement Agreement and the Plan. The Supplemental Settling Insurer Injunction will be effective with respect to each Settling Insurer only as of the occurrence of: (i) all conditions necessary for the effectiveness of such Settling Insurer's Insurance Settlement Agreement and Insurance Settlement Approval Order; and (ii) the Effective Date. The Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers (and such Settling Insurers' Affiliates), property and interests in property of the Settling Insurers, and the Settling Insurer Policies, but against no other Person or thing; provided, however, the Supplemental Settling Insurer Injunction shall not limit or otherwise be deemed to limit the scope of the discharge or Channeling Injunction in favor of the Debtor, Reorganized Debtor, and other Protected Parties.

5.      *Gatekeeper Injunction.*

To the extent permitted by law, and subject in all respects to Article 13 of the Plan, no Enjoined Party may commence or pursue against any Protected Party or Settling Insurer (a) a Survivor Claim or (b) any other Claim or Cause of Action that arose or arises from or is related to a Survivor Claim, the Chapter 11 Case, the Additional Debtor Chapter 11 Cases, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the reorganization of the business of the Debtor, Additional Debtors, Reorganized Debtor, and Additional Reorganized Debtors, the administration of the Trusts, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of

**Action represents a colorable Claim against a Protected Party or Settling Insurer that is not stayed, released, discharged, enjoined, restrained or otherwise barred under the Plan or an applicable Insurance Settlement Approval Order and (ii) subject in all respects to the Channeling Injunction, the Discharge Injunction, and the Supplemental Settling Insurer Injunction, specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against any such Protected Party or Settling Insurer. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article 14 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action or, alternatively, with respect to a Survivor Claim, order that such Claim or Cause of Action be only pursued and resolved as expressly provided in Article 6 of the Plan.**

**For the avoidance of doubt, the Gatekeeper Injunction in Article 13 of the Plan does not apply to Claims seeking recovery from Non-Settling Insurers.**

6.      *Injunction Against Interference with Plan.*

Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

7.      *Exculpation of Exculpated Parties.*

**From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party shall be released from, any Claim by any other Exculpated Party, Claimant, or any other party in interest for any act or omission that occurred during and relating to the Chapter 11 Case, the Additional Debtor Chapter 11 Cases, or relating to the preparation and filing of the Chapter 11 Case and Additional Debtors' Chapter Cases, formulation, negotiation, pursuit of confirmation, consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan, the formulation and negotiation of an Insurance Settlement Agreement, or the seeking or obtaining of an Approval Order related to an Insurance Settlement Agreement, except for Claims arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities, if any, under the Plan; provided, however, that nothing in this provision shall serve to affect any claims against Stinson LLP or Berkeley Research Group, LLC with respect to or arising out of certain data breaches during the pendency of the Chapter 11 Case. Without limiting the generality of the foregoing, the Committee, Debtor, Additional Debtors, and their respective Agents shall be entitled to and granted the benefits of section 1125(e) of the Bankruptcy Code and the Channeling Injunction.**

8.      *Limitation of Liability for Payments to Survivors.*

The Protected Parties, the Settling Insurers, the Trusts, the Survivor Compensation Trustee, Insurance Trustee, and professionals employed by each of the foregoing shall not have any liability to any Person, including any governmental entity or Insurer, on account of payments made to a Survivor Claimant, except as set forth in the Plan.

9.      *Injunctions in Full Force and Effect.*

All injunctions or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer or other Protected Party

70

are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

10.   ***Settlements, Injunctions, and Releases Integral to Plan.***

The foregoing settlements and corresponding injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. Any and all currently pending court proceedings, the continuation of which would violate Article 13 of the Plan or the releases provided for under the Plan or corresponding settlements shall be dismissed with prejudice within twenty-one (21) days of the Effective Date.

11.   ***Timing.***

The settlements, injunctions, releases, and discharges (including the Channeling Injunction, Supplemental Settling Insurer Injunction, and Gatekeeper Injunction) to which any Settling Insurer or other Protected Party is entitled pursuant to an Insurance Settlement Agreement, an Insurance Settlement Approval Order, the Plan, the Confirmation Order, and the Bankruptcy Code shall only become effective upon the occurrence of the Effective Date and all conditions precedent to the effectiveness of each applicable Insurance Settlement Agreement, as applicable.

12.   ***Title to and Vesting of Assets.***

All property of the Debtor, the Additional Debtors, and the Estates is dealt with by and administered under the Plan. Therefore, on the Effective Date, to the fullest extent allowed by sections 1141(b) and 1141(c) of the Bankruptcy Code, all property of the Debtor, the Additional Debtors, and the Estates, including Retained Claims, shall vest in the Reorganized Debtor and Additional Reorganized Debtors, as applicable, and such property shall be free and clear of all liens, Claims and Interests of all Persons, except as expressly provided in the Plan. From and after the Effective Date, the Reorganized Debtor and each Additional Reorganized Debtor may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code. The Reorganized Debtor and each Additional Reorganized Debtor may pursue any Retained Claims at the discretion of the Reorganized Debtor or applicable Additional Reorganized Debtor and retain the proceeds thereof, if any.

13.   ***Cancellation of Instruments.***

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtor or Additional Debtors, except such instruments that are authorized or issued under the Plan, shall be cancelled and extinguished. The holders of or parties to the cancelled notes and other agreements and instruments shall have no rights relating to such notes or instruments or the cancellation thereof, except any rights provided pursuant to the Plan.

14.   ***Dissolution of the Committee.***

On the Effective Date, the Committee shall be dissolved, and the members of the Committee and the professionals retained by the Committee shall be released and discharged from their respective fiduciary obligations.

71

**M.**       **Retention of Jurisdiction.**

    1.      ***By the Bankruptcy Court.***

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain: (a) original and exclusive jurisdiction over the Chapter 11 Case and Additional Debtor Chapter 11 Cases; (b) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case or Additional Debtor Chapter 11 Cases; and (c) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case, the Additional Debtor Chapter 11 Cases, and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

(a)      over disputes concerning the ownership of Claims;

(b)      over disputes concerning the distribution or retention of assets under the Plan;

(c)      over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims;

(d)      over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Debtor, any Additional Debtor, the Estates, or Trusts, or property abandoned or transferred by the Debtor, any Additional Debtor, the Estates, or the Trusts;

(e)      over motions to approve Insurance Settlement Agreements entered into after the Effective Date;

(f)      over matters related to the assets of the Estates or Trusts, including the terms of the Trusts, or the recovery, liquidation, or abandonment of Survivor Compensation Trust Assets or Insurance Trust Assets;

(g)      over removal of either Trustee and appointment of a successor Trustee;

(h)      over matters relating to the subordination of Claims;

(i)      to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(j)      to enforce the Channeling Injunction, the Discharge Injunction, the Supplemental Settling Insurer Injunction, and the Gatekeeper Injunction;

(k)      to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order;

(l)      to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan or settlements included in the Plan (including but not limited to the

Channeling Injunction, the Discharge Injunction, the Supplemental Settling Insurer Injunction, and the Gatekeeper Injunction);

(m)     over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection with the foregoing;

(n)     over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code and any objections to same;

(o)     over all applications for compensation under sections 327, 328, 329, and 330 of the Bankruptcy Code;

(p)     over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q)     over conflicts and disputes among either of the Trusts, Reorganized Debtor, any Additional Reorganized Debtor, and holders of Claims;

(r)     over disputes concerning the existence, nature, or scope of the Discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(s)     to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Debtor, Additional Debtors, or their property, the Reorganized Debtor, Reorganized Additional Debtor, or their property, the Estates or their property, the Trusts or their property, Trustees, the Professionals, or the Confirmation Order;

(t)     to address issues raised by the United States Trustee regarding any obligation of the Debtor, Additional Debtors, Reorganized Debtor, or Additional Reorganized Debtors after confirmation of the Plan;

(u)     to enforce, interpret and resolve any disputes related to any Insurance Settlement Agreement or Insurance Settlement Approval Order;

(v)     to enter a Final Decree closing the Chapter 11 Case and the Additional Debtor Chapter 11 Cases;

(w)     to enforce all orders previously entered by the Bankruptcy Court; and

(x)     over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Plan or otherwise in or relating to the Chapter 11 Case or Additional Debtor Chapter 11 Cases.

2.     ***By the District Court.***

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code and 28 U.S.C. § 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case or the Additional Debtor Chapter 11 Cases.

73

3. ***Actions to Collect Amounts Owed Pursuant to the Plan.***

The Debtor, Additional Debtors, Reorganized Debtor, Additional Reorganized Debtors, and Trusts may, but are not required to, commence an Action to collect amounts owed pursuant to the Plan for any settlements referred to in the Plan or later approved by the Bankruptcy Court that are not paid in accordance with the terms of such settlement. Any such Action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

4. ***Case Closure.***

The existence and continued operation of the Trusts shall not prevent the Bankruptcy Court from closing the Chapter 11 Case or the Additional Debtor Chapter 11 Cases. The Survivor Compensation Trustee and Insurance Trustee shall not take any actions to unreasonably keep the Chapter 11 Case or Additional Debtor Chapter 11 Cases open. In an action involving either of the Trusts, any costs incurred in reopening the Chapter 11 Case or Additional Debtor Chapter 11 Cases, including any Statutory Fees and Court Costs, will be paid by the Survivor Compensation Trustee or Insurance Trustee, as applicable, from Survivor Compensation Trust Assets or Insurance Trust Assets, as applicable.

## V. TAX CONSEQUENCES OF THE PLAN.

THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPTCY ESTATE ARE COMPLEX. THE SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.

THE PLAN PROPONENTS HAVE NEITHER REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.

THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR ANY OTHER ENTITY OR PERSON. EACH HOLDER OF A CLAIM SHOULD CONSULT HIS, HER, OR ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor and holders of general unsecured claims and interests. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the applicable Treasury Regulations promulgated thereunder (the "***Treasury Regulations***"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change. This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims, if any. This summary does not address foreign, state, or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

74

**A.** **Federal Income Tax Consequences to Holders of Unsecured Claims.**

In accordance with the Plan, the holders of Claims in certain Classes will receive a distribution on account of their Claims. Any holder of a Claim will realize a loss in an amount equal to the Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a claim for interest or principal; (ii) the origin of the Claim; (iii) the type of consideration received in exchange for the Claim; (iv) whether the holder is a United States person or a foreign person for tax purposes; (v) whether the holder reports income on the accrual or cash basis method; and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponents anticipate that distributions to Survivor Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Survivor Claims.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A CLAIM OBTAIN THEIR OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A CLAIM AS A RESULT OF THE PLAN.**

**B.** **Federal Income Tax Consequences to the Debtor.**

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Plan Proponents anticipate that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Debtor.

**C.** **Tax Consequences to the Trust.**

The Trusts may satisfy the requirements of a designated settlement fund under section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trusts as designated settlement funds or qualified settlement funds.

**THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER EITHER OF THE TRUSTS IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER EITHER OF THE TRUSTS IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUSTS AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.**

## VI.    ALTERNATIVES TO THE PLAN.

The Plan Proponents believe the Plan is in the best interests of Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (A) an alternative plan of reorganization may be proposed and confirmed or (B) the Debtor's Chapter 11 Case may be dismissed. As discussed below, a third option, liquidation under chapter 7, is not a viable alternative in this Chapter 11 Case.

### A.    Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor or other party in interest may propose a different plan, which might involve an alternative means for reorganization of the Debtor. Alternative plans of reorganization could take many forms, would require additional negotiations and significant expense, would not necessarily provide equivalent or better treatment for creditors of the Debtor, and serious questions would be raised with respect to any plan proposed by a party in interest, including the Committee, without the Debtor's consent, because of the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act. Accordingly, the Plan Proponents believe that the terms of the Plan provide the best result for Creditors. The negotiation and drafting required for a different plan would likely add substantially greater administrative expenses with no guarantee of a better result for Creditors. For these reasons, the Plan Proponents do not believe that alternative plans of reorganization are preferable alternatives to the Plan.

### B.    Dismissal of the Debtor's Chapter 11 Case.

If the Plan is not confirmed, the Debtor or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case. Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon the dismissal of the Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Debtor, Co-Insured Entities, individual Survivor Claimants, and Insurers. In addition to the expense and delay, the Plan Proponents believe that these actions would lead to an unfair distribution to Creditors, with the first Creditors to obtain and enforce a judgment against the Debtor, Co-Insured Entities, or Insurers depleting the Debtor's assets and resulting in insufficient assets to satisfy any further judgments. Further, Survivor Claimants would face the possibility of adverse rulings on charitable immunity, affecting their ability to obtain judgments beyond recoveries obtainable from Insurers. Survivor Claimants may also face issues regarding the level of proof required in a civil action as opposed to the level of proof required for the claims process in this Chapter 11 Case. Therefore, the Plan Proponents believe that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

### C.    Chapter 7 Liquidation Not A Viable Alternative.

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation," a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent. The Debtor, as a non-profit entity, may not be forced to convert its Chapter 11 Case to a chapter 7 case. Thus, conversion to a chapter 7 case is not a viable alternative to the Plan.

76

**D.      Appointment of a Chapter 11 Trustee Is Not A Viable Alternative.**

As a result of limitations imposed by the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act, the Debtor does not believe that a chapter 11 trustee can be appointed to replace the Archbishop's administration of the Debtor.

### VII.      ACCEPTANCE AND CONFIRMATION OF THE PLAN.

**A.      General Confirmation Requirements.**

In order for a plan to be confirmed at the Confirmation Hearing, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case.

With respect to the Debtor and each Additional Chapter 11 Debtor, section 1129(a) of the Bankruptcy Code contains the requirements for confirmation of a plan. Among these requirements are that a plan must: (1) be accepted by the requisite votes of creditors except to the extent that the plan may be confirmed over a dissenting class pursuant to 11 U.S.C. § 1129(b); (2) be feasible, meaning that there is a reasonable probability that the debtor will be able to perform its obligations under the plan without further need of financial reorganization; (3) be in the best interests of all creditors, meaning that creditors will receive at least as much under the plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code; and (4) comply with the applicable provisions of chapter 11 of the Bankruptcy Code.

With respect to each Additional Subchapter V Debtor, section 1191 of the Bankruptcy Code contains the requirements for confirmation of a plan. Among these requirements are that a plan must: (1) be accepted by the requisite votes of creditors except to the extent that the plan may be confirmed over a dissenting class pursuant to 11 U.S.C. § 1191(b); (2) be feasible, meaning that there is a reasonable likelihood the debtor will be able to make all payments under the plan; and (3) be in the best interests of creditors, meaning that the plan provides that all of the projected disposable income of the debtor to be received in a three year period, or such longer period not to exceed five years as the court may fix, will be applied to make payments under the plan or, alternatively, that the value of the property to be distributed by the debtor is not less than the projected disposable income of the debtor for a three-year period, or such longer period not to exceed five years as the court may fix.

The Plan Proponents believe that the Plan complies with all of these requirements, including the specific requirements further discussed below.

**B.      Best Interests Test.**

Best Interests Test With Respect to Debtor and Additional Debtors.

With respect to the Debtor and each Additional Chapter 11 Debtor, the "best interests of creditors" test requires that the Bankruptcy Court find either that: (1) all members of each impaired class have accepted the Plan; or (2) each holder of an Allowed Claim of each impaired class of Claims will receive or retain under the Plan, on account of the Claim, property of a value that is not less than the amount that the holder would receive or retain if the Debtor was hypothetically liquidated under chapter 7 of the Bankruptcy Code, as of the Effective Date.

77

To calculate what holders of Claims would receive if the Debtor or an Additional Debtor was hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the hypothetical liquidation (the "***Chapter 7 Liquidation Fund***"). The Chapter 7 Liquidation Fund would consist of the net proceeds in the Debtor's and each Additional Debtor's hypothetical chapter 7 case from the disposition of the Debtor's and each Additional Debtor's, as applicable, assets augmented by the cash held by the Debtor and Additional Debtors, as applicable, and recoveries on actions against third parties, if any.

The Chapter 7 Liquidation Fund would then be reduced by the costs of liquidation, including without limitation: (1) the fees and expenses of a trustee, counsel for the trustee, and any other professionals for the trustee; (2) selling expenses; (3) unpaid expenses incurred by the Debtor and each Additional Debtor in the Chapter 11 Case and the Additional Debtor Chapter 11 Case, as applicable, such as fees for attorneys, financial advisors, and accountants, that would be allowed in a chapter 7 proceeding; (4) interest expense on oversecured debt, if any; and (5) claims incurred by the Debtor and each Additional Debtor during the pendency of the Chapter 11 Case and the Additional Chapter 11 Debtors' Chapter 11 Cases. These costs of liquidation would be paid from the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund would be made available to the Survivor Claimants and holders of General Unsecured Claims, in accordance with Maryland law. In addition, the conversion to chapter 7 would establish a new bar date for the filing of claims in the chapter 7 case and additional filed claims or claims that would arise upon conversion to a chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to Creditors. The present value of the distributions out of the Chapter 7 Liquidation Fund in accordance with Maryland law after deduction of the amounts described above is then compared to the present value of the property offered to each of the classes of Claims under the Plan, to determine if the Plan is in the best interests of each holder of a Claim.

<u>The Plan Satisfies the Best Interests Test.</u>

The Plan Proponents believe that the Plan as proposed is in the best interest of all Creditors. With respect to the Debtor and Additional Debtors, while neither may be forced to convert to a chapter 7 case, the Plan Proponents believe that Survivor Claimants and holders of General Unsecured Claims will receive a distribution under the Plan greater than a distribution they would receive in a hypothetical chapter 7 liquidation of the Debtor and each Additional Debtor. In a chapter 7 liquidation, the Settling Insurers would no longer be bound by the Insurance Settlement Agreements, resulting in at least $125 million no longer available for distribution. Similarly, in a chapter 7 liquidation, Survivor Claimants would not have the benefit of certain assets of the Debtor and Additional Debtors, because of restrictions imposed by Maryland law regarding the use of charitable assets to satisfy certain categories of liabilities or liabilities inconsistent with the charitable purpose of the Debtor, Additional Debtors, or a donor's intent. Moreover, the chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326, with the compensation necessarily diluting the amount of funds available to pay Creditors. Attached as **Exhibit B** to this Disclosure Statement is an analysis of expected recoveries to Creditors under the Plan and under a hypothetical chapter 7 liquidation of the Debtor and Additional Debtors. While the liquidation analysis includes the liquidation of the Debtor's and Additional Debtors' real and personal property, it is not clear if any of the Debtor's or Additional Debtors' property would be capable of liquidation under chapter 7 pursuant to the protections of the Religious Freedom Restoration Act, the First Amendment, and applicable Maryland law. The inclusion of this property in the liquidation analysis shall not be deemed an admission by the Debtor or any Additional Debtor that the property is capable of liquidation.

Moreover, under the Plan, holders of Administrative Claims will be paid in full and the Plan Proponents believe holders of Administrative Claims will receive faster distribution under the Plan. In sum,

for all of the reasons set forth above, the Plan Proponents anticipate that all Creditors will receive a larger and faster distribution under the Plan than they would under a chapter 7 liquidation or otherwise.

## C.      Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of a plan will not likely be followed by the liquidation of, or the need for further financial reorganization of, the debtor. In this case, the Debtor and Additional Debtors have prepared projections of the cash flow for the ministries and operations of the Debtor and Additional Debtors. The cash flow projections are attached as **Exhibit C** to this Disclosure Statement. The cash flow projections demonstrate that the Debtor and each Additional Debtor will be able to fund the Plan on the Effective Date, and the Reorganized Debtor and each Additional Reorganized Debtor will be able to make all payments required pursuant to the Plan. Accordingly, the Plan Proponents believe that the Plan passes the financial feasibility test.

## D.      Section 1129(b) or Section 1191 Alternative.

In the event that a certain class or classes of Claims reject the Plan, the Plan Proponents may seek confirmation of the Plan pursuant to section 1129(b) or 1191 of the Bankruptcy Code, as applicable. With respect to the Debtor and Additional Chapter 11 Debtors, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. With respect to the Subchapter V Additional Debtors, section 1191 of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes regardless of whether an impaired class has accepted it. A bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and "is fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Plan Proponents believe that the Plan does not discriminate unfairly with respect to any Class.

In addition, under section 1129(b), a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (ii) that the holder of any claim or interest that is junior to the claims of the class will not receive or retain on account of the junior claim or interest any property at all. Under section 1191(b), a plan is fair and equitable if it provides for the payment of all disposable income of the applicable debtor for a period of three years, or such longer period not to exceed five years as the court may fix. The Plan Proponents believe that the Plan meets the "fair and equitable" requirements of section 1129(b) and 1191(b) of the Bankruptcy Code, as applicable, with respect to all Classes. Specifically with respect to holders of Survivor Claims and General Unsecured Claims, the Plan does not provide for the retention of any interests by equity holders because the Debtor, as a non-profit entity, does not have any equity holders.

## VIII.   RISK FACTORS TO BE CONSIDERED.

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

79

**A.      Failure to Satisfy Vote Requirement.**

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative plan of reorganization or to dismiss the Chapter 11 Case.

**B.      Non-Confirmation or Delay of Confirmation of the Plan.**

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

**C.      Non-Consensual Confirmation.**

In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if the cramdown requirements described above are satisfied. The Plan Proponents believe that the Plan satisfies these requirements.

**D.      Risk of Non-Occurrence of the Effective Date.**

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

**E.      Classification and Treatment of Claims.**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtor. The Bankruptcy Code also provides that the Plan may place a Claim in a particular class only if the Claim is substantially similar to the other Claims in the class. The Plan Proponents believe all Claims have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponents could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provides the same treatment for each Claim of a particular class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

**F.      Review of Class 6 Claims.**

The potential recovery for Class 6 Claimants depends on, among other things, the outcome of the Survivor Claim Reviewer's review of the Class 6 Claims both in order to determine if the particular Claims will be allowed and in order to allocate the appropriate point allocation for each Claim for purposes of distribution. Therefore, the distribution to Class 6 Claimants will increase or decrease depending on the allowance of Claims and the point allocation given to each Claim.

80

**G.      General Insurance Coverage Risks.**

The Plan provides that the Insurance Trust will pursue Insurance Claims against Non-Settling Insurers and Non-Settling Insurer Policies for the benefit of Survivor Claimants. The Insurance Trust will have the responsibility for prosecuting Insurance Claims against the Non-Settling Insurers at the Insurance Trust's sole cost and expense. There is no guarantee that the Insurance Trust will be successful in this litigation in light of defenses that Non-Settling Insurers may assert with respect to Insurance Claims. The Plan Proponents make no representations or warranties regarding the value of the Non-Settling Insurer Policies or the Insurance Claims whatsoever, including, but not limited to, any defenses the Non-Settling Insurers may have.

**H.      Insurance Contributions.**

If the Debtor or Insurance Trust are unable to reach settlements with Non-Settling Insurers, there is a risk that the Insurance Trust may not realize recoveries from Non-Settling Insurers, or that the Insurance Trust's efforts to realize recoveries on account of the Non-Settling Insurer Policies will be the subject of litigation that is expensive and time-consuming and in which Non-Settling Insurers could raise meritorious coverage defenses that may reduce the amount of coverage available under the Non-Settling Insurer Policies. Any such reduction in recoveries from Non-Settling Insurers would reduce the funds available for distribution to Survivor Claimants from the Survivor Compensation Trust.

**I.      Insurance Coverage Actions.**

In accordance with the Plan, the Non-Settling Insurer Policies will be assumed and assigned to the Insurance Trust, including all Insurance Claims relating to Survivor Claims to the extent related to Non-Settling Insurers or Non-Settling Insurer Policies. It is not currently known whether any Insurance Claims pursued by the Insurance Trust will result in a favorable outcome for the Insurance Trust or Survivor Claimants. Even if a favorable outcome is realized, the amounts recovered and the costs associated with pursuing such litigation cannot be determined at this time. Therefore, the ultimate value of the Insurance Claims being contributed to the Insurance Trust is unknown.

**J.      Duration and Expense of Insurance Coverage Litigation.**

Litigation of the Insurance Claims against Non-Settling Insurers could be protracted and expensive. There is no guarantee that the Insurance Trust will prevail in its prosecution of the Insurance Claims against Non-Settling Insurers. The Insurance Trust's pursuit of Insurance Claims may require significant time and resources, including attorneys' fees, expert fees, and other costs and expenses of litigation. The costs of pursuing Insurance Claims against Non-Settling Insurers will reduce the total funds available for distribution to Survivor Claimants from the Survivor Compensation Trust, and the time required to resolve such claims could substantially delay distributions.

## IX.      MISCELLANEOUS PROVISIONS.

**A.      Modification of the Plan.**

The Plan Proponents, with the consent of any Settling Insurers, may modify the Plan at any time prior to the confirmation hearing, in accordance with sections 1127(a) and 1193(a) of the Bankruptcy Code, as applicable. After the Confirmation Date and prior to substantial consummation, the Plan Proponents, with the consent of any Settling Insurers, may modify the Plan, in accordance with sections 1127(b) and 1193(b) of the Bankruptcy Code, as applicable, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required

81

unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement and supplement the Insurance Settlement Agreements may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

### B.    Revocation.

The Plan Proponents reserve the right to revoke and withdraw the Plan, prior to entry of the Confirmation Order.

### C.    Controlling Documents.

In the event and to the extent that any provision of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Survivor Compensation Trust Agreement or Insurance Trust Agreement (other than provisions relating to the Survivor Compensation Trustee's or Insurance Trustee's authority to act) is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement, the provisions of the Confirmation Order shall control and take precedence. In the event the Plan or any provision of any agreement referred to in Section 15.9 of the Plan is inconsistent with an Insurance Settlement Agreement, the Insurance Settlement Agreement shall control.

### D.    Filing of Additional Documents.

At any time before substantial consummation of the Plan, the Debtor, any Additional Debtor, the Trusts, the Reorganized Debtor, or any Additional Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise comply with applicable law.

### E.    Direction to a Party.

On and after the Effective Date, the Trusts, Reorganized Debtor, or any Additional Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### F.    Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor or any Additional Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor, any Additional Debtor, or the organizational structure of the Debtor or any Additional Debtor, shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date, as

applicable, pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Debtor or applicable Additional Debtor.

**G.      Plan as Settlement Communication.**

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims, Interests, and Causes of Action that are disputed as to validity or amount (including Survivor Claims), except as otherwise provided above. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rules of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Except as expressly set forth in the Plan, nothing in the Plan is intended to constitute a compromise of Survivor Claims.

**H.      Other Rights.**

Except as expressly set forth in the Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Maryland law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Survivor Claims.

### X.      BANKRUPTCY RULE 9019 REQUEST.

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents request approval of all compromises and settlements included in the Plan.

### XI.      CONFIRMATION REQUEST.

The Plan Proponents request confirmation of the Plan under sections 1129 and 1191 of the Bankruptcy Code, as applicable, with respect to any Impaired Class that does not accept the Plan or is deemed to reject the Plan.

### XII.      RECOMMENDATION AND CONCLUSION.

The Plan Proponents believe the Plan is in the best interests of all Creditors and the Estates and urge the Creditors to accept the Plan and to evidence their acceptance by properly voting and timely returning their respective ballots.

[Signatures on following page.]

*/s/ Blake D. Roth*
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone:      615.850.8749
Email:  blake.roth@hklaw.com
          tyler.layne@hklaw.com

-and-

Philip T. Evans (Fed. Bar No. 11796)
HOLLAND & KNIGHT LLP
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:      202.457.7043
Email:  philip.evans@hklaw.com

-and-

Catherine K. Hopkin (Fed. Bar. No. 28257)
YVS LAW, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:      443.569.0788
Facsimile:      410.571.2798
Email:  chopkin@yvslaw.com

*Counsel for Roman Catholic Archbishop of Baltimore*

CERTIFICATE OF SERVICE

I hereby certify that, on the 15th day of May 2026, notice of filing the foregoing Disclosure Statement was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list.

          /s/ Catherine Keller Hopkin
          Catherine Keller Hopkin

84

**The following parties received CM/ECF notice of the filing:**

- Nathan D. Adler, Esquire - nda@nqgrg.com; terry@nqgrg.com
- Sam Alberts, Esquire - sam.alberts@dentons.com; docket.general.lit.wdc@dentons.com
- Monique Desiree Almy, Esquire - malmy@crowell.com; cbest@crowell.com; malmy@ecf.axosfs.com; monique-almy-7127@ecf.pacerpro.com
- Philip D. Anker, Esquire - philip.anker@wilmerhale.com; Yolande.Thompson@wilmerhale.com
- Ryan S. Appleby, Esquire - rappleby@gibsondunn.com; ryan-s-appleby-6523@ecf.pacerpro.com
- G. Calvin Awkward, Esquire - cawkward@goldbergsegalla.com; wbartholomew@goldbergsegalla.com
- Jesse Bair, Esquire - jbair@burnsbair.com; kdempski@burnsbair.com
- Jodie E. Bekman, Esquire - jbekman@gfrlaw.com; dferguson@gfrlaw.com
- Michael J. Belsky, Esquire - mbelsky@sbwdlaw.com
- Brian Bennett, Esquire - brianbennett1962@comcast.net
- Hugh M. (UST) Bernstein, Esquire - hugh.m.bernstein@usdoj.gov
- Eileen King Bower, Esquire - eileen.kingbower@clydeco.us, christopher.white@clydeco.us
- Diane C. Bristow, Esquire - dcb@nqgrg.com; taylor@nqgrg.com
- Timothy W. Burns, Esquire - tburns@burnsbair.com; kdempski@burnsbair.com,4756200420@filings.docketbird.com
- Edwin H Caldie, Esquire - ed.caldie@stinson.com; jess.rehbein@stinson.com
- Jacob C Cohn, Esquire - jcohn@grsm.com; tdonahue@grsm.com
- Elizabeth Connell, Esquire - elizabeth@connellcounsel.com
- Richard L. Costella, Esquire - rcostella@tydings.com; scalloway@tydings.com; MYoung@tydings.com; zjones@tydings.com; swilliams@tydings.com
- Nicholas Anthony Dellefave, Esquire - nicholas.dellefave@hklaw.com
- Jillian Dennehy, Esquire - jillian.dennehy@kennedyslaw.com
- Robert Wagner DiUbaldo, Esquire - rdiubaldo@carltonfields.com
- Adam Ross Durst, Esquire - adurst@goldbergsegalla.com
- Philip Tucker Evans, Esquire - philip.evans@hklaw.com; kimi.odonnell@hklaw.com; hapi@hklaw.com
- Justin Philip Fasano, Esquire - jfasano@mhlawyers.com; jfasano@ecf.courtdrive.com; tmackey@mhlawyers.com; mevans@mhlawyers.com; cmartin@mhlawyers.com; Fasano.JustinR92003@notify.bestcase.com
- Kevin Foreman, Esquire - kforeman@carltonfields.com
- Andrew Freeman, Esquire - adf@browngold.com; khill@browngold.com; ldyson@browngold.com
- Richard A Galbo, Esquire - rgalbo@goldbergsegalla.com
- Andrew Glasnovich, Esquire - drew.glasnovich@stinson.com
- Gary R. Greenblatt, Esquire - grg@cooncolelaw.com; cmh@cooncolelaw.com; mes@cooncolelaw.com
- Geoffrey Grivner, Esquire - geoffrey.grivner@bipc.com; donna.curcio@bipc.com
- Alan M. Grochal, Esquire - agrochal@tydingslaw.com; scalloway@tydings.com
- Adam P. Haberkorn, Esquire - ahaberkorn@omm.com; adam-haberkorn-2269@ecf.pacerpro.com
- Samantha Hanson-Lenn, Esquire - samantha.hansonlenn@stinson.com; mpl.lssteam5@stinson.com
- Megan Harmon, Esquire - megan.harmon@bge.com
- Ezhan Syed Hasan, Esquire - ahasan@wiley.law
- Matthew Allan Hoffman, Esquire - mhoffman@gibsondunn.com; matthew-a-hoffman-3853@ecf.pacerpro.com
- Catherine Keller Hopkin, Esquire - chopkin@yvslaw.com; pgomez@yvslaw.com; kreese@yvslaw.com; vmichaelides@yvslaw.com; yvslawcmecf@gmail.com; hopkincr39990@notify.bestcase.com
- Sheldon N Jacobs, Esquire - sheldon@sheldonjacobslaw.com
- Todd C. Jacobs, Esquire - tjacobs@phrd.com
- Robert Keith Jenner, Esquire - rjenner@jennerlawfirm.com
- Joshua Kahn, Esquire - jkahn@sfspa.com
- Steven J Kelly, Esquire - skelly@gelaw.com; vbeal@gelaw.com,gnovod@gelaw.com,4523903420@filings.docketbird.com
- Nicole Khalouian, Esquire - nicole.khalouian@stinson.com
- Anthony Kikendall, Esquire - kikendalla@whiteandwilliams.com
- Robert H. Kline, Esquire - kliner@whiteandwilliams.com
- Eric George Korphage, Esquire - korphagee@whiteandwilliams.com
- Robert T Kugler, Esquire - robert.kugler@stinson.com
- Christopher Scott Kunde, Esquire - scott.kunde@hklaw.com
- Emily C Malarkey, Esquire - malarkey@malperl.com
- Stephen A. Markey, Esquire - steve@markeyorsilaw.com; amy@markeylawfirm.com
- Siobhain Patricia Minarovich, Esquire - minarovichs@whiteandwilliams.com
- James R Murray, Esquire - Jim.Murray@blankrome.com
- Michael Raymond Naccarato, Esquire - mrnaccarato@gw-law.com
- Frank Natale, Esquire - fan121968@gmail.com
- Matthew Nelson, Esquire - matthew.nelson@kennedyslaw.com; linda.conigliero@kennedyslaw.com
- Janet M. Nesse, Esquire - jnesse@mhlawyers.com; jfasano@mhlawyers.com; cpalik@mhlawyers.com; jnesse@ecf.inforuptcy.com; tmackey@mhlawyers.com; cmartin@mhlawyers.com; kfeig@mhlawyers.com
- Gordon Z. Novod, Esquire - gnovod@gelaw.com
- Timothy P. Palmer, Esquire - timothy.palmer@bipc.com
- Ryan S. Perlin, Esquire - perlin@malperl.com
- Mark D. Plevin, Esquire - mplevin@plevinturner.com
- Mark David Plevin, Esquire - mplevin@crowell.com
- Marie Ysabelle Hope Gatmaitan Reyes, Esquire - yreyes@wiley.law
- David Kendall Roberts, Esquire - droberts2@omm.com; dave-roberts-9007@ecf.pacerpro.com
- Matthew Roberts, Esquire - mroberts@phrd.com
- Annette Rolain, Esquire - arolain@ruggerilaw.com; bkfilings@ruggerilaw.com
- Michael Rosenthal, Esquire - mrosenthal@gibsondunn.com
- Blake Daniel Roth, Esquire - blake.roth@hklaw.com; brooke.freeman@hklaw.com; cathy.young@hklaw.com
- James Pio Ruggeri, Esquire - jruggeri@ruggerilaw.com
- Isabella Sayyah, Esquire - isayyah@gibsondunn.com
- Jonathan Schapp, Esquire - jschapp@goldbergsegalla.com; bfaulkner@goldbergsegalla.com; kallen@goldbergsegalla.com
- Tancred Schiavoni, Esquire - tschiavoni@omm.com; tancred-schiavoni-9326@ecf.pacerpro.com

- Jeffrey R. Scholnick, Esquire - jscholnick@scholnicklaw.com; ccasado@scholnicklaw.com; scholnick.jeffreyb107952@notify.bestcase.com
- Gary Paul Seligman, Esquire - gseligman@wiley.law
- David J. Shuster, Esquire - dshuster@kg-law.com; ssohn@kg-law.com
- Alex B Silverman, Esquire - asilverman@carltonfields.com
- Natalie L. Soloperto, Esquire - NSoloperto@gibsondunn.com
- Morgan Kathleen Stippel, Esquire - mstippel@burnsbair.com; kdempski@burnsbair.com
- Miranda Turner, Esquire - mturner@plevinturner.com; miranda-turner-7827@ecf.pacerpro.com
- US Trustee - Baltimore, Esquire - USTPRegion04.BA.ECF@USDOJ.GOV
- Nora Anne Valenza-Frost, Esquire - nvalenza-frost@carltonfields.com
- John P Van Beek, Esquire - jvanbeek@goldmanvanbeek.com; gvbparalegal@goldmanvanbeek.com; hcurrier@goldmanvanbeek.com
- Irving Edward Walker, Esquire - iwalker@coleschotz.com; pratkowiak@coleschotz.com; bankruptcy@coleschotz.com
- Joshua D Weinberg, Esquire - jweinberg@ruggerilaw.com
- Matthew Michael Weiss, Esquire - mweiss@phrd.com
- Robert Matthew Westra, Esquire - rwestra@ppsrlaw.com; westrarr66199@notify.bestcase.com
- Harris B. Winsberg, Esquire - hwinsberg@phrd.com
- Thomas Yost, Esquire - staceyhare@yostlaw.com