**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(BALTIMORE DIVISION)**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>        Debtor.[1] | Chapter 11<br><br>Case No. 23-16969-MMH |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' DISCLOSURE**
**STATEMENT FOR THE FIRST AMENDED CHAPTER 11 PLAN OF**
**REORGANIZATION FOR THE ROMAN CATHOLIC**
**<u>ARCHBISHOP OF BALTIMORE</u>**

Dated: May 15, 2026

**Tydings & Rosenberg LLP**

/s/Alan M. Grochal
Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
      agrochal@tydings.com

*Local Counsel to the Official Committee of*
*Unsecured Creditors*

**Stinson LLP**

/s/ Edwin H. Caldie
Edwin H. Caldie (MN # 388930)
Andrew Glasnovich (MN # 0398366)
Christopher Sevedge (MO # 68383)
Nicole Khalouian (NY #5755681)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: (612) 335-1500
Facsimile: (612) 335-1657
Email: ed.caldie@stinson.com
      drew.glasnovich@stinson.com
      chris.sevedge@stinson.com
      nicole.khalouian@stinson.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

CORE/3529758.0002/239580558.7

### ARTICLE I.   PLAIN LANGUAGE SUMMARY OF THE PLAN

You are receiving this document because you might be owed money by the Roman Catholic Archbishop of Baltimore or one of its affiliated parishes, schools, funds, or charities, through a chapter 11 bankruptcy case.

**<u>You must take immediate action, described more below, to protect your rights to pursue a recovery against the Roman Catholic Archbishop of Baltimore and its affiliates.</u>**

The long document that follows below describes something called a plan of reorganization. Because the Roman Catholic Bishop of Baltimore filed for bankruptcy, it needs to have a plan of reorganization to get out of bankruptcy fairly and equitably and in a way that is likely to allow the Archdiocese of Baltimore to keep operating. In that way, the Plan described for you here is a potential path out of bankruptcy for the Archdiocese of Baltimore.

Among other things, the Plan will decide (i) how much you receive for your claim, (ii) who has to pay that money, (iii) what you must give up in exchange for payment, and (iv) how the Roman Catholic Archbishop of Baltimore and its parishes, schools, and affiliates will function after the bankruptcy. At this point, you need to decide if you want to vote to accept the Plan or reject the Plan. This document is designed to help you make that decision.

The Official Committee of Unsecured Creditors created this Plan. The Committee is a group of seven (7) Survivors who themselves experienced sexual abuse when they were children. The members of the Committee were appointed by the Office of the United States Trustee to represent all Survivors in the Archdiocese of Baltimore's bankruptcy case. The Committee believes that the Plan is in the best interests of all creditors and recommends that you vote to accept it.

The following plain language summary is designed to answer common questions about the Plan. It is not a full description of what the Plan does. For technical details on how the Plan functions, please read the entire Disclosure Statement and Plan. If you have questions, you should consult with an attorney. If this plain language summary is different than the Plan, then the language in the Plan controls.

### <u>WHAT IS A PLAN?</u>

A plan is a legal document approved by the Bankruptcy Court that binds the Roman Catholic Archbishop of Baltimore, its affiliates, and all of its creditors. The Plan functions like a contract between these parties, but it also has the force of a court order. Creditors are people owed money by the Roman Catholic Archbishop of Baltimore and its affiliates. Most of the creditors in this bankruptcy are survivors of childhood sexual abuse by employees, priests, and other perpetrators under the supervision of the Roman Catholic Archbishop of Baltimore. The abuse in this case occurred over the course of more than 70 years and involves hundreds of perpetrators and more than 900 Survivors.

2

The Plan requires that the Roman Catholic Archbishop of Baltimore pay its creditors the cash amounts, and transfer the real property and insurance assets, described in the Plan. The Plan also consolidates all of the assets of the Roman Catholic Archbishop of Baltimore with the assets of all of its parishes, schools, charities, funds, and affiliates into one combined pool. The Plan proposes to pay the creditors of all of these entities through one combined pot of money. In exchange, creditors, including Survivors, will no longer be able to sue the Roman Catholic Archbishop of Baltimore or its affiliates for claims that occurred before the bankruptcy case was filed.

The Plan settles all the claims against the Roman Catholic Archbishop of Baltimore and its affiliates (including all of the parishes and schools in the Archdiocese), creates a fast and simplified way for all creditors to get paid, and ensures no one creditor is able to receive more than her or his share of available money and other assets.

## WHAT DO I HAVE TO DO?

You need to read this Disclosure Statement and Plan. If you do not understand something, you should consult a lawyer.

After you read the Disclosure Statement and Plan you need to vote on whether you accept or reject the Plan. You vote using a ballot, which is included with this Disclosure Statement.

"Accepting" the Plan means you agree with the Plan, will accept the settlement payment, and will release your claims against the Roman Catholic Archbishop of Baltimore and many other related people and companies, including all of the people identified on Plan Exhibit 1. The Plan will not release your claims against the person(s) who abused you.

"Rejecting" the Plan means you do not agree to the settlement. Even if you vote to reject the plan, the Bankruptcy Court can extinguish your claims against the Roman Catholic Archbishop of Baltimore (and any affiliated Catholic entities consolidated into it) even without your vote or your consent. But if enough creditors reject the Plan, the Plan will not be approved by the bankruptcy court, no one will get paid, and a new plan will have to be negotiated. That process could take months or even years.

## WHAT IF I DO NOTHING?

If you do not respond, the Bankruptcy Court will act as if you have accepted the Plan. This means you will be paid like other creditors who sent in ballots accepting the Plan. This also means you can never sue the Roman Catholic Archbishop of Baltimore or any of the related people and companies, including all of the other people identified on Exhibit 1.

If you do not respond, return a ballot, or leave the release questions blank, the Plan appoints the Committee as your attorney-in-fact to execute the release for you. If you do not want the Committee to execute a release on your behalf, you need to return a completed ballot before the deadline stated in this Disclosure Statement.

Please consider returning a ballot and voting to accept. By doing nothing you create risk for yourself and other creditors. If you do not return a ballot, you might delay the approval of the Plan

3

for other creditors. If too few people return ballots, the Bankruptcy Court might not approve the Plan. The Committee requests that you vote and return your ballot to avoid unnecessary delay.

## WHAT IF I DO NOT CONSENT TO THE PLAN OR RELEASES?

If you do not want the Plan to be approved or you do not want to release your Abuse Claim, you should vote to reject the Plan. You may also file an objection with the Bankruptcy Court stating your precise concerns with the Plan.

Withholding your consent does not necessarily allow you to sue the Roman Catholic Archbishop of Baltimore or any affiliated Catholic entities consolidated into it by the Plan. The Bankruptcy Court can extinguish your claims against the Roman Catholic Archbishop of Baltimore, and each of the parishes, schools, and affiliates listed on Exhibit 1, even if you vote to reject the Plan and even if you object to the Plan. But even if the Plan is approved by the Court, you still will be able to sue people or parties other than the Roman Catholic Archbishop of Baltimore and any affiliated Catholic entities consolidated into it. Unless a person or party is identified as a Consolidated Party on Exhibit 1, you will still be able to sue them, even if the Plan is approved and becomes effective.

## WHEN IS THE DEADLINE TO TAKE ACTION?

You must return your ballot by _____

## HOW DO I RESPOND?

Complete all the questions on your ballot, sign it, and mail your ballot back to:

[]

If you want to file an objection to the Plan, you should consult an attorney. If you do not have one, you can reference the Bankruptcy Court's website for instructions on proceeding without a lawyer, https://www.mdb.uscourts.gov/dont-have-a-lawyer.

## HOW MUCH WILL I GET PAID?

There are several different kinds of creditors in this case. Your claim will be paid the same way as other creditors similar to you. As far as claims for sexual abuse are concerned, there are two kinds: (i) claims held by Survivors of abuse who filed a claim in the bankruptcy (those are called "Abuse Claims" in the Plan), and (ii) claims held by Survivors who have not come forward yet—these are sometimes called "Uknown Abuse Claims."

### Abuse Claims

Abuse Claims are claims filed in the bankruptcy by survivors of sexual abuse. The Plan sets up a trust to receive the settlement money and use it to pay Abuse Claims. The Trust is funded by payments from the Archdiocese, its parishes, schools, and affiliates, and insurance companies. The Plan anticipates the trust will have more than $526,300,000 in cash, plus the proceeds from the sale of hundreds of parcels of real property. In addition,

4

CORE/3529758.0002/239580558.7

the trust will pursue recoveries against several insurance companies and if successful that insurance litigation might increase the money available to pay claims.

There are several events that must occur before the maximum amount of money can be paid to the Trust. The dollar amounts in the Plan are not certain. They are a projection and are not a guaranty of any total settlement amount or any individual payment. Abuse Claimants will share whatever money is paid into the Trust, after the Trust reserves sufficient money to pay its expenses and costs to operate.

There are currently approximately 920 Abuse Claims. The Trust might object to some of these claims, meaning the number of Abuse Claims may go down. The Bankruptcy Court might allow new claims, which means the number of Abuse Claims may go up. The professional who reviews claims might also disallow claims that do not provide enough evidence to justify payment. While any of those changes is possible, the Committee does not anticipate a meaningful increase or decrease in the number of Abuse Claims.

Each person's share of the settlement is set by a professional claim reviewer who reads each claim and assigns points. The claim reviewer is chosen by the Committee. The points are determined by guidelines approved by the Committee. The guidelines are available as Plan Exhibit 3. Points will be assigned to you depending on the type of abuse that occurred, the impact of the abuse on your life, the contribution you have made to negotiating a settlement, and whether you helped bring in any verdict or settlement that leads to increased payments by insurance companies that would, in turn, lead to an increase in payments to all Survivor claimants.

Your individual award will depend on (i) the points you are assigned, (ii) the total points assigned to other Survivors, and (iii) the total amount of money available in the Trust. So if Claimant ABC received 100 points and the sum of all points given to all Abuse Claimants was 92,000, Claimant ABC would receive approximately 0.1% of the Trust's money. If the Trust receives $541,300,000.00, and is able to distribute all of that money, Claimant ABC would receive $588,369.57. This example is not a guarantee of any payment, but is an example of how the pro rata point system will apply to calculate money awards. You might receive substantially more or less than this example illustrates. You should not rely on this example for anything other than understanding how the formula works. **Do not use this example to set expectations of what you will receive under the Plan, and instead you must consider all the facts in this disclosure statement to understand the risks associated with the total contribution that might be made to the Trust, the risk of appeals and litigation, and the criteria used to evaluate your claim.**

There might be more money available to the Trust than what is paid on the effective date of the Plan. If certain people, like insurance companies, do not settle with the Committee, then Abuse Claimants may sue those non-settling parties in court. If an Abuse Claimant wins a lawsuit against an insurance company for the Debtor and gets paid, the successful Abuse Claimant will receive a percentage enhancement to their distribution, and the rest will go to the Trust. The part of the recovery that goes back to the Trust will increase the amount available to all Abuse Claimants and they will share it. A person who chooses the

5

option to sue non-settling insurance parties is called a Litigation Claimant in the Plan. You do not have to sue non-settling insurance parties to get paid your portion of the Trust's money, but it is possible you would receive more money if you choose to sue and seek recovery against these non-settling insurers. This is something you should discuss with an attorney.

Before they can be paid from the Trust, Abuse Claimants must sign a release and agree that they cannot sue the Archdiocese or any other parties protected by the Plan (again, a complete list of the parties protected by the Plan is included in Exhibit 1).

The Trust might also sue insurance companies to have a court decide legal issues around insurance coverage and how much those insurers have to pay. This process will cost a substantial amount of money and will decrease the initial distribution paid to Survivors. But if it is successful, the litigation might return many times more money in recovery from the insurance companies. More about the risks associated with this litigation in Article XXXVII of the Disclosure Statement.

**Unknown Abuse Claims**

Certain Survivors of sexual abuse might not have filed a claim in the bankruptcy. In most cases, people who did not file a claim will not get paid. But in limited circumstances, a Survivor might still be entitled to recover against the Roman Catholic Archbishop of Baltimore. These people who might be entitled to a payment even though they did not file a claim are called Unknown Abuse Claimants.

People who might be an Unknown Abuse Claimant include people who were under 18 when the bankruptcy was filed, members of the military on active deployment when the deadline to file claims passed, individuals with mental incapacity that prevented them from filing claims, and people that the Archdiocese knew were abused but did not send them notice of the bankruptcy case.

The Bankruptcy Court will appoint a representative to act on behalf of these individuals until the time they come forward and file a claim. This Unknown Claim Representative will also vote to accept the plan for Unknown Abuse Claimants. The Unknown Claim Representative's vote is binding on Unknown Abuse Claimants regardless of when or whether they come forward.

Unknown Abuse Claimants will have their claims assigned points the same way as Abuse Claimants, and the Roman Catholic Archbishop of Baltimore will be responsible for paying each Unknown Abuse Claimant the amount he or she would have received if she were a known Abuse Claimant.

Like known Abuse Claimants, before they are paid from the Trust, Unknown Abuse Claimants must sign a release and agree that they cannot sue the Archdiocese or any other parties protected by the Plan.

6

**WHO WILL PAY THE MONEY?**

The Roman Catholic Archbishop of Baltimore will pay all claims other than Abuse Claims.

The Plan projects that the Roman Catholic Archbishop of Baltimore, along with its insurance companies, parishes, schools, and affiliates will all participate in funding a Trust to pay Abuse Claims, as follows:

- The Roman Catholic Archbishop of Baltimore: $ 115,000,000

- Parishes: $125,000,000

- Schools: $32,000,000

- Catholic Charities: $53,300,000

- Catholic Community Foundation: $80,000,000

- John Carrol Foundation: $15,000,000

- New Cathedral Cemetery Company: $11,900,000

- Other Consolidated Catholic Entities: $9,400,000

- 2024 Tax Assessed Value of Real Estate Assets: $331,670,715

- Known Insurance Settlements: $100,000,000

- Additional Sources:

    o Future Insurance Settlements or Litigation Recovery: Unknown

    o Avoidance Action Proceeds: Unknown

**HOW DO I KNOW IF THIS IS A GOOD DEAL?**

You need to read all of the information in this document, talk to a lawyer, and make a decision based on the information contained in this document.

The Committee, whose members are all Survivors holding Abuse Claims, spent more than 2 years investigating the finances of the Roman Catholic Archbishop of Baltimore and its affiliates. The Committee has negotiated with these Catholic entities for more than 2 years in an attempt to secure a settlement. The Committee continues to negotiate, but believes this Plan is a feasible and fair deal for survivors, other creditors, the Roman Catholic Archbishop of Baltimore, and its affiliates and insurers to move forward and exit bankruptcy.

7

## WHAT HAPPENS IF THE PLAN IS EFFECTIVE?

If the Plan is approved by the bankruptcy court and becomes effective, you will be bound by what it says. This is true even if you vote to reject the Plan or object to the Plan. If you do not want the Plan to be approved by the bankruptcy court and become effective, you must file an objection with the Bankruptcy Court and vote to reject the plan.

If the Plan is approved, on the effective date of the Plan, a Trust will be formed, and the Abuse Claim review process will begin. This process might take several weeks or more. Survivors who hold Abuse Claims will have a chance to give the claim reviewer additional information about their Abuse Claim if they choose to do so. The claim reviewer will then assign points to each Abuse Claim and give Survivors notice of how many points their Abuse Claims were assigned. Once Survivors who hold Abuse Claims receive notice of the number of points assigned to their Abuse Claim by the claim reviewer, they will have the option to pay an additional fee to have the claim reviewer reconsider the points (s)he assigned to his/her Abuse Claim.

If not all of the insurance companies settle, there will be litigation that might go on for years. The Trust will reserve money to pay for that litigation and so this money will not be available to distribute to Abuse Claimants. At the end of the insurance litigation, the Trust might make another distribution (or several) to Survivors who hold Abuse Claims, using any money it has left over.

You will also not receive a payment unless you sign a release, and so failure to return the release by the deadline will delay your payment.

## CAN I SUE THE ARCHDIOCESE AFTER THE PLAN IS EFFECTIVE?

No. You cannot sue the Roman Catholic Archbishop of Baltimore (or any Catholic entity consolidated into it for purposes of the Plan as listed in Exhibit 1) for things that happened before the bankruptcy was filed, except under special circumstances that are allowed by the Trust agreement (like to help recover insurance proceeds for the Trust) and in limited circumstances described in Section 4.3 of the Plan.

## CAN I SUE A CATHOLIC PARTY THAT IS NOT THE ARCHDIOCESE AFTER THE PLAN IS EFFECTIVE?

Maybe. The parishes and schools and many other Catholic Entities will be considered one and the same as the Archdiocese as part of the Plan, so you will not be allowed to sue those parishes, schools, and other parties if the Plan is approved and effective. The parishes, schools, and other Catholic Entities you will not be able to sue if the Plan is approved are listed on Exhibit 1 as the Consolidated Catholic Entities. Some other Catholic Entities will not be protected by the Plan and you will still be able to sue them. If a Catholic entity is not listed as a Consolidated Catholic Entity on Exhibit 1, you will still be able to sue them even if the Plan is approved and becomes effective.

## WHAT HAPPENS TO INSURANCE?

There are several companies that provided insurance for the Roman Catholic Archbishop of Baltimore and its affiliates. The Committee believes those insurers owe millions of dollars to the

CORE/3529758.0002/239580558.7

Roman Catholic Archbishop of Baltimore related to Abuse Claims filed in the bankruptcy. Each of these insurers can either settle or decline to settle.

If an insurer settles with the Committee, it pays money to the Trust and receives total protection from any claim related to policies it provided to the Roman Catholic Archbishop of Baltimore or its affiliates. No one will be able to sue a settling insurer ever again or seek money related to one of its policies, at least with respect to claims against the Archdiocese and any of the other Consolidated Catholic Entities listed in Exhibit 1.

If an insurer does not settle with the Committee, then the insurers will be subject to litigation (they can still be sued). Abuse Claimants will be allowed to sue the Roman Catholic Archbishop of Baltimore and its parishes, schools, and affiliates to obtain judgments. Those judgments will be transferred to the Trust, and the Trust will seek to get money from insurance companies to satisfy those judgments. The insurance companies might assert defenses to providing insurance coverage, and the Trust will litigate those legal disputes. The outcome of that litigation is not certain, and it might result in $0 recovered by the Trust. But it might also be successful and bring in millions of dollars as summarized in Article XXXVII of the Disclosure Statement.

## WHAT ARE THE RISKS THAT THE PLAN MIGHT NOT BE CONFIRMED?

The Archdiocese and other parties may oppose this Plan. That is because the Plan requires the Archdiocese and all of its affiliated parishes, schools, charities, and funds to pay more than what the Archdiocese may be willing to pay. The Archdiocese previously proposed to pay Abuse Claimants $33,184,320 to settle claims against the Archdiocese and all of its Catholic affiliates.

Likewise, certain insurance companies may oppose the Plan because it allows Survivors to pursue litigation against the Archdiocese and its affiliates in order to secure insurance coverage. The insurers would prefer not to be sued after the bankruptcy concludes because they (i) will not receive the same protections as settling insurers would as part of the bankruptcy, (ii) face risk that they wrongfully denied coverage or failed to timely settle in this bankruptcy, and (iii) will likely have to pay more than if they settled in bankruptcy.

The objections the Committee expects may be filed by the Archdiocese and insurers create a serious risk that the Plan might not be confirmed. This means the parties must try again to settle or that someone else must propose a plan that can overcome these objections. The parties have spent more than two years negotiating a global settlement without success. The Committee believes this plan is confirmable and that it can overcome the objections filed by the Archdiocese and its insurers and is the best way to bring this case to a resolution without years more of delay.

9

**WHAT ARE THE RISKS THAT THE PLAN MIGHT NOT BECOME EFFECTIVE ONCE CONFIRMED?**

There is a risk that, even if approved by the bankruptcy court and any objections by the Archdiocese and its insurers are overruled, the Archdiocese or one of its insurers may appeal the approval of the Plan and pause the effective date while those appeals are decided. This could delay payment for Survivors for years while the appeal is pending.

**THE REMAINDER OF THIS DISCLOSURE STATEMENT WILL CONTAIN MORE TECHNICAL LEGAL LANGUAGE DESIGNED TO SATISFY THE PRECISE LEGAL REQUIREMENTS UNDER THE BANKRUPTCY CODE. PLEASE READ THE ENTIRE DISCLOSURE STATEMENT TO FULLY UNDERSTAND YOUR RIGHTS AND THE LEGAL EFFECT OF THE PLAN.**

CORE/3529758.0002/239580558.7

## ARTICLE II.    INTRODUCTION

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the bankruptcy of the Roman Catholic Archbishop of Baltimore (the "Archdiocese" or the "Debtor"), provides this disclosure of information pursuant to 11 U.S.C. § 1125(f) (the "Disclosure Statement") and proposes attached Chapter 11 Plan of Reorganization (the "Plan") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Committee is the proponent of this Plan (the "Plan Proponent") within the meaning of section 1129 of the Bankruptcy Code. If a capitalized term is not defined in this Disclosure Statement, it will have the meaning given it in the Plan.

This Plan provides for the financial restructuring of the Archdiocese and all of its affiliated parishes, schools, funds, and charities, and the settlement of all, or substantially all, Claims against the Archdiocese, including, without limitation, the settlement of all Abuse Claims against the Archdiocese, other Consolidated Catholic Entities, and the Participating Parties.

As set forth in more detail below, the Plan (i) provides for payment in full of all Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, and Claims for U.S. Trustee Fees, (ii) preserves the rights of holders of certain Allowed Secured Claims in accordance with section 1123(b)(2) of the Bankruptcy Code, (iii) leaves unimpaired any Pass-Through claims, (iv) provides payment in full equal to the full Allowed amount of any General Unsecured Claims, (v) establishes the Abuse Claims Settlement Fund to be held by the Trust to compensate holders of Abuse Claims, (vi) provides for the payment of Unknown Abuse Claims on terms similar to the Abuse Claims, and (vii) disallows contingent claims held by insiders of the Archdiocese for contribution or indemnity.

The Plan's treatment of Abuse Claims has been approved by the Committee in consultation with attorneys representing Committee members who collectively represent approximately sixty-four percent (64%) of all Abuse Claimants who have asserted Abuse Claims against the Archdiocese ("State Court Counsel").

**The Plan provides that funding for the Trust and the Abuse Claims Settlement Fund will be provided from, among other potential sources of recovery: (i) a monetary contribution by the Archdiocese and other Participating Parties in the aggregate amount of $441,300,000.00; and, in addition, (ii) at least $100,000,000 in insurance settlement payments paid pursuant to the Insurance Settlement Agreements with various Settling Insurers, (iii) the proceeds of other insurance policies issued to the Archdiocese and/or other Participating Parties by any Non-Settling Insurer(s), (iv) the proceeds of real property transferred to the Trust, and (v) the proceeds of Avoidance Actions transferred to the Trust.**

To the extent the Archdiocese, Committee, and any Non-Settling Insurer(s) can reach agreement on Insurance Settlement Agreements or other terms of settlement prior to confirmation of the Plan, the Plan provides that such Non-Settling Insurers may become Settling Insurers and for settlement proceeds resulting therefrom to be used to further supplement the Abuse Claims Settlement Fund. The Plan does not permit Non-Settling Insurers to become Settling Insurers (as such term is used in the Plan) after the Plan Effective Date. To the extent no settlement is achieved, the Plan provides for the assignment of Insurance Claims held by the Archdiocese or other

11

Participating Parties to the Trust and establishes a framework for post-confirmation litigation of Insurance Claims and other Litigation Claims seeking recovery from Non-Settling Insurers. The Committee, in consultation with State Court Counsel representing approximately sixty-four percent (64%) of all Abuse Claimants, has acknowledged and accepted the risk inherent in pursuing post-confirmation recovery from Non-Settling Insurers in the absence of a settlement.

All holders of Claims against the Archdiocese are encouraged to read this Plan and the Disclosure Statement and other Plan Documents in their entirety before voting to accept or reject this Plan. Among other things, the Disclosure Statement provides further information regarding the Archdiocese, events prior to and during the Chapter 11 Case, and a summary and analysis of the Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

The Plan Documents, once Filed, can be obtained free of charge by visiting the Archdiocese's case management website at https://dm.epiq11.com/case/rcabaltimore/info, and shall also be available for review in the Office of the Clerk of the Bankruptcy Court during the Bankruptcy Court's normal hours of operation. Holders of Claims may also obtain copies of the Plan Documents by contacting counsel for the Committee in writing at the address on the cover page of the Plan. Each Plan Document is an integral part of the Plan and is hereby incorporated by reference and made a part of the Plan.

12

## ARTICLE III.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, SEEKS CONFIRMATION OF THE CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE. A COPY OF THE PLAN IS PROVIDED WITH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENT, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENT OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES FOR THE REORGANIZATION OF THE ARCHDIOCESE'S FINANCIAL AFFAIRS AND FOR DISTRIBUTIONS TO CREDITORS HOLDING ALLOWED CLAIMS FROM THE ARCHDIOCESE'S ASSETS, THE ASSETS OF PARISHES, SCHOOLS, AND OTHER CATHOLIC ORGANIZATIONS, THE CONTRIBUTIONS OF SETTLING INSURERS, AND FOR THE CLAIMS AGAINST NON-SETTLING INSURERS TO BE ASSIGNED TO THE TRUST. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE ARCHDIOCESE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING UNDER "*RISK FACTORS TO BE CONSIDERED*" IN ARTICLE XXXVII.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE ARCHDIOCESE (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE PLAN PROPONENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT FOR THE COMMITTEE CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3). ALL OTHER STATEMENTS REGARDING THE

---

[2] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.

CORE/3529758.0002/239580558.7

PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF IMPAIRED CLAIMS AGAINST THE ARCHDIOCESE TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, OTHER EXHIBITS ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED HERETO OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (I) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, AND (II) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENT FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENT'S KNOWLEDGE, INFORMATION, AND BELIEF. THE PLAN PROPONENT'S RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENT UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE ARCHDIOCESE SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

CORE/3529758.0002/239580558.7

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE ARCHDIOCESE, THE ARCHDIOCESE'S BUSINESS OPERATIONS, THE VALUE OF THE ARCHDIOCESE'S ASSETS, OR THE VALUES OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE ARCHDIOCESE OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DIOCESE, ANY PROTECTED PARTY, OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT IS FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE Archdiocese AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ABUSE CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATIONS OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING UNCERTAINTIES AND TO A WIDE

15

CORE/3529758.0002/239580558.7

VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENT UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.]** HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN. EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

CORE/3529758.0002/239580558.7

## ARTICLE IV.    SUMMARY OF THE PLAN

The Committee submits that the treatment of creditors under the Plan is more favorable than the treatment creditors would receive if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code. Therefore, the Committee believes that the Plan is in the best interests of all creditors and recommends acceptance of the Plan by Abuse Claimants and Unknown Abuse Claimants.

**The summary of significant elements of the Plan below is provided for the convenience of all parties. The summary does not describe every element of the Plan and is not intended as a substitute for a thorough and complete review of the Plan. This summary is subject to, and is qualified in its entirety by reference to, the full text of the Plan. All Creditors are encouraged to review the Plan and this Disclosure Statement, including Exhibits, in their entirety for a more complete understanding of the Plan's provisions and impact upon Creditors. To the extent any term or provision in this Disclosure Statement is inconsistent with a term or provision of the Plan, the term or provision of the Plan shall control.**

Detailed elsewhere in this Disclosure Statement are descriptions of the technical aspects of the classification of Claims, the relative allocations of assets to holders of such Claims, the methodology as to how such assets are to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Plan Proponent believes that a broad overview of what, in their opinion, the Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan. This summary is qualified in its entirety by reference to the Plan:

CORE/3529758.0002/239580558.7

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | Statutory Fees and Court Costs | No | Does Not Vote |
| N/A | Employee Priority Claims | No | Deemed to Accept |
| 1 | School Bond Claims | No | Deemed to Accept |
| 2 | PNC Secured Claims | No | Deemed to Accept |
| 3 | Other Secured Claims | No | Deemed to Accept |
| 4 | Other Priority Claims | No | Deemed to Accept |
| 5 | General Unsecured Claims | No | Deemed to Accept |
| 6 | Abuse Claims | Yes | Yes |
| 7 | Unknown Abuse Claims | Yes | Yes |
| 8 | Non-Abuse Litigation Claims | No | Deemed to Accept |
| 9 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 10 | Non-Debtor Consolidated Entities Secured Claims | No | Deemed to Accept |
| 11 | Non-Debtor Consolidated Entities Unsecured Claims | No | Deemed to Accept |
| 12 | HUD Passthrough Claim | No | Deemed to Accept |

As discussed in the Liquidation Analysis attached hereto as **Exhibit B**, the Plan Proponent estimates that recoveries for holders of Class 6 and Class 7 Claims under the Plan will be greater than in liquidation under chapter 7 of the Bankruptcy Code because the total amount of assets available for Distribution is greater under the Plan than in liquidation under chapter 7. The portion of the Consolidated Catholic Entities' Cash Contribution and assignment of Insurance Claims made by the Consolidated Catholic Entities and any other person that comprise the Participating Parties will not be available to the Estate under chapter 7. The Plan Proponent also believes that theoretical Distributions under a chapter 7 case would likely be delayed due to the time it will take a chapter 7 trustee to assess the Consolidated Catholic Entities' assets, review and analyze Claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in deciding whether to vote to accept or reject the Plan.

### ARTICLE V.    DISCLOSURE STATEMENT ENCLOSURES

Accompanying this Disclosure Statement are the following enclosures:

a.  ORDER APPROVING DISCLOSURE STATEMENT.

A copy of the Order of the Bankruptcy Court dated _____, **2026**, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, scheduling the Confirmation Hearing, and setting the deadline for objecting to confirmation of the Plan (the "Order Approving Disclosure Statement").

18

b. NOTICE OF CONFIRMATION HEARING.

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the Plan (the "Notice of Confirmation Hearing").

c. BALLOT.

A Ballot (and return envelope) for voting to accept or reject the Plan. See Article VII(ARTICLE VIII) below for an explanation of which Creditors may vote to accept or reject the Plan.

## ARTICLE VI.    OVERVIEW OF CHAPTER 11 AND NOTICE OF HEARING

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and interest holders with respect to any distribution of a debtor's assets. The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization. The plan sets forth the means for satisfying the claims of creditors and other stakeholders. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders and members whose claims or interests are impaired, who then vote to accept or reject the plan.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession". Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims against the debtor that arose prior to the commencement of the chapter 11 case.

A class of claims is entitled to vote to accept or reject a plan if the class is "impaired" by the plan. Section 1124 of the Bankruptcy Code provides generally that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on the debtor's schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to

19

accept the plan. Pursuant to Bankruptcy Rule 3018(a), Class 6 Claims shall be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 6 Claims will be determined pursuant to the Allocation Protocol.

The Bankruptcy Court has scheduled a Confirmation Hearing to consider approving the Plan commencing on _____, 2026 at _____ a.m./p.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Maryland, in Baltimore, Maryland. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Committee filing a notice of adjournment.

## ARTICLE VII.   BACKGROUND

a. PRE-BANKRUPTCY OPERATIONS OF THE ARCHDIOCESE

The Roman Catholic Archbishop of Baltimore is the entity through which the Archdiocese of Baltimore carries out the Roman Catholic Church's mission in most of Maryland, including the City of Baltimore and Allegany, Anne Arundel, Baltimore, Carroll, Frederick, Garrett, Harford, Howard, and Washington Counties.

The Catholic Church is a worldwide community with over 1.2 billion members who hold a common creed. The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate, and universal ordinary power in the Church. The Pope exercises such power in concert with the College of Bishops of which he is the head. The organizational structure is intended to serve the mission to teach, to sanctify, and to serve which is realized in a variety of instruments and organizations. A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy. As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds. The bishop of a diocese is appointed by the Pope. The Archbishop of the Archdiocese of Baltimore is the Most Reverend William E. Lori (the "Archbishop"), who was installed as the Sixteenth Archbishop of Baltimore on May 16, 2012.

The Archdiocese reports "more than 500,000 Catholics" within its territory. On the Petition Date, the Archdiocese had 153 parishes and missions across its territory. The Archdiocese has reported 208 archdiocesan priests and 188 permanent deacons. The Archdiocese also purports to support extensive Catholic education: its annual report describes 40 archdiocesan Catholic schools (34 elementary/middle schools and 6 high schools) enrolling almost 17,000 students, and it separately reports "more than 24,000 young people" enrolled in Catholic schools.

Through central archdiocesan offices and programs, the Archdiocese provides operational and administrative support to parishes and ministries and facilitates charitable and outreach work, including programs and ministries identified in its public annual reports (including Catholic Charities and St. Vincent de Paul).

In addition, the Archdiocese reports that its 2023 Annual Appeal for Catholic Ministries raised nearly $7.5 million to support more than 100 programs and ministries, and that contributions

20

are managed through a separate, perpetual, irrevocable trust restricted to those ministries. To the Committee's knowledge, the Archdiocese has never conducted an appeal for the benefit of survivors of sexual abuse ("Survivors").

b.   NEED FOR REORGANIZATION

Over the last century, hundreds of clergy members, teachers, and other Church-associated individuals violated the sacred trust placed in them by children and their families by committing horrific and repeated acts of child sexual abuse, the impact of which has affected thousands of Marylanders.

In April 2023, the Maryland Attorney General released an investigative report concerning child sexual abuse in the Archdiocese of Baltimore; the report describes a multi-year investigation that included a public hotline and interviews of victims and witnesses, and states that over 300 people contacted the Attorney General's office and investigators interviewed hundreds of victims and witnesses.

The Attorney General's investigation described decades of abuse involving "more than 150" clergy and other individuals and "more than 600" victims.

The Archdiocese has publicly identified accused individuals and states that allegations of child sexual abuse are reported to law enforcement and to the Archdiocese's Independent Review Board.

The Archdiocese also reports that its child and youth protection policies have been in place since the 1980s and have been evaluated and strengthened over time. Notwithstanding those policies, claims filed in this case allege abuse has continued to occur within the Archdiocese, at least as recently as the 2010s.

In April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (House Bill 1 / Senate Bill 686) (the "2023 CVA"), which, among other things, eliminated the statute of limitations for civil personal injury claims related to acts of child sexual abuse. The 2023 CVA became effective October 1, 2023.

After the passage of the 2023 CVA, the Archdiocese publicly acknowledged the risk it faced from a wave of litigation, as highlighted by the Attorney General Report. Accordingly, two days before the 2023 CVA became effective, the Archdiocese filed its chapter 11 petition in order to, in its words, seek a collective, court-supervised process for addressing abuse-related liabilities while continuing the Church's mission and ministries. In other words, the Archdiocese wanted breathing room to marshal assets, assess liabilities, and pursue a plan process intended to provide equitable treatment of creditors while continuing the work of the Church within the Archdiocese.

Aside from the several hundred claims related to the sexual abuse of children, the Archdiocese's finances are strong. The Archdiocese has noted that "despite the ongoing $100 million Embracing Our Mission capital campaign, the annual archdiocesan appeal program has remained strong adding $10 million annually to support the mission and programs across the Archdiocese. This represents about a 25% growth in donations during the quinquennial period and

21

demonstrates the financial strength and willingness of the faithful of the Archdiocese to support the Church." Archdiocese Of Baltimore Quinquennial Report (2011 – 2018) at 180.

This "demonstrate[s] the financial strength and willingness of the faithful of the Archdiocese to support the Church." The Archdiocese has never authorized a similar financial campaign to raise funds to pay Survivor claims.

c.  THE BANKRUPTCY CASE

On September 29, 2023, the Archdiocese filed a voluntary petition for relief under chapter 11 in the United States Bankruptcy Court for the District of Maryland (Baltimore Division). The case was assigned to Judge Michelle M. Harner.

On October 11, 2023, the Office of the U.S. Trustee appointed the Committee. The Committee is composed of seven Survivors of child sexual abuse with claims against the Archdiocese.

The Archdiocese is represented by its lead bankruptcy counsel at Holland & Knight LLP as Debtor's counsel, YVS Law, LLC as its local bankruptcy counsel, Blank Rome as its special insurance counsel, and Keegan Linscott & Associates, PC as its financial advisor. The Gallager law firm, the Archdiocese's historic outside general counsel, serves as special counsel to the Archdiocese in matters unrelated to the bankruptcy case.

The Committee is represented by its lead bankruptcy counsel at Stinson LLP, Tydings & Rosenburg as its local bankruptcy counsel, Burns Bair as its special insurance counsel, Berkley Research Group as its financial advisor, and Stout as its claims valuation expert and real estate consultant.

The Archdiocese and the Committee have jointly hired Guidepost Solutions to serve as a child protection consultant for this case.

Since the Petition Date, the Debtor has continued to operate as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

Also on the Petition Date, the Debtor filed a motion seeking an order extending the automatic stay and enjoining litigation as to certain related entities (i.e., non-debtor "Covered Parties") that the Debtor alleges are included as additional insureds under the Debtor's liability insurance programs.

On January 16, 2024, the Court entered a Bar Date Order (Docket No. 316) establishing (i) May 31, 2024 as the deadline to file proofs of claim, and (ii) June 28, 2024 as the deadline for governmental units to file claims. The order also approved a voluntary Sexual Abuse Claim Supplement and provided for confidentiality procedures for Survivor claims and other sensitive case information.

22

Early in the case, the Debtor filed a lawsuit against its insurance companies, seeking to determine various legal issues around insurance coverage that might cover claims of child sexual abuse (the "Insurance Adversary Proceeding").

On July 29, 2024, the Debtor, including its affiliated parishes, schools, and charities, the Committee, and the Debtor's insurers were ordered to mediation. *See Agreed Order Directing Mediation, Appointing Mediators, and Ordering Mediation Discovery* (Docket No. 705). Judge Robert Faris, Bankruptcy Judge for the Bankruptcy Court in the District of Hawaii, Brian Nash, and Marc Isserles were appointed as co-mediators and continue to mediate the case.

As part of the mediation order, the parties agreed to dismiss the Insurance Adversary Proceeding without prejudice.

Throughout the case, the bankruptcy court has allowed Survivors to speak at status conferences, in order to publicly voice how the bankruptcy process has impacted Survivors and to increase engagement and understanding regarding the historic harms perpetuated on children in Baltimore for more than 75 years. To-date, dozens of Survivors have spoken at these status conferences.

In February 2025, the Maryland Supreme Court affirmed the constitutionality of the 2023 CVA. Later in 2025, the Maryland General Assembly amended the 2023 CVA by modifying the existing $1.5 million cap applicable to each incident or occurrence of abuse as to each defendant to now cap liability at $700,000 for each defendant. To avoid a lowered cap, claimants in this Chapter 11 Case were required to file lawsuits before June 1, 2025.

The Archdiocese, through its lobbying arm the Maryland Catholic Conference, advocated for the changes to the 2023 CVA, including the lowered caps and change in the incident/occurrence language.

To address the deadlines set by the 2025 amendments, the Bankruptcy Court entered a Supplemental Stay Order (Docket No. 1127), permitting Survivors to file lawsuits in state court, but immediately staying those lawsuits from further prosecution.

In April of 2025, the Committee filed a limited notice of impasse regarding the Archdiocese's assertion of charitable immunity. This immunity doctrine reasons that a charity should not be forced to use its money to reimburse victims of a car accident or a slip-and-fall because donors to charities do not intend their gifts to be used in this way.

For several reasons, the Committee believed charitable immunity was not applicable to claims of sexual abuse filed against the Archdiocese in this Chapter 11 Case and filed a lawsuit against the Archdiocese to decide the issue.

In parallel to the charitable immunity litigation, the Committee filed a Motion to Dismiss the chapter 11 case (ECF 1320). The Committee argued that, if the Archdiocese was immune from paying Survivor claims under charitable immunity, it did not need bankruptcy protection. After an October 6, 2025 hearing, the Court entered an Interim Order Addressing Motion to Dismiss (Doc.

CORE/3529758.0002/239580558.7

1484, entered Oct. 30, 2025) holding that dismissal was premature and deferring final resolution of dismissal issues pending development of the charitable-immunity record and continued the matter under advisement through January 15, 2026.

On October 3, 2025, the Debtor filed a draft Chapter 11 Plan of Reorganization (ECF 1412-1) proposing (as described in a later motion) a $33 million contribution for survivor compensation from the Archdiocese and affiliated entities, and the Committee filed a competing draft plan that same day (ECF 1413). Neither plan was set for hearing and no disclosure statement was filed or approved for either plan.

The Committee and Debtor each filed motions for summary judgment in the charitable immunity litigation, and on October 30, 2025, the Court denied both sides' summary judgment motions and set the matter for trial, emphasizing that the record required live testimony and fact development because of the significance of the issue to overall path of the bankruptcy case.

In November 2025, the Debtor began objecting to more than 400 Survivor claims on various bases, including that some claims were duplicates, no claim supplement was provided, the Debtor did not supervise the abuser, and other alleged bases to invalidate claims. The Committee filed a motion requesting more time for Survivors to respond to the objections and the Court entered an order extending the deadline through February 27, 2026 and established other interim procedures for claim objections.

In December 2025, the Committee and Debtor settled the charitable immunity lawsuit. The Debtor agreed that it would not assert charitable immunity as to Survivor claims in this case or any future bankruptcy, and that it would not authorize any of its parishes or schools to file bankruptcy without first agreeing to likewise waive charitable immunity.

In February 2026, the Debtor filed a motion to set procedures to expedite the resolution of its existing claim objections and to streamline the filing of more than 600 additional objections.

The Committee opposed the claim objection procedures and disputed the need to file claim objections at this stage of the case. This Plan provides a procedure to allow or disallow claims and to value those claims for distribution, in a way that has been accomplished in every other diocesan bankruptcy case across the country. The Plan relies on a consensual process among Survivors to decide the validity, scope, and damages stated by each claim. The Committee believes a non-consensual claim objection process would be detrimental to the success of this case, alienate survivors, and needlessly prolong settlement among the various parties.

In February 2026, the Committee filed a request to terminate the automatic stay that protects the Covered Parties (parishes, schools, and other affiliates of the Debtor) and permit survivors to pursue lawsuits against those entities.

In March 2026, the Committee filed an adversary proceeding seeking to require the Archdiocese to seek Bankruptcy Court permission before it continues with its plan to close, merge, and consolidate more than 60 of its parishes, a program known as Seek the City to Come. The Committee requests that the Archdiocese seek court approval for the program to proceed and that

24

the Bankruptcy Court enjoin the Archdiocese from taking further actions until it submits evidence to justify the business reasons for instituting Seek the City to Come. The Archdiocese has filed a motion to dismiss the litigation, and the Committee has filed a motion for a preliminary injunction preventing the Archdiocese from implementing Seek the City unless it first provides notice and a hearing as required by the Bankruptcy Code. The Bankruptcy Court granted the preliminary injunction on a limited basis and has also required the Archdiocese to provide 14 days' notice of any sale or lease of property related to Seek the City. The litigation is ongoing.

### d.   FINANCIAL INFORMATION OF THE ARCHDIOCESE

In 2025, the Archdiocese commissioned a financial audit, which combines the operations and accounts of various entities, programs, and activities that the Archdiocese administers or controls. The Archdiocese's audited financial statements for the fiscal year ending June 30, 2025 (the "2025 Audit") states, in relevant part, as follows:



CORE/3529758.0002/239580558.7

26



CORE/3529758.0002/239580558.7

27



CORE/3529758.0002/239580558.7

28



CORE/3529758.0002/239580558.7



CORE/3529758.0002/239580558.7



e. SUBSTANTIVE CONSOLIDATION OF THE PARISHES, SCHOOLS, FUNDS, CHARITIES, AND OTHER SUBSIDIARIES OF THE ARCHDIOCESE

### i. What is Substantive Consolidation?

Solely for purposes of the Plan, the Committee proposes to substantively consolidate the assets and liabilities of the parishes, schools, charities, and other affiliates of the Debtor and add them to the assets and liabilities of the Debtor.

Substantive consolidation is a tool unique to bankruptcy courts. It causes the assets of and claims against the consolidated entities (*e.g.*, Catholic affiliates) to merge into one pool of assets in order to satisfy the collective liabilities of those entities. The process also eliminates inter-company claims, and combines the creditors of the companies for purposes of voting on reorganization plans. In deciding whether to substantively consolidate non-debtor entities, courts consider (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *In re Eagle Creek Subdivision, LLC*, 407 B.R. 206, 210 (Bankr. E.D.N.C. 2008). Courts have identified several other factors relevant to substantive consolidation, including: (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (2) the presence or absence of consolidated financial statements; (3) the commingling of assets and business functions; (4) the unity of interests and ownership between the entities; (5) the existence of parent and intercorporate guarantees on loans; and (6) the transfer of assets without formal observance of corporate formalities. *See Stone v. Eacho*, 127 F.2d 284, 288 (4th Cir. 1942) ("Since, however, the assets in Virginia are unquestionably the assets of the parent corporation, and since all of the creditors of that corporation, and not merely those who have dealt with the Virginia store, have rights with respect thereto, as well as with respect to other assets of the corporation, these rights should be determined in the bankruptcy proceeding of the

CORE/3529758.0002/239580558.7

parent corporation, and the two proceedings should be consolidated that this may be done, with a pooling of assets and with the treatment of claims filed in either proceeding as having been filed in the proceeding as consolidated."); *In re Gordon Properties, LLC*, 478 B.R. 750, 757 (E.D. Va. 2012); *In re Derivium Capital, LLC*, 380 B.R. 429, 442 (Bankr. D.S.C. 2006).

The Plan proposes to merge the assets and liabilities of the parishes, schools, charities, funds, trusts, and other affiliates (the "Non-Debtor Consolidated Entities") of the Debtor into the bankruptcy estate. These entities are identified on Plan Exhibit 1. Together with the Debtor these are the "Consolidated Catholic Entities." This consolidation is proposed solely for the limited purposes of voting, confirmation, distributions, and claims administration under the Plan and the Survivors' Trust created by the Plan. It is not intended to, and will not, alter the separate legal existence of any Catholic entity for any purpose outside the Plan.

The proposed consolidation addresses extensive operational and financial entanglements among the Debtor and the Non-Debtor Consolidated Entities that make administering the Debtor's assets and liabilities impracticable and inefficient in this case without including the assets and liabilities of the Non-Debtor Consolidated Entities. Those entanglements include pooled assets in funds, trusts, and charities, all of which are completely or effectively controlled by the Debtor, centralized services provided to the Non-Debtor Consolidated Entities by the Debtor, shared and overlapping historical insurance programs, coordinated claims defense and settlement practices, and cross-entity proofs of claim asserting similar or identical abuse allegations across multiple Catholic entities. The Bankruptcy Court has already recognized that the Debtor's insurance policies are property of the estate and entered interim orders protecting the Debtor's insurance coverage from alleged erosion during this case. The consolidation will allow a single claims-administration framework and pooled funding to serve all eligible claimants more equitably and efficiently.

The consolidation is cabined by a comprehensive savings clause. Except as necessary to fund the Trust under the Plan, the consolidation will not affect the legal and organizational structure of any Consolidated Catholic Entity; pre- and post-petition guarantees, Liens, and security interests required to be maintained in connection with executory contracts and unexpired leases assumed in these Chapter 11 Cases or pursuant to the Plan; any defenses to Causes of Action or third parties' mutuality requirements to assert setoff; or distributions under any insurance policies or proceeds of such policies. The Plan further preserves valid donor restrictions under applicable non-bankruptcy law, except to the extent that the restriction distinguishes use among the Consolidated Catholic Entities.

### i.    What does it Mean for Creditors?

Creditors of the Archdiocese and all of its affiliates will receive more than if the Consolidated Catholic Entities were separate. The effects of the substantive consolidation are limited to funding, voting, confirmation, distributions, and claims administration. For those purposes only, all assets and liabilities of the Consolidated Catholic Entities will be deemed merged; all guarantees among the Consolidated Catholic Entities will be eliminated; and all inter-company debts will be erased, so that each proof of claim against any Consolidated Catholic Entity asserting claims duplicative of another Consolidated Catholic Entity's obligation becomes a single allowed claim against the consolidated group; and any duplicate or cross-entity proofs of claim

CORE/3529758.0002/239580558.7

will be deemed a single proof of claim. But for purposes of any subsequent litigation or proceeding outside of bankruptcy, the Consolidated Catholic Entities are separate entities, including for purposes of the per-defendant cap under the 2023 CVA, as amended. The Plan Administrator and the Survivors' Trust Claims Reviewer will administer claims from the common fund established by contributions from the Debtor, participating parishes, schools, and affiliates, and from insurance proceeds monetized through settlement or adjudication.

### ii.    What Facts Support Consolidation?

The Committee seeks the substantive consolidation of certain entities affiliated with the Archdiocese so that all of the assets within the control of the Archdiocese can be administered fairly and equitably to pay creditors of the bankruptcy estate. Archbishop Lori has made clear that the Catholic community in Maryland is "called to bear one another's burdens. We are called to atone for one another's sins. . . . We are journeying together, and as I said before, this journey includes really all the faithful of the archdiocese." *Archdiocesan Chapter 11 Filing Both 'a Death and a Resurrection,' Says Archbishop*, OUR SUNDAY VISITOR (Sept. 29, 2023), https://www.oursundayvisitor.com/archdiocesan-chapter-11-filing-both-a-death-and-a-resurrection-says-archbishop/.

The following sections address each entity proposed for consolidation and set forth the factual basis supporting consolidation.

### A.    Parishes

On the Petition Date, there were one hundred fifty-three (153) parishes within the Archdiocese of Baltimore. The list of Parishes is included on Plan Exhibit 1. The following facts apply to each Parish separately and to all the Parishes collectively.

The Debtor has actual and constructive control over the governance of each Parish. The governance and business operations of each Parish is managed by a Board of Corporators. The Board of Corporators is composed of five members: (i) the Roman Catholic Archbishop of Baltimore, (ii) the Vicar General of the Archdiocese of Baltimore, (iii) the pastor or administrator of the parish, and (iv & v) two adult laymen living within the geographic territory of the parish. The officers of each parish are the Roman Catholic Archbishop of Baltimore, the Vicar General of the Archdiocese of Baltimore, and the pastor or administrator of the Parish. The Vicar General is an employee of the Debtor. The pastor and/or administrator of each Parish is an employee of the Debtor.

The Archbishop of Baltimore, i.e. the Debtor, has sole authority to appoint and remove the Vicar General and the pastor and/or administrator of each parish. The Debtor obtains the majority of its revenue from levies it imposes on the Catholic entities within the Archdiocese of Baltimore. One of these levies is the cathedraticum, which is assessed against Parishes based on component parts of each parish's revenues. The formula governing the amount of Parishes' obligation to pay the cathedraticum is set by the Debtor. More than half of the Debtor's revenue comes from the cathedraticum each year.

CORE/3529758.0002/239580558.7

In addition to the cathedraticum, the Debtor taxes the purchase, lease, and/or sale of Parish property, collecting 5% of the transaction price. The Debtor employs its parishes to manage the Debtor's annual appeal, which appeal constitutes additional substantial revenue for the Debtor.

The Debtor also directly manages a substantial portion of each parish's administrative work as part of the Debtor's Central Services department. Central Services provides, among other things, human resource support, legal services, investment services, insurance administration, and other general administrative support and guidance to the parishes. The majority of the funding for Central Services is derived from the cathedraticum.

The Debtor retained title to the real property on which each parish operates until around 2009, when the Debtor began issuing gift deeds (where $0.00 was paid in consideration) to the parishes which deeds transferred legal title to the respective parish.

The Debtor requires parishes to participate in the Interparish Loan Fund (IPLF), which is a rainy-day reserve and pooled depository and loan program. IPLF partners with the Catholic Community Foundation, a board-controlled ownership of endowment assets to invest the IPLF funds.

The Debtor also imposes detailed financial rules on the parishes, including Archbishop approvals for large transactions and centralized legal services for the parishes at the same law firm as the Archdiocese.

The Debtor controls clergy assignment and faculties, imposes uniform finance and audit norms, centralizes investment and liquidity through the IPLF and CCF (defined below), controls and approves capital projects, and binds parish employees to the Debtor's financial, human resources, and information technology policies.

For creditors and other stakeholders, these facts describe a single economic unit operating under common policies, officers, systems, and approvals, notwithstanding separate legal incorporation. This is especially true among Survivors who were abused by the Debtor's employees who were the head of parishes across Maryland and who were placed in those positions by the Debtor.

Each of the parishes was included in the Debtor's request for an extension of the automatic stay.

### B.    Schools

The Archdiocese of Baltimore publicly describes a highly centralized system of governance, strategic direction, financial control, and real estate management, that binds archdiocesan schools—particularly the "archdiocesan schools" (as opposed to "independent Catholic schools")—to the Debtor's control. The list of Schools is included on Plan Exhibit 1. The following facts apply to each School separately and to all the Schools collectively.

Of the archdiocese schools, there are 34 elementary and middle schools and 6 high schools that comprise the 40 Schools administered in this Plan.

33

The Schools' affairs are administered and supervised as part of a single enterprise controlled exclusively by the Debtor. About half of the schools exist under the same legal corporation as their affiliated parish. The remaining schools operate as facially separate corporations from the parishes and/or Debtor. In January of 2024, the Committee requested the formation documents, bylaws, and other governance documents for the approximately 18 archdiocesan schools that are alleged to be separate from the Debtor and any parish and has never received documents in response.

The Debtor imposes centralized governance on all of the archdiocesan Schools. The Department of Catholic Schools ("DCS") is led by a Chancellor of Education and a Superintendent, positions appointed and removed by the Debtor. The Chancellor of Education is described as "overseeing the business operations of the Catholic school system." The DCS acknowledges that its mission includes, "with guidance and oversight from the Archdiocesan School Board, our leadership team strives to strengthen and enhance our schools."

The DCS publishes a comprehensive "Policy Manual for Catholic Schools for the Archdiocese of Baltimore." The manual covers administration, human resources, finance, school boards, and instruction requirements for each of the Schools. The DCS policy manual includes mandates for school compliance with federal, state, and local requirements; accreditation processes; class size; registration documentation; student and family privacy; faculty handbooks; crisis management and safety drills; compliance with archdiocesan technology plans; child and youth protection policies; and compliance with environmental policies. Each of these requirements is set by the Debtor and applies to the Schools as a necessary condition of their existence. The manual also imposes Debtor-imposed requirements for hiring principals (who must be practicing Catholics), teacher certification, teacher observation and evaluation, principal evaluation, and assistant principal evaluation.

Schools must follow the Debtor's Chart of Accounts/Financial Report Submission to the Archdiocese policy and pay fees to the Debtor as assessed by the DCS. Schools must maintain tuition assistance programs, and cash control procedures. The Debtor's Parish & School Reporting Calendar policy requires schools to report financial results on fixed deadlines to the Debtor.

The Debtor imposes centralized financials policies titled "Special Control Procedures For Schools." The policy establishes various procedures that the Schools must follow regarding their cash and tuition records. The Debtor's General Ledger & Financial Reporting policy states that "all parishes and schools shall maintain a computerized general ledger" and that "the Archdiocese selected QuickBooks Online Edition (QBOE) as the standard accounting system for parishes and schools effective July 1, 2014." The Archdiocese also implements a uniform system of accounting across the Schools.

The archdiocesan investment policies apply to Schools like they do the Parishes. The Investment Management policy identifies IPLF and CCF as the organizations established for investment management of the Schools, and requires the Schools to maintain accounts with IPLF unless they obtain approval from the Archbishop to not hold investments in the IPLF.

CORE/3529758.0002/239580558.7

The Extraordinary Administration policy applies to the Schools as well as Parishes. The policy specifies that Parishes and Schools must submit to the Extraordinary Administration Committee (EAC) process when any of the following school financial conditions are present: the school fails to pay fees assessed by the DCS; school insurance invoices are past due greater than 90 days; or the school has operating losses for three years in a row and is using next year's cash for current year's operations. Once a school meets these criteria, the Director of Parish and School Finance evaluates financial results, compiles a list of school locations meeting the criteria, and works with Regional Controllers on preparation of a recovery plan for submittal to the EAC. The Archbishop must approve the recovery plan. Any location for which a recovery plan has been approved "must have written approval from the Archbishop of Baltimore to take action outside the recovery plan," including hiring staff, adjusting compensation, outsourcing services, or entering into contracts greater than one year. Non-compliance with the recovery plan requires the school to meet with the College of Consultors, who will recommend actions to the Archbishop.

All sales and leases of School buildings require the approval of the Archbishop. The Real Estate Transactions Advisory Committee (RETAC)—chaired by the Vicar General and including the Chancellor of Catholic Schools and Superintendent of Catholic Schools—reviews proposed school property transactions and submits recommendations to the Archbishop. The school or head of school must submit a written request to the Archbishop for approval.

The Debtor requires that when a school building is sold, net proceeds shall first be used to repay debts owed to the Archdiocese, including insurance, unfunded pension obligations, IPLF loans, and any other unpaid obligations. The Archdiocese then collects a 5% fee at closing for real estate sales and purchases and for leases and licenses.

At least one of the School buildings and its land is owned by the Archdiocese, which is then leased to the respective School via a memorandum of understanding for consideration of $1.00.

The Archdiocese has publicly described a series of strategic planning processes that govern Schools. In 2010, the Blue Ribbon Committee on Catholic Schools, empaneled by the Debtor, issued a strategic plan with 56 recommendations, including creation of an Archdiocesan Catholic School Board, a new hybrid governance model for elementary schools, financial support of Catholic schools by all Catholic parishes, and expanded tuition assistance. The Committee's stated goal was to achieve "the growth of Catholic school education for the first time in many, many years" and to address "the economic realities we face" as a system. The Debtor announced the creation of an implementation office for these initiatives. The school policy manual requires schools to comply with "AOB Strategic Plan Implementation" and their own "Strategic Plan Implementation" in alignment with archdiocesan direction. The Vision 2030 initiative is referenced in the DCS Resource Portal as a system-level planning document. These system-level strategic planning processes and implementation requirements corroborate that school footprint, enrollment, and financial decisions are made at the archdiocesan level for the benefit and burden of the whole.

The Debtor also levies Parishes to support the various Schools. Parishes are required to budget for and satisfy these assessments, with notice, planning, and payment timelines, and

35

parishes may petition the Archbishop for a waiver, but the Debtor treats the Schools and parishes as a single integrated organization for purposes of providing mutual financial aid and support. The Debtor also requires the Schools to support the lobbying efforts of the Maryland Catholic Conference.

Each of the schools was included in the Debtor's request for an extension of the automatic stay.

### C.    Inter-Parish Loan Fund ("IPLF")

The Inter-Parish Loan Fund was incorporated on March 28, 2011 by the Debtor to replace the Deposit and Loan Program formerly administered by the Debtor without any formal corporate distinction.



The IPLF was included in the Debtor's request for an extension of the automatic stay.

### D.    Maryland Catholic Conference ("MCC")

The Maryland Catholic Conference is a limited liability company organized on October 25, 2011, and serves as the public policy arm of the Catholic Church in Maryland.



36



MCC was included in the Debtor's request for an extension of the automatic stay.

### E. Mother Mary Lange Support Corporation ("MMLSC")

The Mother Mary Lange Support Corporation was created by the Debtor to fund the construction of the Mother Mary Lange Catholic School. MMLSC's address is the same as the Debtor's principal address at 320 Cathedral Street.

MMLSC is covered by the extension of the automatic stay.

### F. John Carroll Foundation ("JCF")

The John Carroll Foundation is a Maryland non-profit corporation incorporated on January 18, 1993. The purpose of the JCF is to "support and promote the religious, educational and financial objectives of the Archdiocese of Baltimore

CORE/3529758.0002/239580558.7



### G.    Catholic Community Foundation of the Archdiocese of Baltimore, Inc. ("CCF")

The Catholic Community Foundation holds substantial financial assets supporting the Debtor



38

CORE/3529758.0002/239580558.7

### H. New Cathedral Cemetery Corporation ("NCCC")

The New Cathedral Cemetery Corporation was incorporated by the Debtor in 1974 and operates the sole cemetery within the Archdiocese that is not operated by a parish



### I. Roman Catholic Foundation ("RCF")

The Roman Catholic Foundation is a Maryland non-profit corporation incorporated on April 3, 1978.



39

CORE/3529758.0002/239580558.7

### J. Associated Catholic Charities, Inc.

Associated Catholic Charities, Inc. ("ACC") is a Maryland nonprofit corporation originally incorporated on September 25, 1947, through the consolidation of Catholic Charities of Archdiocese of Baltimore, Inc. and St. Mary's Female Orphan Asylum.

CORE/3529758.0002/239580558.7

41



### K.   Route 175 East, LLC

Route 175 East, LLC ("**Route 175**") is a Maryland limited liability company formed in 2010 by the Roman Catholic Archbishop of Baltimore, a Corporation Sole, as its sole member.

CORE/3529758.0002/239580558.7



### L. Catholic Community School Land, Inc. ("CCSL")

The Archdiocese formed CCSL to support, benefit, and/or carry out some or all of the purposes of the Roman Catholic Archdiocese of Baltimore, and act for the sole purpose of benefiting the Archdiocese.

42

### M. Other Entities and Funds

The Archdiocese has created a number of special purposes entities and/or trusts to hold assets allegedly for the benefit of the other consolidated entities described above. Among them are the Archdiocese Sexual Misconduct Self-Insurance Program and the Archdiocese's health insurance and general insurance programs. The Committee does not believe these entities are separate or distinct legal entities from the Archdiocese. To the extent they are separate, the beneficiaries of those entities will become part of the Estate and so too will those entities' beneficial interests in these funds. Accordingly, the Estate will retain a beneficial interest in the Catholic Community School Land, Inc., the Archdiocese Sexual Misconduct Self-Insurance Program, and the Archdiocese's health insurance and general insurance programs. Because the controlling documents grant the Archdiocese total control and discretion to use these funds for the benefit of the consolidated entities, the Plan provides the Archdiocese will contribute to fund the Trust from all of the funds, trust, and insurance programs it controls.

### iii. Creditor Reliance on the Integration of the Consolidated Catholic Entities

As children, Survivors entered the care of priests, teachers, and other adults who had the responsibility to care for and protect them from harm. Hundreds of those adults breached that trust when they raped and sexualized children, causing tremendous physical, emotional, psychological, and spiritual harm to thousands of children and the entire Roman Catholic Community in Maryland. All of those priests, teachers, and adults were members of the coordinated enterprise created, lead, and controlled by the Debtor, as described above. These children and their parents did not rely on the separateness of each parish or school from the Debtor when they trusted priests and other adults. It was just the opposite. The imprimatur of the Debtor was often the primary reason families trusted their children to the care of the adult-abusers. As demonstrated by the Debtor's rigid control over the hiring and firing of employees, decision to purchase and construct a common insurance program for the consolidated entities, universal code of conduct, and uniform code of morality that pervades the operations of the entire enterprise and that was imposed on all of the Parishes, Schools, and other entities under its control, families relied on these unified systems of culture, practices, and accountability among the Debtor and its affiliates when they decided to send their daughters to Catholic school or allow their sons to go camping with priests.

Non-abuse creditors likewise considered the Debtor and its parishes and schools to be an integrated enterprise. For example, the Debtor incurred most of its secured debt, and created several of its special purpose entities, to obtain loans for a school building construction project.

### f. FUTURE OF THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE

The Debtor, the Roman Catholic Archbishop of Baltimore, and all of its affiliates, will exist after the Plan becomes effective. The entire enterprise will keep its assets, except those assets that are used to pay creditors or transferred to the Trust under the Plan.

While the Plan takes substantial assets from the Roman Catholic Archbishop of Baltimore and uses them to pay creditors, the Committee believes that the Plan will allow the Roman Catholic

43

Archbishop of Baltimore to function after bankruptcy by providing the same or similar services to its mission as it did before the bankruptcy was filed.

The Committee has prepared financial projections attached as **Exhibit A**, showing how, after the Plan has been fully funded, all claims are paid pursuant to the plan, and any ongoing obligations are reinstated, the Roman Catholic Archbishop of Baltimore and all of its associated parishes, schools, funds, and charities, will continue to operate in the near-term. The Committee believes that these projections show that the Plan will not result in any of these entities requiring liquidation, reorganization, or restructuring in the near-term and so the Plan is feasible.

g.  SOURCES OF INFORMATION

The Committee obtained all of its information from the Roman Catholic Archbishop of Baltimore. The Committee requested the information in January 2024 and has asked its attorneys, financial advisors, real estate professionals, child protection consultant, and claim valuation expert to review and assess some or all of the data. The Roman Catholic Archbishop of Baltimore has a legal obligation to provide accurate and complete information to the Committee in response to these requests for information. But the Committee cannot guarantee the accuracy or completeness of the information provided by the Roman Catholic Archbishop of Baltimore.

h.  LIQUIDATION ANALYSIS

The Committee believes the Plan will provide creditors with more money than they would receive if the Roman Catholic Archbishop of Baltimore were to instead liquidate all of its assets and not reorganize. The Committee has attached its analysis supporting this conclusion as **Exhibit B**.

i.  OFFICERS OF THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE

The Roman Catholic Archbishop of Baltimore will maintain the same officers and organizational structure as it had before the bankruptcy was filed. The Committee believes that on the Effective Date the Archbishop will be William Lori, its Vicar General and Bishop will be Adam Parker, and its Chief Financial Officer will be John Matera. The Plan allows Archbishop Lori to appoint officers according to the Roman Catholic Archbishop of Baltimore's internal rules and procedures at any time.

The officers of the Roman Catholic Archbishop of Baltimore will receive the same compensation as they did prior to bankruptcy.

j.  ALTERNATIVES TO THE PLAN

The Committee believes there are two alternatives to the Plan, both of which are poor alternatives in terms of financial outcomes for creditors.

First, the bankruptcy case could be dismissed. This would allow almost 1,000 lawsuits to proceed in state court. The resolution of those cases will take years. In addition, lawsuits will allow the first creditor to obtain a judgment to take the Roman Catholic Archbishop of Baltimore's assets

CORE/3529758.0002/239580558.7

to satisfy the judgment and leave little for the next creditor. In sum, it will result in uneven distributions to creditors, and most creditors will go unpaid as a result.

Second, the Roman Catholic Archbishop of Baltimore might propose a plan. The Committee believes that the Roman Catholic Archbishop of Baltimore's plan, as proposed in October 2025, does not provide creditors with a fair payment. The Roman Catholic Archbishop of Baltimore's plan allows it to retain substantial assets and releases all of its Parishes and Schools without those entities providing a meaningful or fair contribution to the payment of creditors.

k.   AVOIDANCE ACTIONS

The Roman Catholic Archbishop of Baltimore refused to meaningfully analyze or pursue lawsuits to recover transfers made prior to the filing of the bankruptcy case.

The Committee has identified at least 5 potential lawsuits seeking to recover at least $1,014,539.70 in transfers the Archdiocese made in the years prior to the bankruptcy. In addition, the Committee believes the Archdiocese transferred millions more to its affiliated schools, parishes, and funds. If the Participating Parties become consolidated with the Archdiocese, there will be no avoidance actions against those consolidated entities. But if the Court does not approve consolidation, the Trust will be able to sue the Participating Parties regarding these avoidance actions. The Committee has asked the Court to give the Committee legal standing to file those lawsuits. If the court does not provide the Committee with standing, the Plan provides that the Trustee will have standing to pursue the lawsuits instead of the Roman Catholic Archbishop of Baltimore.

l.   RISKS TO CONFIRMATION

There are substantial risks that the Plan will not be confirmed. The Committee believes all of these risks are outweighed by the substantial benefit to creditors that would be realized by a prompt resolution to this bankruptcy case.

The Roman Catholic Archbishop of Baltimore and its insurers are the primary impediments to confirmation.

The Roman Catholic Archbishop of Baltimore will oppose the plan because it forces it to contribute more money than it wants to pay and does not allow Parishes and Schools to obtain releases unless those affiliates' assets and liabilities are combined into one unified enterprise or they otherwise agree to pay their fair share of a settlement. The Roman Catholic Archbishop of Baltimore will also argue that it has a First Amendment right to not be reorganized without its consent. Likewise, the affiliates will argue that their status as non-profits prevents the bankruptcy court from forcing them to participate in bankruptcy without their consent.

The insurers will argue that the Plan cannot transfer the Roman Catholic Archbishop of Baltimore's insurance rights without the consent of the insurers. They will also try to argue that the Plan is not in the best interest of Survivors and the Roman Catholic Archbishop of Baltimore, even though the insurers do not represent those parties.

45

There is substantial risk to the Plan that these arguments against the plan will succeed. Even if the Committee is right and the Plan is confirmed, the Committee believes the Archdiocese, its insurers, and/or its affiliates will appeal. But without this Plan, the Committee does not see a viable alternative that provides fair compensation to Survivors. The Committee has assessed the risks and believes there is path to achieve confirmation without infringing on the Archdiocese's or its affiliates' right to religious freedom and that the Plan preserves all of the Non-Settling Insurer's legal and contractual rights for determination after the bankruptcy case concludes.

m. OTHER IMPORTANT PLAN PROVISIONS

In exchange for their contributions to the Trust, Settling Insurers, will be entitled to the benefit of certain releases, exculpation, and injunctions, which are summarized below:

> **Exculpation.** The Plan provides certain exculpation provisions which are typical and customary in chapter 11 plans. The provisions provide that the Debtor, the Archdiocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and entities will be released from certain of their acts and omissions that occurred from the Petition Date though Effective Date, or in preparation of the Chapter 11 Case. None of these parties will be exculpated from claims arising from gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty.

> **Releases.** The Plan Provides that the Participating Parties will be granted releases and a channeling injunction regarding certain claims, including all Abuse Claims. If the Plan is confirmed, Abuse Claimants will not be able to recover directly from or pursue further litigation against the Participating Parties (except that some Litigation Claimants may be authorized to pursue Litigation Claims for limited purposes in accordance with the terms of the Plan), and Abuse Claimants' recoveries on account of their Abuse Claims will limited by the terms of the Plan.

> **Injunctions.** The Plan provides for certain injunctions, including a channeling injunction which will channel certain Claims, including all Abuse Claims against the Archdiocese or any of the Participating Parties, into the Trust. This means that any holder of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan.

The releases contained in the Plan are an integral part of the Debtor's restructuring efforts and were an essential element of the negotiations among the parties and in obtaining the Protected Parties' support for the Plan.

46

CORE/3529758.0002/239580558.7

In the opinion of the Committee, the treatment of Claims under the Plan provides an opportunity for greater recovery for Creditors than that which is likely to be achieved under other alternatives. Accordingly, the Committee believes that confirmation of the Plan is in the best interests of, and provides the highest and most expeditious recoveries to, holders of all Claims against the Debtor. All Creditors entitled to vote, therefore, are urged to vote to accept the Plan.

### ARTICLE VIII.  SUMMARY OF VOTING PROCEDURES

**Vote Solicitation and Deadline**.

To be counted, your Ballot must be received, pursuant to the following instructions, by Epiq Corporate Restructuring, LLC ("Epiq"), on or before **5:00 p.m. (Eastern Time) on _____, 2026** (the "Voting Deadline"):

**If by first class mail, overnight courier or hand delivery:**

The Roman Catholic Archbishop of Baltimore – Ballot Processing
c/o Epiq
410 Exchange, Suite 100
Irvine, California 92602

**By electronic, online submission:**

Please visit.
Click on the "***E-Ballot***" section of the Archbishop's website and follow the directions on your Ballot to submit your E-Ballot. If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard (paper) copy of your Ballot.

**IMPORTANT NOTE:  You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

**If You Hold A Claim Entitled To Vote:**

Please (i) complete the information requested on the Ballot; (ii) sign, date, and indicate your vote to accept or reject the Plan; and (iii) return the completed Ballot in the enclosed pre-addressed, postage-paid envelope, or by one of the other methods described above, so that it is actually received by Epiq on or before the Voting Deadline.

**DO NOT RETURN ANY INVOICES, DEBT INSTRUMENTS, NOTES, OR CERTIFICATES THAT YOU MAY HAVE WITH YOUR BALLOT.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY OR EMAIL BE ACCEPTED.**

CORE/3529758.0002/239580558.7

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE ARCHBISHOP'S SOLICITATION AND CLAIMS AGENT, EPIQ, BY EMAIL AT OR BY CALLING AND REQUESTING TO SPEAK WITH A MEMBER OF THE ARCHBISHOP'S SOLICITATION TEAM.**

**Importance of Your Vote**.

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that vote. Only the Ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of Creditors in the case. On October 11, 2023, the United States Trustee appointed the Committee in the Chapter 11 Case to represent the interests of the Archbishop's unsecured Creditors, including Abuse Claimants. Each of the members of the Committee asserted a claim for sexual abuse against the Archbishop and members of the Committee devoted a substantial part of their lives, on an unpaid basis for more than two years, to negotiate the terms set forth in the Plan.

### ARTICLE IX.    CLASSIFICATION OF CLAIMS GENERALLY

Section 101(5) of the Bankruptcy Code defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall designate classes of claims against a debtor. Section 1122 of the Bankruptcy Code further requires that each class of claims contain only claims that are "substantially similar" to each other. The Committee believes that it has classified all Claims in compliance with the requirements of sections 1122 and 1123. However, it is possible that the holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Committee would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

CORE/3529758.0002/239580558.7

## ARTICLE X.    TREATMENT OF CLAIMS

As required by the Bankruptcy Code, all Claims are classified into several separate categories. While the vast majority of Claims have been placed into one of the twelve separate Classes, some Claims are left unclassified. The separate Classes are described in detail within this Disclosure Statement and in the Plan.

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | Statutory Fees and Court Costs | No | Does Not Vote |
| N/A | Employee Priority Claims | No | Deemed to Accept |
| 1 | School Bond Claims | No | Deemed to Accept |
| 2 | PNC Secured Claims | No | Deemed to Accept |
| 3 | Other Secured Claims | No | Deemed to Accept |
| 4 | Other Priority Claims | No | Deemed to Accept |
| 5 | General Unsecured Claims | No | Deemed to Accept |
| 6 | Abuse Claims | Yes | Yes |
| 7 | Unknown Abuse Claims | Yes | Yes |
| 8 | Non-Abuse Litigation Claims | No | Deemed to Accept |
| 9 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 10 | Non-Debtor Consolidated Entities Secured Claims | No | Deemed to Accept |
| 11 | Non-Debtor Consolidated Entities Unsecured Claims | No | Deemed to Accept |
| 12 | HUD Passthrough Claim | No | Deemed to Accept |

### a.  Creditor Recovery Under the Plan

All classified Claims have been placed into one of twelve (12) separate Classes. The Plan affirmatively states whether each Class of Claims is Impaired or Unimpaired and whether such Class is entitled to vote.

49

CORE/3529758.0002/239580558.7

*b.*    **Unclassified Claims.**

i.    ***Administrative Claims.*** Except as provided for otherwise in this Plan, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of General Administrative Expense Claims not previously Allowed by a Final Order must file and serve on the Debtor request for the payment of such Administrative Claims in accordance with the procedures set forth in the Confirmation Order on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims and shall be forever barred from assertion and unenforceable against the Archdiocese, Estate, or property of the foregoing, without the need for any objection by the Archdiocese or further notice to, or action, order, or approval of, the Bankruptcy Court, and any such Administrative Claim shall be deemed fully satisfied, released, and discharged.

With respect to any trade Claims arising after the Petition Date representing obligations incurred by the Archdiocese in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Claim: (i) shall be paid by the Archdiocese as soon as reasonably practicable after the Effective Date or on the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

Except to the extent a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive on account of and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtor or Archdiocese shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtor's operations during the Chapter 11 Case may be paid by the Debtor or Archdiocese in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.

Allowed Administrative Claims based upon liabilities incurred by the Debtor in the ordinary course of its business shall be satisfied by the Archdiocese pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

As further described below in this Plan, holders of Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business shall not

CORE/3529758.0002/239580558.7

be required to file or serve any request for payment of such Administrative Claims. Such Administrative Claims shall be satisfied pursuant to Section 2.1.1 of this Plan.

ii.      ***Priority Tax Claims.*** Except to the extent a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after, the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; provided, however, that the Debtor and Archdiocese reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with, the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty shall be subject to treatment in Class 5 (General Unsecured Claims), if not subordinated to Class 5 claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Archdiocese, or its respective property.

iii.      **Non-Tax Priority Claims.** Unless the holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, on, or as soon as reasonably practicable after, the later of: (i) the Effective Date; or (ii) the date on which such Non-Tax Priority Claim becomes an Allowed Claim, each holder of such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (a) Cash equal to the unpaid portion of such Allowed Claim or (b) such other less favorable treatment as to which the Archdiocese and the holder of such Allowed Claim shall have agreed upon in writing. The Trust shall not be responsible for payment of Non-Tax Priority Claims. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Archdiocese.

iv.      **Professional Fee Claims**. All Professionals or other Persons requesting the final allowance and payment of compensation or reimbursement of expenses pursuant to sections 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered during the period from the Petition Date to and including the Effective Date shall File and serve final applications for allowance and payment of Professional Fee Claims on counsel to the Debtor and the United States Trustee no later than the first Business Day that is sixty (60) days after the Effective Date. Objections to any Professional Fee Claim must be Filed and served on the Archdiocese and the applicable Professional within ten (10) calendar days before the hearing on the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Archdiocese and the Professional requesting allowance

51

and payment of a Professional Fee Claim). The final fee hearing on all Professional Fee Claims shall take place on the same date.

Allowed Professional Fee Claims shall be paid in full in Cash and in such amounts as are Allowed by the Bankruptcy Court on or as soon as reasonably practicable after the later of: (a) the date upon which an order relating to any such Allowed Professional Fee Claim is entered; and (b) such other date(s) as the holder of the Allowed Professional Fee Claim and the Debtor or Archdiocese, as applicable, shall have agreed.

The Archdiocese is authorized to pay compensation for services rendered or reimbursement of expenses incurred by its Professionals after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

Professional Fee Claims of Professionals employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan, shall be paid by the Archdiocese, after notice and a hearing in accordance with this Section 2.1.4. For the avoidance of doubt, Professional Fee Claims of Professionals employed by the Archdiocese for services rendered prior to the Effective Date, shall not be paid by the Trust.

v.        **Statutory Fees and Court Costs.** Statutory Fees and Court Costs will be paid in full in Cash by the Archdiocese on the Effective Date or as soon as reasonably practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines. After the Effective Date, the Archdiocese will continue to pay quarterly fees to the Office of the United States Trustee and File quarterly reports with the Office of the United States Trustee until the Chapter 11 Case is closed, dismissed, or converted.

vi.        **Employee Priority Claims.** The holder of an Allowed Employee Priority Claim will receive, in full satisfaction of such Allowed Employee Priority Claim; (a) payment in full of the unpaid amount of such Allowed Employee Priority Claim in cash as soon as practicable after the later of (i) the Effective Date and (ii) the date such Allowed Employee Priority Claim becomes Allowed; or (b) such other treatment as agreed in writing by the holder of such Allowed Employee Priority Claim or ordered by the Bankruptcy Court.

c.  **Classes of Claims.**

   i.    *Class 1 – School Bond Claims*

**Classification:** Class 1 consists of the School Bond Claims.

**Treatment:** Except to the extent the holder(s) of the School Bond Claims agree to less favorable treatment, on the Effective Date, the School Bond Claims shall be reinstated, as provided by 11 U.S.C. § 1124, and all loan documents and provisions relating to the School Bond Claims shall remain in full force and effect until all obligations of the Consolidated Catholic Entities have been indefeasibly paid in full.

52

**Voting:** The School Bond Claims are Unimpaired. As a result, each holder of a School Bond Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of School Bond Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of School Bond Claims will not be solicited with respect to the School Bond Claims.

### ii.    *Class 2 – PNC Secured Claims.*

**Classification:** Class 2 consists of the PNC Secured Claims.

**Treatment:** Except to the extent the holder(s) of the PNC Secured Claims agree to less favorable treatment, on the Effective Date, the PNC Secured Claims shall be reinstated, as provided by 11 U.S.C. § 1124, and all loan documents and provisions relating to the PNC Secured Claims shall remain in full force and effect until all obligations of the Consolidated Catholic Entities have been indefeasibly paid in full.

**Voting:** The PNC Secured Claims are Unimpaired. As a result, each holder of a PNC Secured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PNC Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of PNC Secured Claims will not be solicited with respect to the PNC Secured Claims.

### iii.    *Class 3 – Other Secured Claims*

**Classification:** Class 3 includes all Other Secured Claims.

**Treatment:** Except to the extent a holder of an Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction of such Allowed Other Secured Claim, each holder of an Other Secured Claim will receive, at the sole option of the Archdiocese: (a) Cash in an amount equal to the Allowed amount of such Other Secured Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (iii) the date on which the holder of such Other Secured Claim and the Archdiocese shall otherwise agree in writing; (b) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including reinstatement, as provided by 11 U.S.C. § 1124; or (c) return of the applicable collateral on the Effective Date or as soon as reasonably practicable after the Effective Date.

**Voting:** Other Secured Claims are Unimpaired. As a result, each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Other Secured Claims will not be solicited with respect to Other Secured Claims.

CORE/3529758.0002/239580558.7

### iv.    Class 4 – Other Priority Claims

**Classification:** Class 4 includes all Other Priority Claims.

**Treatment:** Except to the extent that a Class 4 Claimant agrees to less favorable treatment of their Class 4 Claim, in exchange for full and final satisfaction of their Class 4 Claim, at the sole option of the Archdiocese, each Class 4 Claimant shall receive: (i) payment in Cash in an amount equal to such Allowed Class 4 Claim, payable on or as soon as reasonably practicable after the last to occur of (A) the Effective Date, (B) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, and (C) the date on which a Class 4 Claimant and the Archdiocese shall otherwise agree in writing; or (ii) satisfaction of their Allowed Class 4 Claim in any other manner that renders the Allowed Class 4 Claim Unimpaired, including reinstatement.

**Voting:** Other Priority Claims are Unimpaired. As a result, each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Other Priority Claims will not be solicited with respect to Other Priority Claims.

### v.    Class 5 – General Unsecured Claims

**Classification:** Class 5 includes all General Unsecured Claims.

**Treatment:** Except to the extent a holder of a General Unsecured Claim agrees to less favorable treatment of their General Unsecured Claim, in exchange for full and final satisfaction of such Allowed General Unsecured Claim, each holder of a General Unsecured Claim shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim (excluding interest), which shall be payable on or as soon as reasonably practicable after the later to occur of: (i) the Effective Date; (ii) the date on which the applicable General Unsecured Claim becomes an Allowed General Unsecured Claim; and (iii) the date on which the holder of such General Unsecured Claim and the Archdiocese shall otherwise agree in writing. No Participating Party may be a Class 5 Claimant.

**Voting:** General Unsecured Claims are Unimpaired. As a result, each holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of General Unsecured Claims will not be solicited with respect to General Unsecured Claims.

### vi.    Class 6 – Abuse Claims

**Classification:** Class 6 includes all Abuse Claims except Unknown Abuse Claims.

**Treatment:**

i.      The Plan provides for the establishment of the Trust to fund Distributions to Class 6 Claimants. The Trust shall be funded as provided in Section 8 of the Plan. Distributions

54

from the Trust shall be made to Class 6 Claimants on a fair and equitable basis, pursuant to and in accordance with Sections 4.4 and 4.9 of the Plan, the Trust Agreement, and the Allocation Protocol, which shall represent the sole recovery available to Class 6 Claimants in respect to any obligation owed by the Protected Parties; *provided*, *however*, that nothing in this Plan shall prevent Non-Participating Abuse Claimants from asserting their respective Non-Participating PP Abuse Claims against Participating Parties (other than the Non-Debtor Consolidated Entities) or any Non-Participating Insurance Claims they may have against any Non-Settling Insurer; *provided further*, that (i) all holders (including Class 6 Claimants) of Channeled Claims against the Settling Insurers are subject to the Channeling Injunction and (ii) all holders (including Class 6 Claimants) of Barred Claims against the Settling Insurers are subject to the Settling Insurer Injunction.

ii.        As of the Effective Date of the Plan, and without any further order from the Bankruptcy Court or further action by any party, the Trust shall fully assume (i) the liability of the Archdiocese for all Class 6 Claims, the liability of the Participating Parties for all Class 6 Claims other than Non-Participating PP Abuse Claims, and the liability of the Settling Insurers for all Channeled Claims and Non-Participating Abuse Claims, in each case pursuant to the Channeling Injunction set forth in Section 12.3 of the Plan; and (ii) the liability (if any) of the Settling Insurers for any and all Barred Claims. All Class 6 Claims shall be satisfied solely from the Trust as set forth in the Plan, the Trust Agreement, and the Allocation Protocol; *provided, however*, Distributions made by the Trust to holders of Class 6 Claims shall not prevent holders of Class 6 Claims that are also Litigation Claimants from asserting Litigation Claims to the extent provided for herein; and *provided further*, that nothing in this Plan shall prevent Non-Participating Abuse Claimants from asserting their respective Non-Participating PP Abuse Claims against Participating Parties or any Non-Participating Insurance Claims they may have against any Non-Settling Insurer. Notwithstanding the foregoing or anything herein to the contrary, the Channeling Injunction and Settling Insurer Injunction respectively prohibit any Person (including all Litigation Claimants and Non-Participating Abuse Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the property or assets of either of the foregoing (including Purchased Property).

iii.        In addition to any other requirements set forth in this Plan, in any of the Plan Documents, or in the Confirmation Order that must be satisfied before a Class 6 Claimant is eligible to receive a Distribution from the Trust, no Class 6 Claimant shall receive any Distribution until and unless he or she has executed and delivered to the Trust, as applicable based on their status as a Consenting Abuse Claimant or a Non-Participating Abuse Claimant, either a Consenting Abuse Claim Release Agreement or a Non-Participating Abuse Claim Release Agreement. Notwithstanding the foregoing, to preserve coverage under Non-Settling Insurer Policies, and subject to the provisions of Section 8.2.6 and 12.2 of the Plan, Consenting Abuse Claimants specifically reserve, and do not release, any and all Claims that they may have against the Archdiocese or any Participating Party, to the extent that such Claims implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable by the Trust from any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any proceeds from such judgments or awards will be Distributed in accordance with Section 4.9 of the Plan. Consenting Abuse Claimants may not under any circumstance recover any Channeled Claim (including any Abuse

55

CORE/3529758.0002/239580558.7

Claim) or Barred Claim from any Settling Insurer Releasees, and Settling Insurer's Related Persons, or the property or assets of either of the foregoing (including Purchased Property); all such Claims are subject to the Channeling Injunction and Settling Insurer Injunction and are released as set forth herein. The Trust must provide copies of all executed Consenting Abuse Claim Release Agreements and Non-Participating Abuse Claim Release Agreements to (i) the Protected Parties; and (ii) any Joint Tortfeasor, upon reasonable request and provision of an appropriate, executed non-disclosure or confidentiality agreement.

iv.      Except with respect to Non-Participating PP Abuse Claims (which are preserved as against Participating Parties who are not Non-Debtor Consolidated Entities under the Plan), Class 6 Claims will be released as against the Archdiocese and the Participating Parties upon the occurrence of the applicable Abuse Claim Discharge Date as provided in Sections 12.2.3 and 12.7 below. For the avoidance of doubt, nothing herein shall require a Consenting Abuse Claimant to release any Person that is not a Protected Party, Settling Insurer Releasee, or Settling Insurer Related Person.

v.      The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 6 Claims, and their obligations are not reduced by the Consolidated Catholic Entities being in bankruptcy or by the Trust Distributions Class 6 Claimants receive, or are entitled to receive, based on the Plan, Trust Agreement, or Allocation Protocol. For the avoidance of doubt, (i) determinations by the Abuse Claims Reviewer and/or any Distributions Abuse Claimants may receive from the Trust shall not constitute a determination of the Archdiocese's or any Participating Party's liability or damages for Class 6 Claims; and (ii) under no circumstances shall the Abuse Claims Reviewer's review of a Class 6 Claim affect, or be construed to affect, the rights of a Non-Settling Insurer. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 6 Claims. Any recoveries by the Trust or a Class 6 Claimant from Non-Settling Insurers shall become Trust Assets to be distributed pursuant to Section 4.9 of this Plan and the Allocation Protocol.

vi.      Nothing in this Plan affects, diminishes or impairs any Class 6 Claimant's rights against any Joint Tortfeasor, including with respect to that Joint Tortfeasor's comparative fault or independent and several liability for Abuse, if any. In any litigation against a Joint Tortfeasor, nothing in this Plan or the Plan Documents shall be deemed an adjudication of a Class 6 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor; *provided, however*, that the Channeling Injunction and Settling Insurer Injunction respectively bar any recovery of a Channeled Claim or Barred Claim from any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the property or assets of either (including the Purchased Property).

vii.      No Person, other than the Committee or, following the Effective Date, the Trustee, may: (i) object to any Abuse Claim; or (ii) challenge the merit, validity, or amount of any Abuse Claim, except that nothing in the Plan shall prevent the Archdiocese or any Participating Party, or with respect to any Abuse Claim implicating a Non-Settling Insurer Policy, a Non-Settling Insurer, from asserting any legal or factual defenses that the Archdiocese, Participating Party, and/or Non-Settling Insurer may have in response to any Litigation Claim or Non-Participating Abuse Claim. Any objection or challenge to an Abuse Claim pending in the Chapter 11 Case as of the Effective Date is deemed withdrawn and shall not be refiled. With the exception of the Trustee's objections or challenges to a Consenting Abuse Claim, or the adjudication or

56

settlement of a Litigation Claim, Consenting Abuse Claims shall be treated in accordance with the Allocation Protocol and shall not be subject to any other review or judicial consideration. For the avoidance of doubt, nothing in the Plan shall in any way restrict the Archdiocese, any Participating Party, or any other Person from objecting to or otherwise contesting any Non-Participating Abuse Claim on any basis in any proceeding or action outside of the Chapter 11 Case. Nothing in this Plan or the Plan Documents shall constitute an admission by any Protected Party as to the validity or amount of any Class 6 Claim, nor shall anything herein or therein (i) restrict the Archdiocese or the Participating Parties from satisfying any Post-Effective Date Preconditions to Coverage; or (ii) modify the terms of any Non-Settling Insurer Policy with respect to any failure of the Archdiocese or the Participating Parties to satisfy any Post-Effective Date Preconditions to Coverage.

**Voting:** Class 6 Claims are Impaired, and each holder of a Class 6 Claim is entitled to vote to accept or reject the Plan. Only for purposes of voting, each Class 6 Claim is deemed to be Allowed in the amount of $1.00. The foregoing general procedure with respect to Class 6 Claims is subject to the following exceptions:

a. Epiq shall date-stamp all Ballots when received, with any Ballots received on the Voting Deadline date and time-stamped;

b. any Ballot that is otherwise properly completed, executed, and timely returned but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, will not be counted;

c. if a Creditor casts more than one Ballot voting the same Claim before the Voting Deadline, the last dated, validly executed Ballot received before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede any prior Ballots;

d. Creditors must vote all of their Claims within a particular Class to either accept or reject the Plan, and may not split their votes within the Voting Class and thus a Ballot (or group of Ballots) within the Voting Class that partially accepts and partially rejects the Plan shall be deemed to have voted to accept the Plan;

e. notwithstanding anything contained herein to the contrary, the Committee, may waive any defects in a Ballot, or enter into a stipulation to settle or resolve any dispute in relation thereto, with a holder of a Claim that has completed a Ballot;

f. notwithstanding anything contained herein to the contrary, Epiq, with the Committee's consent, may contact entities entitled to vote to cure any defects in their Ballots; provided, however, that Epiq shall contact counsel of record to any such Class 6 Claimant represented by counsel; and

g. except as otherwise provided, for purposes of determining whether the numerosity and Claim amount requirements of sections 1126(c) and 1126(d) of the Bankruptcy Code have been satisfied, Epiq will tabulate only those Ballots received by the Voting Deadline.

CORE/3529758.0002/239580558.7

### vii.   Class 7 – Unknown Abuse Claims

**Classification:** Class 7 includes all Unknown Abuse Claims.

**Treatment:** This Plan creates a Trust to facilitate the Consolidated Catholic Entities' payment of Class 7 Claims and to pursue Insurance Claims and Extra-Contractual Claims relating to Unknown Abuse Claimants entitled to such payments under this Plan, the Trust Agreement, and Allocation Protocol. As of the Effective Date, the liability of Protected Parties and Settling Insurers for all Unknown Abuse Claims that are Channeled Claims shall be: (i) assumed fully by the Consolidated Catholic Entities, without further act, deed, or court order; and (ii) pursuant to the Discharge Injunction and Channeling Injunction, satisfied solely from the assets of the Archdiocese as set forth in this Plan and the Confirmation Order. No Unknown Abuse Claimant shall receive any payment from the Consolidated Catholic Entities unless and until such Unknown Abuse Claimant has executed a Consenting Abuse Claimant Release Agreement or Non-Participating Abuse Claim Release Agreement (as applicable) attached, respectively, as **Exhibits 6 & 7** to the Plan.

**Voting:** Unknown Abuse Claims are Impaired and, therefore, Unknown Claimant Representative is entitled to vote to accept or reject this Plan on Unknown Abuse Claimants' behalf. The foregoing general procedure with respect to Class 7 Claims is subject to the following exceptions:

h.   Epiq shall date-stamp all Ballots when received, with any Ballots received on the Voting Deadline date and time-stamped;

i.   any Ballot that is otherwise properly completed, executed, and timely returned but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, will not be counted;

j.   notwithstanding anything contained herein to the contrary, the Committee, may waive any defects in a Ballot, or enter into a stipulation to settle or resolve any dispute in relation thereto, with a holder of a Claim that has completed a Ballot;

k.   notwithstanding anything contained herein to the contrary, Epiq, with the Committee's consent, may contact the Unknown Claimant Representative to cure any defects in his or her Ballot.

### viii.   Class 8 – Non-Abuse Litigation Claims

**Classification:** Class 8 consists of Non-Abuse Litigation Claims. For the avoidance of doubt, any Claim that fits the definition of a Non-Abuse Litigation Claim shall only be classified as a Class 8 Claim and shall not receive treatment in any other Class.

**Treatment:** Except to the extent a holder of a Non-Abuse Litigation Claim agrees to less favorable treatment, in exchange for full and final satisfaction of Allowed Non-Abuse Litigation Claims, the holder of each Non-Abuse Litigation Claim shall seek to collect upon such Non-Abuse Litigation Claim solely from applicable insurance proceeds. No holder of a Non-Abuse

58

Litigation Claim shall: (i) seek to compel the Consolidated Catholic Entities to pay any deductible, retainage, or any other amount for or on account of any insurance carrier, provider, broker, or policy; or (ii) obtain any distribution from the Consolidated Catholic Entities or the Estate in or arising out of any Non-Abuse Litigation Claim.

**Voting:** Class 8 is Unimpaired, and each holder of a Non-Abuse Litigation Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Non-Abuse Litigation Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Non-Abuse Litigation Claim will not be solicited with respect to Non-Abuse Litigation Claim.

### ix.   *Class 9 – Inbound Contribution Claims.*

**Classification:** Class 9 Inbound Contribution Claims include any Claim asserted against the Consolidated Catholic Entities for indemnity, contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Abuse Claim.

**Treatment:** Class 9 Claims shall be Disallowed and extinguished, and there will be no Distributions to the holders of Class 9 Claims on account of such Class 9 Claims.

**Voting:** Class 9 Inbound Contribution Claimants will not receive or retain any property under the Plan and therefore are deemed to have rejected the Plan. Class 9 will not vote on the Plan.

### x.   *Class 10 – Non-Debtor Consolidated Entities Secured Claims*

**Classification:** Class 10 includes all Non-Debtor Consolidated Entities Secured Claims.

**Treatment:** Except to the extent a holder of an Non-Debtor Consolidated Entities Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction of such Allowed Other Secured Claim, each holder of an Non-Debtor Consolidated Entities Secured Claim will receive, at the sole option of the Archdiocese: (a) Cash in an amount equal to the Allowed amount of such Non-Debtor Consolidated Entities Secured Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date on which such Non-Debtor Consolidated Entities Secured Claim becomes an Allowed Non-Debtor Consolidated Entities Secured Claim, and (iii) the date on which the holder of such Non-Debtor Consolidated Entities Secured Claim and the Archdiocese shall otherwise agree in writing; (b) satisfaction of such Non-Debtor Consolidated Entities Secured Claim in any other manner that renders the Allowed Non-Debtor Consolidated Entities Secured Claim Unimpaired, including reinstatement; or (c) return of the applicable collateral on the Effective Date or as soon as reasonably practicable after the Effective Date.

**Voting:** Non-Debtor Consolidated Entities Secured Claims are Unimpaired. As a result, each holder of an Non-Debtor Consolidated Entities Secured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

CORE/3529758.0002/239580558.7

Therefore, holders of Non-Debtor Consolidated Entities Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Non-Debtor Consolidated Entities Secured Claims will not be solicited with respect to Non-Debtor Consolidated Entities Secured Claims.

### xi. Class 11 – Non-Debtor Consolidated Entities Unsecured Claims

**Classification:** Class 11 includes all Non-Debtor Consolidated Entities Unsecured Claims.

**Treatment:** Except to the extent a holder of a Non-Debtor Consolidated Entities Unsecured Claim agrees to less favorable treatment of their Non-Debtor Consolidated Entities Unsecured Claim, in exchange for full and final satisfaction of such Allowed Non-Debtor Consolidated Entities Unsecured Claim, each holder of a Non-Debtor Consolidated Entities Unsecured Claim shall receive payment in Cash in an amount equal to such Allowed Non-Debtor Consolidated Entities Unsecured Claim (excluding interest), which shall be payable on or as soon as reasonably practicable after the later to occur of: (i) the Effective Date; (ii) the date on which the applicable Non-Debtor Consolidated Entities Unsecured Claim becomes an Allowed Non-Debtor Consolidated Entities Unsecured Claim; and (iii) the date on which the holder of such Non-Debtor Consolidated Entities Unsecured Claim and the Archdiocese shall otherwise agree in writing. No Participating Party may be a Class 11 Claimant.

**Voting:** Non-Debtor Consolidated Entities Unsecured Claims are Unimpaired. As a result, each holder of a Non-Debtor Consolidated Entities Unsecured Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Non-Debtor Consolidated Entities Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of holders of Non-Debtor Consolidated Entities Unsecured Claims will not be solicited with respect to Non-Debtor Consolidated Entities Unsecured Claims.

### Class 12 – HUD Passthrough Claim

**Classification:** Class 12 includes the HUD Passthrough Claim.

**Treatment:** The HUD Passthrough Claim does not bear interest or require repayment so long as housing remains available to elderly and disabled residents in compliance with HUD guidelines. The Consolidated Catholic Entities will reaffirm their respective commitments to the HUD guidelines and, at the sole option of the Archdiocese the Class 12 Claimants will receive: (a) Cash in an amount equal to the Allowed amount of such HUD Passthrough Claims, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date on which such Non-Debtor Consolidated Entities Secured Claim becomes an Allowed Non-Debtor Consolidated Entities Secured Claim, and (iii) the date on which the holder of such Non-Debtor Consolidated Entities Secured Claim and the Archdiocese shall otherwise agree in writing; or (b) satisfaction of such HUD Passthrough Claims in any other manner that renders the Allowed HUD Passthrough Claim Unimpaired, including reinstatement.

60

CORE/3529758.0002/239580558.7

**Voting:** The HUD Passthrough Claim is Unimpaired. As a result, each holder of a HUD Passthrough Claim is conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of HUD Passthrough Claim(s) are not entitled to vote to accept or reject the Plan, and the votes of holders of HUD Passthrough Claim will not be solicited with respect to HUD Passthrough Claim.

### ARTICLE XI.    ACCEPTANCE OR REJECTION OF THE PLAN

a.  **Impaired Classes Vote.**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

b.  **Presumed Acceptance of the Plan.**

Class 1, Class 2, Class 3, Class 4, Class 5, Class 8, Class 10, Class 11, and Class 12 Claims are Unimpaired under the Plan, and the holders of such Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

c.  **Presumed Rejection of the Plan.**

Class 9 Claims will not receive or retain any property under this Plan. This is because all Class 9 Claims are contingent and unliquidated claims for contribution or indemnity and treated pursuant to 11 U.S.C. § 502(e)(1). The Court is required to disallow all such claims. Holders of Class 9 Claims are therefore deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. **NOTWITHSTANDING SUCH PRESUMED REJECTION, HOLDERS OF CLASS 9 CLAIMS WILL BE DEEMED TO CONSENT TO THE INJUNCTIONS AND RELEASES SET FORTH IN THE PLAN UNLESS THEY FILE A TIMELY OBJECTION TO CONFIRMATION OF THE PLAN IN ACCORDANCE WITH SECTION 12.2.2(b).**

d.  **Voting Classes.**

Class 6 and Class 7 Claims are Impaired, and the holders of Claims in those Classes are entitled to vote to accept or reject this Plan.

e.  **Modification of Treatment of Claims.**

The Archdiocese may modify the treatment of any Allowed Claim other than an Abuse Claim in any manner adverse only to the holder of such Claim at any time after the Effective Date upon the consent of the Committee and the holder of the Claim whose Allowed Claim is being adversely affected, or as Allowed by Bankruptcy Court order prior to the Effective Date.

CORE/3529758.0002/239580558.7

**f.    Elimination of Vacant Classes.**

Any Class of Claims that does not have, as of the Confirmation Date, at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code. Likewise, any Class of Claims where no Allowed Claimant returns a ballot indicating either acceptance or rejection of the Plan, shall be deemed deleted from the Plan for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE XII.    ABUSE CLAIMS

**a.    Trust Liability for Abuse Claims.**

On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims and Barred Claims; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Allocation Protocol and the Trust Agreement; and (ii) the right to pursue Insurance Claims against Non-Settling Insurers. Except as otherwise provided herein, the Trust shall only assume the liabilities of the Archdiocese and Participating Parties with respect to Class 6 Claims upon the occurrence of the applicable Abuse Claim Discharge Date.

**b.    Assessment of Abuse Claims.**

Abuse Claims will be assessed in accordance with the Allocation Protocol, which is designed to provide an expeditious, efficient, and inexpensive method for determining whether an Abuse Claimant is entitled to a Distribution from the Trust. The Archdiocese and the Participating Parties shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee in connection with any inquiries by either related to the administration of the Allocation Protocol, but shall not be required to act in any way that prevents the satisfaction of any Post-Effective Date Preconditions to Coverage under any Non-Settling Insurer Policy, if any (including, if applicable, any Post-Effective Date Precondition to Coverage concerning cooperation with a Non-Settling Insurer). Under no circumstance shall the Abuse Claims Reviewer's review of an Abuse Claim or a Distribution to an Abuse Claimant have any effect on the rights, defenses, or obligations of any Non-Settling Insurer.

**c.    Treatment of Consenting Abuse Claims.**

i.    Each holder of a Consenting Abuse Claim shall be a Litigation Claimant and will receive, in full and final satisfaction and discharge of their Abuse Claim: (i) rights, to the extent set forth in the Plan and Allocation Protocol, to Distributions from the Trust; and (ii) the right, prior to the occurrence of the applicable Abuse Claim Discharge Date, and subject to the Trustee authorizing them to pursue a Litigation Claim in accordance with the provisions of this Plan, to liquidate their Consenting Abuse Claim for its full amount according to proof

CORE/3529758.0002/239580558.7

in order to determine the liability of the Archdiocese or any Participating Party (as applicable) for purposes of the Trust obtaining or seeking recovery from any Non-Settling Insurer that is or may be liable on the Consenting Abuse Claim or any Insurance Claim arising therefrom, pursuant to Section 8.8 of this Plan. For the avoidance of doubt, the Settling Insurers shall not have any duties or obligations to any Person in connection with a Litigation Claim (including without limitation, any duty to defend or indemnify any Person). Further, under no circumstances will a Litigation Claimant or any other Person be able to obtain any recovery whatsoever against (i) any Settling Insurer Releasee, any Settling Insurer's Related Persons, or the property or assets of either (including Purchased Property), or (ii) any asset of the Archdiocese or the Participating Parties (except for collecting proceeds from any Non-Settling Insurer Policy or other amounts for which a Non-Settling Insurer is deemed to be liable), in connection with a Litigation Claim.

ii. Prior to authorizing a Consenting Abuse Claimant that elects to be treated as a Litigation Claimant to proceed with their Litigation Claim, the Trustee shall (a) consult with counsel for the Litigation Claimant, and the Archdiocese and/or any Participating Party against whom such Abuse Claimant's Claim is asserted, to establish, among other things, a mutually acceptable litigation schedule; and (b) require the Litigation Claimant to execute and deliver a Consenting Abuse Claim Release Agreement and a Litigation Claimant Agreement. For the avoidance of doubt, the foregoing sentence does not limit any right a Non-Settling Insurer may have to participate in the formation of a litigation schedule as may be required under applicable law or by the court overseeing adjudication of the Litigation Claims.

iii. The Trustee shall provide a copy of each Consenting Abuse Claim Release Agreement and Litigation Claimant Agreement to the Archdiocese upon execution thereof and to any other Protected Parties upon the reasonable request of such party. For the avoidance of doubt, the Trustee shall have the sole discretion to (a) authorize a Litigation Claimant to pursue their Litigation Claim; (b) make a final decision as to whether a Litigation Claim is pursued; and (c) make final decisions relating to the management and timing of litigation relating to Litigation Claims. For the further avoidance of doubt, nothing set forth in Section 4.3 regarding the Trustee's discretion to make final decisions relating to the management and timing of litigation relating to Litigation Claims shall have any impact on the authority of any court overseeing the litigation of a Litigation Claim or limit any right a Non-Settling Insurer may have under applicable law.

iv. To the extent the Trustee authorized a Litigation Claimant to pursue a Litigation Claim with respect to any Non-Settling Insurer, such Litigation Claimant shall be entitled to an enhanced Distribution (the "Claim Enhancement"), as set forth below, to his or her allocation pursuant to the Allocation Protocol, which enhanced amount shall be payable from the net proceeds of the amount collected (a "Trust Insurance Settlement") from any Non-Settling Insurer on

63

account of his or her Litigation Claim. The Claim Enhancements are independent of one another and are not intended to be cumulative. The Trustee shall reserve sufficient amounts to fund such enhanced payments prior to making any Distribution of Trust Insurance Settlement proceeds to Abuse Claimants who are not Litigation Claimants. The Claim Enhancement shall be applied as follows:

A. A Litigation Claimant shall be entitled to an enhancement of ten percent (10%) if the Trust negotiates a Trust Insurance Settlement of such Litigation Claimant if the Trust Insurance Settlement is entered into prior to commencing litigation in such Litigation Claimant's case.

B. A Litigation Claimant shall be entitled to an enhancement of twenty-five percent (25%) if the Trust negotiates a Trust Insurance Settlement if the Trust Insurance Settlement is entered into after litigation commences but prior to a deposition or interview of the Litigation Claimant by opposing counsel in such Litigation Claimant's case.

C. A Litigation Claimant shall be entitled to an enhancement of forty percent (40%) if the Trust negotiates a Trust Insurance Settlement if the Trust Insurance Settlement is entered into after a deposition or interview of the Litigation Claimant by opposing counsel but before commencement of a trial in such Litigation Claimant's case.

D. A Litigation Claimant shall be entitled to an enhancement of fifty (50%) if the Trust negotiates a Trust Insurance Settlement if the Trust Insurance Settlement is entered into on or after the first day of a trial in such Litigation Claimant's case.

E. A Litigation Claimant shall be entitled to an enhancement of one hundred percent (100%) if the Trust negotiates a Trust Insurance Settlement or otherwise collects from the Non-Settling Insurer, if the Trust Insurance Settlement is entered into after a Litigation Award entered in favor of the Litigation Claimant in such litigation becomes final and non-appealable.

F. The amount of any Claim Enhancement shall not exceed the amount of the Trust Insurance Settlement.

d. **Treatment of Non-Participating Abuse Claims.**

i. **Default Distribution**. Each Non-Participating Abuse Claimant shall receive, in full and final satisfaction of their Non-Participating AOB Abuse Claim: (i) a Distribution from the Consolidated Entities Abuse Claims Settlement Sub-Fund in the amount of $5,000.00; and (ii) the opportunity to establish an entitlement to further Distributions from the Consolidated Entities Abuse Claims Settlement Sub-Fund solely as provided for in this Section 4.4 of the Plan and the Allocation Protocol.

64

ii.     **Establishing Liability.**

1. If a Non-Participating Abuse Claimant wishes to obtain a Distribution in excess of the default Distribution set forth in Section 4.4.1 above, he or she must first execute and deliver to the Archdiocese and Trustee a Non-Participating Litigation Claimant Agreement.

2. Non-Participating Abuse Claimants who deliver to the Archdiocese and Trustee an executed Non-Participating Litigation Claimant Agreement may, subject to the terms of this Plan and the other Plan Documents, litigate their Non-Participating AOB Abuse Claim in any court of competent jurisdiction.

3. Notwithstanding any judgment or settlement obtained by a Non-Participating Abuse Claimant with respect to their Non-Participating AOB Abuse Claim, any recovery against the Consolidated Catholic Entities by such Non-Participating Abuse Claimant shall be limited to the Distributions provided for in this Plan and the Allocation Protocol.

e.  Additional Distribution Upon Successful Litigation.

i.     Once a Non-Participating Abuse Claimant's Non-Participating AOB Abuse Claim is fully adjudicated or settled on a final and non-appealable basis, and if (i) as a result of such adjudication or settlement the any of the Consolidated Catholic Entities are determined to be liable to such Non-Participating Abuse Claimant on their Non-Participating AOB Abuse Claim in an amount greater than the default Distribution provided in Section 4.4.1 above, and (ii) the Trust has not been terminated in accordance with the terms of the Trust agreement on or before the date on which the Non-Participating Abuse Claimant first presents their final and non-appealable judgment or settlement to the Trustee, such Non-Participating Abuse Claimant shall be entitled to a further Distribution from the Trust.

ii.     Such further Distribution shall be made on or before the date that is 120 days after the date on which the Non-Participating Abuse Claimant presents their final and non-appealable judgment or settlement to the Trustee and shall be in an amount equal to the lesser of (i) the amount of the Consolidated Catholic Entities' liability for the applicable Non-Participating AOB Abuse Claim as set forth in such judgment or settlement and (ii) the amount determined as a result of the Abuse Claim Reviewer's assessment of the Non-Participating Claimant's Non-Participating AOB Abuse Claim pursuant to the Allocation Protocol, in each case less the default Distribution previously paid pursuant to Section 4.4.1.

1. To provide for the event that the Trust may be required to make a further Distribution to a Non-Participating Abuse Claimant under Section 4.4.3(b) to the extent such Non-Participating Abuse Claimant

65

establishes liability against any of the Consolidated Catholic Entities pursuant to Section 4.4.2, the Trust shall add the *pro-rata* portion of the Participating Parties' Cash Contribution that the Non-Participating Abuse Claimant would have received had they been a Consenting Abuse Claimant to the Consolidated Entities Abuse Claims Settlement Sub-Fund.

2. For the avoidance of doubt, Distributions to Non-Participating Abuse Claimants pursuant to clause (ii) of Section 4.4.3(b) above shall be limited to the *pro-rata* portion of the Consolidated Entities Abuse Claims Settlement Sub-Fund allocable to such Non-Participating Abuse Claimant's Non-Participating AOB Abuse Claim, and holders of Non-Participating Abuse Claims shall not be entitled to receive any Distribution of any other Trust Assets, including, without limitation, any Trust Assets consisting of (a) the Participating Parties' Cash Contribution, (b) the Settling Insurers' Cash Contribution, (c) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement, (d) any Insurance Claim Proceeds, (e) proceeds of Litigation Awards, (f) proceeds of Outbound Contribution Claims, or (g) any other proceeds which the Trust may obtain pursuant to the terms of the Plan.

3. Any funds held in the Consolidated Entities Abuse Claims Settlement Sub-Fund that are not distributable to Non-Participating Abuse Claimants pursuant to the Plan and the Allocation Protocol shall revert to the Abuse Claims Settlement Fund and be distributed to Consenting Abuse Claimants in accordance with Section 4.9.2(a) of the Plan.

iii. **Retention of Non-Participating PP Abuse Claims and Non-Participating Insurance Claim.** Each Non-Participating Abuse Claimant shall retain the right to assert any Non-Participating PP Abuse Claim they may have against any Participating Party (other than against a Non-Debtor Consolidated Entity) and any Non-Participating Insurance Claim they may have against any Non-Settling Insurer, but only after the Non-Participating Abuse Claimant executes and delivers to the Archdiocese and Trustee a Non-Participating Litigation Claimant Agreement, and in all respects, in accordance with, and subject to, the terms and provisions of the Plan.

f. No Recourse Against Settling Insurers. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Settling Insurer Injunction bars all Non-Participating Abuse Claimants from asserting, enforcing, or seeking to assert or enforce any Barred Claim (including, for the avoidance of doubt, any Non-Participating Abuse Claim, Non-Participating Insurance Claim, or judgment or settlement in respect thereof) against any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the property or assets of either of the foregoing (including Purchased Property).

CORE/3529758.0002/239580558.7

## ARTICLE XIII.  UNKNOWN CLAIMANT TREATMENT.

b.       The Unknown Claimant Representative shall, by written notice Filed on the docket of the Chapter 11 Case on or before the Voting Deadline, elect on behalf of all, but not less than all, Unknown Abuse Claimants, to treat their respective Unknown Abuse Claims as either Consenting Abuse Claims or Non-Participating Abuse Claims.  If the Unknown Claimant Representative fails to File such notice on or before the Voting Deadline, the Unknown Claimant Representative shall be deemed to elect to treat Unknown Abuse Claims as Consenting Abuse Claims. If the Unknown Claimant Representative elects to treat Unknown Abuse Claims as Consenting Abuse Claims, except to the extent that a Unknown Abuse Claimant agrees to less favorable treatment of such Claim, each Unknown Abuse Claimant shall, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, their respective Unknown Abuse Claim, each holder of a Unknown Abuse Claim receive Distributions as provided in Section 4.9.2.d of the Plan and in the Trust Documents.

c.       If the Unknown Claimant Representative elects to treat Unknown Abuse Claims as Non-Participating Abuse Claims, except to the extent that a Unknown Abuse Claimant agrees to less favorable treatment of such Claim or elects to become a Consenting Abuse Claimant as set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, their respective Non-Participating AOB Abuse Claim, each holder of a Unknown Abuse Claim shall receive $5,000 from the Consolidated Catholic Entities, and shall retain the right to assert any Non-Participating PP Claim they may have against any Participating Party (other than against a Non-Debtor Consolidated Entity) and any Non-Participating Insurance Claim they may have against any Insurer, in all respects in accordance with, and subject to, the terms and provisions of the Plan.

d.       If the Unknown Claimant Representative elects to treat Unknown Abuse Claims as Non-Participating Abuse Claims, the holder of an Unknown Abuse Claim may nonetheless elect to become a Consenting Abuse Claimant by delivering to the Trustee a Consenting Abuse Claim Release Agreement (i) at any time prior to executing a Non-Participating Litigation Claimant Agreement, or (ii) with the consent of the Archdiocese and the Trustee. Any Unknown Abuse Claimant that elects to be a Consenting Abuse Claimant shall be entitled to distributions as set forth in Section 4.9.2.d of the Plan.

## ARTICLE XIV.  TRUST'S RIGHTS AGAINST NON-SETTLING INSURERS WITH RESPECT TO ABUSE CLAIMS.

a.       ***Trust's Rights with Respect to Litigation Claims.*** The Trust retains the right to pursue Non-Settling Insurers for the Archdiocese's and any other Protected Party's liability to Litigation Claimants. To the extent that either a settlement is achieved with a Non-Settling Insurer as to any Target Policy or a Litigation Claimant obtains a judgment against the Archdiocese or any Participating Party and the Trust obtains a recovery from a Non-Settling Insurer as to such judgment, such recovery shall be added to the Abuse Claims Settlement Fund; provided, however, such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees) incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable

67

and were agreed to in advance by the Trust. Any amount remaining shall be distributed in a manner consistent with Section 4.9.2 of the Plan and the Allocation Protocol.

b.    ***No Rights with Respect to Settled and Released Claims against Settling Insurers.*** Once a Settling Insurer pays to the Trust the Insurance Settlement Amount due from such Settling Insurer, the Trust shall neither have nor retain any right to take any action against, or pursue any recovery from, such Settling Insurer for any Claim settled, released, and/or sold pursuant to the Settling Insurer's Insurance Settlement Agreement (including without limitation, Released Insurance Claims and Related Insurance Claims). For the avoidance of doubt, the Trust may enforce its rights (if any) and/or each Settling Insurer's obligations under the applicable Insurance Settlement Agreement(s).

c.    ***Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol.***

The Abuse Claims Reviewer's determinations are for estimation and Distribution purposes only and shall not constitute findings as to, or the fixing of, facts or liability concerning the Abuse Claims with any binding legal effect. The determination of the Abuse Claimants' qualifications, the estimation of Abuse Claims, and Trust Distributions to Abuse Claimants shall not be construed as an admission of liability by the Archdiocese, any Participating Party, or the Trust with respect to any Abuse Claim and shall have no *res judicata* or collateral estoppel effect on the Archdiocese, any Participating Party, the Trust, or any Non-Settling Insurer.

The Trust's act of making a Distribution to an Abuse Claimant is immaterial to, and shall not be construed as, a determination or admission of the Archdiocese's, any Participating Party's, or any Non-Settling Insurers' liability for, or damages with respect to, any Abuse Claim, nor shall the Trust present any Non-Settling Insurer with a demand for payment of said Distribution. The determination of qualification, estimation of Abuse Claims, and the payment of Distributions is not a settlement, release, accord, or novation of any Abuse Claim and cannot be used by any Joint Tortfeasor as a defense to any alleged joint liability; *provided, however*, that the Channeling Injunction and Settling Insurer Injunction respectively prohibit any Person (including all Abuse Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the assets or property of either of the foregoing (including Purchased Property). The determination of qualification, estimation of Claims, and payment of partial Distributions does not impair a Litigation Claimant's right to obtain a judgment, including a judgment based on joint and several liability, against the Archdiocese and/or a Participating Party or any Non-Settling Insurer, for purposes of establishing the Archdiocese's and/or a Participating Party's liability with respect to their Litigation Claim; *provided, however*, that (a) recourse on such judgment shall be limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim or any Insurance Claim arising therefrom, and any proceeds from such judgments or awards will be Distributed in accordance with Section 4.9 of the Plan; and (b) the Channeling Injunction and Settling Insurer Injunction respectively shall prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or

68

Barred Claim against any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the assets or property of either of the foregoing (including Purchased Property). Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of qualification, nor the Trust's estimation of an Abuse Claim or the payment of Distributions shall: (i) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Archdiocese or the Participating Parties, Non-Settling Insurers, or any other Person, or (ii) constitute, or be deemed, a determination of the reasonableness of the amount of any Litigation Claim, either individually or in the aggregate with other Litigation Claims, in any coverage litigation with any Non-Settling Insurers. The payment of Trust Distributions does not create an admission of the fact of liability, or the extent of damages, on behalf of the Archdiocese and/or any Participating Parties.

d.      *Release and Discharge of Abuse Claims.*

Notwithstanding anything to the contrary herein, each Abuse Claimant must, prior to receiving a Distribution from the Trust, execute and deliver to the Trustee (i) a Consenting Abuse Claim Release Agreement in the form attached as **Exhibit 6** if such Abuse Claimant is a Consenting Abuse Claimant or (ii) a Non-Participating Abuse Claim Release Agreement in the form attached as **Exhibit 7** if such Abuse Claimant is a Non-Participating Abuse Claimant; *provided, however,* to preserve coverage under Non-Settling Insurer Policies, Consenting Abuse Claimants specifically reserve, and do not release, subject to the occurrence of the applicable Abuse Claim Discharge Date, any and all Abuse Claims that they may have against the Archdiocese and/or any Participating Party that implicate coverage under Non-Settling Insurer Policies, but recourse on such Abuse Claims prior to their release is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable by the Trust from any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled in accordance with the Plan.

Consenting Abuse Claims will be released or enjoined as against the Archdiocese and Participating Parties for any Abuse that may be covered under Non-Settling Insurer Policies only upon the occurrence of the applicable Abuse Claim Discharge Date, as set forth in Section 12.2.3 and 12.7. Consenting Abuse Claimants will expressly reserve their rights against other Persons (other than Protected Parties, Settling Insurer Releasees, or Settling Insurer Related Persons), including Joint Tortfeasors, who will remain severally liable with respect to any Consenting Abuse Claims. For the avoidance of doubt, neither the Channeling Injunction nor the Settling Insurer Injunction, nor any release of a Consenting Abuse Claim, shall be subject to any delayed effectiveness with respect to the Settling Insurers; each shall be immediately effective as to a Settling Insurer upon receipt by the Trust of that Settling Insurer's Insurance Settlement Amount.

Non-Participating AOB Abuse Claims will be released or enjoined as against the Consolidated Catholic Entities upon the occurrence of the applicable Abuse Claim Discharge Date, as set forth in Section 12.2.3 and 12.7. All Barred Claims (including Non-Participating Abuse Claims) against the Settling Insurer Releasees, any Settling Insurer's Related Persons, or the

CORE/3529758.0002/239580558.7

property or assets of either (including Purchased Property) are subject to the Settling Insurer Injunction.

Any Person that is, or was alleged to be, a Joint Tortfeasor with the Archdiocese or any of the Participating Parties in connection with any Abuse Claim, or the Abuse or alleged Abuse that forms the basis of any Abuse Claim, shall not be liable for any share of causal liability or fault attributable to the Archdiocese or any Participating Party, and neither the Archdiocese nor any Participating Party shall be liable for the share of causal liability or fault attributable to any Joint Tortfeasor or other Person.

For the avoidance of doubt, with respect to all Non-Abuse Claims, except as otherwise provided in the Plan, the Consolidated Catholic Entities' liability on account of such Claims shall be discharged pursuant to the provisions of section 1141(d) of the Bankruptcy Code.

### ARTICLE XV.  Distributions to Abuse Claimants.

*a.* **Distributions Generally.**

    i.    ***Tax Considerations.*** Any Distribution to an Abuse Claimant constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

    ii.    ***Distribution Limitations.*** Abuse Claimants' recoveries under the Plan shall be limited to their Trust Distributions, if any, as set forth in this Section 4.9, the Allocation Protocol, and the Trust Documents. Abuse Claimants shall not be entitled to collect personally, or otherwise, any additional amounts whatsoever from the Archdiocese, any Participating Party, or their respective assets, for any Abuse Claims that are Channeled Claims, even if they are denied a Trust Distribution. Abuse Claimants shall not be entitled to collect any portion of a Channeled Claim or Barred Claim (including, for the avoidance of doubt, an Abuse Claim) from any Settling Insurer Releasee, any Settling Insurer's Related Persons, or the property or assets of either (including Purchased Property) under any circumstance.

    iii.    ***No Impact on Non-Settling Insurers***. Nothing in this Plan shall affect in any way the Non-Settling Insurers' rights to argue that any Abuse Claim (whether or not allowed by the Abuse Claims Reviewer for purposes of Distribution) is legally inviable, including by way of illustration and not limitation, the fact that (i) Abuse Claimants may receive Trust Distributions that are determined on the basis of when their Claim was Filed in relation to the Bar Date; and (ii) holders of Disallowed Abuse Claims may be entitled to distribution pursuant to the Allocation Protocol.

For the avoidance of doubt, Trust Distributions made to Litigation Claimants shall have no impact on Litigation Claimants' rights to obtain a judgment, including a

70

judgment based on joint and several liability, against the Archdiocese, any Participating Party, or any Non-Settling Insurer, but recourse is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages, and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim or any Insurance Claim arising therefrom, and any proceeds from such judgments or awards will be Distributed in accordance with Section 4.9 of the Plan.

Neither the Trust's Distributions to Abuse Claimants, nor the Abuse Claims Reviewer's review of Abuse Claims, shall: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages, either individually or in the aggregate, in any litigation whatsoever, or (2) constitute, or be deemed, a determination of the reasonableness or unreasonableness of the amount of any Abuse Claim or any Insurance Claim, either individually or in the aggregate with other Abuse Claims, in any coverage litigation with any Non-Settling Insurers.

Any Trust Distribution to a Litigation Claimant that has obtained a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds in respect of such Litigation Claimant's Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any Insurance Claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

b. **Distributions to Abuse Claimants.** An Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a Distribution pursuant to the Allocation Protocol will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in this Section 4.9.2. Such Distributions may commence only after the entry of an order confirming the Plan is entered.

   i.   *Distributions to Consenting Abuse Claimants*. Distributions to Consenting Abuse Claimants who, on or prior to the Effective Date, Filed an Abuse Claim, shall be made by the Trustee, in his or her discretion, upon determining the allocable portion of the Abuse Claims Settlement Fund available for Distribution to such Consenting Abuse Claimants in accordance with the Abuse Claims Reviewer's evaluation pursuant to the Allocation Protocol.

   ii.  *Distributions to Non-Participating Abuse Claimants.* Distributions to Non-Participating Abuse Claimants who, on or prior to the Effective Date, Filed an Abuse Claim, shall be made by the Trustee, in his or her discretion, upon determining the allocable portion of the Consolidated Entities Abuse Claims Settlement Sub-Fund available for Distribution to such Non-Participating Abuse Claimants in accordance with Section

71

4.4 of the Plan and the Abuse Claims Reviewer's evaluation pursuant to the Allocation Protocol.

iii. ***Distributions to Unknown Abuse Claimants that are Consenting Abuse Claimants.*** Distributions to Unknown Abuse Claimants that are Consenting Abuse Claimants shall be paid by the Consolidated Catholic Entities as follows:

iv. ***Scoring Unknown Abuse Claims and Initial Distributions***. Upon the assertion of an Abuse Claim by an Abuse Claimant that is a Consenting Abuse Claimant after the Effective Date, the Abuse Claims Reviewer shall determine whether the Claim qualifies as an Unknown Abuse Claim pursuant to the Plan. Provided that such determination is made, the Abuse Claims Reviewer shall evaluate and assign a score to such Unknown Abuse Claim pursuant to the Allocation Protocol and notify the Trustee of the same. The Trustee then, but only after the Unknown Abuse Claimant executes and delivers a Consenting Abuse Claim Release Agreement to the Trustee, shall deliver the Claim to the Archdiocese, who shall immediately make an initial Distribution to the Unknown Abuse Claimant in the amount of $10,000.

v. ***Final Distributions to Unknown Abuse Claims***. Upon termination of the Trust, the Trustee shall, after accounting for any Distributions made to Unknown Abuse Claimants under Section 4.9.2(d), calculate and deliver to the Archdiocese the payment amount for a final, *pro-rata* Distribution to Unknown Abuse Claimants that are Consenting Abuse Claimants based on the score each Unknown Abuse Claimant's Unknown Abuse Claim was assigned by the Abuse Claims Reviewer pursuant to the Allocation Protocol and in an amount equal to the amount the Unknown Abuse Claimant would have received had the Claimant received a Distribution from the Trust as a Consenting Class 6 Claimant.

vi. ***Distributions to Unknown Abuse Claimants that are Non-Participating Abuse Claimants.*** Unknown Abuse Claimants that are Non-Participating Abuse Claims **shall receive, in full and final satisfaction of their Non-Participating AOB Abuse Claims,** Distributions in accordance with the provisions of Section 4.4 of the Plan, except that (i) all such Distributions, including an initial payment in the amount of $10,000.00 shall be funded solely **by the Consolidated Catholic Entities** and (ii) any additional Distributions payable to Unknown Abuse Claimants who successfully litigate their Claim in accordance with Section 4.4.3 of the Plan shall be paid by the **Consolidated Catholic Entities** in an amount equal to the amount the Unknown Abuse Claimant would have received had the Claimant received a Distribution from the Trust as a Non-Participating Class 6 Claimant.

72

vii. ***Obligations of the Archdiocese.*** *On the Effective Date*, the Consolidated Catholic Entities shall be obligated under this Section 4.9.2 for payment of Unknown Abuse Claims notwithstanding anything in the Plan, including any injunction, release, discharge, or otherwise.

c. Archdiocese Dismissal of Pending Litigation.

Upon the occurrence of the applicable Abuse Claim Discharge Date, as defined in Section 12.2.3, the subject Abuse Claim asserted in any lawsuit against any Protected Party pending in state or federal court shall be dismissed, with prejudice, and without fees and costs being recoverable against any Protected Party, except that nothing in the Plan shall require Non-Participating Abuse Claimants to dismiss their Non-Participating PP Abuse Claims against Participating Parties that are not Non-Debtor Consolidated Entities.

d. **Claim Withdrawal.**

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trustee. If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be bound by the Archdiocese Discharge and all injunctive provisions of the Plan, including the Channeling Injunction to the same extent that such provisions applied to such Abuse Claimant's Abuse Claim prior to its withdrawal.

e. **Medicare Procedures.**

With respect to all Abuse Claims, other than Unknown Abuse Claims, the Trust shall maintain sufficient funds to perform the following duties:

i. With respect to all Abuse Claims, other than Unknown Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims.

ii. The Trust shall (i) withhold funds sufficient to assure that all obligations owing or potentially owing for Medicare Claims are paid to CMS; and (ii) provide for the payment and/or resolution of any obligations owing or asserted under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Claimant's Channeled Claim.

iii. The Trust shall confirm whether the holder of any Abuse Claims that occurred after December 5, 1980, is enrolled in Medicare Parts A and B (fee-for-service), Part C (Medicare Advantage), or Medicare Part D (drug coverage). This includes implementing an appropriate process to gather the necessary information for querying CMS on such determination, including, the Claimant's first and last name, date of birth, gender, address, and social security number or health insurance claim number.

iv. Upon request, the Trust shall provide to a Settling Insurer or the Archdiocese information sufficient to perform their own queries to CMS, to the extent they wish to do so, including a report setting forth

73

(I) each Abuse Claimant whom the Trustee has determined to be a Medicare Beneficiary; and (II) the amount of (a) all Conditional Payments to each such Medicare Beneficiary, and (b) the reserve maintained by the Trust for each Medicare Claim based upon such Conditional Payments.

Nothing in the Plan shall imply, or constitute an admission, that the Protected Parties are "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

## ARTICLE XVI.  SETTLING INSURERS

### a.  <u>Insurance Settlement Agreements.</u>

Each Insurance Settlement Agreement shall be effective and binding upon all Persons who have notice and any such Person's successors and assigns, upon entry of an Insurance Settlement Approval Order that is a Final Order with respect to such Insurance Settlement Agreement and satisfaction of all of such Insurance Settlement Agreement's conditions precedent. Payments by the applicable Settling Insurer to the Trust, as applicable, and the releases by the Debtor and other Protected Parties of the applicable Settling Insurer shall occur and become effective according to the terms of each Insurance Settlement Agreement and Insurance Settlement Approval Order. Each Insurance Settlement Agreement and Insurance Settlement Approval Order shall survive the confirmation, effectiveness, and consummation of this Plan. The rights of the parties under any Insurance Settlement Agreement and Insurance Settlement Approval Order shall be determined exclusively under the applicable Insurance Settlement Agreement, Insurance Settlement Approval Order, this Plan, and the Confirmation Order.

### b.  <u>Sale Free and Clear of Interests of Settling Insurer Policies.</u>

Each Settling Insurer Policy shall be sold to the applicable Settling Insurer, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all Liens, Claims, and Interests of all Persons, to the extent provided in each applicable Insurance Settlement Agreement.

### c.  <u>Resolution of Claims Involving Settling Insurers.</u>

The Confirmation Order shall provide that the Archdiocese or the Trust, as the case may be, shall dismiss with prejudice any Claims against each Settling Insurer related to Abuse Claims, and each Settling Insurer shall dismiss with prejudice any Claims against the Archdiocese (or, if applicable, the Trust) related to Abuse Claims, in accordance with the term(s) and timeline(s) set forth in such Settling Insurer's Insurance Settlement Agreement. Each side will bear its own fees and costs.

The Confirmation Order shall provide that upon payment of a Settling Insurer's Insurance Settlement Amount, all: (a) releases set forth in the applicable Settling Insurer's Insurance Settlement Agreement shall be in full force and effect; and (b) all injunctive relief set forth in the

74

applicable Insurance Settlement Approval Order shall become effective as set forth in such Insurance Settlement Agreement, Insurance Settlement Approval Order, and the Plan.

### d. The Settling Insurer's Payments.

Each Settling Insurer shall pay to the Trust, as applicable, such Settling Insurer's Insurance Settlement Amount on the terms set forth in the applicable Insurance Settlement Agreement, to the extent applicable, but in no event shall such payments be later than 60 days after the Effective Date.

### f. Further Assurances; Non-Material Modifications.

From and after the Effective Date, the Archdiocese, other Protected Parties, and each Settling Insurer shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlement Agreements without further order of the Bankruptcy Court. The Archdiocese, other Protected Parties, and each Settling Insurer may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of any Insurance Settlement Agreement, subject to (a) the terms and conditions of the applicable Insurance Settlement Agreement and (b) the consent of the Trustee, which consent shall not be unreasonably withheld.

### g. Waiver/Consent.

In consideration of the releases, Channeling Injunction, and other covenants set forth in this Plan, subject to the occurrence of the Effective Date and satisfaction of the conditions precedent in the applicable Insurance Settlement Agreement, each of the Protected Parties: (a) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have now or in the future against the other Protected Parties and any Settling Insurers with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to Channeled Claims covered or alleged to be covered under any Settling Insurer Policy; (b) consents to the sale of the Debtor's and Co-Insured Parties' Claims, if any, related to the Settling Insurer Policies in accordance with each Insurance Settlement Agreement; (c) consents to the contribution of the proceeds of the sale of any Settling Insurer Policies to the Trust, as applicable, pursuant to and in accordance with this Plan, each Insurance Settlement Agreement. For the avoidance of doubt, nothing in this Section 5.6 shall be construed to bar or otherwise prohibit: (x) a Claim based upon Abuse against a Person who is not a Protected Party; or (y) a Claim by such Person for insurance coverage under an Insurance Policy that is not a Settling Insurer Policy.

### h. Rights Under Insurance Settlement Agreements.

All rights under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement, this Plan, and the Confirmation Order.

CORE/3529758.0002/239580558.7

### i. **Timing.**

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to an Insurance Settlement Agreement, this Plan, the Confirmation Code, and the Bankruptcy Code shall become effective pursuant to and in accordance with the applicable Insurance Settlement Agreement.

### j. **Becoming a Settling Insurer.**

Prior to the Effective Date, a Person may become a Settling Insurer if it (a) is an Insurer, (i) who, if listed on Exhibit 10, agrees to pay the respective settlement amounts set forth on Exhibit 10, or (ii) who, if not listed on Exhibit 10, reaches agreement with the Archdiocese and the Committee on its respective settlement amount; and (b) obtains approval from the Archdiocese, the Committee, and the Bankruptcy Court on the form of a written settlement agreement. The Archdiocese's consent, or the consent of any of the Consolidated Catholic Entities, to any such form of a written settlement agreement shall not be unreasonably withheld.

## ARTICLE XVII. MATTERS RELATING TO NON-SETTLING INSURERS

### a. **Preservation of Rights and Obligations.**

If an Abuse Claim is liquidated through the Allocation Protocol or in any state or federal court as may be permitted by the Plan, the Allocation Protocol, or the Trust Agreement, then the Protected Parties, the Trust, and each Non-Settling Insurer shall retain the right to assert any and all rights and defenses of the Protected Parties with respect to such Abuse Claim and, except as set forth in this Section, all coverage defenses. The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by the Archdiocese Discharge.

The rights and obligations (if any) of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred. Each Non-Settling Insurer shall be entitled to all rights and defenses as are provided under the terms of its Non-Settling Insurer Policies as if the determination by the Abuse Claims Reviewer had never occurred.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

CORE/3529758.0002/239580558.7

**b.  Estimations/Assessments of Abuse Claims Are Not Binding.**

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points pursuant to the Allocation Protocol, and payment of Trust Distributions:

i.  shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any *res judicata* or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; (iv) be used by any third-party as a defense to any alleged joint lability; or (v) otherwise prejudice any rights of the Trust, the Archdiocese, the Participating Parties, the Settling Insurers, the Non-Settling Insurers, or Consenting Abuse Claimants in any other contexts or forums;

ii.  shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and Consenting Abuse Claimants in any other contexts and forums; and

iii.  shall not be deemed to be a determination of liability of the Archdiocese or any Participating Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

**c.  Post-Effective Date Preconditions to Coverage.**

If the Trust believes the Archdiocese or a Participating Party has failed to satisfy any Post-Effective Date Preconditions to Coverage, the Trust shall give the Archdiocese or the Participating Party (as applicable) written notice identifying with specificity the Post-Effective Date Preconditions to Coverage at issue and the action the Trust believes must be taken in order to satisfy the same. Subject to further order of the Court, the Archdiocese or other Protected Party, as applicable, shall have not less than sixty (60) days from such notice to: (a) take the actions requested by the applicable Trust; or (b) seek a determination from the Bankruptcy Court as to whether the requested action is required to satisfy any Post-Effective Date Insurance Obligations; *provided, however*, such determination shall not be binding upon any Non-Settling Insurer. With the exception of willful misconduct by the Archdiocese or other Protected Party, the Trust's sole remedy for any failure to satisfy any Post-Effective Date Insurance Obligations shall be specific performance as ordered by the Bankruptcy Court.

Nothing in this Plan shall impair, and each Non-Settling Insurer expressly retains, all contractual defenses to coverage, if any, available under any Non-Settling Insurer Policy arising from or relating to any actual or alleged failure by the Archdiocese or other Protected Party to satisfy their respective Post-Effective Date Insurance Obligations, if any.

**d.  Trust Powers With Respect to Abuse Claims and Non-Settling Insurers.**

Solely as set forth in this Plan, the Allocation Protocol, or the Trust Agreement, the Trust may enter into a settlement of any Insurance Claim or any Abuse Claim, provided that nothing in this Section preempts or prevents a Non-Settling Insurer from raising any defense to such settlement or claim for coverage. For the avoidance of doubt, the Trustee may use the Trust Assets to prosecute any Insurance Claim. If the Trust successfully resolves an Insurance Claim or otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-

CORE/3529758.0002/239580558.7

Settling Insurer, such proceeds shall become Trust Assets available for Distribution pursuant to the Allocation Protocol.

### ARTICLE XVIII.    MEANS FOR IMPLEMENTATION OF THE PLAN

#### a. Plan Implementation.

All Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Secured Claims, and General Unsecured Claims will be paid by the Archdiocese. All Distributions to be made under the Plan on account of Abuse Claims will be paid solely from the Trust to be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan, the Allocation Protocol, and the Trust Agreement. The Allocation Protocol is attached to the Plan as **Exhibit 3** and is incorporated into the Trust Agreement. The proposed Trust Agreement is attached as **Exhibit 2**.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, Distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of Claims and Interests, including any controversies relating to the contractual, legal, and subordination rights that holders of Claim or Interests might have with respect to any Claim or Interests under this Plan. Distributions made to holders of Claim or Interests in any Class are intended to be final.

#### b. Corporate Action.

All matters provided under this Plan involving the corporate structure of the Debtor or corporate action to be taken by or required by the Consolidated Catholic Entities shall be deemed to have occurred and be effective as provided by this Plan and shall be authorized and approved in all respects without any requirement for further approval by the Bankruptcy Court or any other governmental entity. For the avoidance of doubt, to the extent any corporate action or other transaction contemplated under this Plan would otherwise require approval under Maryland law, the entry of the Confirmation Order shall constitute such approval.

#### c. Payments Effective Upon Tender.

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender of such payment by the Archdiocese, Survivor Compensation Trustee, or Insurance Trustee, as applicable, to the applicable Creditor to whom payment is due. If a Creditor refuses a tender, the amount tendered and refused will be held by the Archdiocese or Trustee, as applicable, for the benefit of such Creditor pending final adjudication of the dispute; *provided, however*, upon the adjudication of such dispute, the Creditor shall be obligated to apply the funds in accordance with this Plan as of the date of tender; *provided further, however*, the Creditor shall not have the right to claim interest or other charges or to exercise any other rights while the dispute is pending.

CORE/3529758.0002/239580558.7

### d.  **Agreements, Instruments, and Documents.**

All agreements, instruments, and other documents required by or under this Plan or as may be necessary, useful, or otherwise desirable in order to effectuate this Plan shall be executed before, on, or as soon as reasonably practicable after the Effective Date.

### e.  **Continuation of Insurance Policies**

Any Insurance Policy that is neither (a) bought back under an Insurance Settlement Agreement nor (b) otherwise disposed of by the terms of the Plan shall, as applicable, either be deemed to be assumed by the Archdiocese pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Archdiocese, or continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Archdiocese, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered. A list of all known Insurance Policies is attached as Exhibit 12. To the extent that any or all such Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Archdiocese, the Estate, and all parties in interest in this Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Archdiocese existing as of the Effective Date with respect to any Insurance Policy. Subject to the terms of the Insurance Settlement Agreements, the Archdiocese reserves the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

### f.  **Bar Date for Professional Fee Claims**

Each Professional retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must File with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 60 days after the Effective Date. All applications for the allowance of Professional Fee Claims that are not timely Filed shall be forever barred. Objections to such applications may be Filed in accordance with the Bankruptcy Rules. The Bankruptcy Court shall determine all such Professional Fee Claims.

### g.  **Bar Date for Other Administrative Claims**

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims must File and serve on the Archdiocese requests for the payment of such Administrative Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Archdiocese, the Estate, or their property without the need for any objection by the

Archdiocese further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Claims shall be deemed fully satisfied, released, and discharged.

### h. Effectuating Documents; Further Transactions; Transfer Tax Exemptions.

The Archdiocese shall be authorized to execute, deliver, File, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, or other similar tax: (a) the creation of any mortgage, deed of trust, Lien, or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to this Plan.


## ARTICLE XIX.   THE TRUST

### a. Establishment of the Trust.

On the Confirmation Date, or as soon as practicable thereafter, the Trust shall be established in accordance with the Trust Documents for the exclusive benefit of the holders of Class 6 Claims. The Trust will assume all liability for and rights concerning all Channeled Claims, including the rights to settle the Channeled Claims. The Trust will make Distributions from the Abuse Claims Settlement Funds to Class 6 Claimants pursuant to the terms of the Allocation Protocol, the Trust Agreement, the Plan, and the Confirmation Order.

### b. Funding of the Trust.

#### i. *Consolidated Catholic Entities Cash Contribution and Transfer of Real Estate Assets.*

. On or before the Effective Date, the Consolidated Catholic Entities shall cause the Consolidated Catholic Entities Cash Contribution to be paid to the Trust. The Consolidated Entities Abuse Claims Settlement Sub-Fund shall be funded from the Consolidated Catholic Entities Cash Contribution in the amount necessary to effectuate distributions to any Non-Participating Abuse Claimant(s) pursuant to Section 4.4 of the Plan.  Each Consolidated Catholic Entity will transfer, assign, deed, sell, and forever convey (i) the net sale proceeds obtained prior to the Effective Date and/ or (ii) all of its rights, title, and interest, in the in the Real Estate Assets.

#### ii. *Participating Parties' Cash Contribution.*

On or before the Effective Date, each Participating Parting that is not a Non-Debtor Consolidated Entity shall contribute the amount set forth on Exhibit 1 and each is responsible to cause their respective payment of the Participating Parties' Cash Contribution to be paid to the Trust. Each Consolidated Catholic Entity will transfer, assign, deed, sell, and forever convey (i) the

80

net sale proceeds obtained prior to the Effective Date and/ or (ii) all of its rights, title, and interest, in the real property listed on Exhibit 11 to the Trust.

### iii.    *Settling Insurers' Cash Contribution.*

Each Settling Insurer will pay to the Trust the Insurance Settlement Amount set forth in such Settling Insurer's Insurance Settlement Agreement pursuant to, and in accordance with, the terms of such Insurance Settlement Agreement.

### iv.    *Insurance Claims Assignment.*

Insurance Claims against any Non-Settling Insurer shall be transferred to the Trust as follows:

A. On the Effective Date, and without further action by any party, (i) the Archdiocese and the Consenting Abuse Claimants will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers; and (ii) each of the Participating Parties will assign to the Trust the Participating Parties' rights, if any, to all Insurance Claims against the Non-Settling Insurers and recoveries on account of such Insurance Claims. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of any Insurance Policy; or (ii) to entitle any Person to insurance coverage other than those Persons entitled to coverage under the terms of the Non-Settling Insurer Policies. For the avoidance of doubt, the Trust shall be solely responsible for satisfying, to the extent required under applicable law, any self-insured retention obligations on account of any Consenting Abuse Claim or arising out of any Non-Settling Insurer Policy. Nothing herein shall obligate any Non-Settling Insurers to advance any self-insured retention, unless otherwise required by applicable law. Likewise, nothing herein shall obligate the Trust or the Archdiocese to pay any self-insured retention that is not otherwise required by applicable law.

B. In the event that the Bankruptcy Court determines that the Insurance Claims Assignment is inconsistent with the Bankruptcy Code with respect to the Archdiocese, the Consenting Abuse Claimants and/or one or more Participating Parties, the Archdiocese, the Consenting Abuse Claimants, and each such Participating Party will retain their respective Insurance Claims against the Non-Settling Insurers. In that case, the Archdiocese or a Participating Party will, to the extent reasonably requested by the Trust, assert and pursue any such retained Insurance Claims against any Non-Settling Insurer. The Archdiocese or Participating Party will retain counsel acceptable to the Trustee to prosecute any retained Insurance Claims against any Non-Settling Insurer (subject to any defenses the Non-Settling Insurers may have under applicable state law) and the Trust shall pay all attorney's fees,

81

expert fees, and other costs and expenses incurred by the Archdiocese or the Participating Party in prosecuting the Insurance Claims against any Non-Settling Insurer. For avoidance of doubt, any efforts by the Archdiocese or a Participating Party to prosecute Insurance Claims against any Non-Settling Insurer shall be an accommodation to the Trust and any costs and expenses incurred by the Archdiocese or a Participating Party in connection therewith shall be paid by the Trust in full. The Trust shall have a common interest with the Archdiocese in prosecuting Insurance Claims against any Non-Settling Insurer, and may appear and be heard in connection with the prosecution of such Claims, at its own expense, unconditionally, subject only to any limitations of law and equity. The Archdiocese and the Participating Parties shall not settle any retained Insurance Claims against any Non-Settling Insurer without the prior written consent of the Trustee, which consent shall not be unreasonably delayed or denied. As provided herein, the Trust shall pursue the Insurance Claims, if any, against any Non-Settling Insurer on behalf of the Consenting Abuse Claimants. All recoveries on account of retained Insurance Claims against any Non-Settling Insurer will be paid to the Trust, net of any unreimbursed or unpaid attorney's fees, expert fees and other costs and expenses associated with prosecuting such retained Insurance Claims.

C. For the avoidance of doubt, except as specifically set forth in this Section 8.2.4 and in Section 6.3 with respect to satisfying Post-Effective Date Preconditions to Coverage, the Archdiocese and the Participating Parties make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims. The Trust shall assume all risks with respect to the litigation, liquidation and collection of the Insurance Claims.

D. For the further avoidance of doubt, and notwithstanding anything to the contrary herein, Related Insurance Claims shall not be transferred to the Trust or retained by the Archdiocese or Participating Parties but instead shall be sold to the Settling Insurers and/or settled and released, in each case as set forth in the Insurance Settlement Agreements

### v.    *Outbound Contribution Claims.*

Outbound Contribution Claims shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

### vi.    *Excluded Insurer Claims.*

Excluded Insurer Claims are not included in the Insurance Claims Assignment, or otherwise treated under the Plan, and any Holders of Excluded Insurer Claims shall retain whatever

82

CORE/3529758.0002/239580558.7

rights against Excluded Insurer Policies that they have under applicable law (subject to any defenses the Excluded Insurers may have under applicable law).

### vii.    Vesting of Trust Assets.

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all of their respective right, title, and interest in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Protected Parties, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of the Trust Assets in accordance with this paragraph, and subject to the Insurance Settlement Agreements, the Protected Parties shall have no further interest in or with respect to any Trust Assets.

### c.    Child Protection Protocols.

The current version of the Archdiocese's Child and Youth Protection Policies and Procedures, as modified by the recommendations contained in the report of Guidepost Solutions Filed in this case, shall become the Child Protection Protocols.

### d.    Appointment of the Trustee.

The Trustee is identified in the Trust Agreement. The Trustee shall commence serving as the Trustee on the Effective Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Bankruptcy Court, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

### e.    Rights and Responsibilities of the Trustee.

The Trustee shall be deemed to be a fiduciary of the Trust under the terms of the Trust Agreement and shall have all rights, powers, authority, responsibilities, and benefits under Maryland law specified in this Plan and as reflected in the Trust Agreement, including commencing, prosecuting or settling causes of action, enforcing contracts, and asserting Claims, defenses, offsets, and privileges. If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to the Trustee's authority to act, the provisions of the Trust Agreement shall control but shall not take precedence over any contrary provision in any Insurance Settlement Agreement(s) or the Sale Order(s) (in which case, the Sale Order(s) and the applicable Insurance Settlement Agreement(s) shall control and govern, in that order). Among other things, the Trustee: (1) shall liquidate and convert to Cash the Trust Assets, make timely Distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other Agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

The Trust shall not make Trust Distributions to the Abuse Claimants until after an order is entered confirming the Plan. The Trust shall pursue Insurance Claims against any Non-Settling

CORE/3529758.0002/239580558.7

Insurers. The Trust shall not pursue any Related Insurance Claims against any Settling Insurer Releasee or any Settling Insurer's Related Persons, nor shall the Trust take any other action contrary to, or in violation of, the Insurance Settlement Agreements.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no cause of action shall be commenced in any forum, other than the Bankruptcy Court, against the Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trustee; *provided*, this limitation shall not apply with respect to any Claim or cause of action brought by a Settling Insurer for any actual or alleged (a) breach by the Trustee of such Settling Insurer's Settlement Agreement or (b) violation by the Trustee of any provision of the Sale Order(s).

### f. Unknown Claimant Representative.

The Unknown Claimant Representative's services shall be limited to evaluating the adequacy and fairness of the Plan's treatment of Unknown Abuse Claims and making the election described in Section 4.5 of the Plan. The Unknown Claimant Representative will be compensated for his services to the extent set forth in the order approving the Unknown Claimant Representative's retention.

### g. Trust Pursuit of Insurance Claims Against Non-Settling Insurers.

#### i. *Trust's Rights to Pursue Insurance Claims*.

If the assignment contemplated in Section 8.2.4 is approved, effective as of the Effective Date, the Insurance Claims against Non-Settling Insurers shall be assigned and transferred to the Trust.

A. The Trust shall be entitled to (i) all recoveries on account of Insurance Claims against Non-Settling Insurers that are assigned to the Trust as set forth in the Plan and the Confirmation Order, including the proceeds of any such Insurance Claims relating to or arising out of any Litigation Claim, and (ii) to assert against Non-Settling Insurers on behalf of any Consenting Abuse Claimant or combination of Consenting Abuse Claimants, to the extent permitted by the Non-Settling Insurer Policies and applicable non-bankruptcy law, any and all Insurance Claims that currently exist or may arise in the future.

B. The Trust shall also have the right to pursue Insurance Claims against Non-Settling Insurers related to the Archdiocese's and/or the Participating Parties' liability for Channeled Claims or the Non-Settling Insurers' obligations in respect of such Channeled Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. For the avoidance of doubt, the Trust cannot present Non-Settling Insurers with a demand for Coverage or indemnification based upon Distributions made by the Trust to Abuse Claimants.

C. The Trust may act in its own name, or in the name of any Consenting Abuse Claimant, the Archdiocese, and/or a Participating Party to enforce any right, title,

84

or interest of any such party in the Insurance Claims against Non-Settling Insurers assigned to the Trust.

D. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Archdiocese is in bankruptcy or by any Distribution from the Trust to an Abuse Claimant.

E. The Insurance Claims Assignment shall not affect any Non-Settling Insurer's duty to defend, but to the extent that the failure to defend or a separate agreement between the Archdiocese and/or a Participating Party and any Non-Settling Insurer gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds.

F. Any recovery by the Trust on Insurance Claims against Non-Settling Insurers shall become a Trust Asset and shall be distributed as provided in the Allocation Protocol.

G. The Trust's pursuit of the Archdiocese and Participating Parties shall be limited to enforcing specific performance of the Insurance Claims Assignment and any other rights or interests expressly granted to the Trust under the Plan. Neither the Trust nor the Trustee may pursue any Settling Insurer for any Claim released, waived, sold, or relinquished under such Settling Insurer's Insurance Settlement Agreement (including, for the avoidance of doubt, Related Insurance Claims); *provided, however*, the Trust may enforce its rights (if any) and/or each Settling Insurer's obligations under the applicable Insurance Settlement Agreement(s).

H. The Trust shall have full access to coverage under the Non-Settling Insurer Policies as permitted by applicable non-bankruptcy law, and the Non-Settling Insurers shall retain any and all rights and defenses to coverage under the Non-Settling Insurer Policies and applicable non-bankruptcy law.

I. The Insurance Claims Assignment does not affect any right of the Archdiocese, any Participating Party, or any Non-Settling Insurer to contest any liability or the amount of damages in respect of any Abuse Claims.

### ii. *No Impact on Non-Settling Insurers.*

Nothing in the Plan, the Allocation Protocol, the Trust Documents, the Plan Documents, any Confirmation Order (including any provision in the Confirmation Order), or any judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over the Bankruptcy Case, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any Action brought by or against a Non-Settling Insurer:

A. constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

85

CORE/3529758.0002/239580558.7

(i)      the liquidated liability (in the aggregate or otherwise) of (a) the Archdiocese, the Participating Parties, or the Trust, with respect to any Abuse Claims; or (b) any Non-Settling Insurer with respect to any Insurance Claim;

(ii)      the liability or obligation of the Archdiocese, Participating Parties, or Trust with respect to any Abuse Claim;

(iii)      that the aggregate value of the Abuse Claims is equal to the amount to be paid by the Archdiocese and/or the Participating Parties into the Trust;

(iv)      that it is reasonable, in good faith, or consistent with the terms and conditions of any Non-Settling Insurer Policy for any of the Archdiocese, the Participating Parties, or the Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Non-Settling Insurer for payment) any Abuse Claim on any terms or conditions contemplated by the Plan, the Allocation Protocol (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder), any other Plan Documents, or any other document or agreement;

(v)      that the Plan, any other Plan Document, or any other document or agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder) are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Abuse Claims against the Archdiocese and the Participating Parties before the Petition Date or under the terms and conditions of any Non-Settling Insurer Policy or applicable nonbankruptcy law;

(vi)      that the conduct of the Archdiocese, Participating Parties, the Committee, or the Abuse Claimants, in connection with the negotiation, development, settlement and/or implementation of the Plan (including the aggregate value or amount of the Participating Parties' Cash Contribution), the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Non-Settling Insurer Policy or applicable nonbankruptcy law;

(vii)      that any Non-Settling Insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Allocation Protocol, the Trust Documents and other Plan Documents; and

B. have any *res judicata*, collateral estoppel or other preclusive effect with respect to any matter set forth in Section 8.8.2(a) hereof, or otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, Claim or right any Non-Settling Insurer may have under any Non-Settling Insurer Policy or applicable non-bankruptcy law with respect thereto. Without limiting the

86

foregoing, but subject to Section 8.8.4 below, it is expressly agreed by all Neutrality Parties that the Neutrality Parties are not litigating any issue set forth in Section 8.8.2(a) hereof or any other Non-Settling Insurer coverage defenses, rights, obligations, or other coverage issue of any kind in this Chapter 11 Case.

C. constitute a decision on any matter at issue or which may be raised as an issue in any Action by or against a Non-Settling Insurer. Thus, any judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court in this Bankruptcy Case, or entered by any other court exercising jurisdiction over the bankruptcy case, including any Confirmation Order or the Allocation Protocol and/or other Plan Documents and any finding, conclusion, or determination entered in connection therewith, is not intended—and shall not be construed—to constitute a finding, conclusion, or determination regarding any matter set forth in Section 8.8.2(a) hereof or any other issue for any insurance coverage purpose whatsoever, and the Neutrality Parties shall not contend otherwise in any Action by or against a Non-Settling Insurer;

D. subject to Section 8.8.4 below, impair any Non-Settling Insurer's legal, equitable, or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims, or any policyholder's legal, equitable or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims. The Neutrality Parties shall retain, and be permitted to assert, in any Action against any Non-Settling Insurer, all Claims and/or defenses, including any coverage defenses related to the Abuse Claims, the Insurance Claims and/or the Non-Settling Insurer Policies, notwithstanding any provision of the Plan, Allocation Protocol, the Trust Documents, the other Plan Documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order; or

E. subject to Section 8.8.4 below, impair any Non-Settling Insurer's Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the Archdiocese, the Participating Parties or the Trust (as applicable) in any Action by or against any Non-Settling Insurer. To the extent the Insurer Contribution Claims of a Non-Settling Insurer are determined to be valid, the liability (if any) of such Non-Settling Insurer to the Trust shall be reduced by the amount of such Insurer Contribution Claims. For avoidance of doubt, and notwithstanding anything to the contrary in this Section 8.8.2, all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.5.1 of the Plan, and no Insurer Contribution Claim shall be the basis for any affirmative recovery against the Archdiocese or any Protected Party.

F. On and after the Confirmation Date, no Neutrality Party shall assert anything to the contrary of this Section 8.8.2 in any Action by or against a Non-Settling Insurer. Each Neutrality Party shall be entitled to enforce this Section 8.8.2.

CORE/3529758.0002/239580558.7

### iii.    *Non-Settling Insurers' Remedies.*

Notwithstanding anything to the contrary in Section 8.8.2, the Non-Settling Insurers' remedies are limited to those available under applicable law and nothing in the Chapter 11 Case shall enhance any right(s) a Non-Settling Insurer may have under applicable law.

### iv.    *Preservation of Plan Provisions.*

For the avoidance of doubt, the provisions of Section 8.8.2 above are intended solely to ensure that the Plan leaves intact and does not alter or affect any rights or interests of the Non-Settling Insurers with respect to the Non-Settling Insurer Policies. Nothing set forth in Section 8.8.2 is intended to, nor shall it, impair the effectiveness of any provision of the Plan, including, without limitation, the Archdiocese Discharge, the Settling Insurer Injunction, Channeling Injunction, or any other release or injunctive provisions set forth in the Plan, as such Plan provisions relate to any rights, Claims, Actions, defenses, Interests, transactions or other dealings between or among (i) one or more Neutrality Parties who are not Non-Settling Insurers or (ii) any Neutrality Party who is not a Non-Settling Insurer and any Person who is not a Neutrality Party.

### h.    **Investment Powers; Permitted Cash Expenditures.**

All funds held by the Trust shall be held in Cash or invested in short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement. The Trustee may expend such Cash in a manner consistent with the terms of the Trust Agreement.

### i.    **Tax Matters.**

The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Archdiocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference. The Trust shall not be deemed to be the same legal entity as the Archdiocese, but only the assignee of certain assets of the Archdiocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*, and Maryland law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any. The Trustee may, in its discretion, establish a disputed Claims reserve for the Trust, which shall be administered in accordance with applicable law.

### j.    **No Recourse Against Trustee.**

No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the

CORE/3529758.0002/239580558.7

Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, breach of the fiduciary duty of loyalty, or fraud, and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

None of the Protected Parties shall be liable for any acts or omissions by the Trust, the Trustee, or their respective Agents or Related Persons.

### k.  **Indemnification by Trust.**

The Trust shall defend, indemnify, and hold harmless the Trustee and its Agents to the fullest extent permitted under the laws of Maryland in the performance of their duties hereunder. For the avoidance of doubt, the Archdiocese, the Participating Parties, and their respective Agents shall not be deemed to be Agents of the Trust unless specifically authorized as such in writing by the Trustee.

The Trust shall defend, indemnify, and hold harmless each Settling Insurer, as set forth in such Settling Insurer's Insurance Settlement Agreement, from each and every one of the following "*Indemnified Claims*": any and all Channeled Claims, Barred Claims, and Claims otherwise enjoined by or subject to the Settling Insurer Injunction and/or such Settling Insurer's Insurance Settlement Agreement, including all such Claims made by (i) any Person claiming to be an insured (as a named insured, additional insured, or otherwise) under any of the Settling Insurer Policies; (ii) any Person who has made, will make, or can make (a) a Related Insurance Claim or (b) an Abuse Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Settling Insurer Policies. For the avoidance of doubt, to the extent this Section 8.14.2 (including the subsections immediately below) conflicts or is inconsistent with the provisions of any Insurance Settlement Agreement that relate to Indemnified Claims, the provisions of the applicable Insurance Settlement Agreement(s) will control and govern.

      i.    Each Settling Insurer shall have the right (but not the obligation) to defend any Indemnified Claims brought or made against such Settling Insurer and shall do so in good faith. Each Settling Insurer (i) may, upon receipt of an Indemnified Claim brought or made against such Settling Insurer, undertake the defense of the Indemnified Claim but is not required to do so and (ii) agrees to notify the Trust as soon as practicable of such Indemnified Claim(s) and of the Settling Insurer's choice of counsel. If a Settling Insurer declines to defend an Indemnified Claim brought or made against it, the Trust shall undertake the defense thereof.

89

ii. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by each Settling Insurer defending an Indemnified Claim. Such Settling Insurer may settle or otherwise resolve the Indemnified Claim only with the prior consent of the Trust, which consent shall not be unreasonably withheld. The Trust may settle or otherwise resolve an Indemnified Claim only with the prior consent of the applicable Settling Insurer, which consent shall not be unreasonably withheld. A Settling Insurer's defense, settlement, or other resolution of any Indemnified Claim brought or made against such Settling Insurer shall not diminish the obligations of the Trust to indemnify the Settling Insurer for the Indemnified Claim, as set forth in this Section 8.14.2.

iii. The indemnification and hold harmless undertaking set forth in this Section 8.14.2 also extends to and for the benefit of the other Settling Insurer Releasees, all of which are third-party beneficiaries of the terms hereof

l. **Trust Liability.**

i. Upon the occurrence of the Effective Date, the Trust shall automatically and without further act or deed assume all responsibility for preserving, managing, and distributing Trust Assets.

ii. Subject to and upon the occurrence of each applicable Abuse Claim Discharge Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Participating Parties in respect of all Abuse Claims (other than Non-Participating PP Abuse Claims), which shall become Channeled Claims in accordance with the terms of the Plan. On the Effective Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Settling Insurers in respect of all Barred Claims and Channeled Claims.

m. **Termination.**

The Trust shall terminate after its liquidation, administration, and Distribution of the Trust Assets in accordance with the Plan, the Trust Agreement, and its full performance of all duties and functions set forth in the Trust Agreement.

## ARTICLE XX.    GENERAL CLAIMS ADMINISTRATION

a. **Objections to Non-Abuse Claims.**

Prior to the Effective Date, the Consolidated Catholic Entities shall have the authority to pursue any objection to the allowance of any Non-Abuse Claim. From and after the Effective Date, the Archdiocese will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making any Distributions with respect to Non-Abuse Claims (including those Non-Abuse Claims that are subject to objection by the Archdiocese as of the Effective Date); *provided, however*, that nothing in this Section shall affect the right of any party in interest (including the Archdiocese and the Trustee) to object to any Non-Abuse Claim to

90

the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Plan. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, objections to Non-Abuse Claims will be Filed and served not later than the Claims Objection Deadline. The Claims Objection Deadline or any Bankruptcy Court-approved extension thereof, may be extended upon request by the Archdiocese by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Archdiocese's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

### b.  <u>Determination of Claims.</u>

From and after the Effective Date, any Non-Abuse Claim as to which a proof of claim or motion or request for payment was timely Filed in this Chapter 11 Case, or deemed timely Filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending)), liquidated pursuant to:  (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, Filed by the Archdiocese or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, or causes of action that the Archdiocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157; *provided, however*, that any Claims against the Settling Insurers that the Archdiocese had, has, may have had, or may in the future have shall be waived and released in accordance with the terms of, and to the extent set forth in, the Settling Insurers' respective Insurance Settlement Agreements.

### c.  <u>No Distributions Pending Allowance.</u>

Except in the case of Abuse Claims paid pursuant to the Allocation Protocol, no Distribution will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

### d.  <u>Claim Estimation</u>

To effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, with respect to Disputed Claims (except Abuse Claims), the Archdiocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose

CORE/3529758.0002/239580558.7

permitted under the Bankruptcy Code; *provided, however*, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings.

### e.  Treatment of Contingent Claims

Except with respect to Abuse Claims, until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan.

### f.  Controversy Concerning Impairment

If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before confirming the Plan.

### g.  Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Consolidated Catholic Entities except (i) Insurance Policies that have not been assumed and retained by the respective Consolidated Catholic Entities pursuant to Section 7.5, (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, or (iii) the executory contracts listed on Exhibit 5, will be deemed to be assumed by the Consolidated Catholic Entities on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Consolidated Catholic Entities, except that the Trust shall pay any cure costs under any Insurance Policy assumed and retained by the Archdiocese pursuant to Section 7.5. In the event of a dispute regarding the amount of any cure payments, or the ability of the Consolidated Catholic Entities to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Consolidated Catholic Entities, the Trust or the Consolidated Catholic Entities (as applicable) will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The contracts and leases which will be assumed by the Consolidated Catholic Entities, and their respective cure costs, are identified in **Exhibit 4.** For the avoidance of doubt, none of the Settling Insurer Policies will be assumed or assigned to the Consolidated Catholic Entities.

### h.  Existing Claim Objections.

Any pending adversary proceeding or contested matter pending regarding the allowance or disallowance of a Class 6 or Class 7 claim is dismissed with prejudice, any order sustaining an objection to a Class 6 or a Class 7 Claim Filed by any party in interest prior to the Effective Date is vacated, and the allowance or disallowance of any Class 6 or Class 7 Claim for purposes of distributions under this Plan shall be exclusively governed by the terms set forth in the Plan.

CORE/3529758.0002/239580558.7

Notwithstanding the number of Claims Filed by any Person, no holder of a Class 6 or Class 7 Claim shall be deemed to hold more than one Claim and shall not collect distributions from the Trust on account of more than one Claim, unless authorized by separate order of the Court expressly allowing recovery on multiple Claims.

## ARTICLE XXI.   PROVISIONS GOVERNING DISTRIBUTIONS

### a.   <u>Disbursing Agents.</u>

The Archdiocese shall be the disbursing agent for all aspects of the Plan except for Distributions made from the Trust. With respect to the Trust, the Trustee shall be the disbursing agent and be responsible for all Distributions made under the Trust.

### b.   <u>Manner of Payment.</u>

Unless otherwise agreed by the Archdiocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the respective disbursing agent.

### c.   <u>Distribution Only to Holders of Allowed Claims.</u>

Except as otherwise provided in the Plan for Abuse Claims, Distributions under the Plan and the Plan Documents will be made only to the holders of Allowed Claims. Until a Disputed Non-Abuse Claim becomes an Allowed Claim, the holder of that Disputed Non-Abuse Claim will not receive any Distribution otherwise provided to Non-Abuse Claimants under the Plan or the Plan Documents. If necessary, in determining the amount of a *pro-rata* Distribution due to the holders of Allowed Claims in any Class, the Archdiocese will make the *pro-rata* calculation as if all Disputed Non-Abuse Claims were Allowed Claims in the full amount claimed or in the estimated amount. When a Disputed Non-Abuse Claim in any Class becomes an Allowed Claim, the Archdiocese will make a full or partial Distribution, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and any required withholding of applicable federal and state taxes.

### d.   <u>Disputed Claim Reserve.</u>

Except with respect to Trust Distributions made to Abuse Claimants pursuant to the Allocation Protocol, to the extent that a disbursing agent makes a Distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

### e.   <u>Transmittal of Distributions.</u>

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under the Plan, Confirmation Order, or Trust

CORE/3529758.0002/239580558.7

Documents to Class 6 Claimants will be made by the Trust, and Distributions to all other Claimants will be made by the Archdiocese. Distributions to Class 6 Claimants will be made: (i) to the client trust account for the Claimant's attorney of record; or (ii) if the Class 6 Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim Filed with Epiq or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Trustee, as applicable, by such Claimant in writing; or (iii) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Archdiocese or Trustee, as applicable, to the mailing address set forth in the Schedules Filed by the Archdiocese in this Chapter 11 Case. Distributions to Claimants holding Non-Abuse Claims will be made by wire transfer or by check via first class United States mail, postage prepaid, (i) to the latest mailing address set forth in a proof of claim Filed with Epiq or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Archdiocese, as applicable, by such Claimant in writing, or (ii) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Archdiocese, to the mailing address set forth in the Schedules Filed by the Archdiocese in the Chapter 11 Case. If a Claimant's Distribution is not mailed or is returned to the Archdiocese or to the Trustee because of the absence of a proper mailing address, the Archdiocese or the Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Class 6 Claimant on account of Distributions made to the client trust account of a Class 6 Claimant's attorney.

### f.   Timing of Distributions.

Unless otherwise agreed by the Archdiocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty days after a Distribution is returned to the Archdiocese or to the Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Archdiocese or the Trustee, as applicable, with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Archdiocese, the Trust, the Trustee, or its property. Any undeliverable Distributions to be made by the Trust that are not claimed under this Section will become available for the Trust to distribute to other Abuse Claimants. Any other undeliverable Distributions shall be retained by the Archdiocese in accordance with the Plan. Nothing in the Plan requires the Archdiocese, the Trust, or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

### g.   Time Bar to Check Payments.

If an instrument delivered as a Distribution to a Claimant by the Archdiocese or the Trust is not negotiated within 90 days after such instrument is sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and all Claims in respect of such voided check shall be discharged and forever barred. Any request for re-

94

issuance of a check must be made on or before 90 days after issuance of a non-negotiated check. Except as otherwise provided herein, any Distribution under the Plan which is not negotiated after 90 days following issuance shall be forfeited, and such Distribution, together with any interest earned thereon, and shall return to and revest in the Archdiocese or to the Trust, as applicable.

### h.  No Professional Fees or Expenses.

No professional fees or expenses incurred by a Claimant will be paid by the Archdiocese or the Trust with respect to any Claim except as specified in the Plan or the Trust Documents.

### i.  No Interest on Claims.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Archdiocese and the holder of a Claim approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, the Confirmation Order, or the Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### j.  Saturday, Sunday or Holiday.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

### k.  Withholding Taxes.

The Archdiocese shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Archdiocese may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### l.  Setoffs and Recoupment.

Subject to the terms of this Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Archdiocese may, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Archdiocese may have against the holder of such Claim.

### m.  No De Minimis Distributions.

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash (rounded to the nearest whole cent when and as necessary)

95

will be issued to Claimants entitled to receive Distributions of Cash. Any Distribution of less than $25.00 will be considered *de minimis*, and holders of Allowed Claims that are entitled to Distributions of less than $25.00 will not receive any Distribution. Such funds will remain with, and revest in, the Archdiocese. For avoidance of doubt, this Section 10.13 shall not apply to any Distributions to be made by the Trust, which shall be governed solely by the Trust Documents.

### n.  Prepayment.

Except as otherwise provided in the Plan or the Confirmation Order, the Archdiocese shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## ARTICLE XXII. EFFECTIVE DATE

### a.  Conditions Precedent to Effective Date

The Effective Date shall not occur, and the Plan shall not be consummated, unless each of the following conditions are satisfied or waived as set forth in Plan Section 11.2:

i.  *Confirmation Order.*

The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponent. Without limiting the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

A.  the assignment of Insurance Claims against the Non-Settling Insurers, or alternatively, the retention and prosecution of such Claims following confirmation by the Archdiocese and other Participating Parties as contemplated in the Plan, is authorized by, and does not conflict with, any provision of the Bankruptcy Code, and is therefore approved;

B.  all of the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code have been met and that the Plan should be confirmed;

C.  the Confirmation Order contains appropriate provisions for the examination fees to be paid by Abuse Claimants to their legal counsel under Maryland law

D.  the Plan Consolidation is necessary to administer the Debtor's assets and resolve the Claims against the Debtor;

E.  The Committee is appointed attorney-in-fact for Class 6 Claimants as provided in Section 12.25

CORE/3529758.0002/239580558.7

ii. ***Channeling and Insurer Injunctions.***

The Confirmation Order shall approve and implement the Channeling Injunction set forth in Section 12 of the Plan and shall ratify the Settling Insurer Injunction set forth in the Sale Order(s) approving the respective Insurance Settlement Agreements.

iii. ***Plan Documents.***

The Plan Documents shall be in form and substance acceptable to the Plan Proponent.

iv. ***Trust Formation***. The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee and the Archdiocese shall have executed the Trust Agreement.

v. ***Trust Funding.*** The Consolidated Catholic Entities' Cash Contribution shall have been made to the Trust, the Participating Parties Cash Contribution shall have been made to the Trust, and the Consolidated Catholic Entities shall have executed and delivered to the Trust, deeds to the Real Property Assets (or contributed the cash proceeds from the pre-Effective Date sale of any Real Property Assets) subject to the following:

a. ***Partitioning of Certain Property.*** The Trustee shall, within ninety (90) days after the Effective Date, hire a surveyor and take all steps necessary and prudent to partition the properties as indicated on Plan **Exhibit 11 and 11-A** (the "**Partitioned Parcels**") as follows:

(i) ***Retained Parcels.*** The Trustee shall retain the portion of the Partitioned Parcels substantially consistent with the boundaries indicated in purple on the maps included as **Exhibit 11-A** (the "Retained Parcels") for the purpose of liquidating said parcels for the benefit of Abuse Claimants. For the avoidance of doubt, the maps included as **Exhibit 11-A**, including any boundaries, legal descriptions, markings, or other notes, are only provided for convenience to illustrate the Plan Proponent's intentions, but are not a determination by the Court regarding any Persons' right, title, or interest in the real property depicted. Nothing in **Exhibit 11-A** is binding on any Person, except to the extent **Exhibit 11-A** shall govern the Consolidated Catholic Entities, the Trust, and/or the Archdiocese regarding the partitioning of the Partitioned Parcels.

(ii) ***Preserved Parcels.*** Within thirty (30) days after the Trustee obtains permission from all necessary government authorities to segment the Retained Parcels, the Trustee shall convey to the respective Consolidated Catholic Entities the portion (the "**Debtor Preserved Parcels**") of the Partitioned Parcels that are not Retained Parcels.

CORE/3529758.0002/239580558.7

(iii)    ***Equitable Rights in the Preserved Parcels.*** From the Effective Date, until the date the Trustee conveys legal title to the Debtor Preserved Parcels, the respective Consolidated Catholic Entities shall retain all rights as the sole equitable owner(s) of the Preserved Parcels, including, but not limited to, the right to occupy, use, possess, control, maintain, and exclude others from the same, subject only to the Trustee's rights arising under and related to this Section 11.1.5.

b.    ***Time Limits on Holding Real Property.*** The Trust shall not hold any Real Property Assets for longer than five (5) years after the Effective Date. Should the Trust continue to hold Real Property Assets for more than five (5) years after the Effective Date, a Trust beneficiary may bring a motion with the Bankruptcy Court to compel the sale of the Real Property Asset(s), and the Bankruptcy Court shall grant such motion, unless:

(i)    The real property asset(s) is the subject of an executed purchase agreement with a good faith buyer and the transaction is scheduled to close within 120 days;

(ii)    The Trustee has accepted an offer to purchase the Real Property Asset, but the transaction is the subject of pending litigation; or

(iii)    The Trustee obtains permission from the Bankruptcy Court to hold the real property asset for more than five years, which permission shall be granted only for cause, including, but not limited to (i) the Trustee demonstrates the value of the Real Property Asset will increase by at least 20% of its current value over a specific amount of time, not to exceed 12 months; (ii) an act of God or other force majeure prevents the sale of the Real Property Asset or substantially diminishes the value of the Real Property Asset; or (iii) a delay in selling the real property asset is otherwise in the best interest of the Trust's beneficiaries.

c.    ***Free and Clear of Interests of Trust Real Property Assets.*** On the Effective Date of the Plan, the Real Property Assets shall be sold to the Trust, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all Liens, Claims and Interests, including those of the Consolidated Catholic Entities and Abuse Claimants. The Trust is a good faith purchaser of such assets within the meaning of section 363(m) of the Bankruptcy Code, the consideration exchanged constitutes a fair and reasonable consideration, and the sale complies with the Bankruptcy Code and applicable non-bankruptcy laws. If the Court determines at the confirmation hearing for this Plan that a person(s) other than the Debtor holds an interest in the Real Property Assets, which interest is subject to a bona fide dispute, such interest will transfer only to the proceeds of any sale by the Trust of the respective Real Property Asset(s), and in no event will any person's interest cloud title, affect the Trustee's ability to sell the Real Property Asset(s), or entitle the interested party(ies) to recourse against the Trust in excess of the net-sale proceeds of the respective Real Property Asset(s).

CORE/3529758.0002/239580558.7

vi.   ***Participating Parties Assignment***. Each Participating Party, including all of the Non-Debtor Consolidated Entities, shall assign its respective Insurance Claims against the Non-Settling Insurers, to the extent such Claims exist, to the Trust by executing and delivering such agreements and instruments of assignment as the Trustee may reasonably request.

vii.  ***Insurance Settlement Agreements***. Each Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been duly executed by all parties thereto and approved by the Bankruptcy Court, in each case in form and substance satisfactory to the Plan Proponent and applicable Settling Insurers.

viii. ***The Settling Insurers' Contribution***. Each Settling Insurer shall have paid to the Trust the Insurance Settlement Amount due under such Settling Insurer's Insurance Settlement Agreement, except to the extent the terms of such Insurance Settlement Agreement expressly provide that the applicable Insurance Settlement Amount will be made at a later date.

ix.   ***No Material Amendments***. The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with consent of the Plan Proponent.

### b. <u>Waiver of Conditions</u>

Any condition to the occurrence of the Effective Date set forth in Section 11.1 of the Plan may be waived only by the mutual written consent of the Plan Proponent.

### c. <u>Occurrence of Effective Date.</u>

Prior to the occurrence of the Effective Date, those terms of the Plan that are necessary to allow Litigation Claims to proceed regardless of whether the Confirmation Order is a Final Order shall be implemented. Such terms include (a) the establishment of the Trust, (b) approval of the Trust Agreement, (c) the appointment of the Trustee, (d) and the lifting of the automatic stay with respect to any Litigation Claims the Trustee may authorize to proceed pursuant to Section 4.3.1 of the Plan. If the Effective Date has not occurred within 90 days of the date on which the Confirmation Order becomes a Final Order, the Plan Proponent may elect to withdraw the Plan in their respective sole and absolute discretion.

### d. <u>Notice of Effective Date.</u>

The Plan Proponent shall File a notice of Effective Date with the Bankruptcy Court and serve it on all Creditors and parties in interest, within five Business Days after the occurrence of the Effective Date. Such notice shall include all relevant deadlines put into effect by the occurrence of the Effective Date.

99

**e. Effect of Non-Occurrence of Condition.**

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects, and nothing in this Plan or the Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Protected Parties or any Settling Insurer; (b) prejudice in any manner the rights of the Protected Parties, the Trusts, or any Settling Insurer; (c) constitute an admission, acknowledgement, offer, or undertaking by the Protected Parties or any Settling Insurer in any respect, including in any Action against the Debtor; or (d) be admissible in any Action against the Protected Parties or any Settling Insurer in any court or other forum.

**ARTICLE XXIII.     EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE**

**a. General Injunction and Discharge.**

**i.     *General Injunction*. EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 BELOW, AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, OR AS OTHERWISE PROVIDED IN ANY INSURANCE SETTLEMENT AGREEMENT OR SALE ORDER, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE ARCHDIOCESE, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE ARCHDIOCESE OR THE ARCHDIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE ARCHDIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT**

100

**OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE ARCHDIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE ARCHDIOCESE ON ACCOUNT OF ANY SUCH CLAIM.**

**ii.** Except as otherwise expressly provided in (a) the Plan, (b) the Confirmation Order, or (c) any Insurance Settlement Agreement or Sale Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Archdiocese and the Estate will be discharged from all liability for any and all Non-Abuse Claims. For the avoidance of doubt and notwithstanding anything to the contrary herein, none of the Archdiocese and the Estate will be discharged from its or their respective responsibilities (and corresponding liabilities) under or with respect to any Insurance Settlement Agreement.

**b.** **Injunction and Discharge of Abuse Claims and Inbound Contribution Claims.**

**i.** ***Injunction of Abuse Claims and Inbound Contribution Claims.*** **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 BELOW OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE ARCHDIOCESE OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE ARCHDIOCESE, ANY PARTICIPATING PARTY, OR THE ARCHDIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT: (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE; (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.**

**IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

CORE/3529758.0002/239580558.7

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE ARCHDIOCESE OR ANY PARTICIPATING PARTY.**

ii.         *Limited Exceptions to Injunctions.*

A. Non-Participating PP Abuse Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prevent a Non-Participating Abuse Claimant from pursuing or enforcing his or her Non-Participating PP Abuse Claim (if any) against a Participating Party, but only if such Participating Party is Person other than a Non-Debtor Consolidated Entity.

B. Certain Inbound Contribution Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prohibit the pursuit or enforcement of an Inbound Contribution Claim against a Participating Party that is not a Non-Debtor Consolidated Entity by any Person who affirmatively indicates, by Filing a timely written objection to confirmation of the Plan, that they will not consent to having such Inbound Contribution Claim (if any) enjoined as contemplated in the Plan. Any Person who holds an Inbound Contribution Claim against such a Participating Party, whether or not Filed with the Bankruptcy Court or in any Abuse Action, and who fails to File a timely written objection to confirmation of the Plan shall be conclusively deemed to consent to the injunction set forth in Sections 12.2.1 and 12.3 and shall be bound thereby.

C. Preservation of Insurance Claims.

(i)      To facilitate the pursuit of Insurance Claims against Non-Settling Insurers, the injunctions set forth in Section 12.2.1 above and 12.3 below shall not prevent the prosecution of Abuse Actions against the Archdiocese or any Participating Party (x) by one or more Litigation Claimants authorized by the Trustee to pursue their Litigation Claims, at such Litigation Claimants' expense, in any court of competent jurisdiction solely for the purpose of determining any liability that the Archdiocese and/or any Participating Party may have with respect to such Litigation Claimant's Litigation Claim, and the amount of that liability; (y) as the Trustee may deem necessary in order to prosecute the Insurance Claims against Non-Settling Insurers; or (z) as the Trustee may deem necessary in order to effectuate settlement of any Abuse Claims; *provided*, *however*, that all collection efforts against the Archdiocese and/or any Protected Party shall be enjoined and any Litigation Award obtained as a result of litigating such Abuse

102

CORE/3529758.0002/239580558.7

Actions shall be enforceable solely against Non-Settling Insurers and not against any Protected Party. For avoidance of doubt, the limited exception set forth in this Section 12.2.2(c) permits (subject to the terms hereof) only the prosecution of Abuse Actions against the Archdiocese and/or a Participating Party; all collection efforts against any Protected Party, Settling Insurer Releasee, or any Settling Insurer's Related Persons are permanently barred and enjoined, and any Litigation Award obtained as a result of litigating such Abuse Actions shall be enforceable solely against Non-Settling Insurers and not against any Protected Party, Settling Insurer Releasee, or any Settling Insurer's Related Persons (or any of their respective property or assets except for any Non-Settling Insurer Policy).

(ii)    To preserve coverage under any Non-Settling Insurer Policy, Abuse Claims will not be released or discharged as against the Archdiocese or any other Participating Party until the occurrence of the applicable Abuse Claim Discharge Date. For the avoidance of doubt, prior to the occurrence of the applicable Abuse Claim Discharge Date and subject to the limitations set forth in the Plan, a duly authorized Litigation Claimant or the Trust may name the Archdiocese or any Participating Party in a proceeding to adjudicate whether the Archdiocese or any Participating Party has liability for a Litigation Claim and the amount of any such liability, but recourse shall be limited to the proceeds of any Non-Settling Insurer Policies and all other damages that may be recoverable against any Non-Settling Insurers.

D. Notwithstanding anything to the contrary herein: (i) the Consolidated Catholic Entities shall have no liability whatsoever for any Abuse Claims or Inbound Contribution Claims, and any act by any Person to collect or enforce any Abuse Claim or Inbound Contribution Claim against the Archdiocese shall be permanently enjoined; and (ii) subject to and upon payment of a Settling Insurer's Insurance Settlement Amount, such Settling Insurer shall have no liability whatsoever for any Channeled Claim or Barred Claim, and the Channeling Injunction and Settling Insurer Injunction prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any such Settling Insurer, its corresponding Settling Insurer Releasees, its Related Persons, or the assets or property of any of the foregoing (including the Purchased Property of such Settling Insurer).

iii.    ***Discharge of Abuse Claims and Inbound Contribution Claims.*** Except as otherwise expressly provided in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Archdiocese, the Consolidated Catholic Entities, and their Estate will be discharged from: (i) all liability for any and all Inbound Contribution Claims on the Confirmation

103

Date; and (ii) all liability for any and all Abuse Claims upon the occurrence of the applicable Abuse Claim Discharge Date.

The Abuse Claim Discharge Date with respect to each Abuse Claim shall be determined as follows:

A. With respect to any Filed Abuse Claim held by a Non-Participating Abuse Claimant, the Abuse Claim Discharge Date shall be the Effective Date.

B. With respect to any Filed Abuse Claim held by a Consenting Abuse Claimant who is authorized by the Trustee to liquidate his or her Litigation Claim on or before the first anniversary of the Effective Date, the Abuse Claim Discharge Date shall be the earlier of the date on which (a) all Litigation Claims asserted by such Litigation Claimant against the Archdiocese and/or any Participating Party have been fully adjudicated, settled or dismissed on a final and non-appealable basis and any Non-Settling Insurers' resulting liability with respect to such Litigation Claim, as determined by settlement or Final Order, has been fully satisfied by payment in accordance with the terms of such settlement or Final Order; or (b) the Trust enters into a settlement with respect to all Non-Settling Insurer Policies that are Target Policies of such Litigation Claim.

C. With respect to any Filed Abuse Claim held by a Consenting Abuse Claimant who is not authorized by the Trustee to liquidate his or her Litigation Claim on or before the first anniversary of the Effective Date, the Abuse Claim Discharge Date shall be the first anniversary of the Effective Date.

D. For the avoidance of doubt, notwithstanding anything to the contrary in sub-sections 12.2.3(a) through 12.2.3(c) above: (i) the Abuse Claim Discharge Date for any Abuse Claim shall be deemed to occur no later than the first day following the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against any Non-Settling Insurers who issued Non-Settling Insurer Policies that are Target Policies of any Litigation Claimants' potential Litigation Claims, and (ii) the Abuse Claim Discharge Date for all Abuse Claims shall be deemed to occur no later than the first day following the earlier of (a) the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against all Non-Settling Insurers and (b) the date on which the Trust is terminated.

iv.      ***Preservation of Insurance Claims.*** The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Archdiocese is in bankruptcy or by the amount of any Distributions Abuse Claimants receive, or may be entitled to receive, based on the Allocation Protocol. The

104

Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims as set forth in the Plan. Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement Fund to be distributed pursuant to the terms of the Plan, the Allocation Protocol and the Trust Documents. Nothing in this Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies.

**c. Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties.**

IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION GIVEN, AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE ARCHDIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:

A. ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THIS PLAN, THE ALLOCATION PROTOCOL, AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.

B. ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:

(I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;

(II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES;

CORE/3529758.0002/239580558.7

(III) CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;

(IV) ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:

1. ANY OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES;

2. ANY OF THE PROTECTED PARTIES; OR

3. THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

(V) TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND

(VI) ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 12 OR OTHERWISE IN THE PLAN, LITIGATION CLAIMANTS AND THE TRUST SHALL BE PERMITTED TO NAME THE ARCHDIOCESE AND ANY PARTICIPATING PARTY IN ANY PROCEEDING TO RESOLVE WHETHER THE ARCHDIOCESE OR SUCH PARTICIPATING PARTY HAS LIABILITY FOR A LITIGATION CLAIM, AND THE AMOUNT OF ANY SUCH LIABILITY, FOR THE PURPOSE OF OBTAINING INSURANCE COVERAGE FROM NON-SETTLING INSURERS UNDER THE NON-SETTLING INSURER POLICIES, AND FOR THE PURPOSE OF PURSUING ANY AND ALL INSURANCE CLAIMS AGAINST THE NON-SETTLING INSURERS. ANY SUCH JUDGMENTS OR AWARDS WILL BE TURNED OVER TO THE TRUST FOR DISTRIBUTION IN ACCORDANCE WITH SECTION 4.6 OF THIS PLAN. FOR THE AVOIDANCE OF DOUBT, RECOURSE WITH RESPECT TO ANY AND ALL LITIGATION CLAIMS IS EXPRESSLY LIMITED TO THE PROCEEDS OF NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS, AS AND TO THE EXTENT PERMITTED BY THIS PLAN.

THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THIS PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN THIS SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT

106

**OF THE PROTECTED PARTIES. IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

    d.  **Settling Insurer Injunction.**

**PURSUANT TO SECTIONS 105(a), 363, AND 1123 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS, INCLUDING THE SETTLING INSURERS' PURCHASE OF THE PURCHASED PROPERTY FREE AND CLEAR OF ALL CLAIMS AND INTERESTS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE, THIS PLAN HEREBY INCORPORATES BY REFERENCE, ADOPTS, AND RATIFIES (AND THE CONFIRMATION ORDER SHALL ADOPT AND RATIFY) THE SETTLING INSURER INJUNCTION IN ALL RESPECTS.**

    e.  **Litigation/Settlement of Certain Claims.**

        i.  Except as expressly set forth in Section 12.2.2 of the Plan, the Channeling Injunction shall channel all Inbound Contribution Claims and all Insurer Contribution Claims to the Trust; *provided, however,* that the channeling of Insurer Contribution Claims to the Trust shall not extinguish or reduce Insurer Contribution Claims held by Non-Settling Insurers. For the avoidance of doubt, unless otherwise provided in the Plan, the Allocation Protocol, or Trust Documents, the channeling of an Inbound Contribution Claim or Insurance Contribution Claim does not entitle the holder of such Channeled Claim to a Trust Distribution.

        ii.  If, for any reason, any court does not recognize the channeling of the Insurer Contribution Claims of any Non-Settling Insurers to the Trust, or such Insurer Contribution Claims are not channeled for any reason, then the following shall apply:

          A.  Settling Insurers shall retain their Insurer Contribution Claims; *provided, however*, that:

            (i)  Settling Insurers shall not pursue any Insurer Contribution Claim against any Non-Settling Insurer: (A) that asserts an Insurer Contribution Claim solely against the Trust; (B) whose Insurer Contribution Claim is satisfied and extinguished entirely by the application of this Section 12.5; or (C) that does not assert an Insurer Contribution Claim against them;

CORE/3529758.0002/239580558.7

(ii)     If a Non-Settling Insurer asserts its Insurer Contribution Claim only against the Trust, then Settling Insurers shall assign any Insurer Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Insurer Contribution Claims against such Non-Settling Insurer;

(iii)    If a Non-Settling Insurer releases its Insurer Contribution Claims, if any such exist, that it may have against Settling Insurers, then such released Settling Insurers shall release their Insurer Contribution Claims against such releasing Non-Settling Insurer.

B.  In any Action involving the Archdiocese, a Participating Party, or the Trust (collectively, the "Alleged Insured") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where such Non-Settling Insurer could assert any Insurer Contribution Claim against any Settling Insurers, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Settling Insurer would be liable to pay such Non-Settling Insurer as a result of the Non-Settling Insurer's Insurer Contribution Claim (the "Reduction Amount"), so that the Non-Settling Insurer's Insurer Contribution Claim is thereby satisfied and extinguished entirely. To accomplish this reduction, the Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, establishing the Reduction Amount before obtaining an entry of judgment against such Non-Settling Insurer. The Settling Insurer(s) allegedly responsible for the Non-Settling Insurer's Insurer Contribution Claim shall upon request and at the sole expense of the Trust cooperate in good faith with the Archdiocese and/or the Trust to take reasonable steps to aid the Archdiocese and/or the Trust in defending against the Insurer Contribution Claim or to otherwise establish the Reduction Amount contemplated in this paragraph. In the event that the Reduction Amount is determined to be zero, then such Non-Settling Insurer shall fully reimburse the Archdiocese and/or the Trust their costs and expenses, including legal fees, incurred in defending against (or otherwise responding to) the Insurer Contribution Claim or in establishing the Reduction Amount, including all costs, expenses and fees incurred in seeking relief from the court.

C.  If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Abuse Claims, such agreement shall include a provision whereby such Non-Settling Insurer releases its Insurer Contribution Claims against Settling Insurers so long as Settling Insurers release their Insurer Contribution Claims against such Non-Settling Insurer.

108

D. Nothing contained in this Section 12.5.2 shall be interpreted to require the Trust to maintain or allocate a specific reserve for the costs set forth in this Section 12.5.2.

E. The above procedures shall bind, and inure to the benefit of, all Settling Insurers.

iii. To ensure that the reduction contemplated in Section 12.5.2 is accomplished, the Settling Insurers shall be entitled to: (i) notice, within a reasonable time, of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer in which an Insurer Contribution Claim could be asserted against any Settling Insurers, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations, but only to the extent necessary to accomplish the reduction contemplated in Section 12.5.2; (iii) the reasonable cooperation of the applicable Alleged Insured, at the sole cost and expense of the Trust, so that the Settling Insurers (or, as applicable, the Trust) can assert Section 12.5.2 as a defense in any Action against a Non-Settling Insurer for an Insurer Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the Settling Insurers from any Insurer Contribution Claim. The notice required above shall be given by: (i) the Alleged Insured that is a party to such Action or settlement negotiations; or (ii) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (iii) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Abuse Claimant bound by this Plan.

iv. The Trust shall use reasonable efforts to obtain, from all Settling Insurers, agreements with terms similar to those contained in Section 12.5 hereof.

f. **Injunction Against Interference with Plan.**

Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

g. **Release by Holders of Channeled Claims.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, ALL HOLDERS OF CHANNELED CLAIMS, INCLUDING CONSENTING ABUSE CLAIMS, (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE ARCHDIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE ARCHDIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION,**

109

CORE/3529758.0002/239580558.7

DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.

THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH CONSENTING ABUSE CLAIMANT WILL RELEASE THE ARCHDIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.

FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT MAY NAME THE ARCHDIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE ARCHDIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT THAT LITIGATION CLAIMANT'S RECOURSE IN SUCH CASE OR PROCEEDING SHALL BE LIMITED TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS. UNDER NO CIRCUMSTANCE MAY A LITIGATION CLAIMANT OR THE TRUST NAME, OR OTHERWISE PURSUE, ANY SETTLING INSURER RELEASEES OR ANY SETTLING INSURER'S RELATED PERSON (IN ANY ACTION OR OTHERWISE) FOR OR ON ACCOUNT OF A CHANNELED CLAIM FOLLOWING SUCH SETTLING INSURER'S PAYMENT OF THE APPLICABLE INSURANCE SETTLEMENT AMOUNT.

NOTHING IN THIS SECTION 12.7 SHALL BE DEEMED TO RELEASE ANY NON-PARTICIPATING PP ABUSE CLAIM A NON-PARTICIPATING ABUSE CLAIMANT MAY HAVE AGAINST A PARTICIPATING PARTY (IF ANY).

h. **Mutual Releases.**

EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE ARCHDIOCESE, OBLIGATIONS ARISING UNDER THE PLAN, AND, SOLELY WITH RESPECT TO THE ARCHDIOCESE AND THE PARTICIPATING PARTIES, ABUSE CLAIMS SUBJECT TO DELAYED RELEASE IN ACCORDANCE WITH SECTION 12.7 OF THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE PARTICIPATING PARTIES, THE COMMITTEE, THE TRUST, AND

110

EACH CONSENTING ABUSE CLAIMANT, SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER. FOR THE AVOIDANCE OF DOUBT, CONSENTING ABUSE CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL, AND SHALL BE DEEMED TO RELEASE THEIR ABUSE CLAIMS AGAINST THE ARCHDIOCESE AND THE PARTICIPATING PARTIES AS OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE; *PROVIDED, HOWEVER*, THAT ALL OTHER CLAIMS AND CAUSES OF ACTION ANY CONSENTING ABUSE CLAIMANT MAY HOLD AGAINST ANY OF THE PROTECTED PARTIES SHALL BE RELEASED ON THE EFFECTIVE DATE, AND *PROVIDED FURTHER*, THAT PRIOR TO THEIR RELEASE, ANY SUCH ABUSE CLAIMS SHALL ONLY BE ENFORCEABLE AND COMPENSABLE PURSUANT TO THE TERMS OF THE PLAN AND PLAN DOCUMENTS. CONSENTING ABUSE CLAIMANTS WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST A SETTLING INSURER, SUCH SETTLING INSURER'S RELATED PERSONS, AND ALL OTHER OF SUCH SETTLING INSURER'S SETTLING INSURER RELEASEES ON THE DATE SUCH SETTLING INSURER REMITS ITS INSURANCE SETTLEMENT AMOUNT TO THE TRUST (BUT NO EARLIER THAN THE EFFECTIVE DATE).

i.    Exculpation; Limitation of Liability.

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THIS CHAPTER 11 CASE OR (II) IN CONNECTION WITH THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE ARCHDIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.

111

### j. Gatekeeper Injunction

To the extent permitted by law, and subject in all respects to this Section 12, no Enjoined Party may commence or pursue against any Protected Party (a) an Abuse Claim or (b) any other Claim or cause of action that arose, arises from, or is related to an Abuse Claim, the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind-down or reorganization of the business of the Archdiocese, the administration of the Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or cause of action represents a colorable Claim against a Protected Party and (ii) subject in all respects to the Channeling Injunction and Settling Insurer Injunction, specifically authorizing such Enjoined Party to bring such Claim or cause of action against any such Protected Party. The Bankruptcy Court will have jurisdiction to determine whether a Claim or cause of action is colorable and, to the extent legally permissible and as provided for in Section 13, have jurisdiction to adjudicate the underlying colorable Claim or cause of action.

For the avoidance of doubt, the Gatekeeper Injunction in this Section 12.10 does not apply to Claims commenced for the purpose of seeking recovery from Non-Settling Insurers.

### k. Releases in Insurance Settlement Agreements.

The releases in the Insurance Settlement Agreements are hereby fully incorporated in this Plan by reference and are adopted and ratified in all respects, and the Confirmation Order shall adopt and ratify all such releases. For the avoidance of doubt, but without limiting the generality of the foregoing, the Confirmation Order shall provide that all such releases are binding upon the Archdiocese and the Participating Parties.

### l. Injunctions in Full Force and Effect.

All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies, free and clear of all Claims pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

### m. Injunctions and Releases Integral.

The foregoing injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. The currently pending Abuse Actions commenced by Consenting Abuse Claimants, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of this Plan, the releases provided for under the Plan, or the Insurance Settlement Agreements shall be dismissed with prejudice following the Trustee's receipt of a Consenting Abuse Claim Release Agreement executed by the applicable Abuse Claimant, except for Litigation Claims (or Abuse Claims that may become Litigation Claims), which will be released as against the Archdiocese and/or Participating Parties (as applicable) upon the applicable Abuse Claim Discharge Date in accordance with Sections 12.2.3 and 12.7 of this Plan.

CORE/3529758.0002/239580558.7

n. **Timing.**

The injunctions, releases, and discharges (including the Channeling Injunction and the Settling Insurer Injunction) to which a Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement Agreement, the Plan, the Confirmation Order, the Sale Order approving such Insurance Settlement Agreement, and the Bankruptcy Code shall only become effective when (a) the Trust receives payment in full of the Insurance Settlement Amount from the Settling Insurer pursuant to the terms of such Settling Insurer's Insurance Settlement Agreement, and (b) all other conditions to the effectiveness of such Settling Insurer's Insurance Settlement Agreement are satisfied or waived in accordance with the terms thereof.

o. **Non-Settling Insurers.**

Notwithstanding anything to the contrary herein, the following shall apply to Non-Settling Insurers: (i) no Claim by an Abuse Claimant against a Non-Settling Insurer shall be a Channeled Claim; *provided, however*, any Consenting Abuse Claims which assert liability against a Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims as to such Protected Party; (ii) no Claim by an Abuse Claimant against a Non-Settling Insurer shall be released by operation of this Plan; (iii) the injunctions provided in Section 12.1 and 12.2 of this Plan shall not apply to Claims by any Abuse Claimant against a Non-Settling Insurer; and (iv) all Claims by any Abuse Claimant against a Non-Settling Insurer are preserved.

## ARTICLE XXIV.   TITLE TO AND VESTING OF ASSETS.

All property of the Consolidated Catholic Entities and the Estate is dealt with by the Plan. Therefore, on the Effective Date, to the fullest extent allowed by sections 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b), and 1141(c) of the Bankruptcy Code, all property of the Consolidated Catholic Entities and the Estate, and any property acquired by the Consolidated Catholic Entities pursuant to this Plan, shall revest in the respective Consolidated Catholic Entity, and such property shall be free and clear of all Liens, Claims, charges or other encumbrances whatsoever, except that (a) any charitable assets subject to Donor Restrictions shall remain subject to such Donor Restrictions and (b) all Purchased Property shall be settled, sold, and/or released (as applicable) pursuant to the terms of the Insurance Settlement Agreements. On and after the Effective Date, except as otherwise provided in this Plan, the Consolidated Catholic Entities may operate and manage its affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by Donor Restrictions, the Plan, or the Confirmation Order. The Consolidated Catholic Entities may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

## ARTICLE XXV. CONTINUED CORPORATE EXISTENCE.

Subject only to Plan Section 12.24, the Archdiocese will continue to exist after the Effective Date as a corporation sole established by special act under Maryland law, having tax-exempt status under 26 U.S.C. § 501(c)(3) and applicable Maryland law, without prejudice to any right to alter or terminate such existence, or to change its corporate name, except as such rights may

CORE/3529758.0002/239580558.7

be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

Notwithstanding anything to the contrary in the Plan or otherwise, except to the extent necessary to honor any Donor Restrictions or to the extent it may expressly assume such obligations in the Plan or in writing on or after the Effective Date, the Archdiocese shall not be liable for any Claims arising on or prior to the Effective Date, provided that this limitation of liability shall not apply to any Claims, liabilities, or obligations of the Archdiocese arising under any Insurance Settlement Agreement or Sale Order. All Persons and Entities holding Liens, Claims and encumbrances, and other Interests of any kind or nature whatsoever, against or in the Archdiocese or the Residual Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Archdiocese, the Residual Assets, or the operation of the Residual Assets prior to the Effective Date shall be forever barred, estopped, and permanently enjoined from asserting against the Archdiocese such Liens, Claims, encumbrances, and other Interests; *provided, however*, nothing herein shall prohibit any Person with standing to do so from taking any action to enforce Donor Restrictions, nor shall anything herein bar, estop, or enjoin any Settling Insurer from asserting or enforcing any Claims that arise under such Settling Insurer's Insurance Settlement Agreement or corresponding Sale Order.

## ARTICLE XXVI.    IDENTITY OF TRUSTEES AND OFFICERS.

Unless otherwise noticed by the Debtor, in accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees and officers of the Archdiocese on and after the Effective Date shall remain: (i) The Most Reverend William E. Lori, Archbishop of Baltimore; (ii) The Most Reverend Adam J. Parker; (iii) Dr. Diane Barr, Chancellor; and (iv) John Matera, Chief Financial Officer, all of whom have served in such capacities for the Archdiocese prior to and during this Chapter 11 Case, and each of whom is affiliated with the Universal Roman Catholic Church.

## ARTICLE XXVII.    AUTHORITY TO EFFECTUATE PLAN.

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Consolidated Catholic Entities. The Archdiocese shall be authorized, for itself and any of the Consolidated Catholic Entities, without further application to or order of the Bankruptcy Court, to take whatever action it may deem necessary or beneficial to achieve consummation of and carry out the Plan and to effectuate the transactions provided for thereunder.

## ARTICLE XXVIII.    BINDING EFFECT.

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Consolidated Catholic Entities any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

114

CORE/3529758.0002/239580558.7

### ARTICLE XXIX.     DISSOLUTION OF COMMITTEE.

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or Mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

### ARTICLE XXX. EFFECT OF PLAN ON PARISHES, SCHOOLS, AND OTHER CATHOLIC ORGANIZATIONS.

For the avoidance of all doubt, any Parish, School, or Other Catholic Organization who is not a Consolidated Catholic Entity and/or a Participating Party shall not receive any release, discharge, or other benefit from the Plan, including without limitation, any injunction, release, or discharge contained in Plan Article 12.

### ARTICLE XXXI.     WAIVER OF CHARITABLE IMMUNITY.

On the Effective Date, the Court's *Order Granting the Joint Motion for Entry of an Order Approving Stipulation Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019*, Adv. P. No. 25-00084, Docket No. 170 (Bankr. D. Md.), including all of the Archdiocese's and Consolidated Catholic Entities' promises, representations, and statements relied on, referenced by, or contained therein, shall become a material part of the Plan.

.

### ARTICLE XXXII.     PLAN CONSOLIDATION OF THE CONSOLIDATED CATHOLIC ENTITIES.

**a.**     *Approval of Plan Consolidation.* Entry of the Confirmation Order shall constitute the Court's approval, pursuant to sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code and applicable law, effective as of the Effective Date, of the Plan Consolidation of the Consolidated Catholic Entities for all purposes related to the Plan.

**b.**     *Effects of Plan Consolidation.* Solely for the limited purposes specified in Section 12.24 of this Plan and subject to Section 12.24.3: all assets and liabilities of the Consolidated Catholic Entities shall be consolidated and merged; all guarantees by any Consolidated Catholic Entity of the obligations of any other Consolidated Catholic Entity shall be eliminated, and all debts owed between or among Consolidated Catholic Entities shall be eliminated, so that any Claim against any Consolidated Catholic Entity, and any guarantee thereof executed by any other Consolidated Catholic Entity, shall be a single obligation of the Consolidated Catholic Entities; and each and every Proof of Claim Filed or to be Filed in these Chapter 11 Cases or deemed Filed under the Plan against any Consolidated Catholic Entity that asserts a Claim duplicative of a Claim against any other

115

Consolidated Catholic Entity shall be deemed Filed against the Consolidated Catholic Entities collectively and shall be one Claim against, and if and to the extent allowed, shall be one obligation of, the Consolidated Catholic Entities. For the avoidance of doubt, Plan Consolidation is solely for Plan purposes, including, without limitation, funding and distributions through the Trust, and does not effectuate a merger or dissolution of any legal entity, including without limitation, upon occurrence of the Effective Date, each of the Consolidated Catholic Entities shall be separate legal persons for purposes of any litigation, lawsuit, Claim, or other proceeding related to the 2023 CVA other than this Chapter 11 Case.

c.  **Savings Clause; Preservation of Legal Separateness, Liens, Donor Restrictions, Setoff, and Insurance.** Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Plan Consolidation shall not, other than for the limited purposes specified in this Section 12.24, affect the legal and organizational structure of any Consolidated Catholic Entity; affect prepetition or postpetition guarantees, Liens, and security interests that are required to be maintained in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Case that have been or will be assumed, or that are required to be maintained pursuant to the Plan; affect defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right of setoff; or affect the rights and obligations under, or distributions out of, any insurance policies, surety bonds, or proceeds thereof. In addition, valid restrictions under applicable nonbankruptcy law on the use of Donor-Restricted assets of any Consolidated Catholic Entity are preserved and not altered by the Plan Consolidation, except to the extent that any restriction that limits the use of funds to one Consolidated Catholic Entity shall be deemed to permit the use of those funds for any of the Consolidated Catholic Entities for purposes of this Plan.

d.  **Elimination of Intercompany Obligations Among Consolidated Catholic Entities for Plan Purposes.** On and after the Effective Date and solely for the limited purposes specified in this Section 12.24, all intercompany Claims and Interests among any of the Consolidated Catholic Entities are eliminated and shall be discharged and released without any distribution on account thereof, and no distributions shall be made on account of any such intercompany Claims or Interests; *provided, however*, that nothing in this Section 12.24 shall affect any rights, defenses, or Claims of any Consolidated Catholic Entity against any Person who is not a Consolidated Catholic Entity.

e.  **Claims Administration Consequences.** Any Abuse Claim Filed against any Consolidated Catholic Entity that is duplicative of a Claim Filed against any other Consolidated Catholic Entity shall be treated as a single Claim against the Consolidated Catholic Entities for purposes of distributions under the Plan. The Abuse Claims Reviewer shall, for purposes of scoring, allowing, and/or disallowing Abuse Claims only, designate and consolidate such duplicative filings on the claims register without further order of the Court, consistent with this Section 12.24 and the provisions of the Trust Agreement.

f.  **Findings and Implementation.** The Confirmation Order shall include findings that: the Plan Consolidation is necessary to effectuate the fair and equitable treatment of creditors; the Plan Consolidation is fair and necessary to disentangle the

116

financial records, assets, and operations of the Debtor from the Non-Debtor Consolidated Entities, and simplify and expedite claims administration and distributions under the Plan; the Plan Consolidation is limited to the purposes specified in this Section; and adequate notice and due process have been afforded to all parties in interest, including the Non-Debtor Consolidated Entities. The Trustee is authorized to take all necessary action to implement this Section, including administering duplicate Claims consistent with this Section.

g. ***Avoidance Actions***. On the Effective Date, Avoidance Actions held by the Consolidated Catholic Entities, shall be transferred, assigned, and conveyed to the Trust pursuant to Bankruptcy Code section 1123(b)(3)(B). The Trustee shall be the representative of the Estate and the Consolidated Catholic Entities for all purposes related to the Avoidance Actions and shall have standing to bring, prosecute, defend, litigate, settle or otherwise pursue all Avoidance Actions for the benefit of the Trust. The Consolidated Catholic Entities shall provide the Trustee copies of all books and records necessary to prosecute the Avoidance Actions and shall otherwise cooperate with the Trustee's reasonable request for information, including providing any witnesses to testify at deposition or trial regarding the Avoidance Actions. All proceeds of the Avoidance Actions shall become part of the Trust corpus and be used to make distributions to Class 6 Claimants consistent with the Trust Agreement.

h. ***Appointment of Committee as Attorney-in-Fact.*** Upon entry of the Confirmation Order and solely with regard to any Class 6 Claimant who (i) does not return an Abuse Claim Ballot or (ii) returns an Abuse Claim Ballot that does not make an election to be either a Consenting Abuse Claimant or Non-Consenting Abuse Claimant, the Committee shall be appointed, consistent with its fiduciary duties under Bankruptcy Code Sections 1102 and 1103, as attorney in fact to execute an Abuse Claim Ballot to make an election for the Class 6 Claimant to be either a Consenting Abuse Claimant or Non-Consenting Abuse Claimant and such election shall be binding on the Class 6 Claimant. Pursuant to Fed. R. Bank. P. 7023 and 9014, the Committee reserves the right to seek a declaratory judgment in conjunction with this Plan, confirming the Committee's authority to make elections for Class 6 Claimants pursuant to this Section 12.26.

## ARTICLE XXXIII.      RETENTION OF JURISDICTION

### a. <u>By the Bankruptcy Court.</u>

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain: (a) original and exclusive jurisdiction over the Chapter 11 Case; (b) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case; and (c) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

117

i.        over disputes concerning the ownership of Claims,

ii.        over disputes concerning the distribution or retention of assets under the Plan,

iii.        subject to the Plan Documents, over objections to Claims, motions to allow late-Filed Claims, and motions to estimate Claims,

iv.        over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Archdiocese, the Estate, or the Trust, or property abandoned or transferred by the Archdiocese, the Estate or the Trust,

v.        over motions to approve Insurance Settlement Agreements entered into after the Effective Date by the Trustee,

vi.        over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets,

vii.        over matters related to the removal of the Trustee and the appointment of a successor Trustee,

viii.        over matters relating to the subordination of Claims,

ix.        to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated,

x.        to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order,

xi.        to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan and any Insurance Settlement Agreement (including, without limitation, the Channeling Injunction, Settling Insurer Injunction, and Gatekeeper Injunction),

xii.        over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith,

xiii.        over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code and any objections thereto,

118

      xiv.      over all applications for compensation under sections 327, 328, 329, and 330 of the Bankruptcy Code,

      xv.      over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code,

      xvi.      over conflicts and disputes among the Trust, the Archdiocese, and holders of Claims,

      xvii.      over disputes concerning the existence, nature, or scope of the Archdiocese Discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date,

      xviii.      to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Archdiocese or its property, the Estate or its property, the Trust or its property, the Trustee, the Professionals, or the Confirmation Order,

      xix.      to enter a final decree closing the Chapter 11 Case,

      xx.      to enforce all orders previously entered by the Bankruptcy Court (including without limitation the Sale Order(s)),

      xxi.      over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan, and

      xxii.      to hear and determine any matters related to the indemnification obligations of the Trust under any Insurance Settlement Agreement and/or Section 8.14.2 of this Plan.

### b. **By the District Court.**

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code and 28 U.S.C. § 1334, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

### c. **Actions to Enforce the Plan.**

The Archdiocese and the Trust may, but are not required to, commence an Action to enforce the terms of the Plan or to collect amounts owed pursuant to the Plan and any settlements set forth in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the terms of the Plan or such settlement. Any such Action may be commenced by filing a motion with the Bankruptcy Court. On and after the Effective Date, the Trust shall have the sole and exclusive right to enforce the terms of the Plan against the Archdiocese and/or any

119

Participating Party (except that the Archdiocese or any Participating Party may enforce the terms of the Plan as against each other and the Trust) and may seek any appropriate remedy in law or equity from the Bankruptcy Court which shall retain exclusive jurisdiction over any such Action.

### d. Case Closure.

The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Case upon a motion by the Archdiocese or any other Person. The Trustee shall not take any actions to unreasonably keep the Chapter 11 Case open. The Trustee, in his sole discretion, may seek to reopen the Chapter 11 Case to administer assets of the Trust. If the Chapter 11 Case is reopened upon request of the Trustee, the Trust, and the Archdiocese shall cooperate to assure that no disbursements are made from the Estate during the period when the Chapter 11 Case is reopened, and the case shall be closed at the earliest possibility.

### ARTICLE XXXIV.     TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims. This summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Committee does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not U.S. Persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

CORE/3529758.0002/239580558.7

### a.  Federal Income Tax Consequences to Holders of Unsecured Claims

In accordance with the Plan, all holders of Abuse Claims and Unknown Abuse Claims will receive Distributions on their Allowed Claims. Holders of Abuse Claims and Unknown Abuse Claims will realize a loss, if any, in an amount equal to that Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of Abuse Claims and Unknown Abuse Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a Claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponent anticipates that Distributions to Abuse Claims and Unknown Abuse Claims will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponent has not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN ABUSE CLAIMS OR UNKNOWN ABUSE CLAIMS. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN ABUSE CLAIM AND UNKNOWN ABUSE CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF AN ABUSE CLAIM AND UNKNOWN ABUSE CLAIM AS A RESULT OF THE PLAN.

### b.  Federal Income Tax Consequences to the Consolidated Catholic Entities

The Consolidated Catholic Entities are not-for-profit religious corporations having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Consolidated Catholic Entities' status as a not-for-profit corporation, the Plan Proponent anticipates that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Consolidated Catholic Entities.

### c.  Tax Consequences to the Trust

The Trust may satisfy the requirements of a designated settlement fund under Section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund.

THE PLAN PROPONENT EXPRESSES NO OPINION REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT

121

FUND. THE PLAN PROPONENT HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT THEIR OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUST AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.

**ARTICLE XXXV.      ALTERNATIVES TO THE PLAN**

The Committee believes the Plan is in the best interests of the Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (a) an alternative plan of reorganization may be proposed and confirmed, or (b) the Chapter 11 Case may be dismissed. As discussed below, two other options, liquidation under chapter 7 and the appointment of a chapter 11 trustee, are not viable alternatives in this Chapter 11 Case.

### a.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Archdiocese or another party in interest may propose a different plan, which might involve an alternative means for reorganizing the Consolidated Catholic Entities. Accordingly, the Plan Proponent believes that the terms of the Plan provide for the most favorable outcome for Creditors. The negotiation and drafting required for additional plans would likely add substantially greater administrative expenses with no guarantee of a better result for Creditors. For these reasons, the Plan Proponent does not believe that an alternative plan of reorganization is a preferable alternative to the Plan.

### b.  Dismissal of the Chapter 11 Case

If the Plan is not confirmed, the Archdiocese or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case. Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon dismissal of the Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Consolidated Catholic Entities and individual Abuse Claimants and between the Consolidated Catholic Entities and its Insurers. In addition to the expense and delay, the Plan Proponent believes that these actions would lead to an inequitable recovery for Abuse Claimants, with the first Abuse Claimants to obtain and enforce judgments against the Archdiocese depleting the Archdiocese's assets and resulting in insufficient assets to satisfy later judgments. Therefore, the Plan Proponent believes that dismissal of the Archdiocese's Chapter 11 Case is not a preferable alternative to confirming the Plan.

### c.  Chapter 7 Liquidation Not a Viable Alternative

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation", a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent. The

122

CORE/3529758.0002/239580558.7

Archdiocese, as a non-profit entity, is not a moneyed corporation, and may not be forced to convert this Chapter 11 Case to a chapter 7 case. Thus, conversion to chapter 7 is not a viable alternative to the Plan.

### d. Appointment of a Chapter 11 Trustee

The Committee anticipates that the Archdiocese will assert that the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act prevent a chapter 11 trustee from being appointed to replace the Archbishop's administration of the Consolidated Catholic Entities.

### ARTICLE XXXVI.     ACCEPTANCE AND CONFIRMATION OF THE PLAN

### a. General Confirmation Requirements.

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Plan Proponent, including that (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponent has complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponent proposes the Plan in good faith and not by any means forbidden by law; (v) the disclosures required by section 1125 of the Bankruptcy Code have been made; (vi) the Plan has been accepted by the requisite votes of Creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Archdiocese; (viii) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (ix) all U.S. Trustee Fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### b. Parties in Interest Entitled to Vote.

Pursuant to the Bankruptcy Code, only Classes of Claims that are "Impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the debt. Classes of Claims that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### c. Classes Impaired Under the Plan.

Abuse Claims and Unknown Abuse Claims are the only Classes that are Impaired and entitled to vote under the Plan.

123

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a Distribution under the Plan. Accordingly, the Committee is soliciting acceptances only from holders of Abuse Claims and Unknown Abuse Claims.

### d.    Confirmation Without Acceptance of All Impaired Classes.

The Bankruptcy Code contains provisions for confirming a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date, or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan on account of such junior claim or interest; and (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal priority.

**IF A CLASS OF CLAIMS VOTING ON THE PLAN VOTES TO REJECT THE PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.**

### e.    Best Interests Test.

In order to confirm a plan, the Bankruptcy Court must independently determine that the plan is in the best interests of each holder of a claim in any impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best

124

interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the effective date of the plan, at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Archdiocese was liquidated under a hypothetical chapter 7 case under the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from such liquidation (the "Liquidation Fund"). The Liquidation Fund would consist of the net proceeds from the disposition of the Archdiocese's assets (after satisfaction of all valid liens) and the recoveries on causes of action, if any, held by the Estate. The Liquidation Fund would not include (i) the portion of the Consolidated Catholic Entities' Cash Contribution coming from Entities other than the Archdiocese, (ii) the assignment of Insurance Claims, (iii) any contributions by Settling Insurers, or (iv) restricted funds, which would be subject to a *cy pres* action involving the Maryland General Assembly. The Liquidation Fund would be reduced by the cost of the liquidation. The costs of a hypothetical liquidation under chapter 7 would include the fees and expenses of the chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the chapter 7 trustee, selling expenses and wind-down costs, any unpaid expenses incurred by the Archdiocese during its Chapter 11 Case (such as fees for attorneys, financial advisors and accountants) which would be Allowed in the chapter 7 proceedings, interest expense on secured debt and claims incurred by the Archdiocese during the pendency of the cases. These Claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of General Unsecured Claims and Abuse Claims. In addition, other Claims that would arise upon conversion to a chapter 7 case would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional Claims against the Estate would arise as a result of the establishment of a new Bar Date for the filing of Claims in the chapter 7 case. The present value of the Distributions from the Liquidation Fund (after deducting the amounts described above) must then be compared with the present value of the property offered to each of the Classes of Claims under the Plan, to determine if the Plan is in the best interests of Claim holders.

The Committee believes that a chapter 7 liquidation of the Archdiocese's remaining Assets would result in a better result for holders of Claims. This belief is in spite of, among other factors: (a) the reduced value of the Archdiocese's remaining Assets in a chapter 7 case; (b) the additional administrative expenses involved in the appointment of a chapter 7 trustee, attorneys, accountants, and other chapter 7 professionals; (c) the substantial time that would elapse before Creditors would receive any Distribution in respect of their Claims, due to a chapter 7 trustee's need to become familiar with the Archdiocese's books and records and the chapter 7 trustee's administration of the case; and (d) the additional Claims that may be asserted against the Archdiocese. However, whether the best interest test applies to a non-profit debtor, like the Archdiocese is here, is an unresolved legal issue. This is because the Archdiocese cannot be liquidated without its consent.

### f.   Feasibility.

In connection with confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the need for liquidation or further financial reorganization of the Consolidated Catholic Entities, except as proposed in the Plan.

125

In this case, the Committee has prepared cash flow projections demonstrating that the Archdiocese, will be able to fund the Consolidated Catholic Entities' Cash Contribution, that the Archdiocese will be able to meet their other respective obligations under the Plan, and that the Archdiocese will have sufficient resources to support ongoing ministries and operations. A copy of the financial projections is attached hereto as **Exhibit A.** The cash flow projections demonstrate that the Archdiocese will be able to fund the Plan on the Effective Date and that the Archdiocese will be able to make all payments required pursuant to the Plan so that no further financial restructuring will be necessary. Accordingly, the Committee believes that the Plan satisfies the feasibility test.

### g.  Compliance with the Applicable Provisions of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponent has considered each of these provisions in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

### ARTICLE XXXVII.    RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DIOCESE SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

### a.  Objection to Classifications of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class, only if such claim is substantially similar to the other claims in such class. The Plan Proponent believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponent could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponent believes that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

CORE/3529758.0002/239580558.7

### b. Failure to Satisfy Voting Requirements.

If the Plan Proponent obtains the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponent intends, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponent may be forced to pursue an alternative plan of reorganization or the Archdiocese may dismiss the Chapter 11 Case.

### c. The Plan May Not Be Accepted or Confirmed.

The Plan may not be confirmed without the affirmative acceptance of at least one Impaired Class. Even if all voting Classes accept the Plan, the Plan may not be confirmed if the Bankruptcy Court determines that the Plan does not meet the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. The Plan Proponent believes that the Plan satisfies all of the relevant section 1129 requirements. There can be no assurance, however, that the requisite Creditor consent will be obtained or that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

### d. The Plan Proponent's Assumptions and Estimates May Prove Incorrect.

The Plan Proponent has made certain assumptions regarding, and have attempted to estimate in good faith and to the best of its ability, the aggregate number and amount of Claims in each Class, the projected expenses incurred to date or to be incurred in connection with the confirmation and administration of the Plan, and the assets which may be available for liquidation and Distribution under the Plan. There can be no guarantee, however, that the Plan Proponent's assumptions and estimates regarding these amounts will prove to be accurate. In the event the Plan Proponent's assumptions and estimates prove incorrect, Creditor recoveries under the Plan may be materially less than projected.

### e. Non-Confirmation or Delay in Confirmation of the Plan.

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

### f. Non-Consensual Confirmation.

In the event the Impaired Classes of Claims do not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponent's request if the cramdown requirements described above are satisfied. The Plan Proponent believes that the Plan satisfies these requirements.

### g. Authority to Grant Third-Party Releases.

On June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, No. 23-124 (the "Purdue Decision"). In the Purdue Decision, the Supreme Court ruled that a bankruptcy court does not have the authority to issue nonconsensual releases discharging creditors' claims against non-debtor entities.

127

CORE/3529758.0002/239580558.7

The third-party releases and Channeling Injunction contained in the Plan are an integral part of the Archdiocese's overall restructuring efforts and are an essential element in obtaining the Participating Parties' support for the Plan. Failure of Abuse Claimants to consent to the third-party releases and channeling injunctions may jeopardize Abuse Claimants from receiving any payment under the Plan. If Abuse Claimants withhold consent to the releases and Channeling Injunction contemplated under the Plan, there may not be adequate funding available for distribution to Abuse Claimants under the Plan because the contributions from the Participating Parties are contingent on the Participating Parties receiving the benefit of such releases. Should this scenario occur, a condition to the Effective Date will not be satisfied and the Plan may fail, which will significantly delay any recovery for Abuse Claimants.

### h. Risk of Non-Occurrence of the Effective Date.

Although the Plan Proponent believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

### i. Non-Settling Insurers May Raise Objections to Confirmation.

Certain Non-Settling Insurers may object to confirmation of the Plan by asserting that the Plan impermissibly alters their contractual rights, duties, and obligations under their Insurance Policies. For example, certain insurers raise concerns regarding, among other things, the Plan's treatment of applicable self-insured retentions required under any Non-Settling Insurer Policy. Also, certain Non-Settling Insurers may contend that the Consolidated Catholic Entities has not established the existence of any Insurance Policy that provides coverage for commercial general liability claims that may cover Abuse Claims.

Although the Plan Proponent does not believe there is any merit to such objections or assertions, if the Non-Settling Insurers were to prevail on such contentions, the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable.

### j. Post-Confirmation Litigation May Not Result in Additional Recovery

The Plan provides for the assignment to the Trust of Insurance Claims against Non-Settling Insurers. The Non-Settling Insurers are likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Consolidated Catholic Entities and other Participating Parties for Abuse Claims. Litigation of the Insurance Claims against Non-Settling Insurers could be protracted and expensive. There is no guarantee that the Trust will prevail in its prosecution of the Insurance Claims against Non-Settling Insurers.

In the event the Non-Settling Insurers successfully defend against the Insurance Claims, the Consolidated Catholic Entities' Cash Contribution and the settlement payments from Settling Insurers would be the sole source of recovery for Abuse Claims.

### k. Confirmation of the Plan may be delayed or denied by the District Court.

The Plan Proponent's position is that the Bankruptcy Court has constitutional authority to confirm the Plan. The United States Trustee may assert, however, that the Bankruptcy Court does

CORE/3529758.0002/239580558.7

not have jurisdiction to approve certain of the releases, exculpation, and injunctions contemplated in the Plan. If it is determined that the Bankruptcy Court lacks the authority to approve such provisions, the Plan Proponent anticipates that the Bankruptcy Court will issue proposed findings of fact and conclusions of law with respect to the confirmation of the Plan. The Bankruptcy Courts findings and conclusions would then be subject to de novo review by the District Court for the District of Maryland the Plan can be confirmed, which may result in a delay in the occurrence of the Effective Date. It is difficult to estimate how long the District Court would take to render a decision with respect to confirmation of the Plan; however, in the recent bankruptcy cases which included similar plan concepts, the District Court for the District of Delaware took approximately six months to review and affirm the bankruptcy court's findings and conclusions and to issue a confirmation order.

### ARTICLE XXXVIII. MISCELLANEOUS PROVISIONS

#### a. Amendment or Modification of the Plan.

The Plan Proponent may modify the Plan at any time prior to the Confirmation Hearing, in The Plan Proponent may modify the Plan at any time prior to the Confirmation Hearing, in accordance with section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponent may modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement, supplement, or relate to the Insurance Settlement Agreements may not be severed, waived, amended, deleted or otherwise modified without the prior written approval of each Settling Insurer affected by such severance, waiver, amendment, deletion or modification.

#### b. Headings.

The headings used in the Plan and in this Disclosure Statement are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

#### c. Severability of Plan Provisions.

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

#### d. Validity and Enforceability.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with

129

CORE/3529758.0002/239580558.7

the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in the Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all of the other provisions of the Plan.

   e.  **Revocation or Withdrawal of the Plan.**

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. **If the Plan Proponent revokes or withdraws the Plan before the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Archdiocese or the Committee or to prejudice in any manner the rights of the Archdiocese or the Committee in any further proceedings.**

   f.  **Controlling Documents.**

In the event and to the extent that any provision of the Plan or the Trust Documents is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or the Trust Documents, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Documents is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Documents, the provisions of the Confirmation Order shall control and take precedence.

   g.  **Filing of Additional Documents.**

At any time before substantial consummation of the Plan, the Archdiocese or the Trust, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

   h.  **Direction to a Party.**

On or after the Effective Date, the Trustee or the Archdiocese, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

   i.  **Certain Actions.**

By reason of entry of the Confirmation Order prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers or trustees of the Archdiocese under the Plan, including: (i) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan; and (ii) the adoption, execution, and implementation of other matters provided for under the Plan involving the Archdiocese or the organizational structure of

CORE/3529758.0002/239580558.7

the Archdiocese shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers or trustees of the Archdiocese.

### j.    **Waiver of Subordination**.

Notwithstanding any provision of the Plan to the contrary, all holders of Claims shall be deemed to have waived any and all contractual subordination rights to which they may have with respect to the Distributions made pursuant to the Plan, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving Distributions under the Plan.

### k.    **Reservation of Rights.**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.

### l.    **Plan as Settlement Communication.**

The Plan furnishes or offers or promises to furnish, or accepts or offers or promises to accept, valuable consideration in compromising or attempting to compromise Claims, Interests, and Causes of Action that are disputed as to validity or amount, including Abuse Claims and Insurance Claims. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or Disclosure Statement are subject in all respects to Rule 408 of the Federal Rules of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action.

### m.    **Reports.**

From the Effective Date until the Chapter 11 Case is closed, the Archdiocese shall, within thirty (30) days of the end of each fiscal quarter, File with the Bankruptcy Court and submit to the United States Trustee, quarterly reports setting forth all receipts and disbursements as required by the United States Trustee guidelines. The Archdiocese will not be required to File monthly operating reports or provide copies of bank account statements. The first report shall be Filed within thirty days after the end of the quarter in which the Effective Date occurs.

### n.    **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Maryland, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

CORE/3529758.0002/239580558.7

### o. **No Admissions.**

Notwithstanding anything herein or in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by the Archdiocese, any Participating Party, the Committee, or any Settling Insurer with respect to any matter set forth herein.

## ARTICLE XXXIX.   SETTLEMENT APPROVAL REQUEST

The Plan Proponent requests approval of all compromises and settlements included in the Plan or contemplated by any settlement agreement.

## ARTICLE XL.   RECOMMENDATION AND CONCLUSION

The Committee believes that the Plan is in the best interests of all Creditors. The Plan as structured allows Creditors to participate in Distributions believed to be in excess of those which would otherwise be available were the Chapter 11 Case dismissed and provides an opportunity to maximize insurance recoveries through settlements with the Settling Insurers and post-confirmation litigation of Insurance Claims against Non-Settling Insurers.

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENT BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE PLAN PROPONENT STRONGLY RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY THE ARCHDIOCESE'S SOLICITATION AND CLAIMS AGENT NO LATER THAN 5:00 P.M. PREVAILING EASTERN TIME ON _____, 2026.

## ARTICLE XLI.  DISCLOSURE STATEMENT NOT BINDING

The disclosure statement is not the Plan. It is a summary of the considerations the Committee has undertaken in developing the Plan and is intended to provide adequate information for creditors to vote on whether to accept or reject the Plan. If the Plan and Disclosure Statement conflict, the words and provisions of the Plan control.

132

**<u>EXHIBIT A</u>**
FINANCIAL PROJECTION
**REDACTED**

CORE/3529758.0002/239580558.7

## EXHIBIT B
LIQUIDATION ANALYSIS
**REDACTED**

CORE/3529758.0002/239580558.7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of May, 2026, a copy of the Official Committee of Unsecured Creditors' Disclosure Statement for the Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore was served electronically on D. Blake Roth, Esquire, Holland & Knight LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, blake.roth@hklaw.com; Catherine K. Hopkin, Esquire, YVS Law LLC, 185 Admiral Cochrane Drive, Suite 130, Annapolis, Maryland 21401, chopkin@yvslaw.com; and Hugh Bernstein, Esquire, Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, hugh.m.bernstein@usdoj.gov; and to all parties that are registered to receive electronic filing through the CM/ECF system on the attached list.

/s/Alan M. Grochal
Alan M. Grochal

CORE/3529758.0002/239580558.7

**The following parties received CM/ECF notice of the filing:**

**Nathan D. Adler, Esquire: nda@nqgrg.com**
**Philip D. Anker, Esquire: philip.anker@wilmerhale.com**
**Sam Alberts, Esquire: sam.alberts@dentons.com**
**G. Calvin Awkward, III, Esquire: cawkward@goldbergsegalla.com**
**Gary Bahena, Esquire: garybahena@bahenalaw.com**
**Hugh M. Bernstein, Esquire: hugh.m.bernstein@usdoj.gov**
**Diane C. Bristow, Esquire: dcb@nqgrg.com**
**PhilipTucker Evans, Esquire: philip.evans@hklaw.com**
**Kevin Foreman, Esquire: kforeman@carltonfields.com**
**Andrew Freeman, Esquire: adf@browngold.com**
**Andrew Glasnovich, Esquire: drew.glasnovich@stinson.com**
**Gary R. Greenblatt, Esquire: grg@cooncolelaw.com**
**Geoffrey Grivner, Esquire: geoffrey.grivner@bipc.com**
**Megan Harmon, Esquire: megan.harmon@bge.com**
**Catherine Keller Hopkin, Esquire: chopkin@yvslaw.com**
**Irving Edward Walker, Esquire: iwalker@coleschotz.com**
**Jonathan Schochor, Esquire; jschochor@sfspa.com**
**Kerry Staton, Esquire; kstaton@sfspa.com**
**Joshua F. Kahn, Esquire; jkahn@sfspa.com**
**Thomas F. Yost, Esquire; tyost@yostlaw.com**
**Robert Keith Jenner: rjenner@jennerlawfirm.com**
**Steven J. Kelly, Esquire: skelly@gelaw.com**
**Nicole Khalouian, Esquire: nicole.khalouian@stinson.com**
**C. Scott Kunde, Jr., Esquire: scott.kunde@hklaw.com**
**Anthony May, Esquire: amay@browngold.com**
**Timothy P. Palmer, Esquire: timothy.palmer@bipc.com**
**Mark David Plevin, Esquire: mplevin@crowell.com**
**David Kendall Roberts, Esquire: droberts2@omm.com**
**Annette Rolain, Esquire: arolain@ruggerilaw.com**
**Blake D. Roth, Esquire: blake.roth@hklaw.com**
**James P. Ruggeri, Esquire: jruggeri@ruggerilaw.com**
**Jonathan Schapp, Esquire: jschapp@goldbergsegalla.com**
**U.S. Trustee – Baltimore: ustpregion04.ba.ecf@usdoj.gov**
**Joshua D. Weinberg, Esquire: jweinberg@ruggerilaw.com**
**Adam R. Dunst, Esquire, adunst@goldbergsegalla.com**
**Samantha J. Hanson-Lenn, Esquire, Samantha.hansonlenn@stinson.com**
**Eric G. Korphage, Esquire, korphagee@whiteandwilliams.com**
**Robert H. Kline, Esquire, kliner@whiteandwilliams.com**
**Matthew M. Weiss, Esquire, mweiss@phrd.com**
**John E. Bucheit, Esquire, jbucheit@phrd.com**
**Matthew G. Roberts, Esquire, mroberts@phrd.com**
**John Grossbart, Esquire, john.grossbart@dentons.com**
**Siobhain P. Minarovich, Esquire, manarovics@whiteandwilliams.com**
**Justin P. Fasano, Esquire, jfasano@mhlawyers,com**

136

**Matthew C. Nelson, Esquire, matthew.nelson@kennedyslaw.com**
**Jillian G. Dennehy, Esquire, jillian.dennehy@kenedyslaw.com**
**James R. Murray, Esquire, jim.murray@blankrome.com**
**James D. Carter, Esquire, james.carter@blankrome.com**
**Robyn L. Michaelson, Esquire, robyn.michaelson@blankrome.com**
**Sara G. Klein, Esquire, sklein@manlystewart.com**
**Gary P. Seligman, Esquire, gseligman@wiley.law**
**Ezhan S. Hasan, Esquire, ahasan@wiley.com**
**Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com**
**Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com**
**Isabella R. Sayyah, Esquire, isayyah@gibsondunn.com**
**Matthew A. Hoffman, Esquire, mhoffman@gibsondunn.com**
**Ryan S. Appleby, Esquire, rappleby@gibsondunn.com**
**Michael A. Rosenthal, Esquire, mrosenthal@gibsondunn.com**
**Todd C. Jacobs, Esquire, tjacobs@phrd.com**
**Jesse J. Bair, Esquire, jbair@burnsbair.com**
**Timothy W. Burns, Esquire, tburns@burnsbair.com**
**Jared Zola, Esquire, jared.zola@blankrome.com**
**Anthony J.M. Kikendall, Esquire, kikendalla@whiteandWilliams.com**
**Eileen King Bower, Esquire,  Eileen.kingbower@clydeco.us**
**Robert M. Westra, Esquire, rwestra@ppsrlaw.com**
**Kevin A. Clasing, Esquire, kclasing@ppsrlaw.com**
**Morgan K. Stippel, Esquire, mstippel@burnsbair.com**
**Justine M. Daniels, Esquire, jdaniels@omm.com**
**Ryan S, Perlin, Esquire, perlin@mdtrialfirm.com**
**Emily C. Malarkey, Esquire, malarkey@mdtrialfirm.com**
**Jodie E. Bekman, Esquire, jbekman@gfrlaw.com**
**Timothy Karcher, Esquire, tkarcher@proskauer.com**
**Paul Possinger, Esquire, ppossinger@proskauer.com**
**Christopher White, Esquire, Christopher.white@clydeco.us**
**Clinton Cameron, Esquire, Clinton.cameron@clydeco.us**
**Bret Kabacinski, Esquire, bret.kabacinski@clydeco.us**
**Douglas McGill, Esquire, dmcgill@webbermcgill.com**
**Christopher Sevedge, Esquire, Christopher.sevedge@stinson.com**
**Ysabelle G. Reyes, Esquire, yreyes@wiley.law**
**Jon P. Newton, Esquire, jnewton@reidand riege.com**
**Benjamin M. Fischer, Esquire, bfischer@coleschotz.com**
**Richard A. Galbo, Esquire, rgalbo@goldberg segalla.com**
**Sheldon N. Jacobs, Esquire, sjacobs@snjlaw.com**
**Nicholas A. Dellefave, Esquire, Nicholas.dellefave@hklaw,com**
**Elizabeth Connell, Esquire, elizabeth@connellcounsel.com**
**Jacob C. Cohn, Esquire, jcohn@plevinturner.com**
**E. Christopher Amos, Esquire, eChrisamos@gmail.com**
**Edward J. Kelley, Esquire, ed@constantllp.com**
**W. Charles Meltmar, Esquire, cmeltmar@cochranfirmdc.com**
**Nathaniel L. Foote, Esquire, nate@vca.law**

137

**Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com**
**Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com**
**Kathleen A. Parnow, Esquire, katie.parnow@stinson.com**

138

CORE/3529758.0002/239580558.7