UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

In re:

ROMAN CATHOLIC ARCHBISHOP OF
BALTIMORE,

Debtor.[1]

Chapter 11

Case No. 23-16969-MMH

ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE'S
OBJECTION TO THE DISCLOSURE STATEMENT IN SUPPORT OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

The Roman Catholic Archbishop of Baltimore (the "***Debtor***"), by and through its undersigned counsel, files this objection to *The Official Committee of Unsecured Creditors' Disclosure Statement for the First Amended Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore* (Dkt. No. 2416) (the "***Committee Disclosure Statement***") filed by the Official Committee of Unsecured Creditors for the Roman Catholic Archbishop of Baltimore (the "***Committee***") and respectfully states as follows:

RELEVANT BACKGROUND

1. On September 29, 2023 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

2. The Debtor continues to operate and pursue its religious, non-profit mission and ministry and manage its properties and affairs as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

3. No trustee or examiner has been appointed in this case.

---

[1] The last four digits of the Debtor's federal tax identification number are 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

4.     Additional information regarding the Debtor's history, business operations, operational structure, the reasons for commencing the Chapter 11 Case, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Informational Brief of the Roman Catholic Archbishop of Baltimore* (Dkt. No. 5) and the *Declaration of John Matera in Support of First Day Motions* (Dkt. No. 6).

5.     On April 3, 2026, the Committee filed *The Official Committee of Unsecured Creditors' Disclosure Statement for the Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore* (Dkt. No. 2179) (the "**Initial Committee Disclosure Statement**") and *The Official Committee of Unsecured Creditors' Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore* (Dkt. No. 2178) (the "**Initial Committee Plan**").

6.     On May 7, 2026, the United States Trustee filed *The United States Trustee's Opposition to Confirmation of the Official Committee of Unsecured Creditors' Proposed Chapter 11 Plan and Approval of its Accompanying Disclosure Statement* (Dkt. No. 2365) (the "**UST Objection**").

7.     On May 15, 2026, the Debtor filed its *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore, a Corporation Sole, and Additional Debtors* (Dkt. No. 2412) (the "**Debtor's Plan**") and its *Disclosure Statement in Support of the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore, a Corporation Sole, and Additional Debtors* (Dkt. No. 2413) (the "**Debtor's Disclosure Statement**").

8.     On May 15, 2026, the Committee filed the Committee Disclosure Statement and *The Official Committee of Unsecured Creditors' First Amended Chapter 11 Plan of*

2

*Reorganization for the Roman Catholic Archbishop of Baltimore* (Dkt. No. 2415) (together with the Initial Committee Plan, collectively, the "***Committee Plan***").

<u>**OBJECTION**</u>

9.      The Committee Disclosure Statement should not be approved because it describes a plan that is patently unconfirmable such that solicitation would be a waste of estate resources.

10.      Bankruptcy courts in the Fourth Circuit have determined that "[w]hile courts ordinarily reserve confirmation issues for the confirmation hearing, a court may disapprove a disclosure statement where the underlying plan is clearly unconfirmable." *In re Wong*, 598 B.R. 827, 829 (Bankr. D. Md. 2019); *see also In re Pecht*, 53 B.R. 768 (Bankr. E.D. Va. 1985) ("if the disclosure provides that the plan is not in compliance with 11 U.S.C. § 1129, the court can decline to approve the disclosure statement."). As further noted by this Court, if a disclosure statement describes an unconfirmable plan "[i]t is a waste of all parties' resources for the court to approve such a disclosure statement and set the parties on the course of preparing for a confirmation hearing on a plan that is not legally viable." *In re Alexander Props., LLC*, 2011 Bankr. LEXIS 5498 (Bankr. D. Md. 2011).

11.      A plan is patently unconfirmable where it clearly violates provisions of the Bankruptcy Code. *In re Ard*, 669 B.R. 793, 798 (Bankr. D. S.C. 2025).

12.      Here, the Committee Plan is patently unconfirmable for at least two reasons.

13.      First, the Committee Plan proposes to substantively consolidate with the Debtor certain religious, non-profit entities, which violates section 303(a) of the Bankruptcy Code and applicable law.

14.      Second, the Committee Plan fails to satisfy section 1129(a)(3) because the Committee Plan violates federal and state law.

#538656877_v3

15.     In addition to describing a patently unconfirmable plan, the Committee Disclosure Statement also includes myriad erroneous factual statements and assertions, which are materially misleading and confusing.

16.     Accordingly, the Committee Disclosure Statement should not be approved.

I.     **Substantive consolidation of the Debtor and other "Consolidated Catholic Entities" is impermissible under the Bankruptcy Code and applicable law.**

17.     The Committee Disclosure Statement presents a plan under which it proposes to "substantively consolidate" the assets of the Debtor with other "Consolidated Catholic Entities." (*See* Committee Disclosure Statement, at 30.)

18.     However, substantive consolidation of the "Consolidated Catholic Entities" is impermissible under the Bankruptcy Code and applicable law and, even if it was permissible (it is not), circumstances do not warrant or permit substantive consolidation.

A.     **Substantive consolidation would violate the Bankruptcy Code.**

19.     First, substantive consolidation of the "Consolidated Catholic Entities" is impermissible under the Bankruptcy Code, because each of the "Consolidated Catholic Entities" is non-profit corporation and cannot be involuntarily forced into bankruptcy. 11 U.S.C. § 303(a).

20.     Substantively consolidating non-debtor entities with a debtor in a bankruptcy proceeding necessarily serves as filing an involuntary bankruptcy petition for the non-debtor entities. *See Official Committee of Unsecured Creditors v. Archdiocese of St. Paul & Minneapolis (In re Archdiocese of St. Paul & Minneapolis)*, 888 F.3d 944, 953 (8th Cir. 2018).

21.     As churches, schools, and charitable organizations, there is no dispute each of the Consolidated Catholic Entities falls within the plain and ordinary meaning of section 303(a)'s exclusion from involuntary bankruptcy filings. *In re Archdiocese of St. Paul & Minneapolis*, 888 F.3d at 952–53.

4

22. Accordingly, as independent non-profit entities, substantive consolidation of the Consolidated Catholic Entities—effectively filing involuntary bankruptcy proceedings—would violate the Bankruptcy Code and is impermissible. *In re Archdiocese of St. Paul & Minneapolis*, 888 F.3d at 953.

**B.    Substantive consolidation would violate other applicable law.**

23. Substantive consolidation would be in contravention of Maryland law regarding corporate separateness and "alter ego" theory.

24. Under Maryland law the corporate form "will be disregarded only when necessary to prevent fraud or to enforce a paramount equity." *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 235 (Md. 1975) (rejecting argument that formation of separate corporations for liability purposes provided a basis upon which to disregard the corporate form).

25. In this case, all evidence demonstrates there is no support for an alter ego theory claim with respect to the "Consolidated Catholic Entities" under Maryland law. Indeed, after hearing several days of testimony, this Court acknowledged the separateness of the Consolidated Catholic Entities in this Court's *Interim Order Authorizing Debtor to Use Property in the Ordinary Course of Business Subject to Certain Conditions* (Dkt. No. 2329)

26. Accordingly, substantively consolidating the "Consolidated Catholic Entities" would violate applicable Maryland law.

**C.    The facts here do not warrant substantive consolidation.**

27. Substantive consolidation requires analysis of: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit'"; and (ii) "whether the affairs of the debtors are so entangled that consolidation benefits all creditors." *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co.,*

5

*Ltd.)*, 860 F.2d 515, 518 (2nd Cir. 1988); *see also In re Eagle Creek Subdivision, LLC*, 407 B.R. 206, 210 (Bankr. E.D.N.C. 2008).

28.     Substantive consolidation should be used sparingly, and the test must be applied even more cautiously when considering consolidation of a debtor with a non-debtor. *In re* Bonham, 226 B.R. 56, 83 (Bankr. D. Alaska 1992); *In re Lease-A-Fleet, Inc.*, 141 B.R. 869 (Bankr. E.D. Pa. 1992).

29.     Here, neither factor—let alone both—can be satisfied.

30.     There is no evidence whatsoever that creditors of the various Consolidated Catholic Entities have treated **all** parishes, schools, other related entities, and the Debtor as a single economic unit and extended credit on that basis.

31.     In addition, there is no circumstance in which it can be demonstrated that substantive consolidation of the Consolidated Catholic Entities would benefit all creditors.

32.     At present, there are one hundred seven (107) Parishes, Schools, or Other Catholic Organizations with at least one Survivor Claim asserted against them, leaving not less than seventy-one (71) Parishes, Schools, or Other Catholic Organizations (based upon the Exhibit 1 to the Committee's Plan) that do not have at least one Survivor Claim asserted against them.

33.     Of the one hundred seven (107) Parishes, Schools, or Other Catholic Organizations with at least one Survivor Claim asserted against them, fifty (50) have no uninsured Survivor Claims asserted against them, twenty-seven (27) have only one uninsured Survivor Claim asserted against them, and fourteen (14) have only two uninsured Survivor Claims asserted against them.

34.     Accordingly, there is no set of facts that could establish that the creditors of the seventy-one (71) parishes without Survivor Claims asserted against them would be benefitted by substantive consolidation.

6

35.     Similarly, it would be a stretch to believe that creditors of the additional fifty (50) Parishes with no uninsured claims asserted would be benefitted by substantive consolidation.

36.     Accordingly, under no set of circumstances would substantive consolidation be appropriate in the Chapter 11 Case, and approval of the disclosure statement should be denied.

**II.     The Committee Plan does not comply with section 1129(a)(3) of the Bankruptcy Code.**

37.     Section 1129(a)(3) of the Bankruptcy Code requires all plans to be proposed in good faith and comply with all applicable law.

38.     Despite this requirement, the Committee Plan contains numerous provisions that violate federal law and state law.

**A.     The Committee Plan violates the First Amendment and RFRA.**

39.     As the Committee is well aware, the Debtor is a religious entity and, therefore, the Committee Plan must comply with the Religious Freedom Restoration Act (the "***RFRA***") and the First Amendment to the United States Constitution.

40.     The RFRA provides, in relevant part:

> **(a) In general.** Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
>
> **(b) Exception.** Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> > **(1)** is in furtherance of a compelling governmental interest; and
> >
> > **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.

41.     The threshold inquiry under the RFRA is whether governmental action "substantially burdens" a person's religious practice. *United States v. Crystal Evangelical Free*

7

*Church (In re Young)*, 82 F.3d 1407, 1418 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated by Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854 (8th Cir. 1998).

42.     To be a "substantial burden," the governmental action must: (a) significantly inhibit or constrain conduct or expression that manifests some central tenet of the person's religious beliefs; (b) meaningfully curtail a person's ability to express adherence to his or her faith; or (c) deny a person reasonable opportunities to engage in activities fundamental to the person's religious beliefs. *Young*, 82 F.3d at 1418.

43.     In addition, under the First Amendment to the United States Constitution, religious beliefs and religious activities generally cannot be regulated. *See Thomas v. Collins*, 323 U.S. 516, 530 (1945); *Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Church of the Kukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

44.     Accordingly, the government's ability to intrude into ecclesiastical matters or otherwise interfere with a religious entity's governance of its internal affairs is restricted. *See*, e.g., *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (explaining that the Free Exercise Clause protects the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"); *see also Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (per curiam) (forbidding the courts as well as the legislature from interfering with Free Exercise rights).

45.     Ignoring the foregoing limitations, the Committee Plan asks this Court to compel certain actions that would violate the RFRA and First Amendment.

8

46. The Committee Plan purports to force the Debtor to contribute One Hundred Fifteen Million Dollars ($115,000,000) to the Trust established pursuant to the Committee Plan, along with certain real estate assets of both the Debtor and other Consolidated Catholic Entities allegedly valued at Three Hundred Thirty-One Million Six Hundred Seventy Thousand Seven Hundred Fifteen Dollars ($331,670,715).

47. The Committee Plan further contemplates other Consolidated Catholic Entities to contribute millions more to the Trust.

48. This requirement, however, wholly ignores the limitations imposed upon the Debtor by Canon Law to preserve the "stable patrimony" of the Roman Catholic Church.

49. The "stable patrimony" is the economic means by which a public juridic person is rendered self-sufficient in order to be able to perform its ecclesial mission—i.e., to practice and promulgate the Catholic faith—both in the present and in the future.

50. Accordingly, Canon 1291 provides "the permission of the authority competent according to the norm of law is required for the valid alienation of goods which constitute by legitimate designation the stable patrimony of a public juridic person and whose value exceeds the sum defined by law." Code of Canon Law 1291.

51. Canon 1292 then provides that when the value of goods to be alienated: (a) falls within the minimum and maximum amounts to be defined by the conference of bishops, consent must be obtained from the financial council, the college of consultors, and those concerned; and (b) exceeds the maximum amount, permission of the Holy See is required. Code of Canon Law 1292, §§ 1, 2.

52. The United States Conference of Catholic Bishops (the "*USCCB*") has established Seven Hundred Fifty Thousand Dollars ($750,000) as the minimum limit for the Debtor and Seven

9

Million Five Hundred Thousand Dollars ($7,500,000) as the maximum limit for the Debtor. USCCB Complementary Norms, Canon 1292, § 1.[2]

53.     Similarly, the USCCB has established Twenty-Five Thousand Dollars ($25,000) or 10% of the prior year's ordinary annual income, whichever is higher, as the minimum limit and Three Million Five Hundred Thousand Dollars ($3,500,000) as the maximum limit for parishes, schools, and other Catholic entities and

54.     Accordingly, the amount proposed by the Committee Plan exceeds the maximum amount for the Debtor and Consolidated Catholic Entities and requires the consent of the Holy See.

55.     No such consent has been sought or obtained, nor could such consent be compelled.[3]

56.     To force the Debtor to ignore the preservation of its "stable patrimony" would be to ask the Debtor to ignore a central tenet of its religious practice *and* ignore the internal regulation of ecclesiastical matters within the Roman Catholic Church.

57.     Therefore, this provision of the Committee Plan violates the RFRA and First Amendment to the United States Constitution, rendering the Committee Plan patently unconfirmable.

**B.     The Committee Plan violates Maryland trust law.**

58.     The Committee Plan recognizes that certain assets of the Debtor and other Consolidated Catholic Entities are "restricted assets" that may be used only for specific purposes;

---

[2] Available at https://www.usccb.org/committees/canonical-affairs-church-governance/complementary-norms#tab--canon-1292-%C2%A71-minimum-and-maximum-sums-alienation-of-church-property.
[3] While this Court can certainly determine what amount of contribution under a plan of reorganization satisfies the dictates of the Bankruptcy Code, this Court is prohibited by the First Amendment and RFRA from compelling a religious entity to deploy its assets in a way that contravenes the practice of its religion and internal governance.

however, the Committee Plan brazenly provides that only ten percent (10%) of those restricted assets are unavailable.

59.     Stated a different way, the Committee Plan purports to commit ninety percent (90%) of restricted assets of the Debtor and other Consolidated Catholic Entities to purposes other than those to which the assets are restricted.

60.     Where assets are imposed with donor restrictions, nothing in the Bankruptcy Code empowers a debtor or a bankruptcy court to ignore those donor restrictions and put those assets to other uses. *See, e.g.*, *Tort Claimants Committee v. Roman Catholic Archbishop of Portland in Oregon (In re Roman Catholic Archbishop of Portland in Oregon)*, 345 B.R. 686, 707 (Bankr. D. Ore. 2006); *In re Bishop College*, 151 B.R. 394, 399-401 (Bankr. N.D. Tex. 1993).

61.     Similarly, under Maryland law, it is well-settled that spend-thrift trusts may be created. *Duvall v. McGee*, 826 A.2d 416, 483 (Md. 2003) (citing cases). And these trusts may not be reached in order to satisfy judgments against the beneficiaries of such trusts. *Smith v. Towers*, 14 A. 497 (Md. 1888).

62.     In this case, the Committee has acknowledged assets are subject to restrictions yet proposes employing those assets pursuant to the Committee Plan in violation of the various donor's intent. *See, e.g.*, Committee Disclosure Statement, at 115 (stating "valid restrictions under applicable nonbankruptcy law on the use of Donor-Restricted assets of any Consolidated Catholic Entity are preserved and not altered by the Plan Consolidation, except to the extent that any restriction that limits the use of funds to one Consolidated Catholic Entity shall be deemed to permit the use of those funds for any of the Consolidated Catholic Entities for purposes of this Plan").

#538656877_v3

63.     Similarly, certain of the Consolidated Catholic Entities are trusts or contain trusts with spendthrift provisions, which trusts cannot be employed to satisfy judgments of creditors of beneficiaries of those trusts.

64.     Accordingly, the Committee Plan violates Maryland law and cannot be confirmed.

65.     Therefore, the Committee Disclosure Statement cannot be approved.

**III.     The Committee Disclosure Statement contains factual and legal inaccuracies.**

66.     The Committee Disclosure Statement makes statements and assertions that are inaccurate or contrary to rulings made by this Court.

67.     In particular and without limitation, the Committee Disclosure Statement:

    a.  provides "[t]he Debtor has actual and constructive control over the governance of each Parish" (Committee Disclosure Statement, at 32);

    b.  provides "[t]he pastor and/or administrator of each Parish is an employee of the Debtor" (Committee Disclosure Statement, at 32);

    c.  provides "[t]he Archbishop of Baltimore, i.e. the Debtor, has sole authority to appoint and remove the Vicar General and the pastor and/or administrator of each Parish" (Committee Disclosure Statement, at 32); and

    d.  repeatedly conflates the Archbishop of Baltimore, an individual person, and the Debtor, despite the Archbishop of Baltimore and the Debtor, a corporation sole, being separate and distinct.

68.     The numerous erroneous factual statements and assertions are confusing and misleading.

69.     Unless such erroneous factual statements and assertions are corrected, the Committee Disclosure Statement cannot be approved.

12

## CONCLUSION

70.    As set forth herein, the Committee Plan is patently unconfirmable as it violates provisions of the Bankruptcy Code, other federal law, and Maryland law. Therefore, the Committee Disclosure Statement should not be approved.

71.    The Debtor respectfully requests that the Court sustain this objection and enter an order denying the Committee's request for approval of the Committee Disclosure Statement and grant such other relief as this Court deems just and proper.

Dated: May 29, 2026                          Respectfully submitted,

    */s/ Blake D. Roth*
Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS Law, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone:    443.569.0788
Facsimile:    410.571.2798
Email: chopkin@yvslaw.com

*-and-*

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    615.244.6380
Facsimile:    615.244.6804
Email: blake.roth@hklaw.com
Email: scott.kunde@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone:    202.457.7043
Email: philip.evans@hklaw.com

*Attorneys for the Debtor and Debtor in Possession*

13

#538656877_v3

14

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 29, 2026, notice of the foregoing filing was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notice, and a copy of the objection was mailed first class, postage prepaid to the holder of the claim subject of the objection.

_/s/ Blake D. Roth_

Blake D. Roth

#538656877_v3