Entered: June 5th, 2026
Signed: June 5th, 2026

**SO ORDERED**



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Roman Catholic Archbishop of Baltimore, | * | Case No. 23-16969-MMH |
| | * | Chapter 11 |
| Debtor. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### ORDER ADDRESSING MOTIONS FOR RELIEF FROM AUTOMATIC STAY
### AND DEBTOR'S MOTION TO CONTINUE AUTOMATIC STAY

The automatic stay of section 362(a) of the Bankruptcy Code[1] is a critical component of any bankruptcy case. The stay pauses most collection efforts, litigation, and other actions against a debtor, allowing the debtor to catch its financial breath and develop a reorganization plan. The stay also protects all creditors of the bankruptcy estate by ensuring that no one creditor receives more than its fair and equitable share of any funds available for distribution to creditors. In this way, the automatic stay furthers the dual objectives of chapter 11 of the Code: rehabilitating a debtor's business and financial affairs while maximizing returns to creditors.

The creditors' committee and seven creditors in this case seek relief from the automatic stay to pursue claims and causes of action against the debtor and its nondebtor affiliates in the Maryland state courts. The Court hears the frustration of these (and other) creditors in this case; creditors want a resolution. Most waited years to obtain the right to bring actions against the debtor

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

and then were prevented from exercising those rights by the debtor's filing of this case. That frustration is real and understandable. The Court must, however, also consider the best interests of the bankruptcy estate and all creditors with claims against it.

At this stage of the case—a mere three months from an evidentiary hearing on confirmation of a plan of reorganization for the debtor—the Court finds that the relevant factors tip in favor of maintaining the status quo and continuing the automatic stay through at least the Court's resolution of the confirmation hearing. This approach allows all parties to focus on achieving a feasible and confirmable plan of reorganization without distraction or delay.

The Court is mindful of the impact of this case on individual creditors' rights. Creditors have waited patiently for almost three years for a fair and equitable resolution of their claims. If that result does not materialize after the September 2026 confirmation hearing, the facts and circumstances of this case may look very different. The Court thus will continue the final hearing on the pending matters and allow the parties to supplement the evidentiary record at that time. This hybrid approach to these matters—maintaining the automatic stay while preserving the parties' respective rights pending the outcome of the confirmation hearing—most appropriately balances the competing interests at stake and is in the best interests of the debtor, the bankruptcy estate, and all creditors.

## I.    **Relevant Background**

The Roman Catholic Archbishop of Baltimore (the "Debtor") filed a petition for relief under chapter 11 of the Code on September 29, 2023.[2] ECF 1. On that same date, the Debtor filed a motion to extend the automatic stay to certain related entities included as additional insureds (collectively, the "Covered Parties") under the Debtor's various current and legacy insurance

---

[2] The Debtor is operating as a debtor in possession under section 1107 of the Code. 11 U.S.C. § 1107. All references to the Debtor herein include its role as a debtor in possession in this case.

programs. ECF 12. The Court entered an interim order granting certain of the requested relief, which was then continued under a Second Interim Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay to Certain Related Entities (as amended, the "Interim Stay Order"). ECF 173, 1127.

The Interim Stay Order was grounded, in part, on a finding that the Debtor's prepetition insurance policies are property of the Debtor's bankruptcy estate under section 541 of the Code. The insurance policies name the Debtor as an insured and may be available to pay covered claims asserted against the Debtor, thereby reducing the financial exposure of the bankruptcy estate itself. The Interim Stay Order remains in effect and prevents parties from commencing or continuing litigation that could impact estate property, including insurance policies.[3] Again, the Interim Stay Order is intended to preserve the value of estate property for the benefit of all creditors.

The impact of the Interim Stay Order is perhaps felt most by the primary creditors in this case, namely survivors of child sexual abuse ("Survivors"). The Debtor has acknowledged that the filing of this case and the need for the Interim Stay Order resulted from the Maryland Child Victims Act (the "CVA"), passed by the Maryland General Assembly in April 2023. The CVA eliminated the statute of limitations on civil lawsuits involving child sexual abuse. The CVA became effective on October 1, 2023, immediately after the filing of this case.[4]

Since that time, the Debtor, the Official Committee of Unsecured Creditors (the "Committee"),[5] and the Debtor's insurance carriers (the "Insurers") have been engaged in this

---

[3] For additional information on the current scope of the stay in this case and guardrails to allow parties to seek clarification of coverage, see the Interim Stay Order. ECF 173, 1127.

[4] The Committee (as defined below) filed a motion to clarify the scope of the Stay Order (the "Committee Stay Motion"). ECF 1043. The Committee Stay Motion addressed important and time-sensitive issues facing Survivors, the Debtor, the Covered Parties, and the Insurers (as defined below), relating to an amendment to the CVA adopted by the Maryland General Assembly in April 2025. The Court held a hearing on the Committee Stay Motion and all related papers on May 1, 2025, and entered a supplemental Stay Order shortly thereafter. ECF 1127.

[5] All members of the Committee are Survivors. ECF 81.

case, participating periodically in mediation. ECF 705. Despite the passage of over 32 months, the parties have been unable to reach a consensual resolution, and this case appears set for a contested confirmation hearing on competing chapter 11 plans.

The matters currently before the Court involve the request of seven Survivors (the "Movants") for relief from the automatic stay of section 362(a) of the Code (the "Relief from Stay Motions"), which the Committee supports.[6] Specifically, the Movants seek authority to pursue their claims and causes of action against the Debtor, certain of its insurance policies, and the relevant Covered Parties in the Maryland state courts. The Debtor, the Ad Hoc Committee,[7] and certain of the Insurers oppose the Relief from Stay Motions, and the Debtor seeks the continued protection of the automatic stay (the "Continued Stay Motion"), which the Committee opposes.[8] The Court considered the Pending Matters at a preliminary hearing on April 20, 2026, and an evidentiary hearing on June 1–2, 2026 (collectively, the "Hearings").[9] These matters are now ripe for resolution on a further interim basis.[10]

---

[6] The Relief from Stay Motions include: ECF 2129, 2133, 2151, 2154, 2155, 2157, 2420, 2475.

[7] Refers to the Ad Hoc Committee of Parishes, Schools, and Affiliates in this case.

[8] The term "Continued Stay Motion" as used herein refers to the Debtor's original motion at ECF 12, which the Debtor seeks to continue under the terms of the Interim Stay Order. The following papers, together with the Relief from Stay Motions, are collectively referred to herein as the "Pending Matters": ECF 12, 2097, 2253, 2257, 2269, 2270, 2271, 2402, 2408, 2409, 2410, 2411, 2458, 2461, 2466, 2470, 2472, 2475, 2514. The term "Pending Matters" as used herein includes all related papers.

[9] References to the Hearings record in this Order denote primarily the record of the June 2, 2026 ("Hrg. Rec.").

[10] The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334. The District Court has referred this case and these matters to this Court under 28 U.S.C. § 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. These matters are "core proceedings" under 28 U.S.C. § 157(b)(2). This Order constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to these matters by Bankruptcy Rules 7052 and 9014. The Court details herein its factual findings necessary to resolve the disputed legal issues. *See, e.g.*, *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

Further, the Court sets forth certain references and citations in the footnotes of this Order solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding.

## II.    Key Factual Findings[11]

The Debtor offered the testimony of James R. Murray, a partner in the law firm of Blank Rome, LLP, which is special insurance counsel to the Debtor in this case. Mr. Murray's direct testimony was submitted through a declaration under 28 U.S.C. § 1746 (the "Declaration"). ECF 2409; Hrg. Rec. at 9:09. He was then subject to questions by counsel on cross-examination and redirect. The Court found Mr. Murray credible and knowledgeable on all aspects of his testimony.

Mr. Murray provided a thoughtful review of the Debtor's insurance policies and programs (collectively, the "General Insurance Program") from the period prior to 1966 through present day. *Id.* at 4–13. Mr. Murray explained that the pre-1966 period involves a mixed bag of insurance policies, which include individual insurance policies purchased by the Debtor or a particular related entity or pertaining to a specific location. *Id.* at 4; Hrg. Rec. at 10:44–10:52. After that period, the General Insurance Program generally included policies that named the Debtor as an insured and the Covered Parties as insureds or additional insureds. ECF 2409 at 7–13. Mr. Murray's testimony here focused on insurance policies with Century Indemnity Company, as a successor to CCI Insurance Company, which is a successor to Insurance Company of North

---

[11] To the extent that any party raised a relevancy objection to any part of the testimony or the exhibits included in this Order, the Court evaluated the objection under Federal Rule of Evidence 401 and found the testimony or exhibit helpful to the Court's analysis of the issue and that any potential prejudice was significantly outweighed by the value of the testimony or exhibit to the Court's consideration of these matters. *See* Notes of Advisory Committee on Proposed Rules to Fed. R. Evid. 401("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand. George F. James, *Relevancy, Probability and the Law,* 29 CALIF. L. REV. 689, 696, n.15 (1941), in Selected Writings on Evidence and Trial 610, 615, n.15 (Fryer ed. 1957)."); *see also U.S. v. Tillmon*, 954 F.3d 628, 643 (4th Cir. 2019). *See also* Order Addressing Motion in Limine, ECF 2541, which is incorporated fully herein by reference. In addition, some of the Court's findings of fact are set forth in the Court's analysis in Part III of this Order.

5

America, and Indemnity Insurance Company of North America (together "Century"), and American Casualty Company ("American Casualty").

Based on Mr. Murray's testimony, the Court finds that the insurance policies implicated by the Relief from Stay Motions primarily involve the Century and the American Casualty insurance policies[12] and are property of the bankruptcy estate.[13] Mr. Murray confirmed that, for the most part, these policies include an obligation to defend and, in that sense, are non-wasting assets. Hrg. Rec. at 9:17–9:19, 9:22–9:32; ECF 2409 at 7–8. He also indicated that these specific insurance policies did not contain any aggregate limits and did not include a sexual abuse exception. *Id.* at 9:22–9:32; *see also* ECF 2409 at ¶¶ 19–20, 33–34. These findings support the Committee's assertion that the relief sought by the Relief from Stay Motions and its opposition to the Continued Stay Motion is limited in nature.

That said, Mr. Murray also underscored the disputed nature of many issues surrounding the Century and the American Casualty insurance policies, some of which go directly to the duty to defend and the limitations of the policies. *See, e.g.,* Hrg. Rec. at 9:12–9:13 (scope of per occurrence limit), 9:17–9:19 (reimbursement for defense costs), 9:29 (coverage period and limits under policies); *see also* ECF 2409 at ¶¶ 19–20. Mr. Murray noted that, among other things, the insurance companies issue reservation of rights letters, can decline to defend (subject to potential consequences), and can seek indemnification for defense costs in certain circumstances. Hrg. Rec. at 9:17–9:19, 9:40–9:41, 11:22–11:27. Moreover, with respect to the Century insurance policies, there are certain gaps in policy dates that may create issues; with respect to the American Casualty primary insurance policies, the terms currently are based only on secondary sources as the Debtor

---

[12] The Committee has reached a settlement agreement with The Hartford Insurance Group Inc. ("Hartford") and, thus, structured its objection to the Continued Stay Motion, and the Movants structured their Relief from Stay Motions, to avoid dates that might implicate the Hartford insurance policies.

[13] *See, e.g.,* ECF 2409, at ¶¶ 18–35; Hrg. Rec. 12:14.

has not located copies of the policies. Hrg. Rec. at 9:32, 10:48–11:12, 11:14, 11:59, 12:02; *see also* ECF 2409 at ¶¶ 19–20. The Court finds that Mr. Murray's testimony, while supporting some of the Committee's arguments, also showed significant risks to the Debtor and the bankruptcy estate in granting even that limited relief. *See generally, e.g.,* ECF 2409 at 16–19; Hrg. Rec. at 9:40, 9:43, 9:49, 10:34–10:42, 11:35, 11:50–11:54.

### III.    Analysis

The automatic stay of section 362(a) of the Code is a hallmark of the U.S. bankruptcy system. The stay directly protects the debtor, the debtor's property, and property of the bankruptcy estate. 11 U.S.C. § 362(a). In doing so, it also protects all the debtor's creditors. Indeed, the automatic stay stops the creditors' race to the courthouse, leveling the playing field and protecting the interests of all creditors, regardless of their place in line in the state court litigation or collection process. Thus, although the debtor-protection aspects of the automatic stay garner the most attention, the stay's creditor protections are just as important, particularly in a case like the one before the Court.

The Debtor filed this chapter 11 case to, among other things, halt the state court litigation process against it. With the passage of the CVA, the Debtor anticipated that hundreds of lawsuits would be filed against it and the Covered Parties in the Maryland state court system. The filing of this chapter 11 case brought those creditors and their respective claims and causes of action against the Debtor into one forum and one case. It also ensures that all similarly-situated creditors will receive the same fair and equitable treatment.

There is no doubt that bankruptcy disrupts and delays creditors' rights and remedies, but it also can, in the end, promote a more fair and a more just resolution for all. The Court now turns to the merits of the Relief from Stay Motions and the Continued Stay Motion.

A.  <u>The Relief from Stay Motions</u>

The Movants wish to liquidate their claims in the state court, and they believe that continuing those state court actions will force the Debtor, the Covered Parties, and the Insurers to the negotiating table more quickly. Indeed, one primary response to the Court's concern about the impact of any stay relief on this case and all Survivors was that no one would really be prejudiced because a settlement would likely result. But that assertion is speculative at best and inadequate to outweigh the significant risks to the bankruptcy estate and all Survivors of modifying the stay at this juncture.

The end objective of this chapter 11 case is to confirm a reorganization plan that provides a streamlined resolution process for Survivor claims and facilitates prompt and fair payment on those claims—treatment that will be fair and equitable as to all Survivors. The parties made multiple references to what has happened in other diocesan cases when the court granted or denied creditors' requests for relief from the automatic stay.[14] Those accounts ranged from wildly accelerating success in the chapter 11 case to destroying the estate and any prospects for a reorganization. The Court is always open to considering and learning from other cases, but at the end of the day, the Court must focus on the facts before it and the law by which it is bound.

In this district, a request for relief from the automatic stay, such as the Relief from Stay Motions, is governed by section 362(d) and (g) of the Code and the United States Court of Appeals for the Fourth Circuit's decision in *In re Robbins*, 964 F.2d 342 (1992). In *Robbins*, the Fourth Circuit explained,

> The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied. See In re Peterson, 116 B.R. 247, 249 (D.Colo.1990) (discussing balancing test). The factors that courts consider in deciding whether to lift the automatic stay include (1) whether the issues in the pending litigation

---

[14] The Court limited evidence on these matters, so much of the discussion was in the context of legal argument.

involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Id.* at 345.

The Fourth Circuit also recently had reason to apply the *Robbins* factors in the mass tort context in *Herlihy v. DBMP, LLC*, 167 F.4th 142 (2026). Similar to the case before the Court, the debtor in *DBMP* faced prepetition litigation on account of state law tort claims and, over the objection of creditors, received the protection of the automatic stay as to that litigation upon the filing of the bankruptcy case. Several years into the chapter 11 case, three creditors (a husband and wife and an estate representative) again requested relief from the automatic stay to pursue their state law claims and causes of action against the debtor and certain of its nondebtor affiliates. The Fourth Circuit affirmed the lower courts' decisions maintaining the stay and determined that the bankruptcy court properly applied the *Robbins* factors to the facts of that case. The Fourth Circuit noted,

> The [bankruptcy] court found that granting the motions to lift the stay would "greatly" prejudice the debtor's estate and that such harm would outweigh any harm to the Claimants that might be caused by any delay in the resolution of their asbestos claims. More particularly, the court reasoned that granting the stay [relief] would reduce judicial economy by releasing a wave of asbestos cases back into the court system, severely undermining the bankruptcy court's ability to "treat consistently and fairly all similarly situated claimants in a 524(g) plan." The court was particularly concerned that granting the stay would imperil its ability to protect the interests of future asbestos claimants through the § 524(g) plan. And based on its experience with similar mass-tort bankruptcies, it predicted that lifting the stay would "effectively destroy the bankruptcy case." The court also found that any delays that might occur in the resolution of the Claimants' suits in bankruptcy provided an insufficient basis to lift the stay as such a proposition was speculative.

*Id.* at 150.

9

Admittedly, *DBMP* is not identical to the matters before the Court. For example, the Debtor's chapter 11 case does not involve asbestos litigation or, as a result, section 524(g) of the Code. The estate assets at issue also are different as *DBMP* did not involve insurance policies. The two cases do, however, reflect the important role played by the automatic stay in a chapter 11 case. Indeed, "[s]uch a stay provides the bankruptcy court with the 'opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations.'" *DBMP*, 167 F.4th at 149 (quoting *Robbins*, 964 F.2d at 345).

Following the Fourth Circuit's guidance, this Court must balance the competing interests in these matters. Here, the Movants' claims are grounded in state law, and the Movants have been significantly delayed in exercising their state law rights. The Debtor, the Covered Parties, and to some extent, the Insurers have benefited from the stay, in that they have not been called upon to devote time or estate resources to state court litigation during the pendency of this chapter 11 case. It is really this preservation of estate resources for the benefit of all creditors that supports the continuation of the stay in a case such as this—a case where the individual pursuit of hundreds of claims against the Debtor and its assets could return large sums to those creditors first in line and possibly nothing to those at the end.

More specifically, as noted above and based on the evidentiary record, the Court finds that the Debtor, its property, and property of this bankruptcy estate are negatively impacted by any modification of the automatic stay to allow the Movants to liquidate their claims and causes of action in the state court. Allowing any state court actions to proceed at this time would divert resources and attention from the Debtor's plan of reorganization process and potentially expose the estates to harm and the creditors to unfair and unequal treatment.

10

Even if, as the Movants allege, insurance proceeds are not depleted, active litigation is not cost-free. It consumes a great deal of time and money, and it requires the attention of many—time, money, and attention that could be devoted to the resolution of *this* case for the benefit of *all* creditors. The Debtor and all Survivors will know in a matter of months if the Court can confirm a plan of reorganization for the Debtor. The harm potentially caused by that additional short period of delay for the seven Movants is significantly outweighed by the potential benefits to *all* Survivors from a confirmed chapter 11 plan in this case.

The Court also acknowledges the Movants' arguments that modifying the stay will encourage a consensual resolution. Perhaps. But the record before the Court does not establish that fact; indeed, the Debtor and the Insurers argue the exact opposite—that modification of the stay will destroy the Debtor's reorganization efforts. The Court surmises that the truth is probably somewhere in the middle of those two extremes. All parties are represented by capable and experienced counsel. All parties know what is at stake at this stage of the case. The legal uncertainties that once challenged a path to confirmation have been largely resolved, and what remains, quite frankly, is how much each party is willing to pay or accept to reach a consensual resolution or otherwise satisfy the requirements for confirmation under section 1129(b) of the Code.

B.  The Continued Stay Motion

The Committee argues that the Court should also modify the Interim Stay Order to allow certain claims and causes of action against the Covered Parties to proceed in the state courts. The Committee attempts to cabin the effect of its requested relief by proposing to limit the actions to those involving allegations of sexual abuse prior to June 30, 1974. This limitation appears structured to protect the Committee's settlement agreement in this case with The Hartford

11

Insurance Group, Inc., and to affect only insurance policies with certain characteristics, such as no aggregate limits and a duty to defend.

The Interim Stay Order was entered after two separate hearings in this case and on a largely consensual basis.[15] The objective of the Court—and likely the parties—at the time was to protect property of the Debtor's bankruptcy estate while the Debtor, the Committee, and the Insurers discussed a possible global resolution (or at least a path to a resolution) in this case. The protection afforded by the Interim Stay Order is grounded in the General Insurance Program being property of the estate.[16]

Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The Fourth Circuit has determined that a debtor's insurance policies are part of the debtor's bankruptcy estate. As the Fourth Circuit has explained,

> Under the weight of authority, insurance contracts have been said to be embraced in this statutory definition of "property." *In re Davis,* 730 F.2d 176, 184 (5th Cir. 1984). For example, even the right to cancel an insurance policy issued to the debtor has uniformly been held to be stayed under section 362(a)(3). Lam, *Cancellation of Insurance: Bankruptcy Automatic Stay Implications*, 59 Am. Bank. L.J., 267 (1985), (extensively reviewing the cases to this effect). A products liability policy of the debtor is similarly within the principle: it is a valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be, as one court has remarked in a case like the one under review, "the most important asset of [i.e., the debtor's] estate," *In re Johns Manville Corp.,* 40 Bankr. 219, 229 (S.D.N.Y. 1984). Any action in which the judgment may diminish this "important asset" is unquestionably subject to a stay under this subsection. *In re Johns Manville Corp.,* 33 Bankr. 254, 261 (S.D.N.Y. 1983). Accordingly actions "related to" the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as additional insureds under the policy are to be stayed under section 362 (a)(3). *Ibid.*

---

[15] In addition, the Court held a third hearing in connection with the Committee Stay Motion on May 1, 2025. ECF 1043, 1127.

[16] Mr. Murray testified that the General Insurance Program, including the insurance policies at issue in the Pending Matters, are property of the Debtor's bankruptcy estate. Hrg. Rec. at 12:14. That testimony is consistent with the Court's prior findings in this case. *See, e.g.,* ECF 173, 1127.

*A.H. Robins Co. v. Picinnin*, 788 F.2d 994, 1001–1002 (4th Cir. 1986).

Moreover, section 105(a) of the Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code. *Id*. at § 105(a). Although section 105(a) does not allow the Court to defy another provision of the Code, the section does permit directives in furtherance of the Code and the Code's objectives. *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014).[17]

As discussed above, the Court understands the Committee's and the Movants' arguments that the relief being requested is limited and will not impact the bankruptcy estate in any meaningful way.[18] The Court cannot, however, agree with that position based on the evidentiary record and the stage of this chapter 11 case.

Mr. Murray's testimony identified various insurance policies available to the Debtor and the Covered Parties over the years. As he explained, even prior to 1966, the Debtor and the Covered Parties had insurance, but these policies and the Debtor's insurance program changed over the years in various ways. Some changes include the entity providing the insurance, the scope of the coverage, and the entities covered by the policies.

Based on Mr. Murray's testimony, one constant is the Debtor's involvement in the overarching insurance program and any insurance coverage available to it *or* the Covered Parties.

---

[17] As the Supreme Court explained,

> It is hornbook law that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere.

*Siegel*, 571 U.S. at 421.

[18] Again, the Court appreciates the attempts by the Movants and the Committee to cabin the impact of any modification to the stay on the bankruptcy estate. Nevertheless, as noted above, that impact cannot be contained adequately at this juncture. In addition, the limited nature of the pending Relief from Stay Motions does not prevent other Survivors from seeking similar relief, which could significantly increase the impact on the estate.

Even if the amount of coverage available under any given policy is not diminished on account of state court litigation, Mr. Murray testified that such litigation still affects the Debtor (and in turn this bankruptcy estate).[19] As Mr. Murray stated in his Declaration,

> Where, as here, claims are asserted that implicate the Archdiocese and a parish or other associated entity for the same alleged acts of abuse, coverage provided to the parish for settlement or judgment could deprive the Archdiocese of coverage. Additionally, permitting litigation to proceed against the insured co-defendants raises the risk of discovery materials, factual findings, or jury verdicts that could negatively impact the coverage for claimants alleging similar circumstances who have patiently respected the bankruptcy process.

ECF 2409, at 3.

The Court finds that the potential impact on the bankruptcy estate from parallel state court actions against Covered Parties—even on the limited basis suggested by the Committee—significantly outweighs the harm caused by the continuation of the stay, at least through the confirmation hearing.

As noted above in connection with the Relief from Stay Motions, the Court hears the frustration of Survivors—the Court suspects that Survivors likely feel stonewalled by this chapter 11 case and as if they are fighting an uphill battle. The Court is not trying to diminish those feelings or add to Survivors' burdens. The Court must, however, heed the requirements of the Code and ensure that the bankruptcy estate is protected for the benefit of *all* Survivors. At this time, with the confirmation hearing approximately three months away, the Court must maintain the status

---

[19] *See generally, e.g.,* ECF 2409 at 16–19; Hrg. Rec. at 9:40, 9:43, 9:45, 10:34–10:42, 11:35, 11:50–11:54. Here, the Court notes Mr. Murray's testimony concerning the potential impact of any state court litigation proceeding, even if against only Covered Parties. Both Mr. Murray's Declaration and his testimony speak to ways that such litigation could impair the Debtor's rights in future litigation and/or deplete estate resources, including the General Insurance Program. *See, e.g.,* ECF 2409, at ¶¶ 102–122; Hrg. Rec. at 11:34–11:38. *See also Robins*, 788 F.2d at 999 (explaining that extending the stay to proceedings involving third parties may be appropriate in "unusual situations," such as "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. . . . To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.").

14

quo, protect the bankruptcy estate, and allow the parties to focus on meeting the standards for confirmation under section 1129 of the Code.

    C.  <u>Conclusion</u>

Based on the record of the Hearings, the Court cannot find cause to modify the automatic stay for the Movants at this time or to alter the scope of the Interim Stay Order. Doing so would create additional costs and delay and potentially jeopardize the Debtor's reorganization efforts to the detriment of all Survivors, especially at this delicate stage of the bankruptcy case.

That said, the Court acknowledges that its findings are to some extent based on the facts and circumstances of this case at this moment in time. A time when the parties are approximately three months away from the start of a confirmation hearing on a plan of reorganization. A time that deserves the Debtor's full attention and the preservation of all its resources to determine if a plan can be confirmed for the benefit of all creditors. If a plan cannot be confirmed by the end of September 2026—the three-year anniversary of this case—the delicate balance of competing interests required by *Robbins* and *DMPB* may tip in another direction.

Having considered the possible outcomes for all parties affected by the Pending Matters, the Court determines that the current record supports maintenance of the automatic stay at this time *and* a continuation of the Hearings on the Pending Matters to September 30, 2026.[20] If the Court has not confirmed a plan of reorganization by September 30, 2026, the Court will hold a

---

[20] The Court finds this relief appropriate and warranted under the particular circumstances of this case under sections 105(a), 362(a), 362(d), and 362(e) of the Code. 11 U.S.C. §§ 105(a), 362. *See also In re Hope Plantation Group, LLC*, 393 B.R. 98 (Bankr. D.S.C. 2007) (explaining choices available to courts addressing requests for relief for stay close in proximity to significant events in the case, such as a confirmation hearing). For example, section 362(e)(1) of the Code provides, "Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section." 11 U.S.C. § 362(e)(1). Although the Court generally must hold the final hearing within 30 days of the preliminary hearing, the Court may extend that deadline "for a specific time which the court finds is required by compelling circumstances." *Id*. Here, as set forth in this Order, there are compelling circumstances to continue both the stay and the final hearing.

continued final hearing on the Pending Matters on that date. That approach saves parties time and money, in that motions will not need to be refiled, the evidentiary record from the Hearings can be preserved, and the parties can supplement the record at the September 30, 2026, continued hearing.

Accordingly, it is, by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that, if the Court has not confirmed a plan of reorganization, the Court will hold a continued in-person final hearing on the Pending Matters **on September 30, 2026, at 9:00 a.m., ET, in Courtroom 9-C in Baltimore**; and it is further

**ORDERED**, that the parties to these contested matters may file supplemental briefs and supplemental exhibit/witness lists **on or before September 25, 2026**; and it is further

**ORDERED**, that any responses to any supplemental briefs or objections to any supplemental exhibit/witness lists must be filed **on or before September 28, 2026**; and it is further

**ORDERED**, that the automatic stay of section 362(a) of the Code and the Court's Interim Stay Order shall remain in full force and effect until further Order of the Court.

cc:     All parties in interest

**END OF ORDER**