Entered: August 4th, 2026
Signed: August 4th, 2026

**SO ORDERED**



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Roman Catholic Archbishop of Baltimore, | * | Case No. 23-16969-MMH |
| | * | Chapter 11 |
| Debtor. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER DENYING APPROVAL OF DISCLOSURE STATEMENTS

A disclosure statement should succinctly inform creditors of key information relating to a proposed plan of reorganization. In this context, more does not mean better; more does not equal adequate disclosure. In fact, more can actually undermine the very goal of section 1125 of the Bankruptcy Code.[1] More can leave creditors confused, uninformed, and overwhelmed by the process.

In this case, both plan proponents have added substantial information to their disclosure statements, but the end result may not be helpful or necessary. Any creditor reading either disclosure statement likely would walk away unsure of how the plans work or the extent of their rights and remedies thereunder. Creditors should not need lawyers or translators to read a disclosure statement or understand a proposed plan of reorganization.

In addition, both proposed plans of reorganization contain certain provisions that render them patently unconfirmable. It is a futile waste of precious estate resources to solicit votes on a

---

[1] 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code" or the "Code").

plan that cannot satisfy section 1129 of the Bankruptcy Code, whether because the plan's terms conflict with applicable law, are insufficient under applicable law, or extend beyond the permissible bounds of the Bankruptcy Code and the jurisdiction of this Court. And as much as this Court wants to move this case towards a plan confirmation hearing, it will not do so in a manner that is reckless or prejudicial to the rights of the bankruptcy estate and all creditors.

Accordingly, as explained more fully below, the Court cannot approve either pending disclosure statement. Each is confusing, internally inconsistent, lacking meaningful information, and proposes a plan regrettably not confirmable under applicable law. The plan proponents' requests to approve their respective disclosure statements therefore are denied without prejudice.[2]

## I.    **Relevant Background**

The Roman Catholic Archbishop of Baltimore (the "Debtor") filed a petition for relief under chapter 11 of the Code on September 29, 2023.[3] ECF 1. On that same date, the Debtor filed a motion to extend the automatic stay to certain related entities included as additional insureds (collectively, the "Covered Parties") under the Debtor's various current and legacy insurance programs. ECF 12. The Court entered an interim order granting certain of the requested relief, which the Court then continued under a Second Interim Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay to Certain Related Entities (as amended, the "Interim Stay Order"). ECF 52, 173, 1127.

---

[2] As the Court noted in its Order at ECF 2675, solicitation packages for any confirmation hearing starting on September 14, 2026, must be mailed on or before August 10, 2026. The Court is denying the requested relief without prejudice because this Order is interim in nature and should not foreclose future efforts to achieve approval of a disclosure statement. That said, the Court does not find adequate time to consider amended competing disclosure statements prior to August 10, 2026. The deficiencies are too significant in the pending disclosure statements, and the Court does not want any party wasting additional time or money.

[3] The Debtor is operating as a debtor in possession under section 1107 of the Code. 11 U.S.C. § 1107. All references to the Debtor herein include its role as a debtor in possession in this case.

Since that time, the Debtor, the Official Committee of Unsecured Creditors (the "Committee"),[4] and the Debtor's insurance carriers (the "Insurers") have been engaged in this case, participating periodically in mediation. ECF 705. The Debtor and the Committee also have litigated several issues, both in the main chapter 11 case and in two separate adversary proceedings. Although one or more of the parties framed the issues involved in that litigation as necessary to reach a consensual resolution in this case, no party has filed a plan proposing a global resolution. Rather, the Court has before it two competing disclosure statements and accompanying proposed plans of reorganization and still relatively little agreement on the best path forward.

The current posture of this case stems largely from the fact that, for almost three years, the Court has maintained the Interim Stay Order. The impact of that order is perhaps felt most by the primary creditors in this case, namely survivors of child sexual abuse ("Survivors").[5] In March 2026, seven Survivors filed motions for relief from the automatic stay of section 362(a) of the Code, which the Committee supported.[6] Those motions sought to modify the stay to allow the Survivors to pursue their claims and causes of action against the Debtor, certain of its insurance policies, and the relevant Covered Parties in the Maryland state courts.

The Debtor, the Ad Hoc Committee,[7] and certain of the Insurers opposed the Survivors' stay relief motions, and the Debtor requested the continued protection of the automatic stay, which the Committee opposed.[8] The Court preliminarily resolved the stay matters by setting a firm plan confirmation hearing schedule and continuing the automatic stay and the Survivors' stay relief

---

[4] All members of the Committee are Survivors (as defined below). ECF 81.

[5] The Debtor has acknowledged that the filing of this case and the need for the Interim Stay Order resulted from the Maryland Child Victims Act (the "CVA"), passed by the Maryland General Assembly in April 2023. The CVA eliminated the statute of limitations on civil lawsuits involving child sexual abuse. The CVA became effective on October 1, 2023, immediately after the filing of this case.

[6] *See* ECF 2129, 2133, 2151, 2154, 2155, 2157, 2420, 2475.

[7] Refers to the Ad Hoc Committee of Parishes, Schools, and Affiliates in this case.

[8] *See* ECF 12, 2097, 2253, 2257, 2269, 2270, 2271, 2402, 2408, 2409, 2410, 2411, 2458, 2461, 2466, 2470, 2472, 2475, 2514.

motions to September 30, 2026. ECF 2559. The Court determined it best—at that time—to give the parties a short period to try to reach a global, consensual resolution before potentially altering the status quo and the protections afforded by the automatic stay.

The confirmation schedule set by the Court was tight by design, but not unmanageable. To assist the parties, the Court held multiple continued hearings on the Debtor's and the Committee's disclosure statements and proposed plans of reorganization.[9] When the parties could not agree to an extension of the confirmation schedule, the Court set a final hearing on the disclosure statements for July 31, 2026 (the "Hearing"). ECF 2765. At the Hearing, the Court considered the Debtor's amended disclosure statement [ECF 2785] (the "Debtor DS"), the Committee's third amended disclosure statement [ECF 2787] (the "Committee DS"), and all related papers filed in connection with the Hearing.[10] The Court has reviewed the parties' papers, their statements at the Hearing, and applicable law. These matters are now ripe for resolution.[11]

## II.    Analysis

The Court acknowledges that this case is both difficult and extremely important to many. The Court wants nothing more than to see this chapter 11 case work for all involved. The Court cannot, however, overlook the requirements of the Bankruptcy Code to achieve that result. Indeed, the sections of the Bankruptcy Code most relevant to the pending matters (including sections 1125

---

[9] The Court notes that it held hearings on the Disclosure Statements on June 8, 15, and 29, 2026, and on July 6, 13, and 20, 2026 (collectively, the "Prior DS Hearings").

[10] *See, e.g.,* ECF 2785, 2787, 2789, 2794, 2795, 2796, 2797, 2798, 2799, 2800, 2801, 2803. In addition, the Court is considering all papers filed in connection with the Prior DS Hearings. ECF 2765.

[11] The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334. The District Court has referred this case and these matters to this Court under 28 U.S.C. § 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. These matters are "core proceedings" under 28 U.S.C. § 157(b)(2). This Order constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to these matters by Bankruptcy Rules 7052 and 9014. The Court details herein its factual findings necessary to resolve the disputed legal issues. *See, e.g.*, *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

Further, the Court sets forth certain references and citations in the footnotes of this Order solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding.

and 1129 of the Code) exist in large part to protect creditors of the bankruptcy estate, which here are primarily the Survivors.

Section 1125 of the Bankruptcy Code provides, in relevant part,

"adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

11 U.S.C. § 1125(a)(1).[12] This language requires a straightforward disclosure of key events affecting the debtor—both pre- and postpetition—and, most importantly, the terms, mechanics, and consequences of the proposed plan. As one court explained, "A disclosure statement must be meaningful to be understood, and *it must be understood to be effective*." *In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D. N.H. 1986) (emphasis added).

In addition, the proposed plan of reorganization set forth in the disclosure statement must be one that the Court could confirm under section 1129 of the Bankruptcy Code, if the necessary votes are obtained.[13] Notably, not every factor of section 1129 must or should be considered at the

---

[12] "The determination of whether a disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court. *In the Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988), cert. denied, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 696 (4th Cir. 1989)." *In re Mohammad*, 596 B.R. 34, 39 (Bankr. E.D. Va. 2019), *subsequently aff'd sub nom. Mohammad v. Fitzgerald*, 790 F. App'x 534 (4th Cir. 2020).

[13] In general, the plan proponent must present sufficient evidence to show that the plan, among other things, was filed in good faith and not by any means prohibited by law, satisfies the applicable provisions of the Code, pays creditors at least as much as they would receive in a hypothetical chapter 7 liquidation case, and that all impaired classes of claims voted to accept the plan. 11 U.S.C. § 1129(a). If all impaired classes do not accept the plan, the plan proponent needs at least one impaired accepting class to try to confirm the plan under the cramdown provisions of section 1129(b). *Id.* § 1129(b).

disclosure statement stage; in fact, many confirmation issues can and should be reserved for the confirmation hearing. Nevertheless, certain aspects of a plan may be so flawed or contrary to existing law that allowing the plan to proceed to confirmation would do little more than waste the parties' time and money and further delay any recovery for creditors. Thus, "a court may disapprove a disclosure statement where the underlying plan is clearly unconfirmable." *In re Wong*, 598 B.R. 827, 829 (Bankr. D. Md. 2019).[14]

The Court must evaluate the Debtor DS and the Committee DS under the foregoing standards. The Court appreciates that counsel has, in certain respects, tried to address pending objections and potential legal hurdles by creating some optionality in the plans and adding additional disclosures to their documents. Unfortunately, those efforts have caused each disclosure statement to expand to a point whereby information gets lost or confused in the documents.[15]

The Court does not endeavor herein to identify every issue with each disclosure statement. Rather, this Order discusses the key legal impediments to approval of the disclosure statements under section 1125 of the Bankruptcy Code and related applicable law.[16]

---

[14] *See also, e.g., In re American Capital Equip. LLC,* 688 F.3d 145, 155 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."); *In re Tonawanda Coke Corp.,* 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) ("[T]he Court may decline to approve a disclosure statement that aims to solicit votes in favor of an unconfirmable plan."); *In re Forest Grove, LLC,* 448 B.R. 729, 736 (Bankr. D.S.C. 2011) ("[A] court may deny approval of a disclosure statement, even if it is not itself deficient, if a debtor's plan has no hope of being confirmed.").

[15] As one court explained,

The task is thus to ensure that the disclosure statement contains "adequate information" to enable impaired classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan. In this regard, the Court's overarching view is that (a) less can be more – there are times that including more information makes a document less understandable; (b) plain English is better than legalese; and (c) where a disclosure statement sets forth competing views about the best course for the estate, the positions should be set out in a balanced and measured way. The goal is to inform creditors, not to inflame them.

*In re Yellow Corp.,* No. 23-11069, 2025 WL 2639151, at *2 (Bankr. D. Del. Sept. 12, 2025) (footnote omitted). The Court acknowledges that the Debtor did reduce the number of pages in the Debor DS, but the length of the document is not the only consideration in determining whether meaningful and understandable disclosures have been made.

[16] In deliberating and reaching its conclusions of law in this Order, the Court considered only the parties' respective disclosure statements and the exhibits thereto, and this Court's prior Orders and the documents related thereto. The Court did not find any value or need to consult the other exhibits filed by the parties, several of which were subject to

### A. The Debtor DS

The Debtor DS is a 54-page document (without exhibits) providing an appropriate level of detail about the pre- and postpetition key events concerning the Debtor. The Court, however, finds that the Debtor DS suffers from the following deficiencies.

### 1. Aspects of the Plan Render it Patently Unconfirmable

The Debtor's plan identifies the assets that it believes are available for distribution to creditors in this case and uses the value of those assets to support its hypothetical liquidation analysis under section 1129(a)(7) of the Code. First, the Court observes that section 1129(a)(7) of the Code basically sets a floor that a debtor must surpass to meet the elements for confirmation under section 1129(a).[17] That subsection does not establish the value of adequate or fair and equitable distributions to creditors. Second, even if a distribution similar to, or only slightly higher, than the section 1129(a)(7) liquidation value may be warranted in a particular case, a debtor must still disclose *all* its assets and explain how those assets affect valuation.[18]

The Court notes, among other things, the disparity between the Debtor's section 1129(a)(7) liquidation value and the scope of section 541(a) of the Bankruptcy Code.[19] Certain significant

---

objection and were indeed not relevant to the matters at hand. The Court thus overrules all objections to exhibits filed in connection with the Hearing as moot.

[17] *See, e.g., In re Stone & Webster, Inc.*, 286 B.R. 532, 545 (Bankr. D. Del. 2002) ("Section 1129(a)(7) 'is an individual guaranty to each creditor or interest holder that it will receive at least as much in *reorganization* as it would in *liquidation.*' 7 *Collier on Bankruptcy* ¶ 1129.03[7][b] p. 1129–43 (15th ed. rev.2002) (emphasis added). 'Paragraph (7) of subsection 1129(a) requires a *comparison* between what each member of a class will receive under a *plan* and what such claimant would receive in *liquidation.*' 7 *Collier on Bankruptcy* ¶ 1129.03[7][c] p. 1129–48 (15th ed. rev. 2002) (Emphasis added). Thus, if a plan fails the § 1129(a)(7) test then the creditors are better off in a liquidation."); *In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994) ("In order to make the comparison required by § 1129(a)(7), the plan proponent must provide the court with adequate evidence of the liquidation value of the debtor's assets."); *In re SM 104 Ltd.*, 160 B.R. 202, 219 (Bankr. S.D. Fla. 1993) ("Section 1129(a)(7) sets out the financial minimum that assenting creditors in an assenting class can impose on dissenting creditors within that class. This minimum was drawn from the best interests test that came to the Bankruptcy Code from the old Chapter XI. *See* Bankruptcy Act of 1898, § 366(2) (repealed 1979); H.R.Rep. No. 595, 95th Cong., 1st Sess. 412–13 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.").

[18] *See Union Meeting Partners*, 165 B.R. at 574.

[19] Section 541(a) of the Code provides:

(a)The commencement of a case under section <u>301</u>, <u>302</u>, or <u>303</u> of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

assets of the Debtor's bankruptcy estate are excluded from the section 1129(a)(7) liquidation value, as well as the asset value available for distribution to creditors. *See also* ECF 1801, at 12–13. More specifically, the Debtor includes only a small fraction of the value of its Sexual Misconduct Insurance Program Trust in plan distributions and completely excludes the value of its General Insurance Program Trust and the Health Benefits Program Trust. These exclusions are inconsistent with the Court's prior guidance on the subject.[20] As the Court explained in its July 13, 2026, statements,

> Based on the plain language of the insurance trust documents, Maryland law, and section 541(c)(2) of the Bankruptcy Code … the insurance trusts do not appear to be valid [spendthrift] trusts protected by section 541(c)(2). Moreover, based on my review of the law, any discretionary aspects of the trustee's powers do not appear to change the analysis under the facts of this case. Rather, the insurance trusts appear to be property of the Debtor's estate.

ECF 2715.[21]

---

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
    (A) under the sole, equal, or joint management and control of the debtor; or
    (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

11 U.S.C. § 541 (2026).

[20] ECF 2715. *See also A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir. 1986) (discussing section 541 of the Code and noting that "[u]nder the weight of authority, insurance contracts have been said to be embraced in this statutory definition of 'property.' *In re Davis,* 730 F.2d 176, 184 (5th Cir.1984)."); *In re Humbert*, No. 91-13315, 1992 WL 674744, at *4 (Bankr. D. Kan. Dec. 23, 1992), *aff'd,* No. CIV. A. 93-1006-PFK, 1993 WL 343116 (D. Kan. Aug. 4, 1993) (explaining that, under applicable state (Kansas) law, "the principle providing that self-settled spendthrift trusts, while valid, are subject to the attachment of creditors" renders "the debtor's interest in the policy . . . part of the bankruptcy estate. 11 U.S.C. § 541(c)(2)") (citations omitted).

[21] In response to certain legal positions asserted by the parties at several of the Prior DS Hearings, the Court asked the parties for supplemental briefing on the following two issues (collectively, the "Preliminary Issues"): "(i) whether, and to what extent, the Debtor's insurance trusts (and the related trust property) are property of the Debtor's bankruptcy estate and available for distribution to creditors; and (ii) whether the Committee may seek substantive consolidation of the Debtor's nondebtor affiliates through the Committee's proposed plan of reorganization (rather than, for example, in the context of an objection to any plan(s) proposed by the Debtor and any affiliated debtor entities)." ECF 2675. The parties submitted their supplemental briefs, and the Court set forth several preliminary thoughts on the Preliminary Issues on the record of the July 13, 2026, hearing (the "July 13 Statements"). ECF 2679, 2680, 2681, 2682, 2715. The Court incorporates the July 13 Statements as if fully rewritten herein and, having reviewed again the parties' briefing on the Preliminary Issues, adopts the July 13 Statements as part of this Order. ECF 2715.

8

The Court has again reviewed the Debtor's insurance trusts, the applicable law, and the Debtor's proposed plan of reorganization. The Court could not confirm the proposed plan as currently drafted based on the information disclosed in the Debtor DS, the asset value currently included in the Debtor's liquidation value, and the Debtor's interest in and control over the trust assets.[22]

The Debtor's proposed plan also attempts to classify its general unsecured creditors into three different classes of impaired classes of claims. Section 1122 of the Code requires a plan to set forth classes of claims and states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[23] Section 1123 of the Code further requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment[.]"[24] The Code does not require that all substantially similar claims be placed in the same class,[25] but courts generally require "valid business, legal, and factual reasons [to] justify the separate classification of the particular claims and interests."[26] This is to protect

---

[22] The Court acknowledges the Debtor's disclosures, and apparent disagreement with the Court's July 13 Statements, concerning the trusts. Nevertheless, the Debtor fails to explain how these assets, which appear to the Court to be property of the Debtor's estate under applicable law, can be *completely* excluded from the liquidation analysis. This Order and the July 13 Statements do not necessarily mean that every dollar in the trusts must be distributed to the Debtor's creditors, but certainly something more than that currently included appears subject to creditors' claims in this case.

[23] 11 U.S.C. § 1122(a). Subsection (b) of section 1122 provides that "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). This exception provides for what is commonly referred to as an administrative convenience class. Such use, however, may not be used to create an accepting class of creditors and does not appear to be applicable here. *See, e.g., In re S & W Enters.*, 37 B.R. 153 (Bankr. N.D. Ill. 1984).

[24] 11 U.S.C. § 1123(a)(4).

[25] *See, e.g., Travelers Ins. Co. v. Bryson Props. XVIII* (*In Re Bryson Props. XVIII*), 961 F.2d 496, 502 (4th Cir. 1992); *In re Council of Unit of 100 Harborview Drive Condominium*, 572 B.R. 131, 137 (Bankr. D. Md. 2017).

[26] *In re Retail Grp., Inc.*, No. 20-33113-KRH, 2021 WL 962553, at *7–8 (Bankr. E.D. Va. Mar. 9, 2021), *vacated on other grounds by Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022); *see also Travelers Ins. Co. v. Bryson Props. XVIII* (*In re Bryson Props. XVIII*), 961 F.2d 496, 502 (4th Cir. 1992); *In re Aegerion Pharmaceuticals, Inc.*, 605 B.R. 22, 30 (Bankr. S.D.N.Y. 2019) (*citing In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992)); *In re Consolidated Land Holdings, LLC*, No. 6:19-bk-04760-KSJ, 2021 WL 3701799, at *5 (Bankr. M.D. Fla. Aug. 20, 2021) ("[W]hile the Code does not address whether all substantially

against, among other things, the illegitimate "gerrymandering" of an accepting impaired class of claims.[27]

The Debtor's proposed classification of unsecured claims raises several concerns for the Court. *See also* ECF 2801, at 11. For example, each class of unsecured claims holds the same priority of distribution under applicable nonbankruptcy law and the Code. The Court appreciates the Debtor's attempts to classify unsecured creditors with similar kinds of claims in the same class, but the vastly different treatment of those unsecured claims raises a red flag. Indeed, it appears from the Debtor DS and the classification scheme that the Debtor has the financial ability to pay Class 5 claimants in full on or shortly after the effective date of the plan. The Debtor classifies these claimants as "impaired" apparently because the Debtor is not paying postpetition interest on the claims or some other nominal alteration. That "impairment" allows the Class 5 claimants to vote on the plan. Likewise, although Class 7 includes non-Survivor tort claims, the treatment proposed for Class 7 Claimants is very different from that proposed for Survivor tort claims.

Based upon its review of the Debtor DS and applicable law, the Court has significant concerns that the Debtor's proposed classification scheme under its plan is not being proposed in good faith, may violate several sections of the Code, and may result in unfair distributions in violation of the absolute priority rule.[28] The Court therefore finds that, under the particular

---

similar claims must be placed in the same class, courts have held that separate classification of similar claims must be supported by a legitimate business reason.") (quoting *In re Monticello Realty Invs., LLC*, 526 B.R. 902, 913 (Bankr. M.D. Fla. 2015)).

[27] *See, e.g., In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986) (stating that "there must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class."); *In re Bryson Props., XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) ("Thus, although separate classification of similar claims may not be prohibited, it 'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.' *Greystone*, 948 F.2d at 139.").

[28] *See, e.g., In re Eastern Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) (plan violating absolute priority rule was patently unconfirmable).

circumstances of this case, the Debtor's proposed classification scheme renders this version of the Debtor's plan unconfirmable.

## 2. Certain Disclosures Are Inadequate

In addition to the substance of certain aspects of the plan, the Debtor DS fails to adequately disclose certain information. Most notably and related to one of the points in the prior subsection, the Debtor does not provide adequate disclosures concerning its assets, the value of those assets, and why (from the Debtor's perspective) they are or are not property of the estate subject to distribution to creditors.[29] Even if the Debtor does not believe an asset is available to creditors, the Debtor must still disclose the asset and its value. *Any* interest the Debtor has in property becomes property of the Debtor's estate upon the filing of the bankruptcy petition. 11 U.S.C. § 541(a). The Debtor does not get to decide unilaterally what assets it discloses or makes available for distribution to creditors. Those matters are decided under the Bankruptcy Code in the first instance, even if the assets may subsequently be removed from the estate or restricted from creditors' access.

The Debtor DS also fails to clearly articulate the treatment of its insurance assets and how creditors may collect against those assets. As noted by several objecting parties, the disclosure statements must contain adequate information regarding any settlements with insurers. They also should explain the effect of those settlements on the plan and creditors' collection rights. Likewise, putting aside the legality of the proposed release, injunction, and gatekeeping provisions,[30] the

---

[29] The Court notes that the Debtor DS identifies certain entities related to the Debtor and states affirmatively that none hold assets belonging to this estate. The Court also recognizes the tension between meaningful disclosure and overwhelming information. The Court would encourage the Debtor to take a hard look at its asset base and identify, perhaps in a schedule, any assets in which the Debtor's estate might have an interest and why that interest may be excluded from the estate and the liquidation value. This is not to suggest that the Court here is deviating from the July 13 Statements (it is not), but those statements and the Court's findings in its Interim Order at ECF 2329 might guide the parties concerning property interests not yet reviewed (at least on a preliminary basis) by the Court.

[30] The Court acknowledges the substantive concerns raised by the United States Trustee concerning these provisions and will address them, to the extent not resolved, at any confirmation hearing. ECF 2794, 2795. The Court observes that the Debtor DS does not clearly explain how the third-party releases work. For example, it is not clear what happens

11

disclosure statements must clearly and simply describe creditors' rights with respect to the Debtor's assets and any conditions to collection under the plan against nondebtor assets (including any right to proceed under state law against nondebtor entities).

The Committee also raises concerns regarding the Debtor's commitment to enhanced child protection protocols, which are an important part of any plan of reorganization in this case, particularly from the perspective of the Committee and the Survivors. ECF 2801, at 3–4. Although the Committee frames this issue as a confirmation issue, the Court considers it at this stage as one of disclosure. Given the events leading to this chapter 11 case and the nature of the majority of claims,[31] a hypothetical reasonable investor would want to understand the Debtor's position on enhanced child protection protocols and their implementation in connection with the plan. That information, in the context of this case, is reasonably related to creditors' ability to cast informed votes on the plan.

### B. The Committee DS

The Committee DS is a 158-page document (without exhibits) and also includes an appropriate level of detail about the pre- and postpetition key events concerning the Debtor. The Court, however, finds the following deficiencies with the Committee DS.

### 1. Aspects of the Plan Render it Patently Unconfirmable

The Committee DS describes a number of plan features that would render the Committee's proposed plan of reorganization unconfirmable. For example, the Committee's plan includes language suggesting that nondebtor entities may be substantively consolidated upon the occurrence

---

if a creditor elects to not execute a release, whether that jeopardizes any insurance settlements or the plan, and how creditors should assess that risk (and whether, in that context, the release is truly consensual).

[31] The Court bases these statements on the Debtor's own representations in this case concerning what led to the bankruptcy and the nature of the claims asserted against it. It did not consider the Report of the Attorney General, which is the subject of the Motion in Limine at ECF 2805. That motion is resolved as stated on the record of the Hearing.

of certain events. As this Court previously stated, the Court will not substantively consolidate the Debtor with its nondebtor affiliates on an involuntary basis.[32] ECF 2715. The Court finds that such proposed action violates the express terms of the Bankruptcy Code and renders the plan unconfirmable under section 1129(a)(3).

The Committee's statement that the plan seeks substantive consolidation only of debtor entities or entities that consent to consolidation does not change the analysis at this stage of the case. At present, there is only one debtor before the Court. The Committee has presented no evidence, nor has it articulated a basis for believing, that other entities affiliated with the Debtor will file chapter 11 cases or otherwise voluntarily contribute their assets to the Committee's plan. Moreover, the conditions relied upon by the Committee to gain access to these nondebtor entities'

---

[32] As noted above, the Court incorporates the July 13 Statements as if fully rewritten herein. ECF 2715. *See In re Archdiocese of Saint Paul & Minneapolis*, 888 F.3d 944, 951, 953 (8th Cir. 2018) (no substantive consolidation of nondebtor, nonprofit entities); *In re Concepts Am., Inc.*, No. 14 B 34232, 2018 WL 2085615, at *3 (Bankr. N.D. Ill. May 3, 2018) (no substantive consolidation on nondebtor entities; focused on Seventh Circuit law); *see also, e.g., In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 594 (Bankr. E.D. Va. 2004) ("Substantive consolidation should be 'used sparingly' to prevent injustice. *Id.* at 76. The concept has been applied to consolidate debtor and non-debtor parties; however, this requires an even more cautious application of the usual test. *Id.* at 83; *see also In re Lease–A– Fleet, Inc.,* 141 B.R. 869 (Bankr.E.D.Pa.1992). In this court's opinion, substantive consolidation to effectively declare a non-debtor to be a bankruptcy petitioner would require most unusual and compelling circumstances."); *In re AuditHead, LLC*, 624 B.R. 134, 146–147 (Bankr. D. S.C. 2020) (discussing the split in authority regarding substantive consolidation of nondebtor entities and finding that the facts of the case did not support substantive consolidation).

assets are speculative and lack a legal basis.[33] In this regard, the Committee's plan is not feasible under section 1129(a) of the Bankruptcy Code.[34]

The Committee's plan also contains several defects with respect to the treatment of the Debtor's insurance assets. Regardless of the plan proponent, any plan must comply with applicable law in the treatment and transfer of insurance rights and policies. *See* ECF 2799, at 4–6. The transfer and trust provisions of the Committee's plan create various issues that currently render the plan unconfirmable under section 1129(a)(3) of the Bankruptcy Code.

---

[33] The Court acknowledges that a nondebtor plan proponent (such as the Committee) could use, for example, property of the bankruptcy estate to fund a plan of reorganization. That is, however, very different from the structure proposed by the Committee's plan. The Committee's plan seeks to pull in entities (or their assets) not currently before this Court and property not currently subject to the in rem jurisdiction of this Court. 11 U.S.C. § 541; 28 U.S.C. § 1334(e). The Court also observes that sections 1123 and 1129 of the Code are focused on the debtor and/or property of the estate. 11 U.S.C. §§ 1123, 1129; *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 215–224 (2024) (discussing and interpreting 11 U.S.C. § 1123(b)(6)). Moreover, although section 1123(a)(5) references "merger or consolidation" of the debtor with another, to the extent that reference includes substantive consolidation and not merely mergers and consolidations under applicable corporate law, courts still find substantive consolidation to be an extraordinary remedy and one based in equity. *See id*. 1123(a)(5)(C); ECF 2715; *see also* 2 COLLIER ON BANKRUPTCY ¶ 105.09 (16th ed. 2026); 7 COLLIER ON BANKRUPTCY ¶ 1123.01[5][b] (16th ed. 2026); *In re Stone & Webster, Inc.*, 286 B.R. 532 (Bankr. D. Del. 2002).

There simply is no basis to require or allow use of nondebtor entities' separate property or information (see below) absent the consent of the entities. Any proposed plan must focus on the Debtor and property of the Debtor's estate. A plan that relies on nondebtor participation without the necessary consent or commitment from those parties is speculative, uncertain, and potentially misleading to creditors. *See, e.g., In re Am. Cap. Equip., LLC,* 688 F.3d 145, 156 (3d Cir. 2012) (affirming lowers courts' decisions that plan funding was too speculative and thus plan was patently unconfirmable and explaining that "the plan must be 'reasonably likely [to] succeed[ ] on its own terms without a need for further reorganization on the debtor's part.' *In re Applied Safety,* 200 B.R. at 584; *In re Quigley Co., Inc.,* 437 B.R. 102, 142 (Bankr.S.D.N.Y.2010) (plan was not feasible where funding source was 'speculative at best and visionary at worst')"); *see also In re Fieldstone Mortg. Co.,* 427 B.R. 364, 379 (Bankr. D. Md. 2010) ("'It is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity.") (citations omitted); *Turner v. Turner*, 147 Md. App. 350, 425, 809 A.2d 18, 61 (2002) ("A corporation is regarded as a separate legal entity."); ECF 2329.

[34] As noted by one court in this circuit,

[A] court may deny approval of a disclosure statement, even if it is not by itself deficient, if a debtor's plan has no hope of being confirmed. *In re Bermuda Bay, LLC,* Nos. 09–32133 and 09–32130, 2009 WL 5218071, at \*3 (Bankr.E.D.Va. Dec.31, 2009) (quoting *In re CRIIMI MAE, Inc.,* 251 B.R. 796, 799 (Bankr.D.Md.2000)). In order for a debtor's plan to be confirmed, it must be feasible, meaning that it is reasonably likely to succeed. 11 U.S.C. § 1129(a)(11); *In re Travelstead,* 227 B.R. 638, 650–51 (D.Md.1998).

*In re Forest Grove, LLC*, 448 B.R. 729, 736 (Bankr. D.S.C. 2011). The Court cannot approve a disclosure statement that proposes a plan with significant contingencies or uncertainties, particularly with respect to funding and estimated distributions to creditors.

## 2.   Certain Disclosures Are Inadequate

Several objecting parties posit that the Committee DS is incomplete and redacts a large portion of potentially relevant information. The Court observes the same disclosure flaws for the Committee DS as noted above for the Debtor DS in the context of insurance assets and creditors' collection rights against those assets. The Committee DS contains inadequate information on the substance and impact of any proposed insurance settlements and fails to describe fully all parties' rights under the plan concerning actions by and against settling and non-settling insurers.[35]

With respect to the redacted language, the Court generally agrees that a disclosure statement and plan cannot go out for solicitation with redacted information. As previously discussed, the primary (if not sole) purpose of the disclosure statement is to provide relevant information to inform creditors' votes. Withholding information from the solicitation package fundamentally undercuts the objectives of section 1125 of the Code.

That said, to the extent the redacted information concerns nondebtor parties' separate assets and liabilities, that information is not necessary or appropriate in a disclosure statement concerning the debtor, absent special circumstances. For example, a disclosure statement may include information about a nondebtor entity that is voluntarily providing funding for the plan. It also may include such information if relevant to valid claims or causes or action asserted by the estate. The disclosure statement cannot, however, be used to disseminate information about a nondebtor entity for the purpose of prodding a settlement, to impose bankruptcy-like disclosures on that entity, or to confuse creditors voting on the proposed plan. The latter is of particular concern to the Court in this case, as the Committee DS contains financial information regarding (and suggests potential

---

[35] As with the Debtor DS, the Committee DS is not clear on how the third-party releases work. For example, it is not clear what happens if a creditor opts out of the releases and, if even one creditor opting out jeopardizes the plan, how creditors should assess that risk (and whether, in that context, the release is truly consensual).

15

contributions from) entities that are not before this Court. Unless and until an entity agrees to the disclosures, becomes a debtor in a bankruptcy case, or is otherwise shown to hold assets of this bankruptcy estate, such information should not be included in the disclosure statement.

### C. Certain Disclosures in Both Disclosure Statements Are Confusing and Overly Complicated

Finally, both the Debtor DS and the Committee DS include many defined terms and legalese that complicate an already complicated plan structure. Each disclosure statement is also internally inconsistent in certain respects.[36] The Court appreciates the complexity inherent in this chapter 11 case and is not suggesting any of this is easy. The Court does, however, encourage both plan proponents to take a step back and assess what kind of plan will work in this case and how best to describe that plan to all creditors. The most brilliant, intricate, and innovative plan will mean little in this case if the very people affected by the plan do not understand it or how it works.

Accordingly, it is, by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that the Debtor DS [ECF 2785] and the Committee DS [ECF 2787] fail to meet the requirements of section 1125 of the Bankruptcy Code and are not approved; and it is further

**ORDERED**, that the Court's denial of approval of the Debtor DS and the Committee DS is without prejudice.

cc:    All parties

### END OF ORDER

---

[36] By way of example only, the United States Trustee noted "inconsistencies and inaccurate information regarding the third-party releases" in the Debtor DS, and a lack of clarity regarding the two possible "paths" and "excessive use of defined terms …makes the [Committee] Plan incomprehensible and renders the Disclosure Statement that is meant to describe it lacking in adequate information" regarding the Committee DS. ECF 2794, 2795.

16