**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-16969 |

**DISCLOSURE STATEMENT IN SUPPORT OF THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE**

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
Symphony Place
150 Third Avenue South, Ste. 2800
Nashville, TN 37201
Telephone: 615.244.6380
Facsimile: 615.244.6804
Email: blake.roth@hklaw.com
scott.kunde@hklaw.com

*-and-*

Philip T. Evans (Fed. Bar No. 11796)
**HOLLAND & KNIGHT LLP**
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone: 202.457.7043
Email: philip.evans@hklaw.com

*-and-*

Catherine K. Hopkin (Fed. Bar No. 28257)
**YVS LAW, LLC**
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone: 443.569.0788
Facsimile: 410.571.2798
Email: chopkin@yvslaw.com

*Attorneys for the Debtor and Debtor In Possession*

Dated: August 28, 2026

[1] The last four digits of the Debtor's federal tax identification number are: 1535. The Debtor's principal place of business is located at 320 Cathedral Street, Baltimore, Maryland 21201.

THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE AND THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "***DEBTOR***," "***RCAB***," OR "***DEBTOR***") SEEKS CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE (THE "***PLAN***").

THIS DISCLOSURE STATEMENT ("***DISCLOSURE STATEMENT***"), THE PLAN, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTOR, PURSUANT TO SECTIONS 1125, 1126, AND 1190 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SOLICITATION BY THE DEBTOR OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE **ARTICLE XII** OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT INCLUDING UNDER "***RISK FACTORS TO BE CONSIDERED***" IN **ARTICLE VIII** OF THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR AND PROPERTY OF THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE PLAN OR THIS DISCLOSURE STATEMENT OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE THE ORDER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF THE SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND THE SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE

DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. THE DEBTOR'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, THE DEBTOR'S BUSINESS OPERATIONS, THE VALUE OF THE DEBTOR'S ASSETS, OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENT MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS

FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DEBTOR AND TRUSTS TO BE CREATED FOR THE BENEFIT OF HOLDERS OF SURVIVOR CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

TO OBTAIN, AT YOUR COST, ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT PLEASE CONTACT THE DEBTOR'S COUNSEL AT:

HOLLAND & KNIGHT LLP

Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
Symphony Place
150 Third Avenue South, Ste. 2800
Nashville, TN 37201
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: blake.roth@hklaw.com
scott.kunde@hklaw.com

HOLLAND & KNIGHT LLP

Philip T. Evans (Fed. Bar No. 11796)
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone: 202.457.7043
Email: philip.evans@hklaw.com

YVS LAW, LLC

Catherine K. Hopkin (Fed. Bar No. 28257)
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone: (443) 569-0788
Facsimile: (410) 571-2798
Email: chopkin@yvslaw.com

*Counsel for the Debtor and Debtor in Possession*

# TABLE OF CONTENTS


I. Introduction. 1
- A. Overview of the Plan. 1
- B. Voting Procedures. 12
- C. Brief Explanation of Chapter 11. 13

II. Description of the Debtor. 14
- A. Nature and History of the Debtor. 14
- B. The Work of the Debtor within the Archdiocese. 15
- C. Relationship Between and Property of the Debtor, Parishes, Schools, and Certain Related Entities. 15
- D. The Clergy Sex Abuse Crisis and the Debtor's Response. 22
- E. Events Leading to the Chapter 11 Case. 23

III. Events During the Chapter 11 Case. 24
- A. Bankruptcy Filing and First Day Orders. 24
- B. Retention and Employment of the Debtor's Professionals. 26
- C. Appointment of Official Committee of Unsecured Creditors and Retention of Professionals. 27
- D. Claims Process, Notice, and Deadlines. 28
- E. Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities. 29
- F. Survivor Statement Hearings. 29
- G. Insurance Coverage Adversary Proceeding, Mediation, and Settlement Negotiations. 29
- H. Amendments to the CVA and Commencement of Civil Actions. 30
- I. Charitable Immunity Adversary Proceeding. 30
- J. Committee's Motion to Dismiss Chapter 11 Case. 30
- K. Claim Objections With Respect to Survivor Claims. 30
- L. Seek the City Initiative and Adversary Proceeding. 31
- M. Data Security Incidents. 32

IV. Summary of the Plan. 32
- A. Overview of Classification and Treatment of Claims and Interests. 32
- B. Summary of Claim Treatment by Class. 33
- C. The Two Trusts. 36
- D. Survivor Claims. 37
- E. Settling Insurers. 39
- F. Non-Settling Insurers. 40
- G. Means for Implementation of the Plan. 41

H. Adoption of Additional Child Safety and Protection Policies. 41
I. Claims Administration for Claims. 42
J. Executory Contracts and Unexpired Leases. 42
K. Confirmation and Consummation of the Plan. 43
L. Effects of Confirmation. 43
M. RULE 3016 DISCLOSURES REGARDING INJUNCTIONS IN THE PLAN. 44
N. Retention of Jurisdiction. 45
V. Tax Consequences of the Plan. 46
A. Federal Income Tax Consequences to Holders of Unsecured Claims. 46
B. Federal Income Tax Consequences to the Debtor 47
C. Tax Consequences to the Trust 47
VI. Alternatives to the Plan. 47
A. Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code. 47
B. Dismissal of the Debtor's Chapter 11 Case. 48
C. Chapter 7 Liquidation Not A Viable Alternative. 48
D. Appointment of a Chapter 11 Trustee Is Not A Viable Alternative. 48
VII. Acceptance and Confirmation of the Plan. 48
A. General Confirmation Requirements. 48
B. Best Interests Test. 49
C. Financial Feasibility Test. 53
D. Section 1129(b) Alternative. 53
VIII. Risk Factors to Be Considered 54
A. Failure to Satisfy Vote Requirement. 54
B. Non-Confirmation or Delay of Confirmation of the Plan. 54
C. Non-Consensual Confirmation. 54
D. Risk of Non-Occurrence of the Effective Date. 54
E. Classification and Treatment of Claims. 54
F. Review of Class 6 Claims 55
G. General Insurance Coverage Risks. 55
H. Insurance Contributions. 55
I. Insurance Coverage Actions. 55
J. Specific Coverage Defenses Asserted by Non-Settling Insurers. 56
K. Insurance Assignment Risks. 57
L. Insurance Sale Risks. 57
M. Risks Regarding Insurance Trusts. 57
N. Duration and Expense of Insurance Coverage Litigation. 57

**IX. Miscellaneous Provisions. 58**

- **A. Modification of the Plan. 58**
- **B. Revocation. 58**
- **C. Controlling Documents. 58**
- **D. Filing of Additional Documents. 58**
- **E. Direction to a Party. 59**
- **F. Certain Actions. 59**
- **G. Plan as Settlement Communication. 59**
- **H. Other Rights. 59**

**X. Bankruptcy Rule 9019 Request. 59**

**XI. Confirmation Request. 59**

**XII. Recommendation and Conclusion. 60**

**EXHIBITS**

EXHIBIT A – PLAN OF REORGANIZATION
EXHIBIT B – DEBTOR LIQUIDATION ANALYSIS
EXHIBIT C – DEBTOR CASH FLOW PROJECTIONS

# I. INTRODUCTION.

On September 29, 2023 (the "***Filing Date***"), the Roman Catholic Archbishop of Baltimore, a corporation sole (the "***Debtor***") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The case is pending before the United States Bankruptcy Court for the District of Maryland (the "***Bankruptcy Court***").

The Debtor has proposed the Plan to complete the bankruptcy process and sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan.

## A. Overview of the Plan.

### 1. ***Establishment of Trusts for Payments to Survivors.***

The Debtor's proposed Plan establishes a Survivor Compensation Trust[2] and an Insurance Trust.[3] The Trusts are the sources of payments to Survivor Claimants under the Plan. The Trusts will initially be funded in an aggregate amount of not less than **$283,910,224**. The funding of the Trusts will come from three principal sources:

| | |
|---|---|
| Debtor | $78,910,224 |
| Settling Insurers | $185,000,000[4] |
| Co-Insured Entities | $20,000,000 |

i. The Debtor: $78,910,224.

The amount the Debtor would contribute to the Trusts is informed by the fact that the Bankruptcy Code provides that the Debtor must pay at least the liquidation value of its assets. The liquidation value of the Debtor's assets is the total net cash value of the Debtor's property, investments, and cash that would be paid to unsecured creditors in a liquidation. In order to determine the liquidation value of the Debtor's assets, a careful liquidation analysis was done to determine the total value of all assets of the Debtor.[5] The liquidation analysis not only aggregates the entire value of all assets owned by the Debtor, but also subtracts from the aggregate value various amounts of funds that are restricted for particular purposes, obligations that the Debtor must satisfy ahead of unsecured claims, and the estimated cost of liquidating the assets. The Debtor acknowledges that through the course of this Chapter 11 Case disputes have arisen regarding the scope of the Debtor's property. Having conducted a thorough liquidation analysis, and providing weight to

[2] The Survivor Compensation Trust is discussed in more detail below in Section IV.C.1. of this Disclosure Statement.

[3] The Insurance Trust is discussed in more detail below in Section IV.C.2. of this Disclosure Statement.

[4] The Debtor estimates that approximately ninety-five percent (95%) of the proceeds from the sale of the Settling Insurer Policies could be attributable to the Co-Insured Entities, based upon the Co-Insured Entities' historical share of the insurance premiums paid as part of the Insurance Program.

[5] A fuller discussion of the liquidation value of the Debtor is set forth below in Section VII.B. of this Disclosure Statement.

the various disputes regarding the scope of the Debtor's property, the Debtor determined that the total amount available to contribute to the Trusts is **$78,910,224**.

ii. Settling Insurers: $185,000,000.

Historically, the Debtor and Co-Insured Entities purchased insurance coverage from multiple insurance companies over many years. A typical policy would provide coverage for one year at a time and many single-year periods had multiple policies in effect simultaneously. Survivor Claims made in the Chapter 11 Case are connected to insurance coverage by way of the year(s) the Survivor was impacted as well as the policy(ies) in effect in that year.

In the Chapter 11 Case, the insurance companies from which the Debtor and Co-Insured Entities purchased coverage fall into two categories:

(a) **Settling Insurers**, which are insurance companies that have agreed to enter into a settlement with the Debtor and Co-Insured Entities whereby they will pay a lump sum to the Trusts to cover all claims in all policy periods (i.e., years) for which the Debtor and Co-Insured Entities purchased insurance from them. At present, there are three Settling Insurers making a combined contribution to the Trusts in the amount of $185,000,000.

It is important to note that money used to pay premiums to Settling Insurers came from both the Debtor as well as Co-Insured Entities (i.e., Parishes, Schools, and other entities related to the Debtor, but which are not in bankruptcy). As a result, both the Debtor and the Co-Insured Entities have an interest in the settlement dollars that come from Settling Insurers, and they do not share those interests equally. The Debtor estimates that approximately ninety-five percent (95%) of the proceeds from the sale of Settling Insurer Policies are attributable to the Co-Insured Entities, based upon the Co-Insured Entities' historical share of the insurance premiums paid as part of the Debtor's insurance program.

(b) **Non-Settling Insurers**, which are insurance companies that have not thus far entered into an agreement to make a contribution to the Trusts. As a result, these insurance companies remain subject to claims by Survivor Claimants whose claims implicate their policies due to the year(s) in which the Survivor Claim occurred and the coverage in effect that year provided by the Non-Settling Insurer. The Debtor and Co-Insured Entities are contributing all Non-Settling Insurer Policies and the proceeds of all Non-Settling Insurer Policies for the payment of compensation to Survivor Claimants.

NOTE: It is possible that certain Non-Settling Insurers will choose to enter into settlement agreements and become Settling Insurers prior to or after the final confirmation of the Plan. Should that occur, the Debtor estimates that the additional contributions to the Trusts resulting from potential settlement agreements over and above the $185,000,000 will range from $88,571,693 to $132,857,540. As a result, the total funding of the Trusts would increase from $283,910,224 to between $372,481,917 and $416,757,764.

iii. Co-Insured Entities: $20,000,000.

Parishes, Schools, and Other Archdiocesan-Related Entities participate and historically participated in the insurance program managed by the Debtor. These Co-Insured Entities paid, and continue to pay, premiums to the Debtor's insurance program as one would pay insurance premiums to any insurance company. Consequently, claims made by Co-Insured Entities are paid by the Debtor's insurance program. The insurance program also uses proceeds from these premiums to purchase insurance from third-party

insurance companies such as described above. Note that the Co-Insured Entities are separately incorporated entities and, unlike the Debtor, they have not filed for bankruptcy. However, because they are co-insured alongside the Debtor through various insurance companies, they are affected by the Debtor's filing for bankruptcy due to the impact that the Debtor's bankruptcy will have on their insurance assets. As mentioned above, the Plan contemplates the sale of certain Settling Insurer Policies back to the applicable Settling Insurers and each Co-Insured Entity will consent to the sale of such Settling Insurer Policies in exchange for the protections afforded to the Co-Insured Entities by the Plan. While the Debtor has proposed the Plan in consultation with the Co-Insured Entities and believes the Co-Insured Entities will consent to the sale of the Settling Insurer Policies in exchange for the protections afforded in the Plan, the Co-Insured Entities' consent is not a foregone conclusion and is integral to the implementation of the Plan and payment to Survivor Claimants of material portions of the compensation contemplated by the Plan. In particular, the Co-Insured Entities have presently agreed to provide a contribution to the Trusts in the amount of $20,000,000, in addition to the contribution of their interests in the Settling Insurer Policies, Non-Settling Insurer Policies, and proceeds of each.

**2. *Consequences of Making Contributions to the Trusts.***

As a result of the contributions made to the Trusts and the bankruptcy process, certain protections will be afforded to (a) the Debtor, (b) Settling Insurers, and (c) Co-Insured Entities as follows:

(a) The Debtor will receive a bankruptcy discharge, which means that an individual or entity with a claim against the Debtor arising prior to the Effective Date of the Plan would not be able to sue the Debtor for damages relating to said claim. This benefit arises from and is provided by the Bankruptcy Code once the Plan is confirmed by the Bankruptcy Court and becomes effective.

(b) Settling Insurers will be entitled to the benefit of releases and certain injunctions arising from the purchase of the Settling Insurer Policies free and clear of claims, liens, and other interests, as provided by and permitted under the Bankruptcy Code. These benefits from the sale of the Settling Insurer Policies are incorporated into and made a part of the Plan.

(c) Co-Insured Entities (including those that have closed) will be entitled to the benefit of certain voluntary releases, if granted, and injunctive relief channeling Survivor Claims to Settling Insurer Policies in exchange for the Co-Insured Entities' contribution of the proceeds of Settling Insurer Policies to the Trusts. As a result, certain Survivor Claims will be required to collect from the proceeds of Settling Insurer Policies before being able to pursue any recoveries from Co-Insured Entities.

**3. *Administration of the Trusts.***

Once the Survivor Compensation Trust and the Insurance Trust have been established, a Trustee appointed pursuant to the Plan will oversee and administer each Trust. The Debtor will not oversee the Trusts, nor participate in the distribution of Trust assets to Survivor Claimants. The Survivor Compensation Trustee and Insurance Trustee will fairly distribute the proceeds to the Survivor Claimants, pursuant to the Plan and Survivor Compensation Trust Distribution Plan.

Several factors will impact the ultimate recovery by any particular Survivor Claimant. Such factors include, but are not limited to, the total number of Allowed Survivor Claims[6] as determined by the Bankruptcy Court and/or Trustee(s), the actual amounts contributed to the Trusts resulting from the

[6] At present the Debtor estimates there are between four hundred and eight hundred Survivor Claims based upon its review of Survivor Claims filed in the Chapter 11 Case, objections filed to Survivor Claims, and objections to Survivor Claims that are to be filed.

potential additional insurance settlements, and the options that individual Survivor Claimants choose to exercise regarding the parties the Survivor Claimant consents to release (see below).

In light of these factors and based upon the contributions to be paid to the Trusts as outlined above, the Debtor believes the Plan provides reasonable and equitable compensation to all Survivor Claimants as shown in the following chart:

| **Estimated Average Compensation per Survivor Claim** | | | | | |
|---|---|---|---|---|---|
| **Number of Allowed Survivor Claims** | **Initial Cash Contributions to Trusts** | **Estimated Additional Insurance Settlements** | **Estimated Total Trust Funding** | **Average Recovery for Each Survivor Claim** | **Average Recovery for Each Survivor Claim in a Liquidation**[7] |
| 400 | $283,910,224 | $88,571,693 to $132,857,540 | $372,481,917 to $416,767,764 | **$931,205 to $1,041,919** | $69,914 to $188,300 |
| 500 | $283,910,224 | $88,571,693 to $132,857,540 | $372,481,917 to $416,767,764 | **$744,964 to $833,536** | $55,931 to $150,640 |
| 600 | $283,910,224 | $88,571,693 to $132,857,540 | $372,481,917 to $416,767,764 | **$620,803 to $694,613** | $46,610 to $125,533 |
| 700 | $283,910,224 | $88,571,693 to $132,857,540 | $372,481,917 to $416,767,764 | **$532,117 to $595,382** | $39,951 to $107,600 |
| 800 | $283,910,224 | $88,571,693 to $132,857,540 | $372,481,917 to $416,767,764 | **$465,602 to $520,960** | $34,957 to $94,150 |

Survivors with Allowed Survivor Claims will receive from the Survivor Compensation Trustee an initial proposed compensation award amount. The Survivor Compensation Trustee's proposal will also include information about insurance coverage related to the individual Survivor Claimant's claim along with various options that the Survivor Claimant will choose to exercise. Certain options that the Survivor Claimant may choose to exercise could potentially reduce the amount ultimately awarded to the Survivor Claimant. The primary options that may be presented to a Survivor Claimant are twofold:

i. Election to Be a Litigation Claimant versus a Distribution Claimant (Not all Survivor Claimants will have this option).

Some Survivor Claimants will be given the option to be treated as a Litigation Claimant. A Survivor Claimant may elect to be treated as a Litigation Claimant if the Survivor Claimant's Survivor Claim is covered, in whole or in part, by one or more Non-Settling Insurer Policies or is otherwise completely

[7] Estimates based upon a low liquidation value of $27,965,710 and high liquidation value of $75,319,826, with 92.3% being distributed to Survivor Claimants. These amounts represent the Debtor's calculations regarding the range of amounts that may be available to distribution to unsecured creditors in a hypothetical chapter liquidation, as opposed to confirmation of the Plan.

uninsured. Survivor Claimants with such claims who do not elect to be treated as a Litigation Claimant will be treated as a Distribution Claimant.

By electing to be a Litigation Claimant, a Survivor Claimant will have the option to pursue their Survivor Claim in court against the Non-Settling Insurer and/or the Co-Insured Entities, but also will: (a) accept a reduction of a substantial portion of the proposed compensation as set forth below; (b) assume the risk of failing to obtain a judgment which awards him/her any compensation; (c) assume the risk of obtaining a judgment in an amount less than the proposed compensation amount; and (d) assume the risk of failing to recover any amounts from the Co-Insured Parish/School/Entity beyond proceeds of Insurance Policies.

Litigation Claimants must execute a Litigation Claimant Agreement, providing an acknowledgment of the scope of recourse available to the Litigation Claimant on account of their Litigation Claim, namely that the Litigation Claim may not be pursued against the Debtor, Reorganized Debtor, Debtor's Agents, and Reorganized Debtor's Agents for purposes other than pursuing recovery from Non-Settling Insurers and the Trusts.

Any Survivor Claimant that is not treated as a Litigation Claimant, including Survivor Claimants whose Survivor Claims are insured only by Settling Insurer Policies, shall be considered a Distribution Claimant.

ii. Option to Execute a Full Release of All Affected Parties Versus a Partial Release.

Distribution Claimants must execute a Survivor Claimant Release, providing for the release of the Debtor and Settling Insurers, but will have the option whether to release Co-Insured Entities (i.e., Parishes, Schools, and other entities related to the Debtor, but which are not in bankruptcy). A Distribution Claimant whose Survivor Claim affects or otherwise relates only to Settling Insurer Policies may elect to forgo releasing the Co-Insured Entities and, instead, pursue them in court.

If a Distribution Claimant does not release the Co-Insured Entities, the Distribution Claimant will: (a) accept a reduction of a substantial portion of the proposed compensation as set forth below; (b) assume the risk of failing to obtain a judgment which awards them any compensation; (c) assume the risk of obtaining a judgment in an amount less than the Trustee's proposed compensation amount; and (d) assume the risk of failing to recover any amounts from the Co-Insured Parish/School/Entity beyond proceeds of Insurance Policies.

Important factors to be considered by Distribution Claimants when deciding whether to release the Co-Insured Entities are as follows:

(a) Regardless of a Survivor Claimant's election to release the Co-Insured Entities, a Survivor Claimant will receive that portion of the proposed compensation attributable to the Debtor's cash contribution to the Survivor Compensation Trust plus that portion of the proposed compensation attributable to the Debtor's interests in the proceeds of Settling Insurer Policies contributed to the Survivor Compensation Trust; and

(b) Upon electing also to release the Co-Insured Entities, a Survivor Claimant will receive that portion of the proposed compensation attributable to the Co-Insured Entities' cash contributions to the Survivor Compensation Trust plus the Co-Insured Entities' interests in the proceeds of Settling Insurer Policies contributed to the Survivor Compensation Trust.

The Survivor Compensation Trustee's offer providing proposed compensation from the Survivor Compensation Trust will identify the amount of compensation attributable to each election. As noted above, the Debtor estimates that approximately ninety-five percent (95%) of the proceeds from the sale of the Settling Insurer Policies are attributable to the Co-Insured Entities. Taking that into consideration, the Debtor's contribution to the Trusts combined with its share of the proceeds of Settling Insurer Policies will be slightly less than 25% of the proposed award while the contribution from the Co-Insured Entities combined with their share of the proceeds of Settling Insurer Policies will be slightly higher than 75% of the proposed award. For this reason, those Survivor Claimants who do not elect to release the Co-Insured Entities will receive a substantially reduced award.

**4. *Hypothetical Calculations of Compensation Awards.***

In order to illustrate how awards would be calculated, the following section describes three potential scenarios with corresponding flowcharts/decision trees so that Survivors can better understand the impact of their elections and options. Each of the scenarios uses a hypothetical amount of $500,000 as the initial compensation award proposal. The following hypothetical scenarios are illustrated:

i. Compensation for a Distribution Claimant

ii. Compensation for a Litigation Claimant whose Claim was insured by a Non-Settling Insurer

iii. Compensation for a Litigation Claimant whose Claim was not insured

i. Hypothetical Calculation of Compensation for a Distribution Claimant.

Utilizing the settlement funding assumptions set forth in the "Estimated Average Compensation per Survivor Claim" chart above (i.e., estimated total Trust funding in the amount of $372,481,917 to $416,767,764), assuming a Survivor Claimant's Survivor Claim was insured solely by Settling Insurer Policies and received an initial proposed compensation amount of $500,000 on account of their Survivor Claim, the Survivor Claimant would be treated as a Distribution Claimant and would have the opportunity to choose from one of the following two options:

(a) Option A: the Survivor Claimant does not release Co-Insured Entities, in which case:

(i) the Survivor Claimant immediately would receive between $113,736 to $124,286 (i.e., slightly lower than 25% of the proposed compensation attributable to the Debtor's cash contribution to the Survivor Compensation Trust plus the Debtor's interests in the proceeds of Settling Insurers);

(ii) the Survivor Compensation Trustee would reserve at least $375,713 to $386,264 with respect to the Co-Insured Entities' contribution to cover potential judgments resulting from litigation;

(iii) the Survivor Claimant could pursue the Survivor Claim in court against any Persons other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, and Settling Insurers, seeking to obtain a judgment;

(iv) if the Survivor Claimant obtains a Litigation Award (i.e., a judgment), the Survivor Claimant would return with the judgment to recover from the Survivor Compensation Trust up to

the lesser of the judgment amount and the amount reserved by the Survivor Compensation Trustee with respect to the Co-Insured Entities' contribution; and

(v) the Survivor Claimant could then pursue recovery of any balance of the judgment from sources other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, or the Trusts.

**OR, ALTERNATIVELY, THE DISTRIBUTION CLAIMANT COULD CHOOSE:**

(b) Option B: the Survivor Claimant releases the Co-Insured Entities, in which case:

(i) the Survivor Claimant immediately would receive the entire $500,000; and

(ii) could pursue the Survivor Claim in court against any Persons other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Co-Insured Entities, Settling Insurers, and Trusts.

## Distribution Claimant — Claim Insured Solely by Settling Insurer Policies

Hypothetical Survivor Claimant | Initial Award: $500,000




ii. <u>Hypothetical Calculation of Compensation for an Insured Litigation Claimant.</u>

Utilizing the settlement funding assumptions set forth in the "Estimated Average Compensation per Survivor Claim" chart above (i.e., total funding in the amount of $372,481,917 to $416,767,764), assuming a Survivor Claimant's Survivor Claim was insured only by one or more Non-Settling Insurer Policies and received an initial proposed compensation amount of $500,000 on account of their Survivor Claim, the Survivor Claimant could request the Survivor Compensation Trustee permit their Survivor Claim to be treated as a Litigation Claim and:

(a) **<u>if such request is granted</u>:**

(i) upon executing a Litigation Claimant Agreement, the Survivor Claimant would be treated as a Litigation Claimant;

(ii) the Litigation Claimant would receive $5,000;

(iii) the Survivor Compensation Trustee would reserve at least $495,000 to cover potential judgments resulting from litigation;

(iv) the Survivor Claimant could pursue their Survivor Claim in court, seeking to obtain a Litigation Award (i.e., a judgment);

(v) if the Survivor Claimant obtains a Litigation Award, the Survivor Claimant would return with the judgment to recover from the Trusts upon the terms set forth in the Plan and Survivor Compensation Trust Distribution Plan; and

(vi) the Survivor Claimant could then pursue recovery of any remaining balance of the judgment from sources other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or the Trusts.

(b) **if such request is denied:**

(i) the Survivor Claimant would be treated as a Distribution Claimant;

(ii) the Survivor Claimant would have the same options as set forth above for a Distribution Claimant; provided, however, any litigation against a Co-Insured Entity could only go forward at such time as all implicated Non-Settling Insurers have become Settling Insurers, at which time the Survivor Claimant could pursue their Survivor Claim in court like a Distribution Claimant.

## Litigation Claimant — Claim Insured by Non-Settling Insurer Policies

Hypothetical Survivor Claimant | Initial Award: $500,000




iii. Hypothetical Calculation of Compensation for an Uninsured Litigation Claimant.

Utilizing the settlement funding assumptions set forth in the "Estimated Average Compensation per Survivor Claim" chart above (i.e., total funding in the amount of $372,481,917 to $416,767,764), assuming a Survivor Claimant's Survivor Claim was not insured and received an initial proposed compensation amount of $500,000 on account of their Survivor Claim, the Survivor Claimant could request the Survivor Compensation Trustee permit their Survivor Claim to be treated as a Litigation Claim in which case the Survivor Compensation Trustee shall grant the election and:

(a) the Survivor Claimant shall be treated as a Litigation Claimant;

(b) the Survivor Claimant would receive $5,000;

(c) the Survivor Compensation Trustee would return to the Survivor Compensation Trust the remaining $495,000 for distribution to other Survivor Claimants in accordance with the Survivor Compensation Distribution Plan;

(d) the Survivor Claimant could pursue the Survivor Claim in court against any Persons other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, and Trusts, seeking to obtain a judgment;

(e) the Survivor Claimant could pursue recovery on any judgment from sources other than the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or the Trusts.

## Litigation Claimant — Uninsured Claim

Hypothetical Survivor Claimant | Initial Award: $500,000




**<u>Other Unsecured Claims Under the Plan.</u>**

The Plan provides that holders of Non-Survivor Tort Claims will be entitled to pursue current insurance maintained by the Debtor <u>less</u> any amounts that may consist of any deductible, retention, or any other similar amount that may be payable by the Debtor under the Debtor's insurance programs. Unlike Survivor Claimants, holders of Non-Survivor Tort Claims will not receive any distributions from non-insurance assets of the Debtor, consistent with charitable immunity under Maryland law, and will not recover any amounts attributable to self-insured retentions, deductibles, or other amounts payable from or by the Debtor. Non-Survivor Tort Claims are treated separately from Survivor Claims because the insurance

providing recoveries for Non-Survivor Tort Claims is distinct from the insurance providing recoveries for Survivor Claims.

The Plan provides that the holders of the General Unsecured Claims (i.e., trade or other contractual claims) will be paid in full, with interest. General Unsecured Claims are treated separately from Non-Survivor Tort Claims because they are known, liquidated, and such separate treatment is consistent with Maryland law.

**B. Voting Procedures.**

**1. *Ballots*.**

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class.[8] If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

A ballot that does not indicate an acceptance or rejection of the Plan will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted. You may not change your vote after the voting deadline passes.

To be counted, completed ballots must be actually received by the Debtor's solicitation and claims agent by 11:59 p.m. (prevailing Eastern time), on [_], 2026, using ***one*** of the following methods:

If by First Class mail:

Roman Catholic Archbishop of Baltimore — Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4420
Beaverton, OR 97076-4420

If by overnight courier or hand delivery:

Roman Catholic Archbishop of Baltimore — Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97076

Or, if by electronic submission:

Please visit https://dm.epiq11.com/case/rcabaltimore/info. Click on the "***E-Ballot***" section of the Debtor's website and follow the directions to submit your E-Ballot. If you choose to

[8] A description of the Classes under the Plan and which are entitled to vote is set forth in Section IV.B.2. of this Disclosure Statement.

submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

**IMPORTANT NOTE: You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

**"*E-BALLOT*" IS THE SOLE MANNER IN WHICH BALLOTS WILL BE ACCEPTED VIA ELECTRONIC OR ONLINE TRANSMISSION. BALLOTS SUBMITTED BY EMAIL WILL NOT BE COUNTED.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY EMAIL BE ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTOR'S SOLICITATION AND CLAIMS AGENT, EPIQ CORPORATE RESTRUCTURING, LLC, BY EMAIL AT TABULATION@EPIQGLOBAL.COM WITH A REFERENCE TO "*ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE*" IN THE SUBJECT LINE, OR BY CALLING 1-877-337-1944 (US & CANADA, TOLL-FREE) OR 1-503-438-3079 (INTERNATIONAL) AND REQUESTING TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.**

**2. *Importance of Your Vote.***

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that vote.

Only the ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

## C. Brief Explanation of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under chapter 11, section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek confirmation under section 1129(b) of the Bankruptcy Code. A Debtor may confirm a plan notwithstanding a class voting to reject the plan only if another impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Debtor's solicitation and claims agent, Epiq Corporate Restructuring, LLC, by e-mail at tabulation@epiqglobal.com with a reference to "Roman Catholic Archbishop of Baltimore" in the subject line, or by calling 1-877-337-1944 (US & Canada, toll-free) or 1-503-438-3079 (international) and requesting to speak with a member of the solicitation team.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the chapter 11 process.

If the Plan is confirmed by the Bankruptcy Court, its terms are binding on the Debtor, all Creditors, and other parties in interest, regardless of whether they have voted to accept the Plan.

## II. DESCRIPTION OF THE DEBTOR.

### A. Nature and History of the Debtor.

The Archdiocese of Baltimore (the "***Archdiocese***") is the ecclesiastical district comprising a geographic area decreed by the Roman Catholic Church (the "***Church***") as the Archdiocese of Baltimore. Within the Archdiocese, Archbishop William E. Lori ("***Archbishop Lori***") is the diocesan bishop or ordinary for the Archdiocese (the "***Archbishop***"),[9] exercising ecclesiastical authority and jurisdiction in assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Archdiocese.

The Archbishop carries out his canonical duties in accordance with the Code of Canon Law ("***Canon Law***"), which is the ecclesiastical law of the Church. The Archbishop also has authority over the

[9] All references to the defined term "Archbishop" in this Disclosure Statement refer to the position within the Archdiocese, including Archbishop Lori and all of his predecessors and successors, which is recognized under Maryland law as the ordinary of the archdiocese and under Canon Law as the diocesan bishop.

Debtor, which is a nonprofit religious institution and the civil law instrumentality through which the mission of the Church is administered within the Archdiocese. Archbishop Lori has had authority over the Debtor since May 16, 2012.

### 1. ***The Church.***

The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate and universal ordinary power in the Church. The Pope exercises such power in concert with the College of Bishops of which he is the head. A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy. As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds. A diocese is geographically divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop. As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds. Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church. Under Maryland law, the Debtor is a corporation sole and each parish is organized as a separate corporation, pursuant to and in accordance with the Maryland Corporations and Associations Code.

### 2. ***The Archdiocese and the Debtor.***

The Archdiocese's history extends back more than two hundred years to the eighteenth century. Today, the ecclesiastical district of the Archdiocese: (i) has two co-cathedrals both of which are located in Baltimore City: (a) the Cathedral of Mary Our Queen; and (b) the National Shrine of the Basilica of the Assumption of the Blessed Virgin Mary, which was this country's first cathedral and was dedicated by Archbishop Ambrose Marechal in 1821; (ii) includes a geographic area encompassing approximately 4,800 square miles across nine (9) counties of the State of Maryland; and (iii) contains close to 503,000 Catholics served by one hundred eight (108) (the "***Parishes***") and fifty-eight (58) schools (the "***Schools***"). The Debtor is the civil instrumentality through which the Archdiocese is recognized as a corporation sole, distinct from the Archbishop, Parishes, and other entities, pursuant to Maryland law.

## B. The Work of the Debtor within the Archdiocese.

The primary role of the Debtor is to hold and administer the temporal goods of the Archdiocese and serve as the civil instrumentality through which services are provided to individuals of the Roman Catholic faith, the Parishes, the Schools, and the Co-Insured Entities within the Archdiocese in furtherance of the mission and ministry of the Church within the Archdiocese. The mission and ministry of the Church within the Archdiocese, as administered by the Debtor, are extremely important to the people within the Archdiocese. Many within the Archdiocese, including non-Catholics, depend on the services that the Church, through the Debtor, delivers directly or otherwise supports, some of which services are material and monetary and others of which are purely spiritual.

## C. Relationship Between and Property of the Debtor, Parishes, Schools, and Certain Related Entities.

As set forth above, there are many Roman Catholic ecclesiastical and civil entities that operate within the geographic territory of the Archdiocese, including the Parishes, the Schools, and other non-profit entities, funds, and trusts (collectively, the "***Related Entities***").

### 1. ***Parishes Within the Archdiocese.***

Under Canon Law, the parishes within a diocese are territorial, comprised of certain geographical areas within the applicable diocese. Once established by the bishop of a diocese, parishes are ecclesiastical entities in their own right and consist of communities of the Christian faithful whose pastoral care is entrusted to a priest. Within the Archdiocese, there are one hundred eight (108) Parishes for which pastors are appointed by the Archbishop. Each priest appointed as pastor by the Archbishop serves as the proper shepherd of the pastor's applicable Parish, under the Archbishop's authority.

In accordance with Maryland law, each Parish is organized as a separate and distinct non-profit corporation. Both canonically and under Maryland law, each Parish is a distinct and separate entity, and no Parish assets are assets of the Debtor.

### 2. ***Schools and Other Educational Institutions Within the Archdiocese.***

As set forth above, thousands of students are provided Catholic education through the Schools, consisting of eighteen (18) secondary schools and forty (40) elementary and middle schools. Thirty-four (34) of the forty (40) elementary and middle schools are associated with Parishes (either individually or regionally) within the Archdiocese, with the remaining six (6) being independent Catholic schools that are within the Archdiocese but are operated independently from, and without oversight by, the Debtor. Six (6) of the eighteen (18) high schools are regionally operated by Parishes or as separate corporations, with the remaining twelve (12) being independent Catholic high schools operated independently from, and without oversight by, the Debtor.

A listing of the Schools may be located on the website maintained by the RCAB at https://www.archbalt.org/schools/. Each of the Schools is either separately incorporated or is operated through an existing Parish. In either instance, while some Schools receive varying levels of support from, among others, the RCAB, each School is a distinct entity separate and apart from the RCAB.

Accordingly, no School's assets are assets of the RCAB.

### 3. ***Other Related Catholic Entities, Funds, and Trusts Within the Archdiocese.***

There are additional Related Entities within the Archdiocese.[10]

#### i. Archbishop of Baltimore Annual Appeal Trust.

The Archbishop of Baltimore Annual Appeal Trust was established as a perpetual and irrevocable trust on September 11, 1992 and collects specific gifts for the Annual Appeal for Catholic Ministries. The funds raised by the Annual Appeal for Catholic Ministries are used to support over one hundred life-affirming ministries within the Archdiocese through various entities located within the Archdiocese.

No assets of the Archbishop of Baltimore Annual Appeal Trust are assets of the RCAB.

#### ii. The Catholic Community Foundation of the Archdiocese of Baltimore, Inc.

The Catholic Community Foundation of the Archdiocese of Baltimore, Inc. (the "***CCF***") is a Maryland non-profit corporation, which was incorporated on April 21, 1999. The purpose of the CCF is to

[10] This section of the Disclosure Schedules describes most of the Related Entities but may not describe every Related Entity. In particular, the Debtor holds and manages certain custodial funds for the benefit of the Debtor which are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the Debtor.

support the spiritual, educational and social needs of the Catholic community within the Archdiocese of Baltimore.

The CCF fulfills this mission by establishing fund agreements which provide ongoing support to fund the mission and ministries of Parishes, Schools, Related Entities, and other Catholic institutions located within the Archdiocese. At present, there are approximately five hundred fifty separate fund agreements in the CCF, which generally fall into one of four categories: (a) Field of Interest Funds that are established to support a particular area of need such as Catholic Education or Vocations; (b) Organizational Funds that are established for individual Parishes, Schools, or Other Entities;(c) Individual Community Funds that are established by individual donors with specific donor restrictions; and (d) Donor Advised Funds that are established by individuals who wish to remain active in their philanthropy and have access to the CCF's professional advice and management.

Most of the CCF funds are restricted endowments and all CCF funds are managed by an external investment management firm. The CCF distributes investment proceeds on an annual basis, in accordance with distribution parameters approved by CCF's Board of Trustees and consistent with applicable donor gift agreements and applicable law.

While the CCF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the CCF are assets of the RCAB.

iii. Roman Catholic Foundation in the Archdiocese of Baltimore, Inc.

The Roman Catholic Foundation in the Archdiocese of Baltimore, Inc. (the "***RCF***") is a Maryland non-profit corporation, which was incorporated on April 3, 1978. Since its incorporation, the RCF's sole and specific purposes have been to: (a) further the Roman Catholic religion, including its charitable and educational activities within the Archdiocese; (b) aid and assist other charitable and educational organizations outside of the framework of the Archdiocese but sponsored or approved by it; and (c) assist in programs of the Holy See and institutions enjoying its recognition and approval. The RCF is governed by a board of directors, which is elected by the members of the RCF.

No assets of the RCF are assets of the RCAB.

iv. The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc.

The John Carroll Foundation of the Roman Catholic Archdiocese of Baltimore, Inc. (the "***JCF***") is a Maryland non-profit corporation, which was incorporated on January 18, 1993. Since its incorporation, the JCF's purposes are to: (a) support and promote pre-school, primary, and secondary Catholic education within the Archdiocese; (b) provide financial support to establish and maintain Catholic-sponsored community schools and educational services in the Archdiocese; (c) support the youth ministry within the Archdiocese by providing financial resources for retreats, social activities, field trips and similar activities; (d) foster and strengthen the charitable programs and services within the Archdiocese; and (e) support pastoral services, facilities, and programs within the Archdiocese.

The JCF is governed by a self-perpetuating board of trustees and at all times the Archbishop is also a member of the board of trustees.

No assets of the JCF are assets of the RCAB.

v. Associated Catholic Charities, Inc.

Associated Catholic Charities Inc. ("***Catholic Charities***") is a Maryland non-profit corporation, which was incorporated on September 25, 1947. Catholic Charities is a faith-based agency, acting as a nondenominational social service provider affiliated with the RCAB and the Roman Catholic Church. Catholic Charities focuses upon providing: (a) mental and behavioral health services for children and families, including residential, community, and school-based programs, resources, and referrals; (b) apartment communities and life care options for seniors; (c) programs aimed at (i) assisting immigrants earn citizenship, visas, and other statuses and (ii) providing access to legal services, health care, and other vital resources; (d) meals, shelter, case management, and access to resources for individuals experiencing homelessness and poverty; (e) support, skills training, resources, and job placement services for individuals who are unemployed or underemployed; and (f) meal services, shelter, case management, and access to resources for children and families experiencing poverty and homelessness. Most services provided by Catholic Charities are offered at modest or no cost and all services are provided without regard to the religious affiliation of the recipient.

While Catholic Charities receives various types of support from the RCAB, no assets of Catholic Charities are assets of the RCAB.

vi. Inter-Parish Loan Fund, Inc.

Prior to March 28, 2011, consistent with Canon Law, the Archbishop held in trust certain funds belonging to Parishes, Schools, and Related Entities as part of what was called the Interparish Deposit and Loan Program. On March 28, 2011, the Inter Parish Loan Fund, Inc. (the "***IPLF***") was incorporated under Maryland law, for the purpose of replacing the Interparish Deposit and Loan Program and providing a standalone program of depository, investment, and financing services (the "***IPLF Program***") to Eligible Participants (as defined in the IPLF's organizational and governing documents). Upon the formation of the IPLF, all funds held in trust as part of the Deposit and Loan Program for the benefit of Parishes, Schools, and Related Entities were transferred to the IPLF. Pursuant to the IPLF Program, and in accordance with Canon Law, funds of Parishes, Schools, and Related Entities in excess of amounts for ordinary needs are required to be deposited into the IPLF.

All assets deposited in the IPLF pursuant to the IPLF Program are held in trust, with legal title to all assets in the IPLF Program vested at all times in the IPLF. Assets held by the IPLF are not subject in whole or in part to voluntary or involuntary assignment, anticipation, legal process or claims of creditors of the IPLF or any participant in the IPLF Program. Each participant in the IPLF Program receives a Certificate of Participation evidencing their fractional undivided beneficial ownership interest in the investments and other assets held by the IPLF in an amount equal to: (a) the sum of the amounts deposited by the participant with the IPLF to be held in trust as part of the IPLF Program; (b) less all amounts withdrawn by the Participant in accordance with the IPLF Program; (c) plus interest accruing on the amounts held in trust from time to time, at the rates and in the manner provided by the IPLF Program's guidelines.

While the IPLF currently engages the RCAB to provide certain administration functions in exchange for administrative fees, no assets of the IPLF are assets of the RCAB.

vii. Maryland Catholic Conference, LLC.

Maryland Catholic Conference, LLC (the "***MCC***") is the public policy voice for the Catholic Church in Maryland. The MCC is focused on state-level advocacy, providing opportunities for Catholics to live out their responsibility to engage in public and political life on behalf of the dignity of the human

person and for the common good. The MCC is governed by a Board of Governors, which is comprised of Maryland's bishops and advised by an administrative board composed primarily of lay leaders from across Maryland.

While MCC receives various types of support from the RCAB, no assets of MCC are assets of the RCAB.

viii. Route 175 East, LLC.

Route 175 East, LLC was formed in 2010 to purchase and develop property for the parish community of St. Lawrence the Martyr Parish. Route 175 East, LLC currently owns the land on which St. Lawrence Martyr Catholic Church is located.

The assets of Route 175 East, LLC are not assets of the RCAB.

ix. Catholic Community School Land, Inc.

Catholic Community School Land, Inc. ("***CCSL***") was formed to purchase and build a new Catholic school in Baltimore City. CCSL currently owns the land and fixed assets of the Mother Mary Lange School and is an obligor under a New Market Tax Credit financing transaction entered to finance the construction of the Mother Mary Lange School.

The assets of CCSL are not assets of the RCAB.

x. Mercy Ridge, Inc. Joint Venture.

Mercy Ridge, Inc. ("***Mercy Ridge***") is a continuing care retirement community and joint venture between the RCAB and Mercy Health Services, Inc. Mercy Ridge holds all legal title to all of the real and personal property utilized in the continuing care retirement community.

While the RCAB has certain governance and other rights based upon its partial ownership interest in Mercy Ridge, no assets of Mercy Ridge are assets of the RCAB.

xi. Cemeteries.

Within the Archdiocese, Parishes operate fifty-three cemeteries and a single cemetery is operated by a separate corporation, The New Cathedral Cemetery Corporation (collectively, the "***Cemeteries***"). Each cemetery has its own cemetery administrator, who is responsible for ensuring effective cemetery operations. Each of the Cemeteries receives varying levels of support from the Office of Cemetery Management and, pursuant to the Archdiocese's policies and procedures, all Cemeteries must maintain funds in a CCF endowment that will produce a steady flow of earning sufficient to cover the costs of maintaining the grounds after income diminishes or ceases.

No assets of the Cemeteries are assets of the RCAB.

xii. Catholic Review Media.

Catholic Review Media ("***Catholic Review***") is the official Catholic newspaper within the Archdiocese. The predecessor to the Catholic Review, the Catholic Mirror, was established in 1850. Catholic Review offers complimentary subscriptions to members of Parishes within the Archdiocese and are also offered to non-members for minimal cost. In 2017, the Catholic Review, legally organized as The

Cathedral Foundation, Inc., was merged into the RCAB, and its operations became part of the RCAB's Department of Communication.

xiii. Insurance Programs and Corresponding Trusts.

The Debtor maintains and operates a centralized insurance program, which provides, among other things, the Archdiocesan General Insurance Program (the "***General Insurance Program***"), Archdiocesan Sexual Misconduct Self-Insurance Program (the "***Self-Insurance Program***"), and Archdiocesan Health Benefits Program (the "***Health Benefits Program***" and collectively with the General Insurance Program and Self-Insurance Program, the "***Insurance Programs***").

The General Insurance Program is funded through the Archdiocesan General Insurance Program Trust (the "***General Insurance Trust***"), which in turn is funded through contributions from the RCAB and Co-Insured Entities. The Self-Insurance Program is funded through the Archdiocesan Sexual Misconduct Self-Insurance Program Trust (the "***Self-Insurance Trust***"), which in turn is funded through contributions from the RCAB and Co-Insured Entities. The Health Benefits Program is funded through the Archdiocesan Health Benefits Program Trust (the "***Health Benefits Trust***" and together with the General Insurance Trust and Self-Insurance Trust, the "***Insurance Trusts***"), which in turn is funded through contributions from the RCAB, Co-Insured Entities, and their respective employees. On average: (a) with respect to the General Insurance Program and General Insurance Trust, approximately 96.1% is contributed by Co-Insured Entities with the balance contributed by the Debtor; (b) with respect to the Self-Insurance Program and Self-Insurance Trust, approximately 96.1% is contributed by Co-Insured Entities with the balance contributed by the Debtor; and (c) with respect to the Health Benefits Program and Health Benefits Trust, approximately 73.9% is contributed by Co-Insured Entities, approximately 20.1% is contributed by employees of Co-Insured Entities and the Debtor, and approximately 5.9% is contributed by the Debtor.

The General Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of risk protection; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; and (e) operating and funding the risk protection and risk management initiatives offered under the General Insurance Program.

The Self-Insurance Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of risk protection that provides a documented level of protection in connection with claims relating to sexual misconduct; (b) obtaining contracts of insurance to provide risk protection as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage on a self-insured basis, as documented in memoranda of coverage; (d) obtaining contracts of reinsurance to cover any or all risks provided under any memoranda of coverage; (e) providing risk protection, risk management, and related services and funds, which may include criminal background screening, counseling assistance and pastoral outreach to victims of sexual misconduct, providing investigative services in connection with allegations of sexual misconduct, or funding sexual misconduct prevention efforts; and (f) operating and funding the risk protection and risk management initiatives offered under the Self-Insurance Program.

The Health Benefits Program is operated exclusively for the purposes of: (a) designing, implementing, and maintaining a program of health benefits coverage that covers Participating Employers (as defined by the Health Benefits Program); (b) obtaining contracts of insurance, if desired, on behalf of Participating Employers to provide health benefits as documented in certificates of insurance; (c) retaining risk by agreeing to provide certain coverage to Participating Employers on a self-insured basis, as documented in plan documents; (d) obtaining contracts of stop loss insurance to cover any or all risks

provided under any plan documents; and (e) operating and funding the health benefits initiatives offered under the Health Benefits Program.

While the RCAB provides administrative services for each of the Insurance Programs, the funds held by the RCAB on behalf of each Insurance Program are to be held in trust and to be used solely for each respective Insurance Program. Similarly, all funds in the Insurance Trusts are assets to be used solely for each respective Insurance Program. While a dispute exists regarding the Debtor's interests in the assets in the Insurance Trusts, the Debtor believes, at a minimum, that the assets contributed to the Insurance Programs and Insurance Trusts directly by non-debtor participants in the Insurance Program (i.e., Co-Insured Entities and employees) are not assets of the RCAB. The Debtor contends that approximately ninety-five percent (95%) of the funds held by the RCAB on behalf of the Insurance Programs are collectively on account of non-Debtor contributions (including contributions made at such time as the Insurance Programs were created), and that only approximately five percent (5%) of the funds are property of the Debtor.

xiv. Priest Pension Plan.

Consistent with Canon Law and Church custom, the RCAB maintains the Archdiocese of Baltimore Priests' Pension Plan, which was established on July 1, 1972 (the "***Priest Pension Plan***"). The Priest Pension Plan is funded through contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Pension Plan. The Priest Pension Plan provides defined monthly benefit payments for retired priests, in accordance with Canon Law requirements.

Assets of the Priest Pension Plan, including the assets maintained in the Priest Pension Trust, are not assets of the RCAB.

xv. Postretirement Health and Auto Plan for Priests of the Archdiocese of Baltimore.

Consistent with Canon Law and Church custom, the RCAB provides certain employee benefits for retired priests of the Archdiocese of Baltimore (the "***Priest Benefit Plan***"). The Priest Benefit Plan is funded by contributions from the RCAB and Parishes, which are held in trust and utilized pursuant to and in accordance with the Priest Benefit Plan.

Priests who retire from the Archdiocese of Baltimore, are not in active ministry, and maintain no current assignments are considered eligible for benefits under the Priest Benefit Plan. For those eligible, the Priest Benefit Plan provides (a) medical, vision, prescription drug, and dental benefits and (b) full cost auto insurance. As of July 1, 2022, the Priest Benefit Plan had one hundred twenty-nine (129) active participants (i.e., active priests making contributions), sixty-nine (69) retired priests receiving medical, vision, prescription drug, and dental benefits, and fifty-eight (58) retired priests receiving auto insurance.

Assets of the Priest Benefit Plan, including assets maintained in the Priest Benefit Plan Trust, are not assets of the RCAB.

xvi. Retirement Plan for Lay Employees of the Archdiocese of Baltimore.

The RCAB maintains the Retirement Plan for Lay Employees of the Archdiocese of Baltimore (the "***Lay Pension Plan***"). The Lay Pension Plan is funded from the contributions from the RCAB, Parishes, Schools, and Certain Related Entities, which contributions are held in trust and utilized pursuant to and in accordance with the Lay Pension Plan. The Lay Pension Plan provides defined monthly benefit payments for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

Assets of the Lay Pension Plan, including assets maintained in the Lay Pension Plan Trust, are not assets of the RCAB.

xvii. Lay Employees Retiree Medical Plan.

The RCAB provides certain employee benefits for retired lay employees of the RCAB, Parishes, Schools, and Related Entities (the "***Lay Benefit Plan***"). The Lay Benefit Plan is funded from contributions by the RCAB, Parishes, Schools, and certain Related Entities, with such contributions held in trust and utilized pursuant to and in accordance with the Lay Benefit Plan. The Lay Benefit Plan provides certain health insurance benefits for lay employees within the Archdiocese, regardless of whether they were employed by the RCAB, a Parish, a School, or a Related Entity.

Assets of the Lay Benefit Plan, including assets of the Lay Benefit Plan Trust, are not assets of the RCAB.

## D. The Clergy Sex Abuse Crisis and the Debtor's Response.

In response to the clergy sex abuse crisis, numerous steps and actions have been taken within the Roman Catholic Church and Archdiocese to provide for all survivors of abuse, known and yet to be known, in a fair, just, and equitable manner.

### 1. ***First Written Child Protection Policies Implemented.***

In 1993, the Debtor publicized its first written child protection policies and established an independent review board. The Debtor also began reporting all allegations of child sexual abuse, regardless of age, in response to the Maryland Attorney General's new guidance requiring mandatory reporting of historic allegations.

### 2. ***Charter for the Protection of Children and Young People.***

In spring of 2002, the United States Bishops adopted the *Charter for the Protection of Children and Young People* (the "***Charter***"), adopting a "one strike" policy with regard to clergy serving in any active, public ministry. The Charter also included: (a) permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor; (b) requirement of criminal background checks for adults, including clergy, who work with children and youth; (c) implementation of educational programs for the prevention of child sexual abuse for both adults and children; (d) provision of behavioral guidelines and ethical standards for ministry; (e) establishing outreach for survivors; and (f) creation of review boards to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

That same year, the Debtor apologized for the abuse committed by ministers of the Church and disclosed the names of all credibly accused clergy, and money spent as a result of clergy abuse in a letter sent to all registered parishioners and on the Debtor's website. The most updated version of this list is maintained on the Debtor's website to this day.

### 3. ***Debtor's Voluntary Mediation Program.***

In addition to the foregoing, in 2007 the Debtor launched the Survivor Mediation Program (the "***VMP***"). Under the VMP, the Debtor offers mediated financial settlements to survivors, regardless of how long ago the abuse had occurred. The Debtor works with the survivor and a retired, non-Catholic judge, to see if an agreement can be reached on a cash payment and often continued counseling assistance. As part

of the process, the Debtor apologizes, acknowledges its belief in the allegations made by the survivor, and offers a personal meeting with the Archbishop.

The Debtor asks that survivors be represented by an attorney of their choosing to protect their rights, given that releases are executed in exchange for the cash payments. The Debtor does not require survivors to agree to confidentiality, only agreeing to confidentiality if expressly requested by the survivor.

To date, the Debtor has entered into settlement agreements with approximately one hundred thirty-two (132) survivors, resulting in excess of thirteen million dollars ($13,000,000) being paid to survivors, with one hundred six (106) of those settlements resulting from the VMP.

#### 4. ***Other and Continued Actions by the Debtor.***

In addition to implementation of the dictates of the Charter and establishing the VMP, the Debtor has taken the following additional steps: (i) in 2017, the Debtor contracted with Shield the Vulnerable for online training and compliance management, which training is updated every five (5) years; (ii) the Debtor supported legislation (a) allowing Survivors more time to file civil lawsuits in cases of child sexual abuse, which passed in 2017; and (b) for child protection education in all schools, which passed in 2018; (iii) in 2018, the Debtor began requiring all employees and clergy to complete child protection refresher training annually; (iv) in 2019, the Debtor became the first diocese in the United States to implement a third-party reporting system for allegations against its bishops; (v) in 2020, the Debtor adopted a new reporting system of the United States Conference of Catholic Bishops for allegations against bishops and appointed a retired law enforcement officer to independently receive reports against its bishops and ensure compliance with the new reporting system; and (vi) in 2022, the Debtor was ranked third out of one hundred seventy-seven dioceses by Voice of the Faithful in its annual report measuring abuse prevention and safe environment programs in the United States.

The Debtor has made—and continues to make—child protection and assistance to survivors and their families in their journey toward healing its top priorities.

### E. Events Leading to the Chapter 11 Case.

For years, the Archdiocese has faced shifting demographics and a decline in church attendance, leading to declining revenues. In addition to the decline in attendance and revenues, the Debtor had borne increased expenses in connection with confronting issues regarding clergy sexual abuse. Like other similarly situated Catholic dioceses across the country, the Debtor struggled to balance the financial demands of meeting the needs of the Debtor's ongoing mission and ministry, on the one hand, and addressing the legal expenses and compensation arising from historical abuse committed by ministers of the Church. In addition, while the Debtor carried insurance during many periods in which abuse is alleged to have occurred, and while the Debtor believed and continues to believe such insurance provides coverage for Survivor Claims, the Debtor had been largely unsuccessful in obtaining any coverage for claims asserted against the Debtor.

In addition, in April 2023, the Maryland General Assembly enacted the Child Victims Act of 2023 (the "***CVA***"), which Governor Moore approved on April 11, 2023. The CVA became effective October 1, 2023, and by its terms provides that, among other things, "notwithstanding any time limitation under a statute of limitations, a statute of repose, . . . or any other law, an action for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor may be filed at any time." While the Debtor has made and continues to make significant efforts to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the Debtor has reached consensual settlements, the Debtor believed additional unsettled claims and liabilities remained outstanding. With the

passing of the CVA, and notwithstanding the Debtor's belief regarding the applicability of charitable immunity under Maryland law and the available insurance assets to satisfy Survivor Claims, reality dictated that Survivor Claims would be brought against the Debtor in numbers likely to create legal expenses and other costs well beyond the Debtor's ability to pay.

As a result, the Debtor faced the prospect of legal expenses and other costs exceeding the Debtor's economic ability to pay, in which circumstance (a) survivors of abuse could have been left with limited or no compensation or other support, (b) the Debtor's ability to continue to support the mission and ministry of the Church within the Archdiocese would have been jeopardized, and (c) those within the Archdiocese (including non-Catholics) who depend on the services of the Church delivered through the Debtor could have been left without the material, monetary, and spiritual support the Debtor provides.

Faced with this prospect, the Debtor concluded that seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to assure: (a) equitable compensation to survivors of Abuse within the Archdiocese; (b) marshaling of the assets—particularly insurance assets—available to compensate Survivors in an orderly and efficient process; (c) continuation of the counseling and other services provided through the Debtor to those who have been harmed; (d) continuation of the essential programs for the protection of children; and (e) continuation of the mission and ministry of the Church within the Archdiocese.

## III. EVENTS DURING THE CHAPTER 11 CASE.

### A. Bankruptcy Filing and First Day Orders.

The Debtor commenced the Chapter 11 Case on the Filing Date, by filing a voluntary petition under chapter 11 of the Bankruptcy Code. (Dkt. No. 1.) The Debtor has continued in possession of its assets and the management of its business as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 3, 2023, the Bankruptcy Court held an initial hearing (the "***First Day Hearing***") to consider certain "first day" matters and entered certain orders permitting the Debtor to continue operating in the ordinary course, including the following:

#### 1. *Wages.*

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief* (Dkt. No. 7) (the "***Wage Motion***"), seeking to pay certain prepetition employee wages and benefit obligations. Following the First Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 43) on October 3, 2023, granting the Wage Motion on an interim basis and setting a final hearing to consider the relief requested in the Wage Motion for November 6, 2023 (the "***Second Day Hearing***"). Following withdrawal of an objection filed by the Committee (Dkt. No. 165) and conducting the Second Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 169) on November 6, 2023, granting the relief sought in the Wage Motion on a final basis.

#### 2. *Cash Collateral.*

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* (Dkt. No. 9) (the "***Cash Collateral Motion***"), seeking authority to continue using cash collateral and provide adequate protection to the Debtor's secured lender in exchange for the continued use of cash collateral. Following the First Day

Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 50) on October 4, 2023, granting the relief sought in the Cash Collateral Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Cash Collateral Motion on a final basis. Following the Second Day Hearing, the Bankruptcy Court entered a second interim order (Dkt. No. 171) on November 6, 2023, granting the relief sought in the Cash Collateral Motion on an interim basis and setting a final hearing to consider the Cash Collateral Motion for December 4, 2023 (the "***Final Cash Collateral Hearing***"). On December 1, 2023, the Bankruptcy Court entered an order (Dkt. No. 226), granting the relief sought in the Cash Collateral Motion on a final basis.

**3. *Insurance Programs.***

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage* (Dkt. No. 10) (the "***Insurance Motion***"), seeking authority to continue administering the Debtor's Insurance Programs, continue participating in and obtaining coverage through the Debtor's Insurance Program, and authority to continue purchasing appropriate insurance coverage pursuant to the Debtor's Insurance Programs. Following the First Day Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 51) on October 4, 2023, granting the relief sought in the Insurance Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Insurance Motion on a final basis. On October 30, 2023, the Committee filed *The Official Committee of Unsecured Creditors Limited Objection and Reservation of Rights as to the Motion for Entry of Interim and Final Orders Authorizing the Debtor to: (I) Continue Administration of Insurance Programs, (II) Continue Participation in Insurance Programs, and (III) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage* (Dkt. No. 137). Following the Second Day Hearing and consideration of the foregoing limited objection, the Bankruptcy Court entered an order (Dkt. No. 172) on November 6, 2023, granting the relief sought in the Insurance Motion on a final basis.

**4. *Retention of Claims and Noticing Agent.***

On the Filing Date, the Debtor filed the *Debtor's Emergency Application for Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent; and (II) Granting Related Relief* (Dkt. No. 11) (the "***Claims Agent Application***"), seeking authority to retain Epiq Corporate Restructuring, LLC as the claims and noticing agent in the Chapter 11 Case. Following the First Day Hearing, the Bankruptcy Court entered an interim order (Dkt. No. 47) on October 4, 2023, granting the relief sought in the Claims Agent Application on an interim basis and setting the Second Day Hearing to consider the relief requested in the Claims Agent Application on a final basis. On October 30, 2023, the Committee filed the *Objection of the Official Committee of Unsecured Creditors to Debtor's Emergency Application for Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent; and (II) Granting Related Relief* (Dkt. No. 136). Following the Second Day Hearing and consideration of the foregoing limited objection, the Bankruptcy Court entered a final order (Dkt. No. 180) granting the relief sought in the Claims Agent Application on a final basis.

**5. *Clarification of the Scope and Extent of the Automatic Stay.***

On the Filing Date, the Debtor filed the *Debtor's Motion for Entry of an Order, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Extending the Automatic Stay* (Dkt. No. 12) (the "***Extend Stay Motion***"), seeking entry of an order providing that the automatic stay applied to actions against Co-Insured parties that participated in the Debtor's Insurance Programs or otherwise shared insurance assets with the Debtor. Following the First Day Hearing and consideration of objections, the Bankruptcy Court

entered an interim order (Dkt. No. 52) on October 4, 2023, granting the relief sought in the Extend Stay Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Extend Stay Motion on a final basis. Following the Second Day Hearing and consideration of additional objections, the Bankruptcy Court entered a second interim order (Dkt. No. 173) on November 6, 2023, granting the relief sought in the Extend Stay Motion on an interim basis and holding in abeyance further consideration of the relief sought in the Extend Stay Motion.

**6. _Cash Management._**

On the Filing Date, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Extending the Time to Comply With, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; (V) Authorizing the Debtor's Continued Use of Credit Cards; and (VI) Granting Related Relief* (Dkt. No. 15) (the "***Cash Management Motion***"), seeking authority for the Debtor to continue using its prepetition cash management system investment practices in the ordinary course of business. Following the First Day Hearing, the Bankruptcy Court entered an order (Dkt. No. 44) on October 3, 2023, granting the Cash Management Motion on an interim basis and setting the Second Day Hearing to consider the relief requested in the Cash Management Motion on a final basis. Following the Second Day Hearing and consideration of objections, the Bankruptcy Court entered an order (Dkt. No. 174) on November 6, 2023, granting the relief sought in the Cash Management Motion on a final basis but reserving the U.S. Trustee's ability to request compliance with 11 U.S.C. § 345(b) on or before December 4, 2023. Following a final hearing to consider the Cash Management Motion and additional objections to same, the Bankruptcy Court entered the *Order Granting Waiver of Section 345(b) Requirements and Requirement Supplemental Disclosures on Investment Accounts* (Dkt. No. 345).

**B. Retention and Employment of the Debtor's Professionals.**

During the Chapter 11 Case, the Debtor obtained approval to employ and retain a variety of professionals to assist it in fulfilling its duties and obligations as a debtor and debtor in possession in the Chapter 11 Case:

**1. _Holland & Knight LLP as Lead Bankruptcy Counsel._**

On October 13, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Holland & Knight LLP as Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 88), seeking authority to retain Holland & Knight LLP ("***H&K***") to serve as the Debtor's lead bankruptcy counsel in the Chapter 11 Case. H&K's retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Approving Employment and Retention of Holland & Knight LLP as Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 177).

**2. _Blank Rome as Special Insurance Counsel._**

On October 26, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Blank Rome, LLP as Special Insurance Counsel Effective as of the Petition Date* (Dkt. No. 109), seeking authority to retain Blank Rome, LLP ("***Blank Rome***") as the Debtor's insurance counsel in the Chapter 11 Case. Blank Rome's retention was approved on November 16, 2023, by the Bankruptcy Court's *Order Approving the Employment and Retention of Blank Rome, LLP as Special Insurance Counsel Effective as of the Petition Date* (Dkt. No. 199).

3. ***YVS Law, LLC as Local Counsel and Conflicts Counsel.***

On October 2, 2023, the Debtor filed the *Application to Employ YVS Law, LLC as Local Counsel and Conflicts Counsel to the Debtor* (Dkt. No. 40), seeking authority to retain YVS Law, LLC ("***YVS***") to serve as local counsel and conflicts counsel to the Debtor in the Chapter 11 Case. YVS' retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Granting Application to Employ YVS Law, LLC as Local Counsel and Conflicts Counsel to the Debtor* (Dkt. No. 175).

4. ***Keegan Linscott & Associates, PC as Financial Advisors.***

On October 13, 2023, the Debtor filed the *Debtor's Application to Retain Keegan Linscott & Associates, PC, as Financial Advisors, as of the Petition Date* (Dkt. No. 89), seeking authority to retain Keegan Linscott & Associates, PC ("***KLA***") to serve as the Debtor's financial advisor in the Chapter 11 Case. KLA's retention was approved on November 6, 2023, by the Bankruptcy Court's *Order Authorizing the Debtor to Retain Keegan Linscott & Associates, PC, as Financial Advisors, as of the Petition Date* (Dkt. No. 178).

5. ***Gallagher Evelius & Jones LLP as Special Counsel.***

On October 30, 2023, the Debtor filed the *Debtor's Application for Entry of an Order Approving the Employment and Retention of Gallagher Evelius & Jones LLP as Special Counsel Effective as of the Petition Date* (Dkt. No. 138), seeking authority to retain Gallagher Evelius & Jones LLP, now known as Gallagher LLP ("***Gallagher***") to continue providing all services it previously provided as the Debtor's general counsel and support the efforts of the Debtor in the Chapter 11 Case. Gallagher's retention was approved on November 28, 2023, by the Bankruptcy Court's *Order Approving the Employment and Retention of Gallagher Evelius & Jones LLP as Special Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date* (Dkt. No. 216).

**C. Appointment of Official Committee of Unsecured Creditors and Retention of Professionals.**

On October 11, 2023 the United States Trustee for the District of Maryland appointed the Official Committee of Unsecured Creditors (the "***Committee***") (Dkt. No. 81). Since the Committee's appointment, the Committee has sought to employ and retain a variety of professionals to assist it in fulfilling its duties and obligations in the Chapter 11 Case:

1. ***Stinson LLP as Legal Counsel.***

On November 1, 2023, the Committee filed the *Application to Employ Stinson LLP as Legal Counsel for the Official Committee of Unsecured Creditors Effective as of October 25, 2023* (Dkt. No. 154), seeking authority to retain Stinson LLP ("***Stinson***") as the Committee's primary legal counsel in the Chapter 11 Case. Stinson's retention was approved on November 28, 2023, by the Bankruptcy Court's *Order Approving the Employment of Stinson LLP as Legal Counsel for the Official Committee of Unsecured Creditors Effective as of October 25, 2023* (Dkt. No. 217).

2. ***Tydings & Rosenberg LLP as Local Counsel.***

On November 1, 2023, the Committee filed the *Application by the Official Committee of Unsecured Creditors for Authority to Employ Tydings & Rosenberg LLP, as Local Counsel Nunc Pro Tunc* (Dkt. No. 153), seeking authority to retain Tydings & Rosenberg LLP ("***Tydings***") as local counsel for the Committee in the Chapter 11 Case. Tydings' retention was approved on November 29, 2023, by the Bankruptcy Court's

*Order Authorizing the Employment of Tydings & Rosenberg LLP as Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 220).

### 3. ***Berkeley Research Group, LLC as Financial Advisor***

On February 2, 2024, the Committee filed the *Application to Employ Berkeley Research Group, LLC as Financial Advisor for the Official Committee of Unsecured Creditors* (Dkt. No. 355), seeking authority to retain Berkeley Research Group, LLC ("***BRG***") as financial advisor to the Committee. BRG's retention was approved on February 23, 2024, by the Bankruptcy Court's *Order Approving Application to Employ Berkeley Research Group, LLC as Financial Advisor for the Official Committee of Unsecured Creditors* (Dkt. No. 385).

### 4. ***Stout Risius Ross, LLC as Valuation Expert***

On March 25, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Application to Employ Stout Risius Ross, LLC as Its Valuation Expert* (Dkt. No. 438), seeking authority to retain Stoute Risius Ross, LLC ("***Stout***") as a valuation expert with respect to Survivor Claims and insurance coverage for same. On April 8, 2024, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company (collectively, "***Hartford***") filed a response (Dkt. No. 454) to the Committee's application to retain Stout. On April 11, 2024, Employers Insurance Company of Wausau ("***Wausau***") filed a joinder (Dkt. No. 461) to Hartford's response. On April 17, 2024, Hartford filed a supplemental statement (Dkt. No. 467) to Hartford's response to the Committee's application to retain Stout. Stout's retention was approved on May 1, 2024, by the Bankruptcy Court's *Order Approving the Official Committee of Unsecured Creditors' Application to Employ Stout Risius Ross, LLC as Its Valuation Expert* (Dkt. No. 502).

### 5. ***Burns Bair LLP as Special Insurance Counsel***

On April 1, 2024, the Committee filed the *Application to Employ Burns Bair LLP as Special Insurance Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 448), seeking authority to retain Burns Bair LLP ("***Burns***") as special insurance counsel for the Committee. On April 8, 2024, Hartford filed a response (Dkt. No. 454) to the Committee's application to retain Burns. On April 11, 2024, Wausau filed a joinder (Dkt. No. 461) to Hartford's response. On April 17, 2024, Hartford filed a supplemental statement (Dkt. No. 467) to Hartford's response to the Committee's application to retain Burns. Burns' retention was approved on May 1, 2024, by the Bankruptcy Court's *Order Approving Application to Employ Burns Bair LLP as Special Insurance Counsel for the Official Committee of Unsecured Creditors* (Dkt. No. 503).

## D. Claims Process, Notice, and Deadlines.

On October 30, 2023, the Debtor filed the *Debtor's Motion for Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Proof of Claim Form; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 139) (the "***Claims Motion***"), seeking entry of an order (i) establishing deadlines for the filing of proofs of claim in the Chapter 11 Case, (ii) approving forms for inclusion with proofs of claim filed by claimants asserting claims arising from sexual abuse, (iii) approving the form and manner of proposed notices of the deadline to file claims, and (iv) approving procedures pursuant to which claimants asserting claims arising from sexual abuse could file proofs of claim confidentially. After considering many responses and objections to the Claims Motion, and after notice and a hearing, on January 16, 2024, the Bankruptcy Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Sexual Abuse Claim Supplement; (III) Approving Form and Manner of Notice; and (IV) Approving Confidentiality Procedures* (Dkt. No. 316) (the "***Claims Procedures Order***"). Pursuant to the Claims Procedures Order, the Bankruptcy Court, among other things:

(i) established May 31, 2024 as the deadline for filing proofs of claim against the Debtor and Estate; (ii) established certain confidentiality procedures for proofs of claim filed by Survivor Claimants; and (iii) approved the Debtor's proposed constructive notice procedures with respect to the deadline to file claims in the Chapter 11 Case.

**E. Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities.**

On October 31, 2023, the Debtor filed the Debtor's statement of financial affairs (Dkt. No. 145) and schedules of assets and liabilities (Dkt. No. 146).

**F. Survivor Statement Hearings.**

On March 15, 2024, the Committee filed *The Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 418) (the "***First Survivor Statement Notice***"), requesting the Bankruptcy Court reserve time for Survivor Claimants to present statements off the record to the Bankruptcy Court on April 8, 2024, and May 20, 2024. On March 20, 2024, the Debtor filed the *Roman Catholic Archbishop of Baltimore's Statement in Support of the Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 423), endorsing the Committee's request and providing that Archbishop Lori would attend the hearings on both dates. On March 21, 2024, the Bankruptcy Court entered the *Order Granting Committee Request to Reserve Time for Presentation of Survivor Statements* (Dkt. No. 432), scheduling two, two-hour status conferences for the purposes of hearing statements from Survivor Claimants. Archbishop Lori and Bishop Parker attended both status conferences, hearing statements from six (6) Survivor Claimants on April 8, 2024 and eight (8) Survivor Claimants on May 20, 2024.

On April 7, 2025, the Committee filed *The Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 1036) (the "***Second Survivor Statement Notice***") requesting the Bankruptcy Court reserve additional time for Survivor Claimants to present statements off the record to the Bankruptcy Court. On May 7, 2025, the Debtor filed the *Debtor's Request for Hearing* (Dkt. No. 1134), requesting a hearing be scheduled regarding the Second Survivor Statement Notice. Following an initial hearing regarding the Second Survivor Statement Notice, on June 30, 2025, Chubb filed *Century's Objection to the Official Committee of Unsecured Creditors' Notice of Presentation of Survivor Statements* (Dkt. No. 1204).

**G. Insurance Coverage Adversary Proceeding, Mediation, and Settlement Negotiations.**

On March 28, 2024, the Debtor commenced an adversary proceeding styled as *Roman Catholic Archbishop of Baltimore, et al., v. American Casualty Company of Reading, Pennsylvania, et al.*, Adv. Pro. No. 24-00072 (the "***Insurance Coverage Adversary Proceeding***"), seeking a declaratory judgment against the Debtor's insurers concerning the rights and duties of the Debtor and insurers under the applicable insurance contracts. Following answers being filed, many responsive motions being filed, and multiple hearings and settlement discussions among the Debtor, Ad Hoc Committee of Parishes, Schools and Affiliates, Committee, and defendants in the Insurance Coverage Adversary Proceeding, the Bankruptcy Court entered the *Agreed Order Directing Mediation, Appointing Mediators, and Ordering Mediation Discovery* (Dkt. No. 705; Adv. Pro. Dkt. No. 196) (the "***Mediation Order***") on July 29, 2024, ordering certain parties to mediation, and providing for the appointment of three mediators. Pursuant to and in accordance with the Mediation Order, three mediators were ultimately selected and appointed on August 23, 2024 and the Insurance Adversary Proceeding was dismissed, without prejudice, on September 5, 2024. The Debtor, Committee, the Ad Hoc Committee of Parishes, Schools and Affiliates, and the Debtor's insurers (the "***Mediation Parties***") have subsequently engaged in a number of mediation sessions in accordance with and subject to the Mediation Order. While the mediations have not resulted in a global

resolution among the Mediation Parties, the contents of the Plan and the resulting Trusts are a product of the current state of mediation efforts and strenuous, arms'-length negotiations between all of the Mediation Parties.

### H. Amendments to the CVA and Commencement of Civil Actions.

In April 2025, the Maryland legislature amended the CVA to, among other statutory changes, reduce the damages caps for any claims that had not been commenced by June 1, 2025. As a result of the foregoing amendment, the Committee filed *The Official Committee of Unsecured Creditors' Expedited Motion for (I) Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (II) an Order Establishing the Date on Which Proofs of Claim Initiated or Commenced a Proceeding Under Maryland's CVA* (Dkt. No. 1043), seeking entry of an order (a) modifying the automatic stay to permit Survivor Claimants to file complaints in non-bankruptcy civil actions against the Debtor and non-debtor related parties and/or determining proofs of claim filed by Survivor Claimants constituted the filing of claims in "an action filed on or before May 31, 2025" for purposes of the CVA Amendment. Following the filing of various responses and a hearing on May 1, 2025, the Bankruptcy Court entered on May 2, 2025, the *Order Modifying Automatic Stay Solely for Purposes of Filing and Serving Certain Civil Complaints Under Maryland Law on or Before May 31, 2025* (Dkt. No. 1127) ("***Stay Modification Order***"), modifying the automatic stay solely to the extent necessary to allow individuals to commence an action against the Debtor or any Covered Party (as defined in the order) by filing and serving a complaint for child sexual abuse claims under Maryland law on or before May 31, 2025.

### I. Charitable Immunity Adversary Proceeding.

On April 1, 2025, the Committee filed the *Notice of Limited Mediation Dispute* (Dkt. No. 1032) and commenced an adversary proceeding styled as *The Official Committee of Unsecured Creditors v. Roman Catholic Archbishop of Baltimore*, Adv. Pro. No. 25-00084 (the "***Charitable Immunity Adversary Proceeding***"), seeking a declaratory judgment against the Debtor concerning the applicability of charitable immunity to Survivor Claims under Maryland law. On January 6, 2026, the Court entered the *Order Granting the Joint Motion for Entry of an Order Approving Stipulation Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019* (Adv. Pro. Dkt. No. 170), approving a stipulation resolving the Charitable Immunity Adversary Proceeding. Pursuant to the stipulation resolving the Charitable Immunity Adversary Proceeding, the Debtor agreed the Debtor will not: (a) assert or otherwise rely upon the affirmative defense of charitable immunity in the Chapter 11 Case or any related chapter 11 case with respect to the allowance or disallowance of certain Survivor Claims or confirmation of a plan of reorganization not supported by the Committee; or (b) authorize any parish, school, or other Catholic affiliate within the geographic territory of the Archdiocese of Baltimore to seek bankruptcy protection unless such parish, school, or other Catholic affiliate agree to the same limitations on charitable immunity in their bankruptcy proceedings.

### J. Committee's Motion to Dismiss Chapter 11 Case.

On September 3, 2025, the Committee filed the *Official Committee of Unsecured Creditors' Contingent Motion to Dismiss the Bankruptcy Case* (Dkt. No. 1320) (the "***Motion to Dismiss***"). On January 15, 2026, the Bankruptcy Court entered the *Order Addressing Motion to Dismiss Case* (Dkt. No. 1855), denying the Motion to Dismiss.

### K. Claim Objections With Respect to Survivor Claims.

The Debtor filed: (a) on November 7, 2025, the: (i) *Debtor's First Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1525); (ii) *Debtor's Second Omnibus*

*Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1528); (iii) *Debtor's Third Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1530); and (iv) *Debtor's Fifth Omnibus Objection to Claims (Non-Substantive; Duplicate Claims)* (Dkt. No. 1535); and (b) on November 10, 2025, the *Debtor's Fourth Omnibus Objection to Claims (Non-Substantive; Amended and Superseded Claims)* (Dkt. No. 1584) (collectively, the "***Non-Substantive Claim Objections***").

In addition to the Non-Substantive Claim Objections, the Debtor filed individual claim objections to two hundred two (202) proofs of claim on the following bases (collectively, the "***Substantive Claim Objections***"): (a) one hundred fourteen (114) because the proof of claim does not contain allegations regarding the Debtor, an affiliate of the Debtor, or an agent of the Debtor (the "***No Liability Claims***"); (b) thirty-nine (39) because the proof of claim form does not include a claim supplement or otherwise include information regarding an alleged Survivor Claim (as defined in the Claims Procedures Order) (the "***No Supplement Claims***"); (c) thirty-four (34) because the proof of claim is filed by an individual who has previously entered a settlement with the Debtor, which is documented in an executed settlement agreement containing releases of all claims against, among others, the Debtor (the "***Settled Claims***"); (d) nine (9) because the claimant alleges they were an adult at the time of the alleged abuse, which means the underlying claim is time-barred; and (e) six (6) because the proof of claim alleges the Survivor Claimant was deceased at the time of filing the proof of claim, which means the underlying claim is time-barred (together with the claims identified in (d), the "***Time-Barred Claims***").

### L. Seek the City Initiative and Adversary Proceeding.

On March 10, 2025, the Debtor and Committee filed the *Joint Motion for Entry of an Order Approving Stipulation by and Between the Debtor and the Official Committee of Unsecured Creditors Regarding the Archdiocese of Baltimore's Seek the City to Come Plan* (Dkt. No. 1016). On April 1, 2025, the Bankruptcy Court entered an order (Dkt. No. 1031), approving the stipulation regarding the Archdiocese of Baltimore's Seek the City to Come Plan. The Debtor has been complying with the stipulation since entering into it with the Committee.

Notwithstanding the foregoing, on February 27, 2026, the Committee filed a *Complaint for Declaratory Judgment and Injunctive Relief Regarding Seek the City to Come* (Dkt. No. 2099), commencing adversary proceeding number 26-00041 (the "***Seek the City Adversary Proceeding***"). In the Seek the City Adversary Proceeding, the Committee sought to enjoin implementation of parish consolidation under the Seek the City Initiative and require the Debtor to seek court approval of the sale of any parish property in connection with the foregoing. On March 27, 2026, the Debtor filed a motion seeking dismissal of the Seek the City Adversary Proceeding and the Committee filed a motion for preliminary injunction. On April 2, 2026, the Bankruptcy Court entered the *Order Granting Preliminary Injunction With Limited Carveouts* (Adv. Pro. Dkt. No. 22) to maintain the status quo pending a final hearing on the Debtor's and Committee's competing motions. The Bankruptcy Court conducted hearings on April 16, April 20, and April 21 and has taken the competing motions under advisement as of the date of this Disclosure Statement.

On April 7, 2026, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Providing Real Estate Advisory Services, (II) Continue Collecting Elements of Cathedraticum in Connection With Real Estate Advisory Services, and (III) Granting Related Relief* (Dkt. No. 2196). On April 29, 2026, the Bankruptcy Court entered the *Interim Order Authorizing Debtor to Use Property in the Ordinary Course of Business Subject to Certain Conditions* (Dkt. No. 2329) (the "***Interim Real Estate Services Order***"), permitting the Debtor to continue providing certain real estate advisory services to Parishes and Schools and requiring the Debtor to provide certain disclosures in connection with the provision of such services. In entering the Interim Real Estate

Services Order, the Bankruptcy Court found, among other things, that the Debtor is a distinct and separate entity from each Parish and School corporation and the Archbishop in his capacity as the ordinary of the Archdiocese. (Dkt. No. 2329, at 9.)

### M. Data Security Incidents.

During the pendency of the Chapter 11 Case, each of BRG and Stinson experienced data breaches (collectively, the "***Data Breaches***"). To date, the Debtor knows very little regarding the Data Breaches or whether any claims may exist in relation to or arising out of the Data Breaches; however, the exculpation provisions of the Plan do not provide for the exculpation of BRG or Stinson with respect to any claims arising out of or relating to the Data Breaches.

## IV. SUMMARY OF THE PLAN.

The below summary is provided for the convenience of holders of Claims and Interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits.

The Debtor commenced the Chapter 11 Case primarily to address Survivor Claims, and the Plan's central mechanism is to provide compensation for Survivor Claims through two trusts funded by the Debtor, Co-Insured Entities, and proceeds from the sale of their collective insurance assets in exchange for a discharge of the Debtor and certain releases and other injunctive relief in favor of the Debtor, Co-Insured Entities, and Settling Insurers.

### A. Overview of Classification and Treatment of Claims and Interests.

Following the requirements of the Bankruptcy Code, all Claims are placed in categories. Most are placed into separate classes, others are unclassified. These categories are described in detail in the Plan and later in this section of the Disclosure Statement.

The Plan proposes different "treatment" of Claims, depending on their classification under the Plan as follows:

| Class | Designation | Impaired/ Unimpaired | Entitled to Vote |
|---|---|---|---|
| 1 | School Bond Claims | Unimpaired | Deemed to Accept |
| 2 | PNC Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Survivor Claims | Impaired | Yes |

| | | | |
|---|---|---|---|
| 7 | Non-Survivor Tort Claims | Impaired | Yes |
| 8 | Co-Insured Entity Claims | Impaired | Yes |
| 9 | Inbound Contribution Claims | Impaired | Deemed to Reject |

A class of claims or interests are "impaired" under a plan unless, with respect to each claim or interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. The holders of claims or interests that are classified and are "*impaired*" are entitled to vote on the Plan. The classes that are entitled to vote under the Plan are: (a) Class 6—Survivor Claims; (b) Class 7—Non-Survivor Tort Claims; and (c) Class 8—Co-Insured Entity Claims. **Holders of Claims in Class 1, Class 2, Class 3, Class 4, and Class 5 are deemed to accept the Plan unless they timely file an objection to the Plan.** Holders of Claims in Class 9 are deemed to reject the Plan.

**B. Summary of Claim Treatment by Class.**

The following is a summary of the treatment of Claims by class. The treatment is taken from the Plan, but additional information and descriptions regarding the Claims and various estimates are provided in this Disclosure Statement. In case of inconsistency, the Plan controls.

**1. *Unclassified Claims (Paid Outside the Class Structure).***

Under section 1123(a)(1) of the Bankruptcy Code, certain claims are not placed into voting classes at all, but are still paid according to specific terms in the Plan:

i. **Administrative Expense Claims**.

Holders of general administrative expense claims not already allowed by a final order must file a request for payment by the administrative expense claims bar date set in the confirmation order, or the claim is automatically disallowed and barred. Administrative claims arising in the ordinary course of the Debtor's business do not need to file such a request and are simply paid in the ordinary course.

ii. **Professional Fee Claims.**

Professional Fee Claims include any claim by a professional retained under sections 327, 328, or 1103 of the Bankruptcy Code for compensation and expense reimbursement for services rendered from the petition date through the effective date, sought under sections 328, 330, 331, or 503(b). Professionals must file and serve final fee applications on Debtor's counsel and the U.S. Trustee no later than the first business day that is 45 days after the effective date. Allowed Professional Fee Claims are paid in full in cash, in the amount allowed by the Bankruptcy Court, on or as soon as reasonably practicable after the later of (a) the date the order allowing the claim is entered, or (b) any other date agreed between the holder and the Debtor/Reorganized Debtor.

**iii. Statutory Fees and Costs.**

Statutory Fees and Costs are paid in full in cash by the Reorganized Debtor on the effective date, or as soon as reasonably practicable thereafter, or as otherwise required under the U.S. Trustee's quarterly payment guidelines. After the effective date, the Reorganized Debtor must keep paying quarterly fees to the U.S. Trustee and filing quarterly reports until the Chapter 11 case is closed, dismissed, or

converted. Responsibility for these fees can shift to the trusts if: (a) the Survivor Compensation Trustee or Insurance Trustee opposes closure of the case; or (b) the Chapter 11 Case is later reopened. If a trust is responsible for payment of Statutory Fees and Costs but fails to pay them, the Reorganized Debtor may pay them itself and then seek reimbursement from the applicable Trust.

iv. **Priority Tax Claims**.

Priority Tax Claims will be paid in cash equal to the allowed amount, on the later of the effective date, 30 days after the claim becomes allowed, or when otherwise due in the ordinary course; provided, however, the Debtor may prepay these without penalty. Notably, any tax penalty amounts are classified as Class 5 Claims instead.

**v. Employee Priority Claims.**

Employee Priority Claims will be paid in full in cash as soon as practicable after the later of the effective date or the date the claim becomes allowed, unless otherwise agreed or ordered.

**2. *Classified Claims (Classes 1–9)***

i. **Class 1 — School Bond Claims (Unimpaired).**

The School Bond Claims are reinstated on the Effective Date, with the existing loan documents remaining fully in force until the obligations are paid in full, unless the holder agrees to less favorable treatment. Because School Bond Claims are unimpaired, holders are conclusively presumed to accept the Plan and do not vote to accept or reject the Plan.

**ii. Class 2 — PNC Secured Claims (Unimpaired).**

The PNC Secured Claims are reinstated, with all loan documents and provisions remaining in full force and effect until the obligations are paid in full. Because PNC Secured Claims are unimpaired, holders are conclusively presumed to accept the Plan and do not vote to accept or reject the Plan.

**iii. Class 3 — Other Priority Claims (Unimpaired).**

At the Reorganized Debtor's option, holders of Other Priority Claims receive either (a) cash payment in full as soon as practicable after the later of the effective date, allowance, or an agreed date, or (b) other treatment rendering the Other Priority Claim unimpaired, including reinstatement. Because Other Priority Claims are unimpaired, holders are conclusively presumed to accept the Plan and do not vote to accept or reject the Plan.

**iv. Class 4 — Other Secured Claims (Unimpaired).**

At the Debtor's or Reorganized Debtor’s option, holders of Other Secured Claims receive (a) cash equal to the allowed amount (including any interest required under section 506(b)), (b) other treatment rendering the claim unimpaired, including reinstatement, or (c) return of the collateral itself. Because Other Secured Claims are unimpaired, holders are conclusively presumed to accept the Plan and do not vote to accept or reject the Plan.

**v. Class 5 — General Unsecured Claims (Unimpaired).**

Holders receive cash equal to the full allowed amount of their claim (including interest), paid as soon as practicable after the later of the Effective Date, allowance, or an agreed later date. Because General Unsecured Claims are unimpaired, holders of General Unsecured Claims are conclusively presumed to accept the Plan and do not vote to accept or reject the Plan.

**vi. Class 6 — Survivor Claims (Impaired).**

Liability for Survivor Claims is assumed entirely by the Survivor Compensation Trust and Insurance Trust, and satisfied solely from those trusts pursuant to the discharge injunction, channeling injunction, and supplemental settling insurer injunction. No Survivor Claimant receives payment unless and until they execute a Survivor Claimant Release with respect to at least the Debtor, Reorganized Debtor, and Settling Insurers. Survivor Claimants choose between being treated as either a:

- **Distribution Claimant**, which receives a set distribution amount determined under the Survivor Compensation Trust Distribution Plan. If the claimant releases each of the Debtor, Debtor's Agents, Co-Insured Entities, and Settling Insurers, they receive the full initial compensation amount. If a Survivor Claimant elects to forego releasing Co-Insured Entities, the Survivor Claimant's initial compensation amount is decreased but their ability to liquidate their Survivor Claim in court is preserved, with the Survivor Claimant required to return to the Survivor Compensation Trust to receive trust distributions before pursuing recovery of any additional amounts on any judgments from Co-Insured Entities.

- **Litigation Claimant**, but only if the Survivor Compensation Trustee determines the claim is covered by Non-Settling Insurer Policies or is otherwise uninsured and authorizes the election to be treated as a Litigation Claimant. A Litigation Claimant is permitted to liquidate the Litigation Claimant's Litigation Claim in court to establish liability, while also potentially receiving trust distributions. Recovery mechanics again depend on whether the claimant releases Co-Insured Entities, and recourse against Non-Settling Insurers is limited to available policy proceeds and related damages.

If a claimant does not elect litigation treatment (or is not authorized to proceed as one), they default to being treated as a Distribution Claimant. Because this class is impaired, holders of Survivor Claims are entitled to vote to accept or reject the Plan.

The decision whether to release the Co-Insured Entities impacts the recovery on account of a Survivor Claim as follows:

- upon executing the Survivor Claimant Release, which releases the Debtor, Debtor's Agents, and Settling Insurers, a Survivor Claimant will receive that portion of the proposed compensation attributable to the Debtor's cash contribution to the Survivor Compensation Trust plus that portion of the proposed compensation attributable to the Debtor's interests in the proceeds of Settling Insurer Policies contributed to the Survivor Compensation Trust; and

- upon further electing to release the Co-Insured Entities, a Survivor Claimant will receive that portion of the proposed compensation attributable to the Co-Insured Entities' cash contribution to the Survivor Compensation Trust plus that portion of the proposed compensation attributable to the Co-Insured Entities' interests in the proceeds of Settling Insurer Policies contributed to the Survivor Compensation Trust.

The offer providing proposed compensation from the Survivor Compensation Trust shall set forth the amount of compensation attributable to each election.

**vii. Class 7 — Non-Survivor Tort Claims (Impaired).**

Holders of Non-Survivor Tort Claims may seek recovery solely from applicable insurance proceeds (excluding any settling insurer's policies/proceeds). Holders of Non-Survivor Tort Claims are barred from compelling the Debtor or Reorganized Debtor to pay any deductible, retention, or other insurance-related amount, and cannot obtain any distribution from the Debtor, Estate, or Reorganized Debtor on account of a Non-Survivor Tort Claim. Because this class is impaired, holders of Non-Survivor Tort Claims are entitled to vote to accept or reject the Plan.

**viii. Class 8 — Co-Insured Entity Claims (Impaired).**

These are claims held by parishes, schools, and other Archdiocesan-related entities against the Debtor, including without limitation claims relating to Insurance Policies in which the Debtor and Co-Insured Entities have an interest. As part of the overall settlement on which the Plan is based, the Co-Insured Entities have agreed (i) to waive all rights to receive a cash distribution on their claims, and the Debtor has reciprocally waived its claims against them, and (ii) to consent to the sale and assignment of their rights to Insurance Policies and claims relating to the Insurance Policies in exchange for the Co-Insured Entity Injunction and the releases provided in the Plan for the Debtor, Debtor's Agents, and Co-Insured Entities. Because this class is impaired, holders of Co-Insured Entity Claims are entitled to vote to accept or reject the Plan.

**ix. Class 9 — Inbound Contribution Claims (Impaired, deemed to reject).**

These claims are simply disallowed and extinguished, with no distributions made on account of them. Because Class 9 receives no property under the Plan, it is deemed to have rejected the Plan and does not vote.

## C. The Two Trusts.

The Plan establishes the Survivor Compensation Trust and Insurance Trust to, among other things, facilitate the liquidation of certain assets and provide compensation to Survivor Claimants. The trusts are functionally linked, with the: (i) Survivor Compensation Trust existing to evaluate Survivor Claims and make distributions on account of Survivor Claims; and (ii) Insurance Trust existing to pursue recoveries from Non-Settling Insurers with respect to Survivor Claims, and any recovery ultimately flowing to the Survivor Compensation Trust for the benefit of Survivor Claimants.

### 1. ***Survivor Compensation Trust.***

The Survivor Compensation Trust is established for the exclusive benefit of Survivor Claimants and will receive and distribute settlement funds according to a separate Survivor Compensation Trust Distribution Plan. Funding includes a Debtor contribution of $78,910,224 payable within 10 business days of the confirmation order becoming final (including $18,000,000 to be paid by the Archdiocesan Sexual Misconduct Self-Insurance Program), plus a Co-Insured Entities contribution of $20,000,000 payable within 10 business days of the confirmation order becoming final, plus a total of $185,000,000 to be paid under various insurance settlement agreements. The Debtor's and each Co-Insured Entity's contributions are being made to the Survivor Compensation Trust notwithstanding, and without waiving, applicability of charitable immunity under Maryland Law with respect to Survivor Claims. The Survivor Compensation Trust must also maintain a reserve of up to $12,000,000 for Unknown Survivor Claims for 36 months.

The Survivor Compensation Trust is intended to qualify as a "designated" or "qualified settlement fund" under Internal Revenue Code Section 468B, with the Debtor as "transferor" and the Survivor Compensation Trustee as "administrator" under the relevant Treasury Regulations. The Survivor Compensation Trust is expected to be tax-exempt.

No recourse may be had personally against the Survivor Compensation Trustee or its agents, except where the Survivor Compensation Trustee's own recklessness, gross negligence, willful misconduct, knowing violation of law, or fraud is established. The Survivor Compensation Trust must indemnify the Survivor Compensation Trustee and its agents to the fullest extent permitted under Maryland law, and must also indemnify the Debtor, Debtor's Agents, and Co-Insured Entities for claims arising from the Survivor Compensation Trust's assessment and liquidation of Survivor Claims or administration activities. The Survivor Compensation Trust similarly indemnifies Settling Insurers for certain claims (e.g., fraudulent transfer claims, channeled claims).

**2. *Insurance Trust.***

The Insurance Trust is established to assume or take the assignment of all Non-Settling Insurer Policies and pursues insurance recoveries from Non-Settling Insurers, with recoveries flowing back to the Survivor Compensation Trust. The Insurance Trust is initially funded with $12,000,000 transferred from the Survivor Compensation Trust. Upon the completion of all the Insurance Trust's and Insurance Trustee's duties and obligations, any funds remaining in the Insurance Trust shall be distributed to the Survivor Compensation Trust.

The assumption and assignment of all Non-Settling Insurer Policies by or to the Insurance Trust is "insurance neutral." Nothing in the Plan or related documents may be used in litigation against a Non-Settling Insurer as an adjudication of liability, a finding regarding claim value, or evidence that any settlement approach was reasonable, preserving Non-Settling Insurers' full set of coverage defenses. Non-Settling Insurer contribution claims are channeled solely against the Insurance Trust, not against the Debtor, Debtor's Agents, Co-Insured Entities, or Settling Insurers.

The Insurance Trust is intended to qualify as a "designated" or "qualified settlement fund" under Internal Revenue Code Section 468B, with the Debtor as "transferor" and the Insurance Trustee as "administrator" under the relevant Treasury Regulations. The Insurance Trust is expected to be tax-exempt.

No recourse may be had personally against the Insurance Trustee or its agents, except where the Insurance Trustee's own recklessness, gross negligence, willful misconduct, knowing violation of law, or fraud is established. The Insurance Trust's indemnification obligations largely mirror those of the Survivor Compensation Trust.

**D. Survivor Claims.**

The Trusts automatically assume liability for Survivor Claims by assuming all liability, if any, of the Debtor, Debtor's Agents, Co-Insured Entities, and Settling Insurers with respect to Channeled Claims. The liability of the Debtor, Debtor's Agents, Co-Insured Entities, and Settling Insurers for all Channeled Claims is satisfied solely by the Trusts. A Survivor Claimant must sign a release before receiving any payment from the Trusts and can choose to release the Settling Insurers, Co-Insured Entities, or both the Settling Insurers and Co-Insured Entities, with a corresponding impact on the amount of payment(s) received from the Trusts. Survivor Claimants elect between two tracks: (1) becoming a "Distribution Claimant," receiving a set amount of compensation from the Trusts per the Survivor Compensation Trust Distribution Plan; or (2) becoming a "Litigation Claimant," choosing to pursue their claim in court against

Non-Settling Insurers or Co-Insured Entities, as applicable, if the Survivor Compensation Trustee authorizes it. Survivor Claimants who do not elect a track by default become Distribution Claimants.

Survivor claims are assessed according to the Survivor Compensation Trust Distribution Plan, which is designed to provide an expeditious, efficient, reasonable, and equitable method for determining whether a Survivor Claimant is entitled to a distribution. Co-Insured Entities must reasonably cooperate with the Survivor Claims Reviewer and the Survivor Compensation Trustee regarding Survivor Claim evaluation inquiries, but are not required to act in a way that violates any duty or prevents satisfaction of any condition precedent under a Non-Settling Insurer Policy. The Survivor Claims Reviewer's review of a claim, or a distribution made to a Survivor Claimant, has no effect whatsoever on the rights, defenses, or obligations of any Non-Settling Insurer.

Determinations by the Survivor Claims Reviewer are for estimation and distribution purposes only, carrying no binding legal effect as to reasonableness, facts, or liability. More specifically, the assessment, estimation, and payment process: (a) is not an admission of liability by any of the Debtor, Debtor's Agents, Co-Insured Entities, Settling Insurers, Non-Settling Insurers, or the Trusts, and has no preclusive effect; (b) is not a settlement, release, accord, or novation usable as a defense by a Joint Tortfeasor; (c) does not impair a Litigation Claimant's right to obtain a judgment (including joint-and-several) against a Co-Insured Entity or Non-Settling Insurer, though recourse on such judgment is limited to Non-Settling Insurer Policy proceeds and related damages; and (d) is not a trial, adjudication, or evidence of liability in any related litigation. Non-Settling Insurer obligations are determined solely under their own policies and non-bankruptcy law, and no Chapter 11 Case determination binds a Non-Settling Insurer for coverage valuation purposes.

Within 30 days after being notified of their initial award amount, each Survivor Claimant must elect in writing one of two tracks:

**(a) Distribution Claimant.** A Survivor Claimant who is not a Litigation Claimant is treated as a Distribution Claimant, receiving distributions from the Survivor Compensation Trust per the Survivor Compensation Trust Distribution Plan in full and final satisfaction of their Survivor Claim. Each Survivor Claimant must execute a Survivor Claimant Release:

- **releasing the Debtor and Settling Insurers,** in which case the Survivor Claimant will receive the amount of compensation attributable to the Debtor's contributions in cash to the Survivor Compensation Trust plus the Debtor's interests in the proceeds of Settling Insurer Policies, after which the Survivor Claimant has no further recourse against the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or Trusts; and

- **electing to release the Co-Insured Entities,** in which case the Survivor Claimant will receive additional compensation in amount equal to the compensation attributable to the Co-Insured Entities' contributions in cash to the Survivor Compensation Trust plus the Co-Insured Entities' interests in the proceeds of Settling Insurer Policies to the Survivor Compensation Trust, after which the Survivor Claimant has no further recourse against the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Co-Insured Entities, Settling Insurers, Non-Settling Insurers, or Trusts; or

- **electing not to release Co-Insured Entities**, in which case the Survivor Claimant receives no additional compensation, with at least the remaining proposed compensation held in reserve and distributable only upon presentation of a Litigation Award against a Co-Insured Entity, after which the Survivor Claimant has no further recourse against the

Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or Trusts;

- **provided**, **however**, for the avoidance of doubt, a Survivor Claimant shall not receive any compensation attributable to the $20 million in cash consideration provided by Co-Insured Entities unless and until such Survivor Claimant executes a Survivor Claimant Release, releasing the Co-Insured Entities.

**(b) Litigation Claimant.** A Survivor Claimant may instead elect to have their Survivor Claim treated as a Litigation Claim and pursue liquidation of their Survivor Claim in court, but only if the Survivor Compensation Trustee determines the claim is either covered (in whole or part) by Non-Settling Insurer Policies or is not covered by any Settling Insurer Policy or Non-Settling Insurer Policy and authorizes the Survivor Claimant to be treated as a Litigation Claimant and pursue their Survivor Claim in court. If a Litigation Claimant is authorized to pursue a Litigation Claim and such Litigation Claim is covered in whole or part by a Non-Settling Insurer Policy, the Litigation Claimant must execute a Litigation Claimant Agreement and:

- shall receive compensation in the amount of Five Thousand Dollars ($5,000);

- the Survivor Compensation Trustee shall hold in a reserve an amount equal to: (X) the portion of the Litigation Claimant's initial compensation attributable to the Debtor's interests in the proceeds of Settling Insurer Policies and Non-Settling Insurer Policies; plus (Y) the portion of the Litigation Claimant's initial compensation attributable to the Co-Insured Entities' interests in the proceeds of Settling Insurer Policies and Non-Settling Insurer Policies; plus (Z) a reasonable reserve for anticipated adjustments as a result of potential Litigation Awards with respect to the pending Litigation Claim; and

- upon presentation of any Litigation Award (i.e., a judgment), payment of an amount equal to their initial compensation as adjusted pursuant to this Plan and the Survivor Compensation Trust Distribution Plan less the initial Five Thousand Dollars ($5,000), after which the Litigation Claimant has no further recourse against the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or Trusts.

If a Litigation Claimant's Litigation Claim is not covered in whole or in part by a Non-Settling Insurer Policy or Settling Insurer Policy (i.e., the Litigation Claim is uninsured), the Litigation Claimant shall execute a Litigation Claimant Agreement and shall receive in full satisfaction of the Litigation Claimant's Litigation Claim(s) against the Debtor Five Thousand Dollars ($5,000) and such Litigation Claimant shall have no further recourse against the Debtor, Debtor's Agents, Reorganized Debtor, Reorganized Debtor's Agents, Settling Insurers, Non-Settling Insurers, or Trusts.

If a Survivor Claimant does not make an election or makes an election but is not authorized by the Survivor Compensation Trustee to be treated as a Litigation Claimant, the Survivor Claimant will be treated as a Distribution Claimant.

**E. Settling Insurers.**

The Plan contemplates funding in the amount of $185,000,000 as a result of settlements with three separate Settling Insurers. The material terms of each Insurance Settlement Agreement are largely the same:

First, each Settling Insurer Policy is sold to the applicable Settling Insurer under sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens, claims, and interests of all persons, to the extent provided in the applicable Insurance Settlement Agreement and Approval Order. At its most basic, each Insurance Settlement Agreement contemplates the payment of a purchase price in exchange for the acquisition of the applicable Settling Insurer Policies and the grant of certain releases between the Settling Insurer, on the one hand, and the Debtor and Co-Insured Entities, on the other hand.

Second, to effectuate the sale of the Settling Insurer Policies, the Debtor will file a motion seeking entry of a sale order that provides, among other things, that the applicable sale is free and clear of all claims and interests under section 363(f) of the Bankruptcy Code, the Settling Insurer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, requires any Survivor Claimant receiving proceeds of the Settling Insurer Policies to execute a release, and certain injunctive relief in furtherance of the sale.

Third, each Insurance Settlement Agreement requires incorporation of the key provisions of the Insurance Settlement Agreement and corresponding sale order into any plan of reorganization to be confirmed in the Chapter 11 Case.

Finally, each Insurance Agreement requires confirmation of a plan of reorganization and entry of a confirmation order acceptable to the applicable Settling Insurer, Debtor, and Co-Insured Entities, which provides the protections negotiated as part of and integral to the sale of the Settling Insurer Policies.

## F. Non-Settling Insurers.

### 1. ***<u>Preservation of Rights and Obligations.</u>***

All obligations with respect to Non-Settling Insurers and Non-Settling Insurer Policies are determined by and in accordance with the terms of the Non-Settling Insurer Policies themselves and applicable non-bankruptcy law. The Plan, Plan Documents, Confirmation Order, and trust documents do not impair, alter, supplement, change, expand, decrease, or modify: (a) the terms and conditions of any Non-Settling Insurer Policy; (b) the rights and obligations of the Debtor (or Estate) and Non-Settling Insurers under the Non-Settling Insurer Policies; or (c) the coverage or benefits provided under the Non-Settling Insurer Policies. Similarly, aside from findings necessary to confirm the Plan under section 1129 of the Bankruptcy Code and only for that limited purpose, no Non-Settling Insurer is bound in any current or future litigation concerning a Survivor Claim or Non-Settling Insurer Policy by factual findings or legal conclusions issued in connection with confirmation, with those findings have no res judicata or collateral estoppel effect on any claim, defense, right, offset, or counterclaim that has been or may be asserted in litigation concerning a Survivor Claim or Non-Settling Insurer Policy.

Consistent with the foregoing, Non-Settling Insurers retain and may assert: (a) all insurance coverage defenses available under applicable non-bankruptcy law in connection with Survivor Claims, notwithstanding any Plan provision; and (b) all of the Co-Insured Entities' legal and equitable defenses to liability in connection with any asserted Survivor Claim. These rights are not impaired by the Plan, Plan Documents, Confirmation Order, or trust documents, and remain subject to applicable non-bankruptcy law. Non-settling insurers also remain free to negotiate different terms or treatment through a consensual settlement with the Debtor, Insurance Trust, or Survivor Claimants.

Specifically with respect to Litigation Claimants and Litigation Claims, Non-Settling Insurers: (a) have the right (and, to the extent the applicable Non-Settling Insurer Policy requires it, the obligation) to defend the claim consistent with their policy terms and non-bankruptcy law; (b) may take any actions authorized under their Non-Settling Insurer Policies, including reaching settlements; (c) have their rights to

defend or associate in the defense of such claims fully preserved; (d) have their rights to assert all coverage defenses and issues in any coverage action fully preserved; and (e) face no greater or lesser rights being claimed against them by the Insurance Trust or a Litigation Claimant than would apply against the Debtor or another Co-Insured Entity.

**2. *Post-Effective Date Insurance Obligations and Post-Effective Date Costs.***

Notwithstanding the assignment of Non-Settling Insurer Policies to the Insurance Trust, the Debtor, Debtor's Agents, and Co-Insured Entities (not just the Insurance Trust) must comply with and satisfy all Post-Effective Date Insurance Obligations. This is designed to preserve and maintain as much insurance coverage as possible for the benefit of both the Insurance Trust and the Survivor Compensation Trust. If either Trust believes the Debtor, Debtor's Agents, or any Co-Insured Entity has failed to satisfy a Post-Effective Date Insurance Obligation, the applicable Trust must give the Reorganized Debtor and such other Person written notice specifically identifying the unmet obligation and the required corrective action. The Reorganized Debtor, Reorganized Debtor's Agents, and Co-Insured Entities, as applicable, then have at least 60 days from that notice to either (a) take the requested action or (b) seek a bankruptcy court determination on whether the requested action is actually required, though any such court determination is not binding on Non-Settling Insurers. Except in cases of willful misconduct by the Debtor, Debtor's Agents, or a Co-Insured Entity, the Trusts' sole remedy for a failure to satisfy these obligations is specific performance ordered by the bankruptcy court. Correspondingly, Non-Settling Insurers retain all their contractual coverage defenses arising from any actual or alleged failure by the Debtor, Debtor's Agents, or a Co-Insured Entity to satisfy these obligations.

To secure the performance of Post-Effective Date Insurance Obligations, the Insurance Trust must establish a Post-Effective Date Costs Reserve funded initially with no less than $12,000,000 drawn from Debtor's contributions to the Survivor Compensation Trust. The Insurance Trustee must provide Co-Insured Entities with a written statement of the reserve balance quarterly, or upon reasonable request. If the reserve balance falls below $3,000,000, the Insurance Trustee must immediately report this to Co-Insured Entities and schedule a meet-and-confer to discuss (a) the Insurance Trustee's expectations for continued prosecution of insurance and litigation claims, (b) the outstanding balance of incurred-but-unpaid costs, and (c) the parties' collective expectations about additional costs likely needed to satisfy remaining Post-Effective Date Insurance Obligations. If the Post-Effective Date Costs Reserve is not adequately funded, Co-Insured Entities are relieved of their obligations to continue satisfying Post-Effective Date Insurance Obligations. Non-Settling Insurers retain any coverage defenses arising from a Co-Insured Entity's failure to perform Post-Effective Date Insurance Obligations.

## G. Means for Implementation of the Plan.

The Plan constitutes a comprehensive good-faith settlement and compromise of claims under Bankruptcy Rule 9019. On the effective date, the Debtor continues as the "Reorganized Debtor," with estate property vesting in it free and clear of claims, liens, and interests except as the Plan provides. All executory contracts and leases not specifically assumed are deemed rejected, while assumed agreements (including compensation and benefits programs and workers' compensation obligations) continue uninterrupted.

## H. Adoption of Additional Child Safety and Protection Policies.

The Debtor has jointly retained Guidepost Solutions LLC to conduct a review of the child safety and protection policies and procedures within the Archdiocese and make recommendations on how the Debtor may improve the existing policies and procedures. While Guidepost Solutions LLC continues to undertake its review, the Debtor has agreed it will review the recommendations and, subject to the

occurrence of the Effective Date, the Debtor and Reorganized Debtor undertake to-be-agreed-upon steps to further enhance the existing child safety and protection policies and procedures within the Archdiocese, all as will be set forth in **Exhibit J**, which will be filed as part of the Plan Supplement.

## I. Claims Administration for Claims.

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor, Insurance Trustee, or Survivor Compensation Trustee, as applicable, shall have and retain any and all objections to any and all Claims and motions or other requests for the payment of Claims, including any and all objections to the validity or amount of any and all alleged Administrative Expenses and Priority Tax Claims. The failure to object to any Claim in this Chapter 11 Case shall be without prejudice to the Reorganized Debtor's, Insurance Trustee's, or Survivor Compensation Trustee's, as applicable, right to contest or otherwise defend against such Claim in the Bankruptcy Court when or if such Claim is sought to be enforced by the holder of such Claim.

All parties in interest reserve the right to object to Survivor Claims pursuant to Section 502(a) of the Bankruptcy Code, and Survivor Claimants reserve all defenses to such objections. All parties in interest, including without limitation the Non-Settling Insurers, reserve the right to object in the Bankruptcy Court to any Proofs of Claim on any basis to the extent permitted by applicable law; provided, however, for the avoidance of doubt, nothing in this section is intended to confer and shall not confer upon the Bankruptcy Court jurisdiction over any claim objections over which the Bankruptcy Court would not otherwise have jurisdiction pursuant to applicable law.

## J. Executory Contracts and Unexpired Leases.

### 1. *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Each Assumed Agreement shall be assumed as of the Effective Date, to the extent that each such Assumed Agreement has not already expired, concluded, or terminated under its own terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code. All other executory contracts, unexpired leases, or other agreements that are not Assumed Agreements and were not previously assumed or rejected by order of the Bankruptcy Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, approval of the rejection of all such executory contracts and unexpired leases.

### 2. *Bar Dates for Rejection Damage Claims.*

To the extent not subject to a claim filing deadline set forth in any prior or subsequent order of the Bankruptcy Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court no later than thirty (30) days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim.

### 3. *Compensation and Benefits Programs.*

Other than any Compensation and Benefits Programs assumed by the Debtor prior to the entry of the Confirmation Order, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Assumed Agreements under the Plan and deemed assumed under sections 365 and 1123 of the Bankruptcy Code, and the Debtor's and Reorganized Debtor's obligations under the Compensation and Benefits Programs survive

and remain unaffected by entry of the Confirmation Order and will be fulfilled in the ordinary course of the Debtor's and Reorganized Debtor's operations. Compensation and Benefits Programs assumed by the Debtor prior to the entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtor's and Reorganized Debtor's operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Programs.

**4. *Workers' Compensation Programs.***

As of the Effective Date, the Debtor and Reorganized Debtor shall continue to honor their obligations under: (a) all applicable workers' compensation laws; and (b) the Workers' Compensation Program. For the avoidance of doubt, all written contracts and agreements related to the Workers' Compensation Program shall be deemed executory contracts and assumed as of the Petition Date. No Insurer shall be required to file a Proof of Claim, and any amount due and owing under a written contract or agreement related to the Workers' Compensation Program shall be paid in the ordinary course under such written contract or agreement. All Proofs of Claim on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Program; provided, further, however, that nothing in the Plan shall be deemed to impose any obligations on the Debtor or its Insurers in addition to what is provided for under the terms of the Workers' Compensation Program and applicable state law.

**K. Confirmation and Consummation of the Plan.**

Confirmation requires (among other things) a confirmation order acceptable to the Debtor and settling insurers, and approval/implementation of the channeling and supplemental settling insurer injunctions. The effective date additionally requires execution of the trust agreements, receipt of the funding payments described above, entry of final insurance settlement approval orders, and any required Canon Law approvals. If the Plan is not substantially consummated, it becomes null and void and cannot be used as an admission against the Debtor, Debtor's Agents, Co-Insured Entities, Settling Insurers, or Non-Settling Insurers.

**L. Effects of Confirmation.**

Upon confirmation of the Plan, the Plan will be binding upon the Debtor, Reorganized Debtor, Estate, and all holders of Claims or Interests and provide for the following protections designed to make the Plan's compromises permanent.

First, every Creditor is deemed to have forever waived, discharged, and released the Debtor to the fullest extent permitted by section 1141 of the Bankruptcy Code, regardless of whether a proof of claim was filed, whether the claim was allowed, or whether the holder voted to accept the Plan. In furtherance of the foregoing, all Creditors are permanently enjoined from pursuing any discharged claim against the Debtor, Reorganized Debtor, or their property.

Second, as an integral part of the Insurance Settlement Agreements, sale of the Settling Insurer Policies, and assignment of the Non-Settling Insurer Policies, all Channeled (i.e., Survivor Claims and related claims) are funneled exclusively into the Trusts to be resolved under the Trusts' procedures, which is sole and exclusive remedy for holders of Channeled Claims. Anyone holding or who might in the future hold a Channeled Claim is permanently stayed and barred from taking any action against the Debtor, Debtor's Agents, Co-Insured Entities, or Settling Insurers, including filing suit, enforcing judgments, creating liens, or asserting setoffs.

Third, as another integral part of the Insurance Settlement Agreements and sale of Settling Insurer Policies, a separate, additional injunction bars anyone from taking action against Settling Insurers or Settling Insurer Policies relating to the Settling Insurer Policies, including litigation, judgment enforcement, liens, or setoffs.

Fourth, upon confirmation, no enjoined party may bring a Channeled Claim (or any related claim arising from the case, the Plan's negotiation or administration, or the Trusts) against the Debtor, Debtor's Agents, Co-Insured Entities, or Settling Insurer unless the Bankruptcy Court first determines, after notice and a hearing, that the claim isn't barred by the discharge, channeling injunction, or other Plan provisions, and specifically authorizes it. The Bankruptcy Court has sole and exclusive jurisdiction to make that threshold determination. This "gatekeeper injunction" is purely procedural and does not expand the Bankruptcy Court's jurisdiction, decide any claim's merits or otherwise release non-debtor liability beyond what the Plan already provides.

Fifth, once the Confirmation Order is entered, all persons are enjoined from taking any action to interfere with implementing or consummating the Plan.

Sixth, exculpated parties (the Debtor, Reorganized Debtor, Co-Insured Entities, the Estate, the Committee, Settling Insurers, and their respective agents and professionals) are released from liability for acts or omissions during the case relating to its filing, the Plan's negotiation, confirmation, or administration, or insurance settlement negotiations, except for claims involving gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty. This exculpation does not, however, affect claims against Stinson LLP or Berkeley Research Group relating to certain data breaches during the case.

Finally, on the Effective Date, all property of the Debtor and Estate vests in the Reorganized Debtor free and clear of all liens, claims, and interests (except as the Plan expressly provides). From that point forward, the Reorganized Debtor may operate, use, acquire, and dispose of property without Bankruptcy Court supervision, as if there were no pending bankruptcy case.

## M. Rule 3016 Disclosures Regarding Injunctions in the Plan.

**ARTICLE 13 OF THE PLAN CONTAINS CERTAIN INJUNCTIONS EFFECTIVE UPON THE EFFECTIVE DATE OF THE PLAN. THESE INJUNCTION PROVISIONS MAY AFFECT YOUR RIGHTS, AND YOU ARE ENCOURAGED TO REVIEW THE SPECIFIC PLAN PROVISIONS IN THEIR ENTIRETY AND CONSULT AN ATTORNEY OF YOUR CHOICE REGARDING THEIR IMPACT, IF ANY, ON YOU AND YOUR RIGHTS.**

**FIRST, PURSUANT TO <u>SECTION 13.2.1</u> OF THE PLAN, THE DEBTOR RECEIVES A DISCHARGE AND DISCHARGE INJUNCTION, PROHIBITING ALL PERSONS FROM ASSERTING ANY AND ALL CLAIMS THAT AROSE PRIOR TO THE EFFECTIVE DATE OF THE PLAN AGAINST THE DEBTOR OR REORGANIZED DEBTOR.**

**SECOND, PURSUANT TO <u>SECTION 13.3</u> OF THE PLAN: (A) ANY AND ALL CLAIMS AGAINST THE DEBTOR, REORGANIZED DEBTOR, CO-INSURED ENTITIES, AND SETTLING INSURERS THAT IMPLICATE SETTLING INSURER POLICIES AND NON-SETTLING INSURER POLICIES ARE CHANNELED TO THE SURVIVOR COMPENSATION TRUST AND INSURANCE TRUST; AND (B) ANY AND ALL PERSONS ARE PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTIONS WITH RESPECT TO SUCH CLAIMS AGAINST THE DEBTOR, REORGANIZED DEBTOR, CO-INSURED ENTITIES, AND SETTLING INSURERS, EXCEPT TO THE EXTENT A PERSON IS AUTHORIZED TO PURSUE A LITIGATION CLAIM.**

**THIRD, PURSUANT TO <u>SECTION 13.4</u> OF THE PLAN, ALL PERSONS WITH CLAIMS AGAINST SETTLING INSURERS THAT ARISE OUT OF OR RELATE IN ANY WAY TO SUCH SETTLING INSURERS' SETTLING INSURER POLICIES ARE PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY, INDIRECTLY, OR DERIVATIVELY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM AGAINST THE SETTLING INSURER OR APPLICABLE SETTLING INSURER POLICY.**

**FOURTH, PURSUANT TO <u>SECTION 13.7</u> OF THE PLAN, ALL HOLDERS OF CLAIMS OR INTERESTS ARE PRECLUDED AND ENJOINED FROM INTERFERING WITH IMPLEMENTATION OF THE PLAN.**

**FIFTH, PURSUANT TO <u>SECTION 13.8</u> OF THE PLAN, ALL PERSONS ARE ENJOINED FROM PURSUING CLAIMS AGAINST THE DEBTOR, DEBTOR'S ESTATE, REORGANIZED DEBTOR, CO-INSURED ENTITIES, SETTLING INSURERS, COMMITTEE, AND THEIR RESPECTIVE AGENTS FOR ACTIONS TAKEN IN CONNECTION WITH THIS BANKRUPTCY CASE AND THE PLAN.**

## N. Retention of Jurisdiction.

### 1. <u>*By the Bankruptcy Court.*</u>

On and after the Effective Date, the Bankruptcy Court shall retain: (a) original and exclusive jurisdiction over the Chapter 11 Case; (b) original, but not exclusive, jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case; and (c) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan.

### 2. <u>*By the District Court.*</u>

On and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

### 3. <u>*Actions to Collect Amounts Owed Pursuant to the Plan.*</u>

The Debtor, Reorganized Debtor, and Trusts may, but are not required to, commence an Action to collect amounts owed pursuant to the Plan for any settlements referred to in the Plan or later approved by the Bankruptcy Court that are not paid in accordance with the terms of such settlement. Any such Action may be commenced by filing a motion in aid of confirmation with the Bankruptcy Court.

### 4. <u>*Case Closure.*</u>

The existence and continued operation of the Trusts shall not prevent the Bankruptcy Court from closing the Chapter 11 Case. The Survivor Compensation Trustee and Insurance Trustee shall not take any actions to unreasonably keep the Chapter 11 Case open. In an action involving either of the Trusts, any costs incurred in reopening the Chapter 11 Case, including any Statutory Fees and Court Costs, will be paid by the Survivor Compensation Trustee or Insurance Trustee, as applicable, from Survivor Compensation Trust Assets or Insurance Trust Assets, as applicable.

## V. Tax Consequences of the Plan.

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPTCY ESTATE ARE COMPLEX. THE SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.**

**THE DEBTOR HAS NEITHER REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR ANY OTHER ENTITY OR PERSON. EACH HOLDER OF A CLAIM SHOULD CONSULT HIS, HER, OR ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor and holders of general unsecured claims and interests. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the applicable Treasury Regulations promulgated thereunder (the "***Treasury Regulations***"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change. This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims, if any. This summary does not address foreign, state, or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

### A. Federal Income Tax Consequences to Holders of Unsecured Claims.

In accordance with the Plan, the holders of Claims in certain Classes will receive a distribution on account of their Claims. Any holder of a Claim will realize a loss in an amount equal to the Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a claim for interest or principal; (ii) the origin of the Claim; (iii) the type of consideration received in exchange for the Claim; (iv) whether the holder is a United States person or a foreign person for tax purposes; (v) whether the holder reports income on the accrual or cash basis method; and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Debtor anticipates that distributions to Survivor Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Debtor

has not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Survivor Claims.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A CLAIM OBTAIN THEIR OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A CLAIM AS A RESULT OF THE PLAN.**

### B. Federal Income Tax Consequences to the Debtor.

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Debtor anticipates that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Debtor.

### C. Tax Consequences to the Trust.

The Trusts may satisfy the requirements of a designated settlement fund under section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trusts as designated settlement funds or qualified settlement funds.

**THE DEBTOR EXPRESSES NO OPINION REGARDING WHETHER EITHER OF THE TRUSTS IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER EITHER OF THE TRUSTS IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUSTS AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.**

## VI. ALTERNATIVES TO THE PLAN.

The Debtor believes the Plan is in the best interests of Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (A) an alternative plan of reorganization may be proposed and confirmed or (B) the Debtor's Chapter 11 Case may be dismissed. As discussed below, a third option, liquidation under chapter 7, is not a viable alternative in this Chapter 11 Case.

### A. Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtor or other party in interest may propose a different plan, which might involve an alternative means for reorganization of the Debtor. Alternative plans of reorganization could take many forms, would require additional negotiations and significant expense, would not necessarily provide equivalent or better treatment for creditors of the Debtor, and serious questions would be raised with respect to any plan proposed by a party in interest, including the Committee, without the Debtor's consent, because of the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act. Accordingly, the Debtor believes that the terms of the Plan provide the best result for Creditors. The negotiation and drafting required for a different plan would likely add

substantially greater administrative expenses with no guarantee of a better result for Creditors. For these reasons, the Debtor does not believe that alternative plans of reorganization are preferable alternatives to the Plan.

### B. Dismissal of the Debtor's Chapter 11 Case.

If the Plan is not confirmed, the Debtor or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case. Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon the dismissal of the Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Debtor, Co-Insured Entities, individual Survivor Claimants, and Insurers. In addition to the expense and delay, the Debtor believes that these actions would lead to an unfair distribution to Creditors, with the first Creditors to obtain and enforce a judgment against the Debtor, Co-Insured Entities, or Insurers depleting the Debtor's assets and resulting in insufficient assets to satisfy any further judgments. Further, Survivor Claimants would face the possibility of adverse rulings on charitable immunity, affecting their ability to obtain judgments beyond recoveries obtainable from Insurers. Survivor Claimants may also face issues regarding the level of proof required in a civil action as opposed to the level of proof required for the claims process in this Chapter 11 Case. Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

### C. Chapter 7 Liquidation Not A Viable Alternative.

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation," a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent. The Debtor, as a non-profit entity, may not be forced to convert its Chapter 11 Case to a chapter 7 case. Thus, conversion to a chapter 7 case is not a viable alternative to the Plan.

### D. Appointment of a Chapter 11 Trustee Is Not A Viable Alternative.

As a result of limitations imposed by the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act, the Debtor does not believe that a chapter 11 trustee can be appointed to replace the Archbishop's administration of the Debtor.

## VII. ACCEPTANCE AND CONFIRMATION OF THE PLAN.

### A. General Confirmation Requirements.

In order for a plan to be confirmed at the Confirmation Hearing, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case.

With respect to the Debtor, section 1129(a) of the Bankruptcy Code contains the requirements for confirmation of a plan. Among these requirements are that a plan must: (1) be accepted by the requisite votes of creditors except to the extent that the plan may be confirmed over a dissenting class pursuant to 11 U.S.C. § 1129(b); (2) be feasible, meaning that there is a reasonable probability that the debtor will be able to perform its obligations under the plan without further need of financial reorganization; (3) be in the best

interests of all creditors, meaning that creditors will receive at least as much under the plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code; and (4) comply with the applicable provisions of chapter 11 of the Bankruptcy Code.

The Debtor believes that the Plan complies with all of these requirements, including the specific requirements further discussed below.

**B. Best Interests Test.**

Best Interests Test With Respect to Debtor.

With respect to the Debtor, the "best interests of creditors" test requires that the Bankruptcy Court find either that: (1) all members of each impaired class have accepted the Plan; or (2) each holder of an Allowed Claim of each impaired class of Claims will receive or retain under the Plan, on account of the Claim, property of a value that is not less than the amount that the holder would receive or retain if the Debtor was hypothetically liquidated under chapter 7 of the Bankruptcy Code, as of the Effective Date.

To calculate what holders of Claims would receive if the Debtor was hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the hypothetical liquidation (the "***Chapter 7 Liquidation Fund***"). The Chapter 7 Liquidation Fund would consist of the net proceeds in the Debtor's hypothetical chapter 7 case from the disposition of the Debtor's assets augmented by the cash held by the Debtor and recoveries on actions against third parties, if any.

The Chapter 7 Liquidation Fund would then be reduced by the costs of liquidation, including without limitation: (1) the fees and expenses of a trustee, counsel for the trustee, and any other professionals for the trustee; (2) selling expenses; (3) unpaid expenses incurred by the Debtor in the Chapter 11 Case, such as fees for attorneys, financial advisors, and accountants, that would be allowed in a chapter 7 proceeding; (4) interest expense on oversecured debt, if any; and (5) claims incurred by the Debtor during the pendency of the Chapter 11 Case. These costs of liquidation would be paid from the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund would be made available to the Survivor Claimants and holders of General Unsecured Claims, in accordance with Maryland law. In addition, the conversion to chapter 7 would establish a new bar date for the filing of claims in the chapter 7 case and additional filed claims or claims that would arise upon conversion to a chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to Creditors. The present value of the distributions out of the Chapter 7 Liquidation Fund in accordance with Maryland law after deduction of the amounts described above is then compared to the present value of the property offered to each of the classes of Claims under the Plan, to determine if the Plan is in the best interests of each holder of a Claim.

The Plan Satisfies the Best Interests Test.

The Debtor believes that the Plan as proposed is in the best interest of all Creditors. With respect to the Debtor, while the Debtor may not be forced to convert to a chapter 7 case, the Debtor believes that Survivor Claimants and holders of General Unsecured Claims will receive a distribution under the Plan greater than a distribution they would receive in a hypothetical chapter 7 liquidation of the Debtor ***and will receive such distributions much sooner than would be received if pursued otherwise***. As proposed, the Plan will provide approximately **$283 million** to Survivor Claimants, which includes approximately **$78 million** in cash from the Debtor, **$20 million** from Co-Insured Entities, and **$185 million** from the sale of certain insurance assets of the Debtor and Co-Insured Entities, and approximately **$2 million** to other general unsecured claims, resulting in the Debtor contributing approximately **$80 million** to plan funding for holders of general unsecured claims (i.e., General Unsecured Claims, Survivor Claims, and Non-

Survivor Tort Claims). As compared to the Debtor's proposed contributions to general unsecured claims under the Plan in the approximate amount of **$80 million**, in a hypothetical chapter 7 liquidation of the Debtor, the Debtor estimates general unsecured creditors would receive approximately **$30 million**. The Debtor's belief is based upon concluding the Debtor has interests (equitable or legal) in net assets as of June 30, 2026, in the approximate amount of **$222,624,872** as follows:

| | |
|---|---|
| ***Cash and Cash Equivalents*** | |
| Catholic Center Operating Cash | $3,874,300 |
| Insurance Cash | $21,044,310 |
| School Fund | $1,128,616 |
| Lay Pension | $1,648,560 |
| Priest Pension | $9,917 |
| Newman Center Account | $33,756 |
| Catholic Review Operating | $240,962 |
| All Other | $93,734 |
| Capital Campaign | $2,139,639 |
| Child Nutrition Program | $894 |
| ***Total Cash and Cash Equivalents*** | ***$30,214,688*** |
| | |
| ***Investments*** | |
| Unrestricted/Designated | $41,943,952 |
| Agency | $4,672,354 |
| Insurance Trusts | $73,957,065 |
| Temporarily Restricted | $1,269,883 |
| Permanently Restricted (3rd Party Trusts) | $22,377,495 |
| ***Total Investments*** | ***$144,220,749*** |
| | |
| ***Other Assets*** | |
| Loans, Notes, and Grants Receivable | $8,775,713 |
| Net Accounts Receivable | $6,646,712 |
| Prepaid Expenses and Other Assets | $42,543 |
| Self-Insurance Reserves - Captives | $2,753,012 |
| Insurance Claims | $1,896,098 |
| Other Current Assets | $103,477 |
| Vehicles, net | $44,074 |
| Furniture, Fixtures, and Equipment, net | $82,401 |
| ***Total Other Assets*** | ***$20,344,030*** |

***Real Property - Debtor Real Property***[11]

[11] The Debtor's real property values are based upon actual appraisals or the Debtor's informed judgment, based upon extensive experience of the Debtor with the marketing and sale of real estate, consultation with professionals, or both. The Debtor reserves and preserves all rights to seek additional appraisals to establish the value of all real estate.

| | |
|---|---|
| 1305 Broadway, Frostburg, MD | $121,560 |
| 700 Bishop Walsh Rd., Cumberland, MD 21502 | $34,000 |
| 10 Francis St., Annapolis, MD 21401-1714 | $2,185,000 |
| 8080 New Cut Rd., Severn, MD 21144-0000 | $2,500,000 |
| 15500 York Rd., Sparks, MD 21152 | $2,470,000 |
| 15523 York Rd., Sparks, MD 21152 | $3,390,000 |
| 204 East Gittings St., Baltimore City | $1,547 |
| 3-15 West Franklin St. (3/4 Interest) | $1,561,507 |
| 320 Cathedral Street, Balto., MD 21201 | $13,000,000 |
| 3701 Sinclair Ln., Baltimore, Md. 21213-2079 | $160,000 |
| 7909 York Rd., Towson, MD 21204 | $184,558 |
| Belfast Road near Harrisburg Expressway | $60,619 |
| 1740 Friendship Rd. (Rte. 32) Sykesville, MD 21784 | $815,000 |
| 8414 Opossumtown Pike, Frederick MD 21702 | $721,614 |
| John Carroll High School Land | $640,000 |
| ***Total Debtor Real Property*** | ***$27,845,405*** |

In determining the amount available to unsecured creditors in a hypothetical chapter 7 liquidation of the Debtor, the Debtor then considered the following:

- **First,** the Settling Insurers would no longer be bound by the Insurance Settlement Agreements, resulting in at least $185 million no longer being available for distribution. Similarly, cash from the Debtor's captive insurance entity, Picasso LLC, in the amount of $17 million would no longer be available for distribution.

- **Second,** certain cash and cash equivalents are held by the Debtor either in trust or as a custodian. The Debtor holds cash in the aggregate amount of $1,777,502 relating to cash held for third parties. The Debtor also holds cash from premiums paid for insurance from time-to-time in trust pursuant to certain administrative services agreements and trust agreements. As of June 30, 2026, the Debtor held $21,044,310 in such premiums, approximately ninety-five percent (95%) of which was paid by third parties other than the Debtor. (*See* Cash and Cash Equivalents, Insurance Cash.) As a result, substantially all of the foregoing amounts are unavailable to pay creditors of the Debtor in a chapter 7 liquidation, resulting in a decrease in the Debtor's liquidation value in the approximate amount of $21,769,597 (i.e., 95% of the Insurance Cash and the remaining $1,777,502 held in trust or as a custodian).

- **Third,** certain investment assets of the Debtor are not available to satisfy the claims of creditors, because of restrictions imposed by Maryland law regarding the use of charitable assets to satisfy certain categories of liabilities or liabilities inconsistent with the charitable purpose of the Debtor or a donor's intent. In particular, the Debtor is the beneficiary of certain third-party trusts and restricted gifts in the approximate amount of $22,745,482. (*See* Investments, Permanently Restricted (3rd Party Trusts).) The Debtor is also the custodian of certain agency investments in the approximate amount of $4,672,354. (*See* Investments, Agency.) These assets are not available to satisfy the claims of creditors in a hypothetical chapter 7 liquidation, resulting in a decrease in the Debtor's liquidation value in the approximate amount of $27,417,836.

- **Fourth,** the Debtor is the trustee and one of many settlors of various trusts established as part of the Debtor's insurance program, which contain approximately $73,957,065 in investments held in separate accounts. In a status hearing, the Court provided preliminary thoughts regarding the various trusts established as part of the Debtor's insurance program, based solely on a review of the trust documents, stating the Court's preliminary conclusions were that the entire value of the trusts would be considered property of the Debtor's bankruptcy estate because the trusts were self-settled trusts with the Debtor capable of terminating them. However, Court did not hear evidence that the insurance trusts are subject to substantial post-bankruptcy claims, which must be paid if the trusts and insurance programs are terminated. Similarly, the Court did not hear evidence regarding the approximately ninety-five percent (95%) of the funds contained in the trusts' investment accounts that were contributed by entities other than the Debtor. As a result, a dispute remains regarding the extent to which the various trusts are self-settled trusts and thus available for satisfaction of the claims of creditors of the Debtor; however, Maryland law is clear that a person is a settlor only to the extent of funds contributed to a trust and Md. Code Ann. Est. & Trs. § 14.5-508(a)(3) limits creditors recovery from trusts with spendthrift provisions to the maximum amount contributed to the applicable trust. Therefore, the Debtor believes that at most only approximately five percent (5%) of the funds contained in the various trusts would be available to satisfy the claims of creditors in a hypothetical chapter 7 liquidation, resulting in a decrease in the Debtor's liquidation value in the approximate amount of $70,259,212. (*See* Investments, Insurance Trusts.)[12]

- **Fifth,** certain claims are entitled to be paid ahead of general unsecured claims, because they are secured by properly perfected, first priority liens on and security interests in certain assets of the Debtor. In particular, the Debtor has secured claims due and owing, resulting in a decrease in the Debtor's liquidation value in the approximate amount not less than $22,666,073. (*See* Secured Debt.)

- **Sixth,** in a hypothetical chapter 7 liquidation, the accrued administrative expenses in this chapter 11 case would be paid ahead of general unsecured creditors. As a result, the amount available to satisfy the claims of creditors in a hypothetical chapter 7 liquidation is reduced by approximately $14,526,601. (*See* Post-Petition Payables – Unrestricted, Accrued Expenses.)

- **Seventh,** after considering the foregoing, the Debtor would have assets in the approximate amount of $65,985,554 for distribution in a hypothetical chapter 7 liquidation, before paying the administrative costs of shutting down the Debtor and administering the chapter 7 liquidation.

- **Eighth,** in a hypothetical chapter 7 liquidation, the chapter 7 trustee would be entitled to statutory fees in the approximate amount of $1,896,317 and the Debtor has estimated the professional fees associated with a chapter 7 liquidation of the Debtor to be approximately $25,000,000. (*See* Chapter 7 Trustee Fees, Chapter 7 Professionals' Fees.) As a result, the amount available to satisfy the claims of creditors in a hypothetical chapter 7 liquidation is reduced by approximately $26,896,317.

- **Ninth,** in a hypothetical chapter 7 liquidation, the chapter 7 trustee would incur costs over time for the winddown of operations, to liquidate the assets of the Debtor, and deal with various and significant litigation matters. These costs would include payroll and benefits costs for

[12] At confirmation hearing, the Court will have the opportunity to consider the evidence as well as the trust documents and determine, based on the facts and law the extent to which the Insurance Trust assets weigh into the determination of the Plan meeting the best interest of creditors test.

remaining employees, IT, archival costs, insurance, occupancy costs, insurance program winddown and administration, and other costs. The Debtor has estimated these costs would be approximately $7,540,526, which reduces the amount available to satisfy the claims of creditors in a hypothetical chapter 7 liquidation by $7,540,526.

- **Tenth,** the residual professional fees in the approximate amount of $1,000,000 would be paid ahead of general unsecured creditors, further reducing the amount available in a hypothetical chapter 7 liquidation of the Debtor.

As a result of the foregoing analysis, the liquidation value of the Debtor would be approximately **$30,298,711**. Attached as **Exhibit B** to this Disclosure Statement is the Debtor's analysis supporting the foregoing. While the liquidation analysis includes the liquidation of the Debtor's real and personal property, it is not clear if any of the Debtor's property would be capable of liquidation under chapter 7 pursuant to the protections of the Religious Freedom Restoration Act, the First Amendment, and applicable Maryland law. The inclusion of this property in the liquidation analysis shall not be deemed an admission by the Debtor. Similarly, while the Committee has made allegations regarding the Debtor's legal or equitable interest in a broad swath of property within the geographic boundaries of the Archdiocese, the Debtor's liquidation analysis ***does not include*** assets belonging to separately incorporated non-debtor third parties related to the Debtor.

As revealed by a review of the Debtor's liquidation analysis, the Debtor is proposing to fund substantially more under the Plan than would be funded to general unsecured creditors in a hypothetical chapter 7 liquidation, ***even if excluding the proceeds of Settling Insurer Policies***. Moreover, under the Plan, holders of Administrative Claims will be paid in full, and the Debtor believes holders of Administrative Claims will receive faster distribution under the Plan. In sum, for all of the reasons set forth above, the Debtor anticipates that all Creditors will receive a larger and faster distribution under the Plan than they would under a chapter 7 liquidation or otherwise.

### C. Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of a plan will not likely be followed by the liquidation of, or the need for further financial reorganization of, the debtor. In this case, the Debtor has prepared projections of the cash flow for the ministries and operations of the Debtor. The cash flow projections are attached as **Exhibit C** to this Disclosure Statement. The cash flow projections demonstrate that the Debtor will be able to fund the Plan on the Effective Date, and the Reorganized Debtor will be able to make all payments required pursuant to the Plan. Accordingly, the Debtor believes that the Plan passes the financial feasibility test.

### D. Section 1129(b) Alternative.

In the event that a certain class or classes of Claims reject the Plan, the Debtor may seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the Debtor if the plan "does not discriminate unfairly" and "is fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtor believes that the Plan does not discriminate unfairly with respect to any Class.

In addition, under section 1129(b), a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain

on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (ii) that the holder of any claim or interest that is junior to the claims of the class will not receive or retain on account of the junior claim or interest any property at all. The Debtor believes that the Plan meets the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to all Classes. Specifically with respect to holders of Survivor Claims and General Unsecured Claims, the Plan does not provide for the retention of any interests by equity holders because the Debtor, as a non-profit entity, does not have any equity holders.

## VIII. RISK FACTORS TO BE CONSIDERED.

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

### A. Failure to Satisfy Vote Requirement.

If the Debtor obtains the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtor intends, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may be forced to pursue an alternative plan of reorganization or to dismiss the Chapter 11 Case.

### B. Non-Confirmation or Delay of Confirmation of the Plan.

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

### C. Non-Consensual Confirmation.

In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if the cramdown requirements described above are satisfied. The Debtor believes that the Plan satisfies these requirements.

### D. Risk of Non-Occurrence of the Effective Date.

Although the Debtor believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

### E. Classification and Treatment of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtor. The Bankruptcy Code also provides that the Plan may place a Claim in a particular class only if the Claim is substantially similar to the other Claims in the class. The Debtor believes all Claims have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Debtor could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provides the same treatment for each Claim of a particular class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtor believes that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

**F. Review of Class 6 Claims.**

The potential recovery for Class 6 Claimants depends on, among other things, the outcome of the Survivor Claim Reviewer's review of the Class 6 Claims both in order to determine if the particular Claims will be allowed and in order to allocate the appropriate point allocation for each Claim for purposes of distribution. Therefore, the distribution to Class 6 Claimants will increase or decrease depending on the allowance of Claims and the point allocation given to each Claim.

**G. General Insurance Coverage Risks.**

The Plan provides that the Insurance Trust will pursue Insurance Claims against Non-Settling Insurers and Non-Settling Insurer Policies for the benefit of Survivor Claimants. The Insurance Trust will have the responsibility for prosecuting Insurance Claims against the Non-Settling Insurers at the Insurance Trust's sole cost and expense. There is no guarantee that the Insurance Trust will be successful in this litigation in light of defenses that Non-Settling Insurers may assert with respect to Insurance Claims. The Debtor makes no representations or warranties regarding the value of the Non-Settling Insurer Policies or the Insurance Claims whatsoever, including, but not limited to, any defenses the Non-Settling Insurers may have.

**H. Insurance Contributions.**

If the Debtor or Insurance Trust are unable to reach settlements with Non-Settling Insurers, there is a risk that the Insurance Trust may not realize recoveries from Non-Settling Insurers, or that the Insurance Trust's efforts to realize recoveries on account of the Non-Settling Insurer Policies will be the subject of litigation that is expensive and time-consuming and in which Non-Settling Insurers could raise meritorious coverage defenses that may reduce the amount of coverage available under the Non-Settling Insurer Policies. Any such reduction in recoveries from Non-Settling Insurers would reduce the funds available for distribution to Survivor Claimants from the Survivor Compensation Trust.

**I. Insurance Coverage Actions.**

In accordance with the Plan, the Non-Settling Insurer Policies will be assumed and assigned to the Insurance Trust, including all Insurance Claims relating to Survivor Claims to the extent related to Non-Settling Insurers or Non-Settling Insurer Policies. It is not currently known whether any Insurance Claims pursued by the Insurance Trust will result in a favorable outcome for the Insurance Trust or Survivor Claimants. Even if a favorable outcome is realized, the amounts recovered and the costs associated with pursuing such litigation cannot be determined at this time. Therefore, the ultimate value of the Insurance Claims being contributed to the Insurance Trust is unknown.

**J. Specific Coverage Defenses Asserted by Non-Settling Insurers.**

The Non-Settling Insurers have asserted, or may assert, several defenses in connection with Insurance Claims, including:

1. certain Non-Settling Insurer Policies may only attach, if at all, after certain self-insured retentions have been exhausted and/or after the limits of liability of any applicable underlying insurance and/or any applicable underlying limits have been exhausted, regardless of the exhaustion or unavailability of such underlying insurance and/or underlying limits;

2. certain Non-Settling Insurers may not have a duty to defend or settle, only to indemnify covered ultimate net loss, meaning under these Non-Settling Insurer Policies, there may be no obligation to reimburse defense expenses or a loss payment until after the underlying Survivor Claim is resolved and coverage for that Survivor Claim has been determined;

3. there may be no coverage for any entity or person that does not qualify as an insured under the respective Non-Settling Insurer Policies;

4. the Co-Insured Entities may breach or may have breached their duty to cooperate in the defense and investigation of the Abuse Claims under certain Non-Settling Insurer Policies;

5. there may be no coverage if a Survivor Claimant alleges, or a determination is made, that the Debtor or any Co-Insured Entity was aware of the alleged perpetrator's deviant propensities or history of Abuse prior to or during the alleged Abuse;

6. there may be no coverage for volitional acts;

7. there may be no coverage arising from underlying actions and underlying Survivor Claims that involve Survivor Claimants who previously asserted claims that were litigated to conclusion, settled, or otherwise resolved by the Debtor or any Co-Insured Entity;

8. there may be no coverage for any Survivor Claim known to be false or fraudulent, and coverage under the Non-Settling Insurer Policies may become void, and all claims thereunder may be forfeited, if any such claim is made;

9. punitive damages may be excluded from coverage under the definition of "occurrence" and under the applicable law and public policy;

10. certain Survivor Claims may not be covered under any Non-Settling Insurer Policy, in whole or in part, to the extent that any bodily injury or event resulting in such injury or damage arises from deliberate, willful, and/or intentional conduct substantially certain to result in injury;

11. certain Survivor Claims may not be covered due to application of sexual abuse or molestation exclusions;

12. for claims-made Non-Settling Insurer Policies, there may have been no claims timely made or reported, which could affect Insurance Claims under such Non-Settling Insurer Policies;

13. the Non-Settling Insurer policies may be voided as a result of violations of Non-Settling Insurers' contractual rights to control or participate in defense of claims, including consent to settle clauses, cooperation rights, and rights to associate defense; and

14. the channeling of Non-Settling Insurer Contribution Claims and Contribution Claims to the Insurance Trust may violate the terms of the applicable Non-Settling Insurer Policy.

Any of the foregoing disputes could potentially reduce or eliminate the right to payment under certain Non-Settling Insurer Policies. Moreover, defenses, disputes, and other circumstances could arise, potentially reducing or eliminating the right to payment under Non-Settling Insurer Policies.

**K. Insurance Assignment Risks.**

Pursuant to the Plan, the Non-Settling Insurer Policies will be assumed and assigned to the Insurance Trust, and certain Insurance Claims of the Debtor and Co-Insured Entities will be transferred to the Insurance Trust, to be used to pursue recoveries for the benefit of Survivor Claimants in accordance with the Plan and the Insurance Trust Documents. Certain parties in interest, including certain Non-Settling Insurers or Co-Insured Entities, may contest the ability of the Debtor to assume and assign the Non-Settling Insurer Policies or to transfer Insurance Claims to the Insurance Trust. Certain Non-Settling Insurers may also contest the ability of the Co-Insured Entities to assign their Insurance Claims to the Insurance Trust without insurer consent. To the extent that any such assumption, assignment, or transfer is not allowed or is otherwise held to be invalid, the Insurance Trust Assets available to satisfy Survivor Claims will be reduced, or insurance coverage under the Non-Settling Insurer Policies may be impaired or voided by such assignment. In the event the transfers set forth in the Plan are inconsistent with the Bankruptcy Code, the Plan provides a fallback mechanism under which each applicable Co-Insured Entity would retain its respective Insurance Claims and, to the extent reasonably requested by the Insurance Trust, would assert and pursue any such retained Insurance Claims, at the Insurance Trust's expense. However, this alternative mechanism might be subject to defenses asserted by the Non-Settling Insurers and might not result in recoveries for Survivor Claimants.

**L. Insurance Sale Risks.**

Pursuant to the Plan, significant funding is realized as a result of the sale of certain Settling Insurer Policies. Certain parties in interest, including Co-Insured Entities, may contest the ability of the Debtor to sell the Settling Insurer Policies without the Co-Insured Entities' consent. In the event a party in interest was successful in preventing the sale of Settling Insurer Policies, substantial value contemplated by the Plan—presently $185,000,000—would not be available.

**M. Risks Regarding Insurance Trusts.**

A dispute exists regarding whether cash and investments presently held or otherwise administered by the Debtor as part of the insurance program administered by the Debtor (as more fully described in the Insurance Motion) are property of the Estate. If litigated as part of the confirmation process of the Plan, the outcome of that litigation will impact the Debtor's liquidation analysis and funding under the Plan. The impact of this risk is captured in the Debtor's liquidation analysis attached as **Exhibit B** to this Disclosure Statement.

**N. Duration and Expense of Insurance Coverage Litigation.**

Litigation of the Insurance Claims against Non-Settling Insurers could be protracted and expensive. There is no guarantee that the Insurance Trust will prevail in its prosecution of the Insurance Claims against

Non-Settling Insurers. The Insurance Trust's pursuit of Insurance Claims may require significant time and resources, including attorneys' fees, expert fees, and other costs and expenses of litigation. The costs of pursuing Insurance Claims against Non-Settling Insurers will reduce the total funds available for distribution to Survivor Claimants from the Survivor Compensation Trust, and the time required to resolve such claims could substantially delay distributions.

## IX. MISCELLANEOUS PROVISIONS.

### A. Modification of the Plan.

The Debtor, with the consent of any Settling Insurers and the Co-Insured Entities, may modify the Plan at any time prior to the confirmation hearing, in accordance with sections 1127(a) and 1193(a) of the Bankruptcy Code, as applicable. After the Confirmation Date and prior to substantial consummation, the Debtor, with the consent of any Settling Insurers, may modify the Plan, in accordance with sections 1127(b) and 1193(b) of the Bankruptcy Code, as applicable, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement and supplement the Insurance Settlement Agreements may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

### B. Revocation.

The Debtor reserves the right to revoke and withdraw the Plan, prior to entry of the Confirmation Order.

### C. Controlling Documents.

In the event and to the extent that any provision of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Survivor Compensation Trust Agreement or Insurance Trust Agreement (other than provisions relating to the Survivor Compensation Trustee's or Insurance Trustee's authority to act) is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan, Survivor Compensation Trust Agreement, or Insurance Trust Agreement, the provisions of the Confirmation Order shall control and take precedence. In the event the Plan or any provision of any agreement referred to in Section 15.9 of the Plan is inconsistent with an Insurance Settlement Agreement, the Insurance Settlement Agreement shall control.

### D. Filing of Additional Documents.

At any time before substantial consummation of the Plan, the Debtor, the Trusts, or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise comply with applicable law.

**E. Direction to a Party.**

On and after the Effective Date, the Trusts or Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**F. Certain Actions.**

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or the organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date, as applicable, pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Debtor.

**G. Plan as Settlement Communication.**

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims, Interests, and Causes of Action that are disputed as to validity or amount (including Survivor Claims), except as otherwise provided above. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rules of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity or invalidity of, any Disputed Claim or Cause of Action. Except as expressly set forth in the Plan, nothing in the Plan is intended to constitute a compromise of Survivor Claims.

**H. Other Rights.**

Except as expressly set forth in the Plan, nothing in the Plan shall preclude any Person from asserting in any proceeding, or against any award or judgment entered in such proceeding, any and all rights that may be accorded under Maryland law, or any other applicable statutory or common law, of contribution, indemnity, reduction, credit, or setoff, arising from the settlement and resolution of the Survivor Claims.

## X. BANKRUPTCY RULE 9019 REQUEST.

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Debtor requests approval of all compromises and settlements included in the Plan.

## XI. CONFIRMATION REQUEST.

The Debtor requests confirmation of the Plan under section 1129 of the Bankruptcy Code, as applicable, with respect to any Impaired Class that does not accept the Plan or is deemed to reject the Plan.

## XII. Recommendation and Conclusion.

The Debtor believes the Plan is in the best interests of all Creditors and the Estate and urges the Creditors to accept the Plan and to evidence their acceptance by properly voting and timely returning their respective ballots.

[Signatures on following page.]

**ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, a corporation sole**

*/s/ William E. Lori*
Most Rev. William E. Lori, Archbishop

*/s/ Blake D. Roth*
Blake D. Roth (admitted *pro hac vice*)
C. Scott Kunde (admitted *pro hac vice*)
**HOLLAND & KNIGHT LLP**
Symphony Place
150 Third Avenue South, Ste. 2800
Nashville, TN 37201
Telephone: 615.244.6380
Facsimile: 615.244.6804
Email: blake.roth@hklaw.com
scott.kunde@hklaw.com

-and-

Philip T. Evans (Fed. Bar No. 11796)
HOLLAND & KNIGHT LLP
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone: 202.457.7043
Email: philip.evans@hklaw.com

-and-

Catherine K. Hopkin (Fed. Bar. No. 28257)
YVS LAW, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401
Telephone: 443.569.0788
Facsimile: 410.571.2798
Email: chopkin@yvslaw.com

*Counsel for Roman Catholic Archbishop of Baltimore*

**EXHIBIT A TO DISCLOSURE STATEMENT**
**CHAPTER 11 PLAN OF REORGANIZATION**

**EXHIBIT B TO DISCLOSURE STATEMENT**
**LIQUIDATION ANALYSIS**

| Account Description | 6/30/2026 Present Liquidation Value | Liquidation Analysis w/ Insurance Trusts | Disputed Insurance Trust Amount | Liquidation Analysis w/out Insurance Trusts | Notes |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| ***Cash and Cash Equivalents*** | | | | | |
| Catholic Center Operating Cash | | $3,874,300 | | $3,874,300 | |
| Insurance Cash | | $21,044,310 | $19,992,095 | $1,052,216 | Held in trust pursuant to Administrative Services Agreements; ~5% consists of Debtor-paid premiums, with remaining being Parish, School, employee and other 3rd party premium payments. |
| School Fund | | $1,128,616 | | $1,128,616 | |
| Lay Pension | | $1,648,560 | | $1,648,560 | |
| Priest Pension | | $9,917 | | $9,917 | |
| Newman Center Account | | $33,756 | | $33,756 | |
| Catholic Review Operating | | $240,962 | | $240,962 | |
| All other (Agency/Payroll related) | | $93,734 | | $93,734 | |
| Capital Campaign | | $2,139,639 | | $2,139,639 | |
| Child Nutrition Program | | $894 | | $894 | |
| ***Total Cash and Cash Equivalents*** | $30,214,688 | ***$30,214,688*** | ***$19,992,095*** | ***$10,222,594*** | |
| ***Investments*** | | | | | |
| Unrestricted/Designated | | $41,943,952 | | $41,943,952 | |
| Agency | | $4,672,354 | | $4,672,354 | |
| Insurance Trusts | | $73,957,065 | $70,259,212 | $3,697,853 | Held in trust pursuant to Administrative Services Agreements; ~5% consists of Debtor-paid premiums, with remaining being Parish, School, employee and other 3rd party premium payments. |
| Temporarily Restricted | | $1,269,883 | | $1,269,883 | |
| Permanently Restricted (3rd Party Trusts) | | $22,377,495 | | $22,377,495 | |
| ***Total Investments*** | $144,220,749 | ***$144,220,749*** | ***$70,259,212*** | ***$73,961,537*** | |
| ***Other Assets*** | | | | | |
| Loans, Notes, and Grants Receivable | $8,775,713 | $8,775,713 | | $8,775,713 | |
| Net Accounts Receivable | $6,646,712 | $6,646,712 | | $6,646,712 | |
| Prepaid Expenses and Other Assets | $42,543 | $42,543 | | $42,543 | |
| Self-Insurance Reserves - Captives | $2,753,012 | $2,753,012 | | $2,753,012 | |
| Insurance Claims | $1,896,098 | $1,896,098 | | $1,896,098 | |
| Other Current Assets | $103,477 | $103,477 | | $103,477 | |
| Vehicles, net | $44,074 | $44,074 | | $44,074 | |
| Furniture, Fixtures, and Equipment, net | $82,401 | $82,401 | | $82,401 | |
| ***Total Other Assets*** | ***$20,344,030*** | ***$20,344,030*** | | ***$20,344,030*** | |
| ***Real Property - Debtor Real Property*** | | | | | |
| 1305 Broadway, Frostburg, MD | | $121,560 | | $121,560 | |
| 700 Bishop Walsh Rd., Cumberland, MD 21502 | | $34,000 | | $34,000 | |
| 10 Francis St., Annapolis, MD 21401-1714 | | $2,185,000 | | $2,185,000 | |
| 8080 New Cut Rd., Severn, MD 21144-0000 | | $2,500,000 | | $2,500,000 | |
| 15500 York Rd., Sparks, MD 21152 | | $2,470,000 | | $2,470,000 | |
| 15523 York Rd., Sparks, MD 21152 | | $3,390,000 | | $3,390,000 | |

| Account Description | 6/30/2026 Present Liquidation Value | Liquidation Analysis w/ Insurance Trusts | Disputed Insurance Trust Amount | Liquidation Analysis w/out Insurance Trusts | Notes |
|---|---|---|---|---|---|
| 204 East Gittings St., Baltimore City | | $1,547 | | $1,547 | |
| 3-15 West Franklin St. (3/4 Interest) | | $1,561,507 | | $1,561,507 | |
| 320 Cathedral Street, Balto., MD 21201 | | $13,000,000 | | $13,000,000 | |
| 3701 Sinclair Ln., Baltimore, Md. 21213-2079 | | $160,000 | | $160,000 | |
| 7909 York Rd., Towson, MD 21204 | | $184,558 | | $184,558 | |
| Belfast Road near Harrisburg Expressway | | $60,619 | | $60,619 | |
| 1740 Friendship Rd.(Rte 32) Sykesville, MD 21784 | | $815,000 | | $815,000 | |
| 8414 Opossumtown Pike, Frederick MD 21702 | | $721,614 | | $721,614 | |
| John Carroll High School Land | | $640,000 | | $640,000 | |
| ***Total Debtor Real Property*** | $27,845,405 | ***$27,845,405*** | | ***$27,845,405*** | |
| | | | | | |
| *Real Property - Parish Property Titled in Debtor* | | | | | |
| 1542 N Gimor St. | | $0 | | $0 | |
| 2111 - 2119 Ashland Ave | | $0 | | $0 | |
| 3803 4th St. | | $0 | | $0 | |
| 4500 Park Heights Ave., Baltimore 21215-6330 | | $0 | | $0 | |
| 6800 Mcclean Blvd, Baltimore, MD 21234 | | $0 | | $0 | |
| Parcel ID 1402257440 Parcel Address City ELLICOTT CITY | | $0 | | $0 | |
| Parcel ID 1405448573 Parcel Address City CLARKSVILLE | | $0 | | $0 | |
| Green Valley Rd, Union Bridge, MD 21791 | | $0 | | $0 | |
| 12060 Main St, Frederick, MD 21701 | | $0 | | $0 | |
| 701 E Churchville Rd, Bel Air, MD 21014 | | $0 | | $0 | |
| ***Total Parish Property Titled in Debtor*** | | ***$0*** | | ***$0*** | |
| | | | | | |
| *Not Debtor Property* | | | | | |
| 8300 Old Columbia Rd, Fulton, MD 20759 | | $0 | | $0 | |
| 47 Depaul St, Emmitsburg, MD 21727 | | $0 | | $0 | |
| 806 N Collington Ave, Baltimore, MD 21205 | | $0 | | $0 | |
| 13135 Forsythe Rd, Sykesville, MD 21784 | | $0 | | $0 | |
| 1716 E Churchville Rd, Bel Air, MD 21015 | | $0 | | $0 | |
| 2912 Hanover Pike, Manchester, MD 21102 | | $0 | | $0 | |
| ***Total Not Debtor Property*** | | ***$0*** | | ***$0*** | |
| | | | | | |
| **Total Assets** | **$222,624,872** | **$222,624,872** | **$90,251,306** | **$132,373,566** | |
| | | | | | |
| **LESS:** | | | | | |
| Secured Debt | ($22,666,073) | ($22,666,073) | | ($22,666,073) | |
| Post-petition payables - unrestricted | ($6,837,849) | ($6,837,849) | | ($6,837,849) | |
| Accrued Expenses | ($7,688,752) | ($7,688,752) | | ($7,688,752) | |
| Agency Investments | ($4,672,354) | ($4,672,354) | | ($4,672,354) | |
| Mission Investments | $0 | $0 | | $0 | |
| Custodial Funds | ($1,777,502) | ($1,777,502) | | ($1,777,502) | |
| Accrued Liability for Self-Insured Claims | $0 | ($37,360,000) | | $0 | Postpetition Insurance Trust Obligations (current obligations plus approximately 6 month runoff for parishes, schools, and other insured entities). |
| Insurance Trust Investments | ($73,957,065) | $0 | | $0 | |
| Donor Restricted Assets | ($22,745,482) | ($22,745,482) | | ($22,745,482) | |

| Account Description | 6/30/2026 Present Liquidation Value | Liquidation Analysis w/ Insurance Trusts | Disputed Insurance Trust Amount | Liquidation Analysis w/out Insurance Trusts | Notes |
|---|---|---|---|---|---|
| **Total Post-petition Payables** | ($140,345,077) | ($103,748,012) | | ($66,388,012) | |
| **Total Assets Available Prior to Ch. 7** | **$82,279,795** | **$118,876,860** | | **$65,985,554** | |
| | | | | | |
| **CHAPTER 7 EXPENSES** | | | | | |
| Chapter 7 Trustee Fees | ($2,413,347) | ($3,483,056) | | ($1,896,317) | |
| Chapter 7 Professionals' Fees | ($25,000,000) | ($25,000,000) | | ($25,000,000) | |
| Shut-down Costs | ($7,540,526) | ($7,540,526) | | ($7,540,526) | |
| Residual Costs of Chapter 11 Administration | ($250,000) | ($250,000) | | ($250,000) | |
| Residual Chapter 11 Professionals' Fees | ($1,000,000) | ($1,000,000) | | ($1,000,000) | |
| Total Chapter 7 Expenses | ($36,203,873) | ($37,273,582) | | ($35,686,843) | |
| | | | | | |
| **Total amount available for unsecured creditors** | **$46,075,922** | **$81,603,278** | | **$30,298,711** | |
| **Amount for Survivor Claims (92.3%)** | **$42,528,076** | **$75,319,826** | | **$27,965,710** | |

**EXHIBIT C TO DISCLOSURE STATEMENT**
**CASH FLOW PROJECTION**

**Roman Catholic Archbishop of Baltimore**
**Case No.: 23-16969**

| Plan of Reorganization Cash Flow Projections | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|
| **Debtor** | | | | |
| **Operating Cash Inflows:** | | | | |
| Archdiocesan Support - Assessments | $ 16,016,500 | $ 16,496,995 | $ 16,991,905 | Annual Increase of 3% |
| Insurance Income - Premiums and Fees | $ 79,522,610 | $ 81,908,288 | $ 84,365,536 | Annual Increase of 3% |
| Program and Service Fee Income | $ 8,107,090 | $ 8,275,303 | $ 8,448,562 | Annual Increase of 3% |
| Grant Income | $ 6,182,030 | $ 6,367,491 | $ 6,558,516 | Annual Increase of 3% |
| Restricted and Unrestricted Contributions | $ 4,564,104 | $ 4,655,386 | $ 4,748,494 | Annual Increase of 2% |
| Investment Income | $ 6,246,617 | $ 4,746,617 | $ 4,746,617 | Reduced due to payments made under the Plan |
| Special Collection and Other Income | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 | Flat |
| Interest Income | $ 531,703 | $ 499,801 | $ 469,813 | Annual decrease of 6% |
| **Total Operating Cash Inflows** | **$ 124,170,654** | **$ 125,949,881** | **$ 129,329,443** | |
| **Operating Cash Outflows:** | | | | |
| Program: | | | | |
| Seminarian Costs, Other Supplies, Other Expenses | $ 4,556,502 | $ 4,921,022 | $ 5,314,704 | Annual Increase of 8% |
| Child Nutrition Program | $ 1,514,195 | $ 1,589,904 | $ 1,669,399 | Annual increase of 5% |
| Travel & Hospitality | $ 99,981 | $ 103,480 | $ 107,102 | Annual Increase of 3.5% |
| Profesional Fees and Stipends | $ 775,809 | $ 802,962 | $ 831,066 | Annual Increase of 3.5% |
| Total Program Cash Outflows | $ 6,946,486 | $ 7,417,369 | $ 7,922,271 | |
| Non-Program: | | | | |
| Clergy Salaries and Benefits | $ 4,352,342 | $ 4,482,913 | $ 4,617,400 | Annual Increase of 3% |
| Lay Salaries and Benefits | $ 17,672,954 | $ 18,203,143 | $ 18,749,237 | Annual Increase of 3% |
| Insurance Premiums, Claims, and Fees | $ 75,781,105 | $ 79,570,160 | $ 83,548,668 | Annual Increase of 5% |
| Occupancy | $ 1,446,619 | $ 1,490,017 | $ 1,534,718 | Annual Increase of 3% |
| Office Equipment | $ 1,150,903 | $ 1,208,448 | $ 1,268,870 | Annual Increase of 5% |
| Professional Development and Training | $ 295,758 | $ 304,631 | $ 313,770 | Annual Increase of 3% |
| Meetings and Receptions | $ 484,665 | $ 499,205 | $ 514,182 | Annual Increase of 3% |
| Office | $ 4,016,304 | $ 4,886,793 | $ 5,783,397 | 3% plus increase due to new accounting system requirements |
| Professional Fees | $ 3,141,049 | $ 3,235,280 | $ 3,332,339 | Annual Increase of 3% |
| Grants and Donations | $ 3,072,720 | $ 3,072,720 | $ 3,072,720 | Limited to restricted gifts for PIE and School Fund |
| Interest and Bank Fees | $ 1,156,919 | $ 1,050,868 | $ 960,194 | Assumes 4.8% interest on decreasing amount owed + bank fees |
| Total Non-Program Cash Outflows | $ 112,571,339 | $ 118,004,179 | $ 123,695,495 | |
| **Operating Cash Outflows** | **$ 119,517,825** | **$ 125,421,548** | **$ 131,617,766** | |
| **Net Operating Cash Flow** | **$ 4,652,829** | **$ 528,333** | **$ (2,288,323)** | |
| **Non-Operating Cash Inflow / (Outflow)** | | | | |
| Sale of Assets | $ - | $ - | $ - | No assumed sales |
| A/R Collections | $ - | $ - | $ - | Assumes static balance |
| Notes Receivable Principal Collections | $ 683,972 | $ 722,274 | $ 762,722 | Per Schedules follwed by schools on paying back loans |
| Note Payable Principal Payments | $ (2,208,651) | $ (2,278,235) | $ (1,568,667) | Per Schedules followed by AOB from PNC |
| Reorganization Expenses | $ (5,000,000) | - | - | |
| Cap-Ex/Deferred Maintenance | $ (75,000) | $ (75,000) | $ (75,000) | |
| **Net Non-Operating Cash Inflow / (Outflow)** | **$ (6,599,679)** | **$ (1,630,961)** | **$ (880,945)** | |
| **Net Cash Flow** | **$ (1,946,850)** | **$ (1,102,627)** | **$ (3,169,268)** | |
| **Beginning Unrestricted Cash and Unrestricted Investments** | **$ 71,500,000** | **$ 6,953,616** | **$ 5,850,989** | |
| **Plus: Known Insurance Settlements** | **$ 185,000,000** | **$ -** | **$ -** | |
| **Plus: Cash from Picasso Insurance Captive Trust** | **$ 18,000,000** | **$ -** | **$ -** | |
| **Plus: Cash from Co-Insured Entities** | **$ 20,000,000** | **$ -** | **$ -** | |

**Roman Catholic Archbishop of Baltimore**
**Case No.: 23-16969**

| Plan of Reorganization Cash Flow Projections | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|
| **Debtor** | | | | |
| **Less: General Unsecured Trade Payments** | $ (1,689,310) | $ - | $ - | |
| **Less: Survivor Plan Payments** | $ (283,910,224) | $ - | $ - | |
| **Ending Unrestricted Cash and Unrestricted Investments** | $ 6,953,616 | $ 5,850,989 | $ 2,681,721 | There is no separate reserve for working capital |