**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re:<br><br>Roman Catholic Archbishop of Baltimore,<br><br>Debtor. | Case No. 23-16969-MMH<br>(Chapter 11) |

# THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT IN SUPPORT OF THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, A CORPORATION SOLE

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Archbishop of Baltimore (the "Debtor") respectfully submits this objection ("Objection") to the *Debtor's Disclosure Statement in Support of the Fourth Amended Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of Baltimore, a Corporation Sole*, ECF No. 2870 (the "Disclosure Statement").[1] In support of this Objection, the Committee respectfully states as follows:

## INTRODUCTION

On August 4, 2026, after months of revisions by all parties, this Court issued an *Order Denying Approval of Both Disclosure Statements* (the "Order"), denying both the Debtor's and the Committee's proposed disclosure statements. *See generally* ECF No. 2813. Throughout that Order, the Court identified and described in detail multiple deficiencies in the Debtor's Third Amended Plan and Disclosure Statement.

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Disclosure Statement.

Despite that Order, the Debtor filed the present Plan and Disclosure Statement, with changes that neither fully nor adequately remedy the deficiencies previously identified by the Court. The remaining deficiencies in the Plan and the Disclosure Statement counsel against approval of both.

The Debtor must meet the same standard as every other chapter 11 debtor: it must provide a plan of reorganization that is not patently unconfirmable and a disclosure statement containing adequate information to its creditors. The current Plan and Disclosure Statement do not meet that standard. For these reasons, and for all those set forth below, the Disclosure Statement cannot be approved.

## ARGUMENT

The Disclosure Statement should not be approved for two independent reasons. **First**, the Disclosure Statement describes a patently unconfirmable Plan that violates multiple provisions of section 1129, including: (i) the Plan's classification of unsecured claims violates section 1129(a)(1); (ii) its liquidation analysis contains substantial inaccuracies and omissions in violation of section 1129(a)(7); (iii) no impaired class can properly vote to accept it as section 1129(a)(10) requires; (iv) its funding mechanisms and lack of child protection policies render it infeasible under section 1129(a)(11); and (v) it was not proposed in good faith as section 1129(a)(3) requires. **Second**, the Disclosure Statement does not contain adequate information required under Section 1125 because it fails to disclose (i) all of the Debtor's assets, (ii) the financial information of the affiliates the Plan proposes to release, and (iii) other information material to creditors' votes. Stated plainly, the Debtor has not cured the deficiencies this Court identified in its prior Order denying the Debtor's third disclosure statement, and the Court should again deny approval of the Disclosure Statement.

## I. The Debtor's Disclosure Statement Should Not Be Approved Because It Violates Multiple Requirements of 11 U.S.C. § 1129.

Despite several amendments to the Debtor's Plan and Disclosure Statement, the Debtor's Plan remains patently unconfirmable. "If the Court can determine from a reading of the Plan that it does not comply with [section] 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate."[2] A disclosure statement should be denied when its accompanying related plan fails to meet any one of section 1129's requirements, thus rendering it unconfirmable.[3]

Here, the Debtor's Plan fails to satisfy a number of section 1129's requirements. Thus, approval of the Debtor's Disclosure Statement should be denied.

### A. The Debtor's Proposed Classification of Unsecured Claims Violates Section 1129(a)(1) of the Bankruptcy Code.

Section 1129(a)(1) requires that a plan comply with the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Courts have interpreted this to mean a Debtor must comply with sections 1122 and 1123 of the Bankruptcy Code. *See In re Roman Cath. Bishop of Oakland,* No. 23-40523 WJL, 2026 WL 3094274 at *21–23 (Bankr. N.D. Cal. Oct. 15, 2026). Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Section 1123 further requires that a plan "provide the same treatment for each claim or interest of a particular class,

---

[2] *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986); *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (bankruptcy court can determine at the disclosure statement stage that a chapter 11 Plan is unconfirmable); *In re Eastern Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure statement describes a Plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a Plan which is fatally flawed and thus incapable of confirmation.").

[3] *In re Harenberg*, 491 B.R. 706, 717 (Bankr. D. Md. 2013); *see also In re Wong*, 598 B.R. 827, 829 (Bankr. D. Md. 2019) ("While courts ordinarily reserve confirmation issues for the confirmation hearing, a court may disapprove a disclosure statement where the underlying plan is clearly unconfirmable.").

unless the holder of a particular claim or interest agrees to a less favorable treatment[.]" 11 U.S.C. § 1123.

More specifically, and applicable here, sections 1122 and 1123 protect against the gerrymandering of classes for voting purposes. *See In re Bryson Props., XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) ("If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.") (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990)). Here, like the Debtor's prior plans, this Plan provides "vastly different treatment of th[e] Debtor's unsecured claims" through artificial impairment. *See* Order at 9–11. The Plan suffers from two fatal deficiencies: (i) the Plan impermissibly creates a class of insiders (Class 8) for cramdown purposes only, and (ii) improperly treats Class 7 as impaired when the Debtor's legal position is that those creditors are not impaired.

*First*, the Debtor's Plan creates an impaired class of insiders for voting purposes. Specifically, Class 8 includes claims held by certain "Parishes, Schools, and Other Archdiocesan-Related Entities," all of which are affiliated with the Debtor. Plan §§ 3.2.8 (Class 8—Co-Insured Entity Claims), 1.1.45; *see also* Plan, Ex. A (listing holders of Co-Insured Entity Claims). Every Co-Insured Entity is an affiliate of the Debtor and is therefore an "insider" of the Debtor under the Bankruptcy Code. *See* Plan, Ex. A; 11 U.S.C. § 101(31)(E) (defining an insider as, among others, an affiliate).[4]

[4] *See also Butler v. David Shaw, Inc.*, 72 F.3d 437, 440, 443 (4th Cir. 1996) (discussing 11 U.S.C. 101(31), but observing that "an insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny.") (quoting *Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986)); *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005) ("Courts uniformly treat [Section 101(31)] as illustrative of types of insider relationships but not as exclusive, and instead refer to the definition of insider contained in the legislative history: 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'").

Through its Plan, the Debtor "intend[s] to resolve all claims between the Debtor on the one hand, and the other Co-Insured Entities, on the other hand, which arise under Settling Insurer Policies, Non-Settling Insurer Policies, or otherwise with respect to Survivor Claims." *Id.* § 3.2.8(b). The Plan further provides that, in exchange for the Co-Insured Entities' contribution of their rights under the insurance policies and interests in the proceeds and their agreement to "waive all rights to receive any Cash Distributions[,]" the Co-Insured Entities will be entitled to "receive the benefits and rights to enforce the Co-Insured Entity Injunction[.]" *Id.* The Co-Insured Entities are also deemed impaired and entitled to vote to accept or reject the Plan. *Id.* § 3.2.8(c).

However, nowhere in the Debtor's Disclosure Statement or Plan does the Debtor disclose (i) why the Co-Insured Entities' claims should be considered valid, or (ii) why they are entitled to a vote on the Plan. *See infra* Section II.C (explaining how this lack of information also renders the Disclosure Statement inadequate). In fact, the Debtor has not even identified the basis for these alleged claims, and none of Debtor's affiliates have asserted claims in this case that could qualify as part of this class.[5] The affiliates must each assert and establish a valid claim against the Debtor to be included as a creditor entitled to payment as part of the Debtor's Plan.[6] Because they have not done so, the Co-Insured Entities have no right to either vote or receive distributions under the Plan. *See id.*; *In re AMF Bowling Worldwide, Inc.*, 520 B.R. 185, 191 (Bankr. E.D. Va. 2014), *aff'd sub nom. Bd. v. AMF Bowling Worldwide, Inc.*, 533 B.R. 144 (E.D. Va. 2015) ("As a general

[5] Significantly, none of the Co-Insured Entity claimants appear on the Debtor's Schedules E/F, *see* ECF No. 146 at 47–55, and the only claims filed by Debtor affiliates were for contribution claims, which are separately classified in Class 9. Plan § 3.2.9; *cf.* Fed. R. Bankr. P. 3003(c)(2) ("A creditor or equity security holder whose claim or interest is not scheduled—or is scheduled as disputed, contingent, or unliquidated—***must file a proof of claim or interest***. A creditor who fails to do so will not be treated as a creditor for that claim for voting and distribution.") (emphasis added).

[6] *See* 11 U.S.C. § 101(5) (defining a claim as a "(a) right to payment, . . . or (b) right to an equitable remedy for breach of performance").

proposition, creditors must file a proof of claim . . . prior to the applicable claims bar date in order to receive any distribution in a Chapter 11 case."); *In re Edgefield Inn, LLC*, 521 B.R. 116, 123 (Bankr. D.S.C. 2014) ("Because they did not file their claims prior to the bar date, they forfeited their right to participate in this reorganization.").

Because Class 8 is only composed of insiders and the alleged claimants have not asserted valid claims, it is clear that Class 8 serves one impermissible purpose: to create a consenting class of insiders to cramdown the Plan on nonconsenting classes, here the Survivor claimants in Class 6. *See In re Edgefield Inn, LLC*, 521 B.R. at 123 ("Rainsford's claim, because it is an undisputed insider claim, also cannot be a consenting class.") (citing 11 U.S.C. § 1126(e)); *infra* section I.C (explaining how this provision of the Plan also violates section 1129(a)(10)).

*Second*, the Plan artificially impairs Class 7—consisting of Non-Survivor Tort Claims—by limiting Class 7's recovery to insurance proceeds only. Plan §§ 3.2.7, 1.1.09 (defining "Non-Survivor Tort Claim" to mean "a Claim against the Debtor for tort liability (other than Abuse"). A creditor is impaired if the plan (and not the operation of applicable law) alters the creditor's pre-bankruptcy rights.[7] The Debtor asserts that charitable immunity applies to the Non-Survivor Tort Claims, which would mean (under the Debtor's position) that those claimants are entitled to recovery solely on the basis of available insurance. *See* Discl. Statement at 11 ("Unlike Survivor Claimants, holders of Non-Survivor Tort Claims will not receive any distributions from noninsurance assets of the Debtor, consistent with charitable immunity under Maryland law");

[7] A claim is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles" its holder. *In re Tree of Life Church*, 522 B.R. 849, 861 (Bankr. D.S.C. 2015) (citing 11 U.S.C. § 1124). A creditor "who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain." *In re Blackwelder Furniture Co.*, 31 B.R. 878 (Bankr. W.D.N.C. 1983). Courts read that test broadly, and whether a claim is impaired turns on "whether the plan itself, rather than the operation of a provision of the Bankruptcy Code, impairs a creditor's legal, equitable, or contractual rights." *In re Tree of Life Church* 522 B.R. at 861.

*Ward v. Rebuilding Together Baltimore, Inc.*, No. 1278 Sept. Term 2015, 2016 WL 3185134, at *2–3 (Md. Ct. Spec. App. June 8, 2016) (examining the charitable immunity doctrine). Additionally, because "the insurance providing recoveries for Non-Survivor Tort Claims is distinct from the insurance providing recoveries for Survivor Claims[,]" distributions to Survivors could not affect recoveries for Non-Survivor Tort Claimants. Discl. Statement at 12. Thus, according to the Debtor, the Plan does not alter the rights of Class 7 Claimants and instead contemplates providing Non-Survivor Tort Claims exactly what they would be entitled to under state law. Accordingly, Class 7 is not impaired and is not entitled to vote on the Plan.

As set forth above, the Plan improperly classifies and gerrymanders Classes 7 and 8 to engineer an impaired accepting class and force one outcome: an improper cramdown on Survivor claims. For these reasons, the Plan is patently unconfirmable because it does not offer a valid classification scheme.

### B. The Debtor's Liquidation Analysis Contains Substantial Inaccuracies and Disclosure Issues in Violation of Section 1129(a)(7) of the Bankruptcy Code.

The Debtor's Plan fails the "best interests of creditors" test in violating Bankruptcy Code section 1129(a)(7). Section 1129(a)(7) requires that

> With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7).

Applied here, section 1129(a)(7)(ii) requires that Survivors receive property of a value *not less than* what they would receive in a chapter 7 liquidation.[8] To satisfy this requirement, a "debtor must still disclose *all* its assets and explain how those assets affect valuation." Order at 7. (emphasis in original). The Debtor's liquidation analysis fails, however, to account for a number of assets of substantial value and inadequately explains material valuations that underly both the Disclosure Statement and the Plan.

*First*, the Debtor's Disclosure Statement still excludes the vast majority of its trust assets, specifically those held in the Sexual Misconduct Insurance Program Trust, General Insurance Program Trust, and the Health Benefits Program Trust (collectively, the "Trusts"), despite the Court's order that the Trusts are property of the Debtor's estate. Order at 8 (quoting 7/13/26 H'g Tr. [ECF No. 2715]); *see also In re Roman Cath. Bishop of Oakland*, 2026 WL 3094274, at *36 ("First, the Debtor cannot unilaterally decide which assets to make available for distribution to creditors for purposes of satisfying the best interest test, or even more generally.") (quoting *id.*).[9] Indeed, the current iteration of the Debtor's Disclosure Statement excludes $70,259,212 of Trust assets from the Debtor's valuation of the estate. *See* Discl. Statement at 20–21, 52. Because the Debtor's liquidation analysis, Disclosure Statement, and Plan do not accurately or adequately reflect the Court's findings regarding the Trusts, they do not properly value the estate and are therefore invalid on their face.

*Second*, the Debtor excludes over $27 million of restricted assets in its liquidation analysis without asserting a valid basis for doing so. *See* Discl. Statement at 51. The Debtor asserts that it has not included the assets in its liquidation analysis because they are not available to satisfy the

---

[8] 11 U.S.C. § 1129(a)(7).

[9] The Order incorporated the Court's findings during the July 13, 2026 hearing in full. *See* Order at 8 n.21.

claims of creditors, but this argument fundamentally misconstrues the purpose of a liquidation analysis. *See In re Roman Cath. Bishop of Oakland*, 2026 WL 3094274, at *35 ("The Primary Liquidation Analysis includes only those assets that the Debtor would consent to have liquidated. . . . Obviously, such an interpretation of Section 1129(a)(7)'s requirements would allow the Debtor to compare its Plan solely to a highly restricted pool of assets for liquidation, ensuring that the Plan 'wins' every time."). Even if the Debtor does not believe such assets are available to creditors, it must still include them in the valuation of the estate so that its creditors may evaluate the proposed distributions in comparison.

*Third*, the Debtor's liquidation analysis fails to account adequately for certain of the Debtor's real property. For example, the liquidation analysis fails to account for the full value of the solar lease property at Ensor Mill Rd (Belfast Road near Harrisburg Expressway), Sparks Glencoe, MD 21152. Discl. Statement at 51. Although the Disclosure Statement lists the value of that property as $60,619, the estimated value of the property based on the Debtor's own lease documents is $15 million. *Id.*; *Notice of Debtor's Disposition of Leased Property (Unimproved Acreage Located in Baltimore County, MD)* [ECF No. 1255]. The Debtor's liquidation analysis is therefore undervalued by no less than $15 million before even considering the Debtor's exclusion of its Trust assets.[10] *See In re Roman Cath. Bishop of Oakland*, 2026 WL 3094274, at *38 (finding the debtor in that case incorrectly assigned a liquidation value of $0 to certain real property).

---

[10] Relatedly, the Debtor attempted to transfer title to certain real property to its parishes prior to the Petition Date without recording the transfers in the applicable counties. The Debtor subsequently filed motions seeking authority to record those transfers so that its parishes could sell the underlying real estate. *See generally* ECF Nos. 1821, 2438, 2714, 3069. As the Court is aware, the Committee believes that these unrecorded transfers are ineffective against third parties such that (i) on the Petition Date, the Debtor either retained title to this real estate, or claims to that effect against the parishes under chapter 5 of the Bankruptcy Code; and (ii) the Debtor's interest in that property (or any related chapter 5 claims) became property of the estate upon the filing of the Debtor's petition pursuant to Section 541(a)(1). *See generally* ECF No. 2819. The Debtor's Disclosure Statement and Plan do not value the Debtor's interest in this real property or any proceeds generated from the sale of same.

The Debtor also improperly assigns $0.00 to multiple parcels of real property and contends non-debtors hold the beneficial interest in those properties. *See* Discl. Statement, Ex. B [ECF No. 2870 at 73] (assigning $0 to ten parcels of "Parish Property Titled in Debtor: and six parcels of "Not Debtor Property"); *see also id.* at 53 [ECF No. 2870 at 61]. While that might be the Debtor's preferred outcome, the Committee has repeatedly contested this legal position. *See* ECF Nos. 1849, 2554, 2819 (objecting to the Debtor's motions to record unrecorded prepetition deeds); ECF No. 2838 (objecting to the Amended Notice of Ordinary Course Transaction for Route 175 East, LLC). If the Debtor cannot substantiate its claims, then these $0.00 real property parcels are property of the estate and must be assigned a meaningful value.[11] Accordingly, the Debtor must (i) disclose the Committee's legal position on these disputed properties, (ii) analyze the risks to the Plan if the Committee prevails, and (iii) provide a fair valuation of the real property in its liquidation analysis.

*Fourth*, the Debtor fails to provide any underlying support for its estimation of Survivor claims. The Debtor estimates that Survivor claims account for 92.3% of general unsecured claims. Discl. Statement, Ex. A. However, the Disclosure Statement fails to adequately disclose its methodology, particularly (i) how many Survivor Claims are included in this analysis and (ii) how (and for how much) these claims have been valued. *See In re Roman Cath. Bishop of Oakland*, 2026 WL 3094274, at *36 (denying approval of the disclosure statement because, in part, "the Debtor has not attempted actually to value the aggregate amount of the Abuse Claims in this case[]"). Without disclosing both its methodology, as well as the facts supporting its proposed methodology, creditors cannot assess how the Debtor is valuing Survivor claims or whether those valuations are supportable.

---

[11] 11 U.S.C. § 541.

*Fifth*, the liquidation analysis fails to explain how (or if) the Debtor valued and accounted the Co-Insured Entity Claims despite creating a separate class for those entities. As explained above, the Debtors is attempting to setoff these claims by "waiving" those claimants' rights to receive any cash distributions for their claims. Plan § 3.2.8. However, no claims have been asserted against the Debtor by these parties and, thus, the claims do not exist. *See* Fed. R. Bankr. Proc. 3002 ("Unless [these Rules] provide[] otherwise, every creditor must file a proof of claim—and an equity security holder must file a proof of interest—for the claim or interest to be allowed."). As such, the Debtor does not adequately explain how these claims may have factored into its liquidation analysis. *See In re Roman Cath. Bishop of Oakland*, 2026 WL 3094274, at *36.

As the Court has previously explained, where "certain assets of the Debtor's bankruptcy estate are excluded from the section 1129(a)(7) liquidation value, as well as the asset value available for distribution to creditors[,]" the Plan cannot survive scrutiny under section 1129(a)(7) of the Bankruptcy Code. Order at 7–8. Here, because the Debtor's liquidation analysis fails to (i) include significant assets of the Debtor's estate and (ii) provide necessary information, such as its methodology or assumptions, in support of its liquidation analysis, its Plan cannot meet the best interests of the creditors test under section 1129(a)(7). As such, the Plan is patently unconfirmable.

### C. There is No Impaired Class to Vote in Favor of the Plan as Required by 1129(a)(10) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, ***determined without including any acceptance of the plan by any insider***." 11 U.S.C. § 1129(a)(10) (emphasis added). Here, the Plan identifies three impaired classes entitled to vote on the Plan: (i) Survivors, (ii) Non-Survivor Tort Claimants, and (iii) Co-Insured Entity Claimants.

Plan § 3.1.2. However, for reasons explained below, there is not a scenario in which any one of these classes could be used to satisfy 1129(a)(10) of the Bankruptcy Code.

*First*, the Committee is aware of no diocesan bankruptcy case where Survivors have voted to accept a plan without the support of the Committee. It is therefore likely Survivors will not accept this plan. Therefore, if Class 6 rejects the Plan, the Debtor could not satisfy 1129(a)(8), (10).

*Second*, the Co-Insured Entity Claimants are insiders and, thus Class 8's vote, standing alone, could not be used to satisfy 1129(a)(10). Indeed, this Court has explained,

> Insider votes are excluded 'to nullify the voting of a creditor who is so beholden to, or controlled by, the debtor as to be effectively an alter ego of the debtor. *In re Gilbert,* 104 B.R. 206 (Bankr. W.D. Mo. 1989). Where there is an affinity of interests between a creditor and the debtor, that creditor is less likely to cast a vote formed on an independent judgment of what will best serve his interests, much less those of his fellow class members. *Id.*

*In re Neogenix Oncology, Inc.*, 508 B.R. 345, 355 (Bankr. D. Md. 2014) (quoting *In re Piece Goods Shops Co.*, 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995)). The Co-Insured Entity Class is made up of "the Parishes, Schools, and Other Archdiocesan-Related Entities . . . covered by Insurance Policies[.]" Plan § 1.1.45. Since the Co-Insured Entities are affiliates and, thus, "insiders" of the Debtor as defined by 11 U.S.C. § 101(31)(E), this vote of this class alone cannot be used to satisfy 1129(a)(10).

Therefore, the success of the Debtor's Plan rises and, in this case, falls on Class 7, the Non-Survivor Tort Claimants. But, as explained above, the Non-Survivor Tort Claimants are not impaired under the Plan, *see supra* Section I.A (discussing the gerrymandering present in the Plan). Therefore, the votes of Non-Survivor Tort Claimants cannot properly be counted.

As a result of the foregoing, the Debtor's Plan cannot satisfy section 1129(a)(10) of the Bankruptcy Code and is therefore patently unconfirmable.

### D. The Plan's Funding Mechanisms and its Lack of Child Protection Policies and Procedures Renders the Plan Infeasible Under Section 1129(a)(11) of the Bankruptcy Code.

To assess feasibility, a court "should 'scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.'" *Pookrum v. Bank of Am., N.A.*, 512 B.R. 781, 788 (D. Md. 2014) (internal citations and quotations omitted). Here, the Plan fails on at least two grounds.

*First*, the Plan imperils the tentative insurance settlements and exposes the parishes, schools, and other affiliates to expensive and drawn-out litigation because Survivors will not agree to release the Debtor's affiliates. Specifically, the Plan (and its related Exhibit H) permits a Survivor to receive a distribution without releasing the Debtor's Co-Insured Entities. *See* Plan §§ 3.1.6, 6.3(b); *see also* Plan Ex. H, § 2.3 (setting out the Debtor's "Survivor Claimant Release," which contemplates a subsequent distribution for Survivors who do not release a Co-Insured Entity upon receipt of a "Litigation Award"); Plan, § 1.1.95 (defining "Litigation Award" to include "any judgment or verdict determining that . . . a Co-Insured Entity is liable").

Insurance companies, some of whom have already reached tentative settlements with the Debtor and/or the Committee, have already indicated that they would not agree to a Plan that exposes them and their insured(s) to continued litigation. *See, e.g.*, *Line Reserving the Rights of Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, and Twin City Fire Insurance Company with Respect to the Proposed Plans and Disclosure Statements Filed by the Debtor and the Creditors' Committee* at 5 [ECF No. 2798] ("These apparent inconsistencies should be corrected, and the Plan and Disclosure Statement should confirm that they provide the basic protections that Hartford bargained for (and that, Hartford expects, any other Settling Insurers will require)."). Without such certainty, insurers who have already reached tentative settlements may wish to withdraw, and insurers who have not reached settlements will be

discouraged from trying to do so. At the very least, the Disclosure Statement must explain this risk and should explain Survivors might not receive the proceeds of any insurance settlements if those risks manifest.

Additionally, because Survivors will likely opt out of the releases in the Plan *en masse*, the Debtor is unlikely to achieve the future revenue it projects from its parishes. The Plan's treatment of the claims pending against the Debtor's affiliates is certain to leave the Debtor's parishes, which fund more than half of the Debtor's annual income through the payment of assessments alone,[12] exposed to existing and significant, additional Survivor Claim litigation. Allowing Survivor Claims to proceed against the Debtor's affiliates is likely to result in economic hardship for at least some parishes on which the Debtor depends to fund the majority of its annual budget.[13] If a Survivor obtains a judgment against a parish, the Survivor can foreclose on the parish property, garnish its bank accounts, and seize personal property assets. Especially for parishes with multiple claims, this will likely result in the full liquidation of the parish. The closure of parishes across the Archdiocese will surely have follow-on consequences for the Debtor's public image that will also deplete its revenue streams in still functioning parishes. Such an adverse financial effect on the parishes likely jeopardizes the Debtor's liquidity and makes the plan infeasible.[14]

[12] *See* Apr. 16, 2026 H'g Tr. at 208:4–6 ("[Matera]: So the left pie is the sources of income. So our overall budget is $29.4 million. The sources of that, the cathedraticum is 52 percent.").

[13] *Id.*; *see also* June 2, 2026 H'g Tr. at 303:7–18 ("[I]t is the parishes and schools that pay the freight for this entire case. Every week, collections are made. Percentages ranging from 10 to 14 percent of those go right upstream to the Diocese. The Archdiocese then pays all the administrative expenses of this case."); Ad Hoc Committee of Parishes, Schools, and Affiliates' Opposition to Creditors' Committee Request to Terminate the Bankruptcy Stay ¶ 11 [Dkt. 2253] ("The present case is no ordinary Chapter 11 case. Like other diocese Chapter 11 cases, a successful reorganization here will require substantial contributions from the Covered Parties to fund payments to survivor creditors. In addition, the Debtor depends on revenues from the Covered Parties to fund its daily operations and the work necessary to fulfill its mission. In this case, significant funding of a Chapter 11 plan of reorganization also will be provided by the insurance carriers, who are obligated to provide insurance coverage for most of the claims in the case.").

[14] *Declaration of John Matera in Support of First Day Motions*, ¶ 177 [Dkt. No. 6] ("Absent a stay of the Covered Actions against all Covered Parties, the Debtor—and its prospects of successful reorganization—would suffer crushing and irreparable injury. The Debtor's management would be forced to dedicate ever increasing time and effort

*Second,* the Plan's child protection policies (or lack thereof) also demonstrate its infeasibility. The Plan provides that "[s]ubject to the occurrence of the Effective Date, the Debtor and Reorganized Debtor have agreed to undertake certain non-monetary obligations to further enhance the existing child safety and protection policies and procedures within the Archdiocese, all as set forth in Exhibit J to the Plan." Plan § 9.5. At the time of filing, Exhibit J remains marked as "[to be included in Plan Supplement]" and the Debtor has, at this point, not agreed to undertake ***any*** new obligations to protect children (and thus prevent a similar economic catastrophe for itself) in the future. Plan, Ex. J; *see* Order at 12 (noting concerns about the Debtor's commitment to enhanced child protection protocols).

The Debtor has repeatedly represented that it sought chapter 11 relief to address the widespread abuse claims asserted against it prior to the Petition Date.[15] Yet, the Debtor's Plan provides no assurance that the Debtor can (or will) protect children from sexual abuse and exploitation in the future. If the Debtor cannot develop and implement child protection policies and procedures, vulnerable individuals will continue to face a real and continuing risk of abuse, additional lawsuits will be filed, and the Debtor will end up back before this Court. Indeed, an employee of the Debtor has already been arrested for solicitation of a minor since this case began: on August 5, 2026, Deacon and former Joh Carroll High School teacher Kenneth Goedeke was

to defending any action against a Covered Party rather than operating the business to maximize the value of the Debtor's estate. Moreover, any actions against Covered Parties would further consume the Debtor's resources, divert the Debtor's management, and significantly impact the Debtor's contributions to any trust established for the purpose of providing payments to Claimants. Any fund established for victims of sexual abuse—as well as any concept of equitable distribution among like creditors—would be undermined at every turn by the inevitable races to the courthouse.").

[15] *Declaration of John Matera in Support of First Day Motions*, ¶¶ 15–20 ("[T]he [Debtor] faces potentially catastrophic liability . . . and [] correspondingly expects to struggle financially while balancing the need to compensate survivors for the harms occasioned upon them in the past with the funding demands of the RCAB's present missions and ministries[.]").

arrested for sexual solicitation of a minor.[16] This very recent case demonstrates how critically necessary it is for the Debtor to reform materially its existing child protection policies if it expects to protect children competently in the future.

The Survivor releases and child protection policies are cornerstones of a successful plan of reorganization. Without those key provisions being adequately explained and provided for, the Plan is likely to fail, and the Debtor's reorganization is likely to be followed by a further reorganization or liquidation.

As a result of the foregoing, the Plan does not satisfy section 1129(a)(11) of the Bankruptcy Code.

**E. The Plan violates section 1129(a)(3) of the Bankruptcy Code.**

Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be "proposed in good faith[.]" In assessing the existence of good faith, a court must "consider the totality of the circumstances" and determine whether, if confirmed, the plan would "fairly achieve[] a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Kaiser Gypsum Co., Inc.*, 135 F.4th 185, 194 (4th Cir. 2025) (collecting cases).

The Plan before this Court cannot be confirmed because the Debtor cannot prove that it brought the Plan in good faith, in contravention of section 1129(a)(3). Two features of the Plan, each discussed at length throughout this Objection, demonstrate as much.

*First*, the Plan's voting structure depends on classes that cannot properly accept the Plan. Class 8 consists entirely of the Debtor's insiders, and Class 7 is deemed impaired even though Class 7 claimants are, according to the Debtor, already receiving a full recovery. *See supra* sections

---

[16] *See* Archdiocese of Baltimore, *Statement on Kenneth Goedeke* https://www.archbalt.org/statement-on-kenneth-goedeke/ (last visited November 11, 2026) (providing a statement on Goedeke's arrest); Bryan Lynn, *Catholic Church Deacon in Maryland Arrested and Charged with Sex Crimes*, CBS (Aug 7, 2026), https://www.cbsnews.com/baltimore/news/catholic-church-deacon-in-maryland-charged-with-sex-crimes/.

I.A, I.C; Plan §§ 1.1.45, 3.2.7, 3.2.8; Discl. Statement at 11–12. Because Survivors in Class 6 are virtually certain to reject the Plan, the Debtor can confirm the Plan only if it is allowed to rely on the votes of one of two obviously gerrymandered classes. A plan structured in this manner does not achieve the Bankruptcy Code's objectives and cannot be confirmed.[17]

*Second*, the Plan is premised on a liquidation analysis that grossly understates the value of the Debtor's estate. *See supra* section I.B. The Debtor is aware its liquidation analysis will be subject to intense scrutiny by the Committee and has affirmatively decided to conceal these issues from voting creditors. As drafted, the Plan measures Survivors' recoveries against an estate valued well below the recovery that is available to Survivors based upon the record. The Plan therefore was not proposed in good faith and cannot be confirmed under section 1129(a)(3). *See In re Harenberg*, 491 B.R. 706, 710–14 (Bankr. D. Md. 2013) (finding a lack of good faith where a debtor proposed a plan that "exempt[ed] from the estate over one million eighty thousand dollars in asset[s]").

The Debtor cannot continue to shirk its responsibilities as a debtor in possession. It must fairly and equitably compensate Survivors, establish strong child protection policies, and comply with the Bankruptcy Code. The Debtor's failure to do so more than three (3) years into its reorganization independently demonstrates the Debtor's lack of good faith in proposing its current Plan. The Plan is therefore patently unconfirmable.

---

[17] Notably, although the Court clearly identified multiple classification issues with the Debtor's prior Plan and Disclosure Statement, the Debtor has failed to rectify many of those issues. *See, e.g.*, Order at 10 (noting its concern about the Debtor's lack of good faith in its proposed classification scheme).

## II. The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information to Enable Survivors to Vote to Accept or Reject the Debtor's Joint Chapter 11 Plan.

The Debtor's Disclosure Statement also fails to provide creditors with adequate information. *See* Order at 5 ("A disclosure statement must be meaningful to be understood, and *it must be understood to be effective*.") (quoting *In re Waterville Timeshare Grp*., 67 B.R. 412, 413 (Bankr. D. N.H. 1986)). The Debtor even fails to redress the specific deficiencies that the Court identified in its Order denying the Third Amended Disclosure Statement, including by failing to list all of its assets or describe future child protection procedures. Order at 11–12.

### A. The Disclosure Statement does not adequately disclose all Debtor assets.

A disclosure statement functions to "provide information to creditors to permit them to determine whether to vote for or against the plan." *See Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997) ("[A disclosure statement] plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability."). To that end, a disclosure statement must "provide[] holders of impaired claims with 'adequate information' so that a 'hypothetical investor typical of holders of claims or interests' in a case can make an informed decision on whether they should support a proposed chapter 11 plan[.]" *In re Ferguson*, 474 B.R. 466, 470 (Bankr. D.S.C. 2012).

As explained *supra*, the Debtor's liquidation analysis is deficient in several respects. *See supra* section I.B. Specifically, the Disclosure Statement (i) excludes $70,259,212 of Trust assets that the Court found appear to be property of the estate; (ii) fails to account for, or fully value, certain of the Debtor's non-Trust property, including the solar lease property and real property subject to the Debtor's unrecorded prepetition transfers; (iii) provides no support for its estimate

of Survivor claims; and (iv) fails to explain how (or if) it valued the Co-Insured Entity Claims. Additionally, the Debtor conclusively states that affiliate entities do not "hold [any] assets belonging to this estate[]" without further demonstrated research or explanation. *See* Discl. Statement at 24–30 (describing no less than seventeen (17) categories of assets held by of the Debtor's affiliates, including the Trusts, that the Debtor believes are not assets of the estate); *cf.* Order at 11 n.29 ("The Court would encourage the Debtor to take a hard look at its asset base and identify . . . any assets in which the Debtor's estate might have an interest and why that interest may be excluded from the estate and the liquidation value.").

Given these deficiencies, the Debtor has failed to "provide adequate disclosures concerning its assets, the value of those assets, and why (from the Debtor's perspective) they are or are not property of the estate subject to distribution to creditors." Order at 11. Accordingly, the current Disclosure Statement—as with its prior disclosure statements—has failed to provide adequate disclosures regarding the assets of the Debtor's estate.

**B. The Disclosure Statement fails to adequately disclose the financial information of the Debtor's affiliates despite providing releases for them.**

Although the Plan provides wide-sweeping releases for the Debtor's affiliates and despite the Debtor's assertion that such releases are "integral" to the Plan, the Disclosure Statement does not disclose any information regarding the finances of those affiliates. *See* Plan § 13.3 ("This Co-Insured Entity Injunction is an integral part of: (x) each Insurance Settlement and this Plan; (y) the Co-Insured Entities' agreement to contribute their interests in Settling Insurer Policies and Non-Settling Insurer Policies to this Plan; and (z) the implementation of each Insurance Settlement Agreement and this Plan.").

The Plan allows Survivors to opt out of releasing the Co-Insured Entities. Plan § 6.3(b); Discl. Statement at 38–39. It also provides that the Co-Insured Entities will contribute a total of

$20 million, as well as the sale of certain Settling Insurer Policies back to the applicable Settling Insurer. Discl. Statement at 3. However, Survivors cannot evaluate whether this contribution constitutes adequate consideration in exchange for their release of the Co-Insured Entities without knowing the Co-Insured Entities' financial information. *See Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 218 (2024) (prohibiting nonconsensual third-party releases). If Survivors cannot make an informed decision on the releases they are providing, then they cannot provide consent to such releases. *In re Roman Cath. Diocese of Syracuse, New York*, 667 B.R. 628, 635 (Bankr. N.D.N.Y. 2024) ("The adequacy of consideration paid in exchange for the third-party releases and resulting recovery provided to survivors are factors that also weigh in favor [of] the opt-out process."); *In re Spirit Airlines, Inc.*, 668 B.R. 689, 710 (Bankr. S.D.N.Y. 2025) (considering that the claimants were "receiving substantial recoveries" in determining whether their releases were consensual); *In re Container Store Grp., Inc.*, 676 B.R. 356, 385 (S.D. Tex. 2026) (considering as a factor in whether claimants consented to the releases "[w]hether the payout to the claimants is fair, reasonable, and adequate").

The Committee knows from its review of allegedly confidential financial information (a substantial portion of which can be accessed readily through public internet searches) that the parishes, schools, and other entities seeking third-party releases have tens of millions more in assets they could contribute to fund a plan. But voting creditors, especially Survivors being asked to sign releases, must be provided with full and complete disclosures of these third-parties' financial information as part of the Disclosure Statement. Without these disclosures, Survivors lack adequate information to vote on the plan and analyze the proposed releases. For these reasons, the Disclosure Statement does not contain adequate information and should include complete financial information of each entity the debtor proposes to afford bankruptcy relief.

### C. The Disclosure Statement fails to adequately disclose other information.

In addition to Debtor's failure to disclose its assets—an issue that independently renders the Plan patently unconfirmable— and the other disclosure issues discussed above, the Disclosure Statement suffers from the following further disclosure deficiencies:

| | |
|---|---|
| The Disclosure Statement Fails to Adequately Describe the Co-Insured Entities' Claims, as Provided for in Class 8 under the Plan. | Although the Debtor devotes an entire class under its Plan to claims of Co-Insured Entities, it does not provide even basic information about what those claims are. A claim must assert a right to payment or a right to an equitable remedy for breach of performance, but the Debtor does not describe how the Co-Insured Entities' claims meet this standard. 11 U.S.C. § 101(5). Without adequate information about the Co-Insured Entities' claims, creditors cannot evaluate whether the Plan is fair to all creditors. |
| The Disclosure Statement Fails to Adequately Describe the Debtor's Plans for Child Protection. | As noted above in relation to section 1129(a)(11), and as the Court stated in its Order, "Given the events leading to this chapter 11 case and the nature of the majority of claims, a hypothetical reasonable investor would want to understand the Debtor's position on enhanced child protection protocols and their implementation in connection with the plan. That information, in the context of this case, is reasonably related to creditors' ability to cast informed votes on the plan." Order at 12. |
| The Disclosure Statement Fails to Provide Information Concerning Which Entities Are Contributing to the Plan. | Although the Disclosure Statement adds a contribution of $20 million from the Co-Insured Entities, it fails to actually identify who those entities are, which entities are contributing, and how much each entity is contributing. Survivors must be able to fully evaluate the entities' contribution to and participation in the Plan to determine whether to accept the Plan and whether to provide releases for such entities.[18] |
| The Disclosure Statement Fails to Provide Anticipated Recoveries. | The Disclosure Statement does not provide adequate information regarding the purpose of the discrimination against Survivor creditors or the anticipated recoveries for non-Survivor impaired classes, including the value of claims in and percentage return to Class 8. Thus, Survivors |

[18] *See Harrington v. Purdue Pharma, L.P.*, 603 U.S. at 218 (requiring consent to approve third-party releases as part of a plan of reorganization).

| | |
|---|---|
| | and other creditors cannot evaluate whether the requirements of Section 1129(b) are met. |

Each of these deficiencies keep key information from creditors, make it impossible to sufficiently evaluate and vote on the Plan, and render the Disclosure Statement inadequate.

## CONCLUSION

For all the foregoing reasons, the Committee requests that the Court (i) deny approval of the Debtor's Disclosure Statement and (ii) grant such further relief as is just and proper.

Date: November 12, 2026

Respectfully submitted,

/s/Alan M. Grochal
Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
Tydings & Rosenberg LLP
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
agrochal@tydings.com

*Local Counsel to the Official Committee of Unsecured Creditors*

-and-

Edwin H. Caldie (MN # 388930)
Andrew J. Glasnovich (MN # 398366)
Christopher B. Sevedge (MO # 68383)
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile: 612-335-1657
Email: ed.caldie@stinson.com
drew.glasnovich@stinson.com
chris.sevedge@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of November 2026, a copy of the foregoing Official Committee of Unsecured Creditors' Objection to Debtor's Disclosure Statement accompanying Debtor's Fourth Amended Plan of Reorganization was served on Blake D. Roth, Esquire, Holland & Knight LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, blake.roth@hklaw.com; Catherine K. Hopkin, Esquire, YVS Law LLC, 185 Admiral Cochrane Drive, Suite 130, Annapolis, Maryland 21401, chopkin@yvslaw.com; Hugh Bernstein, Esquire, Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, hugh.m.bernstein@usdoj.gov; and to all parties that are registered to receive electronic filing through the CM/ECF system on the attached list.

/s/Alan M. Grochal
Alan M. Grochal

The following parties received CM/ECF notice of the filing:

Nathan D. Adler, Esquire: nda@nqgrg.com
Philip D. Anker, Esquire: philip.anker@wilmerhale.com
Sam Alberts, Esquire: sam.alberts@dentons.com
G. Calvin Awkward, III, Esquire: cawkward@goldbergsegalla.com
Gary Bahena, Esquire: garybahena@bahenalaw.com
Hugh M. Bernstein, Esquire: hugh.m.bernstein@usdoj.gov
Diane C. Bristow, Esquire: dcb@nqgrg.com
PhilipTucker Evans, Esquire: philip.evans@hklaw.com
Andrew Freeman, Esquire: adf@browngold.com
Andrew Glasnovich, Esquire: drew.glasnovich@stinson.com
Gary R. Greenblatt, Esquire: grg@cooncolelaw.com
Geoffrey Grivner, Esquire: geoffrey.grivner@bipc.com
Megan Harmon, Esquire: megan.harmon@bge.com
Catherine Keller Hopkin, Esquire: chopkin@yvslaw.com
Robert Keith Jenner: rjenner@jennerlawfirm.com
Steven J. Kelly, Esquire: skelly@gelaw.com
Nicole Khalouian, Esquire: nicole.khalouian@stinson.com
C. Scott Kunde, Jr., Esquire: scott.kunde@hklaw.com
Anthony May, Esquire: amay@browngold.com
Timothy P. Palmer, Esquire: timothy.palmer@bipc.com
Mark David Plevin, Esquire: mplevin@crowell.com
David Kendall Roberts, Esquire: droberts2@omm.com
Annette Rolain, Esquire: arolain@ruggerilaw.com
Blake D. Roth, Esquire: blake.roth@hklaw.com
James P. Ruggeri, Esquire: jruggeri@ruggerilaw.com
Jonathan Schapp, Esquire: jschapp@goldbergsegalla.com
U.S. Trustee – Baltimore: ustpregion04.ba.ecf@usdoj.gov
Irving Edward Walker, Esquire: iwalker@coleschotz.com
Jonathan Schochor, Esquire; jschochor@sfspa.com
Kerry Staton, Esquire; kstaton@sfspa.com
Joshua F. Kahn, Esquire; jkahn@sfspa.com
Thomas F. Yost, Esquire; tyost@yostlaw.com
Andrew Janet, Esquire; asjanet@jjsjustice.com
Donna M. Berdych, Esquire; donna@berdychlaw.com
Philip S. Georges, Esquire; phil@wolfofjustice.com
Samantha Ruben, Esquire; Samantha.ruben@dentons.com
Maigreade B. Burrus, Esquire; Maggie.burrus@stinson.com
Michael G. Farag, Esquire; mfarag@gibsondunn.com
Marc E. Shach, Esquire; mes@cooncolelaw.com
Samantha M. Indelicato, Esquire; sindelicato@omm.com
Brian J. Perkins, Esquire; bperkins@peifferwolf.com

Joshua D. Weinberg, Esquire: jweinberg@ruggerilaw.com
Adam R. Dunst, Esquire, adunst@goldbergsegalla.com
Samantha J. Hanson-Lenn, Esquire, Samantha.hansonlenn@stinson.com
Eric G. Korphage, Esquire, korphagee@whiteandwilliams.com
Robert H. Kline, Esquire, kliner@whiteandwilliams.com
Matthew M. Weiss, Esquire, mweiss@phrd.com
John E. Bucheit, Esquire, jbucheit@phrd.com
Matthew G. Roberts, Esquire, mroberts@phrd.com
John Grossbart, Esquire, john.grossbart@dentons.com
Siobhain P. Minarovich, Esquire, manarovics@whiteandwilliams.com
Justin P. Fasano, Esquire, jfasano@mhlawyers,com
Matthew C. Nelson, Esquire, matthew.nelson@kennedyslaw.com
Jillian G. Dennehy, Esquire, jillian.dennehy@kenedyslaw.com
James R. Murray, Esquire, jim.murray@blankrome.com
James D. Carter, Esquire, james.carter@blankrome.com
Robyn L. Michaelson, Esquire, robyn.michaelson@blankrome.com
Sara G. Klein, Esquire, sklein@manlystewart.com
Gary P. Seligman, Esquire, gseligman@tykalaw.com
Ezhan S. Hasan, Esquire, ahasan@wiley.com
Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com
Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com
Isabella R. Sayyah, Esquire, isayyah@gibsondunn.com
Matthew A. Hoffman, Esquire, mhoffman@gibsondunn.com
Ryan S. Appleby, Esquire, rappleby@gibsondunn.com
Michael A. Rosenthal, Esquire, mrosenthal@gibsondunn.com
Todd C. Jacobs, Esquire, tjacobs@phrd.com
Jesse J. Bair, Esquire, jbair@burnsbair.com
Timothy W. Burns, Esquire, tburns@burnsbair.com
Jared Zola, Esquire, jared.zola@blankrome.com
Anthony J.M. Kikendall, Esquire, kikendalla@whiteandWilliams.com
Eileen King Bower, Esquire, Eileen.kingbower@clydeco.us
Robert M. Westra, Esquire, rwestra@ppsrlaw.com
Kevin A. Clasing, Esquire, kclasing@ppsrlaw.com
Morgan K. Stippel, Esquire, mstippel@burnsbair.com
Justine M. Daniels, Esquire, jdaniels@omm.com
Ryan S, Perlin, Esquire, perlin@mdtrialfirm.com
Emily C. Malarkey, Esquire, malarkey@mdtrialfirm.com
Jodie E. Bekman, Esquire, jbekman@gfrlaw.com
Timothy Karcher, Esquire, timothy.karcher@bakermckenzie.com
Paul Possinger, Esquire, ppossinger@proskauer.com
Clinton Cameron, Esquire, Clinton.cameron@clydeco.us
Bret Kabacinski, Esquire, bret.kabacinski@clydeco.us
Douglas McGill, Esquire, dmcgill@webbermcgill.com
Christopher Sevedge, Esquire, Christopher.sevedge@stinson.com
Ysabelle G. Reyes, Esquire, yreyes@tykalaw.com
Jon P. Newton, Esquire, jnewton@reidand riege.com

Benjamin M. Fischer, Esquire, bfischer@coleschotz.com
Richard A. Galbo, Esquire, rgalbo@goldberg segalla.com
Sheldon N. Jacobs, Esquire, sjacobs@snjlaw.com
Nicholas A. Dellefave, Esquire, Nicholas.dellefave@hklaw,com
Elizabeth Connell, Esquire, elizabeth@connellcounsel.com
Jacob C. Cohn, Esquire, jcohn@plevinturner.com
E. Christopher Amos, Esquire, eChrisamos@gmail.com
Edward J. Kelley, Esquire, ed@constantllp.com
W. Charles Meltmar, Esquire, cmeltmar@cochranfirmdc.com
Nathaniel L. Foote, Esquire, nate@vca.law
Michael J. Belsky, Esquire, mbelsky@sbwdlaw.com
Catherine A. Dickinson, Esquire, cdickinson@sbwdlaw.com
Kathleen A. Parnow, Esquire, katie.parnow@stinson.com
Redwan Saleh, Esquire, rsaleh@omm.com
Ryan C. Evans, Esquire, revans@plevinturner.com
Alexander Toth Boudreau, Esquire; aboudreau@gibsondunn.com
Andrea L. Stein, Esquire, andrea.stein@hklaw.com